# EXHIBIT 2

*CONFIDENTIAL*

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| Kevin Brnich Electric LLC, Bolt Electric LLC, Electricalifornia, Zank Electric, Charles Vodicka, Patrick Cates, Bryan Butakis, Rick Keyser, Tyler Barrette, Clifford Oakley, and Jason Wylie, *individually and on behalf of all others similarly situated*,<br><br>                 Plaintiffs<br>v.<br><br>Siemens Industry, Inc.<br>                 Defendant. | Case No. 1:22-cv-01229-MHC |

**EXPERT REPORT OF DAVID NEAL, PH.D.**

1

*CONFIDENTIAL*

1. QUALIFICATIONS.................................................................................................... 3

2. BACKGROUND AND ASSIGNMENT ........................................................................ 5

3. EXECUTIVE SUMMARY OF KEY FINDINGS AND OPINIONS FROM THE CONSUMER SURVEY AND THE COMMERCIAL SURVEY ................................... 9

4. CONSUMER SURVEY: RECRUITMENT AND SAMPLING ................................. 17

5. CONSUMER SURVEY: DETAILED SURVEY SCREENING QUESTIONS AND RESULTS ............................................................................................................... 19

6. COMMERCIAL SURVEY: RECRUITMENT AND SAMPLING ............................. 30

7. COMMERCIAL SURVEY: DETAILED SURVEY SCREENING QUESTIONS AND RESULTS ............................................................................................................... 32

8. MATERIALS REVIEWED AND CONCLUSION ...................................................... 36

9. EXHIBIT A: CURRICULUM VITAE - DAVID NEAL, PH.D.

10. EXHIBIT B-1: CONSUMER SURVEY QUESTIONNAIRE AND CODEBOOK

11. EXHIBIT B-2: COMMERCIAL SURVEY QUESTIONNAIRE AND CODEBOOK

12. EXHIBIT C-1: CONSUMER SURVEY DATA

13. EXHIBIT C-2: COMMERCIAL SURVEY DATA

14. EXHIBIT D-1: CONSUMER SURVEY TABLES OF RESULTS

15. EXHIBIT D-2: COMMERCIAL SURVEY TABLES OF RESULTS

16. EXHIBIT E-1: CONSUMER SURVEY TERMINATION REPORT

17. EXHIBIT E-2: COMMERCIAL SURVEY TERMINATION REPORTS

18. EXHIBIT F-1: CONSUMER SURVEY PRE-TESTS

19. EXHIBIT G-1: CONSUMER SURVEY SOFT LAUNCH DATA

*CONFIDENTIAL*

I, Dr. David T. Neal, hereby declare as follows:

## 1.  Qualifications

1.1.  I am the Managing Partner of Catalyst Behavioral Sciences LLC, a research consulting firm specializing in the analysis of human decision making and consumer behavior, which includes extensive work in connection with consumer surveys. I have been asked to provide an expert report in the litigation between Kevin Brnich Electric LLC, Bolt Electric LLC, Electricalifornia, Zank Electric, Charles Vodicka, Patrick Cates, Bryan Butakis, Rick Keyser, Tyler Barrette, Clifford Oakley, and Jason Wylie, *individually and on behalf of all others similarly situated* (hereinafter, "Plaintiffs") and Siemens Industry Inc. (hereinafter, "Siemens" or "Defendant") in the United States District Court for the Northern District of Georgia.

1.2.  At Catalyst Behavioral Sciences, I provide services for clients across a range of industries. Among others in the corporate sector, I act or have acted as a consultant regarding surveys and consumer behavior to Bayer, Microsoft, Procter & Gamble, Intel, Unilever, and Kenvue. Among others in the public and non-profit sector, I act or have acted as a consultant regarding surveys and health behavior to the World Bank, The Bill and Melinda Gates Foundation, The Centers for Disease Control and Prevention (CDC), USAID, and the Surgeon General of the U.S. Army.

1.3.  I have more than 20 years of experience conducting and reviewing consumer and other scientific surveys. I have been retained as an expert in a variety of class action, trademark, patent, and false advertising matters. I have also

3

*CONFIDENTIAL*

testified as a survey expert in federal court, the National Advertising Division (NAD), and the International Trade Commission (ITC) on multiple occasions. My Curriculum Vitae, attached as Exhibit A, summarizes my education, peer-reviewed publications, and experience spanning both academic and commercial marketing research. My Curriculum Vitae also lists all cases in which, during the previous four years, I testified as an expert in a deposition or at trial.

1.4.    I hold a Ph.D. in psychology from the University of Melbourne, Australia, awarded in 2005, and completed my post-doctoral training at Duke University, working in the psychology department and Fuqua School of Business. At Duke, I served as the Director of the Interdisciplinary Social Science Research Laboratories. I was then an assistant professor of psychology at the University of Southern California (USC). I have published extensively in the areas of consumer behavior and decision-making and have taught advanced research methods (including survey design), consumer behavior, and marketing courses at Duke University and USC. In 2012, I was the joint recipient (with Professor Wendy Wood) of the Park Outstanding Contributor Award presented by the Society for Consumer Psychology. This award recognizes the best peer reviewed paper published each year in the Journal of Consumer Psychology. I have also published specifically on the topic of surveys used in litigation.[1]

1.5.    For the preparation of this report, I am being compensated at my customary

---

[1] David Neal, "Psychological Considerations in Designing Trademark and False Advertising Survey Questionnaires" in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, 273-290 (Shari S. Diamond & Jerre B. Swann, eds. 2022).

*CONFIDENTIAL*

rate of $685 per hour by Siemens. Research assistants under my supervision are being compensated at their customary rate of $110 per hour. Compensation is not dependent in any way on the results of my work, my opinions, or the outcome of this matter.

## 2. Background and Assignment

2.1. In connection with this matter, I reviewed, among other materials, Plaintiffs' Second Amended Consolidated Class Action Complaint[2] and Siemens' Answer to Plaintiffs' Second Amended Consolidated Class Action Complaint.[3]

2.2. Based upon my review of these documents, I understand:

2.2.1. First, that Plaintiffs will move for class certification in this matter and have asserted both a "consumer class" and a "commercial class."[4] The asserted consumer class is defined in Plaintiffs' Complaint as "any person in the United States who purchased a Siemens' AFCI breaker, except for resale."[5] The asserted commercial class is defined as "any business in the United States that installed and investigated, resolved, or attempted to resolve tripping presented by a Siemens' AFCI breaker."[6]

2.2.2. Second, Plaintiffs allege that Siemens manufactured and sold "defective AFCI breakers" that "suffer from nuisance tripping, where the breakers frequently and unnecessarily trip even where no dangerous electrical arc

---

[2] Hereafter, "Plaintiffs' Complaint."
[3] Hereafter, "Defendant's Answer."
[4] Plaintiffs' Complaint, ¶ 174.
[5] Plaintiffs' Complaint, ¶ 174.
[6] Plaintiffs' Complaint, ¶ 174.

*CONFIDENTIAL*

is present and there is no risk of electrical harm."[7]

2.2.3. Third, Plaintiffs allege that, "Despite knowing its AFCIs were defective, Siemens never disclosed and actively concealed that its AFCIs nuisance tripped, including in the presence of harmless arcs and due to the use of common appliances.[8]

2.2.4. Fourth, with respect to the asserted consumer class, Plaintiffs allege that "Had Siemens disclosed that its AFCIs experience frequent and unnecessary nuisance tripping, the Consumer Plaintiffs would not have paid to install Siemens' breakers in their home and would not have suffered damages associated with attempting to identify and resolve the nuisance tripping."[9]

2.2.5. Fifth, with respect to the asserted commercial class, Plaintiffs allege that "Had Siemens disclosed that its AFCIs suffered from frequent and unnecessary nuisance tripping, these Plaintiffs would not have purchased Siemens' AFCIs or installed them in their customers' homes or would not have had to exhaust time and effort searching for the cause of the nuisance tripping occurring due to Siemens' defective AFCIs."[10]

2.2.6. Sixth, Plaintiffs allege that the purported defect in Siemens AFCI breakers

---

[7] Plaintiffs' Complaint, ¶ 5.
[8] Plaintiffs' Complaint, ¶ 81.
[9] Plaintiffs' Complaint, ¶ 10.
[10] Plaintiffs' Complaint, ¶ 9.

was fraudulently concealed[11] from both consumer and commercial class members and that this concealment was material such that "Plaintiffs would not have purchased AFCI breakers that, like Siemens' AFCIs, failed to perform their essential purpose and caused them to repeatedly and unnecessary trip even when no dangerous arcing was occurring in the circuit."[12]

2.2.7. Seventh, Plaintiffs allege that the purported defect in Siemens AFCI breakers constitutes a breach of implied warranty.[13]

2.2.8. Finally, I understand that Defendant generally denies Plaintiffs' allegations, including specifically denying (a) that its AFCIs are defective,[14] (b) that the asserted defect was concealed,[15] (c) that the alleged omission is material to class members,[16] and (d) that the requirements for class certification are met for either the asserted consumer class or the asserted commercial class.[17]

2.3. In connection with my retention in this matter, I designed and conducted two scientific surveys. The purpose of these surveys was to address certain of Plaintiffs' allegations and to provide scientific quantification of various metrics that I understand are relevant to the issue of class certification. I note that I am

---

[11] Plaintiffs' Complaint, ¶ Count 1.
[12] Plaintiffs' Complaint, ¶ 191.
[13] Plaintiffs' Complaint, ¶ Counts 2 and 3.
[14] Defendant's Answer, ¶ 5.
[15] Defendant's Answer, ¶ 81.
[16] Defendant's Answer, ¶¶ 9-10.
[17] Defendant's Answer, ¶¶ 178-182.

