# EXHIBIT 4

## (Redacted)

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

KEVIN BRNICH ELECTRIC LLC,  )
et al.,                      )
                             )
          Plaintiffs,        )
                             )
     vs.                     ) Case No.
                             ) 1:22-cv-01229-MHC
SIEMENS INDUSTRY, INC.,      )
                             )
          Defendant.         )
_____)

VIDEOTAPED DEPOSITION OF KEVIN W. CAVES, Ph.D.

Gainesville, Florida

Tuesday, March 31, 2026

STENOGRAPHICALLY REPORTED BY:
RHONDA HALL-BREUWET, RDR, CRR, CSR, CCR, LCR, FPR
Realtime Systems Administrator
JOB NO. 443575

32

Q.   When you -- you did review his report;
right?

A.   I did review his report.

Q.   And, in part, you relied upon his report
in forming your opinions in this case; right?

A.   Yeah, so in paragraph 3 of my opening
report, I explained that I relied in part on
Dr. Durham's report and in part on plaintiffs to
form -- to describe the defect that's being alleged
here.

Q.   Okay.  Your expert report -- your opening
report is from Halloween 2025; right?

A.   It is, yeah.

Q.   Do you remember when you first reviewed a
draft of Dr. Durham's report?

MR. KAFKA:  Objection.  Assumes facts not
in evidence.

THE WITNESS:  Yeah, so I never -- to be
clear, I never did see a draft of his report.  The
relevant language from his -- what I assume was from
one of his drafts -- or, anyway, the relevant
language was given to me by plaintiffs, and so
that's what I relied upon.  And, you know, I needed
that language to create my survey.  I needed to do
months' worth of work.

33

So -- so I was given that language a long time before my report was finalized and a long time before Dr. Durham's report was finalized.  But, yeah, I never saw a draft.  I was just given the language.

BY MR. NARESH:

Q.   Got it.  You -- when did you do your actual survey?

A.   Oh --

Q.   I guess maybe when did you do the cognitive interviews that led to the survey?

A.   Yeah.  So let's see.  I think I have the dates there in Part III. A., which would be -- I'm in my -- page 14 of my first report.  Let's see if I give a date -- range of dates here.

So, you know, we filed this thing in October.  It was, I want to say, April or May of last year.  Yeah, I think the -- I think it was around the springtime.

Q.   Okay.

A.   Yeah.

Q.   So at some point before then you were given excerpts -- relevant excerpts from Dr. Durham's anticipated report so that you could design your survey.

34

Is that fair?

A.   Yeah.  I mean, I don't know exactly where the language came from.  It could have been an excerpt from a draft.  It could -- I don't -- all I know is plaintiffs told me, you know:  This is -- this is the accurate description of the defect.  This is technically accurate.  This is what we are alleging the defect is.

I just took that as given and used it in my survey.

Q.   Okay.  And that came from counsel, not directly from Dr. Durham?

A.   That came from counsel, yes.

Q.   And at some point did you review the Durham report?

A.   I did after we had both filed our first report on Halloween last year, yes.

Q.   Okay.  Okay.  We'll come back to some of that in a little bit.

I wanted to talk to you a little bit about your professional and educational background.  In your initial report, Exhibit 1, does the version that you have there include your CV?  The version that you gave us does, and I wasn't sure if that version does.

35

A.   Hmm.  Let's see.  Which of the appendices was that supposed to be?

Q.   It would be the very -- at least in the version that I have, it's the very end.

A.   Yeah, right before the sensitivity analysis.

Oh, yeah, here it is.  Yeah, the CV is here.

Q.   Okay.  And does your CV include -- well, strike that.

Is the CV a complete and accurate reflection of your educational and work experience as of October 31st, 2025?

A.   Yeah.  The CV was up to date on that date. I mean, I don't know if you can completely summarize every -- if anybody can completely summarize every aspect of their professional experience in their CV, but that is -- that is one -- you know, one summary that I consistently use, yeah.

Q.   Yeah, and that's fair.  And, look, and we'll -- and I'll walk through some of these things, and if -- you know, there's one line on -- that sometimes covers five years -- right? -- and there's a lot more to it than one line.  So --

A.   Sure.

89

one of Dr. Kivetz's criticisms.  So I think I --
yeah, I do have some of those numbers, but they
weren't used in my analysis of impact and damages.

