# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF GEORGIA

KEVIN BRNICH ELECTRICAL LLC,          )
et al.,                               )
                                      )
          Plaintiffs,                 )
                                      )
     vs.                              ) Case No.
                                      ) 22-01229(MHC)
SIEMENS INDUSTRY, INC.,               )
                                      )
          Defendant.                  )
_____)

VIDEO DEPOSITION OF ANDREW MONTOYA

JANUARY 23, 2025

SAN DIEGO, CALIFORNIA

Job No. 2025-968925

Pages 1 - 226

Reported by

Cynthia J. Vega, CA CSR 6640, RMR, RDR, CCRR 95

31

Q.    How long did you work as a journeyman?

A.    About eight years.

Q.    Okay.  And did you work at one company as a journeyman for the entirety of the eight years?

A.    No.  It was about three years or so as a journeyman.  And then right around 2010, my first daughter was born, and so I actually had to leave my job because, again, this was like during the era of the housing market crash.  So I was lucky to get like 20 hours a week.  Like there was just no work.  Even for a service company, there was just no work.

So with my first daughter being born and my wife having a full-time job still, we opted and decided that she would just go back to her stable job that was recession proof and that I would become a stay-at-home father.  And what's I did for a good maybe two or three years while my daughter was really young.

But at some point as the market sort of started to slowly improve, I started to get phone calls from people who needed basic electrical work.  And I took those on as what we considered to be side jobs or independent journeyman type work.

So in other words, since I had that journeyman certification, I was able to do a lot of

32

small little odd jobs here and there in regards to electrical, you know, infrastructure, troubleshooting repairs, things like that. And it became so that after a while I was able to sustain it and actually was looking at, okay, I should start a business and I can afford day care now.

And that was the slow transition. And that happened by 2016 is when I officially became a licensed contractor here in California to do jobs above $500.

Q. What companies did you serve as a journeyman for?

A. Ideal. Electrical, plumbing, heating, and air-conditioning. That was the company.

Q. So Ideal is the name of the company?

A. That's right. Yes.

Q. And in addition to Ideal, I think I hear you saying that you also completed odd jobs on the side where people would call you individually --

A. That's right.

Q. -- and you would perform?

A. Yeah. I'm sorry to speak over you.

But, precisely, yeah. Just lots of little odd jobs here and there. Nothing major, just anything that was below $500.

33

Q.   Let's talk about your current place of employment.

A.   Sure.

Q.   You work for Electricalifornia; correct?

A.   That's right.

Q.   And you started the company in 2016; is that correct?

A.   That's correct.

(Reporter clarification.)

Q.   So you started Electricalifornia in 2016; correct?

A.   That's correct.

Q.   And describe your company, describe Electricalifornia.  What does it do?

A.   I install electrical infrastructure for new buildings.  And I also perform troubleshooting, repairs, upgrades, modifications, and installs of new electrical -- I mean, it could be lighting, things like that, but anything to do with electrical.  It can also include audio, video, sound systems, lighting rigs at a nightclub, things like that.

Q.   And where is your company located?

A.   Headquarters are in Spring Valley, California, at my home address.

34

Q.    What's the address of that, that address?

A.    It's the same as my home address.  It's 3302 Calavo Drive, Spring Valley, California 91978.

Q.    And in addition to the headquarters, which is your home office --

A.    That's correct.

Q.    -- does your company have any other offices?

A.    No.

Q.    Who would you describe as your company's customers?

A.    Everyday people, average people who want electrical repairs, troubleshooting, and remodels, new construction.  Anywhere from homeowners, business owners, to general contractors, and large-scale developers.

Q.    And are your customers primarily located in Southern California?

A.    Yes.  All in San Diego.

Q.    Would you say that most of your customers are residential or commercial?

A.    Combination of the two.  Because I will perform work at both residential homes and also businesses and offices, commercial, and light industrial.

35

Q. You're the sole proprietor of Electricalifornia; correct?

A. Yes, I am.

Q. What does that mean?

A. That means that I own and operate the business, not just the fieldwork, but also the office work, payroll, insurance, paying bills, accounts receivable, things like that.

Q. Are you an employee of your company?

A. No.

Q. How do you get paid for the work you do -- for the work you just described that you do for the company?

A. It's all based on profit. So I don't have like an hourly rate for myself that I count on on a weekly or daily basis. I do have an hourly charge of what we'll bill a client once I'm on their property. And I don't receive a paycheck. I just, you know -- as I need funds, I just -- I take it.

