# EXHIBIT 10

## (Redacted)

1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

-------------------------X

KEVIN BRNICH ELECTRIC LLC,:

et al.,                   :

          Plaintiffs,:   Civil Action No.

     v.                   :    1:22-CV-01229-MHC

SIEMENS INDUSTRY, INC.,   :

          Defendant.:

-------------------------X


        VIDEOTAPED DEPOSITION OF ROBERT A. DURHAM

              Wednesday, April 8, 2026

                 Tulsa,  Oklahoma

                   9:05 a.m.




Job No.:  2026-1017263

Pages:  1 - 244

STENOGRAPHICALLY REPORTED BY:

GISELLE MITCHELL-MARGERUM, RPR, CRI, CCR, LCR, ACCR, CSR

CALIFORNIA CSR 14424

92

Many of those conditions are covered by 1699.  But 1699, as I determined later on, does not contain sufficient to testing all real-world conditions.  All HEPs, for example, that would be common in a household.

Q.   All right.  You would agree, though, that UL 1699 does cover many real-world conditions?

A.   Some real-world conditions.  And caveat that to say some real-world conditions that were more prevalent in 1999 than they would be in the time frame we are looking at here; '17; '18; '20.

Q.   All right.  Other than UL 1699, are you aware of any other industry standard that sets rules for operation of residential circuit, or AFCIs -- I'll end there.

A.   Can you --

Q.   Yes.

A.   I'm sorry.  Can you repeat the question?

Q.   Yes.  Other than UL 1699, are you aware of any other industry standards that set rules for how residential AFCIs should operate in the real world?

A.   Not that I'm aware of.

Q.   Okay.  Turning to paragraph 95 of your report, which is on page 64.  You write:

"Siemens has had four generations of AFCI

93

breakers with several subgenerations or versions.
Gen 1, Gen 2, Gen 3A, Gen 3B, Gen 3C, Gen 3C plus,
Gen 4A and Gen 4B."

          Do you see that?

     A.   Yes.

     Q.   All right.  So would you agree with me
that each subgeneration of Gen 3 AFCI breaker that
Siemens released to the public was UL 1699
certified?

     A.   Yes.  That's my understanding.

     Q.   Do you intend to offer an opinion in this
case that Siemens' AFCI products sold during the

94

alleged class period failed to meet the requirements of UL 1699 certification?

A.   No.

Q.   UL 1699 requires testing for unwanted tripping.  True?

A.   Yes.  It does have some unwanted -- an unwanted tripping section.

Q.   Okay.

The unwanted tripping section of the UL 1699 tests have six load conditions that they test for.  Is that true?

A.   Yes.

Q.   Is it your understanding, then, that Siemens' AFCIs that have been sold in the U.S. have passed those testing against those six specific load conditions?

A.   Yes.  That's a good way to put it.

Q.   Okay.

Let's turn to paragraph 35 of your report. All right.  Paragraph 35 is the beginning of a section of your report called "Identify the Problem."  Is that correct?

A.   Yes, Ma'am.

Q.   And you write in paragraph 35:

"Plaintiffs have alleged that certain AFCI

95

circuit breakers manufactured by Siemens have a nuisance tripping defect.

Siemens AFCIs use an arc detection method that, according to reports, leads the AFCIs to trip due to common and safe voltage distortions that cause radiofrequency harmonics."

Do you see that?

A.    Yes.

Q.    And your citation for that sentence is the second amended consolidated class action complaint. Is that correct?

A.    Yes.

Q.    Is this your definition -- your engineering definition of what a nuisance tripping defect is?

A.    Yes.  That's my -- much of that's my language.  Yes.

Q.    All right.  What do you mean much of that is your language?

A.    Well, that -- I developed that definition and provided it to counsel.

Q.    When you say "common voltage distortions," what did you do to go about identifying what would constitute a common voltage distortion?

Robert Durham - April 08, 2026



111

ATTORNEY MCVAY:  All right.

BY ATTORNEY MCVAY:

112

Q.    So just because a customer calls in a complaint about nuisance tripping, does not mean that there is not an arc fault present.  Correct?

A.    Correct.  That's correct.  Or an overload or a ground fault.  I should put those in the list as well.

Q.    A homeowner can experience what they perceive as nuisance tripping because there is a loose connection between a plug and a socket.  True?

A.    Generally speaking, that could occur. Yes.

Q.    A homeowner can experience what they perceive as nuisance tripping because furniture is pushed up against electrical wires or a plug. Correct?

ATTORNEY FLANAGAN:  Objection to form.

THE WITNESS:  Up against a plug -- oh.  A plug?  Yes.  Up against a plug.  Yes.

BY ATTORNEY MCVAY:

Q.    A homeowner can experience what they perceive as nuisance tripping because of an overloaded circuit?

A.    Certainly.

Q.    A homeowner can experience what they perceive as nuisance tripping because the

113

electrician who installed the breaker installed it by backstabbing?

A.    Is it within the realm of possibility? Yes.  Is it likely?  No.

Q.    What would an investigator have to do to confirm that a particular complaint about nuisance tripping is attributable to common and safe voltage distortions in the home, that should not have caused the trip?

ATTORNEY FLANAGAN:  Objection to form.

THE WITNESS:  You are talking about a specific incident?

BY ATTORNEY MCVAY:

Q.    Yeah.  What would one have to do in order to confirm that a complaint about nuisance tripping is, in fact, due to common and safe voltage distortions in the home?

A.    That does go beyond my role in this case. But I think an at least reasonable list is on page 44 of my rebuttal report.  And this list was put together by Exponent.

The bottle of the AFCI.  The generation of AFCI.  Room served by the AFCI.  And the load served by the AFCI.  And the inspection to determine whether all fault conditions are present on the

114

circuit served by the AFCI.

So that would be a good start.

Q.   All right.  Any --

A.   To look at a specific incidence.

Q.   Okay.

Are there any other steps that an individual should take to determine whether the cause of a given complaint of nuisance tripping is, in fact, common in safe voltage distortions?

ATTORNEY FLANAGAN:  Objection.  Form.  And scope.

THE WITNESS:  That list doesn't really go to overcurrent or ground fault.  If it's a combination of AFCI-GFCI breaker, ground fault would be important.  So it doesn't go to that.

Although it's probably encompassed by loads served by the AFCI.  I think that list with those caveats is probably a good framework.

ATTORNEY MCVAY:  All right.

Should we take a break?

THE WITNESS:  Sure.

THE VIDEOGRAPHER:  We are off the record.  The time is 11:32.

(Short break.)

115

THE VIDEOGRAPHER:  We are on the record. The time is 11:44.

ATTORNEY MCVAY:  All right.

BY ATTORNEY MCVAY:

Q.   Dr. Durham, I want to continue with your initial report here.  I believe we were just talking about paragraph 35.  Moving on to paragraph 36, you write:

"According to plaintiffs' complaint, if AFCIs with the nuisance tripping defect are installed on circuits with, or in the same panel of circuits serving these devices, they may trip and shut off power when no dangerous arc fault exists."

Do you see that?

A.   Yes.

Q.   And there, you also cite plaintiffs' complaint in footnote 11.  True?

A.   Correct.

Q.   You continue:

"Plaintiffs further allege that other current or future household products that create voltage distortions and radiofrequency harmonics may also cause these same AFCIs to experience nuisance tripping."

Do you see that?

171

A.   Yes.

Q.   All right.  Did you review any other sources -- data sources in testing hypothesis five?

A.   No.

Q.   Did you collect a complete set of Siemens' public disclosures about nuisance tripping before testing the hypothesis -- hypothesis five?

A.   No.

ATTORNEY FLANAGAN:  Objection to form.

THE WITNESS:  It wasn't necessary.

BY ATTORNEY MCVAY:

Q.   What are all of the ways that Siemens communicates with customers about AFCI technology?

A.   Oh, I doubt I can give a comprehensive list.

Q.   Would you agree that product packaging is one way that Siemens communicates with customers about AFCI technology?

A.   Yes.

Q.   Did you look at any AFCI product packaging in coming to your opinions, and opinion with respect to hypothesis five?

A.   No.  It wasn't necessary.

Q.   Okay.

Did you inspect any product -- are you

172

aware that Siemens includes product literature at the point of sale?

A. Yes.

Q. Okay.

Did you inspect any point of sale literature that Siemens includes with its product in testing hypothesis five?

A. No. It wasn't necessary.

Q. Are you aware that Siemens maintains product information about residential AFCIs on its website?

A. Yes.

Q. Did you --

A. Some of that was included in the data discovery.

Q. Did you inspect Siemens' website?

A. No. I inspected the portions of Siemens' website that were included in the discovery documents.

Q. Okay.

Would those portions of Siemens' website that you inspected from the documents be included in your Appendix B?

A. Yes. They should be.

Q. All right. Are you aware that Siemens

173

publishes joint papers under -- with industry groups, such as NEMA?

A. I would not be surprised with that, that they would make joint papers. I know Siemens does individually Siemens papers. I've seen those.

Q. Okay.

Did you review any industry publications co-authored by Siemens, in testing hypothesis five?

A. No.

Q. Are you aware that Siemens conducts site visits when customers for residential AFCIs make complaints about nuisance tripping?

A. Yes. On occasion, they do.

Q. All right. And did you review any records about site visit discussions in coming to your conclusion -- your conclusion with respect to hypothesis five?

A. Yes.

Q. All right.

Did you -- which site visit reports did you review?

A. The ones listed in the Appendix B.

Q. All right. Did you endeavor to get a complete set of site visit reports in testing hypothesis five?

174

A.    Well, I asked for site visit reports in general.  So, yes.  In part of the data collection process.  Not as part of testing the hypothesis.

Q.    All right.  So --

A.    You collect the data and analyze the data before you test the hypothesis.

Q.    So to your knowledge, you received all the site visit reports that raised questions about nuisance tripping.

Is that correct?

A.    I find --

ATTORNEY FLANAGAN:  Objection to form.

THE WITNESS:  I find it unlikely that I received them all, based on the rest of the incomplete data that I found.  But I at least have those that are documented in the documents listed in Appendix B.

BY ATTORNEY MCVAY:

Q.    Were you given access to the entire set of documents produced by Siemens in this case?

A.    No.  I don't believe so.

Q.    Okay.

Did you do any of your own searches across any portion of Siemens' production in this case?

A.    I did probably hundreds of those.

175

Q.   So you -- you were able to search the production Siemens made in this case?

A.   Yes.

Q.   And what platform did you use to conduct that search?

A.   I have a couple of different platforms. Agent Ransack is my favorite, because it does a very good job of capturing the text.  Inside documents. PDFs in particular.

Q.   And what documents did your Agent Ransack program have access to?

A.   All of the documents that I have available in my discovery.

Q.   Okay.

Were you given an entire set of Siemens production in this case?

A.   As I said earlier, I don't believe so.

Q.   Okay.

Are you aware that Siemens also communicates with customers about AFCIs over its support line?

A.   I would expect that to be true.

Q.   Okay.

Did you sample any of the support line data in testing hypothesis five in your report?

176

A.   I don't recall I saw any transcripts of conversations from the support line at all.

Q.   Did you sample any summaries of support line conversations, in testing hypothesis five of your report?

A.   I think some of those summaries were contained in some of the spreadsheets of issues logs.

Q.   All right.  I'm asking --

A.   So, yes.

Q.   -- did you analyze those specifically, in making -- in testing hypothesis five?

A.   Sure.

Q.   All right.  When you say that Siemens' public disclosures did not align with Siemens' internal knowledge regarding nuisance tripping, which specific public disclosures were you considering?

A.   All those that I had access to.  As well as the deposition testimony that -- I believe it was Ms. Kees that said they didn't -- didn't make those disclosures.

Q.   All right.  Would you --

A.   And the rest of the deposition testimony. So if I have a Siemens witness that says, "No, we

177

didn't do that," then they didn't do it.

Q.   All right.  Do you intend to offer an opinion in this case that each of Siemens' public disclosures about its AFCI technology were identical?

ATTORNEY FLANAGAN:  Objection to form.

THE WITNESS:  No.

ATTORNEY MCVAY:  Okay.

BY ATTORNEY MCVAY:

Q.   Would you turn to paragraph 206 of your report?

A.   Okay.

242

C E R T I F I C A T E

I, Giselle M. Mitchell, RPR, CRI, CCR, LCR, ACCR, CSR, do hereby certify that the witness, ROBERT DURHAM, was first duly sworn by me pursuant to stipulation of counsel and that I was authorized to and did report said proceedings.

I further certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; that reading and signing was requested; and that I am neither attorney nor counsel for, nor related to or employed by, any of the parties to the action in which this deposition was taken; and that I have no interest, financial or otherwise, in this case.

IN WITNESS WHEREOF, I have hereunto set my hand this 20th day of April, 2026.

GISELLE MITCHELL-MARGERUM, RPR, CRI, CCR, LCR, ACCR, CSR

Robert Durham - April 08, 2026

243

CERTIFICATE OF DEPONENT

I, ROBERT DURHAM, hereby certify that I have read the foregoing pages, numbered 1 through 241, of my deposition of testimony taken in these proceedings on Wednesday, April 8, 2026 and, with the exception of the changes listed on the next page and/or corrections, if any, find them to be a true and accurate transcription thereof.

Signed: ................................

Name:    ROBERT DURHAM

Date:    May 11, 2026 ....................

Robert Durham - April 08, 2026

244

```
                          ERRATA SHEET

   Case Name:     Kevin Brnich Electric LLC, et al. v. Siemens
     Industry, Inc.
   Witness Name:  ROBERT DURHAM
   Date:
   Page/Line          From        To
```

| Page | Line | From / To |
|------|------|-----------|
| 47 | 13 | home line / Homeline |
| 56 | 24 | lateral / ladder |
| 57 | 25 | various fed..ene..reg / The Fed..Ene...Reg |
| 61 | 6 | in / and |
| 61 | 11 | replace period with comma, no new paragraph |
| 70 | 3 | Dr. Ashe / Dr. Ashenayi |
| 75 | 5 | case / time frame. |
| 77 | 25 | arc flash / arc detection |
| 98 | 23 | indiscernible / Ahir |
| 113 | 22 | bottle / model |
| 128 | 21 | is complete / are incomplete |
| 135 | 22 | replace comma with period, no new sentence |
| 138 | 7 | classifies / misclassifies |
| 205 | 17 | graft / graph |
| 226 | 9 | wild / while |
| 226 | 12 | wild / while |

```
   Subscribed and sworn to before

   me this date 11    day of month   May          , 2026.

                     _____

           ROBERT DURHAM

           SIEMENS_AFCI_00020002
```

www.LexitasLegal.com/Premier    Lexitas                    888-267-1200