# EXHIBIT 15

## (Redacted)

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

KEVIN BRNICH ELECTRIC LLC, BOLT
ELECTRIC LLC, ELECTRICALIFORNIA,
ZANK ELECTRIC, CHARLES VODICKA,
PATRICK CATES, BRYAN BUTAKIS,
RICK KEYSER, TYLER BARRETTE,
CLIFFORD OAKLEY, AND JASON WYLIE,
individually and on behalf of all others
similarly situated,

         Plaintiffs,

    v.

SIEMENS INDUSTRY, INC.,

         Defendant.

Case No. 1:22-cv-01229-MHC

Honorable Mark Howard Cohen

**REBUTTAL EXPERT REPORT OF DR. RAN KIVETZ**

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**TABLE OF CONTENTS**

ASSIGNMENT AND QUALIFICATIONS.................................................................... 4

INTRODUCTION AND SUMMARY OF CONCLUSIONS.................................................. 8

Understanding of Key Allegations and Issues in this Litigation ....................................... 8

Summary of Key Conclusions Regarding the Caves Report and the Caves Conjoint Survey ................................................................................................................. 11

(1) Dr. Caves's "Nuisance Tripping Defect" Attribute is Leading and Misrepresents the Alleged Omission, Generating an Invalid and Artificially Inflated Alleged Price Premium ......................................................................................... 12

(2) The Caves Conjoint Survey is Contrived and Severely Deviates from Electricians' Purchase Decision-Making Process ........................................................... 16

(3) Dr. Caves's 15 "Cognitive Interviews" are Incapable of Showing that his Conjoint Survey is Clear, Realistic, or Unbiased, and These Interviews Show, if Anything, that the Survey is Unclear, Unrealistic, and Biased ........................... 18

(4) The Results of the Caves Conjoint Survey Evidence its Biased and Unrealistic Design ............................................................................................................. 20

A.    OVERVIEW OF THE CAVES CONJOINT SURVEY AND KEY CHALLENGES WHEN USING CONJOINT SURVEYS TO ESTIMATE ALLEGED PRICE PREMIA ...................................................................................................... 21

A.1.    Overview of the Caves Conjoint Survey ........................................................... 21

A.2.    Limitations and Challenges in Using CBC Surveys to Estimate Alleged Price Premia ....................................................................................................... 26

B.    DR. CAVES'S "NUISANCE TRIPPING DEFECT" ATTRIBUTE IS LEADING AND MISREPRESENTS THE ALLEGED OMISSION, GENERATING AN INVALID AND ARTIFICIALLY INFLATED ALLEGED PRICE PREMIUM .... 32

B.1.    The Importance of Defining Clear, Concrete, and Non-Leading Attribute Levels in Conjoint Surveys ................................................................................ 34

B.2.    Dr. Caves's Description of the "Nuisance Tripping Defect" Disclosure is Leading, Biased, and Does Not Resemble Language that AFCI Manufacturers Would Use ...................................................................................................... 38

B.2.1.    *The Caves Conjoint Survey Inappropriately Refers to "Nuisance Tripping" as a "Defect"* .......................................................... 39

B.2.2.    *Dr. Caves's "Nuisance Tripping Defect" Disclosure Omits Relevant Information* .......................................................................... 46

B.2.3.    *Dr. Caves's Description of the "Nuisance Tripping Defect" Disclosure Artificially Highlighted this Attribute Compared to Other Attributes* ...... 53

B.3.    The Two Levels of Dr. Caves's "Nuisance Tripping Defect" Attribute are Leading, Unclear, and Misrepresent Marketplace Reality, Likely Generating Confusion and Erroneous Customer Beliefs and Choices ..................................... 56

B.4.    The Leading Nature of Dr. Caves's "Nuisance Tripping Defect" Disclosure is Exacerbated by the Survey's Repeated Stimuli Presentation ............................. 67

B.5.    Dr. Caves's Reliance on the Durham Report and the Plaintiffs' Counsel for the Phrasing of the "Nuisance Tripping Defect" Disclosure is Inconsistent with the Methods and Principles Relied on in the Relevant Scientific Field...................... 68

C.    THE CAVES CONJOINT SURVEY IS CONTRIVED AND SEVERELY DEVIATES FROM ELECTRICIANS' PURCHASE DECISION-MAKING PROCESS ....................................................................................................... 69

C.1.    The Caves Conjoint Survey's Instructions are Unclear, Unrealistic, and Biased. 70

C.2.    The Caves Conjoint Survey's Presentation of Attributes, Particularly the "Nuisance Tripping Defect" Disclosure, is Contrived, Out of Context, and Fails to Represent How Electricians Would Make Purchase Decisions........................ 76

D.    DR. CAVES'S 15 "COGNITIVE INTERVIEWS" ARE INCAPABLE OF SHOWING THAT HIS CONJOINT SURVEY IS CLEAR, REALISTIC, OR UNBIASED, AND THESE INTERVIEWS SHOW, IF ANYTHING, THAT THE SURVEY IS UNCLEAR, UNREALISTIC, AND BIASED.............................. 84

D.1.    Dr. Caves's 15 "Cognitive Interviews" are Entirely Insufficient for Validating the Clarity, Realism, or Design of the Caves Conjoint Survey ............................ 86

D.2.    Dr. Caves's "Cognitive Interviews" Provide Further Evidence that his Conjoint Survey was Confusing, Unrealistic, and Biased ................................... 90

D.2.1.    *Dr. Caves's "Cognitive Interviews" Further Indicate that Compatibility Constraints are a Dominating Purchase Factor and Show that Interviewees Were Confused by the Conjoint Choice Task* ...................... 90

D.2.2.    *Dr. Caves's "Cognitive Interviews" Show that Interviewees Were Confused About the "Nuisance Tripping Defect" Disclosure and Held Different Views of "Nuisance Tripping" Compared to its Representation in this "Disclosure"*........................................................ 100

D.2.3.    *Dr. Caves's "Cognitive Interviews" Show that the Caves Conjoint Survey is Further Unrealistic by Failing to Represent Other Relevant Purchase Considerations and Constraints* ............................................ 115

D.3.    Evaluation of Dr. Caves's "Cognitive Interviews": Conclusion ........................ 117

E.    THE RESULTS OF THE CAVES CONJOINT SURVEY EVIDENCE ITS BIASED AND UNREALISTIC DESIGN.................................................... 118

E.1.    Dr. Caves's Conjoint Survey Data Reveal Substantial "Extreme Response Bias"............................................................................................................. 119

E.2.    The Caves Conjoint Survey's Results Further Demonstrate the Artificially Inflated Price Premium (or Discount) Estimated for the "Nuisance Tripping Defect" Disclosure .......................................................................... 122

**EXHIBIT A: CURRICULUM VITAE OF DR. RAN KIVETZ........................................... 129**

**EXHIBIT B: LIST OF CASES IN WHICH DR. RAN KIVETZ PROVIDED SWORN TESTIMONY IN DEPOSITION AND/OR TRIAL DURING THE PAST FOUR YEARS ................................................................................................... 155**

**EXHIBIT C: DOCUMENTS MADE AVAILABLE TO DR. KIVETZ IN CONNECTION WITH PREPARATION OF THIS *REBUTTAL EXPERT REPORT* ...................... 157**

**EXHIBIT D: GOOGLE SEARCH RESULTS FOR "NUISANCE TRIPPING (AFCI)" . 160**

**EXHIBIT E: ANALYSIS OF PRICE PREMIUM ESTIMATES FOR BRAND AND THE ALLEGED OMISSION OF THE "NUISANCE TRIPPING DEFECT" DISCLOSURE USING DR. CAVES'S SIMULATOR ............................................. 161**

## ASSIGNMENT AND QUALIFICATIONS

1.    My name is Dr. Ran Kivetz.  I have been asked by Siemens Industry, Inc. ("Siemens") to evaluate the opinions in the report of Kevin W. Caves (the "Caves Report")[1] regarding the choice-based conjoint ("CBC") survey he conducted in this matter on behalf of the Plaintiffs (the "Caves Conjoint Survey").[2]

2.    I am a tenured, chaired Professor of Marketing at Columbia University Business School.  A copy of my curriculum vitae, which includes a complete list of my publications, is attached as Exhibit A.

3.    I earned a Ph.D. in Business from Stanford University, Graduate School of Business; a Master's degree in Psychology from the Stanford University Psychology Department; and a Bachelor's degree from Tel Aviv University with majors in Economics and Psychology.

4.    My field of expertise encompasses consumer psychology and behavior; survey methods, including conjoint analysis; marketing management; behavioral economics; human judgment, perception, and decision making; consumer and sales incentives; advertising; and branding.  Most of my research has focused on buyers' purchase behavior; survey design; and the effect of product characteristics (*e.g.*, brand, features, quality, price), the competitive context, and marketing activities (*e.g.*, promotions, incentives, loyalty programs, advertising, branding) on purchase decisions and perceptions.

5.    I have received multiple research awards and nominations, including: (*i*) the "*Ferber Award*" from the Association for Consumer Research, which is the largest association of consumer researchers in the world; (*ii*) the "*Best Competitive Paper Award*" from the Society of Consumer Psychology, which is the premier association of consumer psychologists in the world; (*iii*) the "*Early Contribution Award*" from the Society of Consumer Psychology; (*iv*) five finalist nominations, for the 2016, 2011, 2009, 2007, and 2005 "*O'Dell Award*," given to the *Journal of*

---

[1] October 31, 2025 "Class Certification Expert Report of Kevin W. Caves, Ph.D." ("Caves Report").
[2] I was not asked to evaluate the Caves Conjoint Survey as it relates to Dr. Caves's market simulation or to supply-side factors.

*Marketing Research* (the major journal on marketing research issues) article that has had the greatest impact on the marketing field in the previous five years; (*v*) two finalist nominations for the 2007 and the 2005 "*Green Award*," given to the *Journal of Marketing Research* article published in the prior year that "demonstrates the most potential to contribute significantly to the practice of marketing research and research in marketing"; (*vi*) three finalist nominations for the awards for the "*Best Article*" published in the *Journal of Consumer Research* between 2002 and 2005, between 2006 and 2009, and between 2011 and 2014; (*vii*) having my research selected by *The New York Times* in its *Annual Year in Ideas* as one of the "Best Ideas in 2006"; (*viii*) being rated as the fourth most prolific scholar in the leading marketing journals during 1982 – 2006;[3] and (*ix*) being ranked by the American Marketing Association as one of the Top 50 most productive scholars in the premier marketing journals during 2009–2013 and during 2010–2014.

6.     At Columbia University, I have taught MBA and Executive MBA courses on Marketing Strategy and Management, Customer Centricity and Innovation, High-Technology Marketing and Entrepreneurship, and Marketing of a Nation, covering such topics as developing marketing strategies, buyer behavior, customer segmentation, customer acquisition and retention, competitive strategies, branding, pricing, advertising, sales promotions, and behavioral economics.  In addition to teaching MBA and Executive MBA courses, I have guided and supervised numerous MBA student teams in their work on company and industry projects dealing with a variety of markets.  I also have taught in various executive education programs, including programs for senior executives, programs for marketing managers in high-technology companies, programs for marketing managers in pharmaceuticals, programs in entrepreneurship, programs on marketing and innovation, and programs on customer centricity.

7.     I have taught several doctoral courses at Columbia University.  One doctoral course, titled "Bridging Behavioral Economics and Marketing Science," examines human judgment and decision making and its application to marketing science.  The course focuses on

---

[3] Seggie, Steven H. and David A. Griffith (2009), "What Does It Take to Get Promoted in Marketing Academia? Understanding Exceptional Publication Productivity in the Leading Marketing Journals," *Journal of Marketing,* 73(1), 122 – 132.

understanding, predicting, and quantitatively modeling (including by employing conjoint analysis models) different phenomena and biases in judgment and decision making. A second doctoral course deals with consumer behavior, covering such topics as the processes underlying choices and judgments, and their influence on purchase decisions, attitudes, and persuasion. I have guided and supervised numerous Ph.D. students in their research. I have also served as the advisor for multiple Ph.D. students who are or were professors at such institutions as University of Chicago Booth School of Business, Harvard Business School, National University of Singapore (NUS), Tsinghua University, and The Wharton School at the University of Pennsylvania.

8.      I have conducted, supervised, and evaluated thousands of marketing research surveys, including many related to consumer behavior and decision making, likelihood of confusion, sales promotions, marketing strategies, branding, trademark/trade dress, patents, and advertising-related issues.

9.      I have served on the editorial boards and as a frequent reviewer for leading journals in our field, such as the *Journal of Marketing Research*. I have served as a Guest Editor for the *Journal of Marketing Research* and as a Guest Associate Editor for *Marketing Science* and *Management Science*. I have served on the editorial board of, and received the "*Outstanding Reviewer Award*" from, the *Journal of Consumer Research*. I have also served on the editorial boards of the *Journal of Consumer Psychology* and the *International Journal of Research in Marketing*. I am a frequent reviewer of articles submitted to journals in our and other fields, such as marketing, psychology, decision making, and economics. As a reviewer, I am asked to evaluate the research of scholars wishing to publish their articles in leading scholarly journals.

10.      I have worked as a consultant for companies and organizations on a variety of topics, including strategy, marketing, consumer behavior and perception, promotions, branding, advertising, and incentives. Additionally, I have served as an expert in litigation and adversarial proceedings, including in front of the National Advertising Division of the Better Business Bureaus National Programs ("NAD"), involving various marketing and buyer behavior issues, false advertising, market surveys, patent infringement, trademark and trade dress related matters,

branding, retailing, promotions, and other areas.  I have also been invited to present at the annual NAD Law Conference, and I have served as an expert witness for the Federal Trade Commission.

11.    My opinions and testimony have been favorably cited and relied upon by courts across the United States.[4]  A list of cases in which I provided sworn testimony at trial and/or by deposition during the past four years is included in Exhibit B.

12.    I am being compensated in this matter at a rate of $950 an hour.  My compensation does not depend in any way on my opinion or the outcome of this matter.

13.    My analyses are based on, *inter alia*, the brands, products, packaging, marketing, and websites relevant to the market for AFCI circuit breakers; existing scientific research and treatises regarding survey design, customer behavior, and decision making; general principles of marketing and psychology; deposition testimony; various documents produced by the parties in this litigation; and various publicly available websites and sources.  In conducting my analysis, I reviewed certain documents, including, but not limited to, documents that I relied on in connection with the preparation of this *Rebuttal Expert Report*.[5]  Those documents are referenced herein and/or listed in Exhibit C.  I also held conference calls with Siemens

---

[4] *See, e.g., California v. Kohl's Department Stores, Inc. et al.*, No. BC643037 (Cal. Superior Court L.A. Cnty Jul. 13, 2021) (noting, *e.g.*, that: "As carefully reviewed by Kohl's rebuttal expert, Ran Kivetz, Ph.D., who the Court found highly competent and entirely credible based on his outstanding academic credentials, his thorough research into Dr. Compeau's reports and his appearance and candor while testifying[.]"; and "[t]he Court accepts as entirely credible and supported by sound scientific analysis, the conclusion of Dr. Kivetz, that none of the articles referenced in Dr. Compeau's reports provide valid scientific evidence for [Dr. Compeau's] opinion [.]"); *Flodin v. Central Garden & Pet Co.*, 21-cv-01631-JST, 2024 WL 4565340, at *10 (N.D. Cal. Oct. 23, 2024) (quoting my testimony criticizing a proposed conjoint survey in denying motion for class certification); *Yates et al. v. Traeger Pellet Grills, LLC*, 2:19-CV-00723-DAK-CMR (D. Utah, July 1, 2024) (denying summary judgment on materiality and noting that: "While Plaintiffs have evidence of materiality from past Traeger studies, Traeger has submitted evidence of lack of materiality. Traeger's expert witness, Dr. Kivetz, conducted two consumer surveys with over 800 participants on precisely this question. The surveys conclusively showed that the alleged omissions were not material to the buying decisions of consumers."); *Dyson, Inc. v. Bissell Homecare, Inc.*, 951 F.Supp.2d 1009, 1019 (N.D. Illinois, 2013) (upholding the methodology, questions, and coding of my survey and denying Bissell's motion to exclude my expert report); *Masimo Corporation et al. v. Apple, Inc.*, 8:20-cv-00048-JVS (C.D. Cal., May 4, 2023, Order Granting-In-Part and Denying-In-Part Apple's Rule 50(a) Motion and Denying Plaintiffs' Rule 50(a) Motion) (citing to my testimony as evidence that the Plaintiffs' alleged business and marketing trade secrets were generally known prior to the alleged misappropriation at issue); Pretrial Conference in *Beef Products, Inc., et al. v. American Broadcasting Companies, Inc., et al.*, No. 12-292 (Union Cnty Cir. Court, First Judicial Circuit, S.D. 2017) (denying motion to exclude my testimony).

[5] I received research assistance from support staff at my direction and guidance.

employees, namely: Ashley Kees, Product Manager; Randall Dollar, Codes & Standards Director; Michael Woods, Director of Electronics Research & Development; Matthew Leidy, Research & Development Systems Architect; and Hugh Kinsel, Principal Engineer.[6]

14.     I have personal knowledge of the matters set forth in this report and, if called to testify at a hearing or trial in this matter, would so state.  Any, and all, of the opinions expressed herein are held to a reasonable degree of professional certainty.  The information on which I relied consists of the type of information that is reasonably relied upon in my field of expertise.

## INTRODUCTION AND SUMMARY OF CONCLUSIONS

15.     In the interest of brevity and organization, I set forth in this executive summary my understanding of the allegations in this matter and my key conclusions.  The scientific analyses and substantiation from which I derived these conclusions are set forth in the remainder of my report (Sections A through E).

## Understanding of Key Allegations and Issues in this Litigation

16.     The products at issue in this matter are Arc Fault Circuit Interrupters (AFCIs), which I understand are a "type of circuit breaker with electronic components designed to protect homes and businesses from an electrical arc fault—a potential dangerous electrical condition where the electrical current travels through an unintended medium, usually the air, instead of through the circuit as intended."[7]  AFCI manufacturers employ "sophisticated circuitry to identify dangerous electrical arcing and trip the breaker in response,"[8] thereby preventing dangerous electrical arcs from causing fires and other harm[9] (*e.g.*, death, injury, property

---

[6] Interviews held on November 19, 2025 (the "November 19, 2025 Interview"), November 26, 2025 (the "November 26, 2025 Interview), and December 4, 2025 (the "December 4, 2025 Interview"), each with outside counsel for Siemens present.

[7] Second Amended Consolidated Class Action Complaint ("Complaint"), ¶ 1.  I understand that the at-issue Siemens AFCIs are *Combination* Arc Fault Circuit Interrupters (CAFCIs), which offer both "parallel" and "series" arc protection and is required by the National Electric Code (NEC) as of 2008; *see, e.g.*, NEMA AFCI Safety, https://www.afcisafety.org/afci/why-afci/; Gubitz, Wes (2019), *Jade Learning*, https://www.jadelearning.com/blog/combination-arc-fault-circuit-breaker-vs-dual-function-arc-fault-gfci-circuit-breaker/.  Because the terms "CAFCIs" and "AFCIs" are frequently used interchangeably, unless otherwise indicated, I will use "AFCI" to encompass all AFCIs (including CAFCIs).

[8] Complaint, ¶ 2.

[9] *Ibid*.

---

damage).[10]  The National Electric Code (NEC) requires the application of AFCIs (and in some cases "dual-function" AFCI/GFCI breakers) to "circuits in various locations of a residence."[11]

17.     The Plaintiffs allege that Siemens-branded AFCI circuit breakers[12] are "defective" because they suffer from "nuisance tripping, where the breakers frequently and unnecessarily trip even where no dangerous electrical arc is present and there is no risk of electrical harm"[13] (the "alleged 'defect'").  According to the Plaintiffs:[14]

> Specifically, Siemens has failed to update its AFCIs to identify and ignore harmless arcing signatures caused by common appliances, especially as new appliances have been developed and electrical codes have expanded the locations where homeowners are required to use AFCIs. Rather, Siemens AFCIs trip in the presence of common appliances, even though they do not pose a risk due to electrical arcing, leading to excessive and frequent nuisance tripping.

18.     The Complaint further alleges that Siemens failed to disclose to customers that its AFCIs "suffered from frequent and unnecessary nuisance tripping"[15] (the "alleged omission"), which commonly misled the putative class members into purchasing and/or paying a price premium for the at-issue Siemens AFCI products.[16]

---

[10] *See, e.g.*, NEMA_S-0004202 – 03 (*e.g.*, "AFCIs provide affordable fire protection by instantly de-energizing arc faults that standard circuit breakers cannot"; "Each year 25,000 electrical fires occur in the U.S. killing hundreds, injuring thousands and resulting in more than $1 billion in property damage, according to the U.S. Fire Administration (USFA)"; "The Consumer Product Safety Commission (CPSC) estimates nearly 50 percent of all home electrical fires annually could be prevented with AFCIs").

[11] Durham Report, ¶ 78.

[12] The Complaint challenges all Siemens AFCI breakers and does not distinguish between different types or generations of these breakers.  However, Dr. Caves, the Plaintiffs' designated damages expert, states that he was asked to assume "that the Class AFCIs include all single-function AFCIs [*i.e.*, *non*-dual-function AFCIs] sold between January 1, 2017 and December 10, 2021 (the 'Damages Period'), when Siemens released its 'Gen 4B' AFCIs" [FNs omitted]); Caves Report, ¶ 11.

[13] Complaint, ¶ 5.

[14] *Ibid*.

[15] *Id*., ¶ 9.  *See also id*., p. 22 ("Siemens Omitted and Concealed its AFCI Breakers' High Nuisance Trip Rate").

[16] *See, e.g., id*., ¶¶ 9 ("Had Siemens disclosed that its AFCIs suffered from frequent and unnecessary nuisance tripping, these Plaintiffs would not have purchased Siemens' AFCIs or installed them in their customers' homes or would not have had to exhaust time and effort searching for the cause of the nuisance tripping occurring due to Siemens' defective AFCIs"), 191 ("The defects Siemens concealed were material. Plaintiffs would not have purchased AFCI breakers that, like Siemens' AFCIs, failed to perform their essential purpose and caused them to repeatedly and unnecessary trip even when no dangerous arcing was occurring in the circuit"), & 193 ("Siemens' fraudulent concealment of defects in its AFCI breakers caused Plaintiffs' injuries. Plaintiffs purchased Siemens' AFCI breakers and paid a premium for Siemens' AFCI breaker because Siemens represented the AFCI breaker could perform functions that the breaker did

19.     The Plaintiffs seek to certify the following two classes:[17]

**Consumer Class.** Any person in the United States who purchased a Siemens' AFCI breaker, except for resale.

**Commercial Class.** Any business in the United States that installed and investigated, resolved, or attempted to resolve tripping presented by a Siemens' AFCI breaker.

In the alternative, the Plaintiffs propose subclasses consisting of "any person or business entity" who purchased a Siemens AFCI breaker and is located in the following states: California, Maine, Nebraska, New Hampshire, North Carolina, Oregon, Pennsylvania, Texas, and Wisconsin.[18] According to the Plaintiffs, the proposed class period "starts from the length of the greatest applicable statute of limitations to the present";[19] the Caves Report defines the "Damages Period" as between January 1, 2017 and December 10, 2021.[20]

20.     I understand that Dr. Robert Durham, the Plaintiff's designated technical expert, has offered opinions regarding "the design, performance, and behavior of Siemens Combination Arc Fault Circuit Interrupter (AFCI) breakers, with specific attention to the causes of reported nuisance tripping and Siemens' technical understanding and handling of those issues."[21]

21.     I understand that in the present litigation, Siemens contends that:

- Siemens's AFCI breakers are not "defective" but rather perform their main safety function as designed and intended, namely, to trip upon detection of a potentially dangerous electrical arc;[22]

- Siemens's AFCIs have all passed relevant industry-standard testing (*i.e.*, per UL 1699, which includes "nuisance tripping" tests) in addition to Siemens' own internal testing, prior to going to market;[23]

---

not perform and that, any nuisance tripping of the breaker was not due to any defect"), 221 ("Had Plaintiffs known that Siemens' AFCI breakers were defective and could not function as promised, Plaintiffs would have purchased a competitor's AFCI breaker instead, or paid less for the Siemens' AFCI breakers").

[17] *Id.*, ¶ 174.
[18] *Id.*, ¶ 176.
[19] *Id.*, ¶ 175.
[20] Caves Report, ¶ 11.
[21] Durham Report, ¶ 8.
[22] *See, e.g.*, Kees 30(b)(6) Deposition, p. 48 ("Because the AFCI needs to trip if it sees these arcing conditions. It's a safety device"). *See also* Subsection B.2 for more references.
[23] *See, e.g.*, Hewitt Deposition, pp. 11 & 13; Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories ("Siemens's Responses to First Set of Interrogatories"), pp. 9 – 10. *See also* Subsection B.2 for more references.

---

- "nuisance tripping" (or "unwanted tripping") is not a "defect" but is an interoperability or incompatibility issue with certain models of home electrical products (*e.g.*, microwaves, LED lighting), which can create a load or combination of loads that emit current signatures (or "waveforms") mimicking an arc fault;[24]

- all manufacturers of AFCIs  contend with some non-zero rate of "nuisance tripping" ▮ ▮ );[25]

- "nuisance tripping" events are rare when considering the number of Siemens AFCIs shipped;[26]

- unwanted tripping events are frequently misdiagnosed as "nuisance tripping" and are instead caused by myriad factors (*e.g.*, faulty or damaged wiring, damaged or non-compliant household appliances), some of which may signal a real electrical danger;[27] and

- Siemens has consistently updated its AFCI breaker technology over time to reduce perceived "nuisance tripping" and mitigate effects caused by interoperability issues with selected home electrical products.[28]

**Summary of Key Conclusions Regarding the Caves Report and the Caves Conjoint Survey**

22. In his declaration submitted on behalf of the Plaintiffs and in support of class certification, Dr. Caves reports the design and results of a choice-based conjoint ("CBC") survey (the "Caves Conjoint Survey") intended to estimate the alleged "price premium" solely attributable to the omission of the alleged "defect." Dr. Caves claims that his price premium calculation measures:[29]

> [...] the difference between the economic value of the Class AFCIs without the Alleged Defect and the economic value of the Class AFCIs with the Alleged Defect, based on the decrease in the market price that would have occurred if the Nuisance Tripping Defect had been disclosed at the point of purchase.

From his survey's results, Dr. Caves opines:[30]

---

[24] *See, e.g.*, SIEMENS_AFCI_00362724 at 26. *See also* Subsection B.2 for more references.

[25] *See, e.g.*, SIEMENS_AFCI_00122997. *See also* Subsections B.2 & B.3 for more references.

[26] *See, e.g.*, SIEMENS_AFCI_00047353; SIEMENS_AFCI_00004504. *See also* Subsection B.3 for more references.

[27] *See, e.g.*, SIEMENS_AFCI_00020560. *See also* Subsections B.2 & B.3 for more references.

[28] *See, e.g.*, Siemens's Responses to First Set of Interrogatories, pp. 7 – 9; Kees 30(b)(6) Deposition, p. 52 ("When there was noncompliant lights causing a problem for one of our breakers, and then we updated it to be able to work with those lights"). *See also* Subsections B.2 & B.3 for more references.

[29] Caves Report, ¶ 51.

[30] *Id.*, ¶ 72.

I conclude that Siemens' failure to disclose the Alleged Defect at the point of purchase resulted in Class Members paying a Price Premium of 32 percent.

23.    Based on the materials on which I have relied, the scientific analyses I have conducted, and my background and expertise, my professional opinion is that the Caves Conjoint Survey is fatally flawed and generates an artificially inflated, unreliable, and invalid estimate that cannot be used to derive conclusions about any economic injury allegedly inflicted classwide.  I summarize my conclusions below.

**(1) Dr. Caves's "Nuisance Tripping Defect" Attribute is Leading and Misrepresents the Alleged Omission, Generating an Invalid and Artificially Inflated Alleged Price Premium** [31]

- As numerous authorities (both scholars and practitioners) in the field of conjoint analysis recognize, the attributes and attribute levels in a proper conjoint survey must be worded and described in a way that is non-leading, clear, concrete, and objectively interpretable to participants.  However, Dr. Caves's "Nuisance Tripping Defect" disclosure—which appeared as a separate attribute in his survey—is severely flawed and upward biased the alleged price premium estimate in multiple ways.

*Dr. Caves's description of the "nuisance tripping defect" disclosure is leading, biased, and does not resemble language that AFCI manufacturers would use.*

- To be valid, a disclosure in a survey must provide the appropriate amount of information and should not generate erroneous beliefs that lead respondents in a particular direction.  Dr. Caves's "Nuisance Tripping Defect" disclosure—whose wording he based on selected paragraphs from the Durham Report—is unrealistic and fails in both respects.

- The Caves Conjoint Survey inappropriately refers to "nuisance tripping" as a "defect."
  - Dr. Caves's use of the term "defect" to characterize "nuisance tripping" does not accurately characterize the issue and is instead leading and slanted.  Available evidence indicates that "nuisance tripping defect" is not a phrase commonly used in the electrical industry, nor do electricians typically refer to "nuisance tripping" or a breaker's incompatibility with certain household products as a "defect."
  - Consistent with academic literature on negativity bias and the psychology of framing, the same product can be perceived in a less favorable light when labeled using a negative (vs. positive or neutral) frame.
  - Calling something a "defect" or "defective" may also (inaccurately) imply to some customers that the product does not work as intended in some major way (*e.g.*, does not meet the manufacturer's own standard) or fails to meet a clear industry standard.  This is particularly problematic given that an AFCI breaker that does not work as intended would more accurately be described be a breaker that *fails to trip*

---

[31] *See* Section B (B.1 – B.5) of this *Rebuttal Expert Report*.

when it should have (*i.e.*, a "miss" or "false negative"), compared to a breaker that may occasionally trip when it should not have (*i.e.*, a "false positive").[32]

- Dr. Caves's "Nuisance Tripping Defect" disclosure omits relevant information.
  - o Other leading statements in Dr. Caves's lengthy description of the so-called "Nuisance Tripping Defect" omit relevant information, including the safety benefits of AFCIs, the fact that perceived "nuisance trip" events are not always caused by the use of common household products and may signal a serious electrical hazard, and the fact that "nuisance tripping" rates have decreased over time with updates in AFCI technology.
  - o Telling participants that "certain AFCIs" carry the "defect" may (erroneously) imply that whether any given breaker is "defective," and hence whether it "nuisance trip," is deterministic and known (or could be known) in advance.
  - o The long list of "common" household appliances, electrical devices, and lighting in Dr. Caves's description, which treats all types and models of products as equally likely to cause "nuisance tripping" and omits any information on the frequency of such tripping, is likely to have conveyed to at least some participants that "nuisance tripping" is bound to occur rather than rare and context dependent.
  - o Dr. Caves's representation about what manufacturers supposedly "have claimed"[33] is also inaccurate and ignores information that these manufacturers either have communicated or are more likely to communicate to customers.
- Dr. Caves's description of the "Nuisance Tripping Defect" disclosure artificially highlighted this attribute compared to other attributes.
  - o Consistent with research on conjoint analysis methodologies, the mere inclusion of a "Nuisance Tripping Defect" disclosure as an attribute (outside the context of any customer-facing marketing) induces a focalism bias, inflating the "importance" participants attached to this attribute.
  - o Unlike in the Caves Conjoint Survey, AFCI manufacturers do not "disclose" "nuisance tripping" as a product "defect" but instead typically discuss unwanted tripping as a potential incompatibility issue with certain household appliance models and, accordingly, provide guidelines for diagnosing and troubleshooting this issue. The appearance of Dr. Caves's novel "disclosure" is likely to have led some participants to assume that the AFCI profiles with this "defect" must have some technical abnormality or pose a more serious problem with "nuisance tripping" compared to what they might otherwise expect to encounter in the field.
  - o Dr. Caves's 8-paragraph, 234-word description of the "Nuisance Tripping Defect" is also highly likely to stand out from participants' perspective because it:

---

[32] Had participants been asked to make tradeoffs between less "sensitive" AFCIs (*i.e.*, that do not "nuisance trip" but have a non-trivial chance of failing to trip in the presence of a dangerous arc) compared to more "sensitive" AFCIs (*i.e.*, that may "nuisance trip" but are much more likely to trip when detecting a dangerous arc), they may very well have preferred AFCIs with greater sensitivity.

[33] The last paragraph of Dr. Caves's "disclosure" states: "Manufacturers of AFCIs with the Nuisance Tripping Defect have claimed their AFCIs are not designed to exclusively identify a true arc, but instead trip when they detect any signal that resembles an arc, even if that signal comes from a safe and properly functioning device"; *see* Caves Report, Appendix A, p. 24.

apparently *always* came first during the survey's introduction of attributes; is the *only* attribute included in his conjoint survey that would be perceived as negative in tone and content; and is by far the longest of all the attributes presented.

  o Dr. Caves has provided no evidence as to why or how his "disclosure" could plausibly be displayed to customers at the point of purchase. His decontextualized presentation further highlighted the "disclosure" and exacerbated the survey's demand and focalism biases.

***The two levels of Dr. Caves's "Nuisance Tripping Defect" attribute are leading, unclear, and misrepresent marketplace reality, thereby likely generating confusion and erroneous customer beliefs and choices.***

- The presence versus absence of the "Nuisance Tripping Defect" disclosure was represented to participants as "DEFECTIVE: Prone to Nuisance Tripping" versus "NOT DEFECTIVE," respectively. These attribute levels are *not* clearly defined and are highly likely to lead participants to overestimate the importance of Dr. Caves's "disclosure."

- The phrase "DEFECTIVE: Prone to Nuisance Tripping" is vague and unclear, while also omitting relevant information.

  o Participants were given no context and left to form their own subjective interpretations or impressions as to how frequently "nuisance tripping" would occur for a hypothetical AFCI breaker carrying this "defect." Nor was any information provided about whether "proneness" to "nuisance tripping" depends on various contributing factors, including the specific types, models/makes, and service life of household devices and appliances; the model or generation of the AFCI breaker in question; and myriad technical factors.

  o To the extent that participants believed that any breaker labeled as "DEFECTIVE: Prone to Nuisance Tripping" meant that the breaker will always be *more likely than not* to experience a "nuisance trip," such a belief would not be accurate, because documented occurrences of "nuisance tripping" industry-wide (including with Siemens AFCIs) have been and remain relatively *rare* ████████████████ ███████████████.

- Dr. Caves's use of the phrase "NOT DEFECTIVE" is fundamentally improper.

  o Not only is this attribute level commercially unrealistic (as no manufacturer would, to the best of my awareness, label their product "NOT DEFECTIVE"), but it is also an *inaccurate* counterfactual or benchmark, as it likely conveyed to many participants that AFCIs labeled as "NOT DEFECTIVE" never cause "nuisance tripping" (or are not "prone" at all to "nuisance tripping"), when such standards and performance do not exist in the actual marketplace.[34]

---

[34] The notion that all AFCI manufacturers (including the three competitor brands included in the Caves Conjoint Survey) face the potential for some non-zero rate of "nuisance trip" events is supported by multiple sources, including: industry articles and troubleshooting resources; the existence of a task force of circuit breaker and appliance manufacturers dedicated to reducing "nuisance tripping" (whose members include Siemens, Eaton, Schneider/Square D, and ABB/GE); deposition testimony; the absence of any evidence that manufacturers other than Siemens do not experience "nuisance tripping" issues;

- Because participants were exposed to some AFCIs labeled as "DEFECTIVE: Prone to Nuisance Tripping" and others labeled as "NOT DEFECTIVE," it is highly likely that many participants (erroneously) inferred: (*i*) that it is possible to engineer AFCIs that are *not* "prone to nuisance tripping" at all or would never "nuisance trip"; and (*ii*) that they should think about the "defect" as a binary metric (*i.e.*, an AFCI either does or does not "nuisance trip"), as opposed to considering the *degree, probability, or frequency of* "nuisance tripping."

- As the Plaintiffs and their technical expert acknowledge, the allegations pertain to purportedly "excessive" rates of "nuisance tripping," making the issue one of frequency. By using a binary or categorical comparison (essentially juxtaposing breakers that either will or will not "nuisance" trip), the Caves Conjoint Survey generated an artificially inflated, overstated alleged price premium for this attribute.

  - In conjoint analysis, a larger range in an attribute generates a greater relative importance, or weight, for that attribute.  Thus, participants are much more likely to attach greater importance to a "nuisance tripping" attribute if shown levels that essentially communicate a 0% versus 100% chance that a breaker will "nuisance trip," as opposed to, for example, levels that communicate lower and narrower likelihoods of "nuisance tripping" (*e.g.*, 5% versus 10% chance).

- Had Dr. Caves presented a fair, accurate, and realistic disclosure related to "nuisance tripping," it could very well have been immaterial to electricians' purchase decisions.

  - For example, if participants were informed that all AFCIs may experience some (small but non-zero) rates of "nuisance tripping," it is likely customers would no longer view this "defect" as a meaningful, differentiating factor.

- Overall, the Caves Conjoint Survey's binary definition of a so-called "Nuisance Tripping Defect" artificially inflated the price premium estimate for this "disclosure" and failed to adequately address the Plaintiffs' theory of liability.  Even if all other aspects of Dr. Caves's conjoint survey were valid and reliable (they were not), his purported price premium estimate would still be overstated.

***The leading nature of Dr. Caves's "Nuisance Tripping Defect" disclosure is exacerbated by the survey's repeated stimuli presentation.***

- The Caves Conjoint Survey's repeated stimuli presentation exacerbated its leading nature, further contributing to inflated and invalid Willingness-to-Pay ("WTP")[35] estimates.

---

"; and even Dr. Caves's own "cognitive interviews" of 15 electricians.

[35] "Willingness to pay" (WTP) is a subjective, demand-based measure of valuation that refers to the maximum price at which consumers would purchase a product unit; that is, "a consumer should be indifferent between having the product or not having the product with an additional income equal to the WTP"; *see* Allenby, Greg M., Jeff D. Brazell, John R. Howell, and Peter E. Rossi (2014b), "Economic Valuation of Product Features," *Quantitative Marketing and Economics*, 12(4), 421 – 456; Orme, Bryan K. (2020), *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research (4th ed.)*, Madison, WI: Research Publishers LLC, p. 430.

    o   The survey's design overly sensitized participants to the "Nuisance Tripping Defect" disclosure across 12 repeated conjoint tasks, guaranteeing participants' attention to this disclosure and inflating its price premium estimate.

***Dr. Caves's reliance on the Durham Report and the Plaintiffs' counsel for the phrasing of the "Nuisance Tripping Defect" disclosure is inconsistent with the methods and principles relied on in the relevant scientific field.***

- To the extent that Dr. Caves would disavow responsibility with respect to the phrasing of his "disclosure," this would not be appropriate and would imply that a survey expert has no obligation to ensure that key elements of the survey—such as the focal attribute of interest—are non-leading and clear to participants, so long as the survey tests the language preferred by the party on whose behalf the survey is conducted.

- In a case such as this where multiple possible "disclosures" can address the alleged omission, the responsibility of appropriately crafting that disclosure lies with the *survey expert*, not with the party on whose behalf the survey is being conducted.

## (2) The Caves Conjoint Survey is Contrived and Severely Deviates from Electricians' Purchase Decision-Making Process [36]

- A key and fatal methodological flaw in Dr. Caves's conjoint survey is its disassociation from marketplace conditions. In particular, the survey induced severe demand and focalism biases[37] by presenting stimuli and attributes in a decontextualized manner that bears *no* resemblance to how electricians actually make AFCI purchase decisions and what information they would realistically encounter in the real world.

- The complete lack of task realism in the Caves Conjoint Survey is such that it renders the survey ***fundamentally invalid and uncorrectable***. This is because an underlying assumption of conjoint analysis is that the choices and tradeoffs presented to participants realistically reflect the choices and tradeoffs that people make in the real world. When this assumption is violated, as it was in the Caves Conjoint Survey, any observed "choices" and "valuation" for the attribute of interest are an artifact of the survey's contrived scenario forced on participants and cannot be used to derive alleged price premia or damages attributable to a given attribute.

*(Continues on next page)*

---

[36] *See* Section C (C.1 – C.2) of this *Rebuttal Expert Report*.

[37] *Demand effects*, which generate predictable, yet biased, responses, relate to the phenomenon whereby survey participants use cues provided by the survey procedure, stimuli, and/or questions to figure out the purpose of the study and the answers expected by the researcher. A *"focalism"* bias (or *"focusing illusion"*) occurs when participants are manipulated to focus on specific aspects presented to the survey—and not enough on other information that is made less salient or unavailable—in turn causing specific aspects to receive more attention and weight than they do under actual marketplace conditions. For references, *see* Subsection A.2 of this *Rebuttal Expert Report*.

***The Caves Conjoint Survey's instructions are unclear, unrealistic, and biased.***

- The assumptions that participants were asked to make prior to and during the conjoint exercise regarding their "typical project(s)/inventory"[38] are unrealistic, unclear, and highly likely to be confusing.
    - Such instructions do not specify the purchase context or "project" for which the participant is buying an AFCI, which can vary considerably across purchasers.
    - Available evidence indicates that electricians' purchase decisions regarding AFCIs depend on specific situational factors, such as: (*i*) *why and for whom* they are purchasing the breakers; (*ii*) *the type of building* they are installing the breakers in; and (*iii*) *the type of room(s)* in the building where they plan to install these breakers.  None of this basic information was provided in the Caves Conjoint Survey.
    - In addition, choices among AFCI breakers are predominantly determined by technical compatibility considerations, including whether the brand of the breaker is *compatible* with (*i.e.*, in most cases, matches) the brand of the panel box and whether the breaker aligns with the required circuit load.
    - Given that participants were forced to consider hypothetical tradeoffs that they likely would not encounter in the real world, Dr. Cave's vague instruction to take panel brand compatibility into consideration is inadequate and meaningless.  Far from accounting for compatibility, this instruction likely led many participants to simply ignore it and to assume that whatever brands of hypothetical breakers they are shown will be compatible, thereby artificially depressing the importance participants would otherwise attach to brand while artificially inflating the weight attached to the "Nuisance Tripping Defect" disclosure.
- The instruction to assume all the AFCIs shown have very similar or identical features except for the features in the survey as well as the introductory descriptions of attributes preceding the conjoint tasks further exacerbated the Caves Conjoint Survey's focalism.
- Instructing participants to imagine both (*i*) that they are in the market to buy an AFCI and (*ii*) that the three AFCIs shown in each choice task are the *only* three types available all but informs the participants that they should indicate that they would purchase one of those three options—even if in the real world they would consider none based on code compliance alone.

***The Caves Conjoint Survey's presentation of attributes, particularly the "Nuisance Tripping Defect" disclosure, is contrived, out of context, and fails to represent how electricians would make purchase decisions.***

- Dr. Caves asserts that his disclosure is "designed to model disclosure of the Alleged Defect to the customer at the point of purchase."[39]  But Dr. Caves failed to give participants any information whatsoever as to how or where his so-called "Nuisance Tripping Defect"

---

[38] Participants were told: "For the remainder of this survey, please assume you are in the market to purchase **AFCIs** for a typical project or projects, or for general inventory. If the typical project(s)/inventory you have in mind would require AFCIs to be compatible with the panels of specific brands or manufacturers, please take this into consideration when deciding on your answer"; *see* Caves Report, Appendix A, p. 21.

[39] Caves Report, ¶ 40.

disclosure would actually be displayed at the point of purchase (*e.g.*, on a sticker printed on the breaker, on a packaging insert, on in-store signage, on the manufacturer's website, in a brochure, in an installation manual, in a troubleshooting guide, or any other medium).

- Unlike any of the typical purchase channels electricians would use (*e.g.*, distributors, big box retailers, online retailers like Amazon), each of which have their own array of information to which electricians would typically be exposed, participants in the Caves Conjoint Survey were abruptly presented with a table of pre-selected attributes, without any other accompanying visual or textual information.
  - o By presenting his "disclosure" in a decontextualized vacuum, Dr. Caves deprived participants of relevant information while distorting their comprehension and interpretation of the singled-out "disclosure."
- The Caves Conjoint Survey also included attributes and attribute levels that do not align with standard industry parlance (*e.g.*, calling AFCIs a "single function") and that may be confusing to participants (*e.g.*, ignoring that a "plug-on neutral" AFCI cannot simply substitute for a "plug-in pigtail" AFCI).
- Nor does the survey capture additional relevant factors in electricians' choices, including: preexisting distributor relationships (including perceived convenience); perceived customer service quality associated with the breaker's manufacturer; availability constraints; and other differentiators, such as diagnostics tools and breaker size.
- Overall, Dr. Caves's survey—with respect to its instructions, attribute presentation, and overall CBC task—is fundamentally unrealistic and deviates sharply from the information and decision environment that AFCI purchasers would ever encounter, virtually *guaranteeing* participants' attention to (and inflated valuation of) the "defect" disclosure.

### (3) Dr. Caves's 15 "Cognitive Interviews" are Incapable of Showing that his Conjoint Survey is Clear, Realistic, or Unbiased, and These Interviews Show, if Anything, that the Survey is Unclear, Unrealistic, and Biased [40]

*Dr. Caves's 15 "cognitive interviews" are entirely insufficient for validating the clarity, realism, or design of the Caves Conjoint Survey.*

- The "cognitive interviews" that Dr. Caves conducted with 15 electricians—using a qualitative, conversation-based approach that did not ensure an objective interview procedure—are entirely insufficient for ensuring that the survey was clear, comprehensible, or realistic; and cannot detect whether the conjoint survey is susceptible to demand effects or other severe biases.

*Dr. Caves's "cognitive interviews" provide further evidence that his conjoint survey was confusing, unrealistic, and biased.*

- While Dr. Caves's 15 interviews cannot be used to *validate* his conjoint survey, they do provide evidence that further *invalidates* this survey by lending insight into how the CBC task likely confused participants and forced them to make unrealistic, biased choices.
- Dr. Caves's interviews further indicate that compatibility constraints are a dominating purchase factor and show that interviewees were confused by the conjoint choice task.

---

[40] *See* Section D (D.1 – D.3) of this *Rebuttal Expert Report*.

- o All 15 electricians indicated that brand and compatibility issues, especially between breakers and panel boxes, are a major, dominant (or even overriding) purchase factor. Interviewees repeatedly cited such compatibility constraints as factors that "limit," "dictate," or even "predetermine" their AFCI breaker choices.
  - o The artificial nature of Dr. Caves's choice exercise was also noted by multiple interviewees, who expressed confusion about the lack of context provided and what assumptions they were supposed to make. For example, interviewees referred to the questions or scenario as "a trick question," "unfair to ask," "confusing," "loaded," and "hard to answer."

- Dr. Caves's "cognitive interviews" show that interviewees were confused about the "Nuisance Tripping Defect" disclosure and held different views of "nuisance tripping" compared to Dr. Caves's representation in his "disclosure."
  - o While all 15 electricians were familiar with "nuisance tripping," there was *no* indication that they thought of this phenomenon as a "defect" or as meaning that an AFCI breaker is therefore "defective."[41]
  - o Multiple interviewees indicated that Dr. Caves's "Nuisance Tripping Defect" disclosure attribute was vague and confusing,[42] and that they would never install a product in a customer's home labeled as "defective."
  - o Instead, consistent with available evidence in this litigation, Dr. Caves's interviewees discussed concepts that indicate a more accurate and balanced view of "nuisance tripping" compared to its representation in Dr. Caves's "disclosure."[43]

- Dr. Caves's "cognitive interviews" show that the Caves Conjoint Survey is further unrealistic by failing to represent other relevant purchase considerations (*e.g.*, distributor relationships and benefits, convenience, and availability constraints).

- Overall, electricians whom Dr. Caves interviewed repeatedly (*i*) reaffirmed that their "choice" of which AFCI to buy is highly context-dependent and determined by situational or project-specific constraints; and (*ii*) communicated to Dr. Caves that the choice exercise was confusing, missing important context, and did not represent how electricians typically viewed "nuisance tripping." Nevertheless, Dr. Caves proceeded to conduct his conjoint survey and treat its results as informative.
  - o Even if Dr. Caves were to incorporate all or most of the feedback from his interviews (which he did *not*), this would not have "corrected" his conjoint survey, which suffers from fundamental and invalidating flaws in its complete lack of marketplace and task realism.

---

[41] One interviewee commented remarked that they found the word "defect" to be "strange," explaining that they viewed a "defective" breaker as one that does *not* trip when it should (which creates a fire hazard); Interview #4, pp. 18 – 19.

[42] One interviewee expressed considerable confusion and surprise at the notion that there could even exist an AFCI breaker on the market that is *not* "defective" in the sense of not causing any "nuisance tripping, calling such a technology a "magic bullet"; Interview #3, pp. 21 – 22.

[43] *See* Subsection D.2.2 of this *Rebuttal Expert Report*.

**(4) The Results of the Caves Conjoint Survey Evidence its Biased and Unrealistic Design** [44]

*Dr. Caves's conjoint survey data reveal substantial "extreme response bias."*

- One empirical indicator that survey participants are not making realistic choices and decisions is "extreme response behavior" (or "extreme response bias"), whereby participants either *always* or almost *never* select the "no purchase" option *across all choice sets.*
  - This is especially true here, because electricians would typically narrow down their consideration set to a small number of AFCIs (or even to a single AFCI brand) due to compatibility constraints. It would thus be unrealistic for participants faced with only three AFCI profiles per choice task (with varying brands) to intend to purchase one of the AFCIs in *every* triplet of AFCIs they are shown.
- The Caves Conjoint Survey's instructions, design, and failure to rotate the position of the price attribute likely contributed to the substantial "extreme response bias" in his data.
  - Specifically, the ***vast majority*** (***83%*** of) participants ***never*** selected the "no purchase" option (*i.e.,* they *always* indicated they would buy one of the three options presented in all 12 choice tasks).
  - Academic research demonstrates that high rates of extreme response behavior give rise to invalid WTP estimates.

*The Caves Conjoint Survey's results further demonstrate the artificially inflated price premium (or discount) estimated for the "Nuisance Tripping Defect" disclosure.*

- The Caves Conjoint Survey's results reveal an inflated and implausibly high price premium estimate for the alleged omission of a "Nuisance Tripping Defect" disclosure.
- Prior to applying his supply-side-related adjustments, Dr. Caves reported already obtaining an alleged price premium estimate of ▮▮ just for his "disclosure." That is, Siemens would have to discount the price of its "single function" AFCIs by more than ▮▮▮▮▮ in order to sell the same quantity it sold without the "disclosure." After applying his supply-side-related adjustments, Dr. Caves reports an estimate of 32%—meaning that Siemens would still have to discount the price of the at-issue AFCIs by *nearly a third*.
  - Such a result, whereby between one-third to ▮▮▮▮▮ of the total price of a Siemens AFCI breaker is attributed solely to the purported omission of a "Nuisance Tripping Defect" disclosure (when "nuisance tripping" is an industry-wide issue and does not even appear to be typically referred to as a "defect" by electricians) evidences the Caves Conjoint Survey's one-sided biases and unrealistic design.
- Dr. Caves obtained a considerably higher average part-worth (*i.e.,* utility or value) for his "disclosure" than for *all other attributes and features* in his survey *combined*, including brand, despite the fact that brand and other technical compatibility aspects are dominant purchase considerations in the market for AFCIs.
- Using Dr. Caves's own survey data and simulator, I calculated the combined WTP for the combination of the Siemens brand and the alleged omission of the "Nuisance Tripping Defect" disclosure.
  - My analysis shows that, using the same approach as Dr. Caves, the Caves Conjoint Survey implies that just the Siemens brand and the alleged omission of

---

[44] *See* Section E (E.1 – E.2) of this *Rebuttal Expert Report*.

the "Nuisance Tripping Defect" disclosure (*i.e.*, a statement that the product is "NOT DEFECTIVE") account for *93% of customers' WTP for the product*.[45] Moreover, **all other attributes** (including the "function," various technical specifications, and all other aspects *excluded* from the survey) are supposedly valued, per Dr. Caves' conjoint analysis simulation, **at only $3.50 in total**.

- o   Such a finding—whereby just the Siemens brand and the "NOT DEFECTIVE" (vs. "DEFECTIVE: Prone to Nuisance Tripping" statement) are valued by consumers at nearly the *entire* value of the AFCI product—is not sensible and contradicts marketplace reality, as demonstrated by multiple convergent sources, including Dr. Caves's own "cognitive interviews."

- •   Overall, the nonsensical results derived from Dr. Caves's data and simulator evidences the severe one-sided biases in the survey's design and the gross overvaluation in the resulting price premium estimate.  Participants' strong disutility for the "Nuisance Tripping Defect" disclosure is exactly what would be expected from a fatally flawed conjoint survey that, among other things: misrepresented "nuisance tripping" in multiple ways; artificially highlighted the "disclosure"; and presented it in a decontextualized manner that does not remotely replicate the relevant decision environment.

24.     In the remaining subsections, I provide an overview of the Caves Conjoint Survey and then evaluate this survey in light of fundamental principles of survey design.

## A.     OVERVIEW OF THE CAVES CONJOINT SURVEY AND KEY CHALLENGES WHEN USING CONJOINT SURVEYS TO ESTIMATE ALLEGED PRICE PREMIA

### A.1.    Overview of the Caves Conjoint Survey

25.     Dr. Caves states that he was asked by counsel for the Plaintiffs to "assess whether economic injury and aggregate damages to members of the Class [] can be reliably determined using data and methods common to the Class."[46]  According to the Caves Report, the Plaintiffs' theory of liability is based on the following "discrepancies" between the marketing of the at-issue AFCIs in the actual world versus in the counterfactual ("but-for" world):[47]

(1)     how Siemens Industry, Inc. ("Defendant" or "Siemens') marketed Class AFCIs to the Class in the actual world; and

(2)     how Class AFCIs would have been marketed to the Class in the but-for world, in which the certain defects alleged by Plaintiffs (described further below as the "Alleged Defect") would have been disclosed to the Class at the point of purchase.

---

[45] That is, the price would need to be dropped to $3.50 from $51.43 to maintain the ▮▮▮▮ market share observed for the Siemens "single function" product without the "disclosure" in Dr. Caves's simulator.

[46] Caves Report, ¶ 1.

[47] *Ibid.*

26.    By "alleged defect," Dr. Caves refers to an 8-paragraph characterization of a purported "Nuisance Tripping Defect" taken from the report of the Plaintiffs' designated technical expert (Dr. Robert Durham),[48] a characterization that counsel for the Plaintiffs "informed"[49] him was at issue in this litigation.

27.    Dr. Caves relies on a ***Choice-Based Conjoint ("CBC") survey*** to try and quantify the alleged price premium (*i.e.*, the amount or percentage that the putative class members allegedly overpaid) due to the alleged omission—that is, due to Siemens's purported failure to disclose the alleged "defect."[50]  A CBC survey is a type of conjoint analysis intended to measure consumers' preferences by varying product features and asking participants to choose among sets of options or profiles.[51]

28.    The conjoint survey was completed by 500 participants (from a "panel provider contracted by Sawtooth")[52] who reported that they purchased Siemens-branded AFCIs between 2017 and the time of survey administration.[53]  Of the 500 participants, the vast majority (450, or 90%) were licensed electricians in the U.S.; the remaining minority (50, or 10%) were non-electricians who indicated having previously purchased a Siemens AFCI that they installed themselves or purchased a Siemens AFCI as part of their "professional responsibilities."[54]  The Caves Survey attempted to represent the "consumer class" (defined as "[a]ny person in the

---

[48] *Id.*, ¶ 3.

[49] *Ibid.* ("Plaintiffs' counsel has informed me that the following defect described in paragraphs 35 and 36 of the Expert Report of Robert Durham is at issue in this litigation").

[50] *Id.*, ¶¶ 9 – 10.

[51] Conjoint analysis, more generally, is a survey-based statistical method that can be used (where appropriate) to quantify consumers' valuation of different attributes of a product or service.  In a choice-based conjoint, the choices made by survey participants in the conjoint task are then analyzed (or decomposed) to estimate relative values or utilities that consumers place on different attribute levels (*i.e.*, the "partworths").  For a review, *see, e.g.*, Allenby, Greg M., Jeff Brazell, John R. Howell, and Peter E. Rossi (2014a), "Valuation of Patented Product Features," *The Journal of Law and Economics*, 57(3), 629 – 663; Allenby et al. (2014b); Orme, Bryan K. (2010), *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research (2nd Ed.)*, Madison, WI: Research Publishers LLC; Orme, Bryan K. and Keith Chrzan (2021), *Becoming an Expert in Conjoint Analysis: Choice Modeling for Pros, Second Edition*, Orem, Utah: Sawtooth Software, Inc.

[52] Caves Report, ¶¶ 24 & 29 (FN 56).

[53] *Id.*, ¶ 29.

[54] *See, e.g., id.*, Appendix A, pp. 9 (Q8) & 11 (Q10).

---

United States who purchased a Siemens' AFCI breaker, except for resale"),[55] and Dr. Caves admits that he "has not been asked to opine on the Commercial Class,"[56] defined as "[a]ny business in the United States that installed and investigated, resolved, or attempted to resolve tripping presented by a Siemens' AFCI breaker."[57]

29.     After passing the screening questions and answering some demographic questions, participants proceeded to the "conjoint module" consisting of the main CBC survey.[58] First, they were shown a series of screens with instructions, which included specific assumptions they should make[59] and displayed descriptions of the attributes and attribute levels they will be shown (*i.e.*, the "Nuisance Tripping Defect"; manufacturer/brand; "single function" vs. dual function AFCIs; various "technical specifications"; and price).[60]

30.     Next, participants were presented with the actual conjoint survey (*i.e.*, CBC task), where they were asked to make a series of 12 choices.[61]  In each choice task, participants viewed a table of three hypothetical options or "profiles," supposedly representing different AFCI products that varied along five attributes, with the profiles displayed as columns and the attributes displayed as rows.  After being reminded that they should take into consideration any compatibility of panels and AFCIs, participants were asked: "Which, if any of the three AFCIs below would you purchase if these were your only options?"[62]  Participants could select one of the three profiles shown, or a fourth button indicating that they "would not purchase any of these

---

[55] Complaint, ¶ 174.
[56] Caves Report, ¶ 5 & FN 5.
[57] Complaint, ¶ 174.
[58] *See* Caves Report, Appendix A, p. 20.
[59] Participants were told to assume: "For the remainder of this survey, please assume you are in the market to purchase **AFCIs** for a typical project or projects, or for general inventory. If the typical project(s)/inventory you have in mind would require AFCIs to be compatible with the panels of specific brands or manufacturers, please take this into consideration when deciding on your answer" (Q19); and "Please assume that all of the AFCIs you are shown in the survey have very similar or identical features, except for the features that you can actually see in the survey" (Q20).  *See id.*, pp. 21 – 22.  Emphasis in the original.
[60] *See id.*, pp. 24 – 28.
[61] *See id.*, pp. 29 – 31.
[62] *See id.*, p. 29.

three types of AFCIs if these were the only options."[63]  Figure A1 below reproduces a sample

choice task as shown to participants.

**Figure A1: Sample CBC Choice Task in the Caves Conjoint Survey** [64]



Note: The third Attribute is restricted such that all offerings for a given Choice Task have the same Current Rating
(either 15A or 20A).

---

[63] *Ibid.*
[64] *Ibid.*

31.     As reproduced in Figure A2 below, each profile consisted of a "product" configuration that varied along five attributes, with varying levels for each attribute.[65]

**Figure A2: Summary of Attributes and Levels in the Caves Conjoint Survey** [66]

| Attribute | Description | Levels |
|---|---|---|
| | | |
| *Brand* | Manufacturer/Brand | ABB/General Electric |
| | | Eaton |
| | | Siemens |
| | | Schneider Electric (Square D) |
| | | |
| *Function* | Presence/Absence of Ground Fault Detection | Single Function (AFCI) |
| | | Dual Function (AFCI/GFCI) |
| | | |
| *Mounting/Connection/ Current Rating/ Pole(s)/Interruption Rating/Voltage* | Technical Specifications | PLUG-IN PIGTAIL 20A 1-POLE (10kA at 120V) |
| | | PLUG-IN PIGTAIL 15A 1-POLE (10kA at 120V) |
| | | PLUG-ON NEUTRAL 15A 1-POLE (10kA at 120V) |
| | | PLUG-ON NEUTRAL 20A 1-POLE (10kA at 120V) |
| | | |
| *Price* | Price Per AFCI | $43.69 |
| | | $55.47 |
| | | $59.97 |
| | | $62.53 |
| | | $70.77 |
| | | |
| *Nuisance Tripping Disclosure* | Defect Disclosure | DEFECTIVE: Prone to Nuisance Tripping |
| | | NOT DEFECTIVE |

32.     Using his conjoint survey's data in the Sawtooth Software's Lighthouse Studio market simulator, Dr. Caves attempted to calculate a purported price premium or overpayment due to the alleged omission (*i.e.*, Siemens's purported failure to disclose the alleged "defect" as characterized by the survey's "Nuisance Tripping Defect" disclosure), which he describes as

---

[65] *See* Caves Report, ¶ 42 (Table 2).
[66] *Ibid.*

measured by:[67]

> […] the difference between the economic value of the Class AFCIs without the Alleged Defect and the economic value of the Class AFCIs with the Alleged Defect, based on the decrease in the market price that would have occurred if the Nuisance Tripping Defect had been disclosed at the point of purchase.

33.     According to Dr. Caves, his "market" simulation found that "Siemens prices would have to decline very significantly—by approximately ▮▮▮▮▮▮—to return Siemens' market share to its initial level."[68]  After then applying an additional adjustment by "allow[ing] Siemens to reduce the supply of the Class AFCIs in the but-for world in response to decreased demand resulting from the Nuisance Tripping Defect,"[69] Dr. Caves reports a final estimated alleged price premium of *32%*.[70]

34.     Before evaluating the Caves Conjoint Survey in detail, I first briefly review the goals, methodology, and limitations of conjoint analysis.

**A.2.     Limitations and Challenges in Using CBC Surveys to Estimate Alleged Price Premia**

35.     Conjoint analysis is a survey-based statistical method that can be used to quantify consumers' valuations of different attributes of a product or service.  Modern conjoint analyses predominantly employ a *CBC* approach.  As I have taught my MBA students at Columbia University Business School, a proper (*i.e.*, valid and reliable) choice-based conjoint study requires not only careful design and sophisticated econometric modeling, but also necessitates sufficient consideration of the methodological challenges that may arise given the particular facts of a case (*e.g.*, the products and alleged omissions at issue).  In instances where such challenges prove insurmountable (*e.g.*, there are too many relevant attributes that characterize a product at issue to realistically capture in a CBC task), a conjoint survey would be *inappropriate* to conduct, and the survey practitioner should turn to other research methodologies.

---

[67] *Id.*, ¶ 51.
[68] *Id.*, ¶ 57.
[69] *Id.*, ¶ 58.
[70] *See, e.g., id.*, ¶¶ 64 & 72 ("I conclude that Siemens' failure to disclose the Alleged Defect at the point of purchase resulted in Class Members paying a Price Premium of 32 percent").

36.     Dr. Caves opines, in an introductory section of his report, that "choice-based conjoint is used to reliably analyze product disclosures and warnings."[71]  To defend this claim, he cites five conjoint analysis studies published in academic journals,[72] and adds that "[c]onjoint analysis has also been used to analyze product labeling claims in a litigation context."[73]  However, the academic studies referenced by Dr. Caves involved health or sustainability-related warnings or claims that (*i*) are relatively short and interpretable (*e.g.*, "Not for sale to minors";[74] "#1 Prescribed"[75]); (*ii*) map to or resemble existing claims in the marketplace (*e.g.*, "This product contains nicotine, a chemical known by the state of California to cause birth defects or other reproductive harm";[76] "USDA Organic"[77]); and (*iii*) would typically appear in the context of product packaging or advertising (*e.g.*, on a wine bottle, in a prescription drug ad, on an apple, on front-of-pack nutrition labels).[78]  Moreover, as is typical of academic (and industry) research using conjoint analysis, none of the five papers calculated a *market* valuation of a feature or claim.[79]

---

[71] *Id.*, Section B (title case removed).

[72] *Id.*, ¶ 23 (citing to Baker, Allison N. et al. (2021), "Flavor and Product Messaging are the Two Most Important Drivers of Electronic Cigarette Selection in a Choice-Based Task," *Nature Scientific Reports*, 4689, p. 2; Cabrera, Manuel et al. (2017), "Nutrition Warnings as Front-of-Pack Labels: Influence of Design Features on Healthfulness Perception and Attentional Capture," *Public Health Nutrition* [cited as *Cambridge Core* in the Caves Report], 20(18), 3360 – 3371; Annunziata, Azzurra et al. (2016), "Nutritional Information and Health Warnings on Wine Labels: Exploring Customer Interest and Preferences," *Appetite*, 106(1), 58 – 69; Aiken, Kathryn et al. (2019), "Consumer Tradeoff of Advertising Claim Versus Efficacy Information in Direct-to-Customer Prescription Drug Ads," *Research in Social and Administrative Pharmacy*, 15(2), 1484; and Onozaka, Yuko and Dawn Thilmany McFadden (2011), "Does Local Labeling Complement or Compete With Other Sustainable Labels? A Conjoint Analysis of Direct and Joint Values for Fresh Produce Claims," *American Journal of Agricultural Economics*, 93(3), 693 – 706).

[73] *Id.*, ¶ 23.

[74] Baker et al. (2021), p. 2 ("Finally, in the health warning category, the levels were 'This product contains nicotine, a chemical known by the state of California to cause birth defects or other reproductive harm,' 'This product contains nicotine, an addictive chemical,' and 'Not for sale to minors.'").

[75] Aiken et al. (2019).  *See also* Cabrera et al. (2017) (using warning symbols with the statements "high in sugar," "too much sugar," and "excess of sugar"); Annunziata et al. (2016) (using a health warning in the form of either a logo or a logo with the words "Don't drive…" on the product label); Onozaka and McFadden (2011) (using logos and claims like "Locally grown," "USDA Organic," and "Certified Fair Trade").

[76] Baker et al. (2021).

[77] Onozaka and McFadden (2011).

[78] Annunziata et al. (2016); Aiken et al. (2019); Onozaka and McFadden (2011); Cabrera et al. (2017).

[79] Of the five papers, all but one (Onozaka and McFadden 2011) did not even estimate consumers' willingness-to-pay (WTP) for the feature or claim of interest.

---

37.    In the present matter, while I understand the Plaintiffs complain about an alleged omission, I have not seen any indication as to what they propose a proper "warning" or "disclosure" should state on the packaging, labeling, or advertising of the at-issue Siemens products.  Nor did Dr. Caves himself test any specific warning or "disclosure" that was represented to participants as appearing on any AFCI packaging, labeling, or advertising.  Overall, the selected academic articles cited by Dr. Caves do not relate to the key issues and facts of the present litigation, do not involve exposing participants to a lengthy decontextualized disclosure of a supposed product "defect" that does not mimic any existing disclosure, and do *not* at all justify Dr. Caves's approach in this litigation.

38.    The mere fact that conjoint analysis as a methodology has been used in some contexts cannot serve to validate the appropriateness of using conjoint analysis in a specific individual case.  Indeed, the same methodology has also been rejected and/or criticized by courts when the conjoint analysis in question exhibited severe deficiencies that rendered the resulting estimates unreliable.[80]  What matters is whether a specific conjoint analysis study is appropriate and valid given the particulars of the theory, products, product category, and attributes or claims being tested.  Reiterating the notion that "there is no substitute for careful conjoint design,"[81] one peer-reviewed article on conjoint analysis cautions:[82]

> Practitioners of conjoint have long been aware that conjoint is appealing because of its simplicity and low cost but that **careful studies make all the difference between realistic predictions of demand and useless results**.  [Emphasis added]

---

[80] *See, e.g.*, *Flodin v. Central Garden & Pet Co.*, 21-cv-01631-JST, 2024 WL 4565340 (N.D. Cal. Oct. 23, 2024); *In re Gen. Motors LLC Ignition Switch Litig.*, 427 F. Supp. 3d 374 (S.D.N.Y. 2019); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 500 F. Supp. 3d 940 (N.D. Cal. 2020); *Adams v. Target Corp.*, 2014 WL 12558858 (C.D. Cal. Nov. 25, 2014); *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010 (C.D. Cal. Mar. 20, 2018); *In re: Fluidmaster, Inc., Water Connector Components Products Liability Litigation*, 2017 WL 1196990 (N.D. Ill. Mar. 31, 2017); *Oracle America, Inc. v. Google Inc.*, 2012 WL 850705 (N.D. Cal. Mar. 13, 2012); *Visteon Glob. Techs., Inc. v. Garmin Int'l, Inc.*, No. 10-cv-10578 (E.D. Mich. Oct. 14, 2016).  Although I am not an attorney, I find it helpful to refer to legal authorities, as well as prior court decisions, to illustrate the types of issues and principles that arise when evaluating surveys used in litigation.
[81] Allenby et al. (2014b), p. 432.
[82] *Id.*, p. 433.

---

Another industry guide writes:[83]

> Conjoint analysis addresses big issues with specific answers.  As a result, **when it fails, it often fails spectacularly**.  […]
>
> **Conjoint failures are generally the result of researchers who fail to properly design their conjoint studies or correctly interpret the output**.  Powerful, user-friendly software gives us opportunities to make mistakes we may not even be aware of.  [Emphases added]

39.    For example, a conjoint survey that substantially departs from what consumers or customers would realistically encounter would fail to do exactly what the survey is intended to do: to measure purchase preferences, choices, and/or willingness-to-pay (WTP) in the relevant marketplace.  A survey conducted for litigation, including a conjoint survey, should mirror as closely as possible essential characteristics of the marketplace.[84]  Failure to properly replicate marketplace conditions—for example, by inadequately or inaccurately (or not at all) representing the at-issue product packaging or relevant decision process in a conjoint survey—can induce severe ***demand effects***[85] and ***focalism***,[86] such that participants are led to focus on specific aspects

---

[83] McCullough, Dick (2002), "A User's Guide to Conjoint Analysis," *Marketing Research*, 14(2), 18 – 23, p. 19.

[84] *See also, e.g.*, McCarthy, J. Thomas (2007, 2025), *McCarthy on Trademarks and Unfair Competition* (*McCarthy*), §32:159; Simonson, Itamar and Ran Kivetz (2012), "Demand Effects in Likelihood of Confusion Surveys," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Diamond, Shari S. and Jerre B. Swann (eds), Chicago, IL: American Bar Association, pp. 243 – 259; Winer, Russell (1999), "Experimentation in the 21st Century: The Importance of External Validity," *Journal of the Academy of Marketing Science,* 27(3), 349 – 358.

[85] "*Demand effects*" (also referred to as "demand characteristics") refer to the phenomenon whereby survey participants use cues provided by the survey's questions, answer choices, and/or stimuli to figure out the purpose of the study and provide the answers expected by the researcher.  *See, e.g.*, Orne, Martin T. (1962), "On the Social Psychology of the Psychological Experiment," *American Psychologist*, 17(11), 776 – 783; Darley, William K. and Jeen-Su Lim (1993), "Assessing Demand Artifacts in Consumer Research: An Alternative Perspective," *Journal of Consumer Research*, 20(3), 489 – 495; *see also* Simonson and Kivetz (2012).  The participants then tend to provide (what they perceive as) the expected answers, to make sure that the results "come out right."  Courts have recognized the importance of demand effects, and such problems have contributed to the rejection of surveys.  *See, e.g.*, *In Re: KIND LLC "Healthy and All Natural Litigation,"* 15-md-02645 (NRB) (S.D.N.Y. Sep. 2022); *Simon Property Group L.P. v. MySimon, Inc.*, 104 F. Supp. 2d 1033, 2000, U.S. Dist. S.D. Indiana; *Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, "Opinion & Order," No. 06 Civ. 550 (U.S. SDNY; Aug. 2007); *Government Employees Insurance Company v. Google Inc., et al.,* East. Dist. of Virginia, 2005 U.S. Dist. LEXIS 18642, 77 U.S.P.Q.2D (BNA) 1841; *THOIP v. The Walt Disney Co. et al.*, OPINION AND ORDER (No. 08 Civ. 6823, S.D. NY, Feb. 2010).

[86] Research in psychology indicates that when survey participants are manipulated to focus on specific aspects, such aspects receive more attention and weight than they do under real marketplace conditions.  Diverse lines of research have provided evidence for such a **"focusing illusion"** or **"focalism" bias**, which

---

and to select the "expected" (or obvious) answers. In the context of this litigation, this means that a survey whose stimuli deviate from what consumers would encounter in the marketplace would yield biased estimates that are unrepresentative of customers' true incremental WTP, if any, for the at-issue Siemens ACFIs (*e.g.*, compared to the same products if the alleged omission was remedied).

40.    A CBC task can be invalid by inducing a "focalism" bias, such as by artificially requiring participants to consider and choose among product "profiles" and attributes: (*i*) that participants may not otherwise consider; and (*ii*) that exclude information about relevant other product attributes or characteristics.[87] The concern with focalism is supported by research on conjoint analysis; in fact, simply mentioning an attribute or statement in the conjoint task can make it appear important, even if this attribute or statement is actually ignored in consumers' actual choices in the marketplace. As Professor Huber writes:[88]

> **Simply mentioning an attribute increases its importance, raising the specter of attributes appearing important that otherwise would be ignored in the market choices**. One way to limit this problem is to load the task with enough attributes so the unimportant ones are ignored in the task process. This task simplification screening is particularly strong in full-profile ratings and choices. [Emphasis added]

41.    Hence, the selection of a suitable survey method should be based primarily on the marketplace-resemblance criterion, instead of choosing a particular method merely for

---

causes survey participants to focus too much on the information that is presented to them and not enough on the effects of other (less salient or unavailable) information. *See, e.g.*, Schkade, David and Daniel Kahneman (1998), "Does Living in California Make People Happy? A Focusing Illusion in Judgments of Life Satisfaction*," Psychological Science*, 9(5), 340 – 346; Kahneman, Daniel, Alan B. Krueger, David Schkade, Norbert Schwarz, and Arthur A. Stone (2006), "Would You Be Happier If You Were Richer? A Focusing Illusion," *Science,* 312(5782), 1908 – 1910; Wilson, Timothy D., Thalia Wheatley, Jonathan M. Meyers, Daniel T. Gilbert, and Danny Axsom (2000), "Focalism: A Source of Durability Bias in Affective Forecasting," *Journal of Personality and Social Psychology*, 78(5), 821 – 836; *see also* Kivetz, Ran and Itamar Simonson (2000), "The Effects of Incomplete Information on Consumer Choice," *Journal of Marketing Research*, 37(4), 427 – 448 (this article was a finalist for the 2005 *O'Dell Award* for the article that has had the greatest impact on the marketing field in the previous five years).
[87] *See also, e.g.*, *Oracle America, Inc. v. Google Inc.*, 2012 WL 850705 (N.D. Cal. Mar. 13, 2012); *In re: Fluidmaster, Inc., Water Connector Components Products Liability Litigation*, 2017 WL 1196990 (N.D. Ill. Mar. 31, 2017); *Visteon Glob. Techs., Inc. v. Garmin Int'l, Inc.*, No. 10-cv-10578 (E.D. Mich. Oct. 14, 2016).
[88] Huber, Joel (1997), "What We Have Learned from 20 Years of Conjoint Research," *Research Paper Series*, Sequim, WA: Sawtooth Software, Inc., p. 10.

---

convenience or because an alternative methodology might produce "unfavorable" results. Indeed, it is well-established that while an adequate survey can provide useful, reliable information, the findings of a survey are often largely determined by its methodology. As I have shown in my own research,[89] the choice of methodology can determine whether the survey will demonstrate a significant consumer preference or WTP for one alternative (or attribute) or another, making it essential that the most suitable survey method is relied upon. There is little doubt that, by choosing a biased, seriously flawed methodology, one can create "evidence" of various consumer preferences, WTP, and supposed price premia.

42.     To achieve the survey's stated objectives and to reach valid and reliable conclusions about customers' preferences and willingness to pay any alleged price premium (*e.g.*, due to the alleged omission regarding purported "nuisance tripping"), a survey expert must follow several well-accepted principles in designing the conjoint survey,[90] including but not limited to:

(*i*)     the adequate representation of the alleged omission and focal attribute at issue, including the use of a valid benchmark or "but-for" product;

(*ii*)     the use of a survey methodology that approximates the putative class members' state of mind and purchase decisions in the actual marketplace, including the use of realistic stimuli and the incorporation of the product attributes most relevant to customer decisions; and

(*iii*)     the use of questions and stimuli that avoid leading participants and inducing demand effects and focalism, which, individually and collectively, upward bias the estimated preferences, WTP, and alleged price premium.

43.     Dr. Caves's conjoint analysis violated numerous principles and requirements of scientific surveys, including those listed above. As set forth in this *Rebuttal Expert Report*, my professional opinion is that the Caves Conjoint Survey, along with Dr. Caves's reported alleged price premium estimate for the purported "Nuisance Tripping Defect" disclosure, are fatally flawed, biased, and unreliable.

---

[89] *See, e.g.*, Kivetz, Ran and Itamar Simonson (2002b), "Self-Control for the Righteous: Toward a Theory of Pre-Commitment to Indulgence," *Journal of Consumer Research*, 29(2), 199 – 217. This article was a finalist for the award for the Best Article published in the *Journal of Consumer Research* (the major journal on consumer behavior) between 2002 and 2005.

[90] *See also* the factors listed in the *Manual for Complex Litigation* (2004), Federal Judicial Center, Fourth, Section 11.493, p. 103; Diamond, Shari S. (2011), "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, Federal Judicial Center.

**B.    DR. CAVES'S "NUISANCE TRIPPING DEFECT" ATTRIBUTE IS LEADING AND MISREPRESENTS THE ALLEGED OMISSION, GENERATING AN INVALID AND ARTIFICIALLY INFLATED ALLEGED PRICE PREMIUM**

44.    To operationalize the alleged omission, Dr. Caves refers to the following 8-paragraph characterization of what he calls the "Nuisance Tripping Defect" taken from the Durham Report,[91] a characterization that counsel for the Plaintiffs "informed"[92] him was at issue (reproduced in Figure B1 below).  The first seven paragraphs were pulled from two paragraphs in Dr. Durham's report that summarize allegations made by the Plaintiffs;[93] the last paragraph was taken from a different section of the Durham Report that opines about Siemens's supposed "admission" based on Dr. Durham's interpretation of two deposition transcripts.[94]

*(Continues on next page)*

---

[91] *Id.*, ¶ 3.  I refer to each numbered bullet item as a paragraph.
[92] *Ibid*. ("Plaintiffs' counsel has informed me that the following defect described in paragraphs 35 and 36 of the Expert Report of Robert Durham is at issue in this litigation").
[93] Durham Report, ¶¶ 35 – 36.
[94] *Id.*, ¶ 135 ("Siemens admits that its AFCIs are not designed to exclusively identify a true arc, but instead trip when they detect any signal that resembles an arc, even if that signal comes from a safe and properly functioning device.").

**Figure B1: The "Disclosure" of the "Nuisance Tripping Defect" as Shown in the Caves Conjoint Survey** [95]

In the questions that follow, certain AFCIs have a "Nuisance Tripping Defect." These AFCIs use an arc detection method that, according to reports, leads these AFCIs to trip due to common and safe voltage distortions that cause radio frequency harmonics. These distortions are generated by some models of common household appliances, electrical devices, and lighting, listed below:

1.  Major household appliances, such as microwaves, ovens, washing machines, dryers, refrigerators, garage door openers and water heaters;
2.  Lighting products, including LED light bulbs, Christmas lights, under cabinet lighting, light fixtures, recessed lighting, light switches, dimmers, halogen and fluorescent lights;
3.  Plug-in electrical devices, like vacuum cleaners, wall charges, internet signal boosters, power tools, and printers; and,
4.  Voltage distortions that may cause radio frequency harmonics from external sources, including electrical transformers and broadband power lines.

If AFCIs with the Nuisance Tripping Defect are installed on circuits with, or in the same panel of circuits serving, these devices, they may trip and shut off power when no dangerous arc fault exists.

Other current or future household products that create voltage distortions and radio frequency harmonics may also cause these same AFCIs to experience Nuisance Tripping.

Manufacturers of AFCIs with the Nuisance Tripping Defect have claimed their AFCIs are not designed to exclusively identify a true arc, but instead trip when they detect any signal that resembles an arc, even if that signal comes from a safe and properly functioning device.

45.    Dr. Caves used this description to introduce the so-called "Nuisance Tripping Defect" attribute in his CBC survey, which took on two different attribute levels to indicate "the presence or absence of the Nuisance Tripping Defect":[96] (*i*) "DEFECTIVE: Prone to Nuisance Tripping"[97] versus (*ii*) "NOT DEFECTIVE."[98]

46.    As I discuss below, Dr. Caves's decision to essentially copy-and-paste the above description into his survey (and to use the "DEFECTIVE" vs. "NOT DEFECTIVE" attribute levels for this "Nuisance Tripping Defect" disclosure), without a rigorous investigation of this underlying attribute,[99] is unscientific and severely flawed.  My analysis of the allegations and

---

[95] *See, e.g.*, Caves Report, ¶ 40.  Dr. Caves made minor modifications to the language from the Durham Report, such as removing "Siemens" and phrases like "Plaintiffs have alleged that," "Plaintiffs contend that," and "According to Plaintiffs' Complaint"; *cf.* Durham Report, ¶¶ 35 – 36 & 135.
[96] Caves Report, ¶ 41.
[97] *Id.*, ¶ 42 (Table 2).
[98] *Ibid.*
[99] As I explain in Section D, the 15 "cognitive interviews" Dr. Caves conducted were neither systematic nor rigorous, and were instead biased and confirmatory.

available evidence indicates that, contrary to the principle that conjoint attributes be clear and non-leading, Dr. Caves's "Nuisance Tripping Defect" disclosure is unclear, leading, and fails to accurately represent the alleged omission.

**B.1.** **The Importance of Defining Clear, Concrete, and Non-Leading Attribute Levels in Conjoint Surveys**

47.     Because participants' choices and valuations are sensitive to both how many and which attributes and attribute levels are included in a conjoint task, the choice of attributes and attribute levels is crucial.  Academic and industry sources on conjoint analysis, including authorities cited by Dr. Caves,[100] have recognized the importance of selecting realistic stimuli and including important features, stating: "Defining proper conjoint attributes and levels is arguably the most fundamental and critical aspect of designing a good conjoint study."[101]

48.     It is essential that the attributes and attribute levels in a conjoint analysis be worded and described in a way that is non-leading, clear, concrete, and objectively interpretable to participants.  A leading survey procedure, question, or instruction suggests to participants particular answers, thereby producing biased and invalid results.[102]  Indeed, seminal research shows that people's survey responses are often distorted based on the survey context and on leading phrases and questions.[103]

---

[100] Dr. Caves cites to writings by Bryan Orme, the President of Sawtooth Software (*see id*., ¶ 20 & FN 37; ¶ 27 & FN 52; ¶ 44 & FN 85; ¶ 52 & FN 92) and by Paul Green and V. Srinivasan (*see id*., ¶ 19 & FN 34; ¶ 20 & FN 36).

[101] Orme, Bryan (2002), "Formulating Attributes and Levels in Conjoint Analysis," *Research Paper Series*, Sequim, WA: Sawtooth Software, Inc., p. 1.  *See also* Green, Paul E., and V. Srinivasan (1978), "Conjoint Analysis in Consumer Research: Issues and Outlook," *Journal of Consumer Research*, 5(2), 103 – 123; Green, Paul E., Abba M. Krieger, and Pradeep Bansal (1988), "Completely Unacceptable Levels in Conjoint Analysis: A Cautionary Note," *Journal of Marketing Research*, 25(3), 293 – 300.

[102] *See also, e.g.*, Alreck, Pamela L. and Robert B. Settle (2004), *The Survey Research Handbook (3rd ed.)*, New York, NY: McGraw-Hill/Irwin, p. 100 ("When questions lead the respondents to a particular answer, they create a very strong bias and often result in data that are completely invalid").

[103] Tversky, Amos and Daniel Kahneman (1981), "The Framing of Decisions and the Psychology of Choice," *Science*, 211(4481), 453 – 458; Loftus, Elizabeth and Guido Zanni (1975), "Eyewitness Testimony: The Influence of the Wording of a Question," *Bulletin of the Psychonomic Society*, 5(1), 86 – 88; Weinberg, Howard I., John Wadsworth, and Robert S. Baron (1983), "Demand and the Impact of Leading Questions on Eyewitness Testimony," *Memory & Cognition*, 11(1), 101 – 104; Loftus, Elizabeth, Diane Altman, and Robert Geballe (1975), "Effects of Questioning Upon a Witness' Later Recollections," *Journal of Police Science and Administration*, 3(2), 162 – 165; Loftus, Elizabeth (1975), "Leading Questions and the Eyewitness Report," *Cognitive Psychology*, 7, 550 – 572; Loftus, Elizabeth and John

---

49.    As Allenby and colleagues (2014) state in their peer-reviewed article:[104]

A general principle of conjoint survey design is that **the product characteristics must be defined in terms that are understandable and meaningful to the respondents**.  For example, smartphone battery capacity should be specified in terms of battery life in use rather than in units of capacity such as milliamperes. […] [Emphasis added]

Likewise, in a widely-cited conjoint analysis textbook and industry guide relied on by Dr. Caves,[105] Bryan Orme (President of Sawtooth Software) writes:[106]

Attribute descriptions should be concise statements with **concrete meaning**.  Avoid using ranges to describe a single level of an attribute, such as "weighs 3 to 5 kilos." **Rather than leaving the interpretation to the respondent**, it would be better to specify "weighs 4 kilos."  **Levels such as "superior performance" also leave too much in question.  What does "superior performance" mean?**  Try to use **specific language to quantify (if possible) the exact meaning of the level**. [Emphases added]

Mr. Orme and his coauthor, Keith Chrzan, gave similar prescriptions in a Sawtooth Software discussion board in response to a post inquiring about how to calculate consumer willingness-to-pay (WTP) from a conjoint survey:[107]

---

C. Palmer (1974), "Reconstruction of Automobile Destruction: An Example of the Interaction between Language and Memory," *Journal of Verbal Learning and Verbal Behavior*, 13, 585 – 589; Burt, Christopher D. and Jennifer S. Popple (1996) "Effects of Implied Action Speed on Estimation of Event Duration," *Applied Cognitive Psychology*, 10(1), 53 – 63.  For example, Professor Loftus and her colleagues studied the impact of question wording on subsequent eyewitness testimony, finding that asking an eyewitness "How fast were the cars going when they smashed?", as opposed to "How fast were the cars going when they contacted?", produced higher speed estimates; Loftus, Altman, and Geballe (1975).  In another study, observers estimated the duration of an event they had themselves experienced two weeks earlier (a person disrupting a university class).  Participants asked to estimate how long it took the person to *walk* through the class as opposed to *run* through the class gave longer duration estimates. Burt and Popple (1996).

[104] Allenby et al. (2014a), pp. 642 – 643.  *See also* Allenby et al. (2014b), p. 433 ("Furthermore, many of the prescriptions for conjoint design including well-specified and meaningful attributes and levels are extremely important.").

[105] *See, e.g.*, Caves Report, ¶ 20 & FN 37 (citing to Orme, Bryan K. (2020), *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research* (4th ed.), Manhattan Beach, CA: Research Publishers LLC).

[106] Orme (2020), p. 50.  *See also id.*, p. 201 ("**Levels should have concrete meaning**, and be mutually exclusive within each attribute, meaning a product concept is defined using one and only one level of each attribute" [emphasis added]).

[107] *See* Chrzan, Keith and Bryan Orme (2018), "How to Calculate the WTP," *Sawtooth Light Studio Forum*, https://community.sawtoothsoftware.com/lighthouse-studio/post/how-to-calculate-the-wtp-SkBZ9NpjGymyJmw.

---

**[Keith Chrzan:]** Finally, for this to work well, we need to know the amount of utility per km. Unfortunately, you seem to have measured your distance as ranges (level 1 and 2) and as an open-ended range (level 3). So is the utility of 0,5795 [*i.e.*, 0.5795] for 0 km or 30 or 50? We don't know. And what is the number of km measured by 150+? Is it 150 km or 200 or is it 384,400 km, the distance to the moon? Again, we don't know. **Given this inability to tie specific distances to your distance levels, I think your data is not well-suited to computing a WTP**.

**[Bryan Orme:]** Keith has provided great advice here. In our introductory training on conjoint analysis (like we'll be offering on Jan 28-30 in Florida), we stress that conjoint levels should be written so that they have **concrete meaning for respondents**. To use squishy language or to provide ranges rather than specific amounts as you've done leaves room up for interpretation by each respondent. It hinders your ability to interpret what the data mean. [Emphases added]

50.    Bridges and colleagues (2011) outline several best practices for designing and conducting conjoint studies, noting, for example, the importance of providing relevant contextual information:[108]

The introductory section for the data-collection instrument can present the overall context of the study, describe the attributes and levels that will be included in the conjoint-analysis tasks, and include one or more practice versions of the tasks. **It is important to describe all attributes and levels thoroughly and consistently, to ensure that all respondents are evaluating the same task and not making unobservable assumptions about the attributes and levels in a given profile**. For example, respondents can have quite different outcomes in mind for symptom levels described simply as mild, moderate, or severe. [Emphases added]

Another article discusses the problems of using conjoint analysis to estimate consumers' valuation for abstract concepts such as those related to "data security" and automobile defects:[109]

[…] [C]onsumers may have more difficulty with an **abstract concept like adequate and reasonable data security**, particularly since **that feature is not typically advertised or described by sellers of consumer products and services**. […]

An issue with **applying conjoint analysis to a "tough-to-value" feature** arose in *Sanchez-Knutson v. Ford Motor Co.* In that case, plaintiffs alleged that certain Ford Explorer vehicles were **defective because they experienced exhaust odor under certain driving conditions**. Plaintiffs' expert opined that he could design a conjoint analysis that would enable him to "determine the difference in value…that customers place on a Ford Explorer with no exhaust leaking into the cabin compared to an

---

[108] Bridges, John F.P., A. Brett Hauber, Deborah Marshall, Andrew Lloyd, Lisa A. Prossner, Dean A. Regier, F. Reed Johnson, and Josephine Mauskopf (2011), "Conjoint Analysis Applications in Health—A Checklist: A Report of the ISPOR Good Research Practices for Conjoint Analysis Task Force," *Value in Health*, 14(4), 403 – 413, p. 409.

[109] Kheyfets, Mike (2018), "Benefit of the But-For Bargain: Assessing Economic Tools for Data Privacy Litigation," *Journal of Technology Law & Policy*, 23(1), 115 – 133, pp. 120 & 121.

otherwise identical Ford Explorer subject to the problems with exhaust." The court took issue with this approach, stating "I don't know how you do that analysis when no one's gonna buy a car if it fills up with carbon monoxide when you drive it," and indicating that if "**you ask a bunch of people, how much would you pay for a Ford Explorer that has carbon monoxide in it…they're all going to say nothing**." [Emphases added]

51.     Multiple other academic and industry sources echo the need to use concrete,

precise attributes and levels that consumers would understand, and correspondingly, the need to

avoid vague or unclear attributes and levels; for example:

> [G]reat care must be taken to ensure that all (or at least as many as possible) of the determinant decision attributes are identified and expressed in terms understood by the individuals to be studied. Some attributes require visual representation, some require elaborate verbal and visual descriptions, and others require actual products, prototypes or scale models to ensure that the information will be understood.[110]

> The more tangible and understandable the levels of each attribute are to the respondents, the more valid the results of the research will be. For example, attribute levels such as ["]really roomy["] are vague, meaning different things to different people, and should be avoided.[111]

> The primary problem with conjoint analysis is poorly defined attributes and levels. […] The aim of conjoint analysis is to simulate a real purchase choice. If level definitions are unclear or vague for a customer or buyer it is very difficult to make a purchase-like decision.[112]

> Abstract attributes are important determinants of brand equity (Aaker, 1991, pp. 110-118), but in general pose operationalisation problems in conjoint research (Louvière, 1988, p. 52).[113]

> Levels should be precise: e.g. the levels of the engine power of a car are 1.5L, 1.8L, 2.0L, not "less than 1.5L" or "more than 2L". […] When describing both attributes and levels, use the language that customers understand because on their screen they will see attributes and levels exactly as you describe them. […][114]

---

[110] Louviere, Jordan J. (1988), *Analyzing Decision Making: Metric Conjoint Analysis*, Iowa City, IA: Sage Publications, Inc., p. 50.

[111] Wilcox, Ronald T. (2003), "A Practical Guide to Conjoint Analysis," Charlottesville, VA: University of Virgina Darden School Foundation, p. 2.

[112] Dobney, "Top 10 Mistakes When Using Conjoint Analysis," *Dobney*, https://dobney.com/Top-10-conjoint-mistakes--k139.

[113] Wedel, Michel, Marco Vriens, Tammo H.A. Bijmolt, Wim Krijnen, and Peter S.H. Leeflang (1998), "Assessing the Effects of Abstract Attributes and Brand Familiarity in Conjoint Choice Experiments," *International Journal of Research in Marketing*, 15(1), 71 – 78, p. 72.

[114] Conjointly, "Nine Tips for Specifying Attributes and Levels," *Conjointly*, https://conjointly.com/guides/tips-for-setting-up-conjoint-studies/.

The implication is obvious: *design CA [conjoint analysis] tasks to match what respondents can answer reliably and validly.*[115]

52.     Contrary to the principles set forth above, the Caves Conjoint Survey's "Nuisance Tripping Defect" disclosure (or attribute) is severely flawed and leading, and it upward biased the alleged price premium estimate in multiple ways.  Specifically, as I explain in the remainder of this section, this "disclosure" attribute: (*i*) was introduced and described to participants in a leading, biased, and unrealistic way, while omitting relevant contextual information; (*ii*) consisted of attribute levels that are unclear and misrepresent the relevant issue, likely generating confusion and erroneous customer beliefs; and (*iii*) was rendered further leading by its repetition across multiple choice tasks.

## B.2.     Dr. Caves's Description of the "Nuisance Tripping Defect" Disclosure is Leading, Biased, and Does Not Resemble Language that AFCI Manufacturers Would Use

53.     Dr. Caves relied on selected paragraphs from the Durham Report for the wording of his "Nuisance Tripping Defect" disclosure.  It is important to note that these paragraphs from the Durham Report reflect Dr. Durham's own summary of the Plaintiffs' allegations,[116] ████.[117]  Despite opining that "Siemens' public disclosures did not align with Siemens' internal knowledge regarding nuisance tripping and incompatibility with common household appliances,"[118] Dr. Durham never specified the exact wording for what he would consider an appropriate "disclosure" that Siemens should have communicated to customers at the point of purchase.

54.     Because customer reactions can be very sensitive to how a disclosure is worded, a disclosure can be rendered highly biased, leading, and therefore improper if it introduces ambiguous and suggestive terminology or omits relevant context and information.  To be valid, a disclosure in a survey must provide the appropriate amount of information and should not generate

---

[115] Chapman, Chris (2013), "9 Things Clients Get Wrong About Conjoint Analysis," in Orme, Bryan (ed.), *Proceedings of the 2013 Sawtooth Software Conference*, Dana Point, CA, p. 8.

[116] Durham Report, ¶¶ 35 – 36.  The list of "common household appliances, electrical devices, and lighting" does not appear in the Complaint, ███████████████████ ████

[117] Durham Report, ¶ 135 (████████████████████████).

[118] *Id.*, p. 132 (Hypothesis 5).

---

erroneous beliefs that lead respondents in a particular direction.  Next, I discuss the ways in which

Dr. Caves's description of the "Nuisance Tripping Defect" disclosure is invalid and flawed.

### B.2.1.  *The Caves Conjoint Survey Inappropriately Refers to "Nuisance Tripping" as a "Defect"*

55.    The Caves Conjoint Survey repeatedly represented the alleged omission to

participants as a disclosure of a "Nuisance Tripping **Defect**":[119]

> In the questions that follow, certain AFCIs have a **"Nuisance Tripping Defect."**

> If AFCIs with the **Nuisance Tripping Defect** are installed on circuits with, or in the same panel of circuits serving, these devices, they may trip and shut off power when no dangerous arc fault exists.

> Manufacturers of AFCIs with the **Nuisance Tripping Defect** have claimed […].

My analysis of available evidence in this litigation indicates that Dr. Caves's use of the term

"defect" to characterize "nuisance tripping" does not accurately characterize the issue and is instead

leading and slanted in the Plaintiffs' favor.

56.    ***First***, while I understand that "nuisance tripping" (sometimes called "unwanted

tripping"[120] or "false tripping"[121]) is common parlance among electricians and a known challenge in

the industry,[122] I have seen no evidence (nor does Dr. Caves cite any) that "nuisance tripping

defect" is an industry-wide phrase, or that electricians typically refer to "nuisance tripping" as a

"defect."  I understand that Siemens, competing AFCI manufacturers, and trade associations such as

the National Electric Manufacturers Association (NEMA)[123] have tended to define "nuisance" or

unwanted tripping as an *interoperability issue* due to incompatibility between a breaker and certain

---

[119] *See, e.g.*, Caves Report, Appendix A, p. 24.  Emphases added.

[120] *See, e.g.*, Kinsel Deposition, pp. 51 & 64; Durham Report, ¶ 91; SIEMENS_AFCI_00081109 at 13-18 (a 2011 NEMA report on "Recommendations on AFCI / Home Electrical Product Compatibility").

[121] *See, e.g.*, shotgunmike (2023), "Arc Fault Nuisance Tripping," *Mike Holt's Forum*, https://forums.mikeholt.com/threads/arc-fault-nuisance-tripping.2575526/; Kumba (2013), "Is There a Good Way to Hunt Down AFCI Receptacle Nuisance Tripping Causes?," *Stack Exchange*, https://diy.stackexchange.com/questions/29866/is-there-a-good-way-to-hunt-down-afci-receptacle-nuisance-tripping-causes.

[122] *See, e.g.*, Keyser Deposition, p. 29.  The 15 licensed electricians whom Dr. Caves interviewed in his "cognitive interviews" all indicated being familiar with the concept of "nuisance tripping"; *see* Section D for further discussion and analysis of these interviews.

[123] The Complaint describes NEMA as "an American National Standards Institute- accredited Standards Development Organization made up of business leaders, electrical experts, engineers, scientists, and technicians"; ¶ 48.

---

models of home electrical products, which can create a load or combination or loads that emit current signatures mimicking an arc fault.[124]

57.    A Google search using the keywords "nuisance tripping" and "nuisance tripping AFCI" returned results on the first two pages that did *not* describe this phenomenon as a "defect."[125]  Likewise, a review of public-facing resources including electrician forums and online sources on AFCIs indicates that those with relevant expertise in the field (*e.g.*, electricians, electrical suppliers, engineers) do not commonly (if at all) call "nuisance tripping" a "defect," nor typically attribute a breaker's incompatibility with certain devices to the breaker being "defective."[126]  Indeed, Dr. Caves's own interviewees (in his 15 "cognitive interviews") expressed

---

[124] *See, e.g.*, SIEMENS_AFCI_00020560 at 61 (2023 NEMA report describing "lack of compatibility with a connected load" as one reason for unwanted tripping); ABB (2024), "Combination Arc-Fault Circuit Interrupter (AFCI) Installer Instructions," p. 1 (noting that a potential cause of tripping is "[a] load or combination of loads on the branch circuit emits a current signature that looks like an arc-fault"); Domitrovich, Thomas, "While AFCI Debates Continue, More Can Be Done to Increase Safety by Broadening Their Use," *EATON*, https://www.eaton.com/us/en-us/company/news-insights/for-safetys-sake-blog/increase-safety-with-AFCI.html ("Many times when an AFCI or GFCI detects a problem, we mistakenly blame the device without realizing it's just doing its job […] Similar to GFCIs, AFCIs saw challenges with connected loads and installation practices when first introduced, but over the past 15+ years significant improvements have been made"); NEMA (2024), "A Quarter Century of Protecting Homes & Occupants," *IAEI Magazine*, https://iaeimagazine.org/electrical-safety/a-quarter-century-of-protecting-homes-occupants/ (*e.g.*, "The compatibility of AFCIs with home appliances has also been a topic of discussion over the years in the electrical industry. […] NEMA indicated AFCI manufacturers conducted more than 130,000 interoperability tests with a variety of appliances and appliance combinations"); NEMA, "Circuit Breaker Arc-Fault Circuit Interrupters (AFCIs) – Myth vs. Fact," https://www.afcisafety.org/wp-content/uploads/2020/05/AFCI-Infographic-Mythbusters.pdf ("*Myth: AFCI circuit breakers are not compatible with common household appliances.* **Fact**: AFCI circuit breakers work extremely well with new appliances that meet U.S. product safety standards. Some older appliances may incorporate components that predate current product safety standards or have operational characteristics that are not compatible with AFCI protection. Counterfeit appliances or those not certified by a Nationally Recognized Testing Laboratory (NRTL) may also be incompatible with AFCI circuit breakers" [emphases in the original]).  Based also on the November 26, 2025 Interview.
[125] *See* Exhibit D to this *Rebuttal Expert Report*.
[126] *See, e.g.*, Peterson, Joshua (2019), "Common Causes for Tripped AFCI Breakers," *Peterson Electric*, https://petersonelectricllc.com/tripped-afci-breakers-reasons/ ("Many electronic devices, by nature of their own design, can cause AFCI breakers to detect a dangerous electrical arc that isn't actually there. This most commonly occurs with electronic products that have motors with brushes such as vacuums, treadmills or even power tools. These brushes can cause sparking, which is normal within the device, but abnormal in the eyes of the breaker. Televisions and fluorescent lights can also cause tripping. If you have a device that regularly trips your breaker, first try using it on a different circuit. If the other breaker trips, you know the device is incompatible. If it doesn't, call an electrician to inspect the tripped breaker."); NEMA (2017), "White Paper: Wiring Practices & Troubleshooting with AFCIs," https://www.afcisafety.org/wp-content/uploads/2017/05/Troubleshooting-with-AFCI.pdf; IrateRetro

skepticism and confusion regarding the term "defect," and gave no indications that they would normally consider "nuisance tripping" to be a "defect" (*see* Subsection D.2).

58.     Contrary to how "nuisance tripping" was represented to participants in the Caves Conjoint Survey, my analysis indicates that this phenomenon is generally treated as a known issue, one that: is balanced against the safety benefit that AFCIs are designed to deliver (by tripping to protect against electrical fires that can cause death, injury, or property loss);[127] cannot be completely avoided;[128] requires diagnostics, troubleshooting, and continuous technological improvements and updates over time;[129] can signal or mask underlying electrical hazards;[130] and therefore does not necessarily mean an AFCI is broken or not working as designed or intended.[131]

---

(2025), "Nuisance Tripping....What Are My Options?," *Reddit*, https://www.reddit.com/r/AskElectricians/comments/1om0b92/nuisance_trippingwhat_are_my_options/ ("I would make sure there's not a reason they are tripping"; "How do you know they are nuisance tripping, and not trying to tell you there's a problem? The solution is remove the protection? Maybe take the batteries out of your smoke detectors too so your sleep isn't interrupted if there's some of that nuisance smoke").

[127] *See, e.g.*, NEMA (2017); WAC Lighting (2023), "What is Nuisance tripping?," *WAC Lighting*, https://support.waclighting.com/hc/en-us/articles/19452670405399-What-is-Nuisance-tripping ("AFCIs are newly-developed electrical devices designed to protect against fires caused by arcing faults in the home electrical wiring. […]"); NEMA_S-0004202 (2021 *ProBuilder Magazine* article); NEMA_S-0013136 (2019 NEMA draft press release); NEMA_S-0019792; NEMA_S-0062898 ("Arc Fault Circuit Interrupters: A Homeowner's Guide"); SIEMENS_AFCI_00278207 (NEMA report on "Arc Fault Circuit Interrupters Using Advanced Technology to Reduce Electrical Fires").

[128] *See, e.g.*, WAC Lighting (2023) (noting that "AFCI devices aim to prevent fires by identifying electrical arcs, but their differentiation between normal and potentially hazardous arcs is not foolproof. Numerous electronic devices, including treadmills, televisions, and fluorescent lights, can mislead AFCI devices, causing nuisance tripping. […] While newer AFCI generations are less susceptible to problems, they are not entirely immune."); NEMA_S-0024317 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[129] *See also, e.g.*, NEMA (2017); SIEMENS_AFCI_00080311 (2019 Troubleshooting Card); SIEMENS_AFCI_00362724 (2020 AFCI-GFCI Circuit Breaker Diagnostic Guide); SIEMENS_AFCI_00199690 (2022 Troubleshooting Training); SIEMENS_AFCI_00257830 (2023 Troubleshooting Guide); SIEMENS_AFCI_00270694 & SIEMENS_AFCI_00000427 (2021 Troubleshooting Card); SIEMENS_AFCI_00133866 (2023 Troubleshooting Training Presentation).

[130] *See also, e.g.*, NEMA (2017); NEMA (2024) ("An early concern when AFCIs first came to market were occasional reports of false tripping. Follow ups by contractors and manufacturers almost always showed the devices were working as designed, meaning they tripped due to detecting potentially dangerous arcing in the circuit").

[131] *See also, e.g.*, NEMA (2017); NEMA (2024); Kees 30(b)(6) Deposition, p. 48.

---

59.     I also understand that "nuisance tripping" can be misdiagnosed, such that an electrician or contractor might attribute the root cause of an unwanted trip to an overly sensitive breaker, when the actual cause may be any number of factors, including faulty or damaged wiring, faulty appliances, electrical overload, human error, and more.[132]  A 2017 NEMA white paper on "Wiring Practices & Troubleshooting with AFCIs" discusses "unwanted tripping" in a broader context:[133]

> Unlike a conventional circuit breaker, which detects overloads and short circuits, an AFCI utilizes advanced electronic technology to "sense" different arcing conditions.  Common household items, such as a motor-driven vacuum cleaner and a furnace motor, **naturally create arcs when they are operating**.  Each of these conditions is considered a normal arc, which can also occur when a light switch is turned off.

> Arc faults, however, may result from **damaged wiring, overheated or stressed electrical cords, worn electrical insulation, wires and/or cords in contact with vibrating metal, damaged electrical appliances and more**. This potentially dangerous condition creates high-intensity heat – which may exceed 10,000 degrees Fahrenheit – resulting in burning particles that can easily ignite surrounding material, such as wood framing or insulation.

> AFCIs are designed to recognize arc faults when they occur and automatically shut the circuit down before it becomes a fire hazard.  Manufacturers of AFCIs test for hundreds of possible operating conditions, and design each AFCI to constantly discern between normal and dangerous arcs.  […]

> An AFCI trip alerts the homeowner or electrician of a potential problem in the electrical wiring that, left uncorrected, could potentially lead to an electrical fire. Opponents who believe AFCIs are not needed **raise concern over "unwanted" tripping. However, consistent findings have revealed that the**

---

[132] *See, e.g.*, Domitrovich, https://www.eaton.com/us/en-us/company/news-insights/for-safetys-sake-blog/increase-safety-with-AFCI.html ("Many times when an AFCI or GFCI detects a problem, we mistakenly blame the device without realizing it's just doing its job"); Peterson (2019) (*e.g.*, "Tripped breakers can also be the result of improperly installed AFCIs or problems within the wiring system"); Jonaitis, Jenna (2025), "Why Is My Arc Fault Circuit Breaker Tripping?," *Angi*, https://www.angi.com/articles/why-your-arc-fault-breaker-keeps-tripping.htm ("Beyond incompatibility, you might have a faulty device, such as a lamp with a damaged cord"; "Your arc fault breaker tripping could be due to something as minor as hanging a picture on the wall and unknowingly putting a nail through a wire—or even a rat chewing at a wire inside your wall"; "You might have issues with your wiring, whether it's loose, exposed, or an outlet that's wired improperly"; "Like any other breaker, an arc circuit breaker can trip if there's too much electrical usage on a single circuit and it overheats the wires"); WAC Lighting (2023) (identifies "wiring problems" and "incompatible electronic devices" as key culprits that may cause, or be perceived to cause, "nuisance tripping").  *See also* Section D.2 (Dr. Caves's "cognitive interviews").

[133] NEMA (2017).

---

**majority of what are referred to as "unwanted" trip issues are, in fact, related to problems with the installed wiring or attached wiring devices**.  [Emphases added]

60.     Another NEMA report, published in 2023, disputed the notion that compatibility issues with home appliances are the cause of a majority of AFCI unwanted tripping incidents:[134]

> Unwanted tripping can manifest itself for many reasons that could include identification of wiring problems or lack of compatibility with a connected load. The American Circuit Breaker Manufacturers Association (ACBMA) reports that received calls on AFCIs tripping is at 0.0078% of AFCIs shipped. […] In reviewing this research data and comparing this data to the number of appliances that are reported to trip AFCIs, it is found that **claims and statements made related to compatibility being the vast majority of AFCI unwanted tripping incidents are not substantiated**.

> NEMA received 35 reports of unwanted tripping through the AFCIsafety.org website in 2021 through 2022, and **none of the reported unwanted tripping issues identified a faulty circuit breaker or an incompatible product issue**. […]

> One of the reasons AFCI technology has performed and continues to perform well is because of the partnerships between AFCI manufacturers and their customers, who together are able to identify applications and practical application examples that facilitate AFCI manufacturer interoperability tests with a variety of appliances and appliance combinations. These home appliance lab emulations conduct over 130,000 test cases covering over 400 appliance brands and 150 product types.  […] The results of these extensive tests are AFCIs that function properly with appliances.  [Emphases added]

The document then summarizes the results of an Electrical Safety Foundation International (ESFI) survey of electrical contractors in Massachusetts, according to which 59% of the service calls contractors made were "related to tripped circuit breakers or fuses," and that further investigation found that "the most common mistakes identified by electrical contractors" included: wiring issues (37%), lack of or inadequate GFCI protection (32%), overloaded circuits (27%), and other causes (2%).[135]  The NEMA article concludes:[136]

> The amount of testing done to verify that AFCIs will work with various appliances is extensive and goes far beyond what the product safety standard requires to make sure homeowners receive the best protection from fires with the installation of AFCIs. In addition, **the ESFI Survey shows that most tripping reports and issues are overloads and short circuits**. The absence of any AFCI reported unwanted tripping issues from a state that requires them to protect most, if not all,

---

[134] SIEMENS_AFCI_00020560 at 61 – 62.
[135] *Id.*, at -62.  *See* NEMA_S-0015646 for the 2022 ESFI survey.
[136] SIEMENS_AFCI_00020560 at -63.

of the receptacles found in the house provides **further data that AFCIs are functioning properly**. This data provides specific information on the successful safety protection of branch circuits by AFCIs when loads are appliances or other devices.  [Emphases added]

61.     ***Second***, and importantly, the fact that the *Plaintiffs* in this litigation may refer to "nuisance tripping" as an alleged "defect" does not justify the use of the word "defect" in a *survey* of electricians and/or consumers—a population that would not otherwise view the phenomenon at issue as a "defect."  There is no doubt that compared to more neutral terms like "behavior," "phenomenon," "challenge," or even "issue," the word "defect" is more likely to steer participants' perceptions of "nuisance tripping" in an unfavorable direction.  This is consistent with a large academic literature on *negativity bias* (or the negativity effect), which has found that negative information, aspects, or values receive greater weight in consumers' product evaluations.[137]  Research on the psychology of *framing*, including my own peer-reviewed research, has also established that the specific language and formatting of a communication or message can significantly affect customer perceptions and choices (*e.g.*, the same product can be systematically perceived in a less favorable light when labeled using a negative compared to positive or neutral frame).[138]

---

[137] *see, e.g.*, Skowronski, John J. and Donald E. Carlston (1989), "Negativity and Extremity Biases in Impression Formation: A Review of Explanations," *Psychological Bulletin*, 105(1), 131 – 142; Ofir, Chezy and Itamar Simonson (2001), "In Search of Negative Customer Feedback: The Effect of Expecting to Evaluate on Satisfaction Evaluations," *Journal of Marketing Research*, 38(2), 170 – 182.  Relatedly, Nobel Prize-winning research has shown that product disadvantages loom larger than do product advantages, a phenomenon termed "loss aversion"; *see* Tversky, Amos and Daniel Kahneman (1991), "Loss Aversion in Riskless Choice: A Reference-Dependent Model," *Quarterly Journal of Economics*, 106(4), 1039 – 1061.

[138] *See, e.g.*, Tversky and Kahneman (1981); Kahneman, Daniel and Amos Tversky (1984), "Choices, Values, and Frames," *American Psychology*, 39(4), 341 – 350; Loftus, Altman, and Geballe (1975); Levin, Irwin P. (1987), "Associative Effects of Information Framing," *Bulletin of the Psychonomic Society*, 25(2), 85 – 86 (*e.g.*, finding that ground beef is rated as better tasting, higher quality, leaner, and less greasy when it is identified, or "framed," using a positive frame ["75% lean"] as opposed to a negative frame ["25% fat"]); Irmak, Caglar, Beth Vallen, and Stefanie Rosen Robinson (2011), "The Impact of Product Name on Dieters' and Nondieters' Food Evaluations and Consumption," *Journal of Consumer Research*, 38(2), 390 – 405 (finding that dieters perceived the same food item to be less healthy when it is identified by a relatively unhealthy name, such as "pasta," as opposed to a relatively healthy name, such as "salad."); Kivetz, Ran and Yuhuang Zheng (2006), "Determinants of Justification and Self-Control," *Journal of Experimental Psychology: General*, 135(4), 572 – 587 (*e.g.*, finding that framing the same resource investment as either effort or income changed consumers' choices as well as willingness to pay in effort vs. in income).

---

62.      ***Third***, the use of the word "defect" or "defective" may (inaccurately) imply to at least some participants that the product in question does not work as intended in some major way (*e.g.*, does not meet the manufacturer's own standard) or fails to meet a clear industry standard—particularly, as I discuss in Subsection B.4, when such a "defect" is directly juxtaposed against a product labeled as "NOT DEFECTIVE." People are likely to associate a "defect" with a problem that is more than an inconvenience; indeed, a "product defect" is often defined or discussed in the context of safety hazards:[139]

> A product defect refers to a lack of safety that a product should ordinarily provide, as defined by the Product Liability Act. It can take various forms, such as a design defect, manufacturing defect, packaging defect, marketing defect, and others. The defect can arise from a flaw in the manufacturing process or a flaw in the product's design itself, where it fails to meet the manufacturer's design standard.

63.      Neither the Plaintiffs nor their designated technical expert, Dr. Durham, have defined a standard for what constitutes acceptable "nuisance tripping" rates. In the context of AFCI breakers, and consistent with readily available resources for diagnosing and troubleshooting perceived "nuisance tripping,"[140] electricians may view "nuisance tripping" as an unwanted but manageable compatibility issue as opposed to an inherent failure of the product itself. Therefore, framing "nuisance tripping" as a "defect" is likely to distort participants' perceptions (relative to their actual experiences in the field), further undermining the validity of the survey's findings.

64.      ***Fourth***, the Caves Conjoint Survey's use of "defect" to describe the attribute at issue—exacerbated by the repeated use of the words "DEFECTIVE" as one of the attribute levels (*see* Subsection B.3)—is particularly problematic given that an AFCI breaker that does not work as intended would more accurately be described as a breaker that *fails to trip*, even once, when it should have (*i.e.*, a "miss" or "false negative"), compared to a breaker that may

---

[139] Taylor & Francis, "Product Defect," *Taylor & Francis Knowledge Centers*,https://taylorandfrancis.com/knowledge/Engineering_and_technology/Engineering_support_and_special_topics/Product_defect/.

[140] *See, e.g.*, Stevenj120volts (2025), "Troubleshooting AFCI Nuisance Tripping.," *YouTube*, https://www.youtube.com/watch?v=XoG9k8I8xps (video on "Troubleshooting AFCI nuisance tripping"); Electrical Code Coach (2022), "AFCI Nuisance Tripping and Trouble Shooting," *YouTube*, https://www.youtube.com/watch?v=kzp5bV3AzgA (video on "AFCI Nuisance Tripping and Trouble Shooting"); Peterson (2019) (online article on "Common Causes for Tripped AFCI Breakers").

occasionally trip when it should not have (*i.e.*, a "false positive").  Indeed, an ABB CAFCI installation manual warns the reader:[141]

> **Caution**: The AFCI must be supplied with power from the load center in order for the tests to function properly. If the power is on and either of these tests fails to trip, the AFCI may be unable to detect arcs. The circuit breaker is defective and should be replaced.

65.    The consequences of a breaker failing to detect a dangerous arc would violate the central purpose for which AFCIs were designed, and would typically be far more serious (*e.g.*, potentially involving death, serious injury, or property destruction) than the inconvenience or productivity loss from a "nuisance trip."  Notably, Dr. Caves's "disclosure" or survey does not even raise the possibility of a "defect" in the sense of a false negative or "miss" (as opposed to a false positive).  If participants had instead been asked to make tradeoffs involving less "sensitive" AFCI breakers (*i.e.*, that are guaranteed to not "nuisance trip" but that have a non-trivial chance of failing to trip in the presence of a dangerous arc) compared to more "sensitive" breakers (*i.e.*, that may lead to some "nuisance tripping" but that are much more likely to trip when detecting a dangerous arc), they may very well have preferred and placed more value on AFCIs with greater sensitivity.

**B.2.2.    *Dr. Caves's "Nuisance Tripping Defect" Disclosure Omits Relevant Information***

66.    Dr. Caves's fundamentally flawed characterization of "nuisance tripping" did not end with the use of the word "defect."  Other statements in Dr. Caves's 8-paragraph description of the so-called "Nuisance Tripping Defect" are leading and omit relevant information that could influence customer perceptions of this focal attribute.

67.    ***First***, Dr. Caves's "Nuisance Tripping Defect" disclosure begins immediately by informing participants: "In the questions that follow, certain AFCIs have a 'Nuisance Tripping Defect.'"  The description proceeds to characterize the "defect" as a faulty arc detection method, without any background explanation about the purpose of AFCIs and why they are required in the first place (*i.e.*, to trip upon detection of a potentially dangerous electric arc and to ultimately guard against electrical fires and hazards).  Siemens's AFCI brochures and diagnostic guides, for

---

[141] ABB (2024), p. 1.

instance, frequently include not only troubleshooting procedures but also information about the history and function of AFCIs as a safety device.[142]  The omission of this context from the Caves Conjoint Survey made it more likely that participants would view "nuisance tripping" in an unfavorable light.

68.    Using the phrase "certain AFCIs" is also likely to be confusing, as it is unclear from the introduction whether the presence versus absence of the so-called "defect" is being applied to different *brands* of AFCIs (*e.g.*, all Siemens-branded AFCIs have the "defect" while all ABB/GE AFCIs do not), or to an individual AFCI from the same brand (*e.g.*, a Siemens-branded AFCI has the "defect" while another Siemens-branded one does not).  The fact that participants are directly told that "certain AFCIs" carry the "defect" may also imply to them that whether any given breaker is "defective" (and therefore whether it will lead to "nuisance tripping") is deterministic and known in advance—that is, prior to making a purchase decision.  Based on my understanding, however, "nuisance tripping" is a challenge that all AFCI manufacturers face, as opposed to any single manufacturer (*see* Subsection B.3), and it is not possible to tell in advance whether an individual breaker from a given manufacturer will or will not lead to a "nuisance trip" event,[143] which is instead dependent on a host of situational and technical factors (*see, e.g.*, Subsection B.3).

69.    ***Second***, the following sentence in Dr. Caves's "Nuisance Tripping Defect" disclosure—"These AFCIs use an arc detection method that, according to reports, leads these AFCIs to trip due to common and safe voltage distortions that cause radio frequency harmonics"—

---

[142] *See, e.g.*, SIEMENS_AFCI_00232362 (native file) (*e.g.*, "AFCIs provide an increased level of safety to the electrical wiring system"); SIEMENS_AFCI_00000289 (2018 "Arc Fault Circuit Interrupter Troubleshooting Guide," noting, *e.g.*, "Arc Fault Circuit Interrupters (AFCIs) are devices that alleviate the effects of arcing faults to protect buildings against the dangers of electrical fires"); AFCI_00362724 (2020 AFCI-GFCI Circuit Breaker Diagnostic Guide, noting, *e.g.*, "Every year, residential electrical fires account for hundreds of deaths, thousands of injur[i]es, and hundreds of millions of dollars in property damage. A significant number of these electrical fires could have been prevented if the circuits had been protected by arc fault circuit interrupters circuit breakers").
[143] *See, e.g.*, SIEMENS_AFCI_00081109-21 (███████████████████████████████████████ ██████████████); SIEMENS-AFCI_00417573 (███████████████████████████ █████████████████████████████████).

is vague and, as I understand, characterizes the underlying technology in an incomplete and biased manner. Not only does Dr. Caves's statement not specify for participants which "reports" are being referenced or how often such tripping happens, or even what "common and safe voltage distortions" means, but it does not comport with how AFCI manufacturers describe their products vis-à-vis incompatibility with household devices.

70. For example, a 2023 Siemens internal presentation on "Troubleshooting Residential Circuit Breakers" explains that the "function" of an AFCI is to "look[] at the waveform signatures to determine if there is an arcing event,"[144] and that AFCIs trip when a waveform mimics an arc fault,[145] not merely due to any "voltage distortions that cause radio frequency harmonics" (as stated in Dr. Caves's description). Similarly, in an AFCI/GFCI Diagnostic Guide, Siemens describes incompatibility with electronic devices as arising from "loads that produce excessive noise that eventually mimics an arc":[146]

> In some situations, the homeowners/end-users and/or electrical contractors may experience a phenomenon called nuisance tripping. This occurs when the AFCI or GFCI circuit breaker trips and the reason is unknown. The main sources of nuisance tripping are wiring issues and **incompatibility with electronic devices**. Wiring issues such as damaged wires, loose connections, or incorrectly wired circuits are some examples of conditions that can create nuisance trip events. To resolve nuisance trip events associated with wiring issues the source of the issue will need to be corrected. **Incompatibility issues can be created by loads that produce excessive noise that eventually mimics an arc.** It is recommended that all installed electronic devices comply with FCC (Title 47 Part 18B/consumer or 15B) regulations to avoid noisy loads from causing nuisance trips. [Emphases added]

An ABB installation manual likewise states that the breaker may trip because a "load or combination of loads on the branch circuit emits a current signature that looks like an arc-fault."[147]

71. ***Third***, the following sentence in Dr. Caves's "Nuisance Tripping Disclosure"— "These distortions are generated by some models of common household appliances, electrical devices, and lighting, listed below: […]"—is likewise vague, overly broad, and omits pertinent details. Participants were presented with a non-exhaustive list of 23 different "common" products

---

[144] SIEMENS_AFCI_00133866 at 87.
[145] *Id.*, 87-93.
[146] SIEMENS_AFCI_00362724 at 26. Also based on the November 19, 2025 Interview.
[147] ABB (2024), p. 1.

across four general categories ("Major household appliances," "Lighting products," "Plug-in electrical devices," and "Voltage distortions that may cause ratio frequency harmonics from external sources"), but were never told which specific models could be problematic or how frequently the AFCIs with the so-called "defect" will trip when these products are used.  I understand that tripping rates vary across different types and combinations of household devices and appliances,[148] and that even within the same category of device or appliance (*e.g.*, LED lights or microwaves) only some models or makes may lead to a breaker tripping.[149]  Moreover, the frequency of "nuisance tripping" can also vary based on the model or generation of AFCI breaker.[150]  As the Plaintiffs' designated technical expert acknowledges, Siemens's "Gen 4" AFCIs



."[151]

[148] *E.g.*, Leidy 30(b)(6) Deposition, pp. 65 – 66 ("                                    "), 68 ("                                    "), 74 – 75 ("                                    & 86 – 87                                    "); SIEMENS_AFCI_00051648 (                                    ).                                    ; *see* SIEMENS_AFCI_00051634.

[149] *E.g.*, Leidy 30(b)(6) Deposition, pp. 66                                    ") & 77                                    ."); November 19, 2025 Interview.

[150] *E.g.*, Peterson (2019) ("With so many changes, older generation breakers may not be up to date or they simply have wear from regular or excessive use and might easily be resolved by upgrading to a new AFCI.").

[151] Durham Report, ¶ 190.

72.     The long list of appliances, electrical devices, and lighting in Dr. Caves's 8-paragraph description, which treats all types and models of products (*e.g.*, all microwaves vs. all garage door openers) as equivalent with respect to causing "nuisance tripping" and omits any information on how tripping rates vary, is likely to have conveyed to at least some participants the impression that "nuisance tripping" is *bound to occur* so long as they have any one of these products in their home.  As one of the 15 electricians whom Dr. Caves's interviewed for his "pilot study" remarked (*see* Section D for further discussion): "It sounds like anything could trip this the way I'm reading this."[152]

73.     ***Fourth***, the next two sentences in Dr. Caves's "Nuisance Tripping Defect" disclosure also suffer from vague, overly broad, and unclear phrasing, namely: (*i*) "If AFCIs with the Nuisance Tripping Defect are installed on circuits with, or in the same panel of circuits serving, these devices, they may trip and shut off power when no dangerous arc fault exists" and (*ii*) "Other current or future household products that create voltage distortions and radio frequency harmonics may also cause these same AFCIs to experience Nuisance Tripping."  From a participant's perspective, it is not clear at all, for instance, how often these breakers with the "defect" will trip and shut off power; whether they will trip and shut off power every time any common household electrical product is used; or which "other" current or future household products will cause "nuisance tripping."

74.     Dr. Caves's "disclosure" does not answer any of these questions and instead is likely to convey the impression that "nuisance tripping" is common (or even bound to occur) and deterministic, rather than rare and context dependent.  That participants may process phrases such as "may trip and shut off power" or "may […] cause" in more certain (*i.e.*, less probabilistic) terms is consistent with academic research, including my own published work, on consumers' neglect of probabilistic judgments.[153]

---

[152] Interview #14, p. 13.
[153] Rottenstreich, Yuval and Ran Kivetz (2006), "On Decision Making without Likelihood Judgment," *Organizational Behavior and Human Decision Processes*, 101(1), 74 – 88.

75.    In addition, the focus on "certain AFCIs" tripping from the use of "common household appliances, electrical devices, and lighting" also assumes that the root cause of a tripping event associated with these AFCIs could be pinpointed to a failure in the AFCI's arc detection method.  However, as multiple sources (including NEMA) have pointed out, what may often appear to be or is diagnosed as "nuisance tripping" could instead be due to several underlying causes, including those (such as damaged wiring) that pose real electrical danger.[154]

76.    *Fifth*, I am informed that the last paragraph in Dr. Caves's "disclosure"—which states that "Manufacturers of AFCIs with the Nuisance Tripping Defect have claimed their AFCIs are not designed to exclusively identify a true arc, but instead trip when they detect any signal that resembles an arc, even if that signal comes from a safe and properly functioning device"—is inaccurate.  This is because, as I understand, it is *not* the case that Siemens or other manufacturers have claimed that AFCI breakers are "designed" to trip when detecting "any signal that resembles an arc" as opposed to "exclusively identify a true arc."  Rather, the technology and algorithms for arc detection are more complicated and nuanced than how they are presented in Dr. Caves's "disclosure."  At his deposition, Mr. Tim Curtis, Application Engineer at Siemens, described arcs as "a little chaotic and random" because they "don't always operate the same, even in the same conditions,"[155] further testifying that:[156]



77.    In fact, although Dr. Durham quotes an excerpt from this deposition as support for his interpretation that Siemens "admit[ted] that its AFCIs are not designed to exclusively identify a

---

[154] *E.g.*, SIEMENS_AFCI_00081109 at 13-18 (a 2011 NEMA report on "Recommendations on AFCI / Home Electrical Product Compatibility"); NEMA (2017); NEMA (2024); November 19, 2025 Interview.
[155] Curtis Deposition, p. 175.  *See also* SIEMENS_AFCI_00135508 at 09 (Trip Investigation Report noting: "A true arc fault event can be very chaotic in nature").
[156] Curtis Deposition, pp. 190 – 191.

true arc,"[157] the broader context of Mr. Curtis's testimony indicates that it is not the case that AFCIs *could* exclusively identify a true arc and that manufacturers simply choose not to implement this. Rather, the underlying technology can only analyze and compare different conditions or values that could be consistent with an arcing event.[158]



[Emphasis added]

Similarly, Mr. Matthew Leidy, Research & Development System Architect at Siemens, testified as follows when asked how the AFCI circuit breaker detects a series arc:[159]



78.     One of the 15 electricians interviewed by Dr. Caves (*see* Section D) specifically asked whether manufacturers have actually made the claim represented in the last paragraph of the "disclosure":[160]

> *Interviewee*: The infect effect [defect], have claimed that area [*sic*] are not designed to [exclus]ively identify on said [*sic*] trip when they detect any signals. **So is this, that last paragraph is, that is, that a statement that they they have presented in in their Ul listing**.
>
> *Kevin Caves*: I don't know if it's in the ul listing. That's a good question. I don't know.

---

[157] Specifically, Dr. Durham asserts that "Siemens admits that its AFCIs are not designed to exclusively identify a true arc, but instead trip when they detect any signal that resembles an arc, even if that signal comes from a safe and properly functioning device" (Durham Report, ¶ 135) and quotes Mr. Curtis's testimony that "at the end of the day, the product isn't trying to make a determination of a real arc or a fake arc or a simulated arc" (Curtis Deposition, p. 252).

[158] Curtis Deposition, p. 252.

[159] Leidy 30(b)(6) Deposition, p. 57.

[160] Interview #13, p. 19.  The raw transcripts provided by Dr. Caves included numerous typographical and transcription errors, while also obscuring portions of sentences.  When quoting participants' verbatim responses throughout this *Rebuttal Expert Report*, unless otherwise indicated (*e.g.*, using square brackets), I reproduce the responses as originally transcribed.  I use empty square brackets ("[]") to denote where sentences have been obscured or cut off from the raw transcripts.

I understand this last paragraph is, in fact, *not* a statement that any manufacturer has presented in their UL listing.[161]

79.     Moreover, Dr. Caves's representation as to what manufacturers have supposedly claimed ignores information that these manufacturers either have actually communicated or are more likely to communicate to customers, including, for instance, that arc detection algorithms have improved over the years; that AFCI breakers have passed industry-standard testing (*i.e.*, per UL 1699, which includes "nuisance tripping" tests) prior to going to market; and that reducing "nuisance tripping" is a collaborative effort among AFCI manufacturers, appliance manufacturers, and other industry experts.[162]

80.     ***In summary***, for all of the reasons outlined previously, Dr. Caves's "disclosure" is unrealistic, biased in the Plaintiffs' favor, omits important and relevant information that could shape electricians' perceptions of "nuisance tripping," and does not, to the best of my knowledge, approximate any disclosure that AFCI manufacturers (including Siemens) have used, or would use, in the marketplace.

### B.2.3.  *Dr. Caves's Description of the "Nuisance Tripping Defect" Disclosure Artificially Highlighted this Attribute Compared to Other Attributes*

81.     Contrary to the principle that "all attributes and levels" in a conjoint survey be described "thoroughly and consistently,"[163] Dr. Caves's description of the focal attribute (*i.e.*, the "Nuisance Tripping Defect") instead artificially singled-out this attribute in multiple ways.

82.     ***First***, consistent with Professor Huber's admonition,[164] the mere inclusion of an attribute referred to as the "Nuisance Tripping Defect" disclosure—which appeared outside the context of any customer-facing marketing communication—induces a focalism bias, inflating the

---

[161] *See* Underwriters Laboratories, AWAH.E82615 - Siemens Arc-fault Circuit Interrupters, Combination Type (last updated Nov. 13, 2025).
[162] *See, e.g.*, SIEMENS_AFCI_00122997 (███████████████████████████████
████████"); Hewitt Deposition, pp. 11 & 13.
[163] Bridges et al. (2011), p. 409 ("It is important to describe all attributes and levels thoroughly and consistently, to ensure that all respondents are evaluating the same task and not making unobservable assumptions about the attributes and levels in a given profile.  For example, respondents can have quite different outcomes in mind for symptom levels described simply as mild, moderate, or severe").
[164] Huber (1997), p. 10.

"importance" participants attached to this attribute.  Unlike in the Caves Conjoint Survey, AFCI manufacturers in the actual marketplace do not "disclose" "nuisance tripping" as a product "defect" but instead typically discuss unwanted tripping as a potential incompatibility issue with certain household appliance models and, accordingly, provide guidelines for diagnosing and troubleshooting this issue.  The appearance of a novel "Nuisance Tripping Defect" disclosure in the survey is likely to have led some participants to assume that those AFCIs with this "defect" must have some technical abnormality or suffers a more serious problem with "nuisance tripping" compared to what they might otherwise expect to encounter during their ordinary business.  Participants may also infer that the frequency of "nuisance tripping" must be so high that they exceed any reasonable industry standard and/or put the customer at risk of a safety hazard.  Otherwise, why would the survey (and manufacturer) "disclose" such a "defect"?

83.  ***Second***, the description of the "Nuisance Tripping Defect" apparently *always* came first during the survey's introduction of attributes prior to the CBC exercise (*i.e.*, Dr. Caves did not randomize the order in which these attributes appeared in the introduction).[165]  Failing to rotate the order in which the attribute descriptions appeared likely contributed to the survey's demand effects and an order bias[166] due to the *primacy effect*—that is, participants' tendency to better remember or assign greater weight to the first piece of information they are presented.[167]

84.  ***Third***, Dr. Caves's "disclosure" is also highly likely to stand out from participants' perspective because it is the *only* attribute included in his conjoint survey that

---

[165] Nothing in the data or materials produced by Dr. Caves indicates that the introductory descriptions of the attributes were randomized.

[166] It is well-established that the order in which participants are presented with information in a survey can influence their evaluation and weighing of that information.  *See, e.g.*, Strack, Fritz (1992), "'Order Effects' in Survey Research: Activation and Information Functions of Preceding Questions," in *Context Effects on Social and Psychological Research*, Schwarz, Norbert and Seymour Sudman (eds.), New York, NY: Springer-Verlag; *see also, e.g.*, Malhotra, Naresh K. (2004), *Marketing Research: An Applied Approach*, Upper Saddle River, NJ: Pearson Prentice Hall; Diamond (2011), pp. 395 – 396; *see also* Dhar, Ravi and Itamar Simonson (1992), "The Effect of the Focus of Comparison on Consumer Preferences," *Journal of Marketing Research*, 29(4), 430 – 440.

[167] *See, e.g.*, https://dictionary.apa.org/primacy-effect ("the tendency for facts, impressions, or items that are presented first to be better learned or remembered than material presented later in the sequence. This effect can occur in both formal learning situations and social contexts. For example, it can result in a **first-impression bias**, in which the first information gained about a person has an inordinate influence on later impressions and evaluations of that person" [emphasis in the original]).

would be perceived as negative in tone and content. As discussed earlier, the "Nuisance Tripping" attribute was repeatedly framed to participants using non-neutral, negative language (*e.g.*, "defect") that is biased in the Plaintiffs' favor. The negativity bias induced by this framing was exacerbated by the fact that Dr. Caves did not include any other negatively-valenced attribute in his survey. Dr. Caves did not, for example, include any other product potential "defects," such as an increased risk of the AFCI breaker *failing* to detect dangerous arc faults, or other product characteristics that would likely be perceived as negative. In fact, as I discuss in Subsection C.1, the only other attributes that participants were asked to consider in the conjoint task, aside from price, consisted of factors that electricians are unlikely to even be able to choose in most cases due to compatibility constraints of the project at hand (*i.e.*, brand, breaker type/function, and various technical specifications).

85.     When only a single attribute in the CBC survey is negative and is represented to participants using a descriptor such as "defect," that attribute is likely to receive greater attention and weight than it otherwise would in the real world. Consequently, the Caves Conjoint Survey artificially inflated participants' preference and willingness to pay (WTP) to *avoid* any products bearing the lone negative "disclosure"—and labeled as "DEFECTIVE"—in the survey.

86.     ***Fourth***, Dr. Caves's description of the "Nuisance Tripping Defect" disclosure is also by far the longest of all the attributes presented to participants, further making this "disclosure" stand out from a participant's perspective. Specifically, this 8-paragraph "disclosure" consisted of a total of 234 words, compared to the single paragraph descriptions for the "Brand" attribute (53 words), the "Function" attribute (23 words), the "Technical Specifications" attribute (50 words), and the "Price" attribute (38 words). Moreover, unlike for the "Nuisance Tripping Defect" attribute, Dr. Caves did not "explain," define, or elaborate on the various other included attributes or levels, such as "single function" versus "dual function" or the different levels under "technical specifications" ("Plug-On Neutral", "Plug-In Pigtail," "current rating", "number of poles," "interruption rating").

87.     ***Fifth***, as I further discuss in Subsection C.2, Dr. Caves has provided no evidence as to why or how his "disclosure" could plausibly (*i.e.*, in a commercially reasonable way) be

displayed to customers at the point of purchase. I am not aware of *any* AFCI product that uses a disclosure resembling the one shown by Dr. Caves in his conjoint survey. The "Nuisance Tripping Defect" disclosure to which participants were exposed was also completely disassociated from any purchase context, such as an actual product package, brochure, installation or troubleshooting guide, or other customer-facing medium. This decontextualized presentation format, which prevented participants from seeing other information they would otherwise have access to in the actual marketplace, further highlighted the "Nuisance Tripping Defect" disclosure and exacerbated the survey's already severe demand and focalism biases.

88.    ***Overall***, the Caves Conjoint Survey's description of the "Nuisance Tripping Defect" is fatally flawed and biased in multiple ways, guaranteeing survey participants' attention—and negative reactions—to this "disclosure." Dr. Caves's leading "disclosure" renders the survey completely uninformative regarding the effect, if any, of the alleged omission on consumers' true willingness-to-pay (WTP) for the at-issue AFCIs. Accordingly, any alleged price premium estimated from the Caves Conjoint Survey is unreliable and invalid.

**B.3.    The Two Levels of Dr. Caves's "Nuisance Tripping Defect" Attribute are Leading, Unclear, and Misrepresent Marketplace Reality, Likely Generating Confusion and Erroneous Customer Beliefs and Choices**

89.    In conjoint analysis, an attribute or feature's "relative importance"[168] cannot be reliably measured unless the range of the levels of the feature or attribute are clearly defined or understood. For example, a product's "battery life" would be defined based on the difference in the customer's valuation for an explicitly stated low level (*e.g.*, 12 hours) versus an explicitly stated high level (*e.g.*, 18 hours), reflecting the range of attribute levels available in the marketplace. In the Caves Conjoint Survey, the presence versus absence of the "Nuisance Tripping Defect" disclosure (the focal attribute) was represented to participants as "DEFECTIVE: Prone to Nuisance Tripping" versus "NOT DEFECTIVE," respectively. These

---

[168] In conjoint analysis, the relative importance of an attribute is defined as the range of variation in values for that attribute from the lowest to the highest attribute value (*i.e.*, the value of the improvement from the least to the most desired attribute level). *See, e.g.*, Green and Srinivasan (1978).

attribute levels are *not* clearly defined and are highly likely to lead participants to overestimate the importance of Dr. Caves's "disclosure."

90.    ***First***, the phrase "DEFECTIVE: Prone to Nuisance Tripping" is vague and unclear, while also omitting relevant information.  Dr. Caves failed to clarify or quantify what "prone to" means; does it mean, for instance, that the so-called "defective" breakers will trip 5% of the time? 20% of the time?  50% of the time?  90% of the time?  Everyday?  Every single time a common household appliance, electrical device, or lighting product is used?  Participants were left to form their own subjective interpretations or impressions as to how frequently "nuisance tripping" would occur for a hypothetical AFCI breaker carrying this "defect."

91.    Dr. Caves also failed to provide *any* context or explanation that participants could use to interpret the "DEFECTIVE: Prone to Nuisance Tripping" attribute level.  For example, the survey provides no information about whether "proneness" to "nuisance tripping" depends on various contributing factors, including: the specific types, models/makes, and service life of household devices and appliances;[169] the model or generation of the AFCI breaker in question (*e.g.*, with newer, more updated breakers reducing unwanted tripping rates);[170] and technical

---

[169] *See, e.g.*, SIEMENS_AFCI_00039664 at 64 ("Common Causes of AFCI Breaker Tripping and General Tips and Tricks*", listing factors that contribute to tripping, including appliance service life: "Loads experiencing a defect or nearing the end of their service life can exhibit similar behavior to hazardous arcing and cause an AFCI to trip"); SIEMENS_AFCI_00051648 ██████████████████████████████████████████████████████████████████████████████ ); SIEMENS_AFCI_00260454 at 58 (2022 Association of Home Appliance Manufacturers [AHAM] report on "Nuisance Tripping of Arc-Fault Circuit Interrupters (AFCIs) for Appliances," explaining that a microwave's "normal operation thus creates non-sinusoidal, noisy, waveforms that may be mistaken for arc signature by present AFCI's trip algorithms"); SIEMENS_AFCI_00135508 at 08-11 (████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ █████████████████████████████)

[170] *See, e.g.*, SIEMENS_AFCI_00133866 at 84-86 (████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ); Siemens's Responses to First Set of Interrogatories, pp. 7 – 9 (████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████ Kees 30(b)(6) Deposition, p. 52.

---

factors such as circuit overloads, RF (radio frequency) interference, current leakage, overvoltage/surge situations, and more.[171]

92.     By relying on an ambiguous and ill-defined attribute level, stripped of any contextual information, the Caves Conjoint Survey's results are uninformative, as participants were left to speculate about—and likely *overestimate*—the nature and extent of the "defect" they are being asked to trade off against brand, price, and other technical specifications in the CBC task.  Inducing such "guided guessing"[172] behavior violates a fundamental assumption of conjoint analysis, namely, that participants understand the attributes in a common way and are able to make informed tradeoffs among the presented attributes.[173]

93.     To the extent that participants believed that any breaker labeled as "DEFECTIVE: Prone to Nuisance Tripping" meant that the breaker will always be *more likely than not* to experience a "nuisance trip," I understand that such a belief would not be accurate, because documented occurrences of "nuisance tripping" industry-wide (including specifically associated with Siemens AFCIs) have been and remain relatively *rare*.  For instance, a 2011 NEMA report discussed "unwanted tripping"—characterized as a "conflict between the home electrical product and the operation of AFCIs"—as "rare."[174] ███████████████

█████████████████████████████████████████████

████████████████████████████████████

---

[171] *See, e.g.*, SIEMENS_AFCI_00081109 at 13-18 (a 2011 NEMA report on "Recommendations on AFCI / Home Electrical Product Compatibility," explaining technical factors that contribute to tripping from product compatibility issues, including current leakage, peak current, and "start-up inrush current"); SIEMENS_AFCI_00135508 at 11 (██████████████████████████████████
████████████████████████████████████████████
██████████); SIEMENS_AFCI_00039664 at 64 ("Common Causes of AFCI Breaker Tripping and General Tips and Tricks*", listing "Overloads," "Overvoltage/Surge," "Excessive Radio Frequency Interference / Electromagnetic Interference," "Load Interoperability," and "Load Failure" as factors).

[172] Diamond, Shari S. (2022), "Control Foundations: Rationales and Approaches," in Diamond, Shari S. and Jerre B. Swann (eds.), *Trademark and Deceptive Advertising Surveys*, Chicago, IL: American Bar Association, p. 243 ("This form of guessing can appropriately be characterized as "guided guessing."  It occurs if questions or response choices contain cues that suggest a particular response.  The extreme form of suggestion is the familiar leading question that makes it clear that a particular response is expected or preferred.").

[173] *See, e.g.*, Orme (2020); Bridges et al. (2011); Wilcox (2003).

[174] SIEMENS_AFCI_00081109 at 13-18 (a 2011 NEMA report on "Recommendations on AFCI / Home Electrical Product Compatibility").



94.    Similarly, a 2018 presentation from ACBMA, the American Circuit Breaker Manufacturers Association (whose members include Siemens, ABB, Eaton, and Square D/Schneider Electric) documented that reported issues "identified as either 'Nuisance Trip' or 'Interoperability' were only 0.0078% of circuit breaker AFCIs shipped,"[177] further noting that "NEMA has received only 24 reports of unwanted AFCI circuit breaker tripping for the entire year 2017."[178]  NEMA published a report in 2023 that evaluated "unwanted tripping" and concluded as follows:[179]

> [D]ata shows that AFCIs are protecting over 60 million appliances with **a very small number of documented reports of unwanted tripping. The claims around high amounts and percentages of unwanted tripping have been anecdotal; lack details on when, where, and why occurrences are happening; and do not constitute facts around AFCI and appliance compatibility performance.** These are clearly unsubstantiated statements in light of the data provided in this document. [Emphases added]

Another recent NEMA article, published in the *IAEI Magazine*, described AFCIs as "not only [] working well with various appliances, but they are doing so consistently," and cited evidence in the field that most reports of "false" tripping turned out to involve potentially dangerous arcing:[180]

> An early concern when AFCIs first came to market were occasional reports of false tripping. Follow ups by contractors and manufacturers **almost always showed the devices were working as designed, meaning they tripped due to detecting potentially dangerous arcing in the circuit**. Recently, a 2023 survey conducted by the Electrical Safety Foundation International (ESFI) in Colorado, Georgia,

---

[175] SIEMENS_AFCI_00047353.

[176] ███████████████████████████████████████████████████ *See* SIEMENS_AFCI_00002842, SIEMENS_AFCI_00002899, & SIEMENS_AFCI_00416124.

[177] SIEMENS_AFCI_00004504 at 06.

[178] *Ibid*.

[179] SIEMENS_AFCI_00020560 at 62-63.

[180] NEMA (2024).

Kentucky, Minnesota, Ohio, Texas, and Washington, surveyed contractors with experience in electrical contracting, design and engineering regarding AFCIs and GFCIs. They reported that roughly 58% of their service calls involved tripped breakers or fuses in homes. Of those calls, only 17% reported a tripped AFCI breaker and **100% of the contractors indicated they saw evidence of dangerous arcing when responding to an AFCI related service call. All of the contractors determined the devices were working as intended.** The trips identified and prevented serious problems that could have otherwise resulted in injuries or the potential loss of life and property.  [Emphases added]

95.   ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████[181]

96.   The magnitudes of unwanted tripping rates reported above—between 0.0078% to ████—are *not* consistent with describing an AFCI breaker as being "DEFECTIVE: Prone to Nuisance Tripping," as was done in the Caves Conjoint Survey.

97.   ***Second***, Dr. Caves's use of the phrase "NOT DEFECTIVE" as the other attribute level for his "Nuisance Tripping Defect" disclosure is fundamentally improper.  Not only is this attribute level commercially unrealistic (as no manufacturer would, to the best of my awareness, label their product "NOT DEFECTIVE"), but it is also an *inaccurate* counterfactual or benchmark, as it likely conveyed to many participants that AFCIs labeled as "NOT DEFECTIVE" never cause "nuisance tripping" (or are not "prone" at all to "nuisance tripping"), when such standards and performance do not exist in the actual marketplace.  My understanding is that it is not technologically feasible as of today (let alone on or before December 2021) for an AFCI breaker to be designed in such a way that "nuisance tripping" is guaranteed to never occur in the field, because there could always be waveforms emitted by certain household electrical products and under certain circumstances that mimic a potentially dangerous arc.[182]

98.   The notion that all AFCI manufacturers (including the three competitor brands included in the Caves Conjoint Survey) face the potential for some non-zero rate of "nuisance trip"

---

[181] SIEMENS_AFCI_00002743 at 45 ██████████████████████████████
████████████████████████

[182] *E.g.*, SIEMENS_AFCI_00362724 at 26.

events is supported by multiple sources, including: industry articles and troubleshooting resources, which do not single out any brands as being immune to "nuisance tripping";[183] the absence of any evidence from the Plaintiffs, to the best of my awareness, that manufacturers other than Siemens do not experience "nuisance tripping" issues; evidence from these competing manufacturers, on the other hand, that they do experience "nuisance tripping,"[184] ████████████████████████████████████████████████████████████████████████████████████████████

█████[185] deposition testimony in this litigation;[186] and even Dr. Caves's own "cognitive

---

[183] *See, e.g.*, WAC Lighting (2023); Stevenj120volts (2025) (video on "Troubleshooting AFCI nuisance tripping"); Electrical Code Coach (2022) (video on "AFCI Nuisance Tripping and Trouble Shooting"); SIEMENS_AFCI_00080311 (2019 Troubleshooting Card); SIEMENS_AFCI_00362724 (2020 AFCI-GFCI Circuit Breaker Diagnostic Guide); SIEMENS_AFCI_00257830 (2023 Troubleshooting Guide); SIEMENS_AFCI_00270694 & SIEMENS_AFCI_00000427 (2021 Troubleshooting Card).
[184] *See, e.g.*, Square D (2025), "Advanced Detection. Familiar Install" (brochure discussing Square D's "Advanced Arc-D-Tect" technology and noting: "This advanced technology strives to **reduce the nuisance of unwanted tripping**"); Eaton "Loadcenters and Circuit Breakers: Next Generation Combination Arc Fault Circuit Interrupters (CAFCI)" product description (noting that "Eaton's next generation AFCI products feature superior protection and circuit diagnostics, along with exclusive features" and identifying one benefit as: "Designed to **reduce unwanted tripping** from non-compliant devices"), https://www.eaton.com/content/dam/eaton/products/low-voltage-power-distribution-controls-systems/circuit-breakers/br-circuit-breakers/canada/eaton-next-generation-combination-arc-fault-circuit-interrupters-cafci-ca.pdf; Domitrovich, https://www.eaton.com/us/en-us/company/news-insights/for-safetys-sake-blog/increase-safety-with-AFCI.html (noting, in a section entitled "**Unwanted tripping of devices**": "Many times when an AFCI or GFCI detects a problem, we mistakenly blame the device without realizing it's just doing its job. […] Contractors in the field should work to understand why a trip occurs"); NEMA_S-0024317 (████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████).
[185] SIEMENS_AFCI_00122997 at 97 ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *See also* SIEMENS_AFCI_00230045 at -51 – 53 (████████████████████████████████████████████████████████████████████)
[186] *See* Kees 30(b)(6) Deposition, p. 108 (███████████████████████ ███████████████); Duemmler Deposition, p. 222 (testifying that, to his knowledge, every AFCI breaker in the industry nuisance trips).

interviews" of 15 electricians.[187]  Indeed, as I detail in Subsection D.2, multiple of these interviewees expressed confusion about what the "Nuisance Tripping Defect" disclosure means, with one electrician repeatedly wondering why certain AFCIs would not have the "defect" and what is different about the technology behind an AFCI breaker that does not "nuisance trip":[188]

> *Kevin Caves*: Okay, so do you. So do you think the question gave enough information to decide which option to select.

> *Interviewee*: **No, because I what what is the like? What are these labeled Nuisance tripping?** What is it about [] the the you get nuisance trips. […] And and what is different about the General electric that there's not nuisance tripping. Right? All this is is a []er telling me. Yeah, this is better than that one. But how do I know right? And and what is the circuits that they use? How how is it done that they're able to get both functions Afci, Gfi. [] and not have nuisance tripping. So yeah, right? What's the [] **What's the magic bullet that they have?** You know I'd like to. I'd like to know what that is.

And:[189]

> **Why does it not have a tripping defect?** Right? Because I know how that [] they operate, you know. So what what is it that catches? [] it's a good arc or a bad arc?

99.    Given the marketplace reality, where I understand no such "magic bullet" exists yet, it is not surprising that participants would tend to choose AFCIs described as "NOT DEFECTIVE" (as presumably "solving" this issue) while simultaneously avoiding those described as "DEFECTIVE: Prone to Nuisance Tripping."  This is even more so when considering the fact that, as I discuss in Section C, the survey instructions prompted participants to ignore purchase considerations that would otherwise be dominant, such as compatibility constraints.

100.    ***Third***, and relatedly, the way in which Dr. Caves's "disclosure" is embedded within his choice task is biased, resulting in product "profiles" that were highly likely to generate what I understand to be *erroneous perceptions*.  Because participants were repeatedly exposed to some AFCIs labeled as "DEFECTIVE: Prone to Nuisance Tripping" and others labeled as "NOT DEFECTIVE," it is highly likely that many participants inferred: (*i*) that it is possible to engineer AFCIs that are *not* "prone to nuisance tripping" at all or would never "nuisance trip" (and know this

---

[187] *See* Subsection D.2.
[188] Interview #3, pp. 21 – 22.
[189] *Id.*, p. 25.  *See also id.*, pp. 32, 36 – 37, & 44 – 46.

prior to the point of purchase); and (*ii*) that they should think about the "Nuisance Tripping Defect" as a binary metric (*i.e.*, an AFCI either does or does not experience "nuisance tripping"), as opposed to considering the *degree*, *probability*, or *frequency* to which they may experience "nuisance tripping."  These inferences, I understand, would be incorrect, because the alleged "defect" at issue is not specific to one brand and cannot be completely eliminated.

101.    Neither the Plaintiffs nor Dr. Durham, their designated technical expert, have quantified what rate or probability of "nuisance tripping" constitutes an expected or acceptable baseline among electricians or industry authorities, let alone established that there is any industry consensus that the expected or acceptable rate is 0% (*i.e.*, no potential for any "nuisance tripping" events).  Nor have I seen any evidence put forward by the Plaintiffs that compare the alleged "nuisance tripping" rates in Siemens's AFCIs relative to those of competitor brands.  Hence, using a baseline level of "NOT DEFECTIVE" (essentially implying no "nuisance tripping") was not justified and served to further steer participants' choices in the Plaintiffs' favor.

102.    ***Fourth***, as the above discussion makes clear, "nuisance tripping" is not a binary or categorical phenomenon where a breaker has either a negligible (0% or near 0%) chance of experiencing a "nuisance trip" event or else a guaranteed (100%) chance of experiencing such an event.  Indeed, even the Plaintiffs' Complaint appears to acknowledge that the issue pertains to the *frequency* of tripping:[190]

> Siemens' AFCIs, however, fail to adequately distinguish between harmless and dangerous electrical arcs.  As a result, Siemens' defective AFCI breakers suffer from nuisance tripping, where the breakers **frequently** and unnecessarily trip even where no dangerous electrical arc is present and there is no risk of electrical harm. […] Siemens AFCIs trip in the presence of common appliances, even though they do not pose a risk due to electrical arcing, leading to **excessive and frequent nuisance tripping**.  [Emphases added]

The Durham Report also states that Siemens's "Gen 4" AFCIs—which are not subject to Dr. Caves's damages calculations[191]—"incorporated machine-learning based detection that, based on

---

[190] Complaint, ¶ 5.
[191] *See, e.g.*, Caves Report, ¶ 11 ("I have been asked by counsel for Plaintiffs to assume that the Class AFCIs include all single-function AFCIs sold between January 1, 2017 and December 10, 2021 (the 'Damages Period'), when Siemens released its 'Gen 4B' AFCIs").

available information, markedly improved performance by reducing the extent and causes of nuisance tripping."[192]  Dr. Durham further writes regarding Siemens's "Gen 3" AFCIs:[193]

> In my professional opinion, the Gen 3 AFCI design **does not fully discriminate** between hazardous and benign electrical phenomena encountered in typical residential environments. **While the device performs its intended protective function under some laboratory test conditions**, its field behavior demonstrates a **greater susceptibility** to nuisance tripping than would be expected from a robust, well-discriminating protective system.  [Emphases added]

103.    Therefore, the appropriate comparison was not a binary one between AFCIs described as "DEFECTIVE: Prone to Nuisance Tripping" and those characterized as "NOT DEFECTIVE."  Rather, since the question is *how frequently* AFCIs exhibit "nuisance tripping," the survey should have made comparisons among AFCIs that differ in the potential "nuisance tripping" rates, with the proper baseline reflecting an industry standard level of tripping or the level of tripping associated with non-Siemens AFCIs.

104.    By using a binary comparison (essentially juxtaposing breakers that either will or will not "nuisance" trip), the Caves Conjoint Survey generated an artificially inflated, overstated alleged price premium for this focal attribute.  In the context of a CBC survey, participants are much more likely to attach greater importance or utility to a "nuisance tripping" attribute if shown attribute levels that essentially communicate a 0% versus 100% chance that a breaker will "nuisance trip," as opposed to, for example, attribute levels that communicate lower and narrower likelihoods of "nuisance tripping" (*e.g.*, 5% versus 10% chance).  This is because in conjoint analysis a larger range in an attribute translates into a greater relative importance, or weight, for that attribute.  To illustrate this point, consider the perceived "importance" of price. The importance of price cannot be understood in absolute terms; price is neither important nor

---

[192] Durham Report, ¶ 190. ████████████████████████████████████████████████████████████████████████████████████████████████████; *see* Leidy 30(b)(6) Deposition, pp. 98 – 99.

[193] Durham Report, ¶ 185.  The Durham Report does not, however, quantify the rate of "nuisance tripping" that would be expected from a "robust, well-discriminating protective system."

unimportant *in general*, but it is more important when price differences are large and less important when price differences are small.[194]

105.    *Fifth*, it is important to note that had Dr. Caves presented a fair, accurate, and realistic disclosure related to "nuisance tripping," it could very well have been immaterial to electricians' purchase decisions.  This is because an important consequence of relative attribute importance is that attributes whose levels are very similar across the different products (within a category) offered in the marketplace are relatively unimportant in driving customer purchase decisions and choices.  In the domestic USA airline industry, for example, because flight safety does not meaningfully vary across different airlines, this attribute is not a major determinant of consumer purchase decisions, airline market shares, or sales.  A properly designed and conducted CBC study would reveal flight safety to be a relatively unimportant attribute in consumers' purchase decisions regarding domestic USA flights.

106.    In the present matter, if participants were informed that the same (or substantial similar) probability of experiencing "nuisance trips" is present regardless of the AFCI or manufacturer brand, then it is likely that customers would no longer view this "defect" as a meaningful factor for distinguishing and making tradeoffs among AFCI breakers.  In other words, this attribute, which would no longer be a differentiator, would be "canceled out" in the minds of participants.[195]

107.    *Overall*, by varying the presence versus absence altogether of a so-called "Nuisance Tripping Defect," the Caves Conjoint Survey artificially inflated the price premium estimate (or discount) attributed to his "disclosure" and failed to adequately address the Plaintiffs' theory of liability.  Conjoint surveys that do not appropriately tie alleged price

---

[194] *See, e.g.*, Green and Srinivasan (1978).

[195] *See, e.g.*, Houston, David A., Steven J. Sherman, and Sara M. Baker (1991), "Feature Matching, Unique Features, and the Dynamics of the Choice Process: Predecision Conflict and Postdecision Satisfaction," *Journal of Experimental Social Psychology*, 27(5), 411 – 430; Dhar, Ravi and Steven J. Sherman (1996), "The Effect of Common and Unique Features in Consumer Choice," *Journal of Consumer Research*, 23(3), 193 – 203; Simonson and Kivetz (2000); Mellers, Barbara A. and Karen Biagini (1994), "Similarity and Choice," *Psychological Review*, 101(3), 505 – 518; Tversky, Amos (1972), "Elimination by Aspects: A Theory of Choice," *Psychological Review*, 79(4), 281 – 299; Kahneman, Daniel and Amos Tversky (1979), "Prospect Theory: An Analysis of Decision Under Risk," *Econometrica*, 47(2), 263 – 292; Kivetz and Simonson (2000).

premium estimates to the alleged deception or theory of liability have been rejected or criticized.[196]  For example, in *Flodin v. Central Garden & Pet Co.*, the court, in denying class certification, criticized a conjoint survey proposed by another opposing expert (a survey that I critiqued) for estimating a price premium due to the statement "made with avocado," when the plaintiff's theory of deception had to do with the *percentage* of avocado in the product, not with the presence versus absence of avocado altogether:[197]

> As Defendants' rebuttal expert Dr. Ran Kivetz argues, "consumers may very well value the presence of avocado but may not necessarily attach additional value to a particular amount or percentage of avocado being present in the dry dog formula, or to avocado being a 'main ingredient[.]'" So **even if Gaskin's proposed model shows that consumers are "willing to pay a premium for a dry pet food product being made with avocado, it cannot demonstrate that consumers are willing to pay a premium because they expect a specific amount of avocado**." […]  The Court thus takes Plaintiffs' silence as a concession and find that they have failed to set forth an adequate model of damages and restitution.  Plaintiffs' argument that conjoint analyses have been accepted for class certification generally is unavailing. [Emphasis added; citations omitted]

108.    Just as the statement "made with avocado" was overly broad in the above-cited case, so the "Nuisance Tripping Defect" disclosure is overly broad in the Caves Conjoint Survey because it assumes that such a "defect" is either present or absent for specific AFCI products (as opposed to present to *some degree* across all AFCI products).  That is, the relevant question is not whether the at-issue Siemens ACFIs are either "DEFECTIVE: Prone to Nuisance Tripping" or "NOT DEFECTIVE," but rather *how "prone"* they are to unwanted tripping.  Hence, even if all other aspects of Dr. Caves's conjoint survey were valid and reliable (they were not, for all the reasons I set forth in this *Rebuttal Expert Report*), his purported price premium estimate would still be overstated, and the survey would not isolate a premium solely attributable to the alleged omission per the Plaintiff's theory of liability.

---

[196] *E.g.*, *Flodin v. Central Garden & Pet Co.*, 21-cv-01631-JST, 2024 WL 4565340 (N.D. Cal. Oct. 23, 2024).
[197] *Id.*, at *10.

**B.4.** **The Leading Nature of Dr. Caves's "Nuisance Tripping Defect" Disclosure is Exacerbated by the Survey's Repeated Stimuli Presentation**

109. Dr. Caves's procedure and questions made the survey's purpose and hypotheses obvious to participants. The conjoint task exposed participants to *both* product profiles *with* Dr. Caves's "Nuisance Tripping Defect" disclosure (*i.e.*, described as being "DEFECTIVE: Prone to Nuisance Tripping") and profiles *without* this disclosure (*i.e.*, described as "NOT DEFECTIVE"), including within the same choice set. This "within-subjects" design[198] overly sensitized participants to the presence versus absence of this purported "defect" across 12 repeated conjoint tasks, thereby guaranteeing participants' attention to this disclosure and upward-biasing its price premium estimate. Over the course of multiple repetitive choices, participants could easily infer that if being "DEFECTIVE: Prone to Nuisance Tripping" versus "NOT DEFECTIVE" were not important, then why would the researcher create a survey that: (*i*) highlights this same attribute repeatedly; and (*ii*) contrasts profiles with versus without a "nuisance tripping" product over and over?

110. One major drawback of such a within-subjects design is that it reveals to participants the factor being investigated and the research hypothesis.[199] Indeed, there is no doubt that such a design would make it obvious to participants that the survey is testing their beliefs, at least in part, about the importance and desirability of certain attributes and levels, including specifically the "nuisance tripping" disclosure intended to address the alleged omission. This, in turn, is likely to lead participants to guess the "expected," and obvious, answer—namely, that an AFCI breaker described as "NOT DEFECTIVE" is better than and should be chosen over an AFCI breaker described as "DEFECTIVE: Prone to Nuisance

---

[198] A within-subjects design is a research design in which participants provide a response to an outcome variable or measure (*e.g.*, choice of an AFCI breaker) while being exposed to different *levels* of a tested independent variable (*e.g.*, whether the product has a certain claim or characteristic, such as "DEFECTIVE: Prone to Nuisance Tripping"). By contrast, in a "between-subjects" design, different groups of participants would be exposed to different levels of the independent variable, with each group being exposed to just one level.

[199] *See*, *e.g.*, Kahneman, Daniel and Amos Tversky (1996), "On the Reality of Cognitive Illusions," *Psychological Review*, 103(3), 582 – 591; Kivetz and Simonson (2000).

Tripping"—as opposed to exhibiting their true preferences, choices, and WTP or valuations in the actual marketplace.

**B.5.    Dr. Caves's Reliance on the Durham Report and the Plaintiffs' Counsel for the Phrasing of the "Nuisance Tripping Defect" Disclosure is Inconsistent with the Methods and Principles Relied on in the Relevant Scientific Field**

111.    To the extent that Dr. Caves would disavow responsibility with respect to the phrasing of his "disclosure," this would not be appropriate and would imply that a survey expert has no obligation to ensure that key elements of the survey—such as the focal attribute of interest—are non-leading and clear to participants, so long as the survey tests the language preferred by the party on whose behalf the survey is conducted.[200]  Such an approach is also contrary to the methods and principles that experts, scholars, and practitioners would apply in the relevant academic discipline (here, survey research and conjoint analysis).

112.    As noted earlier, it is well established and recognized in the field that a valid, reliable conjoint analysis must define attributes to be clear, concrete, non-leading, and to provide sufficient contextual information to participants.  This is particularly important because consumers' perceptions, preferences, and decisions are sensitive to the exact language chosen on a disclosure or warning label.  Ultimately, in a case such as this where multiple possible "disclosures" can address the alleged omission, the responsibility of appropriately crafting and selecting that disclosure—so as to be in accordance with accepted survey standards and principles—lies with the *survey expert*, not with the party on whose behalf the survey is conducted (and who has a vested interest in the outcome).[201]  For this reason, it was crucial to

---

[200] Although the Plaintiffs have set forth a general theory of liability based on Siemens's purported failure to disclose the risk, existence, or frequency of "nuisance tripping" in connection with the at-issue Siemens AFCIs, neither the operative Complaint nor the Plaintiffs' technical expert, Dr. Durham, has specified the exact language of any such disclosure they contend that Siemens should have included on its product packaging or elsewhere.  I am informed that in the event that Siemens were required to make a "nuisance tripping" disclosure, there is no specific wording that such a disclosure must employ, other than that it be truthful and not misleading.

[201] While it is reasonable and expected that the survey expert be informed of relevant legal, regulatory, and/or technical aspects pertaining to the disclosure, the exact wording of the disclosure bears directly on the issue of consumer perceptions and preferences, which lies within the domain of the survey expert.

scientifically and rigorously assess the appropriateness of the "Nuisance Tripping Defect" disclosure language, which Dr. Caves did not do.

### C.    THE CAVES CONJOINT SURVEY IS CONTRIVED AND SEVERELY DEVIATES FROM ELECTRICIANS' PURCHASE DECISION-MAKING PROCESS

113.    Beyond misrepresenting the alleged omission, the Caves Conjoint Survey also induced severe demand and focalism biases by presenting stimuli and attributes—including the "Nuisance Tripping Defect" attribute—in a completely *decontextualized and unrealistic manner*, and in a way that does not resemble how electricians make AFCI purchase decisions in the real world or the set of information to which they would be exposed.  Dr. Caves's CBC task is diametrically opposed to the fundamental survey principle that a feature or disclosure should be evaluated in the context in which customers would realistically see it, and should approximate essential characteristics of customers' decision-making process.

114.    Critically, the complete lack of task realism in the Caves Conjoint Survey is such that it renders the survey *fundamentally invalid and uncorrectable*.  This is because an underlying assumption of conjoint analysis is that the choices and tradeoffs presented to participants realistically reflect the choices and tradeoffs that people make in the real world.[202] When this assumption is violated (*e.g.*, when the tradeoffs in a product category or market cannot be adequately represented in a CBC task), as was the case in the Caves Conjoint Survey, any observed "choices" and "valuation" for the attribute of interest are an artifact of the survey's contrived scenario forced on participants, and cannot be used to derive alleged price premia or damages attributable to a given attribute.

115.    I detail the Caves Conjoint Survey's deviations from marketplace conditions below.

---

[202] Indeed, as Dr. Caves acknowledges in his report: "CBC uses survey responses to **quantify the tradeoffs that customers reveal they are willing to make** when selecting among different products comprised of different combinations of attributes" [emphasis added]; Caves Report, ¶ 21.  *See also, e.g.*, Sawtooth, "What is a Conjoint Analysis & How Is It Used?," *Sawtooth*, https://sawtoothsoftware.com/conjoint-analysis (noting that "conjoint survey questions **mimic the tradeoffs people make every day in the real world**" [emphasis added]).  This Sawtooth Software article is cited in the Caves Report; ¶ 21 & FN 40.

## C.1.    The Caves Conjoint Survey's Instructions are Unclear, Unrealistic, and Biased

116.    Dr. Caves's conjoint survey gave participants instructions that are contrived and confusing, leading participants to overweight the included attributes (including the focal "Nuisance Tripping" disclosure) more than they otherwise would in the real world.

117.    *First*, the assumptions that participants were asked to make prior to and during the conjoint exercise regarding their "typical project(s)/inventory" are unrealistic, unclear, and highly likely to be confusing.  Specifically, participants were told prior to the CBC task:[203]

> For the remainder of this survey, please assume you are in the market to purchase **AFCIs** for a typical project or projects, or for general inventory. If the typical project(s)/inventory you have in mind would require AFCIs to be compatible with the panels of specific brands or manufacturers, please take this into consideration when deciding on your answer.

These assumptions, in fact, appeared repeatedly throughout the survey, with participants being reminded of the following in *every single* choice task (out of 12 such tasks):[204]

> Please assume you are in the market to purchase AFCIs **for a typical project or projects, or for general inventory**. Which, if any of the three AFCIs below would you purchase if these were the only options? **If the typical project(s)/inventory you have in mind would require AFCIs to be compatible with the panels of specific brands or manufacturers, please take this into consideration**. [Emphases added]

118.    As an initial matter, the above instructions are vague and overly broad.  They do not narrow down the specific purchase context, purpose, or "project" for which the participant is buying an AFCI, which can vary considerably across purchasers.  The survey instead left participants to imagine an abstract, hypothetical scenario involving a "typical project or projects" or their "general inventory."  I understand that such a scenario does not represent electricians' day-to-day purchase decisions regarding AFCIs, which are highly dependent on specific situational factors, such as: (*i*) *why and for whom* they are purchasing the breakers (*e.g.*, for a service call to a customer, for a new building or construction, for an existing building, for their own residence); (*ii*) *the type of building* they will be installing the breakers in (*e.g.*, a residential home, a commercial building); and (*iii*) *the type of room(s)* in the building where they plan to

---

[203] Caves Report, Appendix A, p. 21.
[204] *E.g., id.*, p. 29.

install these breakers (*e.g.*, kitchens and laundry rooms, bedrooms and dens, bathrooms and garages).[205]

119.    For example, I understand that AFCI breakers are typically used in living spaces (*e.g.*, bedrooms, dining rooms, dens); GFCI breakers are typically used in bathrooms, garages, and other locations that require shock protection; and dual-function (AFCI/GFCI) breakers are required in kitchens and laundry areas in order to guard against shock and fire hazards.[206]  As Dr. Caves also pointed out in his report, "The NEC requires both arc fault and ground fault protection in kitchen and laundry circuits."[207]  Yet, the Caves Conjoint Survey provides none of the above basic contextual information that electricians would have prior to a service job.

120.    Importantly, my understanding is that choices among AFCI breakers predominantly operate according to an "installed base" scenario, such that selecting an AFCI is predominantly determined by technical compatibility considerations, including: (*i*) whether the breaker is *compatible* with the panel box, which (as I understand) is in many cases already installed in a home or building;[208] and (*ii*) whether the breaker's voltage rating aligns with the required circuit load.[209]  As I understand, because manufacturers have different designs for

---

[205] *See, e.g.*, Electricalifornia's Responses to First Set of Interrogatories, p. 4 (considerations included "building design to the specifications of ampacity, load calculations, and overall dimensions to fit a building design and dimensions, per electrical engineers' drawings"); Brnich Deposition, p. 58 (considering a customer's existing panel); SIEMENS_AFCI_00199690 at 712 (showing the types of breakers in a typical residential load center or panel).

[206] *See, e.g.*, Thor (2025), "How to Install an Arc-Fault Circuit Interrupter (AFCI)?," *Wei Sho Elec*, https://www.weishoelec.com/Blog/how-to-install-an-arc-fault-circuit-breaker/; Leviton, "Dual Function AFCI/GFCI Frequently Asked Questions," *Leviton*, https://leviton.com/products/residential/dual-function-afci-gfci#accordion-f72a5143b8-item-1469f026e7  ("The latest National Electrical Code requires both AFCI and GFCI protection only in kitchens and laundry rooms.").

[207] Caves Report, ¶ 34.

[208] *See, e.g.*, Brnich Deposition (on behalf of Brnich Electrical), pp. 32 – 33 ("Q. Does that mean you only work on new construction? A. No. No. Lots of them are renovations, additions, kitchens, bathrooms, basements") & 58 ("Q. And then if you were repairing or working on an existing panel, you would use the manufacturer of the panel? A. Yes."); Zank's Responses to First Set of Interrogatories, p. 4 ("Plaintiff also purchased Siemens' AFCIs when required by code due to clients' use of a Siemens' panel box."); Section D.2 (Dr. Caves's "cognitive interviews").  Also based on the November 19, 2025 Interview.

[209] *See, e.g.*, Thor (2025) ("You must verify that the AFCI breaker's voltage rating (typically 120V single-pole for residential lighting/outlets, or 240V double-pole for large appliances) perfectly aligns with the required circuit load. Furthermore, closely inspect the panel's bus bar design."); Zank Deposition (Zank Electric), p. 140 ("The only thing was probably we had another job we were doing with an outdoor meter that we needed a 125-volt. This is a 2-pole, 125-amp breaker. This is for feeding a unit, is what this

breakers and panel boxes, panel compatibility is dictated almost entirely by brand, such that electricians are constrained to purchase the AFCI breaker that matches the brand of the installed panel. Multiple sources caution that in most cases, mixing brands (*e.g.*, installing a Siemens breaker into a Square D panel), even if technically feasible, violates electrical safety codes under the National Electric Code (NEC)[210] and may void warranties or lead to failed inspections.[211] Indeed, some manufacturers such as Square D explicitly warn against using breakers that do not match their own brand of panel boxes.[212]

---

breaker is for"); Electricalifornia's Responses to First Set of Interrogatories, p. 4 ("For certain projects, Siemens AFCIs were calculated into a building design to the specifications of ampacity, load calculations, and overall dimensions to fit a building design and dimensions, per electrical engineers' drawings").

[210] *See, e.g.*, Thor (2025) ("Compatibility Check: The chosen AFCI breaker must possess perfect compatibility with the brand manufacturer and the voltage rating of your existing electrical panel. Failure to match brands voids safety certifications and poses extreme risks"; "The Cardinal Rule: The breaker you select must be an exact match for the manufacturer and the specific product line of your existing electrical panel. For instance, a Square D HomeLine panel absolutely demands a Square D HomeLine AFCI breaker; a mismatch is a non-starter. This strict requirement exists because each manufacturer uses proprietary designs for their bus bar interface, the clip mechanism, and the physical electrical connection. A mismatched breaker cannot establish a safe, reliable, and UL-certified connection."; "You are legally required to use a breaker that precisely matches the manufacturer and the product series of your electrical panel (for example, a Siemens panel must use a Siemens breaker)."); William, "What to Know About Replacing Circuit Breakers Across Brands," *Sentop*, https://www.onesto-ep.com/blog/what-to-know-about-replacing-circuit-breakers-across-brands/ ("Each brand makes their breakers with special shapes and ways to lock in. This means you cannot just use any brand's circuit breaker, even if it looks like it will fit. […] Using a breaker not listed for your panel breaks the National Electrical Code (NEC 110.3) […] Manufacturers always say to use their own breakers in their panels. For example, Eaton says to use Eaton breakers in Eaton panels. This keeps everything lined up and locked. If you use a breaker from another brand, it might not connect well and could be unsafe"). Based also on the November 19, 2025 Interview.

[211] *See, e.g.*, Carolina Home Electrical, "Electrical Panels: Mixing Different Brands of Breakers," *Carolina Home Electrical*, https://carolinahomeelectrical.com/blog/electrical-panels-mixing-different-brands-of-breakers; SIEMENS_AFCI_00230231 at -33 ("Siemens Standard Extended Warranty for Residential Products", noting that "If a load center has been deemed nonconforming, has not been modified in the field, has been used under proper application, and contains only Siemens breakers then the load center is covered. Breakers are covered under their own warranty.").

[212] *See, e.g.*, Schneider Electric (2021), "Will Other Manufacturers' Branch Circuit Breakers Work in Square D QO or Homeline Load Centers?," *Schneider Electric*, https://www.se.com/us/en/faqs/FA109246/ ("The Square D QO and Homeline load centers are UL tested, listed, and labeled to accept ONLY Square D circuit breakers. **NOTE:** The use of any other manufacturers' breakers, will VOID the UL listing and warranty of the product."). In its CAFCI specifications, Siemens states that its breakers are "for Siemens single phase load centers or panelboards"; Siemens (2018), "1 & 2 Pole Combination Type Arc-Fault Circuit Interrupters (CAFCI)," *Siemens*, https://digitalcontentcenter.compas.siemens-info.com/SIE_SS_CAFCI.pdf.

---

121.    The notion that compatibility with existing panels and voltage/load capacity is a dominant consideration is consistent with testimony by the named Electrician Plaintiffs.  For example, in response to an interrogatory, Electricalifornia stated:[213]

> For certain projects, Siemens AFCIs were calculated into a building design to the specifications of ampacity, load calculations, and overall dimensions to fit a building design and dimensions, per electrical engineers' drawings.

Mr. Andrew Montoya, the sole proprietor of Electricalifornia, testified at his deposition that he would buy Siemens-branded AFCIs for projects that had an already-installed Siemens panel, because "the inspector will always insist that we put matching brands."[214]

122.    Similarly, Plaintiff Zank Electric LLC answered in response to an interrogatory:[215]

> Plaintiff also purchased Siemens' AFCIs when required by code due to clients' use of a Siemens' panel box.

Mr. Jeffrey Meade, the founder of Bolt Electric, likewise testified that he bought Siemens's AFCIs because the store he purchased them from only stocked Siemens-branded panels, and "you can't put the breakers in, you know, a different panel."[216]  Mr. Kevin Brnich, of Brnich Electrical, testified that if a customer had an existing panel that did not need to be "upgraded," he would

---

[213] December 13, 2024 Electricalifornia's Supplemental Responses and Objections to Siemens' First Set of Interrogatories to Electrician Plaintiffs ("Electricalifornia's Responses to First Set of Interrogatories"), p. 4.

[214] Montoya Deposition, pp. 162 – 163 ("The only reason I went with Siemens in that particular case is because the panel was a Siemens panel and it was already installed in there. […] And that's to say our inspectors – and this has happened to me on a number of times. This is through my experience -- is if I'm working on a remodel and it is getting inspected, they check to see what circuits I've installed.· I have to document what circuits I've installed, what size breaker I put on there, whether it was an AFCI or a GFCI, or a combination breaker.· And they have to look at it. They have to get a visual. And so the inspector will always insist that we put matching brands. So if I have a house, you know, that has a Siemens panel in it, well, knowing the inspection process, I have to put a Siemens AFCI breaker in there if it calls for it.  Q. So is it fair to say that you use Siemens' AFCIs in some projects because it was required? A. Yes. Sort of no other choice. Because we have to satisfy city requirements or the code requirements or otherwise make sure that the two brands match or are made for each other.").

[215] April 7, 2025 Plaintiff Zank Electric LLC's Supplemental Responses and Objections to Siemens' First Set of Interrogatories to New Commercial Plaintiffs ("Zank Electric's Responses to First Set of Interrogatories"), p. 4.

[216] Meade Deposition, pp. 166 – 167 ("Q. Was there anything about the Siemens AFCIs that stood out to you when you went to purchase them? A. It was the only ones they had. Not the breakers, but the panels. You can't – you can't put the breakers in, you know, a different panel. All they – all they stocked at that time was Siemens panels. They had them at Lowe's, and the suppliers had them, too. You could – they had all the breakers for Square D and the other ones, but the panels – because of COVID the Square D panels they couldn't make.").

"use the breakers from whatever manufacturer was in the house already."[217]  In fact, as I discuss in Subsection D.2, all of Dr. Caves's own "cognitive interviewees" whom he interviewed to "pilot" his conjoint survey expressed the importance of compatibility constraints.

123.    Despite the fact that compatibility issues are of critical importance to any job or project performed by electricians, Dr. Caves did not explain to his survey participants what it means to "take this [*i.e.*, panel brand compatibility] into consideration."[218]  Nor did he specify any information about the panel into which the breakers shown in each choice task would presumably be installed, including the brand of panel and whether the panel is installed or needs to be upgraded or changed.  Given that participants had no information to based their choices on and were forced to consider hypothetical tradeoffs that they likely would not encounter in the real world, Dr. Cave's vague instruction to "take [panel brand compatibility] into consideration" is inadequate and meaningless, likely leading many participants to simply assume that whatever brands of hypothetical breakers they are shown happen to be compatible with whatever brands of hypothetical panels any given breaker will be installed in.  Far from properly accounting for the dominant purchase factor of brand compatibility, the Caves Conjoint Survey instead handwaved it away, thereby artificially depressing the importance participants would otherwise attach to brand. This in turn artificially inflated the weight attached to other attributes, especially Dr. Caves's "Nuisance Tripping Defect" disclosure.

124.    ***Second***, both the instruction to "[p]lease assume that all of the AFCIs you are shown in the survey have very similar or identical features, except for the features that you can actually see in the survey"[219] as well as the introductory descriptions of attributes preceding the conjoint tasks[220] further exacerbated the Caves Conjoint Survey's focalism.  Specifically, directing participants to (*i*) essentially ignore everything except for the features presented to them, and (*ii*) focus on the subset of attributes and levels included in the conjoint task before the

---

[217] Brnich Deposition, p. 58 ("Q. So you use Siemens' panels for upgrades? A. For upgrades, new homes. Any time I installed a new panel it was Siemens.  Q. And then if you were repairing or working on an existing panel, you would use the manufacturer of the panel? A. Yes.").
[218] Caves Report, Appendix A, p. 21.
[219] *Id.*, p. 22.
[220] *Id.*, pp. 24 – 28.

choice task has even begun[221] induced participants to treat only the attributes in the conjoint—including the "Nuisance Tripping Defect" disclosure that supposedly represents the alleged omission—as important. This is because survey participants tend to focus on those factors and product attributes that are presented to them most saliently and that help them differentiate among, and compare between, the answer choices they face in the survey.[222] Otherwise, from the participants' perspective, why would the survey designer repeatedly ask them to only make tradeoffs among the set of features repeatedly displayed in the choice tasks?

125.    The appropriate context, however, is not an artificial "laboratory" where participants are directed to make tradeoffs only based on the limited set of features and information displayed in the choice tasks, when many electricians would otherwise base their purchase decisions on other factors excluded from the survey (*e.g.*, breaker-panel compatibility, prior experience and relationship with the distributor/supplier, availability constraints; manufacturer customer service; *see* Subsections C.2 and D.2.3). Rather, the appropriate context is one that reflects essential characteristics of the real marketplace, which include various considerations omitted from Dr. Caves's survey, and where participants do not simply assume all other features to be constant. By highlighting only those attributes included in the CBC task as relevant or important at the expense of omitted considerations, the survey inflated the weight and WTP attached to the included attributes (including the "Nuisance Tripping Defect" disclosure).

126.    ***Third***, instructing participants to both imagine that they are in the market to buy an AFCI and that the three AFCIs shown in each choice task are the "**only three** types of AFCIs available"[223] all but inform the participant that they should choose one of those three options—even if in the real world they would consider none based on code compliance alone. Indeed, it is unclear why anyone would *not* purchase one of the three options under Dr. Caves's hypothetical scenario, given how untethered it is from electricians' actual purchase decisions in the real world.

---

[221] *Ibid*.

[222] *See, e.g.*, Mellers and Biagini (1994). Factors, features, attribute levels, or characteristics that are not described or are assumed to be similar are often inferred to be non-diagnostic and hence edited out (or "cancelled out") by survey participants prior to their survey answers. *See, e.g.*, Tversky (1972); Kahneman and Tversky (1979).

[223] *See, e.g.*, Caves Report, Appendix A, p. 21.

Such instructions further decreased the weight of the price attribute and inflated participants' willingness to buy, in turn inflating the alleged price premium estimate attributable to the "Nuisance Tripping Defect" disclosure.  As I detail further in Subsection E.1, Dr. Caves's unrealistic instructions also likely contributed to the "extreme response behavior" observed in the conjoint survey data (*i.e.*, whereby the vast majority of participants said they would purchase one of the three options presented in *all* 12 choice tasks), a response pattern known to generate invalid WTP estimates.

**C.2.**    **The Caves Conjoint Survey's Presentation of Attributes, Particularly the "Nuisance Tripping Defect" Disclosure, is Contrived, Out of Context, and Fails to Represent How Electricians Would Make Purchase Decisions**

127.    Dr. Caves asserts that his "Nuisance Tripping Defect" disclosure is "designed to model disclosure of the Alleged Defect to the customer at the point of purchase."[224]  However, the Caves Report cites no research or evidence as to (*i*) how electricians actually make decisions in the marketplace at the point of purchase (including the types of information they typically would be exposed to), or (*ii*) how electricians would realistically, if at all, encounter a disclosure of the type tested in the Caves Conjoint Survey.  Product disclosures are typically made on product packaging or labels, on the manufacturer's website, or through other customer-facing marketing materials (as the Complaint appears to acknowledge);[225] such disclosures are not made in isolation and out of context, as was the case in the Caves Conjoint Survey.

128.    ***First***, it is important to reiterate the lack of task realism in Dr. Caves's instructions provided for the CBC exercise, which forced participants to choose among AFCI breakers based on virtually no contextual information and to make assumptions regarding compatibility issues that they would *not* make when purchasing AFCIs in the real world.

129.    ***Second***, the product "profile" tables that Dr. Caves presented to participants deviate sharply from how electricians would buy or encounter AFCI breakers.  I understand that

---

[224] Caves Report, ¶ 40.

[225] The Complaint repeatedly refers to the alleged omission in terms of Siemens's failure to disclose "nuisance tripping" to potential purchasers via "Siemens AFCI breaker labels and brochures" (¶ 81) or "Siemens' troubleshooting guide" (¶ 88), none of which were represented in the Caves Conjoint Survey.

electricians commonly order or purchase AFCIs directly from electrical supply houses or distributors, as well as from big box retailers (*e.g.*, Home Depot, Lowes), smaller hardware stores, and online retailers (*e.g.*, Amazon). The Caves Conjoint Survey did not represent any of these purchase channels, each of which have their own array of information to which electricians would typically be exposed at the point of purchase. For example, an electrician who is purchasing an AFCI breaker at Home Depot might view the products in blister packs or clamshell packages in the store.[226] Those purchasing breakers on Amazon would see Amazon webpages or search results featuring photos of the product itself, user reviews, information from the manufacturer, and a variety of other information (*see, e.g.*, Figures C1a – C1c below for sample screenshots).[227] As Figures C1a through C1b show, customers browsing this Amazon webpage for a Siemens AFCI product would be exposed to, among other things, a "From the Manufacturer" section with background context explaining the purpose of AFCIs and how arc faults are detected—exactly the type of context that is missing from the Caves Conjoint Survey.

**Figure C1a: Siemens AFCI Breaker Amazon Webpage (December 2025)** [228]



---

[226] Based on the December 4, 2025 Interview.
[227] *See, e.g.*, https://www.amazon.com/Siemens-QA115AFC-120-volt-Combination-Breaker/dp/B00J8BVJ9I?th=1 (accessed December 10, 2025; "SIEMENS QA115AFC 15-Amp Single Pole 120-volt Plug-On Combination AFCI Breaker, Black").
[228] *Ibid*.

**Figure C1b: Siemens AFCI Breaker Amazon Webpage ("From the Manufacturer")** [229]

**From the manufacturer**



**Siemens Arc Fault Circuit Interrupters**

What are are Arc Faults?

The UL Standard for AFCIs (UL 1699) defines an arcing fault as an unintentional arcing condition in a circuit. Arcing creates high intensity heating at the point of the arc resulting in burning particles that may over time ignite surrounding material, such as wood framing or insulation. The temperatures of these arcs can exceed 10,000 degrees Fahrenheit. Repeated arcing can create carbon paths that are the foundation for continued arcing, generating even higher temperatures.

Typical Causes of Arc Faults

- Damaged wires
- Worn electrical insulation
- Wires or cords in contact with vibrating metal
- Overheated or stressed electrical cords and wires
- Misapplied or damaged electrical appliances

**Why do we really need AFCIs?**

Smoke alarms, fire extinguishers and escape ladders are all examples of emergency equipment used in homes to take action when a fire occurs. An AFCI is a product that is designed to detect a wide range of arcing electrical faults to help reduce the electrical system from being an ignition source of a fire. Conventional overcurrent protective devices do not detect low level hazardous arcing currents that have the potential to initiate electrical fires. It is well known that electrical fires do exist and take many lives and damage or destroy significant amounts of property. Electrical fires can be a silent killer occurring in areas of the home that are hidden from view and early detection. The objective is to protect the circuit in a manner that will reduce its chances of being a source of an electrical fire.



**How is an arc fault detected?**

Unlike a standard circuit breaker detecting overloads and short circuits, an AFCI utilizes advanced electronic technology to "sense" the different arcing conditions. The end result is the detection of parallel arcs (line to line, line to neutral and line to ground) and/or series arcs (arcing in series with one of the conductors).



In essence, the detection is accomplished by the use of advanced electronic technology to monitor the circuit for the presence of 'normal' and 'dangerous' arcing conditions. Some equipment in the home, such as a motor driven vacuum cleaner or furnace motor, naturally create arcs. This is considered to be a normal arcing condition. Another normal arcing condition that can sometimes be seen is when a light switch is turned off and the opening of the contacts creates an arc.

A dangerous arc, as mentioned earlier, occurs for many reasons including damage of the electrical conductor insulation. When arcing occurs, the AFCI analyzes the characteristics of the event and determines if it is a hazardous event. AFCI manufacturers test for the hundreds of possible operating conditions and then program their devices to monitor constantly for the normal and dangerous arcing conditions.



**The Siemens Advantage**

An AFCI serves many electrical safety functions including arc detection, over current and short circuit protection. When your AFCI trips, do you know why? Was their an arcing condition, ground fault, over current, or short circuit? Trouble shooting the cause of an AFCI trip can be difficult. Beyond the industry leading arc detection technology, the Siemens AFCI includes many other features including the industry exclusive LED trip indicator. The Siemens AFCI will tell you why it tripped! It will also hold that information in its memory for up to 30 days if you require an electrician to come to your residence to correct the condition. Knowing the cause of the trip greatly reduces trouble shooting time and tracking down the cause of the trip. Siemens also offers the smallest sized AFCI in the market, leaving more wiring room in your load center.



---

[229] *Ibid.*

**Figure C1c: Siemens AFCI Breaker Amazon Webpage (Reviews)** [230]



130.    As another example, electricians in the real world can readily access customer-facing manufacturer content such as product brochures.  Mr. Zank (of Zank Electric LLC) testified that the supply house he uses displays brochures, including regarding Siemens AFCIs.[231]  Figure C2 below shows a portion of a Siemens AFCI brochure published in 2018, which includes a troubleshooting procedure and guide to diagnose the cause of a trip.

*(Continues on next page)*

---

[230] *Ibid.*
[231] Zank Deposition, p. 133.

**Figure C2: Sample Siemens AFCI Brochure** [232]



131.     Unlike any purchase journey that consumers would experience in the actual marketplace, participants in the Caves Conjoint Survey were abruptly presented with a table of pre-selected attributes (*see, e.g.*, Figure C3 below), without any other accompanying visual or textual information to which they would be exposed in the real world.

(*Continues on next page*)

---

[232] SIEMENS_AFCI_00232362 (native file).

**Figure C3: Sample CBC Choice Task in the Caves Conjoint Survey** [233]

Please assume you are in the market to purchase AFCIs for a typical project or projects, or for general inventory. Which, if any of the three AFCIs below would you purchase if these were the only options? If the typical project(s)/inventory you have in mind would require AFCIs to be compatible with the panels of specific brands or manufacturers, please take this into consideration. (Click or hover over each feature for details.)

(1 of 12)

| | Eaton | Siemens | ABB/General Electric |
|---|---|---|---|
| **Brand** | Eaton | Siemens | ABB/General Electric |
| **Function** | Dual Function (AFCI/GFCI) | Single Function (AFCI) | Single Function (AFCI) |
| **Technical Specifications** | PLUG-IN PIGTAIL 15A 1-POLE (10kA at 120V) | PLUG-IN PIGTAIL 15A 1-POLE (10kA at 120V) | PLUG-ON NEUTRAL 15A 1-POLE (10kA at 120V) |
| **Price** | $59.97 | $49.56 | $62.28 |
| **Nuisance Tripping** | NOT DEFECTIVE | DEFECTIVE: Prone to Nuisance Tripping | DEFECTIVE: Prone to Nuisance Tripping |
| | Select | Select | Select |

I would not purchase any of these three types of AFCIs if these were the only options.

Select

132.    ***Third***, Dr. Caves failed to give participants any information whatsoever as to how or where his so-called "Nuisance Tripping Defect" disclosure would actually be displayed at the "point of purchase."[234]  It is well-established that customers form perceptions of product attributes, claims, and disclosures in the *context* in which they appear.[235]  The Caves Conjoint

---

[233] *See, e.g.*, Caves Report, Appendix A, p. 29.
[234] *See* Caves Report, ¶¶ 1, 40, 43, 50 – 52, & 72.
[235] The importance of analyzing consumer perceptions of advertising claims (including warnings and disclosures) in the full context in which the claims appear is underscored by seminal research in cognitive psychology and decision making.  For example, research indicates that human perception is dependent on the *general context* provided by words and/or visual stimuli, which drive people's interpretations.  *See, e.g.*, Anderson, John R. (1985), *Cognitive Psychology and Its Implications*, New York, NY: W.H. Freeman and Company.  Context is also critical in determining consumer perceptions of product offerings, as demonstrated in the widely-cited phenomenon of "context effects."  *See, e.g.*, Kivetz, Ran,

Survey provides no context whatsoever for how and where prospective purchasers would encounter Dr. Caves's 8-paragraph "Nuisance Tripping Disclosure."  For example, would electricians see this description, along with "DEFECTIVE: Prone to Nuisance Tripping" on a sticker printed on the breaker itself?  On a packaging insert?  On in-store signage?  On the manufacturer's website (*e.g.*, a support page)?  Inside a manufacturer brochure, installation manual, or diagnostic and troubleshooting guide?  Through an industry-wide notice of some sort?  In a press release?  It is entirely unclear from the Caves Conjoint Survey the means through which the "Nuisance Tripping Defect" disclosure would be transmitted to AFCI purchasers.

133.    By presenting his "disclosure" in a decontextualized vacuum that does not resemble any medium through which electricians would encounter such information at the point of purchase, Dr. Caves simultaneously deprived participants of information that could influence preferences and decisions, while distorting their comprehension and interpretation of the singled-out "disclosure."  Such a complete lack of context, particularly combined with the survey's repeated focus on the presence versus absence of the "Nuisance Tripping Defect" across 12 conjoint choices (*see* Subsection B.4), virtually *guaranteed* participants' attention to, and measured WTP for, the tested "disclosure."

134.    ***Fourth***, the Caves Conjoint Survey included attributes and attribute levels that do not align with standard industry parlance and that may further be confusing to participants, further undermining the reliability of the survey results.  For example, the "Function" attribute consists of either "single function" AFCIs or "dual function" AFCI/FGCIs.  However, I understand that there is no such thing as a "single function" AFCI, which appears to be a term that Dr. Caves simply adopted himself, as neither the Complaint nor the Siemens webpage to which Dr. Caves cites as

---

Oded Netzer, and V. Srinivasan (2004a), "Alternative Models for Capturing the Compromise Effect," *Journal of Marketing Research*, 41(3), 237 – 257 (Lead article; *Finalist*, 2009 *William O'Dell Award; Finalist*, 2005 *Paul Green Award*); Simonson, Itamar and Amos Tversky (1992), "Choice in Context: Tradeoff Contrast and Extremeness Aversion," *Journal of Marketing Research*, 29(3), 281 – 295; Kivetz, Ran, Oded Netzer, and V. Srinivasan (2004b), "Extending Compromise Effect Models to Complex Buying Situations and Other Context Effects," *Journal of Marketing Research*, 41(3), 262 – 268. Similarly, it is necessary to "analyze the message conveyed in full context," "view the face of the statement in its entirety, rather than examining the eyes, nose, and mouth separately and in isolation from each other," and "consider context, [but] not assume context."  Quoted in *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242 (11th Cir. 2002).

seeming justification for this terminology[236] mention the term "single function AFCI."[237]  In addition, I understand that "plug-in" and "plug-on" AFCIs are not compatible for the same slot in a breaker; hence, even if one could mix different brands of AFCI breakers in a panel (which, based on available evidence, is strongly advised against due to safety and compliance reasons), one cannot simply substitute a "plug-on neutral" AFCI when the customer previously had a "plug-in pigtail" AFCI.[238]

135.     *Fifth*, in addition to asking participants to assume away (and therefore artificially depressing participants' weight assigned to) compatibility and code compliance, the Caves Conjoint Survey also deviates from electricians' decision-making process at the point of purchase, because it fails to capture additional aspects that I understand are likely important and relevant in electricians' choices among AFCI breakers, including:

    (*i*)      prior experience or preexisting relationships with a distributor (including perceived convenience);[239]

    (*ii*)     perceived customer service quality associated with the breaker's manufacturer;[240]

    (*iii*)    availability constraints;[241] and

---

[236] Caves Report, ¶ 18 ("Some circuit breakers are single-function AFCIs, meaning that they protect only against arc faults. Other circuit breakers are dual-function ('AFCI/GFCIs'), which combine the functionality of both AFCIs and GFCIs", citing to Siemens, "Residential Dual-Function Circuit Breakers (AFCI & GFCI)", available at https://www.siemens.com/us/en/products/energy/low-voltage/residential-circuit-breakers/residential-dual-fuctioncircuit-breakers.html).

[237] The Durham Report also does not mention the phrase "single[-]function."  In addition, while I understand there are "single-pole" AFCIs, this is an unrelated concept that refers to protecting one hot wire as opposed to two hot wires (as in the case of "double-pole" AFCIs).  *See, e.g.*, https://www.homedepot.com/c/ab/types-of-circuit-breakers/9ba683603be9fa5395fab900f0d22b4.

[238] *See, e.g.*, Leidy 30(b)(6) Deposition, pp. 157 – 158 (explaining that plug-on neutral breakers and plug-in pigtail breakers are for different sets of panels; *e.g.*, "So the plug-on being shorthand for plug-on neutral. And it is for particular sets of breaker where we remove the neutral pigtail from the design and instead have a clip on the bottom of the breaker that could then slot into special plug-on neutral panels where there's a neutral bar directly beneath the breaker slots such that that clip will clip onto that neutral bar and save the electrician from having to separately wire in the neutral pigtail wire into the panel neutral terminal.").

[239] *See, e.g.*, Brnich Deposition, p. 57 ("Q. Is there any reason you chose Siemens? A. Denney Electric was my main supplier, and that was their main product").  Also based on the November 26, 2025 Interview.  *See also* Subsection D.2.3 (verbatim responses from Dr. Caves's "cognitive interviews").

[240] Based on the November 26, 2025 Interview.

[241] *See, e.g.*, Montoya Deposition, p. 156 (explaining that he often purchased Siemens because it was most available); Electricalifornia's Responses to First Set of Interrogatories, p. 4 ("Plaintiff purchased and used

---

(*iv*)     other differentiators, such as diagnostics tools and breaker size.[242]

136.     Overall, the Caves Report does not provide any evidence that the conjoint task presented to survey participants the essential characteristics of the marketplace and approximated electricians' purchase decisions at the point of purchase.  To the contrary, my analysis indicates that Dr. Caves's survey—with respect to its instructions, attribute presentation, and overall CBC task—is fundamentally unrealistic and deviates sharply from the information and decision environment that prospective AFCI purchasers (and the putative class members) would ever encounter.

### D.     DR. CAVES'S 15 "COGNITIVE INTERVIEWS" ARE INCAPABLE OF SHOWING THAT HIS CONJOINT SURVEY IS CLEAR, REALISTIC, OR UNBIASED, AND THESE INTERVIEWS SHOW, IF ANYTHING, THAT THE SURVEY IS UNCLEAR, UNREALISTIC, AND BIASED

137.     According to Dr. Caves, his damages analysis incorporates "interviews with professional electricians"[243] (although his final conjoint survey was not limited to professional electricians).  Dr. Caves states that in this "pilot study using a draft of [his] survey design,"[244] he conducted 15 "cognitive interviews,"[245] each lasting "approximately 30 to 45 minutes,"[246] in order to "ensure that the survey was clear and comprehensible."[247]  He then used these 15 interviews to draw multiple conclusions regarding the appropriateness of the conjoint design,

---

Siemens AFCI breakers based on personal experience with Siemens as being commonly available in Plaintiff's region of suppliers"); Meade Deposition (on behalf of Bolt Electric), p. 166 (testifying that he purchased Siemens AFCIs because the store he shopped at only had Siemens-branded *panels* available).
[242] *See, e.g.*, https://www.amazon.com/Siemens-QA115AFC-120-volt-Combination-Breaker/dp/B00J8BVJ9I?th=1 (in a section entitled "The Siemens Advantage": "[…] Trouble shooting the cause of an AFCI trip can be difficult. Beyond the industry leading arc detection technology, the **Siemens AFCI includes many other features including the industry exclusive LED trip indicator. The Siemens AFCI will tell you why it tripped!** It will also hold that information in its memory for up to 30 days if you require an electrician to come to your residence to correct the condition. Knowing the cause of the trip greatly reduces trouble shooting time and tracking down the cause of the trip. **Siemens also offers the smallest sized AFCI in the market, leaving more wiring room in your load center**" [emphases added]).
[243] Caves Report, ¶ 9.
[244] *Id.*, ¶ 25.
[245] *Ibid.*
[246] *Ibid.*
[247] *Ibid.*

including the various attributes and attribute levels used.  The Caves Report describes the

interview process as follows:[248]

> During the interviews, I discussed the survey with respondents via screen sharing. Respondents were walked through the survey questions and were asked about their comprehension of the questions of the pre-test questionnaire, as well as the choice tasks in the Conjoint Module. They were also asked whether there were any attributes that they considered important that were missing from the Conjoint Module. The interviews indicated that respondents were familiar with AFCIs and dealt with them regularly in a professional capacity. The interview subjects also agreed that the attributes included in the Conjoint Module gave them enough information to make an informed decision as to which (if any) of the AFCIs displayed they would purchase in real life. The interviews revealed some aspects of the survey that would benefit from further clarification. Accordingly, I implemented some modifications in the survey design.  [FN omitted]

138.    As an initial matter, the Caves Report fails to disclose basic information, such as

(*i*) methodological details on how the interviewees were screened (aside from being recruited by

the market research firm NewtonX)[249] and (*ii*) a list of all modifications made to the conjoint

survey based on these "cognitive interviews."  Dr. Caves only indicates that he "implemented

**some** modifications in the survey design,"[250] but points to just one "example" in a footnote.[251]

Moreover, the actual interviews indicate that multiple modifications were made (apparently on

an ongoing basis from interview to interview),[252] including to the introductory instructions in the

CBC task regarding compatibility between breakers and panels.

139.    After I requested (through Siemens's outside counsel) the underlying data and

documentation, Dr. Caves provided the transcribed verbatim responses from his 15 interviewees.

I have carefully reviewed the raw transcripts of all 15 "cognitive interviews."  These interviews,

---

[248] *Id.*, ¶ 26.

[249] *Id.*, ¶ 25 (FN 50).

[250] *Id.*, ¶ 26.  Emphasis added.

[251] *Id.*, FN 51 ("For example, some interview subjects indicated that it might be challenging to compare AFCIs with different current ratings within the same choice task, given that the two types of products are used for different purposes. Accordingly, I modified the survey design such that interview subjects would only be shown AFCIs with a single current rating (either 15 or 20 Amperes) for each choice task").

[252] *See, e.g.*, Interview #4, p. 11 ("Kevin Caves: we we try to keep improving it as we get more feedback from electricians. So we wanna make sure we show you. You know, the latest and greatest version."); Interview #10, p. 12 ("Kevin Caves: we've been doing a lot of updates on. So we want to make sure we show you the latest and greatest version.").

as I explain below, do *not* and *cannot* "ensure that the survey was clear and comprehensible,"[253] or otherwise validate the survey; to the extent they are informative of anything, the interviews further evidence the survey's biased and unrealistic design.

### D.1.    Dr. Caves's 15 "Cognitive Interviews" are Entirely Insufficient for Validating the Clarity, Realism, or Design of the Caves Conjoint Survey

140.    The "pilot testing" conducted by Dr. Caves in the form of 15 "cognitive interviews" is fundamentally inadequate for purposes of validating the final CBC survey.

141.    ***First***, the type of qualitative conversation-based approach that Dr. Caves followed is similar to a "focus group" (albeit at an individual level).  Notably, such a small-scale set of interviews does not aim to, nor can it, generate empirical evidence that generalizes to a target population of interest.  Rather, such research methods are exploratory in nature, whereby the interviewer's goal is typically to explore the mind of the participant and generate hypotheses for subsequent testing.  This approach also lacks the objectivity, neutrality, and scientific rigor that characterizes (properly designed) experiments, and is particularly susceptible to impression management and other response biases.  In qualitative interviews, the interviewer can often—subconsciously, even if not intentionally—steer or lead the participants toward certain responses.  Therefore, data from such qualitative interviews, particularly when obtained from very small samples, cannot inform the researcher whether questions are worded appropriately or whether the design of a survey is non-biased.

142.    ***Second***, based on the materials produced by Dr. Caves, I have seen no indication that proper measures were taken to ensure an objective interview procedure.  For example, there was apparently no standardized script containing neutral, non-leading questions that the interviewer followed for every participant.  This was especially important given that Dr. Caves conducted the interviews *himself* (*i.e.*, the cognitive interviews did not use a "double-blind" procedure in which both the interviewer and the respondent are unaware of the survey's sponsor and purpose).[254]

---

[253] Caves Report, ¶ 25 (FN 50).
[254] *See, e.g.*, Diamond (2011), pp. 410 – 411.

143.    A survey interviewer who is not blind to the research hypothesis—and who may have a vested interest in which "direction" the results "come out"[255]—may, for example, convey a range of nonverbal communications (including unconscious cues) that cue participants to answer in a specific (*i.e.*, "desired") way.[256]  Although no video recordings were produced, the audio transcripts indicate that on several occasions throughout the interviews, Dr. Caves interjected to provide his own personal commentary,[257] preemptively answered questions on

---

[255] A great deal of research on social cognition has demonstrated that people often exhibit "confirmation bias," particularly when they are motivated to confirm a particular hypothesis.  *See, e.g.*, Kivetz and Simonson (2000); Kunda, Ziva (1990), "The Case for Motivated Reasoning," *Psychological Bulletin,* 108(3), 480 – 498; Lord, Charles G., Lee Ross, and Mark R. Lepper (1979), "Biased Assimilation and Attitude Polarization: The Effects of Prior Theories on Subsequently Considered Evidence," *Journal of Personality and Social Psychology*, 37, 2098 – 2109; Wason, P.C. (1960), "On the Failure to Eliminate Hypotheses in a Conceptual Task," *Quarterly Journal Experimental Psychology,* 12, 129 – 140.

[256] According to a large body of literature on social desirability, self-presentation, and impression management, people have an inherent desire to appear reasonable (among other self-enhancement motives); *see, e.g.*, Fiske, Susan T. and Shelley E. Taylor (1991), *Social Cognition* (2nd ed.), New York, NY: McGraw-Hill; *see also, e.g.*, Dhar, Ravi and Klaus Wertenbroch (2012), "Self-Signaling and the Costs and Benefits of Temptation in Consumer Choice," *Journal of Marketing Research*, 49(1), 15 – 25; Gneezy, Ayelet, Uri Gneezy, Gerhard Riener, and Leif D. Nelson (2012), "Pay-What-You-Want, Identity, and Self-Signaling in Markets," *Proceedings of the National Academy of Sciences*, 109(19), 7236 – 7240; McManus, T. Clay and Justin M. Rao (2015), "Signaling Smarts? Revealed Preferences for Self and Social Perceptions of Intelligence," *Journal of Economic Behavior & Organization*, 110, 106 – 118; Touré-Tillery, Maferima and Ayelet Fishbach (2015), "It Was(n't) Me: Exercising Restraint When Choices Appear Self-Diagnostic," *Journal of Personality and Social Psychology*, 109(6), 1117 – 1131.  Hence, participants interviewed by Dr. Caves would be likely to be led to provide easily justifiable (and biased) responses in order to appear logical or reasonable in front of the interviewer (*i.e.*, *Dr. Caves*).

[257] *See, e.g.*, Interview #1, pp. 12 ("Okay, okay, okay, that's helpful.") & 30 – 31 ("Kevin Caves: that's that's really good to hear. Because, you know, again, we don't have the technical expertise. So we we tried to include the details we thought relevant. But you know, It's good to know that there's apparently. Nothing too obvious that we're leaving out."); Interview #2, p. 39 ("Kevin Caves: Oh, great!"); Interview #3, p. 8 ("Kevin Caves: A lot of some of some of them [questions] are pretty cut and dried, for sure."); Interview #5, p. 10 ("Kevin Caves: okay, that's interesting. Yeah, I would have thought you. You chose the 1st one. But no, I see why I see why you're."); Interview #6, pp. 28 ("Kevin Caves: Okay? Yeah, well, I can. I can see why they call it nuisance trip. […]") & 30 ("Kevin Caves: Yeah, yeah. And that's a real problem. If your refrigerator loses power for a long time."); Interview #4, p. 7 ("Kevin Caves: Ebay, huh? Interesting."); Interview #9, p. 34 ("Kevin Caves: Yeah, I think most people like that. Sometimes we'll talk to someone who like they'll always pick one brand, no matter even if it even if we say it's defective, they'll be like, yeah, I want it, anyway, because that's and that's okay."); Interview #10, p. 39 ("Kevin Caves: Sure. Sure. Yeah, we've we've talked to other people who feel the same way."); Interview #11, p. 28 ("Kevin Caves: yeah. Cause it sounds like that [nuisance tripping] happens a lot, anyway. So it's sort of it's something you might expect. You might expect. Anyway. Yeah."); Interview #13, p. 33 ("Kevin Caves: Yeah. Well, like you said it could be 1,400 bucks just to just to deal with one nuisance trip."); Interview #15, p. 36 ("Kevin Caves: Yeah. So you got the. It's the only one that's not defective. It's got a low price, makes sense. It's a it's a brand you trust. Yeah.").

---

participants' behalf or presumed their answers,[258] informed one participant that "you can tell nuisance tripping is something that we're interested in,"[259] and phrased questions so as to confirm, rather than disconfirm, a particular view (*e.g.*, that enough information was given for participants to make an "informed decision").[260]

144.   ***Third***, contrary to Dr. Caves's claim, his "pilot study" (or "cognitive interviews") is completely insufficient for "ensur[ing] that the survey was clear and comprehensible."[261]  Not only did Dr. Caves fail to specify what objective standards were used (if any) to assess whether a question is sufficiently clear in the first place, but the direct questions he posed to interviewees *cannot* determine whether a survey question or task is actually clear or comprehensible.  Nor can these questions reliably identify the subset of attributes that electricians consider when purchasing AFCI breakers.  Investigating which attributes influence consumers' purchase decisions would require a well-conducted and objective materiality survey, which Dr. Caves did not conduct.

145.   ***Fourth***, these "cognitive interviews" also inherently cannot detect whether the conjoint survey is susceptible to demand effects or other severe biases (*e.g.*, whether participants were led in certain ways by the questions, stimuli, or overall study design).  As discussed earlier, a major flaw is that multiple aspects of the Caves Conjoint Survey biased participants towards putting a higher weight on the "Nuisance Tripping Defect" disclosure in their choices, even if electricians would otherwise ignore this attribute in the marketplace.  Neither the Caves Report

---

[258] *See, e.g.*, Interview #1, p. 36 ("Kevin Caves: Right, and it seems like you did that almost just by looking at the brand."); Interview #2, pp. 52 – 53 ("Kevin Caves: okay, so that's we're we're essentially done. The time is up. There's a final question that we ask. We've covered a lot of this already, but I think I know the answer to this question, but."); Interview #3, p. 42 ("Kevin Caves: All right, so alright! I think I know the answer to this one, but for the rest."); Interview #5, p. 26 ("Kevin Caves: Okay? And what's the reason for the choice? Probably brand reputation. But.").

[259] Interview #1, p. 22 ("Kevin Caves: but yeah, you can tell nuisance tripping is something that we're interested in. Obviously, so in the next set of questions, we're gonna Well, actually, it's just gonna be one question.").

[260] *See, e.g.*, Interview #5, p. 33 ("Kevin Caves: Okay? And just looking back on the 12 that you've answered. Now, do you still agree that the you know this this format gives you or another electrician enough information to make an informed decision about what they would buy or not buy.  [Interviewee:] Absolutely.").

[261] Caves Report, ¶ 26.

nor the interview transcripts provide any assurance that Dr. Caves's "pilot study" would be able to identify these kinds of demand effects, which are inherent in Dr. Caves's conjoint design.

146.    Dr. Caves's approach is akin to outsourcing the task of the survey expert to survey participants.  Academic research indicates that such a method would *not* be effective in determining the reliability or objectivity of a survey.  For example, participants' reactions to leading questions can reflect a number of background considerations (*e.g.*, social desirability concerns) and guessing behavior, whereas the true influence, if any, of various representations in the actual marketplace is difficult for survey participants to accurately identify, predict, and verbalize.[262]  Hence, directly eliciting participants' opinions about whether they found a given question to be clear and unbiased, or whether the attributes "gave them enough information to make an informed decision,"[263] in no way demonstrates that the question is actually clear and non-leading, or that the included attributes are sufficient and appropriate.[264]

---

[262] Even when survey participants have no reason to believe that their answer choices will be identifiable or disclosed to others, participants may nevertheless be driven to respond in a way that aligns positively with their self-beliefs or self-perceptions (*e.g.*, the desire or need to appear logical or express logical perceptions).  *See, e.g.*, Fiske and Taylor (1991); Nisbett, Richard E. and Timothy D. Wilson (1977), "Telling More Than We Can Know: Verbal Reports on Mental Processes," *Psychological Review*, 84(3), 231 – 259; Wilson, Timothy D. and Daniel T. Gilbert (2003), "Affective Forecasting," in *Advances in Experimental Social Psychology Vol. 35*, Zanna, Mark P. (ed.), San Diego, CA: Elsevier, pp. 345 – 411; Wilson, Timothy D. and Jonathan W. Schooler (1991), "Thinking Too Much: Introspection Can Reduce the Quality of Preferences and Decisions," *Journal of Personality and Social Psychology*, 60(2), 181 – 192.

[263] Caves Report, ¶ 26.

[264] For the various reasons explained above, Dr. Caves's assertion that "[w]hen the final survey was deployed, over 99 percent of the respondents who completed the survey indicated they did not find any aspect of the survey to be confusing" (¶ 26) is unavailing, because survey participants would typically not be expected to respond that a conjoint survey was "confusing" after completing the survey.  This is especially the case given that: (*i*) the basis for Dr. Caves's claim comes from a *closed-ended* question at the very end of the survey that asked participants whether they found any aspect of the survey to be confusing, where participants seemingly could only explain in their own words if they selected "Yes" (*see, e.g.*, "Survey_Questionnaire Reference.txt.); (*ii*) there were no open-ended questions, "don't know" options, or opportunities for participants to indicate their thought process *during* the CBC task (by contrast, the electricians in Dr. Caves's "cognitive interviews," who were asked to verbalize their reasoning out loud during the CBC task, expressed considerable confusion; *see* Subsection D.2); (*iii*) consistent with academic research on conversational norms and consumers' desire for consistency, by the time participants were asked the closed-ended "confusion" question, they had already finished the CBC task and made their 12 choices and were unlikely to "admit" after the fact that they did not understand (*see, e.g.*, Fiske and Taylor 1991; Grice, H. Paul (1975), "Logic and Conversation," in *Syntax and Semantics 3: Speech Acts*, Cole, Peter and Jerry L. Morgan (eds.), New York, NY: Academic Press, pp. 41 – 58; Schwarz, Norbert (1994), "Judgment in a Social Context: Biases, Shortcomings, and the Logic of

147.    ***Overall***, Dr. Caves's "pilot study" is entirely inadequate and *incapable* of demonstrating that his conjoint survey's procedures, stimuli, and questions are realistic, clear, non-leading, unbiased, and/or reliable (they were not).

**D.2.    Dr. Caves's "Cognitive Interviews" Provide Further Evidence that his Conjoint Survey was Confusing, Unrealistic, and Biased**

148.    While the 15 interviews conducted by Dr. Caves cannot be used to validate his conjoint survey for the reasons set forth in Subsection D.1, these interviews do lend insight into how the CBC task likely confused participants and forced them to make unrealistic choices in a direction that favored the Plaintiffs' position.

**D.2.1.  *Dr. Caves's "Cognitive Interviews" Further Indicate that Compatibility Constraints are a Dominating Purchase Factor and Show that Interviewees Were Confused by the Conjoint Choice Task***

149.    All of the 15 licensed electricians whom Dr. Caves interviewed indicated that brand and compatibility issues, especially between breakers and panel boxes, are a major, dominant (or even overriding) purchase factor.  Interviewees also cited additional or related aspects—including the type of panel connection (*e.g.*, plug-on neutral, plug-in pigtail), the type of building, where the breakers will be installed in the building, and other specifics of the project at hand—as constraints that "limit,"[265] "dictate,"[266] or even "predetermine"[267] their AFCI breaker choices.  Table D1 below lists selected examples, quoting participants' own words, that reiterate the critical role of brand compatibility and code compliance—which are unrelated to "nuisance tripping"—in governing purchase decisions.[268]

---

Conversation," *Advances in Experimental Social Psychology*, 26, 123 – 162); and (*iv*) participants were *not* incentivized to indicate that the survey was "confusing" to the extent that they believed they could be disqualified or not receive credit for participating.

[265] *E.g.*, Interview #2, pp. 16 – 17 & 45; Interview #4, pp. 25 & 32.

[266] Interview #6, p. 47.

[267] Interview #1, p. 25.

[268] The raw transcripts provided by Dr. Caves included numerous typographical and transcription errors, while also obscuring portions of sentences.  When quoting participants' verbatim responses throughout this *Rebuttal Expert Report*, unless otherwise indicated (*e.g.*, using square brackets), I reproduce the responses as originally transcribed.  I use empty square brackets ("[]") to denote where sentences have been obscured or cut off from the raw transcripts.  Bold emphases added throughout.

**Table D1: Selected Verbatim Responses from Dr. Caves's Fifteen "Cognitive Interviews"**
**(Brand and Other Compatibility Constraints as Dominant Purchase Driver)**

| Interview # | Interviewee Verbatim Response |
|---|---|
| 1 | • [pp. 25 – 26:] […] you also got to remember, **it's typically not like my decision. What breakers are going in like. It's all already predetermined**, like [] the the builder will tell us like, or the the engineers will tell []e, what equipment we're installing [] and that's all based on, you know, they're their estimates, their [] plans, like everything, according to the job. What the customer [] like it depends on like [] if the customers installing solar it depends on if they're putting [] lot of ev if they're if how big the services like like, I'll tell []ke like Siemens and Square D will be a lot better for getting big []ent. It. But for like house panels like little panel boards, Abb would be fine. Abb would be least on my list. General electric [] they're not bad breakers.<br>• [p. 27:] But typically **it's going by what's already there. When I'm running everything is decided. The equipment that I'm using. Where the breakers are going in the panel. What those breakers are to be for**.<br>• [p. 32:] the **supply house is just gonna give me a plug on panel**. They're []ven gonna ask me what kind of panel they're just gonna give me a plug on panel. |
| 2 | • [pp. 16 – 17:] they're also limited. To what type of break is. **Only certain []rs can go into a panel**. […] So you're you're limited to what can go into a panel based on who [] it.<br>• [p. 22:] Now you're asking me for making a purchase. Afci. [] looking at a breaker. I have to determine **if the breaker is compatible with the electrical panel** I have.<br>• [p. 23:] I'd have to say **it depends on the circuit that I'm using**. I'm only limited to a choice of 2, meaning that if I'm doing a 15 amp circuit, which is typically a []ng circuit, it's 15 amps, Max. I can put on it. I would use this, Siemens. I can't even consider the other 2.<br>• [pp. 28 – 29:] So again the question, **Am I looking for afci project, or is this [] 2 of them are afci gfci** […] Again it all comes down. To what type of circuit am I putting it []pically lighting circuits are 15 amps. Right? So if I have to put this on a lighting circuit I would go. I would then only I can only select the 15 app. […] you're making it difficult for me to […]e. You're not giving me [] again. **I just couldn't go out and buy any one of these for any []t has to be very specific, for where I'm using it**.<br>• [p. 31:] So again, **it's the application where it's used for if I did, a [] of bedrooms in a residential**. I don't really need gfci protection in a bedroom right? I just need the Afci protection [] bedrooms and hallways. […] So again, this is basically these are very for very specific []s. You have the plug on neutral, which is not typical of an existing or older installation.<br>• [p. 32:] **If I was forced to make a decision again, it all comes down to the []ation. It's a little unfair to ask a licensed electrician. Which would you use? Right? I'd have to know the application first.st […] Well, it's kind of a trick question**. So for me to select, I'm making assumptions that I'm using it for []ght application that I'm doing the job on right. But you didn't provide me that. What's the application.<br>• [p. 34:] Most older buildings, the Plugin [] work. The thing is, I'm **limited to Siemens, which you know Siemens only fit in certain boxes**.<br>• [p. 36:] What make it interesting is, if you choose, across the board. If []ere all plugins or pigtail type like you need to know. **I can't just go buy a panel and say it's a plug on or a pigtail**. |

| Interview # | Interviewee Verbatim Response |
|---|---|
|  | • [p. 42:] **You just can't buy any one of these.** If you were buying based on what I'm using in the industry, this is what I would use right? I like the price because it's a dual function for that price. […]<br>• [p. 43:] And again **the options come down to the application**. Where am I [] it? And what is it for? Is it for this panel? Is it for that? **And so it's it's kind of confusing**, right it.<br>• [p. 45:] **What limits me is the type of panel? Do I have a plugin neutral or a pigtail neutral.** For us. Pigtail neutral is typical of the existing panels that we're working from. So if I go into your [] and you've had a house in like, say, 1980. There's a hundred percent change that. And the panel was never []ed. A 100% chance. I'm using a pig tab breaker in your house. |
| 3 | • [p. 23:] I mean, if you're []ween 3 different manufacturers. **you're obviously you're designing a system [] rather than just going out and purchasing a circuit breaker** []n a in a panel. Right? It's a that's a different purchase. So at that point you have to take a step back. **Look at the panels** that the other circle breakers the cost for that.<br>• [p. 29:] It depends on how many there were also [] And **what's your panel?** So if this is a new a new build, you []ght consider using the Siemens. Just be for the savings. If you only need it for afci right? […] |
| 4 | • [p. 7:] Obviously the breakers have []tch the panels that would be listed for the panels that you're putting in.  So **if I'm working on something with the Siemens panel, I get a []ns breakout**.<br>• [p. 25:] You sort of but under []ption you're assuming that the electrician would already know they can't do that. So so right here, you're really limited to. [] you're either gonna choose one or 2, you know. You can't. **All 3 of them aren't a possibility unless you're buying everything including the panel.**<br>• [pp. 32 – 33:] you're assuming that you just. you know, ahead of time, whether or not you need a Gsci breaker or [] **Obviously, if you're in a project that needs one, then [] you're limited to that option.** But if you don't need it here, sky []er, and it's just an optional. you know. Well, might as well get it for the future. Then it's almost irrelevant to the question other than it's. you know, cause the the Gfci and Afci are the 2 separate [] things altogether, even though they have the dual function []ers. |
| 5 | • [p. 20:] Well, I'm I'm if it's a **new project**. I'm gonna buy the plug on [] because that's the way most of the manufacturers have gone with their load centers and and but if I'm going out on a **replacement** [] call, then then I'm gonna have to **buy whatever is necessary**, []t's the the pigtail or the the plug on neutral.<br>• [p. 21:] you're asking me if these wer my only [] which would I purchase? And but I still have the right to refuse. And so **it would depend in this case on what the project []tions called for.** |
| 6 | • [p. 32:] **it depends what the job is. If it's if I'm doing a panel, or []oing new construction**. I would pick Siemens, because that's the brand that I that I would install.<br>• [p. 33:] Now, looking back again, if I well, the reason I picked []se **you have to get the brand of the breaker for the certain brand panel** because of ul listing []ters, laboratory listing. […] Code right? But then the the next thing that would be is is []lug, a neutral panel? Not every panel is a plug, a neutral panel.<br>• [p. 38:] If I'm assuming, you know again, this is here. and this is says for typical project. If it's a, you know, new []tion project which we do a lot of, then I'd pick the middle one if I'm assuming that that and the reason why is because if we're doing a new panel which we are would be in new construction. I would install a plug on neutral panel. |

| Interview # | Interviewee Verbatim Response |
|---|---|
| | • [pp. 47 – 48:] **It depends on the project, the project kind of dictates which []u're gonna go**. And then, when you know which route you're gonna go. Then you can. **Then it dictates what product you will choose.** You know what I mean. So that would have been a little, I think a little bit just a []asier, because if I'm working an existing home with an existing panel well, I don't have much short. **I can't choose what breaker to []ave to use a certain breaker because of you are listing code requirements**, that sort of thing. So then, the only thing I would choose is, where am I getting it at? Is it home depot, or is it is a supplier. |
| 7 | • [p. 19:] […] as an electrician, I expect a lot of information on what I need to buy almost to where **I don't get the luxury of picking between 2 or 3 different options** are pretty got. Us got to stick down one lane, so to speak, like if if the []ers want to eat in gear. Then it's gonna be eaten gear, and I gotta play the Eaton's world or Siemens the same scenario. |
| 8 | • [p. 14:] So obviously, I stated in before, I'm a Siemens guy. Siemens []ls.<br>• [p. 17:] So that's 1 of the reasons I usually go with []ens.  I like the look of the panel. I like just the just everything about the panels. […] So it's it's more of a panel thing than it is a breaker thing. |
| 9 | • [p. 28:] **It's actually the code you have to use the breaker with that panel unless it's been ul listed**. So I'm just []ng at this list. Let's say that I had a Siemens panel and eaten whatever they have to be rated for each other. You know what I mean. You can't mix. You can mix manufacturers like I don't want to say something wrong. You can mix manufacturers if it's been ul listed, or if you send it in, get ul listing, do you do that? No, **you usually just by the same the same brand**, you know, but with that being said on all the panels or all panels I've ever []d on, you open up the door, and you know there's a lot of writings on there. There's a lot of information people don't realize, but they actually tell you what breakers you can use on there. |
| 10 | • [pp. 18 – 19:] but I'm not sure if these are all interchangeable or not, I know [] and Eaton usually are not […] But usually that will deter you. **If it's a square d panel, you are d and such. So usually you stick to the panel brand.**<br>• [p. 23:] I guess it also depends on what it also depends on what [] on. So like, **one thing the question doesn't ask is like, what situation are you in like? Is this a general house, is it? Are you putting it in something like important, like a hospital, []? Is it just a generic place you're inserting like. […] Or is it your own house like?** Are you thinking about your own you know? Like, is it so sometimes that matters on what what you're putting in. []es you want the best for certain things, and sometimes you need higher protection for things like hospitals and stuff [] at. So.<br>• [p. 29:] but yeah, 1st it's what panel it is, and then you gotta figure []en you kinda you'll have some options, obviously. And then you kind of usually go from there. Do you need Afci and []r just afci?<br>• [p. 31:] And yeah, so is this in? That's another question I'd ask, is it []ss production? Or is it more like a service call.<br>• [pp. 43 – 44:] So that would be confusing on my part, I guess. Just the []ns I had. just **is it for mass production, or more like service jobs**. and I think a lot of people might think like I do about the the []. **Certain breakers only go to certain panels**. […] And whether, yeah, **whether you need afci and gfci, or just fci.** […] Cause that would make a big difference on what breaker you choose when you're in the actual store, getting stocking up, because usually, even if you do just need one or the other, usually, even if you're doing mass things, [], you're doing the same thing over and over again. So you're gonna kind of need one or the other a lot more than the other. One. |

| Interview # | Interviewee Verbatim Response |
|---|---|
| 11 | • [p. 18:] I mean again, **it also depends on this the situation.** I mean, if **if I'm servicing a Siemens panel. I have to go with a Siemens []aker.**<br>[p. 25:] It's it's more of like **the question of okay doing this for a typical project or for general inventory**. Yeah. if it's for general inventory, then I'm I'm gonna go with whatever panels that I most typically install. […] You know, and it's a either. The question could be tailored to like []pecific situation.<br>• [p. 27:] Which one you're gonna go with. **It's just all dependent on what []t you need in that particular situation.** |
| 12 | • [p. 6:] **And usually the panels that I'm working on are eaten in Siemens Brand**, so I'll [] know, use the proper breakers for that panel.<br>• [p. 17:] if I'm buying afci breakers, I'm like the sec, the middle option. []e has a dual function. I **I wouldn't need that unless it's a certain specific scenario**.<br>• [p. 28:] if I were to select breakers, I think 1st choice would be. **I would need to buy a compatible breaker to whatever system I'm using. If I have a if I have a Siemens panel board, I'm gonna buy Siemens.** |
| 13 | • [pp. 10 – 11:] Well, this is kind of a loaded question, because **every manufacturer that's you all listed has their listed []t that has to be provided to the consumer**. So when we purchase, I mean, we purchase based on a variance, I []ow with energy, storage and solar have become big big items, and throughout all the the States they've been around. But we are **required to use only listed products that are listed for []nufacturer**. So let's say, we buy a square D panel unless there is a the fci breaker of a different brand listed in that panel. I'm []n inspector as well. I would not be able to use that another breaker not listed right? **It's got to be per manufacturer specifications.**<br>• [p. 12:]<br>*Kevin Caves*: So so like, what's an example of do? Do you know one off the top of your head of an afci that can be used in a panel with a different brand.<br>*Interviewee*: Have not. I have not encountered it. **I've always matched what []sted**.<br>• [p. 23:] This is a tough one. Here. I would purchase. **depending on the panel that I installed in the residence, or the []e parcel, the the home, or the building. wherever the Afc. Afc. Is required, I would purchase either**. |
| 14 | • [p. 6:] So we were working at the time in a residential service, meaning []o service calls. So if we went to a customer's home a homeowner and their panel we needed to add an arc fault circuit, interrupter, breaker, or perhaps a dual function. We would need to **make sure that the breaker how would I say it was compatible with the panel board**. […] So ideally, we try to get breakers that are an exact match with [] panel board. But in occasion we have to do research and figure out, okay, what breakers that are not the same brand are still compatible. And usually there's about 3 or so that are compatible with a particular panel board.<br>• [p. 12:]<br>*Interviewee*: But basically, it sounds like the the thought here is you're selecting from only 3 different types in a hypothetical []ation there's different features and different prices. and after carefully considering them, I would select, which, if [] I would purchase in real life, I guess my only question would that would immediately come to my mind when I'm reading? This is like, **am I making this purchase from the perspective of this being completely legal to code and compatible with the panel board? Or is this just me trying to make it work?** Which, of course, me, as a licensed electrician, I would be trying to do it according to code and panel board and that sort of thing.<br>*Kevin Caves*: Yeah, so it's it's that's yeah. That's a great point. I would say. The best answer I could give is, you know. you know we're we're just looking for the obviously this is |

| Interview # | Interviewee Verbatim Response |
|---|---|
|  | confidential. But the you know, the honest answer. What you would purchase in real life, and what you're saying is, you know, you would do do everything according to code, which makes perfect sense. So I would just go into the questions with that that mindset. *Interviewee*: Okay, yeah, **if we don't do something to code. The inspector, of []se, would not pass the project.** Yeah.<br>• [pp. 18 – 19:] Well, in this question, I'm asked to take into consideration []her these Afcis would be compatible with the panels of specific brands or manufacturers. without knowing which panel board I'm working with. **That's what difficult to take into consideration, because I haven't been told in this question what the panel board is, but assuming that it is compatible with Siemens, I would definitively select the one that is not defective,** and that's dual function, even though it's a higher price, because it would protect both human life as well as property damage which it could have, of course. […] **The only way I would select I []d not purchase any of these types of Afcis would be as if I knew that the Siemens was not compatible with a particular panel board that I was working with, in which case I couldn't purchase it.** […] So, assuming that the panel board is compatible with Siemens breakers, and I would definitely have selected the Siemens one. But if it's not []atible I would have had to select. I would not purchase any of these. |
| 15 | • [p. 8:] we had one client, that was all square D, and so we knew we [] And so we bought a bunch of square d stuff. Just so we had it. And and to be able to fulfill their need because they had spec square D and square D, only. So we we knew that ahead of time. So we we didn't know exactly what breakers we were going to need. But we knew they were going to be square. D, so we we stockpiled some of that stuff.<br>• [p. 15:] yeah, I mean, you're talking about what's you know? **Compatible panels**, which is something I would I would look at. […] What we're looking for is not a lot of features. What we're looking for is **what meets the national electrical code**.<br>• [p. 25:] **You gotta meet the national []trical code**. And it's a minimum standard.<br>• [p. 31:] And so the idea is, he's looking for efficiency he's looking to **meet the national electrical code**, and he's looking to do it as quick and as efficient as he can. |

150.    As I discussed in Section C, the fact that the Caves Conjoint Survey failed to address the issue of compatibility renders the entire CBC task contrived and highly likely to be confusing for participants, further exacerbating the demand and focalism biased created by the conjoint survey's "Nuisance Tripping Defect" disclosure attribute.  Indeed, the artificial nature of the choice exercise was noted by multiple interviewees, who expressed confusion about the lack of context provided and what assumptions they were supposed to make.  Table D2 below shows selected verbatim responses that provide evidence of participant confusion regarding the CBC task.  Interviewees referred to the questions or scenario as, for instance, "a trick question,"[269]

---

[269] Interview #2, p. 32.

"unfair to ask,"[270] "confusing,"[271] "loaded,"[272] and "hard to answer."[273]  One person emphasized

that they cannot just "randomly"[274] make a choice or "buy any one of these"[275] but that the

choice of breaker would depend on the particular "application"[276] at hand.  Another questioned

whether the breakers shown were "real" or instead "[ma]de up breakers."[277]  This same

interviewee also highlighted the omission of important details such as whether the situation is for

a "mass production" versus a service call,[278] as well as where the breakers are being installed

(*e.g.*, in a general house, a hospital, or their own home)[279]—to which Dr. Caves, inexplicably,

answered that "that's where we've sort of deliberately kept it vague."[280]

**Table D2: Selected Verbatim Responses from Dr. Caves's Fifteen "Cognitive Interviews"**
**(Confusion Regarding Choice Task and Insufficient Context)**

| Interview # | Interviewee Verbatim Response |
|---|---|
| 2 | • [p. 29:] […] **you're making it difficult for me to […]e. You're not giving me [] again**. I just couldn't go out and buy any one of these for any []t has to be very specific, for where I'm using it.<br>• [p. 32:] **If I was forced to make a decision again, it all comes down to the []ation. It's a little unfair to ask a licensed electrician. Which would you use? Right? I'd have to know the application first.**st […] Well, **it's kind of a trick question**. So for me to select, **I'm making assumptions** that I'm using it for []ght application that I'm doing the job on right. But **you didn't provide me that. What's the application.**<br>• [p. 33:] So **it's kind of confusing. You're asking me to select one. And I'm giving you answers based on an application that I'm []ng in my head**. Right? I, Jeff, def each one of these situation. It has to be for that particular application where I'm putting it in. So now **you're asking me to buy one, not knowing the application. []ind of hard to do that.** |

---

[270] *Ibid.*

[271] *E.g., id.*, pp. 33, 42, 43, & 53; Interview #3, p. 43; Interview #10, p. 43; Interview #14, p. 28.

[272] Interview #13, p. 10.

[273] Interview #6, p. 3.

[274] Interview #2, p. 45.

[275] *Id.*, p. 42.

[276] *E.g., id.*, p. 32.

[277] Interview #10, p. 33.

[278] *Id.*, pp. 31 & 43.

[279] *Id.*, p. 23 ("So like, one thing the question doesn't ask is like, what situation are you in like? Is this a general house, is it? Are you putting it in something like important, like a hospital, []? Is it just a generic place you're inserting like. […] Or is it your own house like? Are you thinking about your own you know? Like, is it so sometimes that matters on what what you're putting in. []es you want the best for certain things, and sometimes you need higher protection for things like hospitals and stuff [] at.").

[280] *Ibid.*

| Interview # | Interviewee Verbatim Response |
|---|---|
|  | • [p. 42:] But again, all like all the questions you've asked is, **What what am I using it for? Which is never clear, which was not really clear. You just can't buy any one of these.** […] So you gotta you gotta look at that. **The questions are a little []sing.** If you're asking license, nutrition [licensed electrician], choose a choose a choose one of these, he'd probably say, **I can't choose unless I know where I'm using it.** Right? What's the application for? And **that's what's making it []ult.**<br>• [p. 43:] And again **the options come down to the application**. Where am I [] it? And what is it for? Is it for this panel? Is it for that? And so it's **it's kind of confusing,** right it.<br>• [p. 45:] **How do you want me to make the choice? I just cannot randomly [] choice.** But I'm making the choice based on what my experience has been.<br>• [p. 53:] We know? The answer is, the answer is, yeah. **Some aspects of the []s are confusing.** |
| 3 | • [p. 43:] Sometimes it feels well, **we just gotta get an fci, []t pick one. But yeah [] little bit confusing**. |
| 4 | • [pp. 24 – 25:] It may help to say what type of project you're doing, but. […] Just maybe like a sentence like you wire in a basement or something that. […] And also I, this **assumptions here, too, like you're assuming that [] if I go into a house and the project is. I just gotta imagine a circuit to an Eaton panel**. […] You sort of but under []ption you're assuming that the electrician would already know they can't do that. So so right here, you're really limited to. []<br>• [pp. 32 – 33:] you're **assuming that you just. you know, ahead of time, whether or not you need a Gsci breaker or []** Obviously, if you're in a project that needs one, then [] you're limited to that option. But if you don't need it here, sky []er, and it's just an optional. you know. Well, **might as well get it for the future. Then it's almost irrelevant to the question** other than it's. you know, cause the the Gfci and Afci are the 2 separate [] things altogether, even though they have the dual function []ers. |
| 6 | • [p. 33:] So **it's hard to answer this question**, because, like, it's this is a this is a. It's a good question, but it's a generic [] got it? And what you know, **what scenario would this apply to.**<br>• [p. 38:] Again I have to do. **I have to assume certain things**. […] If I'm assuming, you know again, this is here. and this is says for typical project. If it's a, you know, new []tion project which we do a lot of, then I'd pick the middle one if I'm assuming that that and the reason why is because if we're doing a new panel which we are would be in new construction. I would install a plug on neutral panel. |
| 10 | • [p. 23:]<br>*Interviewee*: I guess it also depends on what it also depends on what [] on. So like, one thing the question doesn't ask is like, **what situation are you in like? Is this a general house, is it? Are you putting it in something like important, like a hospital, []? Is it just a generic place you're inserting like. […] Or is it your own house like?** Are you thinking about your own you know? Like, is it so sometimes that matters on what what you're putting in. []es you want the best for certain things, and sometimes you need higher protection for things like hospitals and stuff [] at.<br>*Kevin Caves*: Yeah, yes, and **that's where we've sort of deliberately kept it vague** by just saying.<br>• [p. 31:] And yeah, so is this in? That's another question I'd ask**, is it []ss production? Or is it more like a service call.** |

| Interview # | Interviewee Verbatim Response |
|---|---|
|  | • [p. 33:] I don't know if it's real. **Are these real examples like real breakers? Or is this kind of []de up breakers.**<br>• [p. 43:] Yes, on the confusion confusing part you kind of answered it. I don't know if you're gonna be there when they're taking the survey. […] So **that would be confusing on my part**, I guess. Just the []ns I had. just **is it for mass production, or more like service jobs.** and I think a lot of people might think like I do about the the []. |
| 11 | • [p. 11:] The only thing that I really kind of stands out to me is it's more of a all. The Afcis are the same. and our fault circuit interrupter, afci breaker is an afci breaker, []t's what it is. There's not really different type of afci breaker […]<br>• [p. 25:]<br>*Kevin Caves*: The way we're presenting this. Does it give you enough information to make an informed decision about what you would actually purchase in real life?<br>*Interviewee*: **No.** it's it's not like the information that you know is being provided []ut each breaker. I mean, that information is fine, you know. You say, okay pigtail, 15 amp. Single pole. Our fault breaker, or, you know, plug on neutral 15 amp. Single bold dual function breaker. It's it's more of like **the question of okay doing this for a typical project or for general inventory**. Yeah. if it's for general inventory, then I'm I'm gonna go with whatever panels that I most typically install. […] You know, and it's a either. **The question could be tailored to like []pecific situation.**<br>• [p. 27:]<br>*Interviewee*: **Which one you're gonna go with. It's just all dependent on what []t you need in that particular situation**.<br>*Kevin Caves*: Yeah, okay, yeah. **So you'd like a little more, a little more specificity about, you know what type of you know, what you need the breaker for.** Basically.<br>*Interviewee*: **Yeah. Like, why? Why am I? Why am I in the market for the artfall []akers [arc fault breakers]?** |
| 13 | • [p. 10:] Well, **this is kind of a loaded question**, because **every manufacturer that's you all listed has their listed []t that has to be provided to the consumer**. […] |
| 14 | • [p. 12:]<br>*Interviewee*: But basically, it sounds like the the thought here is you're selecting from only 3 different types in a hypothetical []ation there's different features and different prices. and after carefully considering them, I would select, which, if [] I would purchase in real life, I guess my only question would that would immediately come to my mind when I'm reading? This is like, **am I making this purchase from the perspective of this being completely legal to code and compatible with the panel board? Or is this just me trying to make it work?** Which, of course, me, as a licensed electrician, I would be trying to do it according to code and panel board and that sort of thing.<br>*Kevin Caves*: Yeah, so it's it's that's yeah. That's a great point. I would say. The best answer I could give is, you know. you know we're we're just looking for the obviously this is confidential. But the you know, the honest answer. What you would purchase in real life, and what you're saying is, you know, you would do do everything according to code, which makes perfect sense. So I would just go into the questions with that that mindset.<br>*Interviewee*: Okay, yeah, if we don't do something to code. The inspector, of []se, would not pass the project. Yeah.<br>• [p. 18:] Well, in this question, **I'm asked to take into consideration []her these Afcis would be compatible with the panels of specific brands or manufacturers. without knowing which panel board I'm working with. That's what difficult to take into consideration, because I haven't been told in this question what the panel board is**, but |

| Interview # | Interviewee Verbatim Response |
|---|---|
|  | assuming that it is compatible with Siemens, I would definitively select the one that is not defective, and that's dual function, even though it's a higher price, because it would protect both human life as well as property damage which it could have, of course. […] <br> • [p. 28:] <br> *Kevin Caves*: **Did you find any of this aspect of this survey to be confusing?** <br> *Interviewee*: **Yes, from the perspective that the []tions are kind of asking me to take into consideration whether or not these are compatible with panel boards, yet I am not presented with any information about which panel boards I'm working with. So at that point, I'm almost having to go with the the general inventory part of the question. I can't even []ider the working on an actual project, because I don't have any information on what the panel board is.** So I'm I'm pretty much forced to look at a general inventory. |

151.     Apparently, based on feedback from his interviewees, Dr. Caves modified the CBC survey's instructions at some point to include a statement asking participants to imagine they are purchasing AFCIs for a "typical project" or for "general inventory."[281]  It is possible that the instruction to "take [breaker-panel compatibility] into consideration" was also subsequently added to the final survey.[282]  As I explained in Subsection C.1, these instructions are themselves unclear and violate marketplace conditions, and they do nothing to alleviate the vague, confusing, and unrealistic nature of the conjoint task that participants were forced to complete. Instead, they likely made the problem worse by essentially prompting participants to *assume* that whatever breakers they are shown in the survey are compatible for any given job, and to therefore (inappropriately) *ignore* the critical issue of compatibility and code compliance.

152.     Indeed, as Interviewee #14 noted, when asked whether they found any aspect of the survey to be confusing:[283]

> Yes, from the perspective that the [ques]tions are kind of asking me to take into consideration whether or not these are compatible with panel boards, yet I am not presented with any information about which panel boards I'm working with. So at that point, I'm almost having to go with the the general inventory part of the question.

---

[281] For example, in Interview #4, Dr. Caves directly asked the interviewee: "Would it make sense if we asked people to imagine that they're purchasing either for a typical project or just for general inventory. Would that make any sense?" (p. 34).  In Interview #6 (p. 38), the interviewee referenced the question asking about a "typical project."

[282] By the time Dr. Caves conducted Interview #14, this statement already appeared in the conjoint module instructions.  *See* Interview #14, p. 18 ("Well, in this question, I'm asked to take into consideration []her these Afcis would be compatible with the panels of specific brands or manufacturers. […]").

[283] *Id.*, p. 28.

I can't even [cons]ider the working on an actual project, because I don't have any information on what the panel board is. So I'm I'm pretty much forced to look at a general inventory.

Another person, Interviewee #11, stressed that their choices would depend on what they need "in that particular situation,"[284] and would vary depending on whether it is for a "typical project or for general inventory."[285]  When Dr. Caves interjected to state his understanding that "So you'd like […] a little more specificity about […] what you need the breaker for,"[286] the interviewee replied: "Yeah. Like, why? Why am I? Why am I in the market for the [arc fault breakers]?"[287]  Unfortunately, this feedback and request for "specificity" was never incorporated into the final Caves Conjoint Survey.

### D.2.2. *Dr. Caves's "Cognitive Interviews" Show that Interviewees Were Confused About the "Nuisance Tripping Defect" Disclosure and Held Different Views of "Nuisance Tripping" Compared to its Representation in this "Disclosure"*

153.    Multiple interviewees also expressed confusion about the "Nuisance Tripping Defect" disclosure as portrayed in Dr. Caves's "pilot" conjoint task.  A closer examination of the raw verbatim responses related to "nuisance tripping" reveals that interviewees perceived this topic differently compared to how it was represented in the survey.

154.    For example, while all of the 15 electricians interviewed were familiar with "nuisance tripping,"[288] there was no indication that they thought of this phenomenon as a "defect" or as meaning that an AFCI breaker is therefore "defective."  Indeed, Interviewee #1 referred to "nuisance tripping" as "not a bad thing"[289] and noted that they did not think "any arc fault breakers are necessarily like bad or defective out of this list."[290]  Interviewee #4 remarked that they found the word "defect" to be "strange," explaining that they viewed a "defective" breaker as one that does *not* trip when it should (thus creating a fire hazard):[291]

---

[284] Interview #11, p. 25.

[285] *Id.*, p. 27.

[286] *Ibid.*

[287] *Ibid.*

[288] *E.g.*, Interview #1, p. 16 ("Every electrician knows what nuisance tripping is").

[289] *Id.*, p. 17 ("It's it's a good thing. I mean [] I'm not saying it's a bad thing that you're describing []is stuff").

[290] *Id.*, p. 23.  This interviewee pointed to Siemens as being, in their opinion, "the only breaker that doesn't nuisance trip"; *ibid.*

[291] Interview #4, pp. 18 – 19.

---

> […] **[d]efect is a little bit of a strange word in it to me. It's like as an electrician. I wouldn't buy anything that says right on it. It's defective.** […] It's almost like it's an older model breaker that doesn't have the newer algorithms and stuff built into it to pick []e nuisance to tech. […] Like the Siemens breakers, the newer ones, or whatever aren't [neces]sarily like the ones that I have from a year ago aren't defective. They're [] They don't have the built in detection that determines whether it's a refrigerator working []rly or than ours. […] Yeah, like, it's not really a defective old breaker. It's just [] like to me. **A defective breaker is one that might not trip at all on anything**, **and then, you know, you could have 30 amps running []gh 15 amp circuit and causing fire**. [Emphases added]

155.    Multiple interviewees also indicated that Dr. Caves's "Nuisance Tripping Defect" disclosure attribute was vague and confusing.  Interviewee #2, who stated that they "haven't really seen where the [breake]rs are like constantly tripping because of an inherent defect in itself,"[292] answered as follows when asked whether the survey question gave them enough information to make a decision:[293]

> The nuisance tripping part. You need to, you know, explain that a bit. **So where it says nuisance tripping product does not have a nuisance, tripping defect. What does that mean?** Does it? And the other one says, Yes, product has a nuisance tripping []. **So it tells me, if it's [] trip based on nuisance, or what? What does that mean?** [Emphasis added]

Another electrician similarly asked for clarification as to what having a "nuisance tripping defect" means,[294] and another commented that unlike electricians, who may not understand what "prone to nuisance tripping" means, engineers "understand more […] how much it trips."[295]

156.    Interviewee #3 expressed considerable confusion and surprise at the notion that there could even exist an AFCI breaker on the market (as represented in the Caves Conjoint Survey) that is *not* "defective" in the sense of not causing any "nuisance tripping":[296]

> *Kevin Caves*: Okay, so do you. So do you think the question gave enough information to decide which option to select.

---

[292] Interview #2, pp. 23 – 24.

[293] *Id.*, p. 25. *See also id.*, pp. 37 ("the yes and no nuisance tripping. It's a nice feature, but I it [doesn']t explain it to me. So I'm kind of not really looking at that.") & 53 ("you need to explain a little bit about the nuisance tripping on the breakers.").

[294] Interview #6, pp. 34 – 35 ("So that also that you know, that would have to be specified as []w, when it says nuisance, Asia [*sic*] has nuisance, tripping defect. what does that mean?").

[295] Interview #10, p. 28 ("And then, like, I've been noticing like the prone to nuisance [trippin]g a lot on all these. So that's something also, too like I feel. Maybe. Hmm! How could I put that like electricians understand what it is? But [e]ngineers understand more how much it actually affects. how much it trips.").

[296] Interview #3, pp. 21 – 22.

*Interviewee*: **No, because I what what is the like? What are these labeled Nuisance tripping?** What is it about [] the the you get nuisance trips. […] And and what is different about the General electric that there's not nuisance tripping. Right? All this is is a []er telling me. Yeah, this is better than that one. But how do I know right? And and what is the circuits that they use? **How how is it done that they're able to get both functions Afci, Gfi. [] and not have nuisance tripping.** So yeah, right? What's the [] **What's the magic bullet that they have?** You know I'd like to. **I'd like to know what that is**.

And:[297]

But at the end of the day. If that really doesn't have [] tripping defect, that's the wet that's the one to go with. Why? **Why does it not have a tripping defect?** Right? Because I know how that [] they operate, you know. **So what what is it that catches? [] it's a good arc or a bad arc?**

And:[298]

*Kevin Caves*: yeah. So so when you're looking at this question, the ones like it, do you feel like, they're giving you enough information, to to make a decision.

*Interviewee*: **Not really. No. Again. I want to know more about how they're [] Product does not have nuisance tripping defect.** I want to know more about that.

And:[299]

That's that's huge for me. **If they actually found a way to []sance trip. Then I that's the 1st thing that I'm looking for.** […] How how much does it of a nuisance trip?  The other thing that I [t]hink about it is, where is it going? Right is, is it? **Are they going in in someone's bedroom? Where you're not gonna be using welders or things that might actually cause a nuisance trip.**

And:[300]

Yes, yes, what? **Why is one different than the other?** Right? What? What is the [] **does it have a special circuit** that sends? And and what is []t sense? Right? What makes a difference, I think, is the right [] terminalize. What? **What makes that product? Not prone to tripping versus the other one** at our. […] So, yeah, I think that's huge for me. […] Why, why, why, what makes one better than the other? How []t? Right? It does it have a special circuit that. [] you know like it? Did they? **Did they? [] have a lab and and run all different kinds of products and what the sine wave is when you plug in a lamp versus a welder or a drill, or you know, a a grill, an electric grill, or, you know []u know which which ones is it good for?**

---

[297] *Id.*, p. 25.

[298] *Id.*, p. 32.

[299] *Id.*, pp. 36 – 37.

[300] *Id.*, pp. 44 – 46.  *See also id*., p. 38 ("I I want to know more about the []pping and and what it stops, you know, when it stops, when when are there? When are there. Nuisance tripping? Is it? Tripping for something that shouldn't be used in those locations? Right? That's 1 thing, so that that might affect how I purchase something.").

I mean, that's another [] that would be nice. You know. **What products does it stop the nuisance trips for right?** Because it must have been [pro]ducts that were causing this right and and generally for me.

157.    As the above-quoted excerpts from Interviewee #3 indicates, Dr. Caves's presentation of the "Nuisance Tripping Defect" disclosure attribute and levels led this individual to believe or imagine that certain manufacturers have somehow uncovered a new breakthrough technology—a "magic bullet"[301]—that solves "nuisance tripping" altogether.  Other interviewees expressed a similar interpretation.[302]  I understand, however, that such a belief would be erroneous, as no current manufacturer of AFCI breakers is immune from some level or probability of "nuisance tripping" (*see* Subsection B.3).  Nor is it accurate, based on my understanding, that a typical breaker would be so "defective" and "prone to nuisance tripping" that, as one interviewee apparently interpreted this undefined attribute level, the breaker would "trip continuously, and there will never be power to use […]."[303]

158.    Consistent with available evidence on "nuisance tripping" as detailed in Subsection B.3, Dr. Caves's interviewees also discussed concepts that indicate a more accurate and balanced view of "nuisance tripping" (*i.e.*, compared to its representation in Dr. Caves's "disclosure"), including, for instance:

(*i*)    that "nuisance tripping" is a commonly known challenge that electricians have troubleshot across multiple brands of breakers;[304]

---

[301] *Id.*, p. 22.

[302] *E.g.*, Interview #12, p. 28 ("[…] if they claim to not have nuisance []pping, then that's a big deciding factor that I would go with  And if I knew that cert, if I were doing panel installations, if I [] that certain brands we're known for not having nuisance tripping issues, then I would install that system and use those []kers.").

[303] Interview #14, pp. 18 – 19 (But I definitively would not purchase something that I, 100% knew was defective. Because it it there'd be essentially no way to to have the branch []uit on. […] So if []re talking about a kitchen and it has a microwave in it. […] And if it's prone to nuisance tripping due to the radio frequencies from microwaves, that means it's going to **trip continuously, and there will never be power to use. So the customer is not going to be able to ever use that branch circuit as long as the microwave is every time the microwaves turned on it's gonna break, and they're never going to use that microwave.** [T]hat would not be something we would install in a customer's home."); *see also id.*, p. 24 ("Yes, because if if it's prone to that much nuisance [trip]ping that we talked about in the original question, where **there was so many different devices that could trip it**. I I don't think we would want to install that for a customer, because **it would be effectively useless**.").

[304] *E.g.*, Interview #1, pp. 17 ("[…] we've all trouble shot it before"), 23 ("Siemens is actually the only breaker that doesn't nuisance trip"), & 30 ("At the end of the day they all do […]"); Interview #3, p. 48

---

(*ii*)     that such unwanted tripping is or should be weighed against the primary safety function and benefit that AFCI breakers provide, as required by code;[305]

(*iii*)    that the likelihood or rate of tripping depends on factors like appliance type and whether the breaker is an older or newer model;[306]

(*iv*)    that the tolerance for "nuisance tripping" could depend on factors like the application or type of building (*e.g.*, a hospital);[307]

(*v*)     that what may appear or be diagnosed as "nuisance tripping" may instead be potentially hazardous or be caused by elements like faulty wiring or cords, incorrect usage or a misapplication, rain, rodents, or a problem with the household device or appliance (as opposed to a problem with the breaker itself);[308]

---

("They're working on the nuisance trips. That's that's the [prob]lem with any of those pieces of equipment."); Interview #10, p. 14 ("Yeah, I I know they've gotten better through the years, for sure. [] they used to trip a lot more. The combination ones.").

[305] *E.g.*, Interview #3, p. 48; Interview # 5 ("And so if you've ever had to go out and replace a device that [] to melt. And it's right. Next to a child's bed, you can **appreciate the technology for interrupting that circuit and preventing any [d]amage or loss of life in that type of situation**."); Interview #6, p. 20 ("the whole point of an arc fault right? It's it's tripping to shut off a circuit, because it's thinking it's catching an arc fault, situation or scenario. Sometimes you may catch something that from you know, nuisance trips. […] So it it doesn't always know which one's which."); Interview #8, p. 11 ("I get the Afci breakers. They **they do do their job**. They do save either like a customer or electrician."); Interview #9, pp. 21 ("there's a purpose []en Aci, it's just we gotta somehow figure out how to distinguish that […]"), 32, & 34 ("Yeah, it may have issues, but it's not as bad as you think, you know, because think about all the people who buy it. But still, **do you want to take that risk when it comes**?"); Interview #14, pp. 18 & 22 ("[…] I feel like eventually all breakers, if it possible, should be [dual] function, because it provides maximum **protection for life and property**"); Interview #15, p. 18 ("Why arc fault, you know people [] a wire underneath of a piece of carpet because they didn't like the wire being a trip hazard. So they put it on their piece of carpet, and then they forget about it. 15 years later, with people living in a home, they've smashed that wire flat and shortened out, catches the carpet on fire, and next thing you know, 3 Am. They wake up and their living rooms on fire, and they can't figure out why. So **that's why the Arc fault is is important and is is a good**.").

[306] Interview #3, pp. 37 ("Are they going in in someone's bedroom? Where you're not gonna be using **welders** or things that might actually cause a nuisance trip.") & 46; Interview #10, p. 16 ("Obviously they **trip easier for like motors** and stuff"); Interview #4, p. 18 ("It's almost like it's an **older model breaker** that doesn't have the newer algorithms and stuff built into it to pick []e nuisance to tech. […]").

[307] Interview #10, p. 23 ("So it's prone to obviously square. D is more prone to tripping. […] Are you putting it in something like important, like a hospital, []? […] [Sometim]es you want the best for certain things, and sometimes you need higher protection for things like hospitals and stuff [] at.").

[308] Interview #2, pp. 18 – 19 ("But you will have a situation where you might use a device that has a certain characteristics or feedback that will cause the [breake]r to trip right? So the breaker is looking for certain characteristics in the circuit. So I've seen in the case here where A nuisance trip was from a vacuum cleaner. [] because the **cord was frail**. […] Right it is. It was **hazardous**, I mean, but every time

---

(*vi*)    that "nuisance tripping" has become less of an issue over the years as manufacturers have improved and updated their arc detection algorithms,[309] with multiple interviewees stating that they have encountered such tripping events infrequently or rarely;[310] and

---

they plugged it in it would trip, and they were like, [w]hat's wrong with this, and they didn't realize when they carefully inspected. If the vacuum cleaner was causing it. There was **an inherent problem with the vacuum cleaner** just needed to take a look at it."), 19 – 20 ("I've seen nuisance stripping on a pump. […] A basement pump, but they've [] that was an **incorrect usage**. […] I've seen it happen. but it was just a **misapplication**. […] The other times. So the most, the most times. the most times I see afci strip are at the light switch. […] Yeah. And usually that's caused by a **loose wiring**."), & 23 – 24; Interview #5, pp. 18 ("One of the [cau]ses surrounding lighting is that the **lamp [] will get loose in the socket**, and and that needs to be checked. […] We know that there are some appliance manufacturers that are claiming that their appliance will trip an arc fault, rated Breaker […].") & 35 ("But if you look at that list of 6 [] typical probable root causes, it's missing a a critical one. A [] couple of them, actually. Oh, really, okay, one would be that the device is not properly []. In other words, it's it's been **push, wired, or backwired** […]. And then the other potential root cause is **squirrel rodent chews up in an attic** where you know they're just doing what Mother Nature programmed them to do, and they start chewing into a conductor, and it starts to arc over up there. […] Or, of course, you know, **people getting up there and doing work that they're not qualified to do**."); Interview #6, p. 20 ("But sometimes it can be. Yeah, you know, **legitimate** where, if you have 2 wires that are []hing, but they're very super close to each other [] that's called. That's an it's jumping. […] So that's a true serious art [arc], [s]ituation."); Interview #10, p. 17 ("[…] A little bit of rain gets in somewhere, and and you have a whole nother issue so."); Interview #11, p. 11 ("it has something to do with of the **led drivers are defective**, that causing making it think that there's a an arc"); Interview #14, pp. 14 ("[…] someone []s in a a device, and the **extension cord** isn't quite right, because it was run over by a scissor left, and it's tripping the breaker, and it's causing [nuis]ance tripping in that way. […] In my experience the more common type ways that something trips [] any afci is when there's **genuinely a problem**."); Interview #15, p. 18.

[309] *E.g.*, Interview #4, p. 15 ("I look at the Siemens breakers. And now there's like updated. I know if you call it firmware or whatever in the breaker itself, but somehow they **update like the algorithms** in the to get rid of the [nuisa]nce trip, and as time goes on, so they've updated them like, I know, if you look at the Siemens, our [arc] fault breakers now. [] the model number of the something on them is slightly different [] it was 2 years ago. And supposedly that's the updated one, because that's what I'm looking for when I put them in now. So **they have gotten better**."); Interview #9, p. 35 ("[…] I don't know what all the manufacturers do for their testing, but they test their stuff more than you're gonna do it, you know. So you know, they have these engineers, and they make stuff to test it and to make it do what it wants to do. [Th]ey know their stuff."); Interview #10, pp. 14 ("I I know **they've gotten better through the years**, for sure.") & 36 – 37.

[310] *E.g.*, Interview #2, pp. 21 ("[…] no, I've not really experienced, and a defect in []ci device"), 22 ("Yeah, I haven't really seen a lot of nuisance stripping [tripping] honestly"), & 23 – 24 ("So like I said, nuisance tripping. I haven't really seen where the [breake]rs are like constantly tripping because of an inherent defect in itself. I really haven't [experi]enced a lot of that. I know. It's something that causes it."); Interview #4, p. 15 ("So you know, usually what I I haven't come across it where it hasn't [] able to be resolved with. A lot of times. They just explain it's nuisance, but it's once in a while."); Interview #6, p. 44 ("And not very common for us, very, very, very rare."); Interview #7, p. 20; Interview #14, p. 14 ("I don't think I've personally been in a situation where this has been a problem."); Interview #15, p. 18

---

(*vii*)    that electricians are unlikely to think about or factor in "nuisance tripping" in their breaker decisions,[311] which are instead largely determined by compatibility constraints and the specific requirements of the job at hand (*see* Table D1).

159.    Tabel D3 below shows various verbatim responses from Dr. Caves's "cognitive interviews" that provide insight into participants' understanding of "nuisance tripping" as a general phenomenon, on the one hand, and to their relative *lack* of understanding of the "Nuisance Tripping Defect" disclosure as presented to them in the survey, on the other hand.

**Table D3: Selected Verbatim Responses from Dr. Caves's Fifteen "Cognitive Interviews" (Perceptions of "Nuisance Tripping" as a Real-World Phenomenon and Confusion About Dr. Caves's "Nuisance Tripping Defect" Disclosure)**

| Interview # | Interviewee Verbatim Response |
|---|---|
| 1 | • [p. 17:] It's **it's a good thing. I mean [] I'm not saying it's a bad thing that you're describing** []is stuff. But yeah, I would say every electrician would know what nuisance []ing is, because we've all trouble shot it before. I do think it's funny. The line where it says, manufacturers of afcis will with a new one. Nuisance tripping defect have claimed nuisance. Tripping is to be expected. [] Yeah, it was also specifically more. It was also specifically [] an issue. When they 1st started rolling them out like around 2017 [] they've since gotten better, but it is still an issue.<br>• [p. 23:] Well, there's no arc fault breaker that I wouldn't purchase. **I [don't] think any arc fault breakers are necessarily like bad or defective out of this list.** It's easy out pick Siemens siemens, is the breakers I've installed the most ironically. You're asking me about nuisance. Shipping. **Siemens is actually the only breaker that doesn't nuisance trip**.<br>• [pp. 29 – 30:]<br>*Kevin Caves*: Like is, is there more detail you'd want to know beyond what's in this simple little square. |

("*Kevin Caves*: So so have have you had experience with with nuisance tripping in in your job? *Interviewee:* Yes, yes, specifically with the ground fault, **not so much with art [arc] fault**").

[311] Interview #1, p. 30 ("I mean an electrician, and at least, in my opinion, is not gonna trust or care about that inside [] of a survey like they already know [] which ones do or do not. At the end of the day they all do so so []r you put that or not. is kinda irrelevant so they're not even gonna care about the news and shipping [nuisance tripping], []e they know what's already in this year."); Interview #10, pp. 28 ("I guess so like I don't know like that wouldn't really go in like we don't usually look at [li]ke we don't like. We looked when we're at like home depot. We're looking for the break[er], the afci or whatnot. Gfci, whichever we wouldn't look if it's prone to nuisance tripping honestly. […] That's not something that we usually think about.") & 32 ("Yes, it would obviously be annoying if it tripped like. But that wouldn't be the 1st thing I would think about when you're []u're getting getting the breaker. […] It would be. Would you need afci, or do you need Afci and gfci []ion. […]"); Interview #14, p. 15 ("They don't really complain much about nuisance tripping, I think, to me, when they complain about nuisance tripping. It's more of an excuse to complain about the price tag.").

| Interview # | Interviewee Verbatim Response |
|---|---|
| | […] *Interviewee*: I I would probably say that like the **the part of it where it says this breaker does or does not have a [nuisan]ce, tripping defect. I mean an electrician, and at least, in my opinion, is not gonna trust or care about that inside [] of a survey like they already know [] which ones do or do not**. At the end of the day they all do so so []r you put that or not. is kinda irrelevant so they're not even gonna care about the news and shipping [nuisance tripping], []e they know what's already in this year. |
| 2 | • [pp. 18 – 19:] But you will have a situation where you might use a device that has a certain characteristics or feedback that will cause the []r to trip right? So the breaker is looking for certain characteristics in the circuit. So I've seen in the case here where **A nuisance trip was from a vacuum cleaner. [] because the cord was frail**. […] Right it is. **It was hazardous, I mean, but every time they plugged it in it would trip, and they were like, []hat's wrong with this, and they didn't realize when they carefully inspected. If the vacuum cleaner was causing it. There was an inherent problem with the vacuum cleaner just needed to take a look at it**.<br><br>• [pp. 19 – 20:] I've seen nuisance stripping on a pump. […] A basement pump, but they've [] that was an **incorrect usage**. We ended up taking the Afci breaker cause it wasn't really really required by code. […] And so we put in a regular breaker. Yeah. […] so I I've seen it happen. but **it was just a misapplication**. […] The other times. So the most, the most times. the most times I see afci strip are at the light switch. […] Yeah. And usually that's caused by a **loose wiring**.<br><br>• [p. 21:] I'm looking for I no, **I've not really experienced, and a defect in []ci device**.<br><br>• [p. 22:] Yeah, **I haven't really seen a lot of nuisance stripping [tripping] honestly**.<br><br>• [pp. 23 – 24:] I have a choice now. It does not have nuisance tripping defects. So like I said, nuisance tripping. **I haven't really seen where the []rs are like constantly tripping because of an inherent defect in itself. I really haven't []enced a lot of that. I know. It's something that causes it**.<br><br>• [p. 25:]<br>*Kevin Caves*: Did the question give you enough information to decide on? You know which of these options you would? You would have chosen in real life.<br>*Interviewee*: The nuisance tripping part. You need to, you know, explain that a bit. **So where it says nuisance tripping product does not have a nuisance, tripping defect. What does that mean?** Does it? And the other one says, Yes, product has a nuisance tripping []. So it tells me, if it's [] trip based on nuisance, or what? What does that mean?<br><br>• [p. 37:] the yes and no nuisance tripping. It's a nice feature, but I I []t explain it to me. So I'm kind of not really looking at that.<br><br>• [p. 53:] you need to explain a little bit about the nuisance tripping on the breakers. |
| 3 | • [p. 19:] So yeah, it's important to to [] have one that's not prone to nuisance. If I heard one was [] you know, be a nuisance more than another. I would stay away from that product as much as I could.<br><br>• [p. 20:] No, no, I mean just it is what it is is, you know. It's it []rc. And there there are certain things that [] arcing are part of their operation.<br><br>• [pp. 21 – 22:]<br>*Kevin Caves*: Okay, so do you. So do you think the question gave enough information to decide which option to select.<br>*Interviewee*: **No, because I what what is the like? What are these labeled Nuisance tripping?** What is it about [] the the you get nuisance trips. […] And and what is different about the General electric that there's not nuisance tripping. Right? All this is is |

| Interview # | Interviewee Verbatim Response |
|---|---|
| | a []er telling me. Yeah, this is better than that one. But how do I know right? And and what is the circuits that they use? How how is it done that they're able to get both functions Afci, Gfi. [] and not have nuisance tripping. So yeah, right? What's the [] **What's the magic bullet that they have?** You know I'd like to. I'd like to know what that is. |
| | • [p. 25:] But at the end of the day. If that really doesn't have [] tripping defect, that's the wet that's the one to go with. Why? **Why does it not have a tripping defect?** Right? Because I know how that [] they operate, you know. So what what is it that catches? [] it's a good arc or a bad arc? |
| | • [p. 32:] <br> *Kevin Caves*: yeah. So so when you're looking at this question, the ones like it, do you feel like, they're giving you enough information, to to make a decision. <br> *Interviewee*: **Not really. No. Again. I want to know more about how they're [] Product does not have nuisance tripping defect.** I want to know more about that. |
| | • [pp. 36 – 37:] That's that's huge for me. **If they actually found a way to []sance trip. Then I that's the 1st thing that I'm looking for.** […] How how much does it of a nuisance trip?  The other thing that I []hink about it is, where is it going? Right is, is it? Are they going in in someone's bedroom? Where you're not gonna be using welders or things that might actually cause a nuisance trip. |
| | • [p. 38:] I I want to know more about the []pping and and what it stops, you know, when it stops, when when are there? When are there. Nuisance tripping? Is it? Tripping for something that shouldn't be used in those locations? Right? That's 1 thing, so that that might affect how I purchase something. But **I would always lean towards [] without having a product effect [defect]**. |
| | • [pp. 44 – 45:] Yes, yes, what? Why is one different than the other? Right? What? What is the [] does it have a special circuit that sends? And and what is []t sense? Right? What makes a difference, I think, is the right [] terminalize. What? What makes that product? Not prone to tripping versus the other one at our. […] So, yeah, I think that's huge for me. |
| | • [p. 46:] Why, why, why, what makes one better than the other? How []t? Right? It does it have a special circuit that. [] you know like it? Did they? Did they? [] have a lab and and run all different kinds of products and what the sine wave is when you plug in a lamp versus a welder or a drill, or you know, a a grill, an electric grill, or, you know []u know which which ones is it good for? I mean, that's another [] that would be nice. You know. **What products does it stop the nuisance trips for right? Because it must have been []ducts that were causing this right** and and generally for me. |
| | • [p. 48:] Well, we, to be honest, we do everything we can to not [] them in wherever we I know like if we don't have to like you tried, not just because the cost of them are very expensive. But you need them, you know. So yeah, **code requires you to put them in certain places, and you know you have to have them**. […] They're working on the nuisance trips. That's that's the []lem with any of those pieces of equipment. |
| 4 | • [p. 15:] So you know, usually what I I haven't come across it where it hasn't [] able to be resolved with. A lot of times. They just explain it's nuisance, but it's once in a while. It's not every time, for example, Samsung microwaves. […] It only happened once in a while, the []gerators. It hasn't been an issue for a while, because that is more of a problem. If the break of trips while they're away, they lose everything in the refrigerator. **So that was an issue that I haven't seen in a while now**, so they must have resolved that either with the updated, because I know, like Siemens. **I look at the Siemens breakers. And now there's like updated.** I know if you call it firmware or whatever in the breaker itself, but |

| Interview # | Interviewee Verbatim Response |
|---|---|
| | somehow they update like the algorithms in the to get rid of the []nce trip, and as time goes on, so they've updated them like, I know, if you look at the Siemens, our fault breakers now. [] the model number of the something on them is slightly different [] it was 2 years ago. And supposedly that's the updated one, because that's what I'm looking for when I put them in now. **So they have gotten better.**<br>• [p. 18:] : The other thing is kind of sorry. I don't mean to take up some, but **[]efect is a little bit of a strange word in it to me. It's like as an electrician. I wouldn't buy anything that says right on it. It's defective. [...] It's almost like it's an older model breaker that doesn't have the newer algorithms and stuff built into it to pick []e nuisance to tech.** You know what I mean like.  That's the only thing I would suggest. **Maybe if you [] because it says product has nuisance tripping defect, I definitely []n't buy anything that has that's known to cause nuisance. Tripping. I don't know many electricians that would, unless it was really [] [...] But if it's like an older model breaker. it just says all the firmware and it, or something like that, it's []eally a defect. It's just not updated.**<br>• [p. 19:] Like **the Siemens breakers, the newer ones, or whatever aren't []sarily like the ones that I have from a year ago aren't defective**. They're [] They don't have the built in detection that determines whether it's a refrigerator working []rly or than ours. [...] **Yeah, like, it's not really a defective old breaker. It's just [] like to me. A defective breaker is one that might not trip at all on anything, and then, you know, you could have 30 amps running []gh 15 amp circuit and causing fire.** |
| 5 | • [p. 18:]: if you get anybody that's asking about lighting. One of the []ses surrounding lighting is that the lamp [] will get loose in the socket, and and that needs to be checked. It's there's evidence that it's been loose. 1st of all, if you [] hand on the lamp and can easily unscrew it. You know that it's it's probably loose, but you can also look for arcing in there, and so I will explain to the client that that's always a potential root cause there. We know that there are some appliance manufacturers that are claiming that their appliance will trip an arc fault, rated Breaker, and we can. We can. We can deal with that as well.<br>• [p. 35:] But if you look at that list of 6 [] typical probable root causes, it's missing a a critical one. A [] couple of them, actually. Oh, really, okay, one would be that the **device is not properly** []. In other words, it's it's been push, wired, or backwired, and [] you know, those of us who've been in the trade for a while are always wrap a screw terminal or or prefer a pressure pad versus a push in type connection. And so if you've ever had to go out and replace a device that [] to melt. And it's right. Next to a child's bed, **you can appreciate the technology for interrupting that circuit and preventing any []amage or loss of life in that type of situation**. And then the other potential root cause is squirrel rodent chews up in an attic where you know they're just doing what Mother Nature programmed them to do, and they start chewing into a conductor, and it starts to arc over up there. It's [] attics. A lot of times have a lot of combustible things that [] thrown up there. And and you know, attic, you can tell when when there's an attic fire you pretty much can come up with [] pretty easy root, cause it's either knob and tube wiring in an []ld? Or has there been some squirrel chews up in there that. Or, of course, you know, people getting up there and doing work that they're not qualified to do. But yeah. |
| 6 | • [p. 20:] **the whole point of an arc fault right? It's it's tripping to shut off a circuit, because it's thinking it's catching an arc fault, situation or scenario. Sometimes you may catch something that from you know, nuisance trips**. They may think it's an arc fault trip, but it's really not because arc faults.  [...] So it it doesn't always know which |

| Interview # | Interviewee Verbatim Response |
|---|---|
|  | one's which. It just takes []l trip. But sometimes it can be. Yeah, you know, legitimate where, if you have 2 wires that are []hing, but they're very super close to each other [] that's called. That's an it's jumping. It's an it's a true. [...] So **that's a true serious art, []ituation.**<br><br>• [p. 29:] every time I've I've done this. Every time there was an trip I always found 100% of time. I was able to find an issue somewhere in that [] meaning, if it's a in a it's usually it's in a box somewhere. It's a search box, an outlet box. It could be on the, on, the outlet itself, on the switch []hen they're pushing those, the product, the device in they're touching their now, nuisance trips. That's that's a tricky one, because it's []s you. I was able to resolve it by replacing a breaker.<br><br>• [pp. 34 – 35:] So that also that you know, that would have to be specified as []w, **when it says nuisance, Asia has nuisance, tripping defect. what does that mean?**<br><br>• [p. 38:] So you know what's what, how common uses stripping [nuisance tripping] are. I say they're super common, but they're common enough that they are of a [] do they impact our decisions as electricians? I would not want a a breaker. That's an arc fall that does not[] defect protection. You know what I mean.<br><br>• [p. 44:] I'd want. I'd wanna buy the one with the nuisance tripping. []y defect. Okay? And **not very common for us, very, very, very rare**. |
| 7 | • [p. 19:] And this whole scenario, what []he decision to me was you just as you say in **bold lighting, does not have the the nudence dripping effect [nuisance tripping defect]. I don't even know why I would. I would even consider something [] had that option in front of me every time they are by default, gonna be the 1st option I'm looking for every single time**. I do not want callbacks, and I don't want warranty work, and I don't want to have to deal with all that.<br><br>• [p. 20:]<br>*Kevin Caves*: And do you still have this issue even even to this day with, or does it still come up the nuisance tripping.<br>*Interviewee*: Not so much anymore.<br><br>• [p. 23:] Yeah, because it does not have the nuisance tripping effect [] I'm gonna say across the board, that's always what I'm going to look@firstst If it doesn't have that, then it qualifies. **If it doesn't have, if it if it still has nuisance tripping, I'm almost []tically going to disqualify it against the other 2.**<br><br>• [p. 27:] I don't want that nuisance effect. That is the biggest bane of it all. So I'm going to pick does not have nuisance tripping defect. |
| 8 | • [p. 11:] **I get the Afci breakers. They they do do their job. They do save either like a customer or electrician.** if somebody's like cutting into a wall, say, if like a child's trying to do some child stuff and plug some things in it.  It works for that aspect. But when you start to put them in like []hens and like garages where people are, gonna be working in the garages. It kind of becomes a pain in the ass where the nuisance trips happen, and then they call you and they're like, Oh, the breaker that you just put in, that you []ged me like such and such is not working no more. And it's like.  like, you know what I mean? It's it's just a.  It just sucks sometimes. So. [...] but I mean, for the most part, I understand why they were made.<br><br>• [p. 14:]  I mean, not really I I really don't know like the internal []onents of an Oc fault breaker. But maybe if we can set the like the the trip rating, maybe up a []le higher. but then that may defeat the purpose of the arc fault? |
| 9 | • [p. 20 – 21:] You know what I mean because his it, you know, circuit trip, you know the sci trip, you know. Nothing's wrong with the bridge, and nothing is wrong with the the |

| Interview # | Interviewee Verbatim Response |
|---|---|
| | sci, but there's. you know, there's something, but, as you know, **there's a purpose []en Aci, it's just we gotta somehow figure out how to distinguish that**, but I thought it was interesting where It said that the that the fci did not detect the arc, but instead it detects what resembles an art. I didn't know that I actually []ht that it detected the ark. So I want to do some some more research on that very interesting yeah.<br>• [p. 24:] that's **a little bit better to have something that's not defective**.<br>• [p. 32:] Yeah, yeah, I mean, just like, you know, cause you know, as []ricians, you know, fault like electricity is the way that I like to think about. You know, they do all the []nt push and all that. But like, if you think about it like electricity, yeah, we can control it. You know what I mean, like we control it, but we don't really have power over it. Necessary like it. Gotta respect it, you know. […] and **at least for me, like when I see defective. And you know, []nce dripping, I don't. We got to be able to control that stuff as much as possible, you know, like faults and all that. I just. I just assume for the worse. You know what I mean. Like Boy []s.** You know what I mean, like, you know. Be prepared. I expect the worst, and hope for you know I expect the worst and hope for the best.<br>• [p. 34:] Well, cause some people just have good []ience, like, **I haven't had any problems like, okay, you know. because you know, I mean when they say prone to nuisance, []ing, in my opinion, when things are like people complain, you know, like with reviews.** Right? I mean, how do you write a good review? Probably not very often. How often do you write a bad review, a heck of a lot more often, you know. **So the point being so when this is like, you know, when there's issues with a product? Yeah, it may have issues, but it's not as bad as you think, you know, because think about all the people who buy it. But still, do you want to take that risk when it comes?** You know.<br>• [p. 35:] And as far as I'm concerned, you know I don't know what all the manufacturers do for their testing, but they test their stuff more than you're gonna do it, you know. So you know, **they have these engineers, and they make stuff to test it and to make it do what it wants to do. []ey know their stuff.** |
| 10 | • [p. 14:] Yeah, I I know **they've gotten better through the years**, for sure. they used to trip a lot more. The combination ones. They have cigfci breakers. I feel like they've gotten better.<br>• [p. 16:] You know, there's putting afcis in because they don't know any better. That could be an issue. […] Obviously **they trip easier for like motors and stuff**.<br>• [p. 17:] **Everything's a little different, too**. I've got a many [] where it'll trip, and then it won't ever do when I'm there, and they say it happens like once every month, and then it might have to do with like. A little bit of rain gets in somewhere, and and you have a whole nother issue so. […] **Kind of depends on the situations**.<br>• [p. 28:] And then, like, I've been noticing like the prone to nuisance []g a lot on all these. So that's something also, too like I feel. Maybe. Hmm! **How could I put that like electricians understand what it is?** But []ngineers understand more how much it actually affects. how much it trips. I guess so like I don't know like that wouldn't really go in like we don't usually look at []ke we don't like. We looked when we're at like home depot. **We're looking for the break, the afci or whatnot. Gfci, whichever we wouldn't look if it's prone to nuisance tripping honestly.** […] **That's not something that we usually think about.**<br>• [p. 32:] So yeah, this for me, like in my mind, like the prone to nuisance tripping. Yes, it would obviously be annoying if it tripped like. But **that wouldn't be the 1st thing I** |

| Interview # | Interviewee Verbatim Response |
|---|---|
|  | **would think about when you're []u're getting getting the breaker.** […] It would be. Would you need afci, or do you need Afci and gfci []ion. […] And that's that's the difference in the cost.<br><br>• [pp. 36 – 37:] And for electricians I feel like engineers might choose differently when it comes to prone to nuisance tripping. [] the electric, like electrician side. They're not gonna notice that as much. […] Out of the box. I mean, like we have to go back and then fix it. But I feel like **they've gotten a lot better** like it's gotten [] like. I remember when I was afcis were 1st getting introduced. it would. It would trip a lot more, and that used to be an issue. [], like they're. I feel like they've gotten a lot better. So they don't have as []isance tripping, at least in my experience. So […] Not too worried about it as I used to be. |
| 11 | • [p. 13:] the manufacturers are starting to identify or recognize publicly []t nuisance trips are a thing they've been going on for, I mean, since the 1st our fault breakers []e were put out.<br><br>• [p. 15:]<br>*Kevin Caves*: So, yeah, okay, so you would put in like, you would swap it out for a new breaker of the same. The same brand that was in there before.<br>*Interviewee*: Yes.<br>[…] Kevin Caves: And does that usually fix the problem.<br>*Interviewee*: Yeah. For the most part it will. Sometimes it will take, you know. swapping out the breaker 2, 3 times […] If it does, if it does happen, it continues to trip over, you know. After that, after you swapped out the breaker for the 1st time. []n, yeah, you'll actually look into troubleshooting some other issues within the circuit. Not a nuisance trip. Maybe. You know, it has something to do with of the **led drivers are defective, that causing making it think that there's a an arc**. |
| 12 | • [pp. 13 – 14:]<br>*Kevin Caves*: Did you buy a different brand when you replace it? Or did you buy, buy just the same breaker.<br>*Interviewee*: I bought the same breaker. It wasn't. There was no tripping nuisance tripping. I think they live there. For it was a new new construction build. So I think it was maybe a year old. And they hadn't had problems up until about a year. So I assume []as just a breaker, and […] Yeah, replaced it with the same exact one.<br><br>• [p. 22:]<br>*Kevin Caves*: Is that because they were, they're both labeled as not defective.<br>*Interviewee*: Yeah, that **that category would trump any of the other ones**. In my []ion.<br><br>• [p. 28:] If I have a if I have a Siemens panel board, I'm gonna buy Siemens. […] And then, you know, if if they claim to not have nuisance []pping, then that's a big deciding factor that I would go with  And if I knew that cert, if I were doing panel installations, if I [] that certain brands we're known for not having nuisance tripping issues, then I would install that system and use those []kers. |
| 13 | • [p. 13:] Oh, boy, did we know about nuisance tripping? So I haven't enough knowledge to agree with or disagree with []ncies. We're talking about noise, right harmonics. It's my understanding that the Afci detects the art and the []ce tripping that we that we do run into daily is because by a light switch engaging. There is a there we're [] allowing for a knife to somehow engage to a receiver right of the knife blade. If you're looking at a disconnect or a single pole switch in a residence?<br><br>• [p. 15:]: So I do understand what you wrote. But **I don't don't understand how high radio frequencies can cause the trip, []e I thought, it's a mechanical where it detects** |

| Interview # | Interviewee Verbatim Response |
|---|---|
| | **an art right? And it protects the circuit right?** So that's what's that's what's opening the circuit breaker in absent.<br>• [p. 19:]<br>*Interviewee*: The infect effect [defect], have claimed that area are not designed to []ively identify on said trip when they detect any signals. **So is this, that last paragraph is, that is, that a statement that they they have presented in in their Ul listing**.<br>*Kevin Caves*: I don't know if it's in the ul listing. That's a good question. I don't know.<br>• [p. 27:] Sure **not defective, is a really big one for me**.<br>• [p. 37:]: I don't know if it was confusing. I just wish I I just don't know enough about the frequency. Know that that [] that that would create. **I don't know how that I think physical arc is physical. It's a mechanical thing that happens**. It's it's an arc that's taken place in a device or 2 wires touching right? Or maybe let's say you had a, you know, a second year apprentice putting in all the outlets, and they did not Torque remember, Torquing is one of the biggest reasons that of house fires. I don't know if you knew that. And properly. |
| 14 | • [p. 13:] **It sounds like anything could trip this the way I'm reading this**.<br>• [p. 14:] Yes, I guess most of the time when I hear nuisance trip nuisance []ping in the field kind of what immediately comes to mind. Is maybe like **someone []s in a a device, and the extension cord isn't quite right, because it was run over by a scissor left, and it's tripping the breaker, and it's causing []ance tripping in that way**. But this type of nuisance tripping is actually very interesting to me. I always assumed that there were probably other types of nuisance tripping. But this is actually very informative to me in this regard that if this is a genuine real problem that exists, and not a []thetical situation. […] **In my experience the more common type ways that something trips [] any afci is when there's genuinely a problem**. I don't really know if I have myself have been in a situation where I noticed this type of nuisance tripping where, according to the question that. let me see here, but where it would shut off power when no []erous arc fault exists. **I don't think I've personally been in a situation where this has been a problem**.<br>• [p. 15:] State legislatures are gradually adopting various editions of the [], and there's lobbying against different editions of the code, because basically because afcis are much more expensive than a standard circuit breaker, and people don't want to pay the extra which it doesn't completely make sense. Because if since, if **it's for safety**, obviously that price is going to be just carried on to the the customer, and the same profit margin is probably going to happen, but they just don't want to pay the extra price. So most []he time, if I'm talking with other electricians about afcis. Their complaints are about the price. **They don't really complain much about nuisance tripping, I think, to me, when they complain about nuisance tripping. It's more of an excuse to complain about the price tag**.<br>• pp. 18 – 19:] That's what difficult to take into consideration, because I haven't been told in this question what the panel board is, but assuming that it is compatible with Siemens, I would definitely select the one that is not defective, and that's dual function, even though it's a higher price, because it would protect both human life as well as property damage which it could have, of course. by extrapolation, include human life so would **protect against both []nitely would prefer that to installing something that in in the end would leave me liable for potentially killing someone and burning down someone's entire home and all their memories and everything else that's in that home**. The only way I would select I []d not purchase any of these types of Afcis would be as if I knew that the Siemens was not compatible with a particular panel board that I |

| Interview # | Interviewee Verbatim Response |
|---|---|
| | was working with, in which case I couldn't purchase it. But **I definitively would not purchase something that I, 100% knew was defective**. Because it it there'd be essentially no way to to have the branch []uit on. […] So if []re talking about a kitchen and it has a microwave in it. Obviously, that's very, very common for a kitchen. And **if it's prone to nuisance tripping due to the radio frequencies from microwaves, that means it's going to trip continuously, and there will never be power to use. So the customer is not going to be able to ever use that branch circuit as long as the microwave is every time the microwaves turned on it's gonna break, and they're never going to use that microwave. []hat would not be something we would install in a customer's home.** <br><br> • [p. 22:] when I say, I should say the common electrician might think of []ance tripping as including other things beyond what is specified in this survey. […] In some cases they wouldn't necessarily want to always use a dual []tion if they could get away with a just an Afci in the situation, because in theory they might think that Gfci would increase nuisance tripping. I don't personally feel that way because I feel **I feel like eventually all breakers, if it possible, should be [] function, because it provides maximum protection for life and property**. But in the case, since this question also says for general inventory. So this is something that would come up. <br><br> • [p. 24:] Correct. Yes, because if if it's prone to that much nuisance []ping that we talked about in the original question, where **there was so many different devices that could trip it. I I don't think we would want to install that for a customer, because it would be effectively useless.** |
| 15 | • [p. 18:] It is going to become problematic, and not only that, but then [] liability aspects start to come into play. People start bypassing it, start doing other things. This opens up a whole can of worms that I don't think the manufacturers would be wanting to expose themselves to it. **The desire to have a safe circuit is paramount**. Safety cannot be. no way can it be jeopardized? Because the because the liability is just too great. So **if I put in one I would know that would trip I don't think I'm doing a service to the. to the installation.** I'm not doing a service to the client, and also exposing myself to a bigger risk. And I wouldn't like any of what we just talked about. <br><br> • [p. 18:] <br> *Kevin Caves*: So so have have you had experience with with nuisance tripping in in your job? <br> *Interviewee*: Yes, yes, specifically with the ground fault, **not so much with art fault** The problem with the arc fault is and I understand that theory. Why arc fault, you know people [] a wire underneath of a piece of carpet because they didn't like the wire being a trip hazard. So they put it on their piece of carpet, and then they forget about it. 15 years later, with people living in a home, they've smashed that wire flat and shortened out, catches the carpet on fire, and next thing you know, 3 Am. **They wake up and their living rooms on fire, and they can't figure out why. So that's why the Arc fault is is important and is is a good.** But the reality is, if people understood that that's not a good idea to put wire underneath []t. So same idea you don't want to take and stick a fork in an outlet. The idea is that's just not a good thing to do, and and you'll []n real quick. So, but with the with the art fault it seemed to be that they're looking to fix those kind of problems and ground fault. The Gfci receptable started out in the same [] of curve. <br><br> • [p. 25:] Yeah, I well, **I can immediately tell you. I'm not. Gonna I'm not going to put in a known defective device**. So it takes Siemens and and Schneider at any price. It wouldn't matter. So Eaton is not defective. […] So it's not the top shelf, you know, |

| Interview # | Interviewee Verbatim Response |
|---|---|
| | platinum plated installation, but you still have to meet the requirements of it, and that is, that is one viable solution. But I would never, ever put in a known defective device.<br>• [p. 37:] Well, **it's the idea of putting in a known defective I think right? There is kind of the qualifying deal and one of the things about the national electrical code**. They [] about a neat and whirlwind-like manner. and **if you're putting in defective stuff that's not workmanlike manner, people trust us to make the good []sions.** They trust us to be knowledgeable. They trust us to to manage those complexities, and **if we knowingly put in []thing defective. My God! It would be you'd open yourself up to all kinds of liability. So that makes []e selections pretty doggone easy.** But once again, I think, Cutler Hammer, which is Eaton. I think they do a really good job, and I think Siemens does a really good job. I think ge's got a tough road. […] Square d kind of kind of drifted in that area, and they they away from being the platinum top shelf manufacturer that you could trust forever. And and they kind of went in the K car direction, and they haven't been able to come back where Cutler, Hammer, and Siemens seems to invest more into their products. |

### D.2.3. *Dr. Caves's "Cognitive Interviews" Show that the Caves Conjoint Survey is Further Unrealistic by Failing to Represent Other Relevant Purchase Considerations and Constraints*

160. Consistent with the discussion in Subsection C.2, interviewees mentioned other relevant purchase considerations (*i.e.*, beyond brand and compatibility requirements), including distributor relationships, convenience, and availability constraints. None of these aspects, which are shown in Table D4 below, were represented in the Caves Conjoint Survey, further contributing to the survey's complete lack of task realism.

**Table D4: Selected Verbatim Responses from Dr. Caves's Fifteen "Cognitive Interviews"**
**(Other Purchase Considerations or Constraints)**

| Interview # | Interviewee Verbatim Response |
|---|---|
| 1 | • [p. 23:] Siemens is also, they're **[]riendly for an electrician**. Like, I like square D is, they're physically **bigger breakers**. So []anels that they come in are still the same size. So when you're cutting in a panel, there's **less space** [] out of these 3. |
| 2 | • [p. 47:] you get good prices at supply warehouses. Sometimes you get good [], but then again, you shop around it all. **It all depends on what you need for specific application and how fast you can get it. You'd pay more if you need it**.<br>• [p. 48:] if I need right away I would definitely hit the home depot if []e close by or a supply house if they're close by. |
| 5 | • [pp. 6 – 7:] And I I know Eaton and Siemens are popular brands that are **available in a crunch** at big box stores []e's and Home Depot.<br>• [p. 8:] But so in summary, it's probably it's [] **convenience**. |

| Interview # | Interviewee Verbatim Response |
|---|---|
| | • [p. 10:] Yeah. If if my local supply house carried the Schneider rbrand I would probably get them more from the supply house. But they don't. They're a Siemens distributor primarily, and they got rid of Eaton<br>• [p. 20:] I mean, I guess my decisions primarily on **reputation** of the [] I frankly didn't really even read through all the stuff down below the manufacturer's name. I didn't need to.<br>• [p. 26:]<br>*Interviewee*: Be well **brand reputation**, but also because I have **professional [] that are also personal friends**. That work for Schneider and I can [] and get product and get reimbursed for a reasonable amount of time to replace the breakers.<br>*Kevin Caves*: So so even if the defect came up, you could still, you know, wouldn't be ideal. But you could. You could manage it.<br>*Interviewee*: Yeah. And and this is a, this is the result of a very long [] **positive relationship with Schneider**. And so I probably won't [] my full rate to help them maintain their image.<br>• [p. 27:] I I support, **I support my suppliers** as they support me. |
| 6 | • [pp. 8 – 9:] So it will say **convenience**. And the other thing is, you're [] a **partnership**. So home depot. Just a retailer. Right? You go in there you get there. You get usually really good prices with home depot. That's always a good benchmark. The thing about Home depot is a lot of times there they will not have what you need. […] So that being said, time is more valuable for a business than []an money. I would say, that's where the electrical supply distributor comes in very [] valuable and convenience. The other thing about convenience is []ll. I can. You know, **I build a relationship with the supplier I can call**. I can make an order on the phone before my guys even go out to pick it up. |
| 8 | • [p. 8:] **When I'm in a pinch** I'll go to a big box retailer. But it's a pain []he ass right now, with, say, like Home Depot and Lowe's because they're always like behind a locked gate. and then you got to go and get an associate and then bring it up []he front with electrical supply. You just you could. I call mine in, and they even deliver it to my house, you know, I mean, or it's ready for me to pick up. I walk in, and my my accounts already in the computer they already charged me. **I walk in and I walk out**. |
| 10 | • [p. 8:] So for my company, **we get a discounts** at all the electrical []utors. So there's a set [] a percentage. They don't allow me to know the exact rates and I know it's a good percentage, because we only go to those distributors.<br>• [p. 24:] Yeah, I mean, if you're looking for like the business side of [] you're pro, you're probably just going to **choose the cheapest one** honestly like, if you're looking for. |
| 13 | • [p. 8:] generally speaking, depending on the matrix that we have with []ectrical supply houses, we there's we, we **hope to get a better discount**. |
| 15 | • [p. 31:] And so the idea is, he's looking for **efficiency** he's looking to meet the national electrical code, and he's looking to do it as **quick and as efficient** as he can. |

### D.3.    Evaluation of Dr. Caves's "Cognitive Interviews": Conclusion

161.    The 15 "cognitive interviews" Dr. Caves collected as a "pilot study" do not and cannot *validate* the survey, in that they are insufficient for showing that the survey is clear, realistic, or otherwise unbiased.  However, they *do* provide evidence that undermines and further invalidates the Caves Conjoint Survey.  In particular, participants' verbatim responses indicates that the conjoint survey represented "nuisance tripping" in a confusing, leading, and biased way, omitted relevant purchase factors, and led participants to artificially overweigh the "Nuisance Tripping Defect" disclosure.  These flaws, combined with the notion that electricians would obviously not want to install equipment they are told is "DEFECTIVE," led the conjoint survey participants to avoid choosing breaker "profiles" described in the conjoint survey as "DEFECTIVE: Prone to Nuisance Tripping."[312]

162.    The electricians Dr. Caves interviewed repeatedly reaffirmed the notion that their "choice" of which AFCI to buy and install is highly context-dependent, and almost exclusively determined by situational and project-specific constraints.  This makes purchase decisions in the market for AFCI breakers subject to a range of individualized factors that vary across electricians and jobs.  In other words, consistent with other evidence in this litigation (*see* Subsection C.1), once information about the panel box and other technical specifications is known, there is no real "decision" for the electrician to make about which AFCI breaker to purchase in many or most circumstances, let alone a decision between hypothetical breakers (unrealistically) disclosed as "DEFECTIVE: Prone to Nuisance Tripping" versus "NOT DEFECTIVE."  To the extent that electricians may choose both the brand of AFCI breaker and of the panel box simultaneously for

---

[312] *E.g.*, Interview #4, p. 18 ("It's like as an electrician. I wouldn't buy anything that says right on it. It's defective."); Interview #7, p. 19 ("And this whole scenario, what []he decision to me was you just as you say in bold lighting [writing], does not have the the nudence dripping effect [nuisance tripping defect]. I don't even know why I would. I would even consider something [] had that option in front of me every time they are by default, gonna be the 1st option I'm looking for every single time"); Interview #12, p. 28 ("Yeah, that that category [not defective] would trump any of the other ones"); Interview #13, p. 27 ("Sure not defective, is a really big one for me."); Interview #15, pp. 25 ("Yeah, I well, I can immediately tell you. I'm not. Gonna I'm not going to put in a known defective device. […] But I would never, ever put in a known defective device.") & 37 ("Well, it's the idea of putting in a known defective I think right? There is kind of the qualifying deal and one of the things about the national electrical code. […] and if we knowingly put in [some]thing defective. My God! It would be you'd open yourself up to all kinds of liability. So that makes []e selections pretty doggone easy.").

new constructions or installations, the Caves Conjoint Survey did not test this specific scenario, provided no information at all about the panels in which breakers would be installed, and thus cannot speak to this issue.

163.    Dr. Caves's interviewees also communicated to him, one after the other, that the choice exercise he asked them to complete was confusing, vague, missing important context, did not reflect the way they typically make decisions in the field, forced them to make unrealistic assumptions, and did not represent how they typically viewed "nuisance tripping."  Nevertheless, Dr. Caves proceeded to conduct his conjoint survey, and treat its results as informative, while, among other things, using the leading words "defect" and "defective"; keeping the context of the scenario and choice tasks "deliberately"[313] vague; failing to clarify or quantify the attribute levels associated with the "Nuisance Tripping Defect" disclosure (*e.g.*, what does "prone to nuisance tripping" mean? What does "NOT DEFECTIVE" mean?); and omitting other information such as the safety function of AFCIs, the inherent probabilistic nature of arc detection methods, the fact that the root cause of a "nuisance trip" may not necessarily be due to simply operating a common household appliance, and the fact that *all* AFCI manufacturers contend with "nuisance tripping" issues.  However, I note that even had Dr. Caves incorporated some of the feedback from his "cognitive interviews," this would not have "corrected" his conjoint survey, which suffers from fundamental and invalidating flaws in its complete lack of marketplace and task realism.

**E.    THE RESULTS OF THE CAVES CONJOINT SURVEY EVIDENCE ITS BIASED AND UNREALISTIC DESIGN**

164.    The Caves Conjoint Survey's deficiencies are not only supported by survey treatises, academic literature, industry authorities, and decades of research on survey methods and on conjoint analysis, but they are also directly evidenced by Dr. Caves's own survey data.

---

[313] Interview #10, p. 23.

**E.1.    Dr. Caves's Conjoint Survey Data Reveal Substantial "Extreme Response Bias"**

165.    When a survey is confusing and unrealistic, participants are likely to engage in simplifying heuristics instead of making choices as they would in the actual marketplace.  One empirical indicator that survey participants are not making realistic choices and decisions is "extreme response behavior" (or "extreme response bias"),[314] whereby participants either *always* or almost *never* select the "no purchase" option *across all choice sets*.

166.    Recall that in each of the 12 conjoint choice tasks, participants in the Caves Conjoint Survey were given the option of indicating that they would not purchase "any of the three types of AFCIs if these were the only options"[315] (*see* Figure E1 below).

**Figure E1: The Caves Conjoint Survey's "No Purchase" Option** [316]



167.    In the real world, my understanding is that electricians who purchase AFCI breakers would typically narrow down their consideration set to a small number of AFCIs (or even to a single AFCI brand) under consideration, almost always constrained by the panel that is or will be installed in a building or other compatibility and project-specific constraints.[317] Because the CBC task offers participants different "triplets" (*i.e.*, representing different AFCI product "profiles" or configurations) across the 12 choice tasks, some triplets are expected to consist of profiles with brands and features that are unacceptable to the participant and/or not compatible with a particular installation context, and, therefore, should lead to a "no purchase" selection.  It would therefore be unrealistic for conjoint survey participants faced with only three AFCI profiles per choice task (with varying brands) to intend to purchase one of the AFCIs in

---

[314] Gensler, Sonja, Oliver Hinz, Bernd Skiera, and Sven Theysohn (2012), "Willingness-to-Pay Estimation with Choice-Based Conjoint Analysis: Addressing Extreme Response Behavior with Individually Adapted Designs, *European Journal of Operational Research*, 219(2), 368 – 378.
[315] *See, e.g.*, Caves Report, Appendix A, p. 29.
[316] *See ibid*.
[317] *See, e.g.*, Subsections C.1 & D.2.

*every* triplet of AFCIs they are shown.  Instead, participants should be choosing *not* to purchase whenever the set of three available options are all incompatible and/or consist of disfavored brands and features.  Therefore, participants who *always* indicate that they would purchase one of the three AFCIs presented to them demonstrate an unrealistic "extreme response behavior."

168.    Dr. Caves's conjoint data exhibit precisely such a result: ***The vast majority (i.e., 83%, or 415/500) of the Caves Conjoint Survey's participants <u>never</u> selected* the *"no purchase" option***—that is, these participants *always* "decided" to purchase one of the three AFCI options presented to them in **<u>*all 12*</u>** conjoint choice tasks.[318]

169.    The fact that over 80% of the survey participants consistently answered (in *all* 12 choice tasks) that they would supposedly purchase their selected option is a red flag that Dr. Caves could and should have checked for and reported.  Academic research on choice-based conjoint indicates that such "extreme response behaviors," whereby participants in CBC studies either never or always select the "no purchase" option, result in invalid WTP and demand estimates.  For example, an academic research article on CBC states:[319]

> If the prices do not sufficiently overlap with consumers' WTP, extreme response behavior occurs: Consumers always or never choose the no-purchase option.  We show in a simulation study and two field studies that **both types of extreme response behavior result in invalid WTP estimates, even if only a small share of consumers exhibit extreme response behavior**.  [Emphasis added]

And:[320]

> Researchers using CBC studies to derive consumers' WTP should check for extreme response behavior in their data and report two measures that reveal extreme response behavior: the shares of consumers who never and who always choose the no-purchase option.

170.    Dr. Caves failed to disclose (and possibly did not even analyze) the rate of extreme response behavior among his study participants.  Consistent with the above-cited academic research, the very high rate of participants (over *80%*) who unrealistically claimed that they would make a purchase in *every single* conjoint task evidences the invalidity and lack of reliability of Dr. Caves's price premium estimates.  This result also suggests that many

---

[318] Analysis based on the raw conjoint data; *see* Caves Report, "Final Survey Data.xlsx."  By contrast, *no* participants indicated that they would not purchase any of the AFCI options in all 12 tasks.
[319] Gensler, Hinz, Skiera, and Theysohn (2012), p. 377.
[320] *Id.*, p. 369.

participants did not understand the tradeoffs (*e.g.*, they assumed every option was compatible with whatever a hypothetical project required) and were simply choosing to make a choice in the survey, even though they would not do so in the real world.  Indeed, a survey in which all but about 20% of the participants exhibit unrealistic behavior is counter to the intended predictive ability of conjoint analysis.

171.    Along with the leading wording of his instructions (*see* Subsection C.1), Dr. Caves's decision to always present price as the last attribute may have contributed to the considerable extreme response bias observed in his data.  In conjoint analysis, the order in which attributes are presented in each product profile can affect the attributes' measured importance.[321]  That is, consistent with a primacy effect,[322] if the same attribute appears earlier it tends to be more important for participants than if that attribute were to appear later.  Further, in CBC, such an order or position effect is particularly strong for the *price* attribute.[323]

172.    Accordingly, conjoint analysis scholars have recommended that the order of attributes be randomized across participants.[324]  Dr. Caves could have also presented the price attribute as the first (or second) attribute to half of the participants and as the last attribute to the other half.   The failure to adequately rotate the position of the price attribute, which likely had the effect of artificially lowering price sensitivity (or weight assigned to price), in turn *upward* biased the estimated WTP and alleged valuation attributed to the alleged omission.

173.    Finally, Dr. Caves's use of a fourth "no purchase" option fails to comport with best practices for modern-day CBC surveys, and likely further contributed to the high rate of extreme response behavior exhibited in his data.  Academic research on conjoint analysis has indicated that compared to a "single response" format (like the one used in the Caves Conjoint Survey), a two-stage approach, or "dual response" choice format, in which participants are first

---

[321] Johnson, Richard M. (1989), "Assessing the Validity of Conjoint Analysis," *Sawtooth Software Conference Proceedings*, pp. 273 – 274 & 279.
[322] *See, e.g.*, American Psychology Association, "Primacy Effect," *APA Dictionary of Psychology*, https://dictionary.apa.org/primacy-effect.
[323] Chrzan, Keith (1994), "Three Kinds of Order Effects in Choice-Based Conjoint Analysis," *Marketing Letters*, 5 (2), 165-172.
[324] *See, e.g.*, Green and Srinivasan (1978).

asked to make a choice among the options presented (*e.g.*, a triplet) and only afterward asked whether they would or would not buy the option they chose, increases the frequency of selecting the "no choice" option and improves parameter estimation.[325]

**E.2.** **The Caves Conjoint Survey's Results Further Demonstrate the Artificially Inflated Price Premium (or Discount) Estimated for the "Nuisance Tripping Defect" Disclosure**

174.    The results obtained from and implied by the Caves Conjoint Survey's data provide additional evidence that Dr. Caves's price premium estimate is implausibly high and artificially inflated.

175.    ***First***, prior to applying his supply-side-related adjustments, Dr. Caves reported already obtaining an alleged price premium estimate of ███ just for the "nuisance tripping defect" disclosure.  In other words, according to the results of the Caves Conjoint Survey, Siemens would have to discount the price of its "single-function" AFCIs by more than ███████ in order to "sell the same quantity of AFCIs that it sold when the Nuisance Tripping Defect was not disclosed to customers."[326]  After applying his supply-side-related adjustments, Dr. Caves reports an estimate of 32%—meaning that Siemens would still have to discount the price of the at-issue AFCIs by *nearly a third*.  Such a result, whereby between one-third to ███████ of the total price of a Siemens AFCI breaker is attributed solely to the purported omission of a disclosure regarding an alleged "Nuisance Tripping Defect" (when "nuisance tripping," as I discussed in Section B, is an industry-wide issue that is not unique to Siemens AFCIs and does not even appear to be typically referred to as a "defect" by electricians) evidences the Caves Conjoint Survey's one-sided biases and unrealistic design.

176.    ***Second***, according to Dr. Caves's own tabulation, he obtained a considerably higher average part-worth (*i.e.*, utility or value) for his "Nuisance Tripping Defect" disclosure than for *all other attributes and features* in his survey *combined*, including brand, despite the fact that brand and other technical compatibility aspects are dominant purchase considerations in the

---

[325] *See, e.g.*, Hung, Cheng-Yu, YiChun Miriam Liu, Jeff D. Brazell, and Greg M. Allenby (2025), "Dual Response in Conjoint Analysis," *Marketing Letters*, 36(4), 857 – 873.
[326] Caves Report, ¶ 52.

market for AFCIs.  Figure E2 below reproduces the summary statistics for part-worths as shown in Table 3 of the Caves Report.  As this figure shows, and indeed as Dr. Caves states himself:[327]

> [T]he results for the Nuisance Tripping attribute confirm that purchasers strongly prefer AFCIs without the Nuisance Tripping Defect. The average utility for a product with the Nuisance Tripping Defect is -1.79, while the average utility for a product without the Nuisance Tripping Defect is 1.79. This means that, on average, a purchaser's utility would increase by 3.58 if they were to purchase an AFCI without the Nuisance Tripping Defect, compared to a product with the Nuisance Tripping Defect, assuming both products are otherwise identical with respect to all other attributes, including their price. The CBC survey results therefore reveal a strong disutility for the Nuisance Tripping Defect.  [FN omitted]

*(Continues on next page)*

---

[327] *Id.*, ¶ 49.

**Figure E2: Summary Statistics for Part-Worths as Shown in the Caves Report** [328]

| Attributes/Levels | Utility | Std Dev | Lower 95% CI | Upper 95% CI |
|---|---|---|---|---|
| **Brand** | | | | |
| Siemens | 0.29 | 0.60 | 0.23 | 0.34 |
| ABB/General Electric | -0.25 | 0.46 | -0.29 | -0.20 |
| Schneider Electric (Square D) | 0.00 | 0.51 | -0.04 | 0.05 |
| Eaton | -0.05 | 0.47 | -0.09 | 0.00 |
| **Function** | | | | |
| Single Function (AFCI) | -0.29 | 0.32 | -0.31 | -0.26 |
| Dual Function (AFCI/GFCI) | 0.29 | 0.32 | 0.26 | 0.31 |
| **Technical Specifications** | | | | |
| PLUG-IN PIGTAIL 15A 1-POLE (10kA at 120V) | 0.25 | 0.36 | 0.22 | 0.28 |
| PLUG-ON NEUTRAL 15A 1-POLE (10kA at 120V) | 0.31 | 0.36 | 0.28 | 0.34 |
| PLUG-IN PIGTAIL 20A 1-POLE (10kA at 120V) | -0.32 | 0.39 | -0.36 | -0.29 |
| PLUG-ON NEUTRAL 20A 1-POLE (10kA at 120V) | -0.24 | 0.37 | -0.27 | -0.20 |
| **Price** | | | | |
| $43.69 | 0.92 | 0.98 | 0.83 | 1.00 |
| $49.56 | 0.60 | 0.63 | 0.55 | 0.66 |
| $59.97 | 0.06 | 0.18 | 0.04 | 0.07 |
| $62.28 | -0.50 | 0.58 | -0.55 | -0.45 |
| $70.77 | -1.08 | 1.07 | -1.17 | -0.98 |
| **Nuisance Tripping** | | | | |
| DEFECTIVE: Prone to Nuisance Tripping | -1.79 | 1.93 | -1.96 | -1.62 |
| NOT DEFECTIVE | 1.79 | 1.93 | 1.62 | 1.96 |
| No Purchase | -3.92 | 1.91 | -4.09 | -3.75 |

177.    Participants in the Caves Conjoint Survey exhibited a considerably stronger aversion (or disutility) to the "Nuisance Tripping Defect" disclosure ("DEFECTIVE" vs. "NOT DEFECTIVE"; -3.58 partworths) than their utility for all other included attributes *combined*— that is, for the most-preferred brand, Siemens (vs. the least-preferred brand, ABB/General Electric; 0.54 partworths), for a dual function AFCI/GFCI (vs. a "single function" AFCI; 0.58 partworths), for a plug-on neutral connection (vs. a plug-in pigtail connection; 0.06 partworths

---

[328] *Id.*, ¶ 49 (Table 3).  I added a red rectangle for emphasis.

for 15A and 0.08 partworths for 20A), and even for a cheaper price ($43.69 vs. $70.77; 2.00 partworths).

178.   ***Third***, my analysis using Dr. Caves's own data and market simulator reveals inflated and implausibly high price premium estimates obtained for the omission of the "Nuisance Tripping Defect" disclosure.  Recall that Dr. Caves's price premium analysis uses a simulation approach to "simulate the effect of disclosing the Nuisance Tripping Defect in Siemens' AFCIs,"[329] which he describes as follows:[330]

> The decrease in demand is calculated using a three-step process.  First, as a baseline, I simulate the market shares of competing AFCIs offered by different manufacturers. Second, I introduce the Nuisance Tripping Defect to the Siemens single-function AFCI, and simulate the extent to which Siemens' market share would decline if the Nuisance Tripping Defect were disclosed at the point of purchase. Third, I simulate the percentage reduction in the price of Siemens's single-function AFCIs that would be required to return Siemens to its initial market share, calculated in the first step. This calculation reveals the extent to which Siemens would have to drop the price of its single-function AFCIs in order to sell the same quantity of AFCIs that it sold when the Nuisance Tripping Defect was not disclosed to customers.

179.   Dr. Caves simulated a market with 8 products (including both AFCI and AFCI/GFCI products for all four brands) first *without* and then *with* the Siemens AFCI product disclosing the so-called "Nuisance Tripping Defect."  He did this in his simulations to estimate how much lower the price of the Siemens AFCI product with the "disclosure" would need to be to retain the same market share, and he ascribed this price difference to the value of omitting the alleged "defect."

180.   To further illustrate the lack of reliability of Dr. Caves's methodology, I calculated the difference in WTP estimated by his conjoint analysis simulator for the *combination* of the Siemens brand and the alleged omission of the "Nuisance Tripping Defect" disclosure.[331]  Adapting Dr. Caves's simulator for the Plug-on 20A product to a seven-product

---

[329] *Id.*, ¶ 52.
[330] *Ibid.*
[331] *See* Exhibit E of this *Rebuttal Expert Report*.

market,[332] I first determined that Siemens's "single function" AFCI had a ▮▮▮ market share at the "NOT DEFECTIVE" (no disclosure) level with the $51.43 price used by Dr. Cave.  I then re-ran the simulator, adding Dr. Caves's so-called "Nuisance Tripping Defect" disclosure (as he did) and also changing the brand from Siemens to ABB (the brand with the lowest estimated part-worth).  I found that the price would need to be dropped to *$3.50* (from $51.43) to maintain the ▮▮▮ market share observed for the Siemens product without the "disclosure" in Dr. Caves's simulator.  Thus, using the same approach as Dr. Caves, the Caves Conjoint Survey implies that just the combination of the Siemens brand (relative to ABB) and the alleged omission of the "Nuisance Tripping Defect" disclosure (*i.e.*, instead indicating that the product is "NOT DEFECTIVE") accounts for *93%* of customers' WTP for the product according to his simulator.  This also implies that all other features and functionality of the product (including the "function," various technical specifications, and all other aspects *excluded* from Dr. Caves's conjoint survey) are supposedly valued, per Dr. Caves's conjoint analysis simulation, at only $3.50 in total.

181.    Such a valuation is unreasonable and contradicts marketplace reality, as demonstrated by the multiple convergent sources (including Dr. Caves's own "cognitive interviews") set forth in Sections B, C, and D which indicate that the most relevant determinants governing which AFCI breakers electricians purchase typically consist of: (*i*) brand, compatibility, and code compliance, such as with already-installed panel boxes, voltage/load capacity, and plug-on vs. plug-in connections; (*ii*) cost; (*iii*) preexisting relationships with distributors and suppliers, including perceived convenience; (*iv*) availability constraints; and (*v*) perceived customer service quality of AFCI manufacturers.

182.    These unrealistic results derived from the Caves Conjoint Survey, whereby just two product characteristics (the Siemens brand and the "NOT DEFECTIVE" compared to "DEFECTIVE: Prone to Nuisance Tripping" statement) are valued by consumers at nearly the *entire* value of the AFCI product, demonstrate the severe , one-sided flaws in Dr. Caves's survey

---

[332] Choice Simulator_8Prod_20A_PON.sim.  I removed the ABB "single function" AFCI product from the simulator base case to avoid duplicate products, yielding a 7-product simulated market.

as well as the gross inflation or overvaluation in his estimated price premium.  Indeed, conjoint analyses that have similarly generated clearly exaggerated price premium estimates have been the subject of criticism.  For example, in *Zeiger v. WellPet*, the plaintiff's expert calculated the alleged price premia for the affirmative misrepresentations at 3.0% ("natural"), 1.9% ("uncompromising nutrition"), 2.6% ("unrivaled quality standards"), 3.0% ("with nothing in excess and everything in balance"), and 4.3% ("complete health"), and for two alleged omissions at 46.2% each.[333]  There, the court engaged in a similar exercise as I did above,[334] characterizing the model in question as essentially a "full refund model" and noting:[335]

> All three Wellness Products always lack both omissions.  **Just the omissions, therefore, are calculated at 92.4 percent of the value of the product.**  Each of the Wellness Products also always contained some combination of Wellness Statements.  Based on their percentages, the net result is that two of the three products have price premiums that are more than 100 percent, and the third is a few percentage points away.  In other words, Gaskin [plaintiff's expert] values two of the three products as worthless (in fact, worse than worthless) and the third as worth close to it.  [Emphasis added]

183.    ***Overall***, the valuations and price premium estimates derived from the Caves Conjoint Survey are implausibly high and do not comport, to the best of my understanding, with electricians' actual valuations and purchase decisions in the marketplace.  Instead, Dr. Caves's results evidences the leading nature of his CBC task, in general, and of his "DEFECTIVE: Prone to Nuisance Tripping" disclosure, in particular.  Importantly, the "finding" that survey participants supposedly weighed (or valued) the nuisance tripping disclosure more than all other attributes *combined*, including brand, is neither consistent with electricians' likely valuations in the real world nor with Dr. Caves's "cognitive interviews" of electricians (who, for example, identified brand compatibility and other situational constraints as dominant choice criteria).

---

[333] *Zeiger v. WellPet LLC*, 526 F.Supp.3d 652, 675 (N.D. Cal. 2021).

[334] To the extent that Dr. Caves may argue that it is somehow not appropriate to "add up" the individual WTP estimates for the Siemens brand name and the omission of the "Nuisance Tripping Defect" disclosure to obtain their collective contribution to the product price, such an argument would be erroneous and unsupported by both logic and fundamental academic principles underlying conjoint analysis.

[335] *Zeiger v. WellPet LLC*, 526 F.Supp.3d 652, 675 (N.D. Cal. 2021).

184.     The "strong disutility" observed in the Caves Conjoint Survey for the "Nuisance Tripping Defect" disclosure is exactly what would be expected from a fatally flawed conjoint survey that, among other things: misrepresented "nuisance tripping" in multiple ways (including by calling it a "defect," omitting relevant information, and using unclear attribute levels that inaccurately treat the purported "defect" as binary or categorical when some level of "nuisance tripping" is common to *all* manufacturers of AFCI breakers); artificially highlighted the "disclosure" compared to all other attributes; and presented this "disclosure" in a decontextualized manner that does not remotely resemble how electricians would encounter any such disclosure in the real world.

185.     I understand that discovery is ongoing and, therefore, reserve the right to supplement and/or revise my opinion and this *Rebuttal Expert Report* in response to any further information provided by the parties and/or in light of additional documents or testimony, which may be brought to my attention after the date of my signature below.  This *Rebuttal Expert Report* is to be used only for the purpose of this litigation and may not be published, distributed, or used for any other purpose without my prior written consent.

| | |
|---|---|
| December 19, 2025 | R.Kivetz |
| Date | Dr. Ran Kivetz, Ph.D. |

## <u>EXHIBIT A: CURRICULUM VITAE OF DR. RAN KIVETZ</u>

*Academic Curriculum Vitae*

Graduate School of Business, Columbia University, 665 West 130th St., NY, NY 10027
Tel : (212) 854-4555 | e-mail :  rk566@columbia.edu

**Education:**

Ph.D., Stanford University, Graduate School of Business
Marketing, September 1996 – June 2000

M.A., Stanford University, Department of Psychology
Psychology, June 2000

B.A., Tel Aviv University
Economics and Psychology, June 1995

**Academic Employment:**

Philip H. Geier, Jr., Professor of Marketing, Columbia University Business School, 2008 – present

Professor of Business, Columbia University Business School, 2006 – 2008

Sidney Taurel Associate Professor of Business, Columbia University Business School, 2004 – 2006

Associate Professor, Columbia University Business School, 2003 – 2004

Assistant Professor, Columbia University Business School, 2000 – 2003

**Publications:**

Weiss, Liad and Ran Kivetz (2019), "Opportunity Cost Overestimation," *Journal of Marketing Research*, 56(3), 518-533.

Simonson, Itamar and Ran Kivetz (2018), "Bringing (Contingent) Loss Aversion Down to Earth – A Comment on Gal & Rucker's Rejection of "Losses Loom Larger Than Gains," *Journal of Consumer Psychology*, 28(3), 517-522.

Kivetz, Ran, Rachel Meng, and Daniel He (2017), "Hyperopia: A Theory of Reverse Self-Control," in *Handbook of Self-Control in Health and Well-Being*, de Ridder, Denise, Marieke Adriaanse, and Kentaro Fujita (eds), Routledge.

Kivetz, Ran and Yuhuang Zheng (2017), "The Effects of Promotions on Hedonic versus Utilitarian Purchases," *Journal of Consumer Psychology*, 27(1), 59-68.

Keinan, Anat, Ran Kivetz, and Oded Netzer (2016), "The Functional Alibi," *Journal of the Association for Consumer Research*, Special Issue on the Science of Hedonistic Consumption, 1(4), 479-496. (Lead article)

**Publications:** (continued)

Rom Schrift, Ran Kivetz, and Oded Netzer (2016), "Complicating Decisions: The Work Ethic Heuristic and the Construction of Effortful Decisions," *Journal of Experimental Psychology: General*, 145(7), 807-829. (Lead article)

Sela, Aner, Itamar Simonson, and Ran Kivetz (2013), "Beating the Market: The Allure of Unintended Value," *Journal of Marketing Research*, 50(6), 691-705.

Gershoff, Andrew, Ran Kivetz, and Anat Keinan (2012), "Consumer Response to Versioning: How Brands' Production Methods Affect Perceptions of Unfairness," *Journal of Consumer Research*, 39(2), 382–398.

Simonson, Itamar and Ran Kivetz (2012), "Demand Effects in Likelihood of Confusion Surveys," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Diamond, Shari S. and Jerre B. Swann (eds), Chicago, IL: American Bar Association, pp. 243-259.

Keinan, Anat and Ran Kivetz (2011), "Productivity Mindset and the Consumption of Collectable Experiences," *Journal of Consumer Research*, 37(6), 935-950. (*Winner*, 2011 *Ferber Award*)

Schrift, Rom, Oded Netzer, and Ran Kivetz (2011), "Complicating Choice," *Journal of Marketing Research*, 48(2), 308-326. (*Winner*, 2010 *Best Competitive Paper Award*, *Society of Consumer Psychology*)

Urminsky, Oleg and Ran Kivetz (2011), "Scope Insensitivity and the 'Mere Token' Effect," *Journal of Marketing Research*, 48(2), 282-295.

Levav, Jonathan, Ran Kivetz, and K. Cecile Cho (2010), "Motivational Compatibility and Choice Conflict," *Journal of Consumer Research*, 37(3), 429-442.

Keinan, Anat and Ran Kivetz (2008), "Remedying Hyperopia: The Effects of Self-Control Regret on Consumer Behavior," *Journal of Marketing Research*, 45(6), 676-689.

Kivetz, Ran, Oded Netzer, and Rom Schrift (2008), "The Synthesis of Preference: Bridging Behavioral Decision Research and Marketing Science," *Journal of Consumer Psychology*, 18(3), 179-186.

Keinan, Anat and Ran Kivetz (2008), "When Virtue Is a Vice," *Harvard Business Review*, July-August.

Kivetz, Ran, "Farsightedness (2007)," in *International Encyclopedia of the Social Sciences*, 2nd Edition, Darity Jr., William (ed.), Detroit: Macmillan/Thomson Gale.

Kivetz, Ran, Oleg Urminsky, and Yuhuang Zheng (2006), "The Goal-Gradient Hypothesis Resurrected: Purchase Acceleration, Illusionary Goal Progress, and Customer Retention," *Journal of Marketing Research*, 43(1), 39-58. (*Finalist*, 2011 *William O'Dell Award*; *Finalist*, 2007 *Paul Green Award*)

**Publications:** (continued)

Kivetz, Ran and Anat Keinan (2006), "Repenting Hyperopia: An Analysis of Self-Control Regrets," *Journal of Consumer Research*, 33(2), 273-282. (*Finalist*, 2009 *Best Article Award* for a paper published in *JCR* in 2006)

Kivetz, Ran, and Yuhuang Zheng (2006), "Determinants of Justification and Self-Control," *Journal of Experimental Psychology: General*, 135(4), 572-587.

Rottenstreich, Yuval, and Ran Kivetz (2006), "On Decision Making without Likelihood Judgment," *Organizational Behavior and Human Decision Processes*, 101(1), 74-88.

Kivetz, Ran (2005), "Promotion Reactance: The Role of Effort-Reward Congruity," *Journal of Consumer Research*, 31(4), 725-736. (*Winner*, 2005 *Ferber Award*)

Kivetz, Ran, Oded Netzer, and V. Srinivasan (2004), "Alternative Models for Capturing the Compromise Effect," *Journal of Marketing Research*, 41(3), 237-257. (Lead article) (*Finalist*, 2009 *William O'Dell Award*; *Finalist*, 2005 *Paul Green Award*)

Kivetz, Ran, Oded Netzer, and V. Srinivasan (2004), "Extending Compromise Effect Models to Complex Buying Situations and Other Context Effects," *Journal of Marketing Research*, 41(3), 262-268.

Kivetz, Ran (2003), "The Effects of Effort and Intrinsic Motivation on Risky Choice," *Marketing Science*, 22(4), 477-502.

Kivetz, Ran and Itamar Simonson (2003), "The Idiosyncratic Fit Heuristic: Effort Advantage as a Determinant of Consumer Response to Loyalty Programs," *Journal of Marketing Research*, 40(4), 454-467.

Kivetz, Ran and Itamar Simonson (2002b), "Self-Control for the Righteous: Toward A Theory of Pre-Commitment to Indulgence," *Journal of Consumer Research*, 29(2), 199-217. (*Finalist*, 2005 *Best Article Award* for a paper published in *JCR* in 2002)

Kivetz, Ran and Itamar Simonson (2002a), "Earning the Right to Indulge: Effort as a Determinant of Customer Preferences Toward Frequency Program Rewards," *Journal of Marketing Research*, 39(2), 155-170. (*Finalist*, 2007 *William O'Dell Award*)

Kivetz, Ran and Itamar Simonson (2000), "The Effects of Incomplete Information on Consumer Choice," *Journal of Marketing Research*, 37(4), 427-448. (*Finalist*, 2005 *William O'Dell Award*)

Kivetz, Ran (1999), "Advances in Research on Mental Accounting and Reason-Based Choice," *Marketing Letters*, 10(3), 249-266.

**Work Under Review or Under Revision in Peer-Reviewed Journals:**

Kivetz, Ran and Rachel Meng, "Circular Self-Rewards vs. Cash (Dis)Incentives: Motivating Effort, Goal Pursuit, and Positive Habits."

Pocheptsova, Anastasiya, Ran Kivetz, and Ravi Dhar, "Consumer Decisions to Rent versus Buy."

**Manuscripts in Preparation:**

Danziger, Shai, Liat Hadar, Ran Kivetz, and Itzhak Gnizy, "Price Quote Format and Inferred Artisanship and Marketing Orientation."

He, Daniel and Ran Kivetz, "Being in the Moment: The Effects of Ephemeral Communication in Social Media."

Shamis, Asaf and Ran Kivetz, "From Colonialism to Networked Colonialism: Personalized Networked Communications and Habermas's Theory of Modern Society."

**Working Papers:**

"Democracy between Private Space, Public Space, and Cyberspace," with Asaf Shamis.

"The Behavioral Economics of Incentives."

"Exercising Self-Control Through Self-reward," with Rachel Meng.

**Selected Research-In-Progress:**

"The Surprising Robustness of Prospect Theory in the Long Run."

"The Effects of Reward Programs," with Ricardo Montoya and Oded Netzer.

"The Bounded Rationality of Effort-Reward Choices: When Principles Overshadow Expectancies," with Oleg Urminsky.

"The Intersection of Behavioral Economics and Political Science."

"A Republic of Selfies: Personalizing Public Messages in Digital Media," with Asaf Shamis & Daniel He.

"Tie Signaling in Social Media," with Daniel He.

"Consumer Search."

---

**Academic Honors and Awards:**

Finalist, 2016 William O'Dell Award for the Journal of Marketing Research article published in 2006 that "made the most significant long-term contribution to marketing theory, methodology, and/or practice"

Faculty Fellow of the Institute for Social and Economic Research and Policy, 2002-2015

Ranked by the American Marketing Association as one of the Top 50 most productive scholars in the premier marketing journals during 2010–2014

Finalist, 2014 Best Article Award for the Journal of Consumer Research article published in 2011

Ranked by the American Marketing Association as one of the Top 50 most productive scholars in the premier marketing journals during 2009-2013

Finalist, 2011 William O'Dell Award for the Journal of Marketing Research article published in 2006 that "made the most significant long-term contribution to marketing theory, methodology, and/or practice"

Winner of the 2010 Best Competitive Paper Award granted by the Society of Consumer Psychology

Rated as the fourth most prolific scholar in the leading marketing journals during 1982-2006 (Seggie, S. H. and D. A. Griffith, 2009; "What Does It Take to Get Promoted in Marketing Academia? Understanding Exceptional Publication Productivity in the Leading Marketing Journals," Journal of Marketing, 73(1), 122-132.)

Finalist, 2009 William O'Dell Award for the Journal of Marketing Research article published in 2004 that "made the most significant long-term contribution to marketing theory, methodology, and/or practice."

Finalist, 2009 Best Article Award for the Journal of Consumer Research article published in 2006

Winner of the 2007 Early Contribution Award from the Society of Consumer Psychology

Finalist, 2007 William O'Dell Award for the Journal of Marketing Research article published in 2002 that "made the most significant long-term contribution to marketing theory, methodology, and/or practice"

Finalist, 2007 Paul Green Award for the Journal of Marketing Research article published in 2004 that "demonstrates the most potential to contribute significantly to the practice of marketing research and research in marketing"

Winner of the 2005 Ferber Award granted to the "best interdisciplinary dissertation article published in the latest volume of the Journal of Consumer Research"

---

**Academic Honors and Awards:** (continued)

Finalist, 2005 William O'Dell Award for the Journal of Marketing Research article published in 2000 that "made the most significant long-term contribution to marketing theory, methodology, and/or practice"

Finalist, 2005 Best Article Award for the Journal of Consumer Research article published in 2002

Finalist, 2005 Paul Green Award for the Journal of Marketing Research article published in 2004 that "demonstrates the most potential to contribute significantly to the practice of marketing research and research in marketing."

Winner of the 2005 Columbia Business School Dean's Award for Innovation in the Curriculum

Lang Faculty Research Fellowship in Entrepreneurship, 2005

Lang Faculty Research Fellowship in Entrepreneurship, 2004

Outstanding Reviewer Award, Journal of Consumer Research, 2003-2004

Invited as Faculty Presenter, 2004 Association for Consumer Research Doctoral Symposium

Young Scholars Program, Marketing Science Institute, 2003

Research Grant, Columbia Center for Excellence in E-Business, 2003

Seed Grant, Institute for Social and Economic Research and Policy, 2001

Doctoral Consortium Fellow, American Marketing Association, 1999

Ph.D. Merit Award, Stanford Graduate School of Business, 1999

Graduate Fellow and Grant, Stanford Center on Conflict and Negotiation, 1997-1998

Jaedicke Award Scholar (in recognition of outstanding academic performance), Stanford Graduate School of Business, 1996-1997

Dean's Honor List with Distinction, Faculty of Social Sciences (Economics), Tel Aviv University, 1995

*******************

---

**Teaching:**

Winner of the Columbia Business School 2005 Dean's Award for Innovation in the Curriculum

*Ph.D. Courses*

Bridging Behavioral Economics with Marketing Science (Fall 2023)
Student Evaluation 5.0 on 5-point scale

Bridging Behavioral Economics with Marketing Science (Spring 2022)
Student Evaluation 5.0 on 5-point scale

Bridging Behavioral Economics with Marketing Science (Fall 2019)
Student Evaluation 4.9 on 5-point scale

Bridging Behavioral Economics with Marketing Science (Spring 2018)
Student Evaluation 5.0 on 5-point scale

Bridging Behavioral Economics with Marketing Science (Spring 2016)
Student Evaluation 4.2 on 5-point scale

Bridging Behavioral Decision Research with Marketing Science (Spring 2013)
Student Evaluation 5.0 on 5-point scale

Bridging Behavioral Decision Research with Marketing Science (Spring 2011)
Student Evaluation 4.7 on 5-point scale

Bridging Behavioral Decision Research with Marketing Science (Spring 2008)
Student Evaluation 5.0 on 5-point scale

Bridging Behavioral Decision Research with Marketing Science (Spring 2005)
Student Evaluation 4.8 on 5-point scale

Consumer Behavior – I (Fall 2005)
Student Evaluation 4.7 on 5-point scale

Multidisciplinary Approaches to Human Decision Making (Spring 2004)

Bridging Behavioral Decision Research with Marketing Science (Spring 2003)
Student Evaluation 4.8 on 5-point scale

Multidisciplinary Approaches to Human Decision Making (Spring 2002)

Totally Eclectic Seminar in Marketing (Spring 2001)
Student Evaluation 6.2 on 7-point scale

*****************

**Teaching:** (continued)

*High-Technology Entrepreneurship (Executive MBA Elective)*

Spring 2025 (1 section) – co-taught with Gary Singer
Student Evaluation 4.7 on 5-point scale

Spring 2024 (1 section) – co-taught with Gary Singer
Student Evaluation 4.4 on 5-point scale

Spring 2023 (1 section) – co-taught with Gary Singer
Student Evaluation 4.5 on 5-point scale

Spring 2019 (1 section)
Student Evaluation 4.5 on 5-point scale

Spring 2018 (1 section)
Student Evaluation 4.6 on 5-point scale

Spring 2017 (1 section)
Student Evaluation 4.5 on 5-point scale

*High-Technology Entrepreneurship (Executive MBA & MBA Elective)*

Spring 2016 (1 section)
Student Evaluation 4.6 on 5-point scale

Spring 2009 (Master Class: 1 section)
Student Evaluation 4.7 on 5-point scale

Spring 2008 (Master Class: 1 section)
Student Evaluation 4.4 on 5-point scale

*High-Technology Marketing and Entrepreneurship (Executive MBA Elective)*

Spring 2008 (1 section)
Student Evaluation 4.5 on 5-point scale

Spring 2006 (1 section)
Student Evaluation 4.5 on 5-point scale

Spring 2005 (1 section)
Student Evaluation 4.9 on 5-point scale

Spring 2004 (1 section)
Student Evaluation 5.0 on 5-point scale

Spring 2003 (1 section)
Student Evaluation 5.0 on 5-point scale

Spring 2001 (1 section)
Student Evaluation 6.5 on 7-point scale

******************

**Teaching:** (continued)

*High-Technology Marketing and Entrepreneurship (MBA Elective)*

Spring 2007 (1 section)
Student Evaluation 4.3 on 5-point scale

Spring 2006 (1 section)
Student Evaluation 4.5 on 5-point scale

Spring 2004 (1 section)

*High-Technology Marketing and Entrepreneurship (MBA Elective)*

Student Evaluation 4.9 on 5-point scale

Spring 2003 (1 section)
Student Evaluation 4.4 on 5-point scale

Spring 2002 (1 section)
Student Evaluation 6.4 on 7-point scale

Spring 2001 (1 section)
Student Evaluation 6.4 on 7-point scale

*Marketing Strategy and Management (Core Executive MBA Course)*

Spring 2024 (2 sections)
Student Evaluations 4.2 and 3.9 on 5-point scales

Fall 2023 (2 sections)
Student Evaluations 4.7 and 4.5 on 5-point scales

Spring 2023 (2 sections)
Student Evaluations 4.1 and 4.3 on 5-point scales

Fall 2022 (2 sections)
Student Evaluations 4.4 and 4.3 on 5-point scales

Spring 2022 (2 sections)
Student Evaluations 4.3 and 4.2 on 5-point scales

Spring 2021 (2 sections)
Student Evaluations 4.1 and 4.1 on 5-point scales

Fall 2020 (2 sections)
Student Evaluations 4.0 and 3.7 on 5-point scales

Spring 2020 (2 sections)
Student Evaluations 3.8 and 3.7 on 5-point scales

Fall 2019 (1 section)
Student Evaluation 4.9 on 5-point scale

**Teaching:** (continued)

Spring 2019 (2 sections)
Student Evaluations 4.2 and 3.2 on 5-point scales

Fall 2018 (1 section)
Student Evaluation 4.8 on 5-point scale

Spring 2016 (1 section)
Student Evaluation 5.0 on 5-point scale

Spring 2012 (2 sections)
Student Evaluations 4.7 and 4.9 on 5-point scales

*Marketing Strategy (Core MBA Course)*

Fall 2023 (3 sections)
Student Evaluations 4.2, 3.9, and 4.0 on 5-point scales

Fall 2013 (3 sections)
Student Evaluations 4.1, 3.8, and 4.1 on 5-point scales

Fall 2012 (3 sections)
Student Evaluations 3.9, 3.1, and 3.2 on 5-point scales

Fall 2011 (3 sections)
Student Evaluations 4.4, 3.8, and 4.1 on 5-point scales

Fall 2010 (3 sections)
Student Evaluations 4.5, 3.7, and 4.2 on 5-point scales

Fall 2009 (3 sections)
Student Evaluations 4.4, 4.3, and 4.2 on 5-point scales

*Marketing Management (Undergraduate Course)*

Fall 2019 (1 section)
Student Evaluations 4.3 on 5-point scale

Spring 2019 (1 section)
Student Evaluations 4.4 on 5-point scale

Fall 2018 (1 section)
Student Evaluations 4.7 on 5-point scale

Spring 2017 (1 section)
Student Evaluations 4.8 on 5-point scale

Spring 2014 (1 section)
Student Evaluations 4.7 on 5-point scale

*The Marketing of a Nation: Israel (Master Class)*

Spring 2009 (1 section)
Student Evaluation 4.8 on 5-point scale

*Columbia Business School Global Immersion Program*

Global Immersion Israel: Leadership & Innovation (March 2018)

*Columbia Business School Executive Education Program*

Design Your Innovation Blueprint (March 2017)

Innovate on Demand (November 2014; November 2015)

Innovation and Entrepreneurship (IE) @Columbia (February 2013; February 2014)

Columbia Senior Executive Program (May 2010; October 2010; May 2011; July 2012)

Marketing and Innovation (June 2013; June 2014; November 2014)

Customer Centricity (May 2010; September 2010; October 2011; February 2012)

New Product Development and Innovation (October 2002; June 2003)

Marketing Management: Strategies, Processes & Tools for Today's Challenges (Sep. 02; Apr. '03)

Marketing Management (April 2002)

Marketing Management in the New Economy (April 2001)

**Main Advisor for:**

Daniel He, Assistant Professor at the National University of Singapore (NUS)

Anat Keinan, Associate Professor at Boston University (formerly Associate Professor at Harvard Business School)

Rachel Meng

Rom Schrift, Associate Professor at Indiana University (formerly Assistant Professor at Wharton; co-advisor with Oded Netzer)

Oleg Urminsky, Full Professor at Chicago Booth School of Business

Yuhuang Zheng, Associate Professor at Tsinghua University

**Doctoral Committee Member for:**

Tamar Avnet, University of Toronto

Josko Brakus, University of Rochester

Cecile Cho, University of California Riverside

Yael Karlinsky-Shichor, Northeastern University

Yaoli Mao, Autodesk, Inc.

Valentina Melnyk, Tilburg University

Anirban Mukhopadhyay, Hong Kong University of Science and Technology (HKUST)

Qitian Ren, Chinese University of Hong Kong (Shenzhen)

Aner Sela, University of Florida

Kavita Srivastava, Indian Institute of Technology

Liad Weiss, University of Wisconsin – Madison

**Conference Publications:**

Danziger, Shai, Liat Hadar, Ran Kivetz, and Itzhak Gnizy (2019), "Price Quote Format and Inferred Artisanship and Marketing Orientation," special session paper presented at Society for Consumer Psychology Conference (SCP), Savannah, GA.

He, Daniel and Ran Kivetz (2017), "Technology-Driven Consumption," special session presented at Society for Consumer Psychology Conference (SCP), San Francisco, CA.

He, Daniel and Ran Kivetz (2016), "Ephemeral Messaging: Intimacy, Spontaneity, and Creativity in Fleeting Experiences," competitive paper presented at Association for Consumer Research Conference (ACR), Berlin, Germany.

Meng, Rachel and Ran Kivetz (2016), "Motivating Choices and Performance: Beyond Monetary Incentives," Association for Consumer Research Conference (ACR), Berlin, Germany.

He, Daniel and Ran Kivetz (2015), "Tie Signaling," in *NA – Advances in Consumer Research* Volume 43, eds. Kristin Diehl and Carolyn Yoon, Duluth, MN: Association for Consumer Research.

Netzer, Oded, Ran Kivetz, and Rom Schrift (2015), "Complicating Decisions: the Effort-Outcome Link and the Construction of Effortful Decision Processes," in *NA – Advances in Consumer Research* Volume 43, eds. Kristin Diehl and Carolyn Yoon, Duluth, MN: Association for Consumer Research.

Weiss, Liad and Ran Kivetz (2014), "Following-Through Opportunities: the Effects of Incidental Versus Inherent Choices," in *NA – Advances in Consumer Research* Volume 42, eds. June Cotte and Stacy Wood, Duluth, MN: Association for Consumer Research.

Simonson, Itamar, Aner Sela, and Ran Kivetz (2013), "Beating the Market: Competitive Mindset and the Allure of Unintended Value," in *NA – Advances in Consumer Research* Volume 41, eds. Simona Botti and Aparna Labroo, Duluth, MN: Association for Consumer Research.

Weiss, Liad and Ran Kivetz (2011), "When Not Redeeming a Coupon Feels Like Missing More Than Its Value," in *E – European Advances in Consumer Research* Volume 9, eds. Alan Bradshaw, Chris Hackley, and Pauline Maclaran, Duluth, MN: Association for Consumer Research.

Schrift, Rom, Ran Kivetz, and Oded Netzer (2011), "Creating the Illusion of Choice Through Selective Information Search and Retrieval," in *NA – Advances in Consumer Research* Volume 39, eds. Rohini Ahluwalia, Tanya L. Chartrand, and Rebecca K. Ratner, Duluth, MN: Association for Consumer Research.

Schrift, Rom, Oded Netzer, and Ran Kivetz (2010), "Complicating Choice," in *NA – Advances in Consumer Research* Volume 37, eds. Margaret C. Campbell, Jeff Inman, and Rik Pieters, Duluth, MN: Association for Consumer Research.

**Conference Publications:** (continued)

Sela, Aner, Itamar Simonson, and Ran Kivetz (2010), "Negative Effects of Explicit Customization on Perceptions of Opportunity," in *NA – Advances in Consumer Research* Volume 37, eds. Margaret C. Campbell, Jeff Inman, and Rik Pieters, Duluth, MN: Association for Consumer Research.

Keinan, Anat, Ran Kivetz, and Oded Netzer (2009), "Functional Alibi," in *NA – Advances in Consumer Research* Volume 36, eds. Ann L. McGill and Sharon Shavitt, Duluth, MN: Association for Consumer Research.

Kivetz, Ran and Anat Keinan (2009), "Hyperopia: A Theory of Reverse Self-Control," in *NA – Advances in Consumer Research* Volume 36, eds. Ann L. McGill and Sharon Shavitt, Duluth, MN: Association for Consumer Research.

Zheng, Yuhuang and Ran Kivetz (2009), "The Differential Promotion Effectiveness on Hedonic Versus Utilitarian Products," in *NA – Advances in Consumer Research* Volume 36, eds. Ann L. McGill and Sharon Shavitt, Duluth, MN: Association for Consumer Research.

Pocheptsova, Anastasiya, Ran Kivetz, and Ravi Dhar (2008), "Consumer Decisions to Rent Vs. Buy," in *NA – Advances in Consumer Research* Volume 35, eds. Angela Y. Lee and Dilip Soman, Duluth, MN: Association for Consumer Research.

Keinan, Anat and Ran Kivetz (2008), "Productivity Mindset and the Consumption of Collectable Experiences," in *NA – Advances in Consumer Research* Volume 35, eds. Angela Y. Lee and Dilip Soman, Duluth, MN: Association for Consumer Research.

Levav, Jonathan, Ran Kivetz, and Cecile Cho (2008), "Too Much Fit? How Regulatory Fit Can Turn Us Into Buridan's Asses," in *NA – Advances in Consumer Research* Volume 35, eds. Angela Y. Lee and Dilip Soman, Duluth, MN: Association for Consumer Research.

Keinan, Anat and Ran Kivetz (2007), "Remedying Hyperopia: the Effects of Self-Control Regret on Consumer Behavior," in *NA – Advances in Consumer Research* Volume 34, eds. Gavan Fitzsimons and Vicki Morwitz, Duluth, MN: Association for Consumer Research.

Urminsky, Oleg and Ran Kivetz (2007), "Scope Insensitivity in the Service of the Rational Self: the 'Mere Token' Effect," in *NA – Advances in Consumer Research* Volume 34, eds. Gavan Fitzsimons and Vicki Morwitz, Duluth, MN: Association for Consumer Research.

Zheng, Yuhuang and Ran Kivetz (2007), "Effort, Excellence and Income Stinginess: How Do People Justify Self-Gratification?," in *E – European Advances in Consumer Research* Volume 8, eds. Stefania Borghini, Mary Ann McGrath, and Cele Otnes, Duluth, MN: Association for Consumer Research.

Kivetz, Ran and Drazen Prelect (2006), "Goal Distance and Consumer Choice," in *NA – Advances in Consumer Research* Volume 33, eds. Connie Pechmann and Linda Price, Duluth, MN: Association for Consumer Research.

**Conference Publications:** (continued)

Kivetz, Ran and Klaus Wertenbroch (2006), "Emerging Perspectives on Self-Control," in *NA – Advances in Consumer Research* Volume 33, eds. Connie Pechmann and Linda Price, Duluth, MN: Association for Consumer Research.

Chernev, Alexander and Ran Kivetz (2005), "Goals and Mindsets in Consumer Choice," in *NA - Advances in Consumer Research*, eds. Gita Menon and Akshay Rao, Volume 32, Provo, UT: Association for Consumer Research.

Kivetz, Ran, Oded Netzer, and V. Srinivasan (2002), "Alternative Models for Capturing the Compromise Effect," in *NA – Advances in Consumer Research*, ed. Punam Anand Keller and Dennis Rook, Volume 30, Provo, UT: Association for Consumer Research.

Kivetz, Ran (2001), "Consumer Preferences Towards Frequency Programs," in *NA – Advances in Consumer Research* Volume 28, eds. Mary C. Gilly and Joan Meyers-Levy, Valdosta, GA : Association for Consumer Research.

Kivetz, Ran and Michal Strahilevitz (2001), "Factors Affecting Consumer Choices Between Hedonic and Utilitarian Options," in *NA – Advances in Consumer Research* Volume 28, eds. Mary C. Gilly and Joan Meyers-Levy, Valdosta, GA : Association for Consumer Research.

Kivetz, Ran (2000), "Hedonic and Utilitarian Motivations in Consumer Choice," in *NA – Advances in Consumer Research* Volume 27, eds. Stephen J. Hoch and Robert J. Meyer, Provo, UT: Association for Consumer Research.

Kivetz, Ran (1999), "Advances in Research on Mental Accounting and Reason-Based Choice," in HEC Symposium on *Advances in Choice Theory*, Conference Summary, Report No. 99-121, Gilles Laurent (ed.), Marketing Science Institute.

Chakravarti, Agnish, Susan Chiu, Ran Kivetz, and Itamar Simonson (1999), "Regret and Self-Congratulation From the Head and From the Heart," Advances in Consumer Research, ed. Eric J. Arnould and Linda M. Scott, Volume 26, Provo, UT: Association for Consumer Research.


**Selected Conference Presentations:**

"Self-Rewards and Cash (Dis)Incentives," with Rachel Meng, Marketing Analytics Symposium, Sydney, Australia, February 2020.

"Change – Attention – Shift," with Rachel Meng, 11th Triennial Invitational Choice Symposium, May – June 2019.

"Self-Rewards and Cash (Dis)Incentives," 4th Coller Conference on Behavioral Economics, Tel Aviv, Israel, June 2019.

"Self-Rewards and Cash (Dis)Incentives" with Rachel Meng, INFORMS Marketing Science Conference, Rome, Italy, June 2019.

**Selected Conference Presentations:** (continued)

"Technology-Driven Consumption," with Daniel He, Society for Consumer Psychology Conference (SCP), San Francisco, CA, 2017.

"The Consumption of Digital Live Content: How Live Streaming Enhances Engagement in Uninteresting Content," with Daniel He and Jonathan Hurwitz, Association for Consumer Research Conference (ACR), San Diego, CA, 2017.

"The Compensation-Driven Nature of Monetary Rewards," with Rachel Meng, Society for Consumer Psychology Conference (SCP), San Francisco, CA, 2017.

"Ephemeral Messaging: Intimacy, Spontaneity, and Creativity in Fleeting Experiences," with Daniel He, Association for Consumer Research Conference (ACR), Berlin, Germany, 2016.

"Motivating Choices and Performance: Beyond Monetary Incentives," with Rachel Meng, Association for Consumer Research Conference (ACR), Berlin, Germany, 2016.

"Consumer Decisions to Rent versus Buy," with Anastasiya Pocheptsova and Ravi Dhar, Association for Consumer Research Conference, Berlin, Germany, 2016.

"Motivating Choices and Performance: Beyond Monetary Incentives," with Rachel Meng, Society for Judgment and Decision Making, Boston, Massachusetts, 2016.

"Opportunity Cost Overestimation in Choices among Opportunities versus Alternatives," with Liad Weiss, Society for Judgment and Decision Making, Boston, Massachusetts, 2016.

"Consumer Behavior in Social Media" with Daniel He, Association for Consumer Research Conference, New Orleans, LA, October 2015.

"Illusions of Preference Construction," with Rom Schrift and Oded Netzer, Association for Consumer Research Conference, New Orleans, LA, October 2015.

"Creating the Illusion of Choice through Selective Information Search and Retrieval," with Rom Schrift and Oded Netzer, Association for Consumer Research Conference, St. Louis, MO, October 2011.

"Seeing-Through Opportunities:  The Effects of Incidental versus Inherent Choices" with Liad Weiss, Judgment and Decision Making Conference, Seattle, WA, November 2011.

"The Effects of Reward Programs" with Ricardo Montoya and Oded Netzer, INFORMS Marketing Science Conference, Rice University, Houston, TX, June 2011.

"Complicating Choice," with Rom Schrift and Oded Netzer, Society for Consumer Psychology Conference, St. Pete Beach, FL, February 2010.

"Complicating Choice," with Rom Schrift and Oded Netzer, Judgment and Decision Making Conference, Boston, MA, November 2009.

**Selected Conference Presentations:** (continued)

"Using Survey Controls Effectively," NAD Annual Conference: What's New in Comparative Advertising, Claim Support and Self-Regulation?, New York, NY, October 2009.

"Complicating Choice," with Rom Schrift and Oded Netzer, Association for Consumer Research Conference, Pittsburgh, PA, September 2009.

"Hyperopia: A Theory of Reverse Self-Control," with Anat Keinan, Association for Consumer Research Conference, San Francisco, CA, October, 2008.

"The Functional Alibi," with Anat Keinan and Oded Netzer, Association for Consumer Research Conference, San Francisco, CA, October 2008.

"The Impact of Marketing Promotions on Hedonic versus Utilitarian Purchases," with Yuhuang Zheng, Association for Consumer Research Conference, San Francisco, CA, October 2008.

"The Functional Alibi," with Anat Keinan and Oded Netzer, 11th Biennial Behavioral Decision Research in Management Conference, San Diego, CA, April 2008.

"From Diligence to Hindrance," with Rom Schrift and Oded Netzer, Marketing in Israel Conference, Tel Aviv University, Tel Aviv, Israel, December 2008.

"Hyperopia," University of Pennsylvania (Wharton), Philadelphia, PA, June 2007.

"Consumer Decisions to Rent versus Buy," with Anastasiya Pocheptsova and Ravi Dhar, Association for Consumer Research Conference, Memphis, TN, October 2007.

"Productivity Mindset and the Consumption of Collectable Experiences," with Anat Keinan, Association for Consumer Research Conference, Memphis, TN, October 2007.

"Too Much Fit? How Regulatory Fit Can Turn Us into Buridan's Asses," with Jonathan Levav and K. Cecile Cho, Association for Consumer Research Conference, Memphis, TN, October 2007.

"Remedying Hyperopia: The Effects of Self-Control Regret on Consumer Behavior," with Anat Keinan, 10th Biennial Behavioral Decision Research in Management Conference, Los Angeles, CA, June 2006.

"Scope Insensitivity and The Mere Token Effect," with Oleg Urminsky, 10th Biennial Behavioral Decision Research in Management Conference, Los Angeles, CA, June 2006.

"Hyperopia: A Theory of Reverse Self-Control", Symposium on "Self-Control Processes: New Theoretical and Empirical Directions," Society for Personality and Social Psychology Annual Meeting, Palm Springs, California, 2006.

**Selected Conference Presentations:** (continued)

"The Psychology of Rewards: Principles of Expectancies?," with Oleg Urminsky, Judgment and Decision Making Conference, Toronto, Canada, November 2005.

"Repenting Hyperopia: An Analysis of Self-Control Regrets," with Anat Keinan, Judgment and Decision Making Conference, Toronto, Canada, November 2005.

"Goal Distance and Consumer Choice" (Session Co-Chair), and "The Goal-Gradient Hypothesis Resurrected: Purchase Acceleration, Illusionary Goal Progress, and Customer Retention," with Oleg Urminsky and Yuhuang Zheng, Association for Consumer Research Conference, San Antonio, Texas, October 2005.

"Emerging Perspectives on Self-Control" (Session Co-Chair), and "Determinants of Justification and Self-Control," with Yuhuang Zheng, Association for Consumer Research Conference, San Antonio, Texas, October 2005.

"Repenting Hyperopia: An Analysis of Self-Control Regrets," with Anat Keinan, Association for Consumer Research Conference, San Antonio, Texas, October 2005.

"Inducing Hyperopia through Inconsequential Early Rewards: A Consumer-Welfare-Enhancing Violation of the Invariance Axiom," with Oleg Urminsky, Association for Consumer Research Conference, San Antonio, Texas, October 2005.

"The Effects of Effort and Intrinsic Motivation on Risky Choice," INFORMS Marketing Science Conference, Emory University, Atlanta, GA, June 2005.

"The Goal-Gradient Hypothesis Resurrected: Purchase Acceleration, Illusionary Goal Progress, and Customer Retention," with Oleg Urminsky and Yuhuang Zheng, INFORMS Marketing Science Conference, Emory University, Atlanta, GA, June 2005.

"The Goal-Gradient Hypothesis Resurrected: Purchase Acceleration, Illusionary Goal Progress, and Customer Retention," with Oleg Urminsky and Yuhuang Zheng, Judgment and Decision Making Conference, Minnesota, November 2004.

"The Effects of Effort and Intrinsic Motivation on Risky Choice," Judgment and Decision Making Conference, Minnesota, November 2004.

Invited to present in session on "Goals, Impulses, and Self-Control," Association for Consumer Research Doctoral Symposium, Portland, Oregon, October 2004.

Discussion Leader for special session on "Simple Payments and Complex Rewards…," Association for Consumer Research Conference, Portland, Oregon, October 2004.

"Promotion Reactance: The Role of Effort-Reward Congruity," Association for Consumer Research Conference, Portland, Oregon, October 2004.

**Selected Conference Presentations:** (continued)

"Principles or Probabilities: When Value Overshadows Expected Value," with Oleg Urminsky, Association for Consumer Research Conference, Portland, Oregon, October 2004.

"How do Promotion Programs Affect Consumers' Purchase Decisions: A Behavioral Perspective," with Yuhuang Zheng, INFORMS Marketing Science Conference, Erasmus University, Rotterdam, The Netherlands, June 2004.

Discussion Leader for special session on "Understanding the Evaluation of Future Events," Association for Consumer Research Conference, Toronto, Canada, October 2003.

"Consumer Self-Control and Time-Discounting," with Oleg Urminsky, Judgment and Decision Making Conference, Vancouver, Canada, November 2003.

"Mindsets of Decision Making," with Yuval Rottenstreich, Judgement and Decision Making Conference, Vancouver, Canada, November 2003.

"Consumer Self-Control and Time-Discounting," with Oleg Urminsky, Association for Consumer Research Conference, Toronto, Canada, October 2003.

"The Effects of Effort and Intrinsic Motivation on Risky Choice," Marketing Science Institute Young Scholars Program, Park City, UT, March 2003.

"Does the End Justify the Means? The Impact of Effort on Preferences toward the Certainty and Magnitude of Rewards," Association for Consumer Research Conference, Atlanta, GA, 2002.

"Alternative Models for Capturing the Compromise Effect," with Oded Netzer and V. Srinivasan, Association for Consumer Research Conference, Atlanta, GA, October 2002.

"Alternative Models for Capturing the Compromise Effect," with Oded Netzer and V. Srinivasan, Marketing Science Conference, Alberta, Canada, June 2002.

"Self-Control for the Righteous: Toward a Theory of Pre-Commitment to Indulgence," with Itamar Simonson, Four School Seminar, New York University, May 2002.

"Self-Control for the Righteous: Toward a Theory of Luxury Pre-commitment," with Itamar Simonson, Judgment and Decision Making Conference, Orlando, FL, November 2001.

"The Influence of Hedonic Concreteness on Mood Regulation versus Mood Congruency," with Yifat Kivetz, Association for Consumer Research Conference, Austin, TX, October 2001.

"Self-Control for the Righteous: Toward a Theory of Luxury Pre-commitment," with Itamar Simonson, UC Berkeley Choice Symposium, Monterey, CA, June 2001.

"Consumer Preferences Towards Frequency Programs" (Session Chair), and "The Effects of Effort and Idiosyncratic Fit on Preference Towards Frequency Programs," with Itamar Simonson, Association for Consumer Research Conference, Salt Lake City, Utah, October 2000.

**Selected Conference Presentations:** (continued)

"Consumer Choices between Hedonic and Utilitarian Options" (Session Co-Chair), and "Earning the Right to Indulge: Effort as a Determinant of Customer Preferences Towards Frequency Program Rewards," with Itamar Simonson, ACR Conference, Salt Lake City, Utah, October 2000.

"Hedonic and Utilitarian Motivations in Consumer Choice" (Session Chair), and "The Joyless Consumer: Using Self-Control Strategies to Increase Hedonic Consumption," with Itamar Simonson, Association for Consumer Research Conference, Columbus, Ohio, October 1999.

"The Effects of Incomplete Information on Consumer Choice," with Itamar Simonson, Association for Consumer Research Conference, Columbus, Ohio, October 1999.

"Regret and Self-Congratulation From the Head and From the Heart," with Chakravarti, Agnish, Susan Chiu, and Itamar Simonson, Association for Consumer Research Conference, Montreal, Canada, October 1998.

"Intransitive Consumer Choice: The Effects of Incomplete Information," with Itamar Simonson, HEC Choice Symposium, Groupe HEC, Jouy-en-Josas (Paris), France, July 1998.

"Intransitive Consumer Choice: The Effects of Incomplete Information," with Itamar Simonson, INFORMS Israel, Tel Aviv, Israel, June 1998.

"Intransitive Consumer Choice: The Effects of Incomplete Information," with Itamar Simonson, Boulder-Colorado Behavioral Decision Theory Camp, Boulder, Colorado, October 1997.

"The Psychology of Versioning: Counterfactual Thinking as a Determinant of Fairness Perceptions and Choice," with Andrew Gershoff, ACR Conference, Toronto, Canada, October 2003.


**Selected Invited Talks:**

Vienna University of Economics and Business, June 2024

INSEAD – France, June 2024

Arison School of Business, The Interdisciplinary Center Herzliya (IDC). November 2022

Marketing Analytics Symposium – Sydney (MASS), February 2020

11th Triennial Invitational Choice Symposium, May-June 2019

4th Coller Conference on Behavioral Economics, June 2019, Tel Aviv

"Marketing Israel," Israeli-American Council.

Licensing Executives Society (LES) 2012 Winter Meeting. March 2012

American Bar Association Section of Antitrust Law. November 2010

**Selected Invited Talks:** (continued)

Tel Aviv University, Recanati Graduate School of Business Administration. August 2010

The 2009 NAD Annual Conference: What's New in Comparative Advertising, Claim Support and Self-Regulation? October 2009

New York University psychology department. March 2009

Israel Business Conference. December 2008

Stanford University, Graduate School of Business, marketing department. October 2008

Olin Business School at Washington University. May 2008

Duke University marketing department. April 2008

Yale University marketing department. April 2007

MIT marketing department. September 2006

University of Chicago marketing department. January 2006

Arison School of Business, The Interdisciplinary Center Herzliya (IDC). January 2006

Tilburg University, Faculty of Economics and Business Administration and Tias Business School, Marketing Research Camp. December 2005

Northwestern University (Kellogg), Marketing Research Camp. September 2005

Stanford University, Graduate School of Business, marketing department. May 2005

University of Pennsylvania (Wharton), Philadelphia PA. November 2004

University of Florida marketing department, Winter Research Retreat. March 2004

Marketing Modellers Group, New York. March 2004

Center for the Decision Sciences, Columbia University. April 2003

Young Scholars Program, Marketing Science Institute. March 2003

MIT marketing department. February 2003

University of Chicago marketing department. January 2003

School of Business, Rutgers University – Camden Campus. November 2002

Arison School of Business, The Interdisciplinary Center Herzliya (IDC). June 2002

Social Psychology Network, Columbia University. May 2002

Center for the Decision Sciences, Columbia University. April 2002

NYU marketing department. March 2002

**Selected Invited Talks:** (continued)

UC Berkeley marketing department. November 2001

2001 UC Berkeley Invitational Choice Symposium. June 2001

University of Texas at Austin, marketing research camp. April 2001

MIT marketing department. April 2001

Center for the Decision Sciences, Columbia University. February 2001

Northwestern University, Evanston Illinois. December 1999

Duke University, Durham NC. November 1999

University of Chicago, Chicago Illinois. November 1999

Cornell University, Ithaca NY. November 1999

Dartmouth College, Hanover, New Hampshire. November 1999

University of California, Berkeley, Berkeley CA. October 1999

Yale University, New Haven Connecticut. October 1999

University of Pennsylvania (Wharton), Philadelphia PA. October 1999

Columbia University, New York NY. October 1999

University of Southern California, Los Angeles CA. October 1999

Stanford University Psychology Department, Stanford CA. November 1998

1998 Groupe HEC Invitational Choice Symposium. July 1998

Boulder-Colorado Behavioral Decision Theory Camp, Boulder, Colorado. October 1997.


******************

---

Dr. Kivetz Rebuttal Expert Report                        149                        Case No. 1:22-CV-01229-MHC
Highly Confidential – Attorneys' Eyes Only

**External Professional Activities & Service:**

<u>Guest Editor</u>:
*Journal of Marketing Research*

<u>Guest Area/Associate Editor</u>:
*Marketing Science*
*Management Science*
*Association for Consumer Research*

<u>Editorial Boards</u>:
*Journal of Marketing Research*
*Journal of Consumer Research*
*Journal of Consumer Psychology,*
*Applied Economics Research Bulletin*
*Marketing Letters*

<u>Reviewer</u>:
*Marketing Science, Quantitative Marketing and Economics, Journal of Experimental Psychology: General, Psychological Science, Journal of Marketing, International Journal of Research in Marketing, Organizational Behavior and Human Decision Processes, Journal of Behavioral Decision Making, Journal of Service Research, Journal of Economic Psychology, Association for Consumer Research, Society for Consumer Psychology, Behavioral Decision Research in Management Conference, National Science Foundation.*

<u>Intel Science Talent Search, Advisor for</u>:

Gregg Gefen, Great Neck North High School (Semi-finalist, 2002)

Jukay Hsu, Stuyvesant High School (Semi-finalist, 2001)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Internal Professional Activities & Service:**

Service to University:

M.S. in Entrepreneurship & Innovation Working Group, 2016

Co-chair of the Provost's Faculty Advisory Committee on Entrepreneurship, 2013-2014

Faculty Fellow of the Institute for Social and Economic Research and Policy (ISERP), 2002-2015

Guest Speaker, Columbia University & Columbia Business School Chicago Alumni Clubs

Panel Discussant, "The Psychology of Money," Columbia University Annual Alumni and Development Officers Retreat, July 15, 2009

Panel Discussant, "The Psychology of Money," GSAS Conversations with Alumni, Columbia University Graduate School of Arts and Sciences, April 20, 2009

Service to Business School:

Member of the Marketing Division Senior Faculty Recruiting Committee, 2018 – 2022

Junior Faculty Research Liaison Committee, 2015 – 2019

Columbia Business School's Conflict of Interest and Conflict of Commitment Policy Review Committee, 2017

Strategy Creation Committee, 2013 – 2014

Core-Coordinator Committee, 2012 – 2014

Committee on the Structure of the Core, 2012

Faculty Committee on the Core Curriculum, 2011-2012

Committee on Enhancing the Effectiveness of the Core Curriculum, 2011

Faculty Ad-Hoc Committee on Columbia Business School Budget Guidelines, 2009

Columbia Business School Green Committee, 2009

Project Adviser for MBA and Executive MBA Independent Projects, 2002-present

MBA Admissions Committee, 2002 – 2006

Finance (Real Estate) Division Faculty Search Committee, 2003-2004

Management Division Faculty Search Committee, 2001-2002

Student Faculty Academic Affairs Committee (SFAAC), 2000-2001

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Internal Professional Activities & Service:** (continued)

Service to Marketing Division:

Chair of the Marketing Division Communications and Outreach Committee, 2019 – 2020, 2023 – 2024

Member of the Marketing Division Faculty Recruiting Committee, 2020 – 2023

Member of the Marketing Division Senior Faculty Recruiting Committee, 2018 – present

Junior Faculty Research Liaison for the Marketing Division, 2015 – 2019

Member of the Marketing Division Faculty Recruiting Committee, 2016 – 2018

Member of the Marketing Division Ph.D. Committee, 2016 – 2018

Chair of the Marketing Division Faculty Recruiting Committee, 2015

Coordinator of the Marketing Strategy Core Course, 2011 – 2014

Chair of the Marketing Division Ph.D. Committee, 2011 – 2013

Co-chair of the Marketing Division Faculty Recruiting Committee, 2010

Member of the Marketing Division Faculty Recruiting Committee, 2002 – 2008

Chair of the Marketing Division Ph.D. Committee, 2006 – 2007

Member of the Marketing Division Ph.D. Committee, 2004 – 2006

Various Sub-committees, 2007 – present

Organizer of Columbia Marketing Research Camp, 2001 and 2002


**Selected Media Reports of Dr. Kivetz's Research (research covered by hundreds of print, electronic, and broadcast media outlets):**

"Losses. Loom. Large. And That, in Short, Explains Your Loss Aversion," *Marketplace*, November 10, 2020.

"Why We're All So Worried About Having Too Little Time," *TIME*, January 30, 2020.

"Use this Simple Psychological Trick if Productivity Culture has Made it Impossible for You to Relax," *Fast Firm*, October 7, 2019.

"Five Below is a Wonderland of Things No One Needs. It's Also One of the Most Successful Retailers in America," *Washington Post*, December 20, 2018.

"New Research From Columbia Business School Sheds Light On Factors Affecting Luxury Versus Practical Purchases," *Markets Insider*, November 15, 2017.

"The Psychology Behind Spending Big," *BBC News*, October 9, 2017.

"There's Power in All Those User Reviews," *The New York Times*, December 7, 2013.

**Selected Media Reports of Dr. Kivetz's Research:** (continued)

"A Closet Filled With Regrets," *The Wall Street Journal*, April 17, 2013.

"Why We Blunder When We Buy," *Chicago Tribune*, July 22, 2011.

"The Business of Weird: Why People Pay for Bizarre Experiences," *TIME*, November 22, 2010.

"The New Abnormal," (Cover Story), *Bloomberg Businessweek*, August 2, 2010.

"Reward, Regret and Consumer Behaviour," *ABC Radio National (Australia)*, July 12, 2010.

"To Achieve Your Goals, Focus on Reasons," *U.S. News & World Report*, July 1, 2010.

"Can a Vacation Help Boost Your Portfolio?" *SmartMoney*, June 25, 2010.

"Reasons—and Ways—to Splurge This Summer," *U.S. News & World Report*, June 23, 2010.

"Field Guide To The Tightwad: Saving Spree," *Psychology Today*, January 1, 2010.

"Club Class," *The Wall Street Journal*, December 3, 2009.

"Don't Work All the Time — You'll Live to Regret It," *Wired Magazine*, July 15, 2009.

"When the Bride Says I Do – to Cash," *The Globe and Mail*, July 9, 2009.

"It Makes Them Sick to Spend – Literally," *The Globe and Mail*, June 8, 2009.

"The Gift-Card Economy," *The Atlantic*, May, 2009.

"Technology Can Save You From Yourself," *Marketplace Public Radio*, April 17, 2009.

"Regret Saving Money," *CNN*, March 26, 2009.

"Oversaving, a Burden for Our Times," *The New York Times*, March 23, 2009.

"Are You a Victim of Saver's Remorse?" *The New York Times*, March 23, 2009.

"Giving in to Temptation," *CNN*, September 20, 2008.

"Splurge Now, Feel Great Later," *ABC News*, July 2008.

"Splurging is Good for Your Health," *The Wall Street Journal*, July 2008.

"Putting a Price on Rewards," *U.S. News & World Report*, June 24, 2007.

"Incentives – Naughty But Nice," *Management Today*, April 1, 2007.

"Hyperopia," *The New York Times*—one of the "Best Ideas in 2006"—Annual Year in Ideas.

---

**Selected Media Reports of Dr. Kivetz's Research:** (continued)

"Delaying Pleasure Results in Regret," *United Press International*, June 27, 2006.

"Why Cash Incentives Fail," *SalesForceXP*, Feature Story, September Issue, 2005.

"Professors Discover Why Business Loyalty Programs Work," *Sacramento Business Journal*, 8.16.2004.

"An Economics Problem: Joyless Consumers," by Peter Martin, *THE AGE*, January, 2004, Australia.

"Consumers Work Hard for Loyalty Programs", *Newswise*, August 16, 2004.

"Studies Question Value of Mass Customization, Find Consumers Work Hard for Loyalty Programmes," *MadeForOne*, August 23, 2004.

"Consumers Prefer Loyalty Programmes that 'Fit'," *The Wise Marketer*, December 10, 2003.

"Indulgence," *Radio National*, with Geraldine Doogue, March 2, 2003, Australia.

"Betty Crocker Coupon Program Spry After More than 70 Years," by Karren Mills, *Dow Jones Interactive*, February 23, 2002.

"Once a Loyalty Craze, S&H Tries to Remake Magic in Digital Age," by Justin Pope, *The New York Times*, November, 2001.

"Earning the Right to Indulge: Guilt about Consuming Luxury Items Plays an Important Role in Consumer Preference Toward Rewards," *Stanford Business Magazine*, August 14, 2001.

"Study: Luxury Rewards Evoke Consumer Guilt," by Kimberly Hill, *CRM Daily*, August 1, 2001.  Also reported in *E-Commerce Times*, *Yahoo! News*.

"Stanford Business School Research Shows Guilt Plays a Role in What Loyalty Program Rewards Consumers Choose," *Transport News*, July 27, 2001.  Also reported in *Business Wire*, *Yahoo! Finance*, *Sharper Media*, *The Timeshare Beat*.

"Consumers Still Buy When Info Incomplete," *Marketing News*, October 9, 2000.

**Professional Affiliations:**

American Marketing Association

Association for Consumer Research

International Trademark Association

Society for Consumer Psychology

Society for Judgment & Decision Making

**<u>EXHIBIT B: LIST OF CASES IN WHICH DR. RAN KIVETZ PROVIDED SWORN TESTIMONY IN DEPOSITION AND/OR TRIAL DURING THE PAST FOUR YEARS</u>**

- *Anne De Lacour, Andrea Wright, and Loree Moran v. Colgate-Palmolive Co., and Tom's Of Maine Inc.*, Case No. 16 Civ. 08364 (RA) (AJP) (S.D. Cal.)

- *The People of the State of California v. Kohl's Department Stores, Inc. et al.*, Case No. BC643037 (Superior Court of the State of California, County of Los Angeles)

- *American Customer Satisfaction Index, LLC v. ForeSee Results, Inc.*, Case No. 2:18-cv-13319 (E.D. Michigan Southern Division); and *CFI Group USA LLC v. Verint Americas Inc.*, Case No. 2:19-cv-12602 (E.D. Michigan)

- *NIKE, Inc. v. Vans, Inc.*, Opposition No. 91253064 (U.S. Patent and Trademark Office, TTAB)

- *Willis et al. v. Colgate-Palmolive Co.*, Case No. 2:19-cv-08542-JGB (C.D. Cal.)

- *In Re: Rock 'n Play Sleeper Marketing, Sales Practices, and Products Liability Litigation*, Case No. 1:19-md-2903 (W.D.N.Y.)

- *La Fosse et al. v. Sanderson Farms, Inc.*, Case No. 19-CV-06570-RS (N.D. Cal.)

- *In Re: KIND, LLC "Healthy and All Natural Litigation"*, Case No. 1:15-md-02645-NRB (S.D.N.Y.)

- *Ripple Analytics Inc. v. People Center, Inc. d/b/a Rippling*, Case No. 2:20-cv-00894 (E.D. N.Y.)

- *Jerome's Furniture Warehouse v. Ashley Furniture Industries, Inc. et al.*, Case No. 20-cv-1765-RBM-BGS (S.D. Cal.)

- *Cat Brooks and Rasheed Shabazz v. Thomson Reuters Corporation*, Case No. 3:21-cv-01418-EMC (N.D. Cal.)

- *Elizabeth J. VanCleave and Katherine Hassan v. Abbott Laboratories*, Case No. 19CV345045 (Superior Court of the State of California, County of Santa Clara)

- *Masimo Corporation and Cercacor Laboratories, Inc. v. Apple Inc.*, Case No. 8:20-cv-00048-JVS-JDE (C.D. Cal.)

- *In Re: Folgers Coffee Marketing Litigation*, Case No. 4:21-2984-MD-C-BP (W.D. Mo.)

- *District of Columbia v. Beech-Nut Nutrition Company*, Case No. 2021 CA 001292 B (Superior Court of the District of Columbia, Civil Division)

- *Carrum Technologies, LLC v. Ford Motor Company*, Case No. 1:18-cv-01647-RGA (D. Del.)

- *Maker's Mark Distillery, PBC v. Spalding Group, Inc., et al.*, Case No. 3:19-CV-14-GNS-LLK (W.D. Ky.)

- *Delta Air Lines, Inc. v. Marriott International, Inc. et al.*, Case No. 1:20-CV-01125-ELR (N.D. Ga.)

- *Anthony Bush v. Rust-Oleum Corporation*, Case No. 3:20-CV-03268-LB (N.D. Cal.)

- *The PNC Financial Services, Inc. v. Plaid Inc.*, Case No. 2:20-cv-1977 (W.D. Pa.)

- *Illinois Tool Works Inc. v. J-B Weld Company, LLC*, Case No. 3:19-cv-01434-JAM (D. Conn.)

- *Marie Falcone v. Nestlé USA, Inc.*, Case No. 3:19-CV-00723-L-DEB (S.D. Cal.)

- *Doniece Drake and Deborah Bowling v. Bayer Healthcare LLC*, Case No. 3:22-cv-01085-MMA-JLB (S.D. Cal.)

- *Charlotte Willoughby et al. v. Abbott Laboratories*, Case No. 4:21-cv-01631-JST (N.D. Cal.)

- *Aaron Brand and John Flodin v. Central Garden & Pet Company, Breeder's Choice Pet Foods, Inc., and Does 1 – 50*, Case No. 4:21-cv-01631-JST (N.D. Ill.)

- *Alpenspruce Education Solutions Inc. v. Cascade Parent Limited and Parallels Inc.*, Case No. 2:23-cv-0092-MJP (W.D. Wash.)

- *Federal Trade Commission v. Amazon.com, Inc., et al.*, Case No. 2:23-cv-0932-JHC (W.D. Wash.)

- *David Swartz v. Dave's Killer Bread, Inc. and Flowers Foods, Inc.*, Case No. 4:21-cv-10053-YGR (N.D. Cal.)

- *Mikhail Gershzon, Kristin Della, and Jill Lienhard v. Colgate-Palmolive Company*, Case No. 3:23-cv-04086-JCS (N.D. Cal.)

- *Minnesota Teamsters Service Bureau v. GoodRx, Inc.*, Case No. 27-cv-24-9554 (Minn. Dist. Ct. 4th Dist.)

- *Joanne Noriega v. Abbott Laboratories*, Case No. 23-CV-0414 (PAE) (S.D. N.Y.)

---

## EXHIBIT C: DOCUMENTS MADE AVAILABLE TO DR. KIVETZ IN CONNECTION WITH PREPARATION OF THIS *REBUTTAL EXPERT REPORT*

In addition to academic research and articles, publicly-available websites, and other materials specifically referred to in the enclosed *Rebuttal Expert Report*, I received documents produced in this action, and other documents, including without limitation the following:

**Filed Documents**

- September 19, 2025 Order Amending the Scheduling Order and Extending Case Deadlines
- August 19, 2025 Bolt Electric's Supplemental Responses and Objections to Siemens' First Set of Interrogatories to Electrician Plaintiffs
- May 27, 2025 Siemens Industry, Inc.'s Answer to Plaintiffs' Second Amended Consolidated Class Action Complaint
- May 12, 2025 Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' Fourth Set of Interrogatories
- May 12, 2025 Second Amended Consolidated Class Action Complaint
- April 7, 2025 Plaintiff Zank Electric LLC's Supplemental Responses and Objections to Siemens' First Set of Interrogatories to New Commercial Plaintiffs
- December 13, 2024 Electricalifornia's Supplemental Responses and Objections to Siemens' First Set of Interrogatories to Electrician Plaintiffs
- November 22, 2024 Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' Second Set of Interrogatories
- June 19, 2024 Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories
- December 22, 2023 Kevin Brnich Electric LLC's Responses and Objections to Siemens' First Set of Interrogatories to Electrician Plaintiffs

**Expert Reports**

- October 31, 2025 Class Certification Expert Report of Kevin W. Caves, Ph.D. (with appendices and backup materials)
  - NewtonX Transcript - #1 - #15 (Cognitive Interview Transcripts)
- October 31, 2025 "25-CMLGA-23093 Siemens AFCI" (Expert Report of Robert A. Durham, PhD, FIEE, PE) (with appendices)

**Deposition Transcripts**

- August 6, 2025 Deposition Transcript of the 30(b)(6) Deposition of Matthew Leidy (with exhibits)
- July 25, 2025 Deposition Transcript of the 30(b)(6) Deposition of Ashley Kees (with exhibits)

- June 5, 2025 Deposition Transcript of the Deposition of Hugh Kinsel (with exhibits)
- May 20, 2025 Deposition Transcript of the Deposition of David Hewitt (with exhibits)
- May 8, 2025 Deposition Transcript of the Deposition of Richard (Rick) Keyser (with exhibits)
- April 30, 2025 Deposition Transcript of the Deposition of Tim Curtis (with exhibits)
- April 24, 2025 Deposition Transcript of the Deposition of Juergen Duemmler (with exhibits)
- April 24, 2025 Deposition Transcript of the Deposition of Trevor Zank (Zank Electric) (with exhibits)
- April 23, 2025 Deposition Transcript of the Deposition of Chenario Abrams (with exhibits)
- March 4, 2025 Deposition Transcript of the Deposition of Kevin Brnich (Kevin Brnich Electrical) (with exhibits)
- February 26, 2025 Deposition Transcript of the Deposition of Jeffrey Meade (Bolt Electric) (with exhibits)
- January 23, 2025 Deposition Transcript of the Deposition of Andrew Montoya (Electricalifornia) (with exhibits)

**Bates-Stamped and Other Documents**

- NEMA_S-0004202-04
- NEMA_S-0013136-37
- NEMA_S-0015646
- NEMA_S-0019790
- NEMA_S-0019792
- NEMA_S-0019795
- NEMA_S-0024317-25
- NEMA_S-0027296-300
- NEMA_S-0062898-99
- NEMA_S-0067791-804
- NEMA_S-0075998-6053
- SIEMENS_AFCI_00000289
- SIEMENS_AFCI_00000426-7
- SIEMENS_AFCI_00002743
- SIEMENS_AFCI_00002842
- SIEMENS_AFCI_00002899
- SIEMENS_AFCI_00004504-12
- SIEMENS_AFCI_00013306
- SIEMENS_AFCI_00016127
- SIEMENS_AFCI_00019107
- SIEMENS_AFCI_00020000
- SIEMENS_AFCI_00020002
- SIEMENS_AFCI_00020560
- SIEMENS_AFCI_00023696
- SIEMENS_AFCI_00039664-67
- SIEMENS_AFCI_00039995
- SIEMENS_AFCI_00040540
- SIEMENS_AFCI_00047011
- SIEMENS_AFCI_00047353
- SIEMENS_AFCI_00048769
- SIEMENS_AFCI_00048899
- SIEMENS_AFCI_00051634
- SIEMENS_AFCI_00051648
- SIEMENS_AFCI_00053986
- SIEMENS_AFCI_00054821
- SIEMENS_AFCI_00054862
- SIEMENS_AFCI_00054887
- SIEMENS_AFCI_00079578
- SIEMENS_AFCI_00080311
- SIEMENS_AFCI_00090070
- SIEMENS_AFCI_00098400
- SIEMENS_AFCI_00101877
- SIEMENS_AFCI_00104874
- SIEMENS_AFCI_00108430

- SIEMENS_AFCI_00113650
- SIEMENS_AFCI_00115093
- SIEMENS_AFCI_00122997
- SIEMENS_AFCI_00133866
- SIEMENS_AFCI_00135508-11
- SIEMENS_AFCI_00175611-27
- SIEMENS_AFCI_00197030
- SIEMENS_AFCI_00199690
- SIEMENS_AFCI_00217892
- SIEMENS_AFCI_00222368
- SIEMENS_AFCI_00226247
- SIEMENS_AFCI_00230045
- SIEMENS_AFCI_00230231
- SIEMENS_AFCI_00232362 (with native file)
- SIEMENS_AFCI_00257830
- SIEMENS_AFCI_00260454-59
- SIEMENS_AFCI_00270694
- SIEMENS_AFCI_00278207
- SIEMENS_AFCI_00362079
- SIEMENS_AFCI_00362080
- SIEMENS_AFCI_00362600
- SIEMENS_AFCI_00362724
- SIEMENS_AFCI_00416123
- SIEMENS_AFCI_00416124
- SIEMENS_AFCI_00416452
- SIEMENS_AFCI_00455705
- SIEMENS_AFCI_00455706
- SIEMENS-AFCI_00417573