*CONFIDENTIAL*

not an attorney, and I do not offer any legal opinions or legal conclusions herein.  Instead, my opinions are based on my scientific training and my survey findings with respect to the decision making and behavior of homeowners and electricians.

2.4.  The "Consumer Survey" was a nationally representative survey[18] of 2944 U.S. consumers who personally own (either solely or with another person) a house, townhouse, or apartment/condo. The primary goals of the Consumer Survey were to scientifically quantify how many members of the asserted class (a) know they have a Siemens brand breaker, (b) know they have a Siemens AFCI breaker, (c) were involved in purchasing the Siemens branded AFCI, (d) reviewed manufacturer materials prior to purchase, and (e) were involved in choosing the electrical panel. For each of these metrics (a through e), the survey also quantified the number and percentage of consumers who had, versus had not, experienced nuisance tripping in the last 18 months. The Consumer Survey was conducted from November 26, 2025, through December 3, 2025.

2.5.  The "Commercial Survey" was a nationally representative survey of 280 U.S. trade workers with electrical expertise (electricians, electrical contractors, and electrical apprentices/journeymen). The primary goal of the Commercial Survey was to scientifically quantify whether the inclusion of a disclosure regarding

---

[18] The Consumer Survey used click-balancing based on U.S. Census data to ensure that survey starts were matched to the U.S. general population with respect to age, gender, race/ethnicity, and Census region.

8

*CONFIDENTIAL*

nuisance tripping influences the purchasing decisions of commercial class members. The Commercial Survey was conducted from December 4-12, 2025.

2.6.  As documented in Sections 4-7, the sample selection, questionnaire design, data analysis, and data reporting procedures for both surveys followed scientific best practices and the surveys were designed to meet the criteria detailed in the Federal Judicial Center's <u>Manual for Complex Litigation, Fourth</u> and the <u>Reference Manual on Scientific Evidence, Third</u>.

2.7.  The remainder of my report proceeds as follows:

   2.7.1.  In Section 3, I provide an executive summary of key findings from each survey and my primary conclusions based on those findings.

   2.7.2.  In Section 4, I describe the full methodology for the Consumer Survey.

   2.7.3.  In Section 5, I provide detailed results and data tables for key questions in the Consumer Survey. Exhibit D-1 has results/data tables for all questions in the Consumer Survey.

   2.7.4.  In Section 6, I describe the full methodology for the Commercial Survey.

   2.7.5.  In Section 7, I provide detailed results and data tables for key questions in the Commercial Survey. Exhibit D-2 has results/data tables for all questions in the Commercial Survey.

3. **Executive Summary of Key Findings and Opinions from the Consumer Survey and the Commercial Survey**

   3.1.  **The Consumer Survey:** The primary findings from the nationally

9

*CONFIDENTIAL*

representative Consumer Survey of 2944 respondents who personally own (either solely or with another person) a house, townhouse, or apartment/condo (hereafter, "homeowners") are as follows:

3.1.1.  Among the overall sample of 2944 U.S. homeowners:

    3.1.1.1.  **Finding 1A:** 55.8% (1642/2944) of homeowners were not aware of the brand(s) of electrical breakers in their home.

    3.1.1.2.  **Finding 1B:** 47.1% (1387/2944) of homeowners were not aware of the type of electrical breakers in their home (i.e., AFCI breakers versus GFCI breakers).[19]

    3.1.1.3.  **Finding 1C:** 64.9% (1912/2944) of homeowners were not involved in purchasing any of the circuit breakers in their home.

    3.1.1.4.  **Finding 1D:** 71.6% (2108/2944) of homeowners were not involved in choosing the brand of circuit breakers in their home.[20]

    3.1.1.5.  **Finding 1E:** 80.0% (2356/2944) of homeowners did not review any printed or online materials (e.g., advertising, product packaging, or product guides, etc.) from the brand prior to the purchase of any breakers[21] in their home.[22]

---

[19] For respondents who reported owning more than one brand of circuit breaker, this number is conservative in that it only counts homeowners who are not aware of the type of either brand.

[20] For respondents who reported owning more than one brand of circuit breaker, this number is conservative in that it only counts homeowners who were not involved in the brand selection of either brand.

[21] This includes respondents who were either not involved in selecting the brand of breakers in their home or were involved but did not review, or did not recall viewing, any printed or online materials from the brand prior to purchase.

[22] For respondents who reported owning more than one brand of circuit breaker, this number is conservative in that it only counts homeowners who did not review materials for either brand prior to purchase.

10

*CONFIDENTIAL*

3.1.1.6.  **Finding 1F:** 15.0% (442/2944) of homeowners experienced nuisance tripping[23] in the last 18 months.

3.1.1.7.  **Finding 1G:** 7.7% (227/2944) of homeowners experienced nuisance tripping in the last 18 months and were involved in purchasing at least one brand of circuit breaker in their home.

3.1.1.8.  **Finding 1H:** 6.0% (178/2944) of homeowners experienced nuisance tripping in the last 18 months, were involved in purchasing at least one brand of circuit breaker in their home, and reviewed printed or online materials prior to purchase (e.g., advertising, product packaging, or product guides, etc.) for at least one brand of circuit breaker in their home.

3.1.1.9.  **Finding 1I:** 5.6% (164/2944) of homeowners were aware they had a Siemens AFCI breaker in their home.

3.1.2.  I also conducted a series of analyses within the subset of homeowners who were aware they have a Siemens AFCI breaker in their home (N= 164). I note that these analyses are, again, conservative (i.e., favorable to Plaintiffs) because, (a) most homeowners do not know which brand of breakers they have (see Finding 1A), and (b) those who do know the brand of breakers in their home are logically skewed towards individuals

---

[23] In the survey, nuisance tripping was defined as follows: "Nuisance tripping of an electrical breaker(s) (i.e., a breaker that frequently and unnecessarily trips even when there is no apparent risk of electrical harm)." I note that the definition of nuisance tripping I used was based on allegations in the Complaint (e.g., see Plaintiffs' Complaint. ¶ 5) and represents a conservative design approach because it counted as nuisance tripping any frequent/unnecessary tripping in in the absence of apparent risk of electrical harm (i.e., the definition did not require respondents to have investigated/affirmatively ruled out other possible causes of the tripping).

11

*CONFIDENTIAL*

who are more knowledgeable about the electrical breaker category and/or are more likely to have experienced nuisance tripping (as nuisance tripping is one logical cause of brand awareness). Among this subset of consumers who know they have a Siemens AFCI breaker, the key findings were as follows:

3.1.2.1.  **Finding 2A:** 31.7% (52/164) of those who knew they had a Siemens AFCI breaker had experienced nuisance tripping in the last 18 months. For purposes of comparison, (a) among those who were aware they have a General Electric/ABB brand AFCI breaker, 33.6% (72/214) experienced nuisance tripping in the last 18 months, and (b) among all those who were aware they have an AFCI breaker and knew the brand of that AFCI breaker (excluding a Siemens brand AFCI), 33.3% (142/427) experienced nuisance tripping in the last 18 months.

3.1.2.2.  **Finding 2B:** 28.7% (47/164) of those who knew they had a Siemens AFCI breaker, had experienced nuisance tripping in the last 18 months and were involved in selecting the brand of Siemens AFCI electrical breakers that subsequently experienced nuisance tripping. For purposes of comparison, (a) among those who were aware they have a General Electric/ABB brand AFCI breaker, 28.5% (61/214) experienced nuisance tripping in the last 18 months and were involved in selecting the brand of the General Electric/ABB AFCI electrical breakers that subsequently experienced nuisance tripping,

*CONFIDENTIAL*

and (b) among all those who were aware they have an AFCI breaker and knew the brand of that AFCI breaker (excluding a Siemens brand AFCI), 29.5% (126/427) experienced nuisance tripping in the last 18 months and were involved in selecting the brand of electrical breakers that subsequently experienced nuisance tripping.

3.1.2.3.   **Finding 2C:** 25.6% (42/164) of all those who knew they had a Siemens AFCI breaker had experienced nuisance tripping in the last 18 months, were involved in selecting the brand of the Siemens AFCI electrical breakers that subsequently experienced nuisance tripping, and reviewed printed or online materials for those Siemens breakers prior to purchase. For purposes of comparison, (a) among those who were aware they have a General Electric/ABB brand AFCI breaker, 22.4% (48/214) experienced nuisance tripping in the last 18 months, were involved in selecting the brand of the General Electric/ABB AFCI electrical breakers that subsequently experienced nuisance tripping, and reviewed printed or online materials for those General Electric/ABB breakers prior to purchase; (b) among all those who were aware they have an AFCI breaker and knew the brand of that AFCI breaker (excluding a Siemens brand AFCI), 26.0% (110/427) experienced nuisance tripping in the last 18 months, were involved in selecting the brand of the electrical breakers that subsequently experienced nuisance tripping, and reviewed printed or online materials for those breakers prior to purchase.

13

*CONFIDENTIAL*

3.2.  Based on these findings (1A-2C), I conclude as follows:

3.2.1.    A majority (55.8%) of U.S. homeowners are unaware of the brand(s) of circuit breakers in their home (see Finding 1A).

3.2.2.    A strong majority (64.9%) of U.S. homeowners were not involved in purchasing any of the circuit breakers in their home (see Finding 1C).

3.2.3.    A strong majority (71.6%) of U.S. homeowners were not involved in selecting the specific brand of any of the circuit breakers in their home. (see Finding 1D).

3.2.4.    A strong majority (80.0%) of U.S. homeowners were not involved in selecting the specific brand of any of the circuit breakers in their home or were involved in the brand selection but did not review any materials from the brand prior to purchase (see Finding 1E).

3.2.5.    Among the subset of U.S. homeowners who know they have a Siemens AFCI, the rate of reported nuisance tripping over the past 18 months is lower (31.7%) than it is among those who know they have a General Electric/ABB AFCI (33.6%), and lower than among all of those who know their brand of AFCI (excluding Siemens brand), (33.3%). Thus, consumer reports of nuisance tripping, as defined, show that nuisance tripping is not unique to, or higher for, Siemens brand AFCIs (see Finding 2A).

3.2.6.    Among the subset of U.S. homeowners who know they have a Siemens AFCI, only a small minority (25.6%) experienced nuisance tripping, were involved in purchasing the Siemens AFCI, and reviewed materials from Siemens prior to purchase (see Finding 2C). Importantly, this value cannot

14

*CONFIDENTIAL*

be extrapolated to all homeowners of a Siemens AFCI because the majority of homeowners do not know what brand of breakers they have.[24] Among this larger group (all homeowners) an even smaller minority (6.0%; 178/2944) experienced nuisance tripping, were involved in purchasing the brand of breakers in their home, and reviewed materials prior to purchase. Thus, we can conclude that, among all consumers who have Siemens AFCI breakers (whether they know it or not), the subset who were involved in purchasing those breakers, have experienced nuisance tripping, and reviewed materials prior to purchase falls somewhere between 6.0% (Finding 1H) and 25.6% (Finding 2C).

3.3.  **The Commercial Survey:** The primary goal of the Commercial Survey was to scientifically quantify whether the alleged failure to disclose nuisance tripping influences the purchasing decisions of electricians and electrical contractors. To answer that question, respondents were assigned to review a Siemens AFCI breaker brochure that either did not have a disclosure concerning nuisance tripping (Test Cell) or did have such a disclosure (Control Cell). The likelihood of purchasing the Siemens AFCI breakers in the brochure was then measured in each cell.

3.4.  The survey included 280 trade workers with electrical expertise (electricians, electrical contractors, and electrical apprentices/journeymen) who had

---

[24] As explained earlier, the 25.6% is a highly conservative estimate (i.e., especially favorable to Plaintiffs), because it is drawn from the subset of those with a Siemens AFCI who are aware of their brand and type of breaker. This subset is, by definition, either high category involvement and/or more likely to have experienced tripping (both of which are logical causes of knowing one's brand and/or type of breaker).

15

personally selected or purchased circuit breakers in the course of their work in the past 18 months, and/or were likely to select or purchase circuit breakers in the course of their work in the next 18 months (hereafter, "electricians"). The primary findings from the Commercial Survey are as follows:

3.4.1. **Finding 3A:** 97.1% (132/136) of electricians in the Test Cell (who viewed the unmodified Siemens brochure with no disclosure concerning nuisance tripping) indicated that they would buy one or more of the Siemens AFCI breakers shown in the brochure.

3.4.2. **Finding 3B:** 95.1% (137/144) of electricians in the Control Cell (who saw the modified Siemens brochure, with an added nuisance tripping disclosure) indicated that they would buy one or more of the Siemens AFCI breakers shown in the brochure.

3.4.3. **Finding 3C:** The percentage of respondents indicating they would buy the Siemens AFCI did not vary significantly across the Test Cell (97.1%) versus the Control Cell (95.1%). A chi-square test of independence showed that the proportion of respondents who indicated that they would purchase a Siemens AFCI did not significantly differ between the Test (97.1%) and Control (95.1%) Cells, $\chi^2$ (1, N = 280) = .68, $p$ = .41.

3.4.4. Based on Findings 3A, 3B, and 3C, I conclude that the alleged omission of a nuisance tripping disclosure does not influence the purchasing decisions of commercial class members. Stated differently, commercial class members were no less likely to purchase a Siemens AFCI breaker after reading a brochure that included a disclosure concerning nuisance tripping

16

*CONFIDENTIAL*

versus reading the same brochure without that disclosure.

3.5. In Sections 4-7, I provide further details regarding each of the two surveys.

## 4. Consumer Survey: Recruitment and Sampling

4.1. The Consumer Survey was fielded from November 26, 2025, to December 3, 2025. I collected data from 2,944 U.S. consumers aged 18 or older who own a house, townhouse, or apartment/condo. Attached as Exhibit B-1 is a copy of the survey questionnaire, including the questions that survey respondents were asked and the coding of response options. Exhibit C-1 includes the raw data from all qualifying respondents, including both their numeric and text responses. Exhibit D-1 provides the results of all questions in the survey, including screening questions. Exhibit E-1 provides a termination report showing the number of respondents who started the survey but were terminated for any reason.

4.2. Following standard quality control practices in the field, I excluded 58 respondents who failed an attention check, spent more than one hour on the survey, had a reCAPTCHA score of less than 0.5, and/or warranted exclusion for another reason.[25] There were no duplicate IP addresses. 66 respondents (2.2%) indicated an industry affiliation.[26] No conclusions materially change based on whether these 66 respondents are included versus excluded from the analyses. All 58 respondents excluded through the quality control review and all

---

[25] Subject No. 2866 was excluded due to their verbatim stating that they had fuses and not breakers at Q1 (see Exhibit C-1).

[26] Respondents were coded as industry-affiliated if they or anyone in their household works for a company that manufactures, distributes, sells or installs electrical circuit breakers (F1, Exhibit B-1).

17

*CONFIDENTIAL*

66 respondents with an industry affiliation are included in Exhibit C-1.

4.3.  On November 24-25, 2025, I and an experienced interviewer conducted pre-testing with five respondents. Each respondent was probed about the main questions (Q0-Q6). Specifically, respondents were asked about their understanding of the questions and whether they were clear and easy to understand or not. See Exhibit F-1 for pre-testing results. I revised Q4 for clarity based on the pre-testing.[27] As an additional pre-test, I paused data collection after an initial soft launch and examined respondents' open-ended and closed-ended answers.[28]

4.4.  I was responsible for the design of the survey and all procedures that were followed in executing it. Data collection was conducted using the Qualtrics online survey platform. Respondents were provided by Prodege, an industry-leading provider of survey respondents for research studies. Prodege uses multiple methods to verify the identity and quality of their panelists, including a double opt-in registration process with verification of a panelist's physical address, mobile phone number, device, and IP address against third-party databases and resources, CAPTCHA, and proprietary and third-party digital fingerprinting. Prodege was instructed to send survey invitations using the "click-balancing method" in which respondents who start the surveys are matched to National Census data with respect to age, gender, Census region,

---

[27] Pre-test Respondent 4 recommended adding in the brand name and adjusting spacing for clarity.

[28] After a review of the first 75 responses, it was determined that the survey was inadvertently missing two questions intended to measure respondents' potential affiliations with market research, advertising, and/or circuit breaker companies (S8, F1). See Exhibit G-1 for this soft launch data. These responses are not included in data analyses.

18

*CONFIDENTIAL*

and race/ethnicity. By using this sampling frame and methodology, I ensured that the characteristics of the final survey sample matched known attributes of the broader target population and ruled out any concerns about non-response bias.[29]

4.5.    The methodology used in the survey met the threshold of a double-blind survey protocol. Specifically, respondents were not informed of the purpose or sponsor of the survey and thus were "blind" to this information. By virtue of being conducted through automated online survey platforms, the survey also removed any potential for interviewer bias or errors in data recording. Thus, the data collection method was also "blind" to the hypothesis being tested.

## 5.  Consumer Survey: Detailed Survey Screening Questions and Results

5.1.    2,944 respondents completed the survey and passed all the attention checks. The relevant universe for this survey is homeowners in the U.S., aged 18 and older (S9 and S2, Exhibit B-1). The survey included four quality control items designed specifically to ensure respondents were paying attention and providing valid and reliable responses. These included a randomly generated "CAPTCHA" question (S1, Exhibit B-1), two questions about age to ensure honest and consistent answers (S2 and S6, Exhibit B-1), an attention check (S7, Exhibit B-1), and excluding for yea-saying or straight-lining[30] (S9, Exhibit B-1). All respondents agreed to comply with a set of instructions, including not

---

[29] For a general discussion of non-response bias and sample representativeness, see Shari S. Diamond, "Reference Guide on Survey Research," Reference Manual on Scientific Evidence (3rd ed. 2011).
[30] *See* Neal *supra* note 1.

19

*CONFIDENTIAL*

guessing and not consulting other sources (S0, Exhibit B-1).

5.2.   After these screening procedures, qualifying respondents proceeded to the

Main Survey. See Exhibit B-1 for the full question text and response options.

5.3.   The tables below provide the number and percentage of qualifying respondents

who provided each answer for the questions below from the Main Survey.

Q0.

You indicated you own a house, townhouse, or apartment/condo. Thinking about that property, have you experienced any of the following in the last 18 months? Please select all that apply or select "None of these/I don't recall." **[MULTI-SELECT; RANDOMIZE EXCEPT FINAL OPTION]**

1.  Nuisance tripping of an electrical breaker(s) (i.e., a breaker that frequently and unnecessarily trips even when there is no apparent risk of electrical harm)Sticking door or window (i.e., when it becomes hard to open or close even though nothing is damaged)
2.  Leaking roof (i.e., water entering through the roof, regardless of whether the water visibly damages the ceiling)
3.  Pest infestation (i.e., an issue with ants, termites, roaches, or rodents)
4.  Blockage of a drain or pipe (i.e., a backed-up toilet or other pipe where water drains very slowly or not at all)
5.  None of these/I don't recall **[ANCHOR; EXCLUSIVE]**

20

*CONFIDENTIAL*

**Table 1. Results for Q0: Percentage and Number of Respondents Who Indicated That They Had Experienced Nuisance Tripping or Other House-Related Events in The Past 18 Months (Total N=2944).**

| Response Options | Percentage and Number Selecting |
|---|---|
| **Nuisance tripping** | 15.0% (442/2944) |
| **Sticking door or window** | 34.7% (1023/2944) |
| **Leaking roof** | 19.8% (582/2944) |
| **Pest infestation** | 35.7% (1052/2944) |
| **Blockage of a drain or pipe** | 39.4% (1159/2944) |
| **None of these/I don't recall** | 29.0% (853/2944) |

Q1.

**[A VERSION]**[31]

You indicated that, in the last 18 months, you experienced nuisance tripping of an electrical breaker(s) (i.e., a breaker that frequently and unnecessarily trips even when there is no apparent risk of electrical harm), in the house, townhouse, or apartment/condo you own. We'd now like to ask you some questions about that nuisance tripping.

First, if you know, what brand of electrical circuit breaker(s) was involved in the nuisance tripping? You may select up to two brands, but please only select brands that experienced nuisance tripping in the last 18 months.

**[B VERSION]**

First, if you know, what brand of electrical circuit breaker(s) is in the house, townhouse, or apartment/condo you own?

You may select up to two brands, but please only select brands that are in the house, townhouse, or condo you own.

---

[31] Respondents were each classified as a "Tripper" or "Non-Tripper" based on their response to Q0. "Trippers" indicated that yes, they had experienced nuisance tripping in the past 18 months. Trippers saw Version A of Q1-Q4. Non-trippers saw Version B of Q1-Q4.

21

*CONFIDENTIAL*

[MULTI-SELECT; DO NOT RANDOMIZE]

1. Eaton/Cutler-Hammer
2. General Electric/ABB
3. Leviton
4. Murray
5. Siemens
6. Square D/Schneider Electric
7. Other (please specify): **[TEXT BOX] [ANCHOR]**
8. I don't know **[ANCHOR; EXCLUSIVE]**

**Table 2. Results for Q1: Percentage and Number of Respondents Who Indicated Having the Respective Circuit Breaker Brand in Their Home (Total N=2944).**

| Response Options | Percentage and Number Selecting |
|---|---|
| **Eaton/Cutler-Hammer** | 4.1% (120/2944) |
| **General Electric/ABB** | 20.0% (590/2944) |
| **Leviton** | 5.6% (165/2944) |
| **Murray** | 5.1% (149/2944) |
| **Siemens** | 13.8% (405/2944) |
| **Square D/Schneider Electric** | 8.2% (240/2944) |
| **Other (please specify)** | 0.3% (8/2944) |
| **I don't know** | 55.8% (1642/2944) |

Q2.

**[A VERSION]**

And, if you know, what type **of [PIPE BRAND SELECTED AT Q1 UNLESS "I DON'T KNOW" IS SELECTED]** electrical circuit breaker(s) was involved in the nuisance tripping in the house, townhouse, or apartment/condo you own?

**[B VERSION]**

And, if you know, what type of **[PIPE BRAND SELECTED AT Q1 UNLESS "I DON'T KNOW" IS SELECTED]** electrical circuit breaker(s) is in the house, townhouse, or apartment/condo you own?

22

*CONFIDENTIAL*

**[MULTI-SELECT; RANDOMIZE EXCEPT ANCHORED]**

1. Arc-Fault Circuit Interrupter breaker(s), including AFCI, combination CAFCI, and/or dual function AFCI + GFCI breaker(s)
2. Ground-Fault Circuit Interrupter (GFCI) breaker(s)
3. Neither of the above **[ANCHOR; EXCLUSIVE]**
4. I don't know **[ANCHOR; EXCLUSIVE]**

**Table 3. Results for Q2: Percentage and Number of Respondents Who Indicated That the First, Only, or Unspecified Brand of Circuit Breaker They Indicated Owning at Q1 was an AFCI, GFCI, Neither of the Above, or Who Indicated That They Didn't Know (Total N=2944).**

| Response Options | Percentage and Number Selecting |
| --- | --- |
| **Arc-Fault Circuit Interrupter breaker(s), including AFCI, combination CAFCI, and/or dual function AFCI + GFCI breaker(s)** | 19.0% (559/2944) |
| **Ground-Fault Circuit Interrupter (GFCI) breaker(s)** | 37.4% (1100/2944) |
| **Neither of the above** | 3.3% (97/2944) |
| **I don't know** | 47.1% (1387/2944) |

Respondents saw Q2 a second time (Q2_2) if they indicated more than one brand of circuit breaker at Q1.

23

*CONFIDENTIAL*

**Table 4. Results for Q2_2: Percentage and Number of Respondents Who Indicated That the Second Brand of Circuit Breaker They Indicated Owning at Q1 was an AFCI, GFCI, Neither of the Above, or Who Indicated That They Didn't Know (N=375). Note: Denominator is total sample (N=2944)**

| Response Options | Percentage and Number Selecting |
|---|---|
| **Arc-Fault Circuit Interrupter breaker(s), including AFCI, combination CAFCI, and/or dual function AFCI + GFCI breaker(s)** | 7.4% (217/2944) |
| **Ground-Fault Circuit Interrupter (GFCI) breaker(s)** | 7.3% (216/2944) |
| **Neither of the above** | 0.3% (10/2944) |
| **I don't know** | 0.7% (22/2944) |

Q3.

**[A VERSION]**

Which of the following accurately describes your personal involvement, if any, in **purchasing** the electrical circuit breaker(s) in the house, townhouse, or apartment/condo you own that was later involved in the nuisance tripping?

**[B VERSION]**

Which of the following accurately describes your personal involvement, if any, in **purchasing** the electrical circuit breaker(s) in the house, townhouse, or apartment/condo you own?
**[SINGLE-SELECT; RANDOMIZE EXCEPT FINAL OPTION]**
1.  I **was** involved in some or all of the purchases (i.e., I made the purchase or participated in the decision)
2.  I **was not** involved in any of the purchases (i.e., they were installed before I purchased the property or someone else made the decision)
3.  I don't recall **[ANCHOR]**

24

*CONFIDENTIAL*

**Table 5. Results for Q3: Percentage and Number of Respondents Who Indicated Whether They Were Involved in the Purchases of the Electrical Circuit Breakers in Their Home or if They Don't Recall (Total N=2944).**

| Response Options | Percentage and Number Selecting |
|---|---|
| **I was involved in some or all of the purchases (i.e., I made the purchase or participated in the decision)** | 35.1% (1032/2944) |
| **I was not involved in any of the purchases (i.e., they were installed before I purchased the property or someone else made the decision)** | 60.2% (1773/2944) |
| **I don't recall** | 4.7% (139/2944) |

Q4.

**[A VERSION]**
You indicated that you had some personal involvement in purchasing the electrical circuit breaker(s) in the house, townhouse, or apartment/condo you own that was later involved in the nuisance tripping.
Which of the following accurately describes your personal involvement in selecting **[PIPE BRAND SELECTED AT Q1][PIPE "as" UNLESS "I DON'T KNOW" IS SELECTED]** the specific brand to purchase?

**[B VERSION]**
You indicated that you had some personal involvement in purchasing the electrical circuit breaker(s) in the house, townhouse, or apartment/condo you own**.**

Which of the following accurately describes your personal involvement in selecting **[PIPE BRAND SELECTED AT Q1][PIPE "as" UNLESS "I DON'T KNOW" IS SELECTED]** the specific brand to purchase?
**[SINGLE-SELECT; RANDOMIZE EXCEPT FINAL OPTION]**
1. I **was** personally involved in selecting **[PIPE BRAND SELECTED AT Q1][PIPE "as" UNLESS "I DON'T KNOW" IS SELECTED]** the specific brand of electrical circuit breaker(s) to purchase
2. I **was not** personally involved in selecting **[PIPE BRAND SELECTED AT Q1][PIPE "as" UNLESS "I DON'T KNOW" IS SELECTED]** the specific brand of electrical circuit breaker(s) to purchase
3. I don't recall **[ANCHOR]**

**Table 6. Results for Q4: Percentage and Number of Respondents Who**

25

*CONFIDENTIAL*

**Indicated Whether They Were Personally Involved in Selecting the First, Only, or Unspecified Brand of Electrical Circuit Breakers in Their Home or if They Don't Recall (N=1032).[32] Note: Denominator is total sample (N=2944)**

| Response Options | Percentage and Number Selecting |
|---|---|
| **I was personally involved in selecting the specific brand of electrical circuit breaker(s) to purchase** | 28.3% (834/2944) |
| **I was not personally involved in selecting the specific brand of electrical circuit breaker(s) to purchase** | 5.5% (162/2944) |
| **I don't recall** | 1.2% (36/2944) |

Respondents saw Q4 a second time (Q4_2) if they indicated more than one brand of circuit breaker at Q1.

---

[32] Only the subset of respondents who indicated having some purchase involvement at Q3 were asked Q4 (i.e., 1032). However, the percentages are calculated based on the total sample size because anyone who did not reach Q4 could not have been involved in selecting the specific brand of electric circuit breaker to purchase, because they were not involved in the purchase at all.

26

*CONFIDENTIAL*

**Table 7. Results for Q4_2: Percentage and Number of Respondents Who Indicated Whether They Were Personally Involved in Selecting the Second Brand of Electrical Circuit Breakers in Their Home or if They Don't Recall (N=304).[33] Note: Denominator is total sample (N=2944)**

| Response Options | Percentage and Number Selecting |
|---|---|
| I was personally involved in selecting the specific brand of electrical circuit breaker(s) to purchase | 9.5% (280/2944) |
| I was not personally involved in selecting the specific brand of electrical circuit breaker(s) to purchase | 0.6% (19/2944) |
| I don't recall | 0.2% (5/2944) |

Q5.

Before selecting **[PIPE BRAND SELECTED AT Q1][PIPE "as" UNLESS "I DON'T KNOW" IS SELECTED]** the specific brand of electrical circuit breaker(s) to purchase, did you personally look at any printed or online materials (e.g., advertising, product packaging, or product guides, etc.) for that specific **[PIPE BRAND SELECTED AT Q1 UNLESS "I DON'T KNOW" IS SELECTED]** electrical circuit breaker(s)?
**[SINGLE-SELECT; RANDOMIZE EXCEPT FINAL OPTION]**
1. Yes I did
2. No I didn't
3. I don't recall **[ANCHOR]**

---

[33] Only the subset of respondents who selected two brands at Q1 and indicated having some purchase involvement at Q3 were asked Q4_2 (i.e., 304). However, the percentages are calculated based on the total sample size because anyone who did not reach Q4_2 could not have been involved in selecting the specific brand of electric circuit breaker to purchase, because they were not involved in the purchase at all.

27

*CONFIDENTIAL*

**Table 8. Results for Q5: Percentage and Number of Respondents Who Indicated Whether They Reviewed Brand Materials Before Selecting the First, Only, or Unspecified Brand of Electrical Circuit Breakers in Their Home or if They Don't Recall (N=834).[34] Note: Denominator is total sample (N=2944)**

| Response Options | Percentage and Number Selecting |
|---|---|
| Yes I did | 19.7% (581/2944) |
| No I didn't | 6.5% (190/2944) |
| I don't recall | 2.1% (63/2944) |

**Table 9. Results for Q5_2: Percentage and Number of Respondents Who Indicated Whether They Reviewed Brand Materials Before Selecting the Second Brand of Electrical Circuit Breakers in Their Home or if They Don't Recall (N=280).[35] Note: Denominator is total sample (N=2944)**

| Response Options | Percentage and Number Selecting |
|---|---|
| Yes I did | 8.2% (242/2944) |
| No I didn't | 0.9% (27/2944) |
| I don't recall | 0.4% (11/2944) |

Q6.

As you may know, electrical circuit breakers are generally located in a home's electrical panel (i.e., the main "breaker box" or "fuse box" in the home). Thinking again about the house, townhouse, or apartment/condo you own, which of the following describes the electrical panel?
**[SINGLE-SELECT; RANDOMIZE EXCEPT FINAL OPTION]**
1.  The electrical panel was installed **before** I purchased the home

---

[34] Only the subset of respondents who indicated involvement in brand selection at Q4 were asked Q5 (i.e., 834). However, the denominator is the full sample in order to capture the percentage of respondents who 1) have involvement in brand selection and 2) reviewed brand materials out of all U.S. homeowners surveyed.

[35] Only the subset of respondents who selected two brands at Q1 and indicated involvement in brand selection at Q4_2 were asked Q5_2 (i.e., 280). However, the denominator is the full sample in order to capture the percentage of respondents who 1) have involvement in brand selection and 2) reviewed brand materials out of all U.S. homeowners surveyed.

28

*CONFIDENTIAL*

2. The electrical panel was installed **after** I purchased the home, but I **was not** personally involved in deciding what brand of electrical panel to install
3. The electrical panel was installed **after** I purchased the home, and I **was** personally involved in deciding what brand of electrical panel to install
4. I don't recall **[ANCHOR]**

**Table 10. Results for Q6: Time of Electrical Panel Installation in Relation to Purchase of Home and Whether Respondent Had Personal Involvement in Deciding the Electrical Panel Brand (Total N=2944).**

| Response Options | Percentage and Number Selecting |
|---|---|
| **The electrical panel was installed <u>before</u> I purchased the home** | 68.8% (2025/2944) |
| **The electrical panel was installed <u>after</u> I purchased the home, but I <u>was not</u> personally involved in deciding what brand of electrical panel to install** | 10.6% (312/2944) |
| **The electrical panel was installed <u>after</u> I purchased the home, and I <u>was</u> personally involved in deciding what brand of electrical panel to install** | 17.0% (500/2944) |
| **I don't recall** | 3.6% (107/2944) |

F1.

We have one final question for classification purposes.
Do you, or does anyone in your household, work for any of the following types of companies? Please select all that apply.
**[MULTI-SELECT; RANDOMIZE EXCEPT ANCHORED]**
1. A company that manufactures, distributes, sells or installs electrical circuit breakers **[MARK AS INDUSTRY AFFILIATED]**
2. A company that manufactures or installs doors, windows, frames, or related hardware
3. A company involved in producing, selling, or installing roofing materials or roofing components
4. A company that provides pest-control products or professional pest-management services

29

*CONFIDENTIAL*

5. A company that manufactures, supplies, or installs plumbing fixtures, piping, or drain-clearing equipment
6. None of these **[ANCHOR/EXCLUSIVE]**

**Table 11. Results for F1: Percentage and Number of Respondents Who Indicated That They, Or Someone in Their Household, Works for Any of The Indicated Types of Companies (Total N=2944).**

| Response Options | Percentage and Number Selecting |
|---|---|
| **A company that manufactures, distributes, sells or installs electrical circuit breakers** | 2.2% (66/2944) |
| **A company that manufactures or installs doors, windows, frames, or related hardware** | 2.4% (70/2944) |
| **A company involved in producing, selling, or installing roofing materials or roofing components** | 2.8% (82/2944) |
| **A company that provides pest-control products or professional pest-management services** | 2.3% (68/2944) |
| **A company that manufactures, supplies, or installs plumbing fixtures, piping, or drain-clearing equipment** | 2.6% (76/2944) |
| **None of these** | 93.3% (2747/2944) |

**6. Commercial Survey: Recruitment and Sampling**

6.1. The Commercial Survey was fielded from December 4, 2025, to December 12, 2025. The survey was designed to scientifically quantify whether the alleged failure to disclose nuisance tripping is or is not material to the purchasing decisions of electricians.

30

*CONFIDENTIAL*

6.2.  I collected data from 280 U.S. trade workers with electrical expertise (i.e., electricians, electrical contractors, and electrical apprentices/journeymen, hereafter, "electricians"). Attached as Exhibit B-2 is a copy of the survey questionnaire including the questions that survey respondents were asked, the coding of response options, and the imagery presented. Exhibit C-2 includes the raw data from all qualifying respondents, including both their numeric and text responses. Exhibit D-2 provides the results of all questions in the survey, including screening questions. Exhibit E-2 provides a termination report showing the number of respondents who started the survey but terminated for any reason.

6.3.  Following standard quality control practices in the field, I excluded 58 respondents from the data analysis who had duplicate IP addresses, failed an attention check, or had a reCAPTCHA score of less than 0.5.[36] No one spent more than one hour taking the survey. As a pre-test, I paused data collection after an initial soft launch and examined respondents' open-ended and closed-ended answers.

6.4.  I was responsible for the design of the survey and all procedures that were followed in executing it. Data collection was conducted using the Qualtrics online survey platform. Respondents were provided by Full Circle and Dynata,

---

[36] Data from five additional terminated responses are also provided in Exhibit C-2 due to a minor programming error that was corrected during fielding. These respondents were terminated before beginning the survey due to failing Dynata's verification process (see "verification" variable, Exhibit C-2) and thus would not alter the analysis findings.

31

*CONFIDENTIAL*

two industry-leading providers of survey respondents for research studies. Full Circle uses multiple methods to verify the identity and quality of their panelists, validating member identities via proprietary security initiatives. To ensure quality, Full Circle's methods include a quality-control algorithm, digital fingerprinting, frequency cap enforcement, permission-based, double opt-in, suspect IP/domain elimination, and third-party verification. Dynata also uses multiple methods to verify the identity and quality of their panelists, including validation of a panelist's physical addresses, email address, and mobile phone number against third-party databases and resources, location confirmation based on IP address, double-opt-in engaged panelists, proxy server detection, and registration quality scoring.

6.5. The methodology used in the survey met the threshold of a double-blind survey protocol. Specifically, respondents were not informed of the purpose or sponsor of the survey and thus were "blind" to this information. By virtue of being conducted through automated online survey platforms, the survey also removed any potential for interviewer bias or errors in data recording. Thus, the data collection method was also "blind" to the hypothesis being tested.

## 7. Commercial Survey: Detailed Survey Screening Questions and Results

7.1. 280 respondents completed the survey and passed all the attention checks. The relevant universe for this survey is electricians in the U.S., aged 18 and older, who have personally selected or purchased circuit breakers in the course of their work in the past 18 months, and/or that were likely to select or purchase circuit breakers in the course of their work in the next 18 months (S8-S12,

32

*CONFIDENTIAL*

Exhibit B-2).

7.2.  The survey included four quality control items designed specifically to ensure respondents were paying attention and providing valid and reliable responses. These included a randomly generated "CAPTCHA" question (S1, Exhibit B-2), two questions about age to ensure honest and consistent answers (S2 and S6, Exhibit B-2), an attention check (S7, Exhibit B-2), and excluding for yea-saying or straight-lining[37] (S9, Exhibit B-2). All respondents agreed to comply with a set of instructions, including not guessing and not consulting other sources (S0, Exhibit B-2).

7.3.  After these screening procedures, qualifying respondents proceeded to the Main Survey. See Exhibit B-2 for the full question text, response options, and the imagery presented. Respondents were asked to imagine that they were shopping for an AFCI circuit breaker (Q1) and reviewed a Siemens AFCI brochure (Test or Control version; see Exhibit B-2) for at least 90 seconds (Q2). I used a Siemens brochure in my survey because Plaintiff Trevor Zank stated that he had viewed a brochure when purchasing a Siemens AFCI.[38] The particular brochure used in my survey was available during the Class Period.[39] The brochure imagery was identical across the Test and Control Cells except for the second-to-last page in the brochure (i.e., Panel 7 in Exhibit B-2's appendix). In the Test Cell, the original version of the brochure page was

---

[37] *See* Neal *supra* note 1.
[38] See Zank Depo at 133:9-14.
[39] SIEMENS_AFCI_00232362-63

33

*CONFIDENTIAL*

displayed. In the Control Cell, the following disclosure was added:

7.3.1. "Nuisance tripping: These AFCIs use an arc detection method that may lead the AFCI to trip due to common and safe voltage distortions that cause radio frequency signals. These distortions can be generated by some models of common household appliances, electrical devices, and lighting. If these AFCIs are installed on circuits with, or in the same panel of circuits serving these devices, they may trip and shut off power when no dangerous arc fault exists. Other current or future household products that create voltage distortions and radio frequency signals may also cause these same AFCIs to experience nuisance tripping."[40]

7.1. The test and control images are shown in Exhibit B-2's appendix.

7.2. After reviewing the brochure images, respondents were asked whether they could clearly view and read the brochure (Q3). Respondents who could not clearly view and/or read the brochure were terminated.

7.3. The table below provide the number and percentage of qualifying respondents who provided each answer for Q4, the key question in the Commercial Survey.

Q4.

Having reviewed the brochure, please select the answer below that best captures whether or not you would be likely to buy one or more of the AFCI breakers shown in the brochure.

---

[40] The disclosure was based on the text used by Plaintiffs' survey expert, Dr. Kevin Caves, to define nuisance tripping in his conjoint study. See Caves Report, ¶ 40. I revised the definition for concision and, based on input from Defendant's technical expert, Dr. Scott Wright, to correct what I understand to be certain technical errors in Dr. Caves's definition (e.g., removing the term "harmonics").

*CONFIDENTIAL*

**[SINGLE-SELECT; RANDOMIZE EXCEPT IF ANCHORED]**

1. I would buy one or more of the AFCI breakers shown in the brochure
2. I would not buy one or more of the AFCI breakers shown in the brochure
3. Don't know/no opinion **[ANCHOR]**

**Table 12. Results for Q4: Percent and Number of Respondents Who Indicated Whether They Would Buy One or More of the AFCI Breakers Shown in the Brochure or if They Don't Know or Have No Opinion (N=280).**

| Response Options | Percentage and Number Selecting | |
|---|---|---|
| | Test Cell (N=136) | Control Cell (N=144) |
| **I would buy one or more of the AFCI breakers shown in the brochure** | 97.1% (132/136) | 95.1% (137/144) |
| **I would not buy one or more of the AFCI breakers shown in the brochure** | 2.9% (4/136) | 3.5% (5/144) |
| **Don't know/no opinion** | 0.0% (0/136) | 1.4% (2/144) |

7.4.  As Table 12 above shows, 97.1% (132/136) of electricians in the Test Cell (who viewed the unmodified Siemens brochure with no disclosure concerning nuisance tripping) indicated that they would buy one or more of the Siemens AFCI breakers shown in the brochure. In the Control Cell, where a disclosure concerning nuisance tripping was added to the brochure, 95.1% (137/144) of electricians indicated that they would buy one or more of the Siemens AFCI breakers shown in the brochure.

35

*CONFIDENTIAL*

7.5.   A chi-square test of independence[41] showed that the proportion of respondents who indicated that they would purchase a Siemens AFCI did not significantly differ between the Test (97.1%) and Control (95.1%) cells, $\chi^2$ (1, N = 280) = .68, p = .41. Accordingly, I conclude that the alleged omission of a nuisance tripping disclosure does not influence the purchasing decisions of commercial class members. Stated differently, Commercial Class members would be no less likely to purchase a Siemens AFCI breaker after reading a brochure that included a disclosure concerning nuisance tripping versus reading the same brochure without that disclosure.

## 8.  Materials Reviewed and Conclusion

8.1.   In preparing this Report, I reviewed:

8.2.   Plaintiffs' Second Amended Consolidated Class Action Complaint

8.3.   Siemens' Answer to Plaintiffs' Second Amended Consolidated Class Action Complaint

8.4.   The Expert Report of Dr. Kevin W. Caves, Ph.D.

8.5.   The Expert Report of Dr. Robert Durham, Ph.D.

8.6.   The deposition of Mr. Trevor Zank, April 24, 2025

8.7.   SIEMENS_AFCI_00232362-63

---

[41] A chi-square test of independence is a standard statistical test used to assess whether there is a statistically significant association between two categorical variables. In this context, the test evaluates whether the proportion of electricians who indicated they would purchase a Siemens AFCI breaker differs depending on whether they viewed a brochure that included a nuisance tripping disclosure versus an otherwise identical brochure without that disclosure. The test compares the observed purchase responses in each group to the responses that would be expected if the disclosure had no effect on purchasing decisions. A non-significant result indicates that any observed difference in purchase likelihood between the two groups is consistent with random variation rather than a systematic effect of the disclosure.

*CONFIDENTIAL*

8.8.  C. Vodicka's Amended Supplemental Responses and Objections to Siemens's First Set of Interrogatories to Homeowner Plaintiffs

8.9.  P. Cates's Responses and Objections to Siemens's First Set of Interrogatories to Homeowner Plaintiffs

8.10. B. Butakis's Responses and Objections to Siemens's First Set of Interrogatories to Homeowner Plaintiffs

8.11.  T. Barrette's Responses and Objections to Siemens's First Set of Interrogatories to Homeowner Plaintiffs

8.12.  R. Keyser's Responses and Objections to Siemens's First Set of Interrogatories to Homeowner Plaintiffs

8.13.  J. Wylie's Second Supplemental Responses and Objections to Siemens's First Set of Interrogatories to New Homeowner Plaintiffs

8.14.  C. Oakley's Responses and Objections to Siemens's First Set of Interrogatories to Homeowner Plaintiffs

8.15.  Bolt Electric's Supplemental Responses and Objections to Siemens's First Set of Interrogatories to Electrician Plaintiffs

8.16.  Electricalifornia's Supplemental Responses and Objections to Siemens's First Set of Interrogatories to Electrician Plaintiffs

8.17.  Kevin Brnich Electric LLC's Responses and Objections to Siemens's First Set of Interrogatories to Electrician Plaintiffs

8.18.  This report is based on information currently available to me, and I reserve the right to amend or supplement this report and my opinions when and if additional information, data, or documents are made available to me.

*CONFIDENTIAL*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief, this 19th day of December 2025.

David T.  Neal, Ph.D.

# Exhibit A
## Curriculum Vitae

**David T. Neal, Ph.D.**
**Founding Partner**
**Catalyst Behavioral Sciences LLC**

**Prior appointments** _____

2010-2013        Founding Partner, Empirica Research PTY LTD

2009-2011        Assistant Research Professor of Psychology
                 University of Southern California

2006-2009        Director, Social Science Research Laboratories
                 Duke University

**Education** _____

2006 – 2009      Postdoctoral Fellow
                 Duke University, Psychology and Neuroscience

2001 – 2005      Ph.D. in Social Psychology, University of Melbourne, Australia.
                 Dissertation: Automatic influences of stereotypes and affect on
                 judgment and decision-making

1996 – 2000      B.A. (Hons) University of Melbourne
                 Majors: Psychology, Philosophy

**Peer Reviewed Publications**_____

Neal, D. (2022). Psychological considerations in designing trademark and false advertising survey questionnaires. Shari S. Diamond & Jerre B. Swann (Eds.) *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, 273-290.

Wood, W., Mazar, A., & Neal, D. (2021). Habits and goals in human behavior: Separate but interacting systems. *Perspective on Psychological Science*.

Townsend, C., Neal, D. T., & Morgan, C. (2019). The impact of the mere presence of social media share icons on product interest and valuation. *Journal of Business Research*, *100*, 245-254.

Ascarza, E., Neslin, S. A., Netzer, O., Anderson, Z., Fader, P. S., Gupta, S., et al., (2018). In pursuit of enhanced customer retention management: Review, key issues, and future directions. *Customer Needs and Solutions*, *5*(1-2), 65-81.

Carden, L., Wood, W., Neal, D. T., & Pascoe, A. (2017). Incentives activate a control mind-set: good for deliberate behaviors, bad for habit performance. *Journal of the Association for Consumer Research*, *2*(3), 279-290.

1

Labrecque, J. S., Wood, W., Neal, D. T., & Harrington, N. (2016). Habit slips: When consumers unintentionally resist new products. *Journal of the Academy of Marketing Science*, 1-15.

Wood, W., & Neal, D. T. (2016). Healthy through habit: Interventions for initiating and maintaining health behavior change. *Behavioral Science and Policy*, *2*(1), 71-83.

Rothman, A. J., Gollwitzer, P. M., Grant, A. M., Neal, D. T., Sheeran, P., & Wood, W. (2015). Hale and hearty policies: How psychological science can create and maintain healthy habits. *Perspectives on Psychological Science*, *10*(6), 701-705.

Teyhen, D. S., Aldag, M., Centola, D., Edinborough, E., Ghannadian, J. D., Haught, A., Jackson, T., Kinn, J., Kunkler, K. J., Levine, B., Martindale, V.E., Neal, D. T., Snyder, L. B., Styn, M. A., Thorndike, F., Trabosh, V., & Parramore, D. J. (2014). Incentives to create and sustain healthy behaviors: Technology solutions and research needs. *Military Medicine, 179,* 1419-1431.

Teyhen, D. S., Aldag, M., Edinborough, E., Ghannadian, J. D., Haught, A., Kinn, J., Kunkler, K. J., Levine, B., McClain, J., Neal, D. T., Stewart, T., Thorndike, F. P., Trabosh, V., Wesensten, N., & Parramore, D. J. (2014). Leveraging technology: Creating and sustaining changes for health. *Telemedicine and e-Health*, *20*(9), 835-849.

Teyhen, D. S., Aldag, M., Centola, D., Edinborough, E., Ghannadian, J. D., Haught, A., Jackson, T., Kinn, J., Kunkler, K. J., Levine, B., Martindale, V. E., Neal, D. T., Snyder, L. B., Styn, M. A., Thorndike, F., Trabosh, V., & Parramore, D. J. (2014). Key enablers to facilitate healthy behavior change: Workshop summary. *Journal of Orthopedic & Sports Physical Therapy, 44,* 378-387.

Norton, M. I., Neal, D. T., Govan, C. L., Ariely, D., & Holland, E. (2014). The not-so-commonwealth of Australia: Evidence for a cross-cultural desire for a more equal distribution of wealth. *Analyses of Social Issues and Public Policy, 14*(1), 339-351.

Neal, D. T., Wood, W., & Drolet, A. (2013). How do people adhere to goals when willpower is low? The profits (and pitfalls) of strong habits. *Journal of Personality and Social Psychology,104,* 959 –975.

Neal, D. T., Wood, W., Labrecque, J., & Lally, P. (2012). How do habits guide behavior? Perceived and actual triggers of habits in daily life. *Journal of Experimental Social Psychology, 48,* 492–498.

Moore, S. G., Neal, D. T., Fitzsimons, G., & Shiv, B. (2012). Wolves in sheep's clothing: When and how hypothetical questions influence behavior. *Organizational Behavior and Human Decision Processes*, *117*, 168-178.

Neal, D. T., Wood, W., Wu, M., & Kurlander, D. (2011). The pull of the past: When do habits persist despite conflict with motives? *Personality and Social Psychology Bulletin, 37,* 1428–1437.

Neal, D. T., & Chartrand, T. L. (2011). Embodied emotion perception: Dampening and amplifying facial feedback modulates the accuracy of emotion perception. *Social and Personality Psychology Science, 2,* 673-678.

Quinn, J., Pascoe, A., Wood, W., & Neal, D. T. (2010). Can't control yourself? Monitor those bad habits. *Personality and Social Psychology Bulletin, 36*, 499-512.

Wood, W., & Neal, D. T. (2009). The habitual consumer. *Journal of Consumer Psychology, 19*,

2

579-592.

Neal, D. T., & Wood, W. (2008). Automaticity *in situ*: Direct context cuing of habits in daily life. In E. Morsella, J.A., Bargh, & P.M. Gollwitzer (Eds.), *The Psychology of Action, Volume 2: Mechanisms of Human Action.* Oxford University Press.

Neal, D. T., & Wood, W. (2008). Linking addictions to everyday habits and plans. *Behavioral and Brain Sciences, 31,* 455-456.

Neal, D. T., Wood, W., & Pascoe, T. (2008). Triggers of real-world habits. *Proceedings of the Annual Conference of the Association for Consumer Research*. Memphis, TN.

Wood, W., & Neal, D. T. (2007). A new look at habits and the habit-goal interface. *Psychological Review, 114,* 843-863.

Neal, D. T. (2007). Habit. In W.A. Darity (Ed.), *International Encyclopedia of the Social Sciences (2nd Ed.).* Macmillan Reference, USA.

Neal, D. T., Wood, W., & Quinn, J. (2006). Habits: A repeat performance. *Current Directions in Psychological Science, 15,* 198-202.

Haslam, N., Bain, P., & Neal, D. T. (2004). The implicit structure of positive characteristics. *Personality and Social Psychology Bulletin, 30,* 529-541.

**Other Publications** _____

Neal, D. T., Vujcic, J., Burns, R., Wood, W., & Devine, J. (2016). Nudging and Habit Change for Open Defecation: New Tactics from Behavioral Science. The World Bank Group & Catalyst Behavioral Sciences.

Neal, D. T., Vujcic, J., Hernandez, O., & Wood, W. (2015).  The Science of Habit: Creating Disruptive and Sticky Behavior Change in Handwashing Behavior.  Washington, D.C., USAID/WASHplus.

Cuddy, A. J. C., Govan, C. L., Neal, D. T., & Coster, A. (2012). "Qantas Luxury: Grounded Flights, First-class Pajamas, and Twitter Hashtags." Harvard Business School Case N9-912-026.

Neal, D. T., Govan, C., Norton, M., & Ariely, D. (2011a). Australian attitudes towards wealth inequality and the minimum wage.

Neal, D. T., Govan, C., Norton, M., & Ariely, D. (2011b). Australian attitudes towards wealth inequality and the progressive taxation.

**Invited Keynotes and Presentations** _____

Sep 2025    Invited panelist. Unveiling the Power of Consumer Surveys in IP Litigation: Strategic Insights and Case Studies. CLE Seminar: The Knowledge Group.

May 2025    Invited panelist. Surveys in Intellectual Property Litigation. CLE Seminar. Practicing Law Institute.

April 2024  Invited lecture. Tacklng "introspection bias" in consumer research: When and how should we go beyond self-report? Procter and Gamble Global Products Research

3

Technology Council.

June 2023  Invited lecture. Promising Practices Seminar Series sponsored by the U.S. Centers for Disease Control and Prevention.

May 2022  CLE Webinar. Use of surveys in patent litigation. The San Francisco Intellectual Property Law Association (SFIPLA).

Nov 2021  Invited lecture. UNC-Chapel Hill. Master's in Applied Statistics.

Oct 2021  Invited lecture. Abbott. Consumer Survey Design.

Aug 2021  Keynote Speaker: Habit Day Event.

Oct 2019  Speaker. R-SHOT: Results of the Zika Grand Challenge Experience. USAID. Washington, DC.

Nov 2018  Invited address. Habit, Behavior Change and the National Diabetes Prevention Program. The Centers for Disease Control and Prevention. Atlanta, GA.

Apr 2018  Speaker. Food as Medicine Conference. University of Pennsylvania.

Oct 2017  Guest speaker. Wharton Business School, University of Pennsylvania.

Aug 2017  Speaker. Habits Conference, University of Southern California

Mar 2017  Guest speaker. Miami Business School, University of Miami    .

Dec 2016  Keynote address. Physician Organization Exchange. Torrey Pines, CA.

Nov 2016  Keynote address. Norton Medical Group Summit. Louisville, KY.

Oct 2016  Guest speaker. Habit and Behavior Change. World Vision, Washington, DC.

Sep 2016  Guest speaker.  GAIN Thought Leaders Discussion Event, Washington, DC.

Sep 2016  Moderator. Behavioral Economics and SBCC. Springboard for Health Communication.

May 2016  Guest speaker. Triennial Invitational Choice Symposia, Alberta, Canada.

Apr 2016  Keynote address. Health Leaders Media Population Health Exchange, Austin, TX.

Apr 2016  Expert panelist. Behavioral Economics in Reproductive Health Initiative, New Orleans, LA.

Feb 2016  Keynote address. SBCC Summit, Ethiopia, Africa.

Nov 2015  Guest speaker. USAID Nudges & Tactics to Reduce Open Defecation, Washington, DC.

Aug 2015  Keynote address. Health Leaders Media CFO Exchange, Colorado Spring, Texas.

Jan 2015  Presentation. Surgeon General of the US Army. Brain Health Consortium, Fairfax, Virginia.

Aug 2014    Presentation. Habit and behavior change. Cincinnati Children's Hospital.

May 2013    Keynote address. National Center for Women and Information Technology, Annual Summit, Tucson, AZ.

Jul 2012    Guest speaker. Control and the Absent Mind Conference, Essen, Germany.

Oct 2011    Keynote address. EU Cognition Conference, Groningen, Netherlands.

Feb 2011    Symposium presentation. Society for Personality and Social Psychology Annual Conference, San Antonio, Texas.

Oct 2010    Colloquium presentation. Psychology Department. San Diego State University.

May 2008    Colloquium presentation. Department of Epidemiology and Health. University College London.

May 2008    Guest speaker. London School of Hygiene and Tropical Medicine.

Jan 2008    Symposium presentation. Society for Personality and Social Psychology Annual Conference, Albuquerque, NM.


**Testimony at Trial or Deposition Last Five Years**_____


Adidas America Inc and Adidas AG v. Aviator Nation Inc. and Paige Mykoskie. United States District Court for The District of Oregon, Portland Division

Mullen Industries, LLC v Samsung Electronics Co., Ltd., and Samsung Electronics America, Inc. United States District Court for the Eastern District of Texas, Marshall Division.

RightQuestion, LLC v. Verizon Business Network Services, LLC et al., and RightQuestion, LLC v. AT&T Inc, AT&T Corp., AT&T Mobility LLC, AT&T Mobility II LLC, and AT&T Services Inc. United States District Court for the Eastern District of Texas, Marshall Division.

ExeGi Pharma, LLC, and Claudio De Simone v. VSL Pharmaceuticals, Inc. United States District Court District of Maryland, Southern Division.

Qingdao Maxwell Commercial and Trading Company LTD v. Zero Technologies, LLC. United States District Court for the Eastern District of Pennsylvania.

PSI Marine, Inc. et al. v. Seahorse Docking, LLC. United States District Court for the District of Connecticut.

Polaris Powerled Technologies LLC v. Samsung Electronics Inc., Samsung Electronics Co., LTD, and Samsung Display Co., LTD. United States District Court for the Eastern District of Texas, Marshall Division.

Enterprise Holdings Inc. v. Europcar International. In The United States Patent and Trademark Office Before the Trademark Trial and Appeal Board.

5

Apollo Healthcare Corp. d/b/a Apollo Health and Beauty Care v. Sol de Janeiro USA Inc. and Sol de Janeiro IP, Inc. United States District Court for the Southern District of New York.

FujiFilm North America Corporation v. PLR IP Holdings, LLC and PLR Brand Services, LLC. United States District Court for the Southern District of New York.

Nike, Inc. v. StockX, LLC. United States District Court for the Southern District of New York.

Dr. Mark A. Barry v. DePuy Synthes Products, Inc., Medical Device Business Services, Inc., and DePuy Synthes Sales, Inc. D/B/A/ DePuy Synthes Spine. United States District Court for the Eastern District of Pennsylvania.

The California Institute of Technology v. Samsung Electronics Co, Ltd., and Samsung Electronics America, Inc. United States District Court for the Eastern District of Texas, Marshall Division.

Delta Airlines Inc. v. Marriott International, Inc. & Marriott Worldwide Corporation. United States District Court for the Northern District of Georgia: Atlanta Division.

Edible IP, LLC & Edible Arrangements LLC v. 1-800-FLOWERS.COM, Inc.; & 800-FLOWERS, Inc. United States District Court for the Northern District of Georgia: Atlanta Division.

RVCFloor Décor, Ltd., v. Floor & Decor Holdings, Inc. and Floor and Decor Outlets of America, Inc. United States District Court for the Eastern District of New York.

The Pennsylvania State University v. Vintage Brands, LLC. United States District Court for the Middle District of Pennsylvania.

Sinomax USA Inc. v. American Signature Inc. United States District Court for the Southern District of Ohio, Eastern Division.

Stitch Editing Ltd. v. Tiktok, Inc., Tiktok Llc, Tiktok Ltd., and Bytedance Ltd. United States District Court for the Western District of California.

Adidas America, Inc., an Oregon Corporation; and Adidas AG, a Foreign Entity v. Thom Browne Inc. United States District Court for the Southern District Oof New York.

Hermès International and Hermès of Paris, Inc., v. Mason Rothschild. United States District Court for the Southern District of New York.

State of Arizona ex rel. Mark Brnovich, Attorney General v. Google LLC, a Delaware limited liability company. The Superior Court of the State of Arizona in and for the County of Maricopa.

RightQuestion, LLC, v. Samsung Electronics Co., LTD., and Samsung Electronics America, Inc. United States District Court for the Eastern District of Texas, Marshall Division.

Luckenbach Texas, Inc., v. Stewart Skloss, Stemma Holdings, L.P., Luckenbach Road Whiskey Distillery, LLC, Luckenbach Whiskey, LLC, LRW Ventures, LLC, Frontier Spirits, LLC, and Pura Vida Spirits Company, LLC. United States District Court for the Western District of Texas, Austin Division.

Growmark, Inc., v. Hanse Orga GMBH. United States Patent and Trademark Office, The Trademark Trial and Appeal Board.

Deckers Outdoor Corporation v. Walmart Inc & Does 1-10. United States District Court for the Central District of California.

6

Adidas America Inc. and Adidas AG v. Fashion Nova Inc. United States District Court for the District of Oregon, Portland Division.

TherapeuticsMD v. Evofem Biosciences Inc. United States District Court for the Southern District of Florida, West Palm Beach Division.

River Light V, L.P. and Tory Burch LLC, v. Olem Shoe Corp. United States District Court for the Southern District of New York.

Solid 21, Inc. v. Richemont North America, Inc.; Richemont International, S.A.; and Montblanc-Simplo GMBH. United States District Court for the Southern District of New York.

D. H. Pace Company, Inc., D/B/A Overhead Door Company of Atlanta and Overhead Door Company of Kansas City v. OGD Equipment Company, LLC. United States District Court for the Northern District of Georgia, Atlanta Division.

Solid 21, Inc. v. Breitling U.S.A., Inc. and Breitling SA (a/k/a Breitling AG). United States District Court for the Southern District of Connecticut.

Gree Inc. v. SuperCell OY. United States District Court for the Eastern District of Texas, Marshall Division.

Oroville Dam Cases. Superior Court of California. County Of Sacramento.

American Airlines, Inc. v. Delta Airlines, Inc. United States District Court for the Northern District of Texas, Fort Worth Division.

Gree Inc. v. SuperCell OY. United States District Court for the Eastern District of Texas, Marshall Division.

Bluetooth SIG Inc. v. FCA US LLC. United States District Court for the Western District of Washington, Seattle Division.

Jam Cellars, Inc. v. The Wine Group LLC. United States District Court for the Northern District of California.

AWGI, LLC, Atlas Logistics, Inc. and Atlas Van Lines, Inc., V. Atlas Trucking Company, LLC., Atlas Logistics, LLC., and Eaton Steel Bar Company, Inc. United States District Court for the Eastern District of Michigan.

Solid 21, Inc. v. Ulysse Nardin, Usa Inc. A/K/A/ Ulysse Nardin, Inc.; Kering, S.A.; and Ulysse Nardin SA. United States District Court for the Southern District of Florida.

OGD Equipment Co. D/B/A Overhead Garage Door, LLLC, v. Overhead Door Corporation and Overhead Door Company of Lubbock, Inc. United States District Court for the Eastern District of Texas, Sherman Division.

Corus Realty Holdings, Inc. v. Zillow Group, Inc., Zillow, Inc., and Trulia, LLC. United States District Court for the Western District of Washington.

7

<u>Dr. Mark A. Barry v. DePuy Synthes Products, Inc., Medical Device Business Services, Inc., and DePuy Synthes Sales, Inc. D/B/A/ Depuy Synthes Spine.</u> United States District Court for the Eastern District of Pennsylvania.

<u>Mahindra & Mahindra, LTD. and Mahindra Automotive North America, Inc. v.  FCA US LLC.</u> United States District Court for the Eastern District of Michigan.

<u>RVCFloor Décor, Ltd., V. Floor & Decor Holdings, Inc. and Floor and Decor Outlets of America, Inc.</u> United States District Court for the Eastern District of New York.

<u>Ferring Pharmaceuticals Inc., Ferring B.V., and Ferring International Center S.A., v. Serenity Pharmaceuticals, LLC, and Reprise Biopharmaceutics, LLC.</u> United States District Court for the Southern District of New York.


**Teaching Experience** _____

University of Southern California (2009-2011)

    Professor of Research Methodology

Duke University (2005-2009)

    Research Fellow teaching Consumer Psychology and Research Methodology

**Expert Journal Reviewer**_____

Basic and Applied Social Psychology

European Journal of Social Psychology

Journal of Consumer Research

Journal of Marketing Research

Journal of Personality and Social Psychology

Journal of Experimental Social Psychology

Personality and Social Psychology Bulletin

Psychological Science

Social Influence

Social and Personality Psychology Compass

Social Cognition

**Awards and Fellowships** _____

U.S. Centers for Disease Control and Prevention (2019-2023), Research Grant to Investigate Retention and Enrollment Predictors in the National Diabetes Prevention Program, $1,515,000.

2012 Society for Consumer Psychology, Park Outstanding Contributor Award (jointly with Professor Wendy Wood)

NSF Major Equipment Grant (2008-2009), $252,000. Co-PI.

8

Australian Postgraduate Award, 2001-2005, ($60,000)

9