Q.   And what is your general understanding of
those numbers?  Just point me to specifically what
you're thinking about, if you don't mind.

A.   Yeah.  So it'll be in the reply.  The
question is, where in the reply?  Let me see if I
can figure it out from the TOC.

There's a paragraph where I -- I know it's
around where I reference Dr. Neal, because it's the
only time I cite him.  It would be in that
paragraph.

If I had an electronic copy, I would just
do Control F.

Q.   Yeah, Control F right now for you.
So . . .

There's a reference to Neal in Footnote 4
on page 6.

A.   Oh, way back there.  Okay.  I think there
might be another one, though.  That's -- yeah, I
think there's one more reference.  I guess I cited
him initially just to define his report.

Q.   Paragraph 43.

A.   Yeah, that sounds more like it.  Yes.  So

90

this is what I mentioned when I said I had -- you know, I had cited some of these numbers from Dr. Kivetz and from Dr. Neal.

Q. Okay. And so you note here that Dr. Kivetz had referenced a unwanted tripping rate of somewhere between less than a percent to 4.9 percent; right?

A. Correct. He cited some -- he cited those numbers, and then I just point out that Dr. Neal has different numbers that are higher. I point to the parts of his report where you can find those numbers, and then I point out that this is all irrelevant to my damages analysis.

I'm basing it on plaintiffs' allegation, which is that every class AFCI contain the same defect based on the same faulty algorithm for detecting arcs.

Q. Got it. I understand your testimony. Okay.

You are not offering any opinions in this case that Siemens AFCIs experience nuisance tripping more or less frequently than the AFCIs of other potential manufacturers. True?

A. Yeah, I haven't studied that. I haven't looked at that. It's not relevant to my opinions.

91

Q.    All right.  In your opening report, Exhibit 1, you calculated aggregate damages for the nationwide consumer class of about $108 million for the time period; right?

A.    Yes.

Q.    And then you also say that if the damages are limited to the subclasses, then the aggregate damages are approximately 39.5 million for the same period; right?

A.    Yes.

Q.    And was the survey that you conducted the same for the nationwide classes as opposed to the -- as opposed to the state classes?

A.    Same survey.

Q.    And the price premium calculation, was that the same for the nationwide class and the state subclasses?

A.    Yes.

Q.    And so it was just the application of the price premium to state-level data that drives the difference?

A.    Yes.  So the -- yes.  So essentially, just to summarize, I conducted one survey -- right? -- which I talk about in the report.  I used it to -- once you have the price premium, you can use it to

122

formula you use, that I used in this case, that I spell out in my reports.

Q.   The inequality?

A.   There's an inequality involved --

Q.   Right.

A.   -- yeah.

Q.   Okay.  Here, you had about 15 people do the cognitive interviews, and you had 500 people fill out the survey; right?

A.   Yeah.

Q.   So that's about 3 percent?

A.   Yeah.  The cognitive interviews are a qualitative analysis.  They're not a statistical analysis.  So when you -- when you're looking at the number of cognitive interviews to conduct, there's no formula to say, like, you have to conduct this many to have statistically significant results.

Q.   Were the 15 people in addition to the 500 or were they part of the 500?

A.   Oh, that's an important point.  They were in addition to.  So the 15 people, they were pilot testing the survey.  They saw the survey -- or they saw the version of the survey that was operative at the time they were interviewed.  None of them took the final survey.  You know, they -- we recruited

123

fresh -- a fresh set of 500 respondents for that.

Q.   And you mentioned that all 15 of them -- all the -- all 15 of the cognitive interview participants were electricians?

A.   They were all professional electricians, yes.

Q.   Why not include some nonelectricians?

A.   Well, the focus of the -- of the sampling -- the target sample and the exercise was what was professional electricians.  We focused on professional electricians because, you know, you need a certain amount of expertise to understand anything about these products, and professional electricians provide a very good proxy for that level of expertise.

Now, we did -- we did include a smaller sample of nonelectricians who have purchased these products.  I wanted to confirm my sample was robust to including nonelectricians, and what I found is that damages are actually slightly higher when you include those nonelectricians because they're -- so I conservatively -- when I actually came up with the damages number, I just used the professional electricians and got a slightly smaller damages number as a result.

124

Q.   Ultimately of the 500, about 90 percent of them were electricians and 10 percent of them were not; right?

A.   Yeah.  I think it was exactly 90 percent, yeah.  450 and 50.

Q.   Why not have 10 percent of the cognitive interviews be nonelectricians to match what you had in the survey?

A.   I mean, I don't think that would have made any difference.  I -- you know, again, I wanted to focus on those with the expertise that were needed to complete the survey.  I haven't seen any suggestions by the other experts that, you know, doing that differently would have changed anything.

Q.   Okay.  You personally interviewed these cognitive interview participants?

A.   I did.

Q.   Did you know any of them personally before the interview?

A.   No.

Q.   Did they get paid anything?

A.   They did get compensated for participating in the interviews, yeah.

Q.   How much did they get paid?

A.   I'd have to check.  I think it was around

125

$200.  Yeah.

Q.    And how about the folks who did the survey later?  Did they get paid?

A.    They were compensated.  I don't know the amount.

Q.    Was it more or less or about the same?

A.    Probably less than 200, yeah.

Q.    Like $20 or --

A.    I don't know.

Q.    Can you give an order of magnitude?

A.    I can certainly find out.  But, yeah, I mean, it might be -- I don't know.  It's hard to keep track with, you know, people.  $20 used to be a lot more money than it is now; so I don't know if it was as low as 20.

Q.    What do you typically pay people?  I mean, you do conjoint surveys all the time.

A.    Yeah.  I mean, so I don't know.  Maybe they got -- maybe they got a $100 gift card.  Maybe they got a $50 gift card.  Maybe they got a $25 gift card.  They got some sort of incentive just to participate.

Q.    Right.

A.    And I think it's -- anyway, the panel provider has ways of recruiting them.

127

information, did you-all make any edits to the cognitive interviews transcripts?

A.   No.  No.  I mean, we didn't -- we certainly didn't change the transcripts.  We just -- we blacked out certain personal information.

Q.   I mean, some of it -- I'll show you when we look at some of them -- there's, like, gibberish sometimes, and I'm trying to figure out if that's an editing issue or a transcription issue.

Do you have any understanding as to why that would be?

A.   My guess is it would be a transcription issue.

Q.   Okay.

A.   I mean . . .

Q.   The cognitive interview respondents confirmed that they were familiar with nuisance tripping in their professional experience; right?

A.   Yes.

Q.   And you provided a definition of "nuisance tripping" in your survey; right?

A.   Well, I -- I read the nuisance tripping defect to all of them, yeah.

Q.   And so I'm going to say something circular here, but the respondent that has experience with

128

nuisance tripping has existing knowledge about nuisance tripping; right?

A.   Yes, and I think it's fair to say I don't think -- I don't think the other experts even contest this; that nuisance tripping is common enough that, you know, when you talk to a professional electrician, they're familiar with -- I mean, they've heard the term before --

Q.   Right.

A.   -- yeah.

Q.   A professional electrician receiving a definition of a nuisance tripping defect already has existing knowledge about nuisance tripping; right?

A.   They do, which helps them, you know, along with all their other technical background, that's what helps ensure that they understand what the attributes of the survey -- of the survey really are, you know.

So they need to understand what all the technical specifications mean.  They need to understand what the defect means.  And everyone who took the survey, of those 500, not a single one of them indicated that they found the defect description confusing.

Q.   All right.  I'm focused right now on the

129

cognitive --

A.    Sure.

Q.    -- interviews.

A.    Sure.

Q.    And the cognitive interview participants would have been answering questions about nuisance tripping at least partially informed by their existing understanding of nuisance tripping.  True?

MR. KAFKA:  Objection.  Form.

THE WITNESS:  Yeah, I think it's true when I -- if you're asked a question about anything in a survey and if you have prior knowledge about that subject, then that -- that's likely to inform your answer, sure.

BY MR. NARESH:

Q.    And here, every single person that was in the cognitive interviews had some prior understanding of nuisance tripping because they were all professional electricians; right?

MR. KAFKA:  Objection to form.

THE WITNESS:  Correct, yeah.  It's -- that's sort of like saying they were -- you know, they were -- well, it's not the same, but it's a little bit like saying they were all familiar with AFCIs.  You know, it's like, "Of course" -- "of

159

BY MR. NARESH:

Q.   Right.  If somebody has a longstanding relationship with a local store or an electrical supply distributor, they might be more likely to use that person than somebody who doesn't have that relationship; right?

MR. KAFKA:  Objection to form.

THE WITNESS:  Yeah.  I suppose there -- you know, I mean, my survey allows for the possibility and shows that different electricians use different -- you know, buy from different distribution channels.

BY MR. NARESH:

Q.   Right.

We talked about typical projects.  The other part of this question was "or for general inventory."  And what do you mean by that?

A.   Yeah.  So this is one of the changes I mentioned that we implemented to help, you know, maximize the realism and the -- the clarity of the survey to the respondents.  And so the idea here was that -- was, you know, based on feedback we got from the interviews based on market research, the idea here was that, you know, we don't necessarily want the respondent to be restricted to whatever they

160

think of as a typical project. You know, a typical project might just be reloading their inventory. So we wanted to allow for that possibility.

Q. And so the idea of the inventory is so that an electrician has AFCIs on hand if a customer needs them --

A. Correct.

Q. -- without having to go through a purchasing process?

A. Correct. You know, depending on the size of the operation, you know, some will maintain a large stock of inventory; others, maybe just a few extra ones in their van or, you know -- but it's a possibility that we wanted to allow for when we -- when we, you know, laid out the framework for the respondents.

Q. And did you study at all what electricians do when they're installing AFCIs in terms of how they charge the homeowner?

A. That -- that wasn't very relevant to my analysis. I mean, I may have seen some evidence along those lines, but the electrician charges to the homeowners just wasn't what I was focused on.

Q. Right.

So, for example, it didn't matter to you

161

if electric -- one elec- -- Electrician A, it's just a straight pass-through, and Electrician B is charging the 5 percent markup?  That was not relevant to your analysis.  True?

A.    What do we mean by a "straight pass-through"?

Q.    The AFCI cost $50.  The electrician installed it and charged the homeowner $50 for that AFCI.  That's Electrician A.

A.    Oh, I see.  Yeah.

Q.    Electrician B charged a 5 -- a 10 -- a 5 percent markup, and so they charged 57 and a half dollars for that --

A.    Sure.

Q.    -- AFCI?

A.    Sure.  Yeah.  Yeah.  So, yeah.  No, that wasn't relevant to my analysis the way damages are being assessed here.

Q.    You go on to say in that Question 19:  "If the typical project/inventory that you have in mind would require AFCIs to be compatible with the panels of specific brands or manufacturers, please take this into consideration when deciding on your answer."  Right?

A.    Sure.

162

Q.   And what does it mean -- what were you intending to get across with the "take it into consideration" prompt?

A.   Well, so this is -- this is, again, part of -- part of the, you know, survey design to frame the purchase decision in a reliable way, and so the idea here was to -- based on, you know, a significant amount of feedback we got from the cognitive interviews, was to let respondents know that they can take panel compatibility into account when deciding on your answer, because, for some respondents, that can be an important factor.

Q.   For some respondents, it could be a dispositive factor; right?

MR. KAFKA:  Objection to form.

THE WITNESS:  Could be -- could it be dispositive as a hypothetical matter?  Yeah, it could be.  Yeah.

BY MR. NARESH:

Q.   Well, I mean, this goes back to the point we were talking about earlier.  There are -- whether they are preferences or requirements for breaker and box compatibility; right?

A.   Yes.  Yes.  So there's -- there is -- compatibility can be a significant issue.  We

220

BY MR. NARESH:

Q.   Prone to nuisance tripping?

MR. KAFKA:  Objection to form.

BY MR. NARESH:

Q.   Right?

A.   Yes, as -- summarized as prone to nuisance tripping to respondents, yes.  But that's -- I mean, that's not the only thing it means.  It means all these things.  They were shown this language here, and they could refresh their memory as to what this language meant or any of the attribute language, during the survey.

Q.   What does "not defective" mean?

A.   "Not defective" means it does not have the nuisance tripping defect.

Q.   So it'll never nuisance trip?

MR. KAFKA:  Objection to form.

THE WITNESS:  That's not what the survey says.  Something -- something -- you know, just thinking hypothetically, something that's not prone to nuisance tripping might still nuisance trip occasionally.  I suppose it's possible.

BY MR. NARESH:

Q.   How often?

MR. KAFKA:  Objection.  Form.

221

THE WITNESS:  I don't know, because it's not relevant for my analysis.  I'm just telling you, I didn't tell the respondents at any point that, you know, nuisance tripping would never, ever happen for the nondefective products.

BY MR. NARESH:

Q.    Well, are you aware that all brands of AFCIs have some degree of nuisance tripping?

A.    I think I've seen some numbers to that effect, some of which I think we touched on earlier today.  Again, they weren't -- they didn't inform my analysis, but . . .



223

Q.   In fact, the cognitive interviews, they also told you that all AFCI brands experience some degree of nuisance tripping, didn't they?

A.   Well, you'd have to point me to what transcript.  I don't know if anyone gave me a quote that clean, but . . .

Q.   Yeah.

MR. NARESH:  So let's do Exhibit 11, please, Tab 7.

(Exhibit Number 11, Interview Transcript for Interview Participant Number 3, was marked for identification.)

224

THE WITNESS:  Thank you.

BY MR. NARESH:

Q.  So this is Cognitive Interview Transcript Number 3.

A.  Okay.

Q.  Does that look like one of your cognitive interview transcripts?

A.  It does.

Q.  And then if you look at the -- towards the bottom, it says 264 on the bottom left.

A.  Yeah, I'm there.

Q.  Okay.  And then if you look at the next page, there's a series of comments from the respondent.  And there's a lot of black boxes; so it's going to end up being a little bit more gibberish because of the redactions.

So it says:  "I mean, if I'm buying these according to" something "the way this graph, or whatever you call it is" -- again, something cut off -- "the only one you would want to buy would be ABB General" -- and then it says something about "cheaper and does not have the" -- "does not have nuisance tripping defect."

A.  Yeah.

Q.  "So, I mean, if this list is actually

225

saying yes," something "ton and this Square D have nuisance trip, a high probability of a nuisance trip, then I might" -- and then who knows; right?

And then he talks about not being a big GE person. And then at the bottom, you say: "Okay. So do you think the question gave enough information to decide which option to select?"

And he said -- and he said: "No, because what I" -- "what what is the like? Why are these labeled nuisance tripping? What is it about" something "you get nuisance trips?"

You say: "Right."

And he says [as read]: "What is different about the General Electric" something "that there's not nuisance tripping. Right? All this is, is" something "telling me, yeah, this is better than that one. But how do I know; right? And what is the circuits that they use? And how is it . . . that they're able to get both functions AFCI, GFI and not have nuisance tripping. So, like, what's the magic bullet that they have? You know, I'd like to know" -- "I'd like to know what that is."

Do you see that?

A.   I do, yeah.

Q.   And so he's expressing some -- some

226

confusion; right?

A.   Let's see.  He's definitely talking through his thought process.  I don't know if he uses the term "confused."

I don't see him using that term, unless I missed it.

Q.   I don't think he used the word "confused," but I don't think --

A.   But he's --

Q.   -- you need to use the word to be -- "confused" to be confused, do you?

A.   Yeah, so -- yeah, so he's -- he's -- you said this is Number --

Q.   It's Number 3.

A.   Three?  Yeah, so Number 3 out of 15, yeah, is expressing -- yeah, he's expressing some -- I guess you could call it incredulity about whether or not there's a magic bullet that will get rid of nuisance tripping.

Q.   Right.  And, again, you didn't make any changes to your survey after getting this feedback -- true? -- on the -- on the nuisance tripping defect?

A.   I did not change the nuisance tripping defect.  That's correct.  Yeah.

227

MR. NARESH:  Let's have Exhibit 12.

(Exhibit Number 12, Interview Transcript for Interview Participant Number 14, was marked for identification.)

THE WITNESS:  Thank you.

BY MR. NARESH:

Q.   All right.  For the record, this is Transcript Number 14.

A.   14.

Q.   14.  Yes.

So let's look at the page where it says 134 at the top.

A.   Yep, I'm there.  I was there.

Okay.  Finally I'm there.

Q.   And in the top it says -- you say: "Yeah" -- "let's go to the next one."

A.   Okay.

Q.   And you say:  "This one is pretty wordy."

I think we can guess which one he's -- you're talking about; right?  This is the nuisance tripping one you're directing him to?

A.   He appears starting where it says 1:38. Yeah, he appears to be just reading the text of the nuisance tripping disclosure.

Q.   So he reads -- he reads it, and it talks

239

not specific to one time period or another.

Q.   It would be the same 32 percent regardless of where in the country the person bought it?

A.   That's correct.

Q.   It would be the same 32 percent whether it was an electrician buying it or a nonelectrician buying it?

A.   That's right.  It's always 32 percent. The dollar amount's going to vary depending on what they buy and how much they pay for it and all that sort of thing.

Q.   It would be the same 32 percent whether someone got rebates or discounts or anything else; right?

A.   Rebates and discounts.  Yeah, the same price premium would be used.  That's right.

Q.   All right.  And so if somebody was buying in bulk from a trusted supplier that they buy a lot of AFCIs from and they were getting a 20 percent discount, you would add a 32 percent price premium on that discounted amount; right?

A.   I mean, put another way, all of -- I'm basing this off my damages estimates off all Siemens data on the revenue it got from these products.  So any discounts that Siemens offered would be

240

incorporated into the damages estimates.  I'd be multiplying 32 percent by a discounted number, to the extent Siemens was offering discounts.

Q.   You would agree that some survey respondents already knew about nuisance tripping before their purchase; right?

A.   Yeah.  I think that's a point the experts generally agree on, is that nuisance tripping is not some, you know, foreign concept that electricians have never heard of.

Q.   Right.  And, in fact, because so many of your survey respondents were licensed electricians, most of them would have known about nuisance tripping; right?

A.   Which is an asset to the reliability of the survey.  It's important to have product attributes that the respondents are familiar with and understand.

Q.   Is the answer to my question yes?

A.   So yes.  "Yes," comma, "which is."

Q.   And you would agree that some survey respondents may not know about nuisance tripping before they purchase; right?

A.   Some survey -- some of the 500?  I've seen no indication -- indication that any of them did not

241

know about nuisance tripping.  So, like, none of -- none of them responded, "I didn't understand the survey because I don't understand what 'nuisance tripping' means."

Q.    Right.  I mean, you had some qualifying and disqualifying questions in your survey on -- like, for example, "Do you know what an AFCI is?" Right?

A.    So there were the initial screeners, which narrowed it down to folks who either -- were either professional electricians or had, you know, a similar level of knowledge and expertise.

And then at the end, those folks that completed the survey, you know, were asked, "Did you find any aspect of it confusing?"

If they found the nuisance tripping to be a confusing comment, they could have put "yes" and then typed in, "What the heck are you talking about when you say 'nuisance tripping'?"  But they didn't.

Q.    You did not have a qualifying or disqualifying question about someone's knowledge with respect to nuisance tripping; right?

A.    That's true.

Q.    So for all you know, there are some people who knew about nuisance tripping before the survey

242

and some people who didn't; right?

A.    It's -- there were some -- again, if there were some who knew about -- some who did not know about nuisance tripping, I'd feel -- I'd find that very unlikely to be true of the professional electricians, which are the vast majority, which are the ones that actually informed my conservative damages estimate.

Is it possible -- you're asking me is it possible -- out of the 50 remaining respondents, is it possible that some of them took the survey without knowing anything about nuisance tripping beforehand?  I think it's unlikely, given how they were screened.

Q.    Okay.  So it is your testimony that all 450 electricians that participated in the survey knew about nuisance tripping, even though there was no qualifying or disqualifying question?

A.    Oh, what I'm saying is every -- all the evidence I've seen indicates that knowing about nuisance tripping is just -- it's just part of being an electrician.  So I would find it unlikely that any of the 450 didn't know about nuisance tripping, and still less likely that they would be unfamiliar with it and then not indicate at the end of the

243

survey that they found it confusing.

Q.   So that is an inference that you're making; right?

MR. KAFKA:  Objection to form.

THE WITNESS:  An inference.  I'm inferring there's a high -- yeah, I guess that you could say I'm inferring there's a high -- very low likelihood that a professional electrician would have no idea what nuisance tripping is when they start the survey.

BY MR. NARESH:

Q.   And of the 50 others --

A.   Yeah.

Q.   -- who are not professional electricians, you are making an inference that those 50 nonelectricians, every single one of them, knew about nuisance tripping before the survey.  True?

A.   I'm making an inference that it would be unlikely that anyone who qualified for the survey, among those 50 respondents, would be unfamiliar with nuisance tripping.

Now, for those 50, it really doesn't matter because, at the end of the day, they're not included in my damages estimate.  I conservatively exclude them.

244

Q.   Did you know about nuisance tripping before this case?

A.   No.  And I had never done any kind of electrical work anywhere.

MR. KAFKA:  You can keep going.  We've been going about an hour, but we can keep going. Whenever you guys want to break is fine.

MR. NARESH:  You can keep going?

THE WITNESS:  Yeah.

MR. KAFKA:  That's go.

BY MR. NARESH:

Q.   If a purchaser was aware that an AFCI was prone to nuisance trip before buying that AFCI, then the purchaser wouldn't be deceived by the failure to disclose the defect.  True?

MR. KAFKA:  Objection to form.

THE WITNESS:  I wouldn't say that's true because the defect is everything that's described in the text of my report.  It's not just -- just the statement that the AFCI is prone to nuisance tripping.

BY MR. NARESH:

Q.   If the -- if a purchaser -- let's take a hypothetical purchaser who knew everything in your Question 22.  Okay?

251

Siemens?

A.   No.  You mean just people returning --
returning the product to the store, to the
manufacturer?  No, I didn't.  I didn't study that.

Q.   Were you aware that some purchasers
returned their AFCIs for a full refund?

A.   I think I might have heard of that
happening in isolated instances, but I don't have
any knowledge of how extensive it was.

Q.   A customer who bought an AFCI for $50 and
returned it and got $50 back would suffer no injury.
True?

A.   I would say that certainly sounds right
from an economic point of view.  And if there are
returns, then they should be netted out of the
revenue data that I used to calculate Siemens
damages.  So they shouldn't be included there in the
first place, assuming Siemens has accounted for
those, which is typically how companies do account
for returns; they just net them out of the revenue.

Q.   That's an assumption that you're making?

A.   Yeah.  I mean, we'd have to -- we'd have
to look at the documentation that comes with the
data and see what -- exactly how Siemens records the
data.

252

But, yeah, in general, I would say if someone buys a product and then returns it, gets their money back, I don't see why they would, from an economic point of view, why would they -- why they'd be entitles to damages.

Q.    And you believe that the model would account for that because you believe that the revenue data would back out the returns.

But you don't know that for sure.  True?

A.    So the -- yeah, I would -- it would be odd if Siemens recorded its revenue in such a way that didn't net out return, because then it would essentially be overreporting the amount of money that it actually took in.  But, yeah, I don't know for a fact what its accounting practices are.

Q.    What did you do in your analysis to take into account the Siemens warranty?

A.    The Siemens warranty on AFCIs, yeah, I don't know much about that.  I didn't -- I don't think I used the word or -- in my report, I don't think it informed my analysis.

Q.    Were you aware that there is a warranty on these AFCIs?

A.    I mean, it wouldn't surprise me if there were.

253

Q.   Were you aware that the warranty provides buyers with the right to repair or replacement at their option, or at the seller's option, of any item, subject to the warranty?

A.   Yeah, I haven't read it, but that sounds like that's something a warranty might say, yeah.

Q.   And were you aware that, under the Siemens warranty, a purchaser who experienced an issue might receive a replacement breaker at no additional cost?

A.   Yeah, I think the "might" is doing a lot of work in that question.  I think it would be very different if Siemens sort of had a policy that said, you know, "Anybody with a defective breaker can turn it in and we'll give you a full refund, no questions asked."  But it sounds like it was much more case-dependent than that.

Q.   Are you drawing that inference from the question that I just asked?

A.   Yeah, I mean, I don't know how -- how it worked, but I certainly haven't seen any evidence that there were -- you know, there -- that Siemens implemented a program that would, you know, make customers aware that they could -- that they could -- you know, if they had any issues with nuisance tripping, they could get a -- they could

254

get a full refund.

Q.   Did you look for that evidence?

A.   I would have noticed it if I had seen it. I don't -- I just -- I didn't think to look for it because it seemed like that's the kind of thing that that would come up naturally during discovery that Siemens itself would raise; right?

But, no, I don't recall specifically asking if Siemens had started offering refunds.

Q.   Sitting here today, do you know anything about what Siemens did or did not do with respect to repairing or replacing AFCIs that anybody raised with a -- with Siemens or a seller of the product?

A.   Yeah.  Yeah, I don't know what their -- what their official policy or even if they had a policy that they followed consistently.  I just -- I don't know what they were doing about it.

Q.   It's just not something that you took into account; right?

A.   Yeah.  I certainly -- you know, when I talked to the -- when I talked to the electricians, I don't recall any of them saying they got their money back for any AFCI.  Sitting here right now, I don't remember that coming up.

Typically what they would tell me is if

255

they had -- if they had a problem with nuisance tripping, they'd just have to go buy another breaker and eat the costs.  So if even a professional electrician isn't aware of the refund policy, I don't know how -- if it existed or how widespread it was.

Q.   Again, you didn't read any of the plaintiff depositions; right?

A.   Not yet, no.

Q.   You could have?

A.   Sure.  Sure.  And I mean if you want to show me one -- an example of a plaintiff getting a full refund, I'm happy to look at it.

Q.   How would that affect your analysis?

A.   I doubt it would have any effect, but I'm happy to look at it.

Q.   Why?

MR. KAFKA:  Objection to form.

THE WITNESS:  Why wouldn't it affect my analysis?  Well, it would just be one piece of testimony from one individual, not evidence of a -- I don't think there's evidence of a systematic generous refund policy.

BY MR. NARESH:

Q.   Okay.  And you didn't read any of the

256

Siemens depositions either; right?

A.   No, I haven't read those yet.  Yeah.  I mean, if I were one of their defense experts, I sure would have cited that early and often in my reports and neither of their experts raised such a policy at all.

MR. NARESH:  All right.  Let's take a break.

THE VIDEOGRAPHER:  The time is 2:42.  Off record.

(Break taken from 2:42 p.m. to 3:02 p.m.)

THE VIDEOGRAPHER:  The time is 3:02.  Back on record.

BY MR. NARESH:

Q.   Dr. Caves, in addition to the CBC survey and the price premium or as part of your price premium, you did a market simulation analysis; right?

A.   I did a market sim- -- various market simulation analyses, yes.

Q.   And the purpose of the market simulation was to estimate damages by calculating a price premium that you believe purchasers overpaid for the product at issue; right?

A.   I used the market simulation as -- yeah,

301

CERTIFICATE OF OATH


STATE OF FLORIDA

COUNTY OF ALACHUA


        I, the undersigned authority, certify that KEVIN W. CAVES, Ph.D., personally appeared before me and was duly sworn.

        WITNESS my hand and official seal this 12th day of April, 2026.

_____

Rhonda Hall-Breuwet, RDR, CRR, CSR, LCR, CCR, FPR

NCRA Realtime Systems Administrator

Notary Public - State of Florida

My Commission Expires:  9/28/27

Commission No. HH 414033

Kevin Caves, Ph.D. - March 31, 2026

302

CERTIFICATE OF STENOGRAPHER

STATE OF FLORIDA:

        I, RHONDA HALL-BREUWET, RDR, CRR, CSR, LCR, CCR, FPR, NCRA Realtime Systems Administrator, shorthand reporter, do hereby certify:

        That the witness whose deposition is hereinbefore set forth was duly sworn, and that such deposition is a true record of the testimony given by such witness.

        I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

        IN WITNESS WHEREOF, I have hereunto set my hand this 12th day of April, 2026.

_____

RHONDA HALL-BREUWET, RDR, CRR, CSR, LCR, CCR, FPR,

NCRA Realtime Systems Administrator

Shorthand Reporter

303

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: KEVIN BRNICH ELECTRIC LLC, et al. V.
SIEMENS INDUSTRY, INC.
Dep. Date: March 31, 2026
Deponent:  KEVIN W. CAVES, Ph.D.
                    CORRECTIONS:

Pg.     Ln.     Now Reads          Should Read          Reason

____    ____    _____       _____          _____

____    ____    _____       _____          _____

____    ____    _____       _____          _____

____    ____    _____       _____          _____

____    ____    _____       _____          _____

____    ____    _____       _____          _____

____    ____    _____       _____          _____

____    ____    _____       _____          _____

____    ____    _____       _____          _____

____    ____    _____       _____          _____

____    ____    _____       _____          _____

_____

Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME

THIS _____ DAY OF _____, 2026


_____

(Notary Public)  MY COMMISSION EXPIRES: _____