Q. Okay. Now, I want you to help me understand.

A. Of course.

Q. You are not an employee of Electricalifornia; right?

A. Uh-huh.

Andrew Montoya - January 23, 2025

55

A.   Yes.  Putting too many space heaters on one outlet, for example.  Sometimes there has been instances with the utility company where perhaps they're working on a line somewhere or a main service, and it -- they do something technically wrong and it creates a surge.  I've seen that happen before.

Q.   So a circuit breaker can be overloaded if someone has too many devices plugged into that circuit; right?

A.   That's correct.

Q.   And in this case for Mr. Castle, is that what happened to this circuit?

A.   I'm not entirely sure with this one, no.  I mean, I know the description is in there, but I cannot recall at this moment exactly what overloaded it or what caused the overload.

Q.   Is there any reason why I should not understand your description to mean that the circuit was overloaded because of one of the examples that you just gave today?

MR. GUDMUNDSON:  Object to form.

Go ahead and answer if you can.

THE WITNESS:  I don't think there should be any misunderstanding.

56

BY MR. DAILEY:

Q. Okay. The unit price, $89 an hour, is that for the work that you performed to replace the circuit breaker?

A. Yeah. At the time that was my hourly rate of, you know, what to bill the client.

Q. So that I'm clear, the $89 was for the troubleshooting; correct?

A. That's right.

Q. Was it also for replacing the breaker? Is that right?

A. Yes.

Q. Okay. Would one of your employees normally assist you in troubleshooting an issue with a breaker?

A. No. Usually it's a one-man -- one-man job to go troubleshoot something, unless it's a really large building, but typically it's one person troubleshooting.

Q. And the $89 was for both the troubleshooting and the replacement of the breaker. Did you do all of that at one time?

A. Because it fell within one hour, yes.

Q. And then I see the next row, material, $16 with tax. Does that mean you paid $16 for the new

57

breaker plug, this 15-amp Siemens/Murray breaker plug?

A. That's what was billed to the client, $16 off of truck stock.

Q. What is truck stock?

A. It's material that I keep in the work van that we sell to clients if and when needed.

Q. So this $16 is just for the truck stock?

A. That's correct.

Q. Who purchased the breaker plug?

A. I did.

Q. But you didn't bill the client for it?

A. What do you mean?

Q. You purchased a new breaker plug out of your own money; right?

A. Yes. Company money.

Q. And did you bill Mr. Castle for that purchase?

A. No. That came from truck stock. So I purchase large quantities of material. I put them in the truck and we sell it as needed.

Q. So --

A. It could have been -- I could have purchased 20 breakers at one time, put them in the truck, and then sell them off if and when needed.

58

Q.   I see.  So in the ordinary course for you, if you are performing work on a breaker and you have to replace a breaker, you would charge your clients an amount that may or may not be the total amount of the breaker that you purchased; is that correct?

MR. GUDMUNDSON:  Object to form.

Go ahead.

THE WITNESS:  Will you clarify the question?

BY MR. DAILEY:

Q.   So let's just use this as an example.  You charged Mr. Castle $16 for this new breaker; correct?

A.   Yes.

Q.   Did that breaker cost $16 when you purchased it?

A.   No.

Q.   How much did it cost?

A.   I'm not sure how much I paid for it back then.

Q.   Ordinarily how much would a breaker go for?

A.   For that style, that type, between 10 and $15, depending on where I get it from.

Q.   And you would purchase, as you pointed out, maybe 20, 30 breakers at one time and keep them in

59

your truck --

A.   That's correct.

Q.   -- and then sell them to your clients when needed; right?

A.   That's right.

Q.   The last line here says trip.  Does that refer to the distance from where you lived to Mr. Castle?

A.   That's correct.

Q.   And specifically to the rental property where you performed the work?

A.   That's right.

Q.   How much do you charge in mileage?  I see there is $15 here.  How did you get to that total?

A.   That's a good question.  I think at the time it was just a -- maybe 50 cents a mile or something like that.  Or a dollar a mile, something like that.

Q.   This La Mesa, California, address at the bottom, is that your home address?

A.   That's my old address.

Q.   Your old home address?

A.   That's right.

Q.   And when did you move from the La Mesa address?

60

A.   May of 2021, I believe.  I'm sorry.  2022, May of 2022.

Q.   The total for this invoice is $120 even.

A.   Uh-huh.

Q.   It says total with tax.  Did you tax this work?

A.   I paid the tax.  But to the client, it was already just all included.

Q.   So, for example, the material here, $16 with tax, that includes the raw material, the actual breaker --

A.   That's correct.

Q.   -- plus any tax that you include in the total amount; right?

A.   Yes.

Q.   How do you calculate the tax that you include in your material or scope of work?

A.   Yearly, at this point.  Just yearly based on how much I have to spend, how much I have to pay for the income tax, business tax, stuff like that.

Q.   And this type of invoice would be kept on the cloud as a digital invoice; correct?

A.   Yes.  Yes.

Q.   Do you recall if Mr. Castle paid you by check?

Andrew Montoya - January 23, 2025

72

is no risk in normal operation of a home. What would be abnormal operation of a home?

A. A DI wire who -- a DIY person who wants to do work on their own home.

Q. So someone who is doing their own work on their home and not hiring a professional perhaps?

A. That's right. Somebody who perhaps watched a how-to video on YouTube and decided they would take a stab at it.

Q. And your basis that there is no risk associated with not having AFCIs is based on what?

A. Experience.

Q. Your years of experience as an electrician; right?

A. That's correct.

Q. You mentioned that this lawsuit is about unwanted tripping in Siemens' AFCIs; correct?

A. Yes.

Q. Can you describe to me what tripping is?

A. Yes. So the AFCI characteristics of the design of that breaker is that it is supposed to sense characteristics associated with arc flashes. That's when there is this sudden burst of energy when there is a short circuit somewhere. So rather than allow that large burst to appear, it just

Andrew Montoya - January 23, 2025

73

quickly shuts off.

And with an abnormal scenario would be something as simple as your refrigerator cycling on and off. The AFCI senses that as a arc signature and decides to shut it off. Or you're using your microwave and it decides to shut it off, thinking that there is an arc in there when it is just simply performing the duty of heating up your food.

Q. Why would it think it's an arc in there?

A. That's a good question.

From a technical standpoint, I can't really answer that because I don't really understand how an AFCI works on the inside. I've never looked inside one of those. I've never taken them apart.

All I know is that a non-AFCI breaker has a small little electromagnetic coil which produces an electric field to shut off when it senses an overcurrent. AFCIs, though, have something different going on with them where they're subject to even the most miniscule of things, like a vacuum cleaner or even booting up your laptop.

So it is hard to say exactly why these things happen. I just know that they happen all the time. And it's a known fact. I know it.

Q. And what you just described is something

74

that happens with all AFCIs, all types of AFCIs, different brands or just Siemens' AFCIs?

A.  I believe in this case it is primarily Siemens.

Q.  So you worked with clients -- have you installed non-Siemens AFCIs in any homes or properties?

A.  Yes.

Q.  Have they experienced nuisance tripping?

A.  No.

Q.  So you have no experience with nuisance tripping except for with Siemens' AFCIs?

A.  That's correct.

Q.  When did you first become aware of the potential for unwanted tripping in an AFCI?

MR. GUDMUNDSON:  Object to form.

Go ahead if you can.

THE WITNESS:  I would say early on.  Really early in my career I first started hearing about this from my superiors.  That's when I first caught wind.  That's when I first heard the terminology AFCI, arc-fault circuit interrupter.  That's the first time I heard that was when I entered the trade.  So as far back as 2006.

///

75

BY MR. DAILEY:

Q.   And you heard this from some of your teachers?

A.   Some of my superiors, yeah.  People who were training me, my foremen, my supervisors, my journeymen that I worked under would talk about -- would talk about them.

Q.   And is it your understanding that a properly functioning AFCI should have zero unwanted tripping?

A.   Yes.  In my understanding, it should do its job when there is an actual potential arc flash, not when you just have a basic appliance doing basic operations.  It shouldn't do that.

Q.   So I'm clear, in your experience an AFCI that functions properly does not have unwanted tripping; correct?

A.   Correct.

Q.   And if it does have unwanted tripping, it's your understanding that there is something wrong with the AFCI itself; is that right?

A.   Not until there is further investigation.

Q.   But some reasons for the unwanted tripping could be overload, for example; right?

A.   No.  The overload characteristics are a

76

function of current or overcurrent draw.  However, the nuisance tripping is something that is below the rated impassity.

Q.   In other words, nuisance tripping -- in other words, overload does not cause nuisance tripping.  Is that your testimony?

A.   That's correct.

Q.   So what causes nuisance tripping in your experience?

A.   Well, I believe it has something to do with the design of the AFCI itself.  Whether it's a quality control issue or just underspec'd, because I don't believe an AFCI should trip when you have a basic appliance plug into it.

It should, however, trip when it senses an arc-fault somewhere, such as when I mentioned you accidentally cut into it because you're doing a remodel in your house.  You're doing your own work, or whatever it is that you're doing in your own house.  You're modifying it.  You accidentally cut the wire or you accidentally drive a screw into it, that's when I believe that things should do the work of preventing the arc flash.  Just daily living.

Q.   And just so that I am recalling your testimony correctly, you said that a properly

114

house and hear the alarm.

Because there are certain devices, I believe, you know -- and this is out of my control. This is out of my -- my wheelhouse, because I don't write the code. I don't write the enforcements. I'm only there to follow those rules.

Q. So on the projects where you've experienced nuisance tripping, were they all in new construction homes?

A. New construction and new construction that is no more than about 20 years old. So let's just say from current time to 20 years back. That's where I've experienced a lot of that nuisance tripping.

Q. About how many times do you think -- and this is just an approximation -- that you've installed AFCIs in your career?

A. The whole time.

Q. How many times do you think you've installed AFCIs? Put a numerical value on it. 100 times?

A. Pardon me.

I've been in the trade about 18 years now. And in those years, I've had to install several hundred AFCIs. So we're talking about several

Andrew Montoya - January 23, 2025

115

thousand AFCI breakers in the residential sector. I can't approximate, but let's just say it's thousands at this point.

Q. And of the thousands of AFCIs you've installed, how many of those AFCIs do you think were Siemens' AFCIs?

A. Thousands of them. Several thousand. I never really kept track of exactly what brands went where and how many went where, but I just know it is by the thousands.

Q. And do you get calls -- or have you received callbacks from customers related to nuisance tripping after you've installed their AFCIs or is it usually after someone else has installed AFCIs?

A. Both. Yeah. Both my own installations, which have passed with flying colors according to the inspectors, and then existing installations that I go to troubleshoot and repair and service.

Q. Let's deal with your installations for a minute. You said they passed inspection.

A. Uh-huh.

Q. Do you have someone to come out and evaluate every home that complains of nuisance tripping before you begin your work, before you

Andrew Montoya - January 23, 2025

116

begin trying to resolve the nuisance tripping?

A.    Yeah.  We have very strict inspectors here in San Diego that inspect.  It's usually drawn up into two phases.  So we have phase 1 where we install all the infrastructure in these open walls before insulation and before wall covering goes up, like drywall or tile or whatever goes on the wall.  And that gets inspected by the city.  And some inspectors are very thorough with their inspections.  And some of them are less thorough, but nonetheless they still have to pass it or fail it.

And the second part of that, or phase 2, would be coming to inspect it after your wall coverings have gone up and we're able to install light fixtures and wall switches, receptacles, and to test for functionality.  They want to see that everything works.  They want to see that the lights work, the exit signs work, the basic -- they test the smoke detectors.

So it is a two-part inspection.  So the prewiring, or we call it the rough-in, and then the final, which is the trim stage or the final.  And that gets inspected by both the city, and in some instances if it's a multiplex, it's going to be inspected by the fire marshal as well.

Andrew Montoya - January 23, 2025

142

would be 2020 or 2021 or so, around there, whenever the last revision was.

We usually have to look at the plans themselves to see when they were stamped. And it will typically display what year NEC we have to abide by so that we are up to date on the current code of when that thing was stamped or when those drawings were stamped.

So to answer your question, yes.

Q. What do the codes tell you about the breaker?

A. They don't have any specifics as far as specifications or tolerance or -- other than just applications. The NEC only tells us where they have to go and where they don't have to go.

Q. So one of the codes that you provided in response to our interrogatories was capital P1805231733.

A. What is that number in reference to? Is that a model or a serial number?

Q. So this is a code on a breaker.

A. May I see it?

Q. So my question to you is, when you see codes on an AFCI breaker, what do those codes mean to you?

143

A.   Oh.   That's what you meant.   Okay.   So I think there is a misunderstanding.

So the code that I was referencing is the National Electrical Code.   That code that you're referencing is a part number or a factory line or something.   Those numbers mean nothing to me.

Q.   Why did you choose to install AFCIs versus another type of circuit breaker for the work you perform for your clients?

A.   Only if and when required I installed AFCI breakers.   When they were predetermined by the drawings that we were working off of or the current code standards that are enforced by the city and the city inspector and the building department.

Q.   So you only install AFCIs because they're required under the code?

A.   That's right.   We have no other choice.   If we decided not to put AFCIs, the city inspector would not pass the inspection and thus causing an issue or time delay with the progress of the property.

Q.   Did you research AFCIs prior to purchasing them?

A.   I researched their functionality and their applications, but I've never researched any specific

144

brand or model number.

Q.   You shared today that you purchased AFCIs from local vendors like Home Depot and Lowe's, Gexpro, Dixieline.  Did all of the AFCIS that you purchased from these local vendors result in unwanted tripping?

A.   Yes.

Q.   And you know this because, after the unwanted tripping, you can identify where you purchased each of the AFCIs that tripped?

A.   Not specifically.  This is more general -- in general, generalized.

Q.   So you do not know if all of the AFCIs that experienced unwanted tripping were purchased from the vendors that you've talked about today?

A.   Other than general purchases, I can't give you a specific quantity as to how many came from which vendor and -- one or another.  But they all came from all those vendors.

Q.   And for all of those vendors where you purchased these AFCIs, those AFCIs experienced nuisance tripping?

A.   That's correct.

Q.   So have you ever installed an AFCI that did not experience nuisance tripping?

145

A.    Made by Siemens?

Q.    Generally.

A.    Or in general?  Yes, I have.

Q.    And where did you purchase those AFCIs?

A.    The same places that were listed.  So Home Depot, Lowe's, Dixieline, Gexpro, Rexel, CES, CED.

Q.    Okay.

A.    All those vendors that I mentioned, I have purchased both faulty and fully functional AFCI breakers.

Q.    I just want to make sure the record is clear, because earlier you said that for all of the vendors where you purchased these AFCIs, they all experienced nuisance tripping.

Is it correct that your testimony is that you have purchased both faulty -- you have purchased AFCIs from these vendors, some of which have resulted in unwanted tripping; correct?

A.    That's correct.

Q.    And some of those AFCIs did not result in unwanted tripping; correct?

A.    That's correct.

Q.    Have you purchased any Siemens AFCIs from any of the vendors that you talked about today that did not result in unwanted tripping?

146

A.    Yes.

Q.    Because I think earlier you testified that all of the Siemens AFCIs that you purchased and installed have resulted in unwanted tripping; is that incorrect?

MR. GUDMUNDSON:  Objection.  Misstates testimony.

Go ahead, please.

THE WITNESS:  I'm not sure what I said earlier.  But all I know is that some of them trip oftenly, nuisancely.  Some of them perform fine.

BY MR. DAILEY:

Q.    Okay.  Thank you for clearing that up.

A.    Yeah.

Q.    Have you ever purchased AFCIs online?

A.    Yes.

Q.    From who?

A.    Amazon.

Q.    Who is the seller?

A.    I can't recall at this moment, but I want to say Schneider Electric maybe, but I'm not 100 percent sure.  Usually when I purchase off -- products off of Amazon that are electrical related, I don't pay attention to who it is coming from.  In my mind it's coming from Amazon.

147

Q.   Were those Siemens brand?

A.   Yes.  Some of them are Siemens.  Some of them are other brands.

Q.   And for the AFCIs that you purchased online, did some of them trip unwantedly?

A.   Yeah.

Q.   And did some of them perform without nuisance tripping?

A.   Yes.

Q.   Do you keep receipts of your purchases of AFCIs?

A.   Not tangible receipts, no.

Q.   How would I know how much a Siemens AFCI cost for any of the work that you've performed?

A.   Transaction history maybe, because I make all my purchases through a business credit card. That would be the only way.

Q.   So your transaction records will show when you purchased AFCIs and the brand of those AFCIs?

A.   I don't even think it gets that into detail.  I think it's more so amounts and date.  I don't think it -- I don't think my credit card transaction history specifies exactly what I bought, so I don't think that's -- I don't think that's -- I've never thought about that.  I don't think so.

148

Q. So how do you -- how do you determine how much you've spent on Siemens' AFCIs for purposes of this lawsuit?

A. Well, I can tell you for a fact -- and this is -- let's just say one instance, for example. The 30-unit apartment complex that I installed all the electrical infrastructure. That whole project called for Siemens brand equipment, from the switchgear all way to the subpanels down to all the branch circuits and AFCI breakers.

And those were designed by an electrical engineer who called out for Siemens' equipment. And all that -- for all that equipment, there is a transaction record with a supplier. So that information would be accessible. We can find exactly how many AFCI units we purchased for that particular project.

Q. Does your company keep a log of how many AFCIs it purchases and which brands they are?

A. No.

Q. So for purposes of this lawsuit, you're alleging that only Siemens' AFCIs have resulted in nuisance tripping; right?

A. That's correct.

Q. And in this lawsuit, are you requesting

157

right?

A.   Yes.

Q.   Like GE?

A.   That's correct.

Q.   And you experienced tripping with the GE AFCIs; right?

A.   Yes.

Q.   You installed Cutler-Hammer?

A.   Yes.

Q.   Would you experience unwanting tripping with those?

A.   No.

Q.   What about Square D?

A.   No problems with Square D.

Q.   But you installed them?

A.   Yes, I have.

Q.   But no issues of nuisance tripping?

A.   No.

Q.   Leviton, did you install those AFCIs?

A.   Not Leviton, no.  Leviton, they just started making panels, but I haven't installed any of their equipment.

Q.   And you installed Murray AFCIs; right?

A.   Yes.

Q.   And you experienced nuisance tripping?

158

A.   Yes.  With Murray, yes.

Q.   So of all of the AFCI brands that you've installed, you've experienced nuisance tripping -- alleged nuisance tripping with GE, Murray, and Siemens only; correct?

A.   That's correct.

Q.   What would you say the percentage of the AFCIs you've installed have been Siemens versus another brand?

A.   Career-wise or company-wise?  Or does it matter?

Q.   In your career.

A.   My career, it's probably been about 80 percent or more.  Been a lot.

Q.   And for your company?

A.   At this point it's probably about 50, 60 percent, around there thus far.  I was almost exclusively installing that equipment because of its accessible nature.

And at some point I had -- I want to say that I started installing more Square D equipment that had to do with availability with my suppliers. Because there came a point where I moved from these big-box retailers to local suppliers or supply houses, they call them, or wholesale prices --

159

wholesale warehouses.

And some of them had exclusive vendorship to certain brands only.  So like if I went to Gexpro, they could only give me like Cutler-Hammer, for example.  They couldn't give me Siemens.  Or if I went to Winsupply up in Vista or whatever, wherever that place is at, they can only get me Eaton, for example.

So certain supply houses have exclusive like contracts with some of these brands.  And in recent years my -- one of my preferred vendors is called Rexel, because they have really good inventory and they have a good delivery service.  And they have really good -- we have really good rapport with each other.

They recently started supplying Square D products.  I don't know if it is exclusively, but at least now like that's what I've requested for my jobs for the past two or three years now.

So when I send a bill of material order to my suppliers, I will usually state some specifications for a panel I need.  I'll say X, Y, Z panel.  Give me a price for Square D, Eaton, or Cutler-Hammer.  No Siemens, please.  I will specifically say, don't give me that brand, only

Andrew Montoya - January 23, 2025

160

because I know I've been having issues with those AFCI breakers.

And I know that with some of these projects that get inspected, I know I'm going to have to throw in an AFCI in there somewhere on some of those branch circuits.

Q. Were there any statements made by Siemens about its AFCI products that made you want to purchase them?

A. No.

Q. Did the price of the Siemens AFCIs influence you to purchase them over other brands?

A. No. I feel their pricing was comparable to just about everybody else.

Q. Did you rely on any statements made on the Siemens AFCI packaging to make your decision to purchase their AFCIs?

A. Other than technical details, no. There was nothing on the packaging that convinced me to buy brand A versus brand B.

Q. Did you rely on any other Siemens product literature to influence you to purchase their AFCIs?

A. No. Only technical jargon that is sort of irrelevant. There is no sales pitch in technicalities.

Andrew Montoya - January 23, 2025

161

Q.   Is there anything on their website that made you want to purchase their brand over others?

A.   No.  The only thing -- when I go to a website, the only things I look at are technical specifications.  I don't look at selling points or why I should buy brand A over brand B.  It's only for specifications that are specific to any project.

Q.   When you told a homeowner that you were going to install a Siemens brand AFCI breaker, Did you ever say that you were doing so as a premium?

MR. GUDMUNDSON:  I'm sorry.  Objection. Form.

BY MR. DAILEY:

Q.   Let me ask it a different way.

Have you ever told any of your clients that you were installing Siemens' AFCIs before installing it?

A.   No.

Q.   Would you ever tell your clients what brand of AFCIs you were going to use on the project?

A.   Typically, no.  Most homeowners don't care. Unless they want to know, they can ask and I'll tell them.

But just to give you a little perspective, like the only reason we would even install a Siemens

Andrew Montoya - January 23, 2025

162

AFCI breaker in an existing installation; right?

So I want to go back to my example that I gave earlier for the two bathrooms I did a remodel for where I was having that breaker trip prematurely at 3 amps.  The only reason I went with Siemens in that particular case is because the panel was a Siemens panel and it was already installed in there.

Now -- and I can't really put my finger on this only because I can't really recite the code off the top of my head because it is a big boring technical book.  And it's more of like you have to research as you go as needed for whatever application you're working on.

And that's to say our inspectors -- and this has happened to me on a number of times.  This is through my experience -- is if I'm working on a remodel and it is getting inspected, they check to see what circuits I've installed.  I have to document what circuits I've installed, what size breaker I put on there, whether it was an AFCI or a GFCI, or a combination breaker.  And they have to look at it.  They have to get a visual.

And so the inspector will always insist that we put matching brands.  So if I have a house, you know, that has a Siemens panel in it, well,

163

knowing the inspection process, I have to put a Siemens AFCI breaker in there if it calls for it.

Q.   So is it fair to say that you use Siemens' AFCIs in some projects because it was required?

A.   Yes.  Sort of no other choice.  Because we have to satisfy city requirements or the code requirements or otherwise make sure that the two brands match or are made for each other.

Q.   And your testimony today is that the matching brand requirement is in the NEC?

A.   I don't know.  That's sort of been a gray area for me, because I tend to believe otherwise.  I tend to believe that that particular style of breaker, which is called a BR plug-in, that's the style, the type, the design.  It's just a rectangular boxoid looking thing.  And it's interchangeable with a lot of other brands of breakers.

I can fit a Cutler-Hammer, an Eaton, or a Square D home light breaker on a Siemens panel or vice versa.  Like a lot of these parts are interchangeable, but for some reason the inspector has always called us out on that -- or has called me out on that, and say, hey, you can't put this brand A in a brand B breaker box, for example.  And

164

that's always been sort of a mystery to me.

But me being who I am, I'm not there to argue with a superior.  He's there to pass my work so I can move on to the next gig and not think about it any more than that.

Q.   Okay.  Has anyone else ever purchased Siemens' AFCIs on your behalf?

A.   It's a possibility that my -- any one of my employees over the years have purchased Siemens' AFCI breakers for a circuit or an install in some instance.

Q.   Did you pass along the price of the Siemens AFCI to your customer?

MR. GUDMUNDSON:  Object to form.

Go ahead.

THE WITNESS:  Not always.  If and when I could, when I saw it to be of no fault or no -- how do you say it? -- like no quality control or even a -- what do you call that? -- warranty period, then, yeah, I would eat the cost of that.

But if this is for, say, a new client and we've never done work for them, and they have a Siemens panel and we need to put a Siemens breaker in there, then, yes, I would charge them for that part, whatever the price was at that moment in time.

Andrew Montoya - January 23, 2025

170

to send me to the next person who's their manager and they may send me to a voice mail.

Like I don't think a company of that magnitude even has the desire to help me troubleshoot something that I've already troubleshot and determined that it's not my wiring.  It's not my install.  It's not my appliances.  It's the breaker itself that's the problem.

Q.   And you have those feelings because it is a big, big company?

A.   Yeah.  And I think the easiest solution for me that's most cost-effective and efficient is just to remove the part and put a new one in there and call it a day and not have to think about it ever again.  And if I have time, and if I think about it and I keep these -- this pile of faulty breakers handy, I may go back to the supplier or maybe try to return it at the store, but there has been instances where they say you can't return it without a receipt, or it's been more than 30 days or it's been more than 90 days, or whatever the policy is.

So in most instances, I don't even bother because it's not worth it to me to spend time when I could just be out in the field generating more income or whatever.

171

Q.   And all of the reasons that you just gave for why you wouldn't call Siemens because you don't think they would be helpful because they are a big entity, because you wouldn't talk to a technician, you can't confirm any of that because you never called them; right?

A.   No.  I've never called them.  But, again, like I don't think they're there to necessarily help me with that.  They would probably just say go back to the supplier or the vendor, which I did a few times.  I did -- I will say that there was at least a couple of times where I took the faulty breaker back to my supplier or I took it back to the Home Depot or whatever and was able to get either a refund or get a replacement.  You know, either get my money back or get the part replaced for free.

But I -- even to this day, I have like a whole box of these breakers and I haven't done anything with them.  They're just sitting there.

Q.   Have you conducted your own research on nuisance tripping?

A.   No.

Q.   How do you know what it is?

A.   Through my own experience.

Q.   When did you first hear the term nuisance

172

tripping?

A. Pretty early on in my career, but it wasn't worded that way. It wasn't the word nuisance. It was more of like pain in the ass or thorn on my side or problematic. Finicky. Sensitive.

Q. So you've heard throughout your career that there are finicky sensitive AFCIs; right?

A. That's correct.

Q. So you weren't surprised when you received calls about sensitive, finicky AFCIs; right?

MR. GUDMUNDSON: Object to form.

Go ahead.

BY MR. DAILEY:

Q. Were you surprised when you received calls about sensitive AFCIs since you have known since the beginning of your career that they exist?

A. Not necessarily surprised but more annoyed that it's something that I have to be utmost responsible for.

Q. So from the beginning of your career, you knew there was the likelihood of finicky AFCIs?

A. That's correct.

Q. And for you finicky sensitive, those are terms that are kind of interchangeable with nuisance tripping because you didn't really know the word

173

nuisance tripping early on in your career?

A. That's correct. Yeah. Nuisance is -- I don't know. I think that's just another word to use to describe the same thing.

Q. I think I may have asked this question earlier this morning. But do you know of any of your customers that have experienced fires in their home?

A. None of them have experienced any fires in their home.

Q. And they've not experienced any electrical fire in their homes, electrical fires?

A. No electrical fires, no.

Q. Do you know anything about the design of the Siemens AFCIs in this case?

A. I know a little bit, only through -- only through my own curiosities and independent research. But from what I understand, they have a sort of design feature that is there to sense very small -- very small currents between the black wire and the white wire, or the hot and the neutral wire. And they're there to look for these little currents or these spikes, really fast transients that are associated with arcs or short circuits.

But other than that, I don't really know

174

what they look like on the inside.  I've never seen the inner workings.

Q.   And what you just described about your knowledge of the design of the Siemens AFCIs is purely based on your own individual research; right?

A.   That's correct.

Q.   And that research took the form of online research?

A.   Autodidacticism, online, books, literature. Whatever I can get my hands.

Q.   On what is autodidacticism?

A.   Self-taught.  You know, you go out and learn for yourself.  Other than being taught by my superiors.  So it's a combination of the two.

Q.   But when we're talking just about the design of the Siemens AFCIs, you learned what you just described based on online research; right?

A.   Right.  Yeah.

Q.   And what kinds of websites would you go on to learn about the Siemens design?

A.   Specifically mikeholt.com.  It is a really good resource for electricians.  There is a lot of insight as to applications, code.  It's meant for electricians.

Mike Holt is an electrical teacher, teaches

Andrew Montoya - January 23, 2025

225

I declare under the penalty of perjury under the laws of the State of California, United States of America, that the foregoing is true and correct; that I have read my deposition and have made the necessary corrections, additions or changes to my answers that I deem necessary.

Dated: _____

_____
Andrew Montoya

Andrew Montoya - January 23, 2025

226

CERTIFIED SHORTHAND REPORTER'S CERTIFICATE

I, Cynthia J. Vega, a Certified Shorthand Reporter for the State of California, do hereby certify:

That the witness in the foregoing deposition was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported by me stenographically and were transcribed through computerized transcription under my direction; and the foregoing is a true and correct record of the testimony and proceedings taken at that time.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing proceeding and caption named or in any way interested in the outcome of the cause in said caption.

IN WITNESS WHEREOF, I have subscribed my name this 4th day of February, 2025.

Reading and Signing was not requested.

_____

Cynthia J. Vega, CA CSR No. 6640, RMR