# EXHIBIT 16

## (Redacted)

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| KEVIN BRNICH ELECTRIC LLC, BOLT ELECTRIC LLC, ELECTRICALIFORNIA, ZANK ELECTRIC, CHARLES VODICKA, PATRICK CATES, BRYAN BUTAKIS, RICK KEYSER, TYLER BARRETTE, CLIFFORD OAKLEY, and JASON WYLIE, *individually and on behalf of all others similarly situated*, <br><br> Plaintiffs, <br><br> v. <br><br> SIEMENS INDUSTRY, INC., <br><br> Defendant. | Case No. 1:22-cv-01229-MHC |

**<u>REBUTTAL EXPERT REPORT OF KEITH R. UGONE, PH.D.</u>**

**December 19, 2025**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

# REBUTTAL EXPERT REPORT OF KEITH R. UGONE, PH.D.

## TABLE OF CONTENTS

### December 19, 2025

I.  OVERVIEW OF ASSIGNMENT ........................................................................ 1

II. SUMMARY OF OPINIONS ............................................................................ 4

  A.  Determining Whether And To What Extent A Putative Class Member Was Injured Because Of The Alleged Defect Requires Individual Inquiry ..................................... 4

  B.  Dr. Caves' Conjoint Survey / Market Simulation Analysis Is Flawed and Unreliable 7

  C.  Outline Of Remainder Of Report ................................................................ 12

III. QUALIFICATIONS AND EXPERIENCE ........................................................ 12

IV. FACTS, DATA, AND INFORMATION CONSIDERED ..................................... 15

V.  OVERVIEW OF PARTIES AND PROPOSED CLASSES .................................. 17

  A.  Named Plaintiffs ...................................................................................... 17

  B.  Siemens Industry, Inc. ............................................................................. 19

VI. OVERVIEW OF AFCIS AND THE CHALLENGED PRODUCTS ..................... 20

  A.  General Overview Of AFCIs ...................................................................... 20

    1.  Purpose Of AFCIs ............................................................................... 21

    2.  Competing AFCI Breakers And Models ................................................. 22

    3.  Regulatory Requirements .................................................................... 24

    4.  Tripping Due To Potentially Dangerous Electrical Arcing ...................... 25

    5.  Concept Of Nuisance Tripping ............................................................ 26

    6.  Trade-Offs Between AFCI Sensitivity And Increased Ability To Detect Dangerous Electrical Conditions ........................................................... 28

  B.  Challenged Products ................................................................................ 30

    1.  Summary Of Challenged CAFCIs and AFCI/GFCIs ................................ 30

    2.  Generations Of Siemens' Challenged Products ..................................... 33

    3.  Supply Chain For Siemens' Challenged Products .................................. 35

    4.  Warranty For Siemens' Challenged Products ........................................ 36

VII. OVERVIEW OF PLAINTIFFS' ALLEGATIONS AND PUTATIVE CLASS DEFINITION ................................................................................................ 38

  A.  Plaintiffs' Allegations .............................................................................. 38

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

B. Putative Class Definition ........................................................................................ 41

    1. Putative Class As Described In Amended Complaint .................................... 41

    2. Putative Class As Described In Caves Report ............................................... 42

VIII. SUMMARY OF NAMED PLAINTIFFS' CLAIMS OF HARM AS PRESENTED IN AMENDED COMPLAINT ...................................................................................... 44

A. Commercial Plaintiffs' Claims Of Harm .................................................................. 44

B. Consumer Plaintiffs' Claims Of Harm ..................................................................... 46

IX. SUMMARY OF PLAINTIFFS' EXPERTS' REPORTS ............................................. 47

A. Caves Report ............................................................................................................. 47

    1. CBC Survey .................................................................................................. 49

    2. Conjoint Analysis .......................................................................................... 53

    3. Market Simulation ......................................................................................... 53

    4. Asserted Damages Estimates ........................................................................ 56

B. Durham Report .......................................................................................................... 57

X. DR. CAVES' DAMAGES ANALYSIS DOES NOT ADDRESS CERTAIN CLAIMED DAMAGES THEORIES PRESENTED IN THE AMENDED COMPLAINT ........... 58

XI. DETERMINING WHETHER AND TO WHAT EXTENT A PUTATIVE CLASS MEMBER WAS INJURED BECAUSE OF THE ALLEGED DEFECT REQUIRES INDIVIDUAL INQUIRY ........................................................................................... 64

A. Individual Inquiry Is Required To Determine Putative Class Members' Reasons For Purchasing The Challenged Products ..................................................................... 65

B. Individual Inquiry Is Required To Determine Putative Class Members' Knowledge And Perceptions Relating To The Alleged Defect ..................................................... 71

    1. General Information Regarding Nuisance Tripping ....................................... 71

    2. Siemens Communications Regarding Tripping Prevention And Troubleshooting ............................................................................................. 76

C. Individual Inquiry Is Required To Determine The Challenged Products Purchased By Putative Class Members ........................................................................................... 80

D. Individual Inquiry Is Required To Determine The Price(s) Each Putative Class Member Paid For The Challenged Products ............................................................... 80

E. Individual Inquiry Is Required To Determine The Claimed Damages Allegedly Suffered By Individual Putative Class Members Given The Lack Of Class-wide Evidence ..................................................................................................................... 87

    1. Form Of Claimed Injury And Documentation Issues ................................... 88

    2. Existence, Frequency, And Reasons For Tripping ........................................ 91

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

F.    Summary Of Conclusions..................................................................................... 95

XII. EVALUATION OF NAMED PLAINTIFFS' CLAIMED DAMAGES AS PRESENTED IN THE CAVES REPORT ........................................................................ 95

A.    The Caves Report Fails To Evaluate the Individual Inquiry Issues Associated with Assessing Plaintiffs' Claimed Economic Injury and Damages ................................. 95

1.    Failure To Address Individual Inquiry Issues: Consumer Class...................... 95

2.    Failure To Address Individual Inquiry Issues: Commercial Class ............... 100

3.    Failure To Address Individual Inquiry Issues: Omission Of Key Attributes (Drivers Of Demand) ...................................................................... 101

4.    Conclusion With Respect To Individual Inquiry Issues ............................... 102

B.    The Caves Report Does Not Differentiate Between Nuisance Tripping Common To All AFCIs And Nuisance Tripping Allegedly Specific To Siemens' Arc Detection Method .................................................................................................... 102

C.    The Caves Report Does Not Derive A New Claimed Market Equilibrium Price Incorporating The Alleged Defect ............................................................... 106

D.    The Caves Report Does Not Account For Nuisance Tripping Information Available In The Market.................................................................................................. 109

E.    The Caves Report Fails To Differentiate Between A "Defect Rate" And A "Manifestation Rate" ....................................................................................... 111

F.    The Caves Report Omits Incorporating The Primary Benefit Associated With The Challenged Products. ........................................................................................ 115

G.    The Caves Report Inappropriately Uses A Single, Constant, Claimed Price Premium Percentage Applied To All Purchases Of The Challenged Products...................... 119

1.    Differences In Prices........................................................................... 119

2.    Differences In Technical Specifications ................................................ 120

3.    Differences Over Time......................................................................... 121

4.    Differences Implied by Dr. Caves' Own CBC Analysis.............................. 121

H.    The Caves Report Fails To Account For The Potentiality Of Double-Counting Claimed Damages.............................................................................................. 122

I.    The Caves Report Makes Unsupported And Incorrect Assumptions About AFCI Prices In The Market ....................................................................................... 124

J.    The Caves Report Does Not Use Real World Market Share Statistics .................. 127

K.    The Caves Report Claims, But Does Not Reliably Show, That A Price Decrease Of 32 Percent Is Sustainable For Siemens.................................................................. 132

L.    The Caves Report Contains Irreconcilable Economic Inconsistencies And Omissions .................................................................................................................. 134

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

1.    Irreconcilable Economic Inconsistency Between The Consumer Class And The CBC Survey Respondents ................................................................... 134

2.    Important Demand Drivers—Convenience And Availability—Are Omitted From Dr. Caves' Model .................................................................. 139

M.    The Approach And Stages Utilized By Dr. Caves To Determine His Claimed Price Premium Do Not Make Economic Sense ........................................ 141

1.    Simulated Market Shares From Conjoint Survey: No Disclosure Statement  141

2.    Intermediate Observation: Total Market Size ............................................. 144

3.    Simulated Market Shares From Conjoint Survey: With Disclosure Statement ................................................................................................... 144

4.    Intermediate Observation: Firms Maximize Profits ..................................... 146

5.    Simulated Market Shares: Equalizing Siemens' Market Share With And Without The Disclosure Statement .......................................................... 147

6.    Supply Side Adjustment ............................................................................. 149

7.    Dr. Caves Has Not Demonstrated That His Claimed Price Reduction Is Sustainable ................................................................................................ 151

XIII.  THE CLAIMED SENSITIVITY ANALYSES PRESENTED IN THE CAVES REPORT DO NOT VALIDATE THE CONJOINT SURVEY / MARKET SIMULATION RESULTS PRESENTED IN THE CAVES REPORT ..................... 153

XIV.  SUMMARY OF CONCLUSIONS ............................................................... 155

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

# REBUTTAL EXPERT REPORT OF KEITH R. UGONE, PH.D.

## December 19, 2025

## I.    OVERVIEW OF ASSIGNMENT

1.    I am an economist and have been retained on behalf of Siemens Industry, Inc. ("Siemens" or "Defendant") to provide my opinions regarding various economic and class certification damages-related issues relevant to the matter of *Kevin Brnich Electric LLC, et al. v Siemens Industry, Inc.* captioned above.  I understand Plaintiffs (or "Named Plaintiffs") are those Plaintiffs whose claims have been consolidated in the matter *Kevin Brnich Electric LLC, et al. v. Siemens Industry, Inc.*, Case No. 1:22-cv-01229-MHC.[1]  Plaintiffs allege that certain Arc Fault Circuit Interrupters ("AFCIs") sold to them by Siemens (the "Challenged Products," defined below) suffer from "nuisance tripping" and therefore are claimed to be defective.[2]

2.    Generally, it is my understanding that Plaintiffs assert that the Challenged Products sold to them by Siemens "fail to adequately distinguish between harmless and dangerous electrical arcs" and, as a result, "suffer from nuisance tripping, where the breakers frequently and unnecessarily trip even where no dangerous electrical arc is present and there is no risk of electrical harm" (the "Alleged Defect" or "Nuisance Tripping Defect").[3]  Throughout my

---

[1] Second Amended Consolidated Class Action Complaint, *Kevin Brnich Electric LLC, et al., v. Siemens Industry, Inc.*, Case No. 1:22-cv-01229-MHC, United States District Court for the Northern District of Georgia, filed May 12, 2025 ("Amended Complaint"), at p. 1.  Commercial Named Plaintiffs are the following companies: Kevin Brnich Electric LLC; Bolt Electric LLC; Electricalifornia; and Zank Electric.  Consumer Named Plaintiffs are the following individuals: Charles Vodicka; Patrick Cates; Bryan Butakis; Rick Keyser; Tyler Barrette; Clifford Oakley; and Jason Wylie.

[2] Amended Complaint, at ¶ 5.

[3] Amended Complaint, at ¶ 5. *See also* Class Certification Expert Report of Kevin W. Caves, Ph.D., dated October 31, 2025 ("Caves Report") at ¶ 4: "Throughout this report, I [Dr. Caves] will refer to the defect in Siemens AFCIs

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

report I use Named Plaintiffs' "Alleged Defect" nomenclature for ease of exposition and

to reduce the potential for confusion over terms.

3.      I understand that Plaintiffs primarily seek certification of two putative Classes consisting

of:

   a.  a "Consumer Class" comprised of any person in the United States who purchased a
       Siemens AFCI breaker, except for resale;[4] and

   b.  a "Commercial Class" comprised of any business in the United States that installed and
       investigated, resolved, or attempted to resolve tripping presented by a Siemens AFCI
       breaker.[5]

Plaintiffs also assert numerous state subclasses that include individual consumers and

business entities (as identified later in my report).

4.      Named Plaintiffs allege that Consumer Class members have suffered various forms of harm

and damages because of the Alleged Defect, including (a) downtime experienced as a result

of nuisance tripping preventing circuits controlled by the breaker from operating and (b)

replacement costs.[6]  Named Plaintiffs allege that Commercial Class members suffered

various forms of damages because of the Alleged Defect, including (i) replacement costs

and (ii) uncompensated time spent investigating the cause of nuisance tripping by

electricians.[7]  (The above list is expanded upon later in my report.[8])

---

challenged by Plaintiffs and described above as the "Alleged Defect", or the "Nuisance Tripping Defect.""  (Bracketed
text added for clarification.)

[4] Amended Complaint, at ¶ 174.

[5] Amended Complaint, at ¶ 174.

[6] Amended Complaint, at ¶¶ 6-8.

[7] Amended Complaint, at ¶¶ 8-9.

[8] For an overview of the various forms of claimed harm and damages being asserted by Named Plaintiffs, *see* Amended
Complaint, at ¶¶ 6–10.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

5.  On October 31, 2025, Dr. Kevin W. Caves submitted an expert declaration (the "Caves Report") in this case.[9]  In his report, Dr. Caves proposes and carries out a Choice-Based Conjoint ("CBC") analysis of claimed economic injury and aggregate damages flowing from alleged discrepancies between (a) how Siemens marketed the Challenged Products in the actual world and (b) how the Challenged Products would have been marketed wherein the Alleged Defect was disclosed at the point of purchase.[10]  Dr. Caves estimates claimed price premium damages from Siemens' alleged failure to provide a Nuisance Tripping Disclosure (discussed later in my report) with the Challenged Products.[11]

6.  I have been asked by counsel for Defendant to independently evaluate from an economic and damages perspective the following topics:

a.  Whether standard economic analysis can be used to quantify reliably on a Class-wide basis (using common proof) the claimed economic injury and economic damages being asserted in this matter; and

b.  Whether Dr. Caves' CBC approach can be used to quantify reliably on a Class-wide basis (using common proof) the price premium Named Plaintiffs assert was paid by the Consumer Class on the Challenged Products due to the Alleged Defect, if any exists.

7.  I note that Dr. Caves did not propose a methodology for evaluating, or conduct any analyses quantifying, any non-price premium form of economic damages alleged to be suffered by the Consumer Class.  Dr. Caves also did not propose a methodology for evaluating, or conduct any analyses quantifying, any damages claimed to be suffered by the Commercial

---

[9] *See* Caves Report.

[10] Caves Report, at ¶¶ 1, 9.

[11] *See* Caves Report, at ¶ 10: "The magnitude of the overpayment ("Price Premium") is conservatively estimated at 32 percent."  *See also* Caves Report, Appendix D, at ¶ 8: "My [Dr. Caves'] final estimate of the Price Premium is 32 percent." (Bracketed text added for clarification.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

Class.  This includes any alleged price premium damages that may have been suffered by the Commercial Class.[12]

8.    I do not offer any liability-related opinions, opinions about the materiality of the Alleged Defect, or survey design opinions that are unrelated to economic or damages quantification concepts.

## II.    SUMMARY OF OPINIONS[13]

9.    Based upon (a) my economics and damages quantification training and experience, (b) documentary evidence, (c) deposition testimony, (d) my review of the Caves Report and Durham Report, (e) an interview of Siemens' employees, (f) legal filings in this matter, and (g) independently obtained publicly available documents, *inter alia*, I have reached the following conclusions with respect to the assignments I was asked to undertake:

   a. Determining whether and to what extent a putative Class member was injured because of the Alleged Defect requires individual inquiry and is not amenable to a common proof approach; and

   b. Dr. Caves' conjoint survey / market simulation analysis is flawed and unreliable from an economic and damages quantification perspective and does not provide a valid common proof approach to evaluating claimed Class-wide injury and damages suffered by the Consumer Class.

### A.    Determining Whether And To What Extent A Putative Class Member Was Injured Because Of The Alleged Defect Requires Individual Inquiry

10.    Based on the facts and circumstances of this case, determining whether an individual putative Class member was injured because of the Alleged Defect—and if so, the extent of

---

[12] *See* Caves Report, at ¶ 5, Footnote 5: "I [Dr. Caves] have not been asked to opine on the Commercial Class." (Bracketed text added for clarification.)

[13] This Summary of Opinions is intended to be an overview.  A full description of my opinions is contained throughout my report (i.e., narrative and associated exhibits).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

that injury—requires a highly individualized inquiry into factors and considerations that vary across putative Class members. In this matter, common evidence and a common proof approach cannot be used to evaluate whether individual putative Class members were injured and the quantum of that injury and damages. Individual inquiry and analysis are needed to determine, among other things:

a. why any given putative Class member purchased a Challenged Product and whether the alleged failure to disclose the Alleged Defect had anything to do with that decision (e.g., did a putative Class member buy the Challenged Product because of its ability to mitigate the risk of a dangerous arc fault and place less importance on nuisance tripping);

b. what any given putative Class member knew and perceived relating to the Alleged Defect when they purchased the Challenged Products (e.g., did they know or consider the trade-off between how often an AFCI nuisance trips and its ability to detect dangerous arcs);

c. what Challenged Products were purchased by putative Class members, given that the putative Class members have a variety of choices and that the Challenged Products consist of many AFCIs with different technical specifications (which means that there are different demands for the different Challenged Products and potentially different values placed upon product attributes);

d. what price(s) each putative Class member paid for the Challenged Products, given that actual prices paid by each consumer vary considerably according to several factors including: negotiations between manufacturers, distributors, contractors, retailers, and end users; price differences over time and in different geographic locations; differences in models with different technical specifications; and whether the purchase was made in combination with a price sale or other promotion; among other things; and

e. the claimed damages allegedly suffered by individual putative Class members given the lack of Class-wide evidence. Plaintiff depositions demonstrate that these concerns are not hypothetical. For example, certain putative Commercial and Consumer Class members:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

     i.   did not retain receipts for and could not recall the price(s) they paid for the purchase, installation, replacement, or investigation of the Challenged Products;[14]

     ii.   could not recall exactly how many of the Challenged Products they had purchased, installed, used, or replaced;[15] and/or

     iii.  could not recall the exact timing of their purchase(s) of the Challenged Products, including the circumstances leading up to the purchase and the period of time over which the purchase took place.[16]

11.    From an economic and damages quantification perspective, it is critical to examine the circumstances surrounding each putative Class member's purchase of the Challenged Products to evaluate whether there is an economic nexus between the Alleged Defect and the claimed harm. A viable damages model must (a) be able to distinguish between someone who was or was not injured by any alleged failure to disclose the Alleged Defect and it must (b) be able to reliably quantify damages for those that were injured by the

---

[14] *See, e.g.,* Deposition of Andrew Montoya, January 23, 2025 ("Montoya Deposition"), at pp. 147-148 (does not keep tangible receipts of AFCI purchases). *See also* Deposition of Patrick Cates, January 21, 2025 ("Cates Deposition"), at pp. 73-74, 139 (does not have records or receipts of bills for purchases and replacements of Challenged Products), Deposition of Bryan Butakis, March 5, 2025 ("Butakis Deposition"), at pp. 146-147 ("Q: You've never seen an invoice or a receipt for [] replacement breakers? A: I have not."); Deposition of Jeffrey Meade, February 26, 2025 ("Meade Deposition"), at pp. 78-79 (does not have receipts for Siemens AFCI purchases); Deposition of Tyler Barrette, May 5, 2025 ("Barrette Deposition"), at pp. 128-129, 133 (confirmed that Plaintiff paid in cash and does not recall the exact dollar amount paid).

[15] *See, e.g.,* Deposition of Kevin Brnich, March 4, 2025 ("Brnich Deposition"), at p. 124 (cannot recall how many times Plaintiff has installed AFCIs). *See also* Deposition of Trevor Zank, April 24, 2025 ("Zank Deposition"), at pp. 248-249; Butakis Deposition, at pp. 82-83 (explaining that Plaintiff is unsure of the "exact count" of the number of Challenged Products in his home); Montoya Deposition, at p. 148 (testifying that Plaintiff does not keep track of its purchases of the Challenged Product); Meade Deposition, at p. 78 (does not keep track of when Plaintiff purchased the Challenged Product "year after year"); Plaintiff Jason Wylie's Responses and Objections to Siemens' First Set of Interrogatories to New Homeowner Plaintiffs, dated December 13, 2024, at p. 3 ("[T]he Siemens AFCIs installed in Plaintiff's home were purchased by the homebuilder who first built Plaintiff's home or were otherwise purchased on the homebuilder's behalf. Plaintiff has no information on where the homebuilder purchased the Siemens' AFCIs.").

[16] *See, e.g.,* Montoya Deposition, at p. 164. *See also* Butakis Deposition, at p. 119; Barrette Deposition, at pp. 170-171 ("Q. And you personally had no involvement in the selection of the Siemens AFCI that was installed in your home? A. Correct. Q. No builder or agent made any representation that the value of your home increased because of the Siemens AFCI, correct? A. Correct."); Plaintiff Charles Vodicka's Supplemental Responses and Objections to Siemens' First Set of Interrogatories to Homeowner Plaintiffs, dated December 13, 2024, at p. 12 ("An electrician replaced Plaintiff's Siemens AFCIs. Plaintiff has no knowledge of the exact date or where the Replacement AFCIs were purchased.").

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

Alleged Defect. Failure to acknowledge and examine the individualized considerations summarized here and enumerated throughout my report would sever the economic nexus tying the claimed harm to the Alleged Defect. A valid common proof approach would take these considerations into account and would calculate damages for putative Class members based on whether or not they suffered harm due to the alleged nondisclosure of the Alleged Defect.

**B. <u>Dr. Caves' Conjoint Survey / Market Simulation Analysis Is Flawed and Unreliable</u>**

12. From an economic and damages quantification perspective, Dr. Caves' conjoint survey / market simulation analysis is flawed and unreliable. Dr. Caves' conjoint survey / market simulation analysis does not provide a valid common proof approach to evaluating claimed Class-wide injury and damages suffered by the Consumer Class for at least the following reasons.

   a. The Caves Report fails to evaluate the individual inquiry issues associated with assessing putative Class members' claimed economic injury and damages.[17]

   b. The Caves Report fails to take into account evidence that all AFCIs, regardless of manufacturer, may nuisance trip. Dr. Caves' claimed price premium measures a world that does not exist. Within Dr. Caves' framework, he measures a price premium between an AFCI that nuisance trips and an AFCI that does not. He does not, however, measure a price premium between an AFCI with "high rates of nuisance tripping" and an AFCI exhibiting average or typical rates of nuisance tripping. In other words, Dr. Caves' conjoint survey / market simulation measures the wrong claimed price premium.[18]

---

[17] Despite the individual inquiry issues noted throughout my report, neither Named Plaintiffs nor Dr. Caves have proposed any method (or methods) to identify individual Class members within the putative Classes (or for overcoming or addressing the significant challenges associated with identifying all individual members within the putative Classes).

[18] *See, e.g.,* Amended Complaint, at ¶ 199: "As described herein, the Siemens' AFCI breakers sold to Plaintiffs and members of the Class *were not of average quality*, were not fit for their ordinary purpose, *were not within the variations of quality permitted*, and did not conform to Siemens' representations." (*Italics* added.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

c.  The Caves Report does not allow Siemens' competitors to adjust their prices after introducing the Nuisance Tripping Disclosure and thus does not derive any new claimed market equilibrium price incorporating the Nuisance Tripping Disclosure.  By not allowing Siemens' competitors to adjust prices in the marketplace, Dr. Caves uses a method of computing a price premium that does not conform to standard models of determining market prices (and changes in market prices) in a competitive environment.  Consistent with this observation, his method also does not allow Siemens to adjust its dual-function AFCI/GFCI price, which might have offset some of its losses even had the Alleged Defect been disclosed.  Dr. Caves' claimed Price Premium estimates thus misrepresent any potential actual damages.

d.  The Caves Report does not account for nuisance tripping information already available in the market during the Class Period and the fact that the nuisance tripping attribute already was embedded in the prices of AFCIs.

e.  The Caves Report fails to distinguish between a "defect rate" (*whether* a defect is present) and a "manifestation rate" (*how often* the defect manifests, when it is present).  For example, a world of 100 purchasers, 5 of whom buy an AFCI that trips every day, is very different from a world of 100 purchasers, *all* of whom experience nuisance tripping but at a rate of only *once a year*.  This is important because the value received by the purchaser depends on this type of metric.  Yet, Dr. Caves' analysis is completely silent on the manifestation rate.  Without a valid measure of the value received, Dr. Caves lacks the required basis for computing any price premium.  His approach fails to recognize that, from an economic perspective, a very different claimed Price Premium would result when the manifestation rate is low compared to when the manifestation rate is high.

f.  The Caves Report fails to account for the primary benefit associated with the Challenged Products.  Consumer purchases often involve trade-offs (costs *and* benefits). A reliable market analysis or simulation must account for both.  Dr. Caves attempts to measure the price impact of a Nuisance Tripping Disclosure (lessening the product's attractiveness), but he does not balance the Nuisance Tripping Disclosure attribute with the trade-off that an AFCI more prone to nuisance tripping may also be more likely to detect true dangerous arcs and prevent electrical fires – and thus would be *safer for the homeowner*.  Many consumers likely are willing to accept marginally higher levels of nuisance tripping (more false positives) if they also gain the security of a product that will not miss conditions that may lead to dangerous fires (fewer false negatives).  This would illustrate a basic economic phenomenon.  Dr. Caves commits a fundamental economic error by omitting an important determinant of demand for AFCIs that would directly offset the disutility consumers experience because of nuisance tripping.  As a result, his claimed Nuisance Tripping Disclosure and associated Price Premium estimate fails to represent how consumers actually value AFCIs in a real-world marketplace.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

g.   The Caves Report inappropriately applies a single, constant, claimed Price Premium percentage to all purchases of the Challenged Products regardless of the time period, model purchased, technical specifications, location, retailer or wholesaler distribution outlet, or net price paid (which can vary extensively due to price negotiations over bulk purchases, as well as discounts, promotions, rewards memberships, or special events like Black Friday sales).  Using a single, constant price premium percentage is an inappropriate "one size fits all" approach that does not reflect the economics of the real-world AFCI supply chain.  This is a problem for the Caves Report.  To calculate the actual price premiums (if any) paid by consumers, the Caves Report would have to address the numerous individualized issues outlined throughout my report and thereby negate a common proof approach.

h.   The Caves Report fails to address the possibility of double-counting claimed damages if the Price Premium damages for the Consumer Class are combined with claimed price premium damages for the Commercial Class. [19]  The Caves Report applies the Consumer Class Price Premium to Siemens' revenue data to estimate Consumer Class Aggregate Damages, but that data is based on sales to members of the *Commercial Class* (wholesalers, electrical supply stores, or box stores, who in turn sell to the Consumer Class).  From a damages perspective, this leads to double-counting problems, because a member of each Class cannot claim the same damages on the same unit.  Furthermore, to the extent that the Commercial Class purchased AFCIs that were not then resold to members of the Consumer Class, the Caves Report likely has overestimated total damages (if any) to the Consumer Class.

i.   The Caves Report utilizes unsupported and incorrect assumptions about AFCI prices in the market.  Consequently, the analyses presented in the Caves Report do not simulate the purchase environment facing putative Class members.

j.   The Caves Report relies on market share statistics improperly derived from Dr. Caves' flawed survey rather than from real-world market shares that represent comparative product performance in the AFCI market.

k.   The Caves Report claims that Siemens can sustain a 32 percent price decrease in the Challenged Products over a multi-year period.  That assertion is wrong for several reasons, including but not limited to: (i) Siemens' profitability data does not support this conclusion and (ii) the conclusion does not take into account the potential opportunity costs Siemens would face with such a pricing reduction (i.e., at the lower profitability level, would Siemens' resources be better used elsewhere).

---

[19] *See* Amended Complaint, at ¶ 9: "The Commercial Plaintiffs have suffered substantial harm from Siemens' defective AFCI breakers."  I understand that Dr. Caves offers no opinion on the Commercial Class.  *See* Caves Report, at ¶ 5, Footnote 5: "I [Dr. Caves] have not been asked to opine on the Commercial Class." (Bracketed text added for clarification.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

    l.   The conjoint analysis contained in the Caves Report suffers from key irreconcilable economic inconsistencies and omissions.

        i.   While Dr. Caves claims his survey yields a Price Premium paid by putative Consumer Class members, his survey targets *electrician* respondents (who fall into the Commercial Class whenever they purchase AFCIs for resale). These electrician respondents are instructed to act in a way that would not mirror the purchasing behavior of putative Consumer Class members but would mirror the purchasing behavior of putative Commercial Class members. Dr. Caves instructed them to act during the survey as though they were in the market to purchase AFCIs for a typical project(s) or for general inventory. It is highly unlikely that a putative Consumer Class member (i.e., a homeowner with no special electrical knowledge) would be purchasing AFCIs for general inventory purposes (and no evidence has been presented that this would be the case).

        ii.   Dr. Caves omits important product attributes (i.e., demand drivers) that are explicitly referenced by Named Plaintiffs as having influenced their decision to purchase these products.

    m.   The approach and stages utilized by Dr. Caves to determine his claimed Price Premium do not make economic sense. Dr. Caves claims to treat Siemens as profit-maximizing in obtaining his claimed Price Premium estimate, but Siemens is demonstrably not maximizing profit in Dr. Caves' "supply-side analysis" given his conjoint survey results.

    n.   There is a disconnect between the analyses presented in the Caves Report and the damages theories presented in the Amended Complaint.

        i.   Neither Dr. Caves nor the Named Plaintiffs have provided any analyses establishing that the <u>non-price premium damages</u> claimed by the putative <u>Consumer Class</u> can be reliably evaluated using common proof or that <u>any</u> of the damages that may be claimed by the putative <u>Commercial Class</u> can be reliably evaluated using common proof.

        ii.   Neither Dr. Caves nor the Named Plaintiffs have provided any analyses <u>quantifying</u> the non-price premium damages claimed by the putative <u>Consumer Class</u> or <u>quantifying</u> any of the damages that may be claimed by the putative <u>Commercial Class</u>.

    o.   The claimed alternative simulations and sensitivity analyses presented in the Caves Report (Appendix D) are very limited and do not confirm that the calculated Price Premium is "robust" or "fluctuates in a narrow range" as claimed by Dr. Caves.[20] From an economic perspective, in the claimed determination of alternative Price Premiums,

---

[20] Caves Report, Appendix D, at ¶¶ 7-8.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

the same underlying deficient survey results were used with no new or different attributes (i.e., demand drivers) or alternative phraseologies for the tested disclosure statement (i.e., alternatively phrased disclosure statements with different informational content were not tested).

p.  Many of the aforementioned issues were expressly raised by the electricians Dr. Caves interviewed to prepare for his analysis.  For example, electricians raised the diversity and variability of factors driving individual purchasing decisions, such as:

   i.   cost;[21]

   ii.  compatibility with other hardware;[22]

   iii. brand loyalty;[23]

   iv.  convenience in sourcing; and[24]

   v.   personal relationships with suppliers.[25]

q.  Dr. Caves' cognitive interviews indicate that electricians' perspectives on the concept of nuisance tripping contradict positions advanced in the Caves Report.  Electricians noted that nuisance tripping is a well-known and understood phenomenon in the market.[26]  In one instance, an electrician acknowledged that Siemens is the only AFCI brand that does not nuisance trip.[27]  Electricians also described how a "defective" AFCI is actually one that fails to detect dangerous arcs (a false negative), not one that does trip without a dangerous arc (false positive).[28]  These interviews should have alerted Dr. Caves to the numerous inconsistencies and errors in his economic analysis.  Yet, Dr. Caves did not adjust his analysis to incorporate this feedback.

---

[21] *See, e.g.,* NewtonX Transcript - #1, May 19, 2025 ("Cognitive Interview 1"), at p. 24-25.

[22] *See, e.g.,* Cognitive Interview 1, at p. 25.

[23] *See, e.g.,* NewtonX Transcript - #5, May 21, 2025 ("Cognitive Interview 5"), at p. 26.

[24] *See, e.g.,* NewtonX Transcript - #6, May 27, 2025 ("Cognitive Interview 6"), at p. 11.

[25] *See, e.g.,* Cognitive Interview 6, at p.11.

[26] *See, e.g.,* Cognitive Interview 6, at p. 19. ("[A]ny electrician … will tell you [t]hey have a lot of experience with nuisance tripping.").

[27] Cognitive Interview 1, at p. 23. "Siemens is the breaker I've installed the most.  Ironically, you're asking me about nuisance tripping; Siemens is actually the only breaker that doesn't nuisance trip." (Cleaned up).

[28] *See, e.g.,* NewtonX Transcript - #4, May 20, 2025 ("Cognitive Interview 4"), at p. 19.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

### C. Outline Of Remainder Of Report

13. The remainder of my report proceeds as follows.

    a. In **Sections III-VI,** I provide background information relevant to the analyses I have performed.

        i. In **Section III**, I summarize my qualifications and experiences.

        ii. In **Section IV**, I describe the facts, data, and information available to me in conducting my analyses and in forming my opinions.

        iii. In **Section V**, I provide an overview of the parties.

        iv. In **Section VI**, I provide an overview of AFCIs and the Challenged Products.

    b. In **Sections VII-VIII**, I provide an overview of Plaintiffs Allegations, putative Class definitions, and claims of harm as presented in the Amended Complaint.

    c. In **Section IX**, I provide a summary of the Caves Report (i.e., a summary of Dr. Caves' Choice-Based Conjoint survey and market simulation analysis) and a brief summary of a document labeled "24-CMLGA-23093 Siemens AFCI" which is signed by Robert A. Durham, Ph.D., FIEE, PE as Principal Engineer and dated October 31, 2025 ("Durham Report").

    d. In **Section X**, I identify certain putative Class members and theories of claimed damages that are referenced in the Amended Complaint but are not addressed in the Caves Report.

    e. In **Section XI**, I present individual inquiry considerations associated with putative Class members' purchases.

    f. In **Sections XII-XIII**, I present a detailed economic evaluation of Dr. Caves' conjoint survey / market simulation analysis.

    g. In **Section XIV**, I summarize my overall conclusions.

## III. QUALIFICATIONS AND EXPERIENCE

14. I am a Senior Advisor (Managing Principal - Retired) at Analysis Group, Inc. ("AG"). AG provides economic, financial, and business strategy consulting to its clients and specializes in the interpretation of economic and financial data and the development of economic and financial models. Internationally, AG consists of more than 1,000 professionals who

- 12 -
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

specialize in, among other things, the fields of economics, accounting, finance, statistics, and strategy consulting.

15. My primary responsibility at AG is to provide economic, financial, and/or damages-related consulting services to clients. Throughout my career I have provided these consulting services in class certification matters, antitrust cases, breach of contract cases, intellectual property cases, fraud-related cases, business tort cases, business interruption cases, and securities-related cases, among others. I have worked on engagements relating to class certification issues numerous times, including defective product claims relating to artificial turf, automobile grills, power cords, tires, and tread-mills, among others. Other class certification matters I have worked on have related to beverages, fast food, non-stick cooking sprays, gas mileage, hand soap, facial cream, sunscreen, lipstick, foundation, and probiotics, among others. I also have worked on engagements relating to false advertising assertions, including but not limited to matters relating to pet food, furniture, soap, flea and tick medication, automobiles, pregnancy tests, and kombucha drinks, among others.

16. I specialize in the application of economic principles to complex commercial disputes, and I am generally retained in cases requiring economic, financial, and/or damages-related analyses. I worked at PricewaterhouseCoopers (or its legacy firms) for over 18 years (i.e., 1985 – 2003). Subsequently, I have worked at Analysis Group for over 21 years (i.e., 2004 – present). Prior to my consulting career, I taught college economics, including Microeconomics, Macroeconomics, Intermediate Price Theory, and "Companies In Crisis." Every year since (and including) 2014, I have been named in the IAM Patent 1000 (World's Leading Patent Practitioners). Since (and including) 2014, I have been in the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

GCR Global Competition Review Who's Who Legal: Competition (Economists) category. In 2023 and 2024, I was named in the Thought Leaders category of the same GCR Global Competition Review. In 2025, I continued to be recognized in various Global Competition Review Who's Who Legal categories of Thought Leader, Competition, Intellectual Property, and Consulting Economics – Competition Economics.

17.    Financial models I have constructed or evaluated in the past have contained as components revenue analyses, cost analyses, assessments of capacity, assessments of profitability, assessments of reasonable royalties, and assessments of the competitive business environment. I also have evaluated various claims of economic value using peer group comparisons and/or discounted cash flow analyses relating to projected future earnings streams. During the course of my career, I have frequently performed economic analyses using large databases of information and complex computer models. I have provided expert testimony in deposition and trial settings numerous times.

18.    I received my B.A. in Economics from the University of Notre Dame in 1977, my M.A. in Economics from the University of Southern California in 1979, and my Ph.D. in Economics from Arizona State University in 1983. Attached as **Exhibit 1** is a true and correct copy of my current resume. A list of publications I have authored is contained in my resume. Attached as **Exhibit 2** is a listing of my trial and deposition testimony experience. My business address is Analysis Group, Inc., Park Place Center, 2911 Turtle Creek Blvd., Suite 600, Dallas, Texas, 75219.

19.    AG is being compensated based upon hours incurred and the hourly rates of the personnel involved. Payment to AG is not contingent upon my findings or the outcome of this matter.

- 14 -
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

AG is being compensated at a rate of $1,080 per hour for my time.  Hourly rates for other

staff at AG assisting me with this matter range from $485 to $735 per hour, depending

upon the level and experience of the staff involved.

## IV.    FACTS, DATA, AND INFORMATION CONSIDERED

20.    The facts, data, and information available to me in forming my opinions are contained in

**Exhibit 3** or elsewhere in my report (including footnotes and exhibits).  Examples of the

types of information available to me include the following.

a.  Legal documents (e.g., Amended Complaint and interrogatory responses).

b.  Deposition transcripts (e.g., deposition transcripts of certain putative Commercial
Class Named Plaintiffs, certain putative Consumer Class Named Plaintiffs, and certain
Siemens employees).

  i.  Commercial Plaintiffs: including Kevin Brnich (Kevin Brnich Electric, LLC) dated
March 4, 2025 ("Brnich Deposition"); Andrew Montoya (Electricalifornia) dated
January 23, 2025 ("Montoya Deposition"); Trevor Zank (Zank Electric LLC) dated
April 24, 2025 ("Zank Deposition"); and Jeffery Meade (Bolt Electric LLC) dated
February 26, 2025 ("Meade Deposition").

  ii.  Consumer Plaintiffs: including Charles Vodicka dated January 13, 2025 ("Vodicka
Deposition"); Patrick Cates dated January 21, 2025 ("Cates Deposition"); Bryan
Butakis dated March 5, 2025 ("Butakis Deposition"); Tyler Barrette dated May 5,
2025 ("Barrette Deposition"); Rick Keyser dated May 8, 2025 ("Keyser
Deposition"); Jason Wylie dated May 20, 2025 ("Wylie Deposition"); and Clifford
Oakley dated June 3, 2025 ("Oakley Deposition").

  iii.  Siemens Personnel: including the deposition of Juergen Duemmler dated April 24,
2025 ("Duemmler Deposition"); the deposition of Siemens Industry, Inc. (Ashley
Kees) dated July 25, 2025 ("(30)(b)(6) Kees Deposition"); the deposition of Ashley
Kees dated July 24, 2025 ("Kees Deposition"); and the deposition of Matthew
Leidy dated August 5, 2025 ("Leidy Deposition").

c.  Expert reports: including the Caves Report; a document labeled "24-CMLGA-23093
Siemens AFCI" which is signed by Robert A. Durham, Ph.D., FIEE, PE as Principal
Engineer and dated October 31, 2025 ("Durham Report"); the Rebuttal Expert Report

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

of Dr. Ran Kivetz, Ph.D. dated December 19, 2025 ("Kivetz Report")[29]; and the Expert Report of David Neal, Ph.D. dated December 19, 2025 ("Neal Report").[30]

d. <u>Documents produced by Siemens</u> (e.g., documents covering product technical specifications, AFCI sales data, marketing materials, nuisance tripping rates and troubleshooting materials).

e. <u>Interview of Siemens' employees</u> (e.g., call with Ashley Kees, Product Manager, and Juergen Duemmler, Director of Strategic Pricing ("Kees and Duemmler Discussion") on December 16, 2025).

f. <u>Documents and other information independently obtained</u> (e.g., website information, AFCI article searches, and electrical contractor online forums).

21. My analyses and opinions are based upon the information available, standard economic theory, and my education and training. The information I am relying upon is information typically relied upon with a reasonable degree of certainty by experts in my field. I reserve the ability to (a) review additional documents, deposition transcripts, expert reports, or other information to be produced by the parties to this dispute and (b) supplement my

---

[29] I understand that Dr. Kivetz has provided an evaluation of the Caves Report from a survey perspective. Dr. Kivetz has reached the following conclusions: (1) Dr. Caves' "Nuisance Tripping Defect" attribute is leading and misrepresents the "alleged omission," generating an invalid and artificially inflated alleged Price Premium; (2) Dr. Caves' conjoint survey is contrived and severely deviates from electricians' purchase decision-making process; (3) Dr. Caves' 15 "cognitive interviews" are incapable of showing that his conjoint survey is clear, realistic, or unbiased, and these interviews show, if anything, that the survey is unclear, unrealistic, and biased; and (4) the results of Dr. Caves' conjoint survey evidence its biased and unrealistic design.

[30] I understand that Dr. Neal designed and conducted two separate scientific surveys – a "Consumer Survey" and a "Commercial Survey." I understand the purpose of these surveys was to address certain of Plaintiffs' allegations and to provide scientific quantification of various metrics relevant to the issue of class certification.

- According to the Neal Report, the "Consumer Survey" was a nationally representative survey of 2,944 U.S. consumers who personally own (either solely or with another person) a house, townhouse, or apartment/condo. The survey designed with the aim of scientifically quantifying how many members of the asserted class (a) know they have a Siemens brand breaker, (b) know they have a Siemens AFCI breaker, (c) were involved in purchasing the Siemens branded AFCI, (d) reviewed manufacturer materials prior to purchase, and (e) were involved in choosing the electrical panel.

- The "Commercial Survey" was a nationally representative survey of 280 U.S. trade workers with electrical expertise (electricians, electrical contractors, and electrical apprentices/journeymen). The survey was designed with the aim of scientifically quantifying whether the inclusion of a disclosure regarding nuisance tripping influences the purchasing decisions of commercial class members.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

opinions based upon that review, if appropriate. I also reserve the ability to use demonstrative exhibits and/or other information to explain and illustrate my opinions.

## V.    OVERVIEW OF PARTIES AND PROPOSED CLASSES

### A.  Named Plaintiffs

22.    There are 11 Named Plaintiffs in this matter, divided into two groups.

    a.  The "Commercial Plaintiffs" consist of Kevin Brnich Electric, LLC ("Plaintiff KB Electric"), Bolt Electric LLC ("Plaintiff Bolt Electric"), Electricalifornia ("Plaintiff Electricalifornia"), and Zank Electric LLC ("Plaintiff Zank Electric").[31]

    b.  The "Consumer Plaintiffs" consist of Charles Vodicka (Plaintiff Vodicka), Patrick Cates (Plaintiff Cates), Bryan Butakis (Plaintiff Butakis), Rick Keyser (Plaintiff Keyser), Tyler Barrette (Plaintiff Barrette), Clifford Oakley (Plaintiff Oakley), and Jason Wylie (Plaintiff Wylie).[32]

An overview of each Named Plaintiff and their experience with Siemens AFCIs based upon their deposition testimony and/or the Amended Complaint is provided in the paragraphs below. **Exhibit 4** provides a summary of topics from each of their depositions which are discussed in my report.

23.    Putative Commercial Plaintiffs. The putative Commercial Class includes any business that installed, investigated, resolved, or attempted to resolve tripping by a Siemens AFCI breaker.[33]

    a.  Plaintiff KB Electric. A limited liability company owned by Kevin Brnich and located in Pennsylvania that provides electrical services to its customers, including installing AFCIs and performing troubleshooting for AFCIs experiencing nuisance tripping. It alleges damages for time and money spent investigating nuisance tripping and replacing one or more of the Challenged Products.[34]

---

[31] Amended Complaint, at ¶ 9.

[32] Amended Complaint, at ¶ 10. For Consumer Plaintiffs' full names, *see also* Amended Complaint, at p. 1.

[33] Amended Complaint, at ¶ 174.

[34] Amended Complaint, at ¶ 15.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

    b.   <u>Plaintiff Bolt Electric</u>.  A limited liability company owned by Jeff Meade and located in Maine that provides electrical services to its customers, including installing AFCIs and performing troubleshooting for AFCIs experiencing nuisance tripping.  It alleges damages for time and money spent investigating nuisance tripping by and relacing one or more of the Challenged Products.[35]

    c.   <u>Plaintiff Electricalifornia</u>.  A sole proprietorship owned by Drew Montoya and located in La Mesa, California that provides electrical services to its customers, including performing residential and commercial circuitry work installing and replacing circuit breakers, and investigating and resolving the cause of ripped circuit breakers.  It alleges damages for costs incurred purchasing one or more of the Challenged Products, time spent investigating potential tripping causes, and for replacing one or more of the Challenged Products.[36]

    d.   <u>Plaintiff Zank Electric</u>.  A limited liability company located in Wisconsin that provides electrical services to its customers, including performing residential and commercial circuitry work, installing and replacing circuit breakers, and investigating and resolving the cause of tripped circuit breakers.  It alleges damages for costs incurred purchasing one or more of the Challenged Products, time spent investigating potential tripping causes, and for replacing one or more of the Challenged Products.[37]

24.    <u>Putative Consumer Plaintiffs.</u>  The putative Consumer Class includes any person who purchased a Siemens AFCI breaker, except for resale.[38]

    a.   <u>Plaintiff Vodicka</u>.  A consumer residing in North Carolina who purchased and had installed one or more of the Challenged Products in his home and alleges damages as a result of nuisance tripping attributed to the Alleged Defect.[39]

    b.   <u>Plaintiff Cates</u>.  A consumer residing in California who purchased and installed one or more of the Challenged Products in their home and alleges damages in terms of "time effort" and repair and replacement costs as a result of nuisance tripping attributed to the Alleged Defect.[40]

    c.   <u>Plaintiff Butakis</u>.  A consumer residing in Pennsylvania who purchased and installed one or more of the Challenged Products in their home and alleges damages in terms of

---

[35] Amended Complaint, at ¶ 16.

[36] Amended Complaint, at ¶ 17.

[37] Amended Complaint, at ¶ 18.

[38] Amended Complaint, at ¶ 174.

[39] Amended Complaint, at ¶ 19.

[40] Amended Complaint, at ¶ 20.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

"time effort" and repair and replacement costs attributed to the Alleged Misrepresentation of the Challenged Products.[41]

d.  Plaintiff Keyser.  A Nebraska resident who purchased and installed one or more of the Challenged Products in their home, which they replaced after allegedly experiencing nuisance tripping.[42]

e.  Plaintiff Barrette.  A New Hampshire resident who paid to replace one or more of the Challenged Products in their home after allegedly experiencing nuisance tripping. Plaintiff also alleges "other costs" attributed to the Challenged Products.[43]

f.  Plaintiff Oakley.  An Oregon resident who paid to replace one or more of the Challenged Products in their home after allegedly experiencing nuisance tripping. Plaintiff also alleges "other costs" attributed to the Challenged Products.[44]

g.  Plaintiff Wylie.  A consumer who resides in Texas who purchased and installed one or more of the Challenged Products in a home and allegedly experienced nuisance tripping.[45]

**B.  Siemens Industry, Inc.**

25.  Siemens Industry, Inc. ("Siemens") is a subsidiary of Siemens AG, a global conglomerate that operates in 190 countries with approximately 285 production and manufacturing facilities.[46]  Siemens offers an extensive array of products and services across sectors such as "infrastructure and buildings, automation, energy, lighting, electrical, medical, and transportation and logistics" for residential homes and businesses.[47]

26.  With respect to the current dispute, Siemens designs and manufactures circuit breakers and electrical panel boxes that help distribute electricity throughout a home and offer safety

---

[41] Amended Complaint, at ¶ 21.

[42] Amended Complaint, at ¶ 22.

[43] Amended Complaint, at ¶ 23.

[44] Amended Complaint, at ¶ 24.

[45] Amended Complaint, at ¶ 25.

[46] Amended Complaint, at ¶ 27.

[47] Amended Complaint, at ¶ 29.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

protection against electrical fires and hazards resulting from electrical surges, electrical arcs, ground faults, short circuits, and other unintended electrical problems.[48]

27.     With respect to AFCIs, Siemens is a major provider to the U.S. marketplace, along with Eaton (Cutler Hammer), ABB/GE, Leviton, and Schneider Electric (Square D).[49]

## VI.     OVERVIEW OF AFCIS AND THE CHALLENGED PRODUCTS

### A.  General Overview Of AFCIs

28.     Circuit breakers are important components in a modern electrical system.  AFCIs, ground fault circuit interrupters ("GFCIs"), and standard circuit breakers are three common types of circuit breakers that offer varying layers of protection for different environments and electrical threats.[50]  An AFCI is "[a] device intended to mitigate the effects of arcing faults by functioning to deenergize the circuit when an arc-fault is detected."[51]  A GFCI, on the

---

[48] Amended Complaint, at ¶ 30.

[49] List of AFCI brands from Home Depot and Simply Breakers. Siemens identifies Eaton, GE, Schneider and Leviton as competitors. *See* "Circuit Breakers," The Home Depot (https://www.homedepot.com/b/Electrical-Power-Distribution-Electrical-Panels-Protective-Devices-Circuit-Breakers/AFCI/AFCI-GFCI/N-5yc1vZbm16Z1z0mha0 Z1z1zdzd?NCNI-5, accessed December 5, 2025); "Arc Fault Circuit Breakers," Simply Breakers (https://www.simplybreakers.com/collections/arc-fault-circuit-breakers, accessed December 5, 2025); SIEMENS_AFCI_00047011-024, at 015. *See also*, "About Us," ABB (https://electrification.us.abb.com/about-us, accessed November 13, 2025); "About Us," Eaton (https://www.eaton.com/us/en-us/company/about-us.html, accessed November 13, 2025); "About Leviton," Leviton (https://leviton.com/company/about-leviton, accessed November 13, 2025); "About Us," Siemens (https://www.siemens.com/us/en/company/about.html, accessed November 13, 2025); "Company Profile," Schneider Electric (https://www.se.com/us/en/about-us/company-profile/, accessed November 13, 2025). Square D is a brand name of Schneider Electric.  *See* "The Square D Advantage," Schneider Electric (https://www.se.com/us/en/brands/squared/about/, accessed November 13, 2025). ABB acquired GE Industrial Solutions in 2018. *See* "GE Industrial Solutions – Heritage Brand," ABB (https://www. abb.com/global/en/company/about/history/heritage-brands/ge-industrial-solutions, accessed December 15, 2025); "ABB Completes Acquisition of GE Industrial Solutions," ABB (https://resources.news.e.abb.com/ attachments/published/5475/en-US/F84A0015F158/ABB_completes_acquisition_ of_GE_Industrial_Solutions.pdf, viewed on December 16, 2025).

[50] "Understanding Different Types of Circuit Breakers," AGWAY Energy Services (https://www.agwayenergy.com/blog/understanding-different-types-of-circuit-breakers/, accessed November 12, 2025); "What's the Difference Between AFCI, GFCI & Standard Circuit Breakers," Docking Drawer (https://www.dockingdrawer.com/pages/faq-what-s-the-difference-between-afci-gfci-standard-circuit-breakers, accessed November 12, 2025).

[51] NEMA_S-0024317-325, at 319.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

other hand, is designed to prevent potentially lethal electric shocks and trip or interrupt the circuit when a ground fault is detected.[52] A GFCI activates when there is 5 milliamperes or more of current leakage.[53] According to NEMA (National Electrical Manufacturers Association), "AFCI and [GFCI] can co-exist[.] … One way to provide both [arc faults protection and ground faults protection] is to use an AFCI circuit breaker and a GFCI receptacle. Another way is to install a dual-function device that provides both AFCI and GFCI protection."[54] Standard circuit breakers are intended to prevent electrical fires resulting from overheating caused by excessive current flow and trip when the circuit experiences an overload or overcurrent.[55]

### 1. Purpose Of AFCIs

29.    AFCIs are devices designed to prevent electrical fires by detecting and responding to arc faults.[56] Arc faults relate to unintentional arcing conditions in a circuit that create heating at the point of the arc, sometimes exceeding 10,000º F, resulting in burning particles that may ignite surrounding material.[57] In contrast to a standard circuit breaker that detects

---

[52] "What's the Difference Between AFCI, GFCI & Standard Circuit Breakers," Docking Drawer (https://www.dockingdrawer.com/pages/faq-what-s-the-difference-between-afci-gfci-standard-circuit-breakers, accessed November 12, 2025).

[53] "What's the Difference Between AFCI, GFCI & Standard Circuit Breakers," Docking Drawer (https://www.dockingdrawer.com/pages/faq-what-s-the-difference-between-afci-gfci-standard-circuit-breakers, accessed November 12, 2025); "GFCI vs AFCI Devices," American Society of Home Inspectors (https://www.homeinspector.org/reporter-articles/gfci-vs-afci-devices/, accessed November 12, 2025).

[54] NEMA_S-0062898-899, at 898.

[55] "Types of Circuit Breakers & How They Work," Phoenix Phase Converters (https://phoenixphaseconverters.com/blogs/news/types-of-circuit-breakers?srsltid=AfmBOoqkOUO0bB2mqmrxXrcdsfbt4OCxz7PXLXD_2bPPYmNDwH, accessed November 12, 2025); "What's the Difference Between AFCI, GFCI & Standard Circuit Breakers," Docking Drawer (https://www.dockingdrawer.com/pages/faq-what-s-the-difference-between-afci-gfci-standard-circuit-breakers, accessed November 12, 2025).

[56] NEMA_S-0024317-325, at 319.

[57] NEMA_S-0062898-899, at 898.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

overloads and short circuits but does not detect low-level hazardous arcing currents with the potential to initiate electrical fires, an AFCI employs advanced electronic technology to sense different arcing conditions by monitoring the circuit for the presence of normal and dangerous arcing conditions.[58]

### 2. Competing AFCI Breakers And Models

30.     Branch/feeder AFCIs And Combination AFCIs.  Branch/feeder AFCIs and combination AFCIs are two types of AFCIs.[59]  A branch/feeder AFCI normally is installed at the origin of a branch circuit or feeder and detects parallel arc faults, which can occur line-to-line, line-to-neutral, and line-to-ground.[60]  A combination AFCI offers one more layer of protection against arc faults.  In addition to parallel arc faults, a combination AFCI is able to detect series arc faults.  Combination AFCI protection has been required by the National Electric Code ("NEC") since January 1, 2008.[61]

31.     Dual-Function AFCIs (AFCI/GFCI).  Another common type of AFCI is a dual-function AFCI circuit breaker, also known as an AFCI/GFCI.  An AFCI/GFCI combines AFCI protection and GFCI protection.[62]  The NEC requires both arc fault and ground fault

---

[58] NEMA_S-0067791-804, at 794-795; SIEMENS_AFCI_00101877-878, at 877.

[59] SIEMENS_AFCI_00278207-214, at 212.

[60] SIEMENS_AFCI_00278207-214, at 212; "What is the Difference between a Parallel Arc Fault and a Series Arc Fault?," Schneider Electric (https://www.se.com/us/en/faqs/FA94231/, accessed December 10, 2025).

[61] SIEMENS_AFCI_00278207-214, at 212.

[62] "Types of Circuit Breakers & How They Work," Phoenix Phase Converters (https://phoenixphaseconverters.com/blogs/news/types-of-circuit-breakers?srsltid=AfmBOoqkOUO0bB2mqmrx Xrcdsfbt4OCxz7PXLXD_2bPPYmNDwH, accessed November 12, 2025).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

protection on kitchen and laundry units.[63]  The only way to comply with the NEC prior to the development of dual-function AFCI circuit breakers was to pair an AFCI circuit breaker with a GFCI receptacle.[64]

32.    1-Pole And 2-Pole AFCIs.  An AFCI usually is 1-pole or 2-pole.[65]  A 1-pole circuit breaker offers protection for one 15-ampere ("15A") or 20-ampere ("20A") circuit and provides 120 volts ("120V") to a circuit.[66]  A 2-pole circuit breaker takes up two spaces in the breaker panel to offer protection for two circuits simultaneously.[67]  A 2-pole circuit breaker can provide 120 volts/240V volts ("120V/240V") or 240 volts ("240V") with two hot wires that share a neutral.[68]  Generally, a 2-pole AFCI is designed for two 120V circuits with a

---

[63]  NEMA_S-0019795; "Residential Dual-Function Circuit Breakers (AFCI & GFCI)," Siemens (https://www.siemens.com/us/en/products/energy/low-voltage/residential-circuit-breakers/residential-dual-fuction-circuit-breakers.html, accessed November 13, 2025).

[64]  "Residential Dual-Function Circuit Breakers (AFCI & GFCI)," Siemens (https://www.siemens.com/us/en/products/energy/low-voltage/residential-circuit-breakers/residential-dual-fuction-circuit-breakers.html, accessed November 13, 2025); NEMA_S-0062898-899, at 898.

[65] Siemens offers 1-pole combination type AFCIs, 2-pole combination type AFCIs, and tandem combination type AFCIs, which utilizes a new technology that "expands the capabilities of the [combination type AFCI] by feeding two separate circuits from one breaker position."  *See* "Arc Fault Circuit Breakers or AFCIs," Siemens (https://www.siemens.com/us/en/products/energy/low-voltage/residential-circuit-breakers/residential-afci-circuit-breakers.html, accessed November 13, 2025).

[66]  "Types of Circuit Breakers & How They Work," Phoenix Phase Converters (https://phoenixphaseconverters.com/blogs/news/types-of-circuit-breakers?srsltid=AfmBOoqkOUO0bB2mqmrxXrcdsfbt4OCxz7PXLXD_2bPPYmNDwH, accessed November 12, 2025).

[67]  "Types of Circuit Breakers & How They Work," Phoenix Phase Converters (https://phoenixphaseconverters.com/blogs/news/types-of-circuit-breakers?srsltid=AfmBOoqkOUO0bB2mqmrxXrcdsfbt4OCxz7PXLXD_2bPPYmNDwH, accessed November 12, 2025).

[68]  "Types of Circuit Breakers & How They Work," Phoenix Phase Converters (https://phoenixphaseconverters.com/blogs/news/types-of-circuit-breakers?srsltid=AfmBOoqkOUO0bB2mqmrxXrcdsfbt4OCxz7PXLXD_2bPPYmNDwH, accessed November 12, 2025); "What's the Difference Between a Single and a Double-Pole Breaker?," CoolToday (https://www.cooltoday.com/blog/whats-the-difference-between-a-single-and-a-double-pole-breaker, accessed November 13, 2025).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

common trip and are used on multi-wire branch circuits (commonly known as "shared neutrals").[69]  A 2-pole AFCI monitors and protects 2 separate circuits that share a neutral.[70]

33.    Major AFCI brands include Eaton (Cutler Hammer), ABB/GE, Leviton, Siemens, and Schneider Electric (Square D).[71]

### 3.    Regulatory Requirements

34.    The first requirement for AFCI breakers to be used with single-phase 15A and 20A branch circuits serving bedroom branch circuit outlet receptacles was in the 1999 NEC, to be effective in 2002.[72]   The requirement was driven by the Consumer Product Safety Commission and the Electronic Industries Association "in response to concerns that the conventional circuit breaker was not providing protection of branch circuit arcing, resulting

---

[69]   SIEMENS_AFCI_00438503-506, at 503; "Arc Fault Circuit Breakers or AFCIs," Siemens (https://www.siemens.com/us/en/products/energy/low-voltage/residential-circuit-breakers/residential-afci-circuit-breakers.html, accessed November 13, 2025).

[70] "When Would You Use a 2-Pole AFCI Breaker," Leviton (https://decorasmartsupport.leviton.com/hc/en-us/articles/360052082054-When-would-you-use-a-2-pole-AFCI-breaker, accessed November 13, 2025).

[71] List of AFCI brands from Home Depot and Simply Breakers. Siemens identifies Eaton, GE, Schneider and Leviton as competitors. See "Circuit Breakers," The Home Depot (https://www.homedepot.com/b/Electrical-Power-Distribution-Electrical-Panels-Protective-Devices-Circuit-Breakers/AFCI/AFCI-GFCI/N-5yc1vZbm16Z1z0mha0 Z1z1zdzd?NCNI-5, accessed December 5, 2025); "Arc Fault Circuit Breakers," Simply Breakers (https://www.simplybreakers.com/collections/arc-fault-circuit-breakers, accessed December 5, 2025); SIEMENS_AFCI_00047011-024, at 015. See also, "About Us," ABB (https://electrification.us.abb.com/about-us, accessed November 13, 2025); "About Us," Eaton (https://www.eaton.com/us/en-us/company/about-us.html, accessed November 13, 2025); "About Leviton," Leviton (https://leviton.com/company/about-leviton, accessed November 13, 2025); "About Us," Siemens (https://www.siemens.com/us/en/company/about.html, accessed November 13, 2025); "Company Profile," Schneider Electric (https://www.se.com/us/en/about-us/company-profile/, accessed November 13, 2025). Square D is a brand name of Schneider Electric.  See "The Square D Advantage," Schneider Electric (https://www.se.com/us/en/brands/squared/about/, accessed November 13, 2025). ABB acquired GE Industrial Solutions in 2018. *See* "GE Industrial Solutions – Heritage Brand," ABB (https://www.abb.com/global/en/company/about/history/heritage-brands/ge-industrial-solutions, accessed December 15, 2025); "ABB Completes Acquisition of GE Industrial Solutions," ABB (https://resources.news.e.abb.com/attachments/published/5475/en-US/F84A0015F158/ABB_completes_acquisition_of_GE_Industrial_Solutions.pdf, viewed on December 16, 2025).

[72] NEMA_S-0067791-804, at 795.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

in home electrical fires and deaths, injuries, and property loss."[73]  Subsequent editions of the NEC expanded locations where AFCIs were required to be installed, "moving beyond bedrooms, into living rooms, dining rooms, sunrooms and other gathering places including kitchen and laundry areas as required in the 2023 NEC."[74]  AFCIs are "also now required for sleeping quarters in such dwellings as police, fire and ranger stations, in addition to previous requirements for hotels, dormitories and others."[75]

### 4. Tripping Due To Potentially Dangerous Electrical Arcing

35.    Arc faults may occur for many reasons including damaged wires, worn electrical insulation, wires or cords in contact with vibrating metal, overheated or stressed electrical cords and wires, and misapplied or damaged electrical appliances.[76]  Upon detecting signatures of arcing events, an AFCI analyzes the characteristics of the event to assess whether the arc is hazardous.[77]  AFCI manufacturers evaluate hundreds of possible operating conditions and program their devices to continuously monitor for the harmless and dangerous arcs.[78]

36.    Series arcs and parallel arcs are two types of potentially dangerous arcs.[79]  A series arc can occur if there is damaged wiring or if the conductor wire has an exposed or un-insulated

---

[73] SIEMENS_AFCI_00020560-563, at 561.

[74] NEMA_S-0067791-804, at 796.

[75] NEMA_S-0067791-804, at 796.

[76] SIEMENS_AFCI_00016127-162, at 133; SIEMENS_AFCI_00278207-214, at 209.

[77] NEMA_S-0062898-899, at 898.

[78] NEMA_S-0062898-899, at 898.

[79] "What is an Arc-Fault?," Leviton (https://leviton.com/support/literature/blogs/arc-faults, accessed November 13, 2025).

- 25 -
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

gap.[80]  A parallel arc can occur "between two conductors of different potential, such as a hot and neutral wire."[81]  For instance, a parallel arc may result from a wire's insulation being cut into the wire by a nail or staple or an appliance cord being sliced or damaged by an object such as a table or chair.[82]

### 5. Concept Of Nuisance Tripping

37.    Nuisance tripping occurs when circuit protection devices activate in response to conditions that are not genuinely hazardous or "when the processing algorithm encounters conditions in an actual load that closely approximate the characteristics of an arc fault."[83]  AFCI nuisance tripping often results from equipment that creates arc-like signatures during normal operation.  For instance, vacuum cleaners, treadmills, and older fluorescent ballasts can generate waveforms that mimic the waveforms of dangerous arcing and make an AFCI trip when there are no arcing risks.[84]  The start-up or inrush current created when some electrical products are initially energized, which is typically multiple times of the normal operating current of the product, may be misinterpreted by an AFCI as a dangerous arc and lead to unwanted tripping.[85]  Older appliances that predate U.S. consumer product safety

---

[80] "What is an Arc-Fault?," Leviton (https://leviton.com/support/literature/blogs/arc-faults, accessed November 13, 2025).

[81] "Arc Fault Circuit Breakers," Peerless Electronics Inc. (https://peerlesselectronics.com/blog/arc-fault-circuit-breakers.html, accessed December 19, 2025).

[82] "What is an Arc-Fault?," Leviton (https://leviton.com/support/literature/blogs/arc-faults, accessed November 13, 2025).

[83] "Diagnosing Nuisance Tripping," Delta Wye Electric (https://deltawye.com/diagnosing-nuisance-tripping/, accessed November 11, 2025); SIEMENS_AFCI_00222368-401, at 371.

[84] "Diagnosing Nuisance Tripping," Delta Wye Electric (https://deltawye.com/diagnosing-nuisance-tripping/, accessed November 11, 2025).

[85] "Recommendations on AFCI / Home Electrical Product Compatibility," NEMA (https://structuretech1.com/wp-content/uploads/2016/02/AFCI-Tripping-NEMA-Compatibility.pdf, viewed on December 5, 2025).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

standards, unlisted appliances, or appliances not used as the manufacturers intended also can cause AFCIs to trip.[86]  "The expansion of the NEC AFCI requirements to include kitchens and laundry areas [and] the evolution in appliance designs" also "[present] new unwanted tripping challenges" and make it harder for AFCI manufacturers to design an AFCI that is compatible or interoperable with every conceivable other electrical device or combination of electrical devices that could end up in a home.[87]  According to NEMA, "the market does not distinguish unwanted tripping as being a problem with only certain brands of AFCIs [but sees] it as an AFCI problem in general."[88]  In addition, nuisance tripping may be the result of improperly installed AFCIs or problems within the wiring system.[89]

38.    <u>Industry Data</u>.  According to a presentation by the American Circuit Breaker Manufacturers Association ("ACBMA"), reported issues experienced by AFCIs identified as either "Nuisance Trip" or "Interoperability" were determined to represent 0.0078 percent of AFCIs shipped based upon data collected by ACBMA.[90]  The same ACBMA presentation also noted that "NEMA has received only 24 reports of unwanted AFCI circuit breaker tripping for the entire year 2017."[91]  During 2021 through 2022, "NEMA received 35 reports of unwanted tripping through the AFCIsafety.org website" and "none of the

---

[86] NEMA_S-0019795.

[87] NEMA_S-0024317-325, at 319; SIEMENS_AFCI_00222368-401, at 371.

[88] NEMA_S-0024317-325, at 319.

[89] "Common Causes for Tripped AFCI Breakers," Peterson Electric (https://petersonelectricllc.com/tripped-afci-breakers-reasons/, accessed December 5, 2025).

[90] SIEMENS_AFCI_00020560-563, at 561; SIEMENS_AFCI_00004504-512, at 506.

[91] SIEMENS_AFCI_00004504-512, at 506.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

reported unwanted tripping issues identified a faulty circuit breaker or an incompatible product issue" according to a document prepared by NEMA in 2023.[92]

39.    Siemens' Data.  Siemens' tracking data on nuisance tripping rates also reflects the low percentage of AFCIs experiencing nuisance tripping as reported in the ACBMA data.[93] ███ ████████████████ issues reported to Siemens were categorized as "Nuisance Trip Issues," which Siemens estimated to account for approximately ████████████ ███████████████████████████.[94]  Reports from subsequent years of the Class Period appear to capture similarly low counts of reports featuring "nuisance tripping" in the complaint summary.[95]

### 6.    Trade-Offs Between AFCI Sensitivity And Increased Ability To Detect Dangerous Electrical Conditions

40.    The discussion surrounding the trade-offs between the sensitivity of AFCIs and their ability to detect dangerous arcing conditions—and thereby prevent potential electrical fires—has a long history.  However, NEC has not considered nuisance tripping as a barrier to the widespread adoption of AFCIs.  For example, a public comment submitted during the Second Draft Ballot of the 2017 NEC raised concerns about AFCI nuisance tripping and asserted that the AFCI devices available on the market at that time were defective and should therefore not be mandated by the NEC until the nuisance tripping issue could be

---

[92] SIEMENS_AFCI_00020560-563, at 561.

[93] SIEMENS_AFCI_00047353, at tab "FY17 Summary."

[94] SIEMENS_AFCI_00047353, at tab "FY17 Summary."  Includes all single pole, two pole, and dual-function AFCI products and assumes an average of three AFCIs involved in each call.

[95] SIEMENS_AFCI_00002899, at tabs "2019," "2020," "2021," "2022," "2023."  While these data do not appear to capture the proportion of nuisance tripping reports vs. number of AFCI products sold, I filter on the column "SR Abstract" or "Abstract" for each year using the term "nuisance" to yield report counts of 157, 158, 198, 164, and 44 for fiscal years 2019, 2020, 2021, 2022, and Q1 2023, respectively.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

resolved.[96]  Specifically, the public comment claimed that contractors had spent "countless dollars trying to find what [was] causing [the trips of AFCI breakers]" only to find out that these trips were the result of electronic equipment "interfering with the electronics of the [AFCIs]."[97]  According to the public comment, electronic equipment that could make an AFCI trip "at random and not on demand" included "LED bulbs, … [DVD] players, TV[s], computers[,] electronic noise, line side connections … dimmers, electronic switching devices, vacuums, hair dryers, power tools, fluorescent light ballasts" and ham radios.[98]  The Committee rejected this comment, noting "[t]he need for arc fault protection in dwelling units is well substantiated.  No mention was made in the substantiation of contractors contacting AFCI manufacturers for assistance which is an important step in the problem resolution process."[99]

---

[96] "Public Comment No. 1063-NFPA 70-2015 [ Global Input ]," NFPA (https://docinfofiles.nfpa.org/files/AboutTheCodes/70/70_A2016_NEC_PCresponses.pdf, viewed on December 5, 2025); "NFPA 70 - National Electrical Code," NFPA (https://www.nfpa.org/codes-and-standards/nfpa-70-standard-development/70, accessed November 14, 2025).

[97] "Public Comment No. 1063-NFPA 70-2015 [ Global Input ]," NFPA (https://docinfofiles.nfpa.org/files/AboutTheCodes/70/70_A2016_NEC_PCresponses.pdf, viewed on December 5, 2025).

[98] "Public Comment No. 1063-NFPA 70-2015 [ Global Input ]," NFPA (https://docinfofiles.nfpa.org/files/AboutTheCodes/70/70_A2016_NEC_PCresponses.pdf, viewed on December 5, 2025).

[99] "Public Comment No. 1063-NFPA 70-2015 [ Global Input ]," NFPA (https://docinfofiles.nfpa.org/files/AboutTheCodes/70/70_A2016_NEC_PCresponses.pdf, viewed on December 5, 2025).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

### B. **Challenged Products**

### 1. **Summary Of Challenged CAFCIs and AFCI/GFCIs**

41.    I understand that Siemens AFCI circuit breakers, combination type AFCI breakers ("CAFCI"), and AFCI/GFCI dual-function breakers are at issue in this matter.[100] **Table 1** and **Table 2** below summarize the challenged CAFCIs and AFCI/GFCIs.

a.  Siemens combination type AFCIs are available with a current rating of 15A or 20A and an interruption rating of 10kA, 22kA, or 65kA.[101]

b.  Siemens 1-pole and 2-pole combination type AFCIs are available in either a plug-in, bolt-on, or plug-on-neutral format.[102] Siemens Tandem combination type AFCIs are available in either a plug-in or plug-on neutral format.[103]

c.  Siemens AFCI/GFCI dual-function breakers combine class A 5-milliampere ("5mA") GFCI and combination type AFCI.[104] The current rating of Siemens AFCI/GFCI dual-function breakers is 15A or 20A.[105] The interrupting rating of Siemens AFCI/GFCI dual-function breakers is 10kA, 22kA, or 65kA.[106] Siemens AFCI/GFCI dual-function breakers are available in either a plug-in or bolt-on format.[107]

---

[100] Amended Complaint, at ¶ 61; Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories, dated June 19, 2024, at pp. 3-6.

[101] Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories, dated June 19, 2024, at p. 4.

[102] Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories, dated June 19, 2024, at p. 4.

[103] Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories, dated June 19, 2024, at p. 4.

[104] "Residential Dual-Function Circuit Breakers (AFCI & GFCI)," Siemens (https://www.siemens.com/us/en/products/energy/low-voltage/residential-circuit-breakers/residential-dual-fuction-circuit-breakers.html, accessed November 13, 2025).

[105] Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories, dated June 19, 2024, at p. 5.

[106] Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories, dated June 19, 2024, at p. 5.

[107] Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories, dated June 19, 2024, at p. 5. Siemens also offers AFCI/GFCI dual-function circuit breakers in a plug-on neutral format. *See* "Dual Function AFCI/GFCI Circuit Breaker," Siemens (https://s3.amazonaws.com/dcc-data-extract/new-delta/asset/Compas/daily/Compas/Selection%20Application%20Guide/SIE_BR_Dualfunction.pdf, viewed on December 5, 2025).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

**Table 1**
**Summary of Challenged Siemens CAFCIs[108]**

| First Available Date | UL Type | Product Type | Current Rating | Interrupting Rating | Pole | Connection |
|---|---|---|---|---|---|---|
| January 1, 2017 | QAF | CAFCI | 15A, 20A | 10kA | 1-pole, 2-pole | Plug-in, Bolt-on |
| January 1, 2017 | QAF2 | CAFCI | 15A, 20A | 10kA | 1-pole, 2-pole | Plug-in, Bolt-on |
| January 1, 2017 | QAFH | CAFCI | 15A, 20A | 22kA | 1-pole, 2-pole | Plug-in, Bolt-on |
| January 1, 2017 | QAFH2 | CAFCI | 15A, 20A | 22kA | 1-pole, 2-pole | Plug-in, Bolt-on |
| January 1, 2017 | HQAF2 | CAFCI | 15A, 20A | 65kA | 1-pole | Plug-in, Bolt-on |
| April 1, 2020 | QAFN | CAFCI | 15A, 20A | 10kA | 1-pole, 2-pole | Plug-on Neutral |
| April 1, 2020 | QAF2N | CAFCI | 15A, 20A | 10kA | 1-pole, 2-pole | Plug-on Neutral |
| April 1, 2021 | QTA | CAFCI | 15A, 20A | 10kA | Tandem | Plug-in, Plug-on Neutral |
| April 1, 2021 | QTAN | CAFCI | 15A, 20A | 10kA | Tandem | Plug-in, Plug-on Neutral |

---

[108] Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories, dated June 19, 2024, at p. 4. QAF, QAF2, QAFH, QAFH2, and HQAF2 may have been available before January 1, 2017.  *See* Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories, dated June 19, 2024, at p. 4.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

**Table 2[109]**
**Summary of Challenged Siemens AFCI/GFCIs**

| First Available Date | UL Type | Product Type | Current Rating | Interrupting Rating | Pole | Connection |
|---|---|---|---|---|---|---|
| January 1, 2017 | QFGA2 | CAFCI/GFCI | 15A, 20A | 10kA | 1-pole | Plug-in, Bolt-on |
| January 1, 2017 | QFGAH2 | CAFCI/GFCI | 15A, 20A | 22kA | 1-pole | Plug-in, Bolt-on |
| January 1, 2017 | HQFGA2 | CAFCI/GFCI | 15A, 20A | 65kA | 1-pole | Plug-in, Bolt-on |

42.    The Amended Complaint refers to a variety of Challenged Products, including Siemens' "AFCI Circuit Breakers, Combination AFCI ('CAFCI') breakers, and its AFCI/GFCI dual-function[] breakers for both 1 and 2 poles."[110]  In contrast (and to be discussed later in my report), Dr. Caves provides in his report two definitions for the products at issue, separated only by the dates over which products were sold.  In his first definition, Dr. Caves assumes that "the Class AFCIs include all single-function AFCIs sold between January 1, 2017 and December 10, 2021 [], when Siemens released its 'Gen 4B' AFCIs."[111]  In the alternative, Dr. Caves assumes that "the Class AFCIs [are limited] to single-function AFCIs sold

---

[109] Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories, dated June 19, 2024, at p. 5. QFGA2, QFGAH2, and HQFGA2 may have been available before January 1, 2017.  *See* Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories, dated June 19, 2024, at p. 5.

[110] Amended Complaint, at ¶ 61.

[111] Caves Report, at ¶ 11, Footnote 12.  While Dr. Caves uses the term "single-function AFCIs" in his report to refer to AFCI products without dual AFCI/GFCI functionality, I understand that "single-function" is not a term commonly used to refer to certain AFCI products in the market.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

between June 21, 2027, when Siemens released its 'Gen 3A' AFCIs, and December 10, 2021."[112]

## 2.   Generations Of Siemens' Challenged Products

43.    Siemens was selling the second generation ("Gen 2") of its 1-pole CAFCIs by January 1, 2017.[113]  Siemens subsequently released "Gen 3A", "Gen 3B", "Gen 3C", "Gen 3C+", and "Gen 4B" AFCI products (among others) over the 2017 to 2021 time period.

   a.  "Gen 3A".  Siemens' 1-pole CAFCIs ("Gen 3A") were released on or about July 2017.[114]  (This latter date is the beginning of the putative Class Period.)  Two key updates included in the Gen 3A were (a) the conversion of the Application-Specific Integrated Circuit ("ASIC") chip to an analog-only design and (b) the addition of a microcontroller chip and external 30mA ground fault detection.[115]

   b.  "Gen 3B".  A subsequent generation of Siemens' 1-pole CAFCIs ("Gen 3B") was released on or about October 2018.[116]  For Gen 3B, Siemens updated the RF coupling circuit, removed the 30mA ground fault detection, switched the load current sensing from the neutral conductor to the live conductor and updated the arc fault detection algorithm.[117]

   c.  "Gen 3C".  Gen 3C of Siemens' 1-pole CAFCIs was released on or about February 2020.[118] Siemens updated the arc fault detection algorithm for Gen 3C. [119]

---

[112] Caves Report, at ¶¶ 11-12.

[113] Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories, dated June 19, 2024, at p. 5.

[114] Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories, dated June 19, 2024, at p. 5.

[115] Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories, dated June 19, 2024, at p. 7.

[116] Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories, dated June 19, 2024, at p. 5.

[117] Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories, dated June 19, 2024, at pp. 7-8.

[118] Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories, dated June 19, 2024, at p. 5.

[119] Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories, dated June 19, 2024, at p. 8.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

    d.   <u>"Gen 3C+"</u>. Gen 3C+ of Siemens' 1-pole CAFCIs was released on or about February 2021.[120] Siemens updated the arc fault detection algorithm and upgraded to a newer microcontroller chip for Gen 3C+.[121]

    e.   <u>"Gen 4B"</u>.  Gen 4B, which was released on or about November 2021, is the latest generation of Siemens' 1-pole CAFCIs.[122]  Siemens updated the arc fault detection algorithm to employ a machine learning approach for Gen 4B.[123]  The Gen 4B products are not accused.  I understand that the release of the Gen 4B products established the end of the putative Class Period.

    f.   <u>Other Siemens AFCIs</u>. Siemens' 2-pole AFCIs were only updated once in March 2019. Siemens' dual-function CAFCI/GFCIs have not been updated since 2014.[124]

44.    Over the evolution of these generations, Siemens "updated the design of its AFCI circuit breakers in part to mitigate the effects created by products or appliances … that present interoperability challenges and/or do not comply with government … regulations."[125]  As Matthew Leidy from Siemens explained, ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[126]  While Siemens does not track when each generation of

---

[120] Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories, dated June 19, 2024, at p. 5.

[121] Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories, dated June 19, 2024, at p. 8.

[122] Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories, dated June 19, 2024, at p. 5.

[123] Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories, dated June 19, 2024, at p. 8.

[124] Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories, dated June 19, 2024, at p. 5.

[125] Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories, dated June 19, 2024, at p. 7.

[126] Deposition of Matthew Leidy, August 5, 2025, at pp. 252-253.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

its product is sold, it observes that it typically takes about four months for a product to reach store shelves after its release date.[127]

### 3. **Supply Chain For Siemens' Challenged Products**

45.    Siemens primarily distributes its AFCIs either through distributors or participating retail partners, including but not limited to Amazon, The Home Depot ("Home Depot"), and Lowe's.[128] Consumers such as homeowners usually purchase Siemens AFCIs through retailers while contractors and electricians generally purchase Siemens AFCIs from their distributors.[129] Location information for Siemens' distributors can be found using Siemens' Distributor Locator.[130] According to Ashley Kees, who is an AFCI and GFCI product manager at Siemens,[131] Siemens' sales engineers also have direct relationships with distributors, contractors, and builders.[132] In addition, Siemens offers an e-commerce platform, SiePortal (formerly Industry Mall) for industrial procurement.[133]

---

[127] Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories, dated June 19, 2024, at p. 6.

[128] "Arc Fault Circuit Breakers or AFCIs," Siemens (https://www.siemens.com/us/en/products/energy/low-voltage/residential-circuit-breakers/residential-afci-circuit-breakers.html, accessed November 13, 2025); Deposition of Juergen Duemmler, April 24, 2025 ("Duemmler Deposition"), at pp. 46-47; 30(b)(6) Deposition of Siemens Industry, Inc. (Ashley Kees), July 25, 2025 ("(30)(b)(6) Kees Deposition"), at pp. 27-28.

[129] Duemmler Deposition, at pp. 46-47; (30)(b)(6) Kees Deposition, at pp. 27-28.

[130] "Siemens USA - Distributor Locator," Siemens (https://www.siemens.com/us/en/company/partners/distributorlocator.html, accessed December 5, 2025).

[131] Deposition of Ashley Kees, July 24, 2025 ("Kees Deposition"), at p. 24.

[132] (30)(b)(6) Kees Deposition, at pp. 29-30.

[133] "The Siemens Industry Mall: Industrial Procurement," Manufacturing Flex (https://flexifactories.com/the-siemens-industry-mall-industrial-procurement/, accessed November 18, 2025); "Industry Mall Has Been Upgraded to SiePortal!," Siemens (https://mall.industry.siemens.com/goos/WelcomePage.aspx?regionUrl=/US&language=en, accessed December 8, 2025); "SiePortal," Siemens (https://sieportal.siemens.com/en-us/home, accessed December 8, 2025).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

46.    Prices offered to customers and end users vary across retailers and distributors.[134]

    a.    <u>Pricing Differences Offered By Siemens Varies Across Distributors</u>.  According to Mr. Duemmler, a Director of Strategic Pricing, Siemens "sell[s] products [including AFCIs] to distributors via a stock price" which is a "list price minus a discount, and the stock price is not the same for every distributor."[135]  According to Mr. Duemmler, the Siemens pricing team will offer customized pricing arrangements to distributors "[s]hould their stock price not be sufficient because the opportunity requires a better price."[136]

    b.    <u>Pricing Differences Offered By The Same Distributor Can Vary Across Electricians And Contractors</u>.  Pricing differences may occur even with the same distributor.  For example, electricians and contractors may be able to purchase the same product from a distributor at lower prices than individual consumers because electricians and contractors typically buy in bulk and therefore are sometimes offered discounted prices.[137]  Depending upon the volumes of their purchases, different contractors may negotiate different pricing agreements with a distributor.[138]

### 4.    Warranty For Siemens' Challenged Products

47.    Siemens offers at least two types of warranties: a Standard Limited Warranty and a Standard Extended Warranty for Residential Products.[139]

48.    <u>Standard Limited Warranty</u>.  Siemens' Standard Limited Warranty warrants that "on the date of shipment the goods are of the kind and quality described herein and are free of non-conformities in workmanship and material" and allows buyers to request that Siemens repair or replace any item with a nonconformity.[140]  The Standard Limited Warranty is effective for one year from initial operation of the goods but not more than 18 months from

---

[134] *See, e.g.,* Brnich Deposition, at p. 128; Montoya Deposition, at pp. 129-131; Zank Deposition, at pp. 43-45; **Table 5**.

[135] Duemmler Deposition, at p. 74.

[136] Duemmler Deposition, at p. 74.

[137] Brnich Deposition, at p. 144.

[138] Kees Deposition, at pp. 22-23.

[139] *See, e.g.,* SIEMENS_AFCI_00090070-071; SIEMENS_AFCI_00230231-234.

[140] SIEMENS_AFCI_00090070-071, at 070.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

"Seller's shipment of the goods, provided Buyer has sent written notice within that period of time to Seller that the goods do not conform to the […] warranty."[141]  Repaired and replacement parts are warranted "for the remainder of the original period of notification … but in no event less than 12 months from repair or replacement."[142]  In the case that "Seller is unable or unwilling to repair or replace, or if repair or replacement does not remedy the nonconformity, Seller and Buyer shall negotiate an equitable adjustment in the contract price, which may include a full refund of the contract price for the nonconforming goods."[143]  Siemens disclaims all other warranties, express or implied, and specifically, disclaims the implied warranties of merchantability, fitness for a particular purpose, course of dealing and usage of trade.[144]

49.    Standard Extended Warranty For Residential Products.  Siemens Standard Extended Warranty for Residential Products extends the warranty period for a selection of products, not including AFCI or GFCI breakers.[145]  According to Siemens Standard Extended Warranty for Residential Products, AFCI and GFCI breakers are still covered by the standard warranty.[146]  Siemens Standard Extended Warranty for Residential Products does not disclaim any other warranties.[147]

---

[141] SIEMENS_AFCI_00090070-071, at 070.

[142] SIEMENS_AFCI_00090070-071, at 070.

[143] SIEMENS_AFCI_00090070-071, at 070.

[144] SIEMENS_AFCI_00090070-071, at 070.

[145] SIEMENS_AFCI_00230231-234, at 232.

[146] SIEMENS_AFCI_00230231-234, at 232.

[147] SIEMENS_AFCI_00230231-234.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

## VII.    OVERVIEW OF PLAINTIFFS' ALLEGATIONS AND PUTATIVE CLASS DEFINITION

### A.    Plaintiffs' Allegations

50.    Plaintiffs allege that Siemens AFCIs are not able to "adequately distinguish between harmless and dangerous arcs"[148] and are "defective and frequently and unnecessarily trip in the presence of common and harmless arcs."[149]  Plaintiffs allege that "Siemens has failed to update its AFCIs to identify and ignore harmless arcing signatures caused by common appliances, especially as new appliances have been developed and electrical codes have expanded the locations where homeowners are required to use AFCIs."[150]

51.    <u>Commercial Plaintiffs</u>.  I understand that the Commercial Plaintiffs claim that they "have installed Siemens' AFCI breakers that experienced nuisance tripping and needed to be replaced or paid for someone to do so" and have "expended uncompensated time and effort seeking to identify the cause of the nuisance tripping, finding later that the issue was Siemens' defective AFCI itself."[151]  The Commercial Plaintiffs allege that they "have suffered substantial harm from Siemens' defective AFCI breakers" and had "Siemens disclosed that its AFCIs suffered from frequent and unnecessary nuisance tripping," they "would not have purchased Siemens' AFCIs or installed them in their customers' homes or would not have had to exhaust time and effort searching for the cause of the nuisance tripping[.]"[152]

---

[148] Amended Complaint, at ¶ 50.

[149] Amended Complaint, at ¶ 65.

[150] Amended Complaint, at ¶ 5.

[151] Amended Complaint, at ¶ 9.

[152] Amended Complaint, at ¶ 9.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

52.    <u>Consumer Plaintiffs</u>.  I understand that the Consumer Plaintiffs claim that the Siemens AFCIs, which they "either paid an electrician to install … in their homes" or were already installed in their home when they purchased it, "experienced frequent and unexplained nuisance tripping[.]"[153]  According to the Consumer Plaintiffs, they "[lost] money paying companies to investigate and determine the cause of the nuisance tripping and replace the malfunctioning AFCIs."[154]  The Consumer Plaintiffs assert that they have found no evidence of any dangerous arcing despite the frequent nuisance tripping and "[h]ad Siemens disclosed that its AFCIs experience frequent and unnecessary nuisance tripping," they "would not have paid to install Siemens' breakers in their home and would not have suffered damages associated with attempting to identify and resolve the nuisance tripping."[155]

53.    <u>Overlapping Claims</u>.  All Plaintiffs raise a claim against Siemens for fraudulent concealment under Georgia law.[156]  According to Plaintiffs, Siemens "fraudulently concealed the defects in its AFCI breakers" and "puts the blame on homeowners and electricians" when "Siemens' AFCI breakers trip unexpectedly and unnecessarily."[157] Plaintiffs allege that they

> . . . paid a premium for Siemens' AFCI breaker because Siemens represented the AFCI breaker could perform functions that the breaker did not perform and that, any nuisance tripping of the breaker was not due to

---

[153] Amended Complaint, at ¶ 10.

[154] Amended Complaint, at ¶ 10.

[155] Amended Complaint, at ¶ 10.

[156] Amended Complaint, at ¶¶ 183-194.

[157] Amended Complaint, at ¶¶ 184, 188.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

any defect. Plaintiffs lost the value of the AFCI breaker when they suffered from frequent, and unnecessary nuisance tripping.[158]

In addition, the Commercial Plaintiffs "suffered harm investigating the potential causes of nuisance tripping when, in reality, the issue was Siemens' defective AFCI breaker."[159]

54.    Subsets of Named Plaintiffs and putative Subclasses raise claims for breach of implied warranty under the various states' laws.[160] Subsets of Named Plaintiffs and putative Subclasses allege that Siemens' AFCI breakers are "not of average quality, [are] not fit for their ordinary purpose, [are] not within the variations of quality permitted, and [do] not conform to Siemens' representations."[161]

55.    In addition (based upon the Amended Complaint), certain of the Named Plaintiffs and putative Subclasses raise various statutory claims (i.e., mainly statutory consumer protection claims). Examples are provided immediately below.

   a.  Plaintiffs Electricalifornia and Mr. Cates claim that "Siemens acted unfairly and deceptively by making available for sale AFCI breakers that could not perform the basic and required function of AFCI breakers" in violation of California Civil Code § 1750, *et seq.* and Business and Professional Code § 17200 *et seq.*[162]

   b.  Plaintiff Jason Wylie claims that "Siemens knew that AFCIs should not be nuisance tripping and, to function as expected and required, should only trip in the present [*sic*] of a dangerous arc." Plaintiff Jason Wylie also claims that Siemens violated the Texas Deceptive Trade Practices Act, Texas Business & Commerce Code § 17.46 for failing to disclose this information at the time of purchase.[163]

---

[158] Amended Complaint, at ¶ 193.

[159] Amended Complaint, at ¶ 193.

[160] Amended Complaint, at ¶¶ 195-209.

[161] Amended Complaint, at ¶ 199.

[162] Amended Complaint, at ¶¶ 211, 214, 224, 226.

[163] Amended Complaint, at ¶¶ 235, 236, 241.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

### B. Putative Class Definition

#### 1. Putative Class As Described In Amended Complaint

56.    As identified in the Amended Complaint, Plaintiffs seek certification of two putative

Classes.

   a.  A putative Commercial Class is defined as "[a]ny business in the United States that installed and investigated, resolved, or attempted to resolve tripping presented by a Siemens' AFCI breaker."[164]

   b.  A putative Consumer Class is defined as "[a]ny person in the United States who purchased a Siemens' AFCI breaker, except for resale."[165]

57.    In the alternative, Plaintiffs seek to certify nine putative subclasses that include both

individual consumers and business entities.[166]

   a.  Putative California Subclass: "Any person or business entity located in California who purchased a Siemens AFCI breaker."[167]

---

[164] Amended Complaint, at ¶ 174.  Instead of a putative Commercial Class, the Consolidated Complaint filed in August 2022 defines a putative Electrician Class as "[a]ny electrician or electrical business in the United States that installed and investigated, resolved, or attempted to resolve tripping presented by a Siemens' AFCI breaker."  The putative Commercial Class was added to replace the putative Electrician Class in the Amended Complaint filed in September 2024.  *See* Consolidated Class Action Complaint, *Kevin Brnich Electric LLC, et al. v. Siemens Industry, Inc.*, United States District Court for the Northern District of Georgia, filed August 2, 2022, at ¶ 192; Amended Consolidated Class Action Complaint, *Kevin Brnich Electric LLC, et al. v. Siemens Industry, Inc.*, United States District Court for the Northern District of Georgia, filed September 19, 2024, at ¶ 212.

[165] Amended Complaint, at ¶ 174.

[166] The Consolidated Complaint filed in August 2022 defines nine putative subclasses: California, Pennsylvania, Maine, Nebraska, New Hampshire, North Carolina, Ohio, Oregon, and Washington. The Amended Complaint filed in September 2024 defines twelve putative subclasses: California, Maine, Massachusetts, Nebraska, New Hampshire, New Jersey, North Carolina, Oregon, Pennsylvania, Texas, Washington, and Wisconsin.  Subclasses defined in the Consolidated Complaint filed in August 2022 and the Amended Complaint filed in September 2024 both include individual consumers and business entities in the respective states.  *See* Consolidated Class Action Complaint, *Kevin Brnich Electric LLC, et al. v. Siemens Industry, Inc.*, Case No. 1:22-cv-01229-MHC, United States District Court for the Northern District of Georgia, filed August 2, 2022, at ¶ 194; Amended Consolidated Class Action Complaint, *Kevin Brnich Electric LLC, et al. v. Siemens Industry, Inc.*, Case No. 1:22-cv-01229-MHC, United States District Court for the Northern District of Georgia, filed September 19, 2024, at ¶ 214.

[167] Amended Complaint, at ¶ 176.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

   b.  Putative Maine Subclass: "Any person or business entity located in Maine who purchased a Siemens AFCI breaker."[168]

   c.  Putative Nebraska Subclass: "Any person or business entity located in Nebraska who purchased a Siemens AFCI breaker."[169]

   d.  Putative New Hampshire Subclass: "Any person or business entity located in New Hampshire who purchased a Siemens AFCI breaker."[170]

   e.  Putative North Carolina Subclass: "Any person or business entity located in North Carolina who purchased a Siemens AFCI breaker."[171]

   f.  Putative Oregon Subclass: "Any person or business entity located in Oregon who purchased a Siemens AFCI breaker."[172]

   g.  Putative Pennsylvania Subclass: "Any person or business entity located in Pennsylvania who purchased a Siemens AFCI breaker."[173]

   h.  Putative Texas Subclass: "Any person or business entity located in Texas who purchased a Siemens AFCI breaker."[174]

   i.  Putative Wisconsin Subclass: "Any person or business entity located in Wisconsin who purchased a Siemens AFCI breaker."[175]

## 2.  Putative Class As Described In Caves Report

58.  As addressed later in my report, Dr. Caves defines the putative Class as "[a]ny person in the United States who purchased Siemens' AFCI breaker, except for resale[,]" and the putative Subclasses as enumerated in the Amended Complaint.[176]  Although not explicitly

---

[168] Amended Complaint, at ¶ 176.

[169] Amended Complaint, at ¶ 176.

[170] Amended Complaint, at ¶ 176.

[171] Amended Complaint, at ¶ 176.

[172] Amended Complaint, at ¶ 176.

[173] Amended Complaint, at ¶ 176.

[174] Amended Complaint, at ¶ 176.

[175] Amended Complaint, at ¶ 176.

[176] Caves Report, at ¶ 5.

- 42 -
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

stated, the "except for resale" phraseology appears to indicate that Dr. Caves is referencing the Consumer Class as defined in the Amended Complaint. In his report, however, Dr. Caves also claims that the "[putative] Class and the [putative] Subclasses alleged in the Complaint include electricians that purchased the Class AFCIs in order to provide electrical services, as well as individuals that purchased the Class AFCIs for use in their own homes."[177] While Dr. Caves is referencing the "Class," as previously described, the Amended Complaint identifies two separate Classes (not one class): the Commercial Class and the Consumer Class.[178] While not clear in the phraseology used by Dr. Caves, he does appear to recognize this distinction when he states that "[t]he Amended Complaint defines a "Consumer Class," and distinguishes it from a "Commercial Class" comprised of "[a]ny business in the United States that installed and investigated, resolved, or attempted to resolve tripping presented by a Siemens' AFCI breaker.""[179]

59.    As explained in more detail later in my report in **Section X**, I understand that Dr. Caves only is evaluating claimed damages associated with the putative Consumer Class and the Subclasses.[180] Dr. Caves does not address the putative Commercial Class as he "ha[s] not been asked to opine on the Commercial Class."[181] However, the putative Class definition used by Dr. Caves is not clear on this point, especially (as described later in my report) given that Dr. Caves is simultaneously stating (a) he "ha[s] not been asked to opine on the

---

[177] Caves Report, at ¶ 6.

[178] Amended Complaint, at ¶ 174.

[179] Caves Report, at ¶ 5, Footnote 5.

[180] Caves Report, at ¶ 5, Footnote 5.

[181] Caves Report, at ¶ 5, Footnote 5.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

Commercial Class"[182] but (b) 90 percent of the respondents to Dr. Caves survey are electricians,[183] and he states "[t]he Class and the Subclasses alleged in the Complaint include electricians that purchased the Class AFCIs in order to provide electrical services, as well as individuals that purchased the Class AFCIs for use in their own homes."[184]

60. I evaluate Dr. Caves' analysis under the assumption that the conclusions he reaches apply to the Consumer Class and state Subclasses. I also comment on issues that apply to the Commercial Class.

## VIII. SUMMARY OF NAMED PLAINTIFFS' CLAIMS OF HARM AS PRESENTED IN AMENDED COMPLAINT

### A. Commercial Plaintiffs' Claims Of Harm

61. According to the Amended Complaint, Named Commercial Plaintiffs allege that they suffered monetary losses in terms of the cost of unusable Siemens AFCIs they purchased, and the time spent investigating and attempting to resolve nuisance tripping.[185] Named Commercial Plaintiffs all claim that these monetary and time costs were not passed on to customers.[186]

62. According to the Amended Complaint, Commercial Plaintiffs also allege that they would not have purchased or used Siemens AFCIs and would have advised their customers not to use them if they had known that Siemens AFCIs "contained an algorithm incapable of

---

[182] Caves Report, at ¶ 5, Footnote 5.

[183] Caves Report, at ¶ 29.

[184] Caves Report, at ¶ 6.

[185] *See, e.g.,* Amended Complaint, at ¶¶ 102, 103.

[186] *See* Amended Complaint, at ¶¶ 101-102, 110-111, 119, 126-127.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

distinguishing dangerous and harmless arcs."[187]  Furthermore, members of the California subclass, including Commercial Plaintiff Electricalifornia, allege that they would have purchased a competitor's AFCI breakers instead of the Challenged Products, or would have paid less for the Challenged Products, had they known about the Alleged Defect.[188]  At least one of the Commercial Plaintiffs stated that they would sometimes purchase Siemens AFCIs because homeowners had already fitted Siemens breaker panels, or because their supplier carried Siemens products.[189]

63.    According to the Amended Complaint, all Commercial Plaintiffs claim that they "would not have [knowingly] purchased AFCI breakers that, like Siemens' AFCIs, failed to perform their essential purpose and caused them to repeatedly and unnecessary trip even when no dangerous arcing was occurring in the circuit."[190] All Commercial Plaintiffs further allege that they paid a premium for the Challenged Products "because Siemens represented the AFCI breaker could perform functions that the breaker did not perform and that, any nuisance tripping of the breaker was not due to any defect."[191]

---

[187] *See, e.g.,* Amended Complaint, at ¶¶ 100, 109, 125.

[188] *See* Amended Complaint, at ¶¶ 221, 232.

[189] *See, e.g.,* Amended Complaint, at ¶ 94.  "Where he has used Siemens, he has done so because his customers have a Siemens' panel, which requires a Siemens' AFCI breaker be used and, additionally, because his supplier carries Siemens electrical products."

[190] Amended Complaint, at ¶ 191.

[191] Amended Complaint, at ¶ 193.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

### B. Consumer Plaintiffs' Claims Of Harm

64. Named Consumer Plaintiffs claim damages in numerous forms. Examples from two Consumer Plaintiffs are outlined below. Additional examples are provided throughout my report.

   a. Plaintiff Vodicka, who replaced his Siemens AFCIs with competitor AFCIs after allegedly experiencing nuisance tripping, alleges he "lost the value he paid for the defective Siemens' AFCI breakers," incurred expenses paid to electricians to investigate and resolve nuisance tripping, and that he would not have installed Siemens AFCIs had he known that they "were subject to frequent nuisance tripping."[192]

   b. Plaintiff Cates, whose Siemens AFCIs had not been replaced as of the Amended Complaint, also alleges he "lost the value he paid for the defective Siemens' AFCI breakers" and incurred expenses paid to his builder to investigate and resolve nuisance tripping.[193]

65. I understand the claims by Consumer Plaintiffs that they "lost the value [they] paid for the defective Siemens' AFCI breakers"[194] can have at least two different meanings, depending upon the circumstances of the Named Plaintiff in question. In the case of Plaintiff Vodicka who replaced his Siemens AFCIs, "lost value" may mean the entire purchase price of his Siemens AFCIs. For Plaintiff Cates who is still using his Siemens AFCIs, "lost value" can refer to the difference between the purchase price and the price he would have been willing to pay had he known about the Alleged Defect prior to purchasing his Siemens AFCIs.

66. Named Consumer Plaintiffs claim injuries based upon having paid for Siemens AFCIs, for replacement AFCIs, and for electricians to investigate and resolve nuisance tripping.[195]

---

[192] Amended Complaint, at ¶ 134.

[193] Amended Complaint, at ¶ 139.

[194] *See, e.g.,* Amended Complaint, at ¶¶ 134, 139.

[195] *See, e.g.,* Amended Complaint, a ¶¶ 130-131, 134. "[Plaintiff Vodicka] hired a builder and electrician, among others, to build his home in 2014 … his builder and electrician installed Siemens' breakers, including Siemens AFCIs,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

According to the Amended Complaint, all Consumer Plaintiffs claim that they "would not have [knowingly] purchased AFCI breakers that, like Siemens' AFCIs, failed to perform their essential purpose and caused them to repeatedly and unnecessary trip even when no dangerous arcing was occurring in the circuit."[196]

67.    All Consumer Plaintiffs allege that they paid a premium for the Challenged Products "because Siemens represented the AFCI breaker could perform functions that the breaker did not perform and that, any nuisance tripping of the breaker was not due to any defect."[197]

## IX.    SUMMARY OF PLAINTIFFS' EXPERTS' REPORTS

68.    Plaintiffs submitted at least two expert reports (the Caves Report and the Durham Report) in support of class certification in this matter.  In this section, I summarize these two reports.  My summary primarily focuses on describing the analyses undertaken by Dr. Caves.  An economic and damages-based evaluation of the results of Dr. Caves' analyses is presented later in my report.

### A.  Caves Report

69.    Dr. Caves has been asked by Plaintiffs' Counsel "to assess whether economic injury and aggregate damages to members of the Class … can be reliably determined using data and methods common to the Class."[198]  Based upon the analyses conducted by Dr. Caves, he presents the following opinions.

---

in his Siemens' panel box … He replaced four Siemens' AFCIs with brand new ones at his own expense … [Plaintiff Vodicka] also incurred expenses hiring electricians to investigate and resolve nuisance tripping in Siemens AFCIs."

[196] Amended Complaint, at ¶ 191.

[197] Amended Complaint, at ¶ 193.

[198] Caves Report, at ¶ 1.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

    a. <u>Caves Opinion #1</u>: "[T]hat economic injury and aggregate damages can be reliably demonstrated using Choice-Based Conjoint ("CBC") analysis."[199]

    b. <u>Caves Opinion #2</u>: "[T]hat the Alleged Defect resulted in Class Members overpaying significantly for [the Challenged Products]."  Furthermore, via a market simulation based upon his CBC analysis, Dr. Caves offers what he refers to "conservatively" as a 32 percent estimated Price Premium (overpayment) attributable to the Alleged Defect.[200]

70.    In support of Caves Opinion #1, Dr. Caves describes conjoint analysis as a technique grounded in economic modeling frameworks that have been widely used in academic studies and widely adopted by the private sector.[201]  Dr. Caves further states that CBC analysis "is used to rigorously quantify customer valuations of product attributes that are not priced separately" and that "[f]rom the perspective of CBC analysis, product labels, warnings, or similar information constitute product attributes and are readily incorporated into the standard CBC framework."[202]  Dr. Caves asserts "CBC analysis uses data and methods common to all Class Members."[203]  I address this latter point later in my report.

71.    In support of Caves Opinion #2, Dr. Caves proposes a claimed damages analysis consisting of four elements: (a) a CBC survey, (b) a conjoint analysis of the CBC survey data, (c) a market simulation, and (d) damages estimates based upon his estimated Price Premium and Siemens' sales and financial data.

---

[199] Caves Report, at ¶ 9.

[200] *See e.g.* Caves Report, at ¶ 53. Dr. Caves states that "the market shares used in [his] simulations are calculated using the utilities obtained from the Hierarchical Bayesian analysis of the CBC survey data." *See also* Caves Report, at ¶ 10.

[201] Caves Report, at ¶¶ 19-20.

[202] Caves Report, at ¶¶ 21, 23.

[203] Caves Report, at ¶ 22.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

72.    In the remainder of this section, I summarize each element of Dr. Caves' claimed damages assessment.

### 1.    CBC Survey

73.    To perform his conjoint analysis, Dr. Caves conducts a CBC survey of 500 respondents.[204] Dr. Caves "defined the target population to include primarily licensed electricians in the U.S. who purchased Siemens AFCIs between 2017 and the present."[205]  Approximately 90 percent of respondents identified themselves as licensed electricians.[206]

74.    Prior to participating in the CBC survey, Dr. Caves' survey participants were subjected to a number of screening questions.  These questions restricted his sample to include only individuals who, at the time of the survey:

a.    resided in the U.S.;[207]

b.    were older than 18;[208]

c.    could identify AFCI as the acronym for Arc Fault Circuit Interrupter among 10 alternatives;[209]

d.    had purchased one or more Siemens brand AFCIs in the U.S. between 2017 and "present;"[210]

e.    could recall the location where they made the purchase and where they made the purchase most often;[211] and

---

[204] Caves Report, at ¶ 27.

[205] Caves Report, at ¶ 29.  Presumably, "the present" would be as of the date that Dr. Caves conducted his survey.

[206] Caves Report, at ¶ 29.

[207] Caves Report, Appendix A, at p. 2.

[208] Caves Report, Appendix A, at p. 3.

[209] Caves Report, Appendix A, at p. 4.

[210] Caves Report, Appendix A, at pp. 5-6.

[211] Caves Report, Appendix A, at pp. 7-8.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

    f.  had not participated in any surveys about circuit breakers in the prior 30 days.[212]

75.    Electricians also were asked which U.S. state they were licensed in and were excluded from the survey if they did not provide a U.S. state.[213]

76.    After the screening questions, respondents were asked to act, for the remainder of the survey, as though they were in the market to purchase AFCIs for a typical project(s) or for general inventory.[214]  Respondents were told that "[i]f the typical project(s)/inventory [they] have in mind would require AFCIs to be compatible with the panels of specific brands or manufacturers, [they should] take this into consideration when deciding on [their] answer."[215]

77.    During Q22 of the survey, respondents were shown the following prompt defining nuisance tripping.

> In the questions that follow, certain AFCIs have a "Nuisance Tripping Defect."  These AFCIs use an arc detection method that, according to reports, leads these AFCIs to trip due to common and safe voltage distortions that cause radio frequency harmonics.  These distortions are generated by some models of common household appliances, electrical devices, and lighting, listed below:
>
> 1.  Major household appliances, such as microwaves, ovens, washing machines, dryers, refrigerators, garage door openers and water heaters;
>
> 2.  Lighting products, including LED light bulbs, Christmas lights, under cabinet lighting, light fixtures, recessed lighting, light switches, dimmers, halogen and fluorescent lights;
>
> 3.  Plug-in electrical devices, like vacuum cleaners, wall charges, internet signal boosters, power tools, and printers; and,

---

[212] Caves Report, Appendix A, at p. 12

[213] Caves Report, Appendix A, at p. 10.

[214] Caves Report, Appendix A, at p. 21.

[215] Caves Report, Appendix A, at p. 21.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

> 4. Voltage distortions that may cause radio frequency harmonics from external sources, including electrical transformers and broadband power lines.
>
> If AFCIs with the Nuisance Tripping Defect are installed on circuits with, or in the same panel of circuits serving, these devices, they may trip and shut off power when no dangerous arc fault exists.
>
> Other current or future household products that create voltage distortions and radio frequency harmonics may also cause these same AFCIs to experience Nuisance Tripping.
>
> Manufacturers of AFCIs with the Nuisance Tripping Defect have claimed their AFCIs are not designed to exclusively identify a true arc, but instead trip when they detect any signal that resembles an arc, even if that signal comes from a safe and properly functioning device.[216]

78. For the purposes of his survey, Dr. Caves assigned two "levels" to an "attribute" for disclosure of the Alleged Defect ("Nuisance Tripping Disclosure"):[217]

   a. "DEFECTIVE: Prone to Nuisance Tripping;" and

   b. "NOT DEFECTIVE."

79. In addition to this Nuisance Tripping Disclosure, Dr. Caves' CBC survey included the following AFCI attributes.

   a. <u>Manufacturer/Brand</u>: Siemens, Eaton, Schneider Electric (Square D), and ABB/General Electric.[218]

   b. <u>Function</u>: Single-function AFCIs which protect against arc faults only and dual-function AFCI/GFCIs (required in kitchen and laundry circuits).[219]

---

[216] Caves Report, at ¶ 40; Caves Report, Appendix A, at p. 24.

[217] Caves Report, at ¶ 41, Table 2.

[218] Caves Report, at ¶ 33.

[219] Caves Report, at ¶ 34. While Dr. Caves uses the term "single-function AFCIs" in his report to refer to AFCI products without dual AFCI/GFCI functionality, I understand that "single-function" is not a term commonly used to refer to certain AFCI products in the market.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

      c.   Mounting/Connection: The older "Plug-In Pigtail" and newer "Plug-On Neutral" connection types.[220]

      d.   Current Rating: The maximum current that the circuit can carry under normal conditions.[221]

      e.   Price: "[C]onstructed…using market data on actual retail prices compiled from sources such as Home Depot, Lowes [sic], Amazon, and Simply Breakers, an online electrical supply retailer."[222] The prices used in his survey are $43.69, $49.56, $59.97, $62.28 and $70.77 (although different prices are reported in Table 2 and Table 3 of the Caves Report).[223]

80.    Dr. Caves also includes AFCI interruption rating and number of poles as attributes with single levels across all products.[224] For features not otherwise listed, Dr. Caves asked

---

[220] Caves Report, at ¶ 35.

[221] Caves Report, at ¶ 37.

[222] Caves Report, at ¶ 39.

[223] Caves Report, at ¶ 39, Table 3. *See also* Caves Report backup material "Survey_Questionnaire Reference.txt", at line 1211-1215. Dr. Caves explains that the prices used for his CBC survey's Price attribute were "constructed…using market data on actual retail prices compiled from sources such as Home Depot, Lowes [sic], Amazon, and Simply Breakers, an online electrical supply retailer." *See* Caves Report, at ¶ 39. For support, Dr. Caves provides a spreadsheet ("AFCI Product Research.xlsx") containing hardcoded price points for 16 of the top 25 Siemens AFCIs listed in Table 1 of his report. (*See* Caves Report, at Table 1.) Dr. Caves does not indicate which specific sources provide support for each individual price, nor does he provide evidence as to whether these prices were observed during or outside of the Class Period. Consequently, I cannot validate with the data Dr. Caves uses (if any) as to how he determined the prices reported, the price range, or the increments in prices that he uses in the CBC survey and market simulation. Also, there appear to be unexplained differences in the prices Dr. Caves reports as being used in his CBC survey (although, ultimately, one can determine the prices used in the conjoint survey from Dr. Caves supporting materials).

- In Table 2 of his report, Dr. Caves states that he includes prices of $43.69, $55.47, $59.97, $62.53, and $70.77 in his CBC survey. (*See* Caves Report, at Table 2.)
- The prices $55.47 and $62.53 included in Table 2 are not included in the list of prices in Table 3.
- The prices $49.56 and $62.28 included in Table 3 are not included in the list of prices in Table 2.

(*See* Caves Report, at Table 2, Table 3.) Dr. Caves' supporting materials indicate that the Table 3 prices were the prices used by Dr. Caves in his survey. However, I note that two of the prices Dr. Caves includes in his CBC survey—his $59.97 and $62.28 price points—do not appear in his supporting spreadsheet ("AFCI Product Research.xlsx").

[224] Caves Report, at ¶¶ 36, 38, Table 2.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

respondents to assume that the products shown to them "have very similar or identical features."[225]

### 2. <u>Conjoint Analysis</u>

81.    Dr. Caves applies the standard Hierarchical Bayesian statistical method to his survey data to obtain respondent utility estimates for each attribute described previously.[226] Based upon his survey results, Dr. Caves claims a large part-worth, or "strong consumer disutility," attributed to the Nuisance Tripping Disclosure (as measured by responses to his survey question).[227] Dr. Caves states "AFCIs that deliver greater total utility are more likely to be selected than AFCIs that deliver lower total utility."[228]

### 3. <u>Market Simulation</u>

82.    According to Dr. Caves, "[c]onjoint practitioners use market simulators to analyze how equilibrium prices shift in response to changes in product attributes."[229] Using the estimates of consumer utilities obtained from his conjoint analysis, Dr. Caves estimates a Price Premium for the Challenged Products via a market simulation.[230]

83.    For his analysis, Dr. Caves starts by defining a hypothetical AFCI market to simulate. In this market, all four manufacturers included in his CBC survey produce two products: a single-function AFCI and a dual-function AFCI/GFCI.[231] Each product has technical

---

[225] Caves Report, Appendix A, at p. 22.

[226] Caves Report, at ¶ 43.

[227] Caves Report, at ¶¶ 43-44, 49.

[228] Caves Report, at ¶ 44.

[229] Caves Report, at ¶ 52.

[230] Caves Report, at ¶¶ 50-51.

[231] Caves Report, at ¶ 34, Table 2, Table 3.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

specifications that are otherwise identical to Siemens model QA120AFCN AFCI with

respect to the attributes included in his CBC survey.[232]

84.     Dr. Caves then conducts his market simulation analysis in three steps.

   a.   First, he obtains simulated market shares for the eight hypothetical competing AFCIs
        (and the outside option of "no purchase"), assuming a price of $51.43 for each brand
        for all single-function AFCIs and a price of $57.19 for each brand for all dual-function
        AFCI/GFCIs,[233] to obtain market shares under a hypothetical market outcome without
        the Nuisance Tripping Disclosure.[234]  At this stage, Dr. Caves reports that Siemens
        accounts for a 32 percent share of sales in the simulated market, the largest combined
        share of all brands considered.[235]

   b.   Second, Dr. Caves performs another market simulation wherein simulated market
        shares are determined after including the Nuisance Tripping Disclosure as an attribute
        with Siemens single-function AFCIs.[236]  In this simulation, consumers who would have
        bought Siemens single-function AFCIs without the Nuisance Tripping Disclosure are
        allowed to substitute to Siemens dual-function AFCI/GFCIs or to a single-function or
        dual-function product offered by another manufacturer.[237]  Relative to his first
        simulation, Siemens' simulated market share drops three percentage points, with a four
        percentage point drop in Siemens' single-function AFCI simulated market share and a
        one percentage point increase in Siemens' dual-function AFCI/GFCI simulated market
        share.[238]

   c.   Third, Dr. Caves simulates the percentage reduction in price for Siemens single-
        function AFCIs that would be required to return Siemens to a simulated market share
        of 32 percent, as in the first simulation.[239]  Through a process of trial-and-error, Dr.
        Caves concludes that to equalize Siemens' simulated market shares, Siemens would

---

[232] According to Dr. Caves, Siemens' QA120AFCN is a single-pole AFCI with a plug-on neutral connection, a rating
of 20 amperes, and an interruption rating of 10 kiloamperes at 120 volts.  *See* Caves Report, at ¶ 53.

[233] According to Dr. Caves, this is the average of the prices he observed for Siemens products in the market.  *See*
Caves Report, at ¶¶ 53-54, Figure 4.

[234] *See* Caves Report, at ¶¶ 53-54, Figure 4.

[235] Caves Report, at ¶ 54.

[236] Caves Report, at ¶ 55.

[237] Caves Report, at ¶ 55.

[238] Caves Report, at ¶ 56.

[239] Caves Report, at ¶ 57.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

need to reduce (in the simulation) the price of its single-function AFCIs by approximately 68 percent.[240]

85.    To arrive at his final Price Premium estimate, Dr. Caves supplements his market simulation with a claimed "supply-side analysis" wherein he allows Siemens to adjust its quantity supplied of single-function AFCIs with the Nuisance Tripping Disclosure attribute in response to the shift in demand associated with the Nuisance Tripping Disclosure.[241] According to Dr. Caves, allowing Siemens to restrict its quantity supplied in response to a shift in demand increases Siemens' profits by allowing it to charge a higher price and incur lower costs than it would holding quantity supplied fixed.[242]

86.    For his supply-side analysis, Dr. Caves allows Siemens to adjust its single-function AFCIs price in response to shifts in demand (associated with the Nuisance Tripping Disclosure) while holding prices and quantities fixed for all other AFCIs in the market (including Siemens dual-function AFCIs).[243]  Dr. Caves also assumes that demand for Siemens single-function AFCIs is linear (i.e., a straight line).[244]  Finally, Dr. Caves solves the model to obtain the change in price that maximizes Siemens' profits in response to a shift in

---

[240] Caves Report, at ¶ 57.  Dr. Caves states the following: "Next, I conduct additional supply-side analysis that allows Siemens to reduce the supply of the Class AFCIs in the but-for world in response to decreased demand resulting from the Nuisance Tripping Defect."  (Caves Report, at ¶ 58.)

[241] Caves Report, at ¶ 58.

[242] Caves Report, at ¶ 58.  "This analysis also allows Siemens to incur lower costs in the but-for world by supplying fewer Class AFCIs than it did in the actual world."  This assertion by Dr. Caves is unclear. I infer that by "costs," Dr. Caves means "total costs," as he assumes constant marginal cost later in his analysis. *See* Caves Report, at ¶ 60.

[243] Caves Report, at ¶ 60.

[244] Caves Report, at ¶ 60.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

demand, which he states is equal to one-half of the price change required to keep market shares fixed (based upon the aforementioned assumptions).[245]

87.    Adjusting the estimated price difference required to equalize market shares (within Dr. Caves' market simulation model) with and without the Nuisance Tripping Disclosure to account for supply-side changes (using a linear downward sloping demand curve), Dr. Caves obtains a Price Premium estimate of 34 percent.[246]  Dr. Caves then performs a series of alternative simulations of his model (which he calls "sensitivity analyses") that yield claimed Price Premium estimates in the range of 32 percent to 38 percent.[247]  Dr. Caves concludes his "final estimate of the Price Premium is 32 percent.  This is the low end of the various Price Premium estimates detailed in Appendix D."[248]

### 4.    Asserted Damages Estimates

88.    Dr. Caves obtains a claimed damages estimate of ▮▮▮▮▮▮▮ for the period January 1, 2017 to December 10, 2021, and an alternative damages estimate of ▮▮▮▮▮▮▮ for the period June 21, 2017 to December 10, 2021.  To obtain these estimates, Dr. Caves

---

[245] Caves Report, at ¶¶ 60-61.  (Footnote omitted.)

For a linear demand curve, $Q = \alpha - \beta P$, where $\alpha$ is the intercept of the demand curve, $\beta$ is the slope of the demand curve, $Q$ is the quantity demanded, and $P$ is price. This equation can be rewritten $P = \alpha/\beta - Q/\beta$. If the intercept of the demand curve, $\alpha$, shifts downward to $\alpha'$, then the downward vertical shift is $\Delta P = [\alpha/\beta - Q/\beta] - [\alpha'/\beta - Q/\beta] = [\alpha - \alpha']/\beta$. The profit maximizing price for a firm facing a linear demand curve is $\Delta P_{MAX} = 0.5[\alpha/\beta + C]$, where $C$ is marginal cost. The decrease in the firm's profit-maximizing price resulting from a downward shift in demand is $\Delta P_{MAX} = 0.5[\alpha/\beta + C] - 0.5[\alpha'/\beta + C] = 0.5[\alpha - \alpha']/\beta = 0.5\Delta P$.

Accordingly, the decrease in the profit-maximizing price resulting from a downward vertical shift in the demand curve can be estimated as one-half of the distance of the vertical shift—that is, [68 percent] x [0.5] = 34 percent.

[246] $34 = 68 \times 0.5$. Caves Report, at ¶ 61.

[247] Caves Report, at ¶ 63.  Caves Report, Appendix D, at Table D1, ¶ 7.

[248] Caves Report, at ¶ 64.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

multiplies Siemens' aggregate revenues for the Challenged Products during these periods

by his estimated 32 percent Price Premium.[249]  Summarized in **Table 3** below are the

claimed aggregate damages presented in the Caves Report.

**Table 3[250]**
**Claimed Aggregate Damages Presented in the Caves Report**

| Fiscal Year | Siemens Putative Class AFCI Revenue | Price Premium | Claimed Aggregate Damages |
|---|---|---|---|
| 2017 (Partial) | | | |
| ███ | | | |
| ███ | | | |
| ███ | | | |
| ███ | | | |
| ███ | | | |
| ███ | ███ | ███ | ███ |
| ███ | | | |
| ███ | ███ | ███ | ███ |

### B. Durham Report

89.    In my report, I do not evaluate the opinions presented in the Durham Report.  However,

the opinions expressed in the Durham Report are foundational to the analysis conducted

by Dr. Caves.  Consequently, I present here a brief overview of the opinions expressed in

the Durham Report.

90.    The scope of Dr. Durham's report is limited to a technical evaluation of Siemens' AFCI

breakers and related materials.[251]  The Durham Report provides Dr. Durham's evaluation

---

[249] Caves Report, at ¶ 70.

[250] Caves Report, at Table 4.

[251] Durham Report, at ¶ 11.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

of the design, performance, and behavior of Siemens AFCI breakers "with specific attention to the causes of reported nuisance tripping and Siemens' technical understanding and handling of those issues."[252]

91.    Dr. Durham forms the following opinions regarding "the design characteristics of Siemens' Gen 3 AFCIs, the adequacy of applicable testing standards, and Siemens' interpretation and communication of product performance and reliability."[253]

> **Opinion 1**: Siemens' Gen 3 AFCI breakers are susceptible to nuisance tripping.
>
> **Opinion 2**: Siemens' engineers knew its Gen 3 AFCIs experienced nuisance tripping.
>
> **Opinion 3**: Siemens knew compliance with UL 1699 did not guarantee adequate real-world performance of Siemens' Gen 3 AFCI breakers.
>
> **Opinion 4**: Siemens incorrectly interpreted and applied FCC Part 15 regulations and its relation to nuisance tripping.
>
> **Opinion 5**: Siemens failed to align public disclosures with known technical limitations of its Gen 3 AFCIs.

92.    In the remainder of my report, from an economic and damages quantification perspective, I present my evaluation of the analyses and opinions contained in the Caves Report.

## X.    DR. CAVES' DAMAGES ANALYSIS DOES NOT ADDRESS CERTAIN CLAIMED DAMAGES THEORIES PRESENTED IN THE AMENDED COMPLAINT

93.    Dr. Caves acknowledges in his report that the Amended Complaint defines a "Consumer Class" and distinguishes it from a "Commercial Class." Dr. Caves acknowledges that the Commercial Class is comprised of "'[a]ny business in the United States that installed and

---

[252] Durham Report, at ¶ 8.

[253] Durham Report, at ¶¶ 27-32.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

investigated, resolved, or attempted to resolve tripping presented by a Siemens' AFCI breaker.'"  Dr. Caves specifically clarifies that he has "not been asked to opine on the Commercial Class."[254]  In addition, with respect to the Consumer Class, Dr. Caves conducts a claimed price premium analysis (i.e., that putative Consumer Class members allegedly overpaid for the Challenged Products).  Given the above, there is a disconnect between the analyses conducted by Dr. Caves and the damages theories presented in the Amended Complaint.  (No other damages-related report has been submitted by Named Plaintiffs.)  Consequently, I make the following economic and damages-related observations.

a.  Neither Dr. Caves nor the Named Plaintiffs have provided any analyses establishing that the <u>non-price premium damages</u> claimed by the putative Consumer Class can be reliably evaluated using common proof or that <u>any</u> of the damages that may be claimed by the putative Commercial Class can be reliably evaluated using common proof.

b.  Neither Dr. Caves nor the Named Plaintiffs have provided any analyses <u>quantifying</u> the non-price premium damages claimed by the putative Consumer Class or <u>quantifying</u> any of the damages that may be claimed by the putative Commercial Class.

c.  Neither Dr. Caves nor the Named Plaintiffs have provided any analyses describing or <u>quantifying</u> what might amount to "<u>equitable relief</u>" related to a <u>disgorgement</u> and/or <u>unjust enrichment</u> monetary remedy as outlined in the Amended Complaint.[255]

94.  I also make the following observations relating to the analyses conducted by Dr. Caves and the putative Classes (and associated claims of damages) as outlined in the Amended Complaint.

a.  <u>Consumer Plaintiffs</u>.  Consumer Plaintiffs are described in the Amended Complaint as "consumers who either paid an electrician to install a Siemens' panel box and AFCI

---

[254] Caves Report, at ¶ 5, Footnote 5.

[255] Amended Complaint, at p. 78.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

breakers in their homes or purchased a home with Siemens AFCI breakers already installed."[256]

    i.    While Dr. Caves asserts he has assessed damages for the putative Consumer Class alone, in implementing his CBC, he defines "the target population to include primarily licensed electricians in the U.S. who purchased Siemens AFCIs between 2017 and the present," noting that "[l]icensed electricians constituted the vast majority (90 percent) of survey respondents."[257]

        (a)    According to Dr. Caves, "[d]efining the target population this way ensures that survey respondents are familiar with the Class AFCIs."[258]

        (b)    However, Consumer Plaintiffs are described in the Amended Complaint as including consumers who paid an electrician to install a Siemens panel box and AFCI breakers in their homes.  It is not clear (and Dr. Caves has not commented on) whether the electricians included as respondents in his survey paid other electricians to install panel boxes and/or install AFCI breakers.

    ii.    Dr. Caves does not appear to acknowledge or attempt to reconcile this apparent mismatch between the Class for which he conducts his damages analysis (which includes individuals who paid electricians to install the Challenged Products or, in some cases, simply purchased homes where the Challenged Products had been previously installed) and the survey participants he targets, who overwhelmingly are themselves licensed electricians.

    iii.    Dr. Caves does not present a claimed damages analysis (i.e., either a common proof methodology or an actual calculation) for Consumer Plaintiffs who purchased a home with Siemens AFCI breakers already installed.

    b.    <u>Subclasses</u>.  The Amended Complaint includes a proposal by Plaintiffs in the alternative which concentrates on subclasses of "[a]ny person or business entity located in" the states of California, Maine, Nebraska, New Hampshire, North Carolina, Oregon, Pennsylvania, Texas, and Wisconsin "who purchased a Siemens AFCI breaker."[259]

        i.    Dr. Caves does not attempt to address these putative subclasses in his analysis, as he considers Siemens Challenged Product sales to all states (excluding "states"

---

[256] Amended Complaint, at ¶ 10.

[257] Caves Report, at ¶ 29.

[258] Caves Report, at ¶ 29.

[259] Amended Complaint, at ¶ 176.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

coded "11, CMX, GU, LI, ON, QC, SJ, and blanks") in his aggregate damages calculations.[260]

    ii. Dr. Caves does not address, comment on, or clarify his understanding of "business entity" as part of the state subclasses.  It is not clear if "business entities" are meant to be (a) businesses that had Siemens AFCIs installed at their location or (b) electrician businesses doing the installing.

95.     As introduced previously, Dr. Caves assesses putative Class damages by assuming "the Alleged Defect resulted in Class members overpaying significantly for Class AFCIs."[261] He then estimates the "magnitude of the overpayment ('Price Premium')" paid by putative Class members for the Challenged Products.[262]  In focusing on the putative Consumer Class and a "Price Premium" theory of damages, certain theories of damages outlined in the Amended Complaint are not addressed at all in the Caves Report – as more explicitly outlined below.

    a. Commercial Plaintiffs.

        i. [Commercial] Plaintiffs who allegedly "installed Siemens' AFCIs that experienced unexplained nuisance tripping that required time and money to investigate."[263]  Dr. Caves does not address these alleged damages associated with the time and cost Commercial Class members spent investigating the Alleged Defects.

        ii. [Commercial] Plaintiffs who allegedly "installed Siemens' AFCIs that experienced unexplained nuisance tripping…and needed to be replaced."[264]  Dr. Caves does not address these alleged damages associated with replacement costs Commercial Class members spent on the Challenged Products.

---

[260] Caves Report, at Table 4.

[261] Caves Report, at ¶ 10.

[262] Caves Report, at ¶ 10.

[263] *See* Amended Complaint, at ¶ 15.  *See also*, Amended Complaint, at ¶¶ 16-18.

[264] *See* Amended Complaint, at ¶ 15.  *See also*, Amended Complaint, at ¶¶ 16-18.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

b. Consumer Plaintiffs.

i. [Consumer] Plaintiffs who allegedly "expend[ed] time effort, and repair…costs related to Siemens' defective AFCI breakers."[265] Dr. Caves does not address these alleged damages associated with time, effort, and repair costs Consumer Class members spent on the Alleged Defects.

ii. [Consumer] Plaintiffs who allegedly had to "pay professionals to investigate and attempt to resolve the nuisance tripping, which were ultimately determined to be caused by Siemens' defective AFCI breakers."[266] Dr. Caves does not address these alleged damages associated with costs Consumer Class members spent paying professionals to investigate and resolve the Alleged Defects.

iii. [Consumer] Plaintiffs who allegedly "paid to replace Siemens' AFCI breakers in [their] home."[267] Dr. Caves does not address these alleged damages associated with costs Consumer Class members spent to replace the Challenged Products.

96. Therefore, Dr. Caves' attempts to quantify claimed Class-wide damages using a common proof method fail to account for the various types of damages alleged in the Amended Complaint. For example (and for illustrative purposes only), claimed Class-wide damages based upon a "Price Premium" approach does not have a nexus to the alleged harm to an individual who purchased a home in which an allegedly defective Siemens AFCI was already installed. In such a case, an individual may have allegedly suffered damages due to the cost of hiring professionals to troubleshoot the Alleged Defect or replacement cost of the Challenged Products, but Dr. Caves' Price Premium does not address either of these theories of alleged damages, which I discuss further below in **Section XII.A**.

97. Also, and as discussed further below, the Amended Complaint refers to a variety of Siemens residential arc fault products, including "its AFCI Circuit Breakers, Combination

---

[265] *See* Amended Complaint, at ¶¶ 20-21.

[266] *See* Amended Complaint, at ¶ 19.

[267] *See* Amended Complaint, at ¶¶ 20-22, 24.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

AFCI ('CAFCI') breakers, and its AFCI/GFCI dual function[] breakers for both 1 and 2 poles."[268]   However, Dr. Caves' analysis only "assume[s] that the Class AFCIs include all single-function AFCIs sold between January 1, 2017 and December 10, 2021."[269]   His alternative analysis also only considers single-function AFCIs.[270]   Similarly, Dr. Caves only considers 1-pole products in his CBC survey.[271]

   a.  Dr. Caves appears to omit entire categories of the Challenged Products (e.g., dual-function breakers, 2-pole AFCIs) identified in the Amended Complaint from his common proof approach to calculating claimed damages.

   b.  Dr. Caves does not appear to acknowledge, consider, or evaluate whether the price premium he bases his claimed damages estimates upon would differ for individuals who purchased a dual-function product, who (for example) would receive the additional benefits of the GFCI functionality.

98.    Given the variety of Challenged Products referenced in the Amended Complaint and Named Plaintiffs' different forms of alleged harm, the amount of claimed damages can only be accurately estimated using individual inquiry to determine the specific products purchased, the prices paid, the circumstances under which the alleged nuisance tripping occurred, the investigations made, and the cost of such investigations borne by individual putative Class members.   Individual inquiry is required to appropriately quantify the claimed damages as outlined in the Amended Complaint, which are alleged to be more varied than the "Price Premium" approach used by Dr. Caves.

---

[268] Amended Complaint, at ¶ 61.

[269] Caves Report, at ¶ 11.

[270] Caves Report, at ¶ 12.

[271] Caves Report, at ¶ 38.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

## XI.    DETERMINING WHETHER AND TO WHAT EXTENT A PUTATIVE CLASS MEMBER WAS INJURED BECAUSE OF THE ALLEGED DEFECT REQUIRES INDIVIDUAL INQUIRY

99.    In this section (and in the sections that follow), I focus many of my observations and opinions on the putative Consumer Class asserted by Named Plaintiffs. Throughout this section (and in the sections that follow), "Consumer Class" may be shortened to "Class" as the context dictates. When appropriate, I specifically identify when I am making a distinction between the putative Commercial Class and the putative Consumer Class.

100.    Based upon the facts and circumstances of this case, determining whether an individual putative Class member was injured because of the Alleged Defect requires individual inquiry into the factors and considerations that vary across putative Class members. In this matter, common evidence and a common proof approach cannot be used to evaluate whether individual putative Class members were injured and the quantum of that injury. Individual inquiry and analysis are needed to determine, among other things:

   a.    the putative Class member's reasons for purchasing a Challenged Product and whether the reasons for purchase were or were not related to the alleged failure to disclose the Alleged Defect (e.g., a person who bought the Challenged Product because of its ability to mitigate the risk of a dangerous arc fault and who placed less importance on nuisance tripping);

   b.    the putative Class member's knowledge and perceptions relating to the Alleged Defect when they purchased the Challenged Products (i.e., knowledge of the trade-off between an AFCI's nuisance tripping manifestation rate and its ability to detect dangerous arcs);

   c.    the Challenged Products purchased by putative Class members given the variety of choices and that the Challenged Products consist of many AFCIs with different technical specifications (implying different demands for the different Challenged Products and potentially different values placed upon product attributes);

   d.    the price(s) each putative Class member paid for the Challenged Products (e.g., individual purchases versus from an electrician; across retailers or other distribution outlets; over time; in different geographic locations; different models with different

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

technical specifications; whether the purchase was made in combination with a price sale or other promotion; etc.); and

e. the claimed damages allegedly suffered by individual putative Class members given the lack of Class-wide evidence.

101. The circumstances surrounding each putative Class member's purchasing and consumption of the Challenged Products must be evaluated to determine whether and to what extent a putative Class member was injured because of the Alleged Defect. Failure to acknowledge and examine the considerations identified in this section of my report on an individualized basis would sever the economic nexus tying the claimed harm to the Alleged Defect. A common proof approach (such as that proposed by Dr. Caves which I evaluate directly later in my report) would not isolate the putative Class members who suffered little or no harm due to the Alleged Defect from those putative Class members claiming to have suffered damages due to the Alleged Defect (and, hence, should not be part of a Class-wide, common proof, claimed injury and damages calculation).

### A. Individual Inquiry Is Required To Determine Putative Class Members' Reasons For Purchasing The Challenged Products

102. From an economic perspective, a person who purchased the Challenged Product for reasons unrelated to the alleged failure to disclose the Alleged Defect (e.g., a person who bought the Challenged Product because of its ability to mitigate the risk of a dangerous arc fault and who placed less importance on nuisance tripping) and who would have purchased the same products at the same price regardless of the Alleged Defect did not suffer economic injury and damages attributable to the Alleged Defect. In economic terms, that purchaser received a value that was at least commensurate with what was paid. Therefore, individual inquiry and analysis regarding putative Class members' motivations in purchasing the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

Challenged Products may be determinative of whether individual putative Class members suffered claimed economic injury and damages with a nexus to the Alleged Defect.

103.    As discussed, the Amended Complaint differentiates between (a) "Commercial Plaintiffs" or "individuals or entities that provide electrical-related or homebuilding services to their customers" and (b) "Consumer Plaintiffs" or "consumers who either paid an electrician to install a Siemens' panel box and AFCI breakers in their homes or purchased a home with Siemens AFCIs already installed."[272]   From an economic and damages quantification perspective, a common proof approach cannot reliably assess reasons for the acquisition of the Challenged Products across these different groups of Plaintiffs.

   a.   Commercial Plaintiffs may have preferences related to manufacturer brand loyalty or familiarity, convenience of product acquisition and availability, or expected profit margin from purchasing and installing the product.

   b.   Consumer Plaintiffs' preferences may be influenced by their greater distance from the actual installation process (e.g., ease of installation may be less important) and greater proximity to the products' daily functioning (e.g., mitigation of fire risk may be more important).

104.    Even within the putative Consumer Class defined in the Amended Complaint, reasons for purchasing the Challenged Products may differ substantially between consumers.  For example, consumers who "paid an electrician to install a Siemens' panel box and AFCI breakers in their homes" may have used a more deliberate product selection process, while "consumers who … purchased a home with Siemens AFCIs already installed" may have been motivated primarily by other reasons pertaining to home purchase (e.g., home

---

[272] Amended Complaint, at ¶¶ 9-10.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

location, home features, home price) with the Challenged Products having little to no influence over their home (and consequently, product) purchase decisions.[273]

105.    Documentary evidence confirms that Commercial and Consumer Plaintiffs purchased the Challenged Products for a variety of reasons unrelated to the alleged failure to disclose the Alleged Defect, including supplier/distributor accessibility, pricing/discounts, and brand familiarity and reputation.  Some of the Consumer Plaintiffs did not even make the decision to purchase the Challenged Products, which were installed by professionals in their homes.[274]

106.    The rationale behind each putative Class member's decision to purchase a particular Challenged Product varies across putative Class members as demonstrated by the deposition testimony of the Named Plaintiffs.

   a.    Purchase Drivers Identified In Commercial Plaintiff Depositions.

      i.    Price. Commercial Plaintiffs cite product price as a driver for purchasing the Challenged Products.  Discussing the selection of Siemens for a development project, Mr. Zank testified "we went with a Siemens brand, because they had a price point that looked good for us."  Mr. Zank also testified that he had switched from Cutler Hammer, a competing product, to Siemens due to Siemens' cheaper price point.[275]  Mr. Zank went on to specify that "you had to meet a price point to get these jobs … [s]o I just found a product that met that criteria, and that's what we did," suggesting that the lower price point of Siemens' product enabled his access to certain projects.[276]  The electricians interviewed by Dr. Caves made similar statements.[277]

---

[273] Amended Complaint, at ¶¶ 9-10.

[274] Barrette Deposition, at pp. 170-171; Butakis Deposition, at pp. 119, 123-124; Cates Deposition, at pp. 53-54, 74, 76-79, 136; Vodicka Deposition, at pp. 130-131; Deposition of Jason Wylie, May 20, 2025 ("Wylie Deposition"), at pp. 41-44.

[275] Zank Deposition, at pp. 40-41.

[276] Zank Deposition, at p. 42.

[277] See, e.g., Cognitive Interview 1, at pp. 24-25.

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

ii. <u>Availability</u>. Commercial Plaintiffs cite product availability, including at retail and distributor outlets frequented by Commercial Plaintiffs, as a driver for purchasing the Challenged Products.

(a) When asked why he purchased Siemens-branded AFCIs, Mr. Montoya testified that "between the years of 2016 and … 2019 … there certainly was a saturation of Siemens equipment at these Home Depots which I frequented…I don't have to spend time shopping around or looking around for other brands."[278]

(b) Mr. Zank testified "our supplier had [Siemens breakers] readily accessible."[279]

(c) Mr. Brnich testified "[Siemens AFCIs] were always in stock at Denney Electric, where some of the other brands they would carry just in case someone was in a pinch.  They would never be out of stock at Denney."[280]

(d) Mr. Meade testified "I made a choice of … what was available … at the time I think [Siemens] was the only breaker panel available," and "all they stocked at that time was Siemens panels … they had all the breakers for Square D and the other ones, but the panels – because of COVID the Square D panels they couldn't make," noting "you're not supposed to [put a Square D breaker into a Siemens panel]."[281]

iii. <u>Convenience</u>.  Commercial Plaintiffs cite the convenience of buying multiple products in a package as a driver for purchasing the Challenged Products.  When asked why he started using Siemens AFCIs in 2019, Mr. Zank testified "[w]e had multifamily units that were using, and you buy everything as a package.  So I'm buying multiple buildings worth in a package."[282] Similarly, one electrician interviewed by Dr. Caves explained that he frequented one store "because they were pretty close to me," so "it was convenience of a distance, but [I] also had a very good relationship with the salesman and the manager."[283]

iv. <u>Brand</u>.  Commercial Plaintiffs cite brand recognition as a driver for purchasing the Challenged Products.  When asked whether there was "anything about Siemens' AFCIs that stood out … that informed [his] decision to use them and not some other brand," Mr. Brnich testified that "[Siemens] were a very large, well-known

---

[278] Montoya Deposition, at pp. 155-156.  *See also* Montoya Deposition, at pp. 128-130.

[279] Zank Deposition, at pp. 120-121.

[280] Brnich Deposition, at p. 63.

[281] Meade Deposition, at pp. 162, 166-167.

[282] Zank Deposition, at pp. 110-111.

[283] Cognitive Interview 6, at p. 11.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

company and they were readily available at the supply house [he] used."[284] One electrician interviewed by Dr. Caves reported that Siemens "is the breaker[] I've installed the most;" he preferred Siemens because Siemens is "the only breaker that doesn't nuisance trip."[285] Other interviewees made similar statements about their brand loyalty.[286]

b.  Purchase Drivers Identified In Consumer Plaintiff Depositions.

i.  Size. Consumer Plaintiffs cite product size as a driver for purchasing the Challenged Products. Mr. Oakley discussed new electrical panel installations he performed as part of a home renovation and testified "I went to Glover Electric and they recommended the Square D box, said that was their favorite. I went with the Siemens box because my friend Chris had one and it was the right size."[287]

ii.  Brand Reputation. Consumer Plaintiffs cite experience with Siemens products and brand reputation as drivers for purchasing the Challenged Products. In discussing his purchase decision, Mr. Keyser testified "I work around Siemens' products regularly, and I'm comfortable with them as a…company. I feel like they have a reputation … generally for industrial equipment … I installed Siemens because I thought my experience with them was that they provided a better product."[288] Many Named Consumer Plaintiffs also confirmed they did not review any advertisements, brochures, commercials, or other marketing materials specific to Siemens AFCIs prior to any being purchased by any subcontractors or electricians.[289]

iii.  Others Made The Purchase or Selection. Some Consumer Plaintiffs note that the decision to purchase the Challenged Products was made for them. Despite initially claiming that "had [he] known that Siemens AFCIs allegedly suffered from alleged

---

[284] Brnich Deposition, at pp. 137-138.

[285] Cognitive Interview 1, at p. 23.

[286] *See e.g.* Cognitive Interview 5, at p. 26.

[287] Deposition of Clifford Oakley, June 3, 2025 ("Oakley Deposition"), at p. 35.

[288] Deposition of Richard (Rick) Keyser, May 8, 2025 ("Keyser Deposition"), at pp. 41-42. *See also* Keyser Deposition, at p. 112.

[289] *See, e.g.,* Plaintiff Jason Wylie's Responses and Objections to Siemens' First Set of Interrogatories to New Homeowner Plaintiffs, dated December 13, 2024, at p. 5; Plaintiff Bryan Butakis's Responses and Objections to Siemens' First Set of Interrogatories to Homeowner Plaintiffs, dated December 13, 2024, at p. 6; Plaintiff Rick Keyser's Responses and Objections to Siemens' First Set of Interrogatories to Homeowner Plaintiffs, dated December 13, 2024, at pp. 4-5; Plaintiff Clifford Oakley's Responses and Objections to Siemens' First Set of Interrogatories to Homeowner Plaintiffs, dated December 13, 2024, at p. 5; Plaintiff Patrick Cates's Responses and Objections to Siemens' First Set of Interrogatories to Homeowner Plaintiffs, dated December 13, 2024, at p. 5; Plaintiff Tyler Barrette's Responses and Objections to Siemens' First Set of Interrogatories to Homeowner Plaintiffs, dated December 13, 2024, at p. 5; Plaintiff Charles Vodicka's Supplemental Responses and Objections to Siemens' First Set of Interrogatories to Homeowner Plaintiffs, dated December 13, 2024, at p. 5.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

nuisance tripping, [he] would not have purchased [his] Siemens AFCIs or would have paid less than [he] did," Mr. Wylie confirmed that he did not in fact purchase the Challenged Product, and he did not know what the electrician knew about the Challenged Product when the electrician made the purchase.[290]  Other Consumer Named Plaintiffs similarly testified that their Siemens AFCIs were purchased or selected by electricians or other individuals, including Mr. Vodicka, Mr. Cates, Mr. Wylie, Mr. Barrette, and Mr. Butakis.[291]

107.    Consumers who purchased the Challenged Products for reasons other than the alleged failure to disclose the Alleged Defect, as highlighted above, were not injured (or, under the Plaintiffs' theory of liability, were not injured to the same degree, if at all) as consumers who purchased solely (or in large part) because of the alleged failure to disclose the Alleged Defect.  In combination with the other individualized factors discussed throughout my report, the degree to which consumers cared about the presence or frequency of nuisance tripping (and how they evaluated the presence or frequency of nuisance tripping against the reliability of interrupting dangerous arc fault conditions), is an important consideration in the determination of the degree to which consumers suffered injury and damages.  If a consumer was willing to accept a certain frequency of nuisance tripping and purchased the Challenged Products for other reasons (with a willingness to pay the market-determined price), they were not injured or injured to the same degree as someone not willing to accept

---

[290] Wylie Deposition, at pp. 132-133.

[291] *See* Vodicka Deposition, at pp. 130-131 (an electrician recommended and installed the AFCIs in Vodicka's home), Cates Deposition, at pp. 45, 53 (an electrician installed and purchased the AFCIs in Cates' home); Wylie Deposition, at pp. 41-42 (an electrician installed the "specific breakers" in Wylie's home); Barrette Deposition, at pp. 170-171 (explaining that Barrette did not have any involvement in the selection of the Siemens AFCI that was installed in his home); Butakis Deposition, at pp. 110-111 (explaining that he does not know why the electrician used Siemens' AFCIs in Butakis' home).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

a certain frequency of nuisance tripping.  This aspect of economic injury and causation analysis cannot be determined using common proof.

**B. Individual Inquiry Is Required To Determine Putative Class Members' Knowledge And Perceptions Relating To The Alleged Defect**

108.    Individual putative Class members' knowledge and perceptions relating to the Alleged Defect may affect the determination of whether an individual purchaser suffered economic injury and damages with a nexus to Plaintiffs' allegations.  Different putative Class members' knowledge and perceptions may vary with respect to (a) the existence of nuisance tripping, (b) the occurrence (frequency) of nuisance tripping in AFCI products, and (c) the degree to which the alleged nuisance tripping experienced by consumers of the Challenged Products is incrementally greater (e.g., more frequent tripping, greater sensitivity to tripping) than any individual's baseline expectations of nuisance tripping as described in (b).  From an economic and damages quantification perspective, putative Class members who were not misled by the alleged failure to disclose the Alleged Defect did not suffer economic injury or damages with a nexus to Plaintiffs' allegations.

**1.    General Information Regarding Nuisance Tripping**

109.    While certain members of the putative Consumer Class may have been unaware of the potential for nuisance tripping in the AFCI products they purchased, many Plaintiffs and putative Class members may have had prior knowledge of AFCI nuisance tripping obtained from general information regarding AFCI nuisance tripping that was readily-available throughout the Class Period.

110.    In some instances, Named Plaintiffs had demonstrable knowledge of Siemens AFCI nuisance tripping prior to installing one or more Siemens AFCIs.  For example, Mr. Keyser

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

(a member of the putative Consumer Class) testified that he was aware of the Challenged Products' potential for nuisance tripping at the time of purchase.[292]  Mr. Brnich (a member of the putative Commercial Class who are relevant here since 90 percent of Dr. Caves' CBC survey respondents are professional electricians[293]) testified that he continued to install Siemens AFCIs after personally experiencing Siemens AFCI nuisance tripping.[294] In fact, in one instance, a cognitive interview respondent told Dr. Caves that "[e]very electrician knows what nuisance tripping is."[295]

111.   As summarized in **Table 4** below, the concept of nuisance tripping is a well-described phenomenon in the AFCI marketplace and has been described in numerous online websites and forums throughout the period at-issue.  To the extent that certain putative Class members accessed these or similar online forums or were aware of the issues described prior to purchasing the Challenged Products, that knowledge would have been taken into account in the purchaser's decision-making process and embedded in the price(s) they were willing to pay for the Challenged Products.  Summarized in **Table 4** are illustrative articles relating to tripping and AFCIs over the 2017 – 2021 time period (roughly the putative Class Period).

---

[292] Keyser Deposition, at pp. 134-135.

[293] Caves Report, at ¶ 29.

[294] *See, e.g.*, Brnich Deposition, at pp. 135-136.

[295] Cognitive Interview 1, at p. 16.  Note that all of Dr. Caves' cognitive interview respondents are electricians. *See* Caves Report, at ¶ 25.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

**Table 4[296]**
**Summary of Select Articles on Nuisance Tripping in AFCI Products**

| Article Title | Date | Website | Brief Description |
|---|---|---|---|
| "Why Your Circuit Breaker Trips When Vacuuming" | March 30, 2017 | CoolToday | Blog article suggests that vacuums, flat screen TVs, computers, power drills, and treadmills are prone to cause AFCI nuisance tripping.[297] |
| "Arc-Fault Circuit Interrupters (AFCIs)" | January 29, 2018 | High Range Home Inspection | Article recognizes that an AFCI may "activate in situations that are not dangerous and create needless power shortages" and that "[t]here are a few procedures an electrical contractor can perform in order to reduce potential 'nuisance tripping.'"[298] |
| "The Importance of Arc-Fault Circuit Interrupters" | August 3, 2018 | A to Z Electric Co. | Article claims that improperly installed AFCI devices can lead to nuisance tripping and that certain products, including treadmills, televisions, and fluorescent light fixtures are "[c]ommon causes of false arc-fault readings."[299] |

---

[296] Illustrative articles are identified through Google and Bing search results using search terms including "Pros and Cons of AFCI," "AFCI Nuisance Tripping," and "Pros and Cons of AFCI/GFCI." Illustrative articles are limited to publications dated January 1, 2017 through December 10, 2021 (roughly coincident with the claimed Class Period).

[297] "Why Your Circuit Breaker Trips When Vacuuming," CoolToday (https://web.archive.org/web/20200927010615/https://www.cooltoday.com/blog/why-your-circuit-breaker-trips-when-vacuuming, accessed November 7, 2025).

[298] "Arc-Fault Circuit Interrupters (AFCIs)," High Range Home Inspection (https://www.highrangehome.com/learn, accessed November 7, 2025).

[299] "The Importance of Arc-Fault Circuit Interrupters," A to Z Electric Co. (https://www.electricatoz.com/the-importance-of-arc-fault-circuit-interrupters/, accessed November 7, 2025).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

| "Comparing Dual Function AFCI/GFCI Breakers to AFCI Breakers Paired with a GFCI Receptacle" | October 30, 2018 | ElectricianTalk.com | Article claims that dual-function breakers "are a relatively new technology" and "have a history of nuisance trips." "Many contractors have reported repeated nuisance trips for no apparent reason; troubleshooting those occurrences is challenging, as there's no indication of the cause of the trip."[300] |
|---|---|---|---|
| "Fixing a Sensitive Arc-Fault Circuit Breaker" | March 13, 2019 | Roberts Electric Co. | Blog recognizes that "AFCIs are prone to 'nuisance tripping.'"[301] |
| "Common Causes for Tripped AFCI Breakers" | April 9, 2019 | PetersonElectric | Blog states that AFCIs "can be very sensitive and easily tripped for a few common reasons."[302] |
| "GFCIs, AFCIs, and Nuisance Tripping" | July 3, 2020 | Appliantology.org | Blog suggests that AFCIs are "not perfect" and nuisance tripping happens when "a particular appliance comes along with a wave pattern that is perfectly safe, but not permitted by the AFCIs database."[303] |

---

[300] "Comparing Dual Function AFCI/GFCI Breakers to AFCI Breakers Paired with a GFCI Receptacle," Electrician Talk (https://www.electriciantalk.com/threads/comparing-dual-function-afci-gfci-breakers-to-afci-breakers-paired-with -a-gfci-receptacle.284748/, accessed November 20, 2025).

[301] "Fixing a Sensitive Arc-Fault Circuit Breaker," Roberts Electric Co. (https://robertselectric.com/fixing-a-sensitive-arc-fault-circuit-breaker/, accessed November 6, 2025).

[302] "Common Causes for Tripped AFCI Breakers," Peterson Electric (https://peterson electricllc.com/tripped-afci-breakers-reasons/, accessed December 5, 2025).

[303] "GFCIs, AFCIs, and Nuisance Tripping," Appliantology.org (https://appliantology.org/blogs/entry/1099-gfcis-afcis-and-nuisance-tripping/, accessed November 10, 2025).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

| "AFCIs Tell a Life Saving Story Worth Listening to About Home Electrical Safety" | November 2, 2021 | NFPA | An electrician with 30 years of experience suggests that time spent on troubleshooting AFCI nuisance tripping can be reduced by "modifying the way [electricians] wired homes."[304] |
|---|---|---|---|

112.    The knowledge and perceptions of putative Consumer Class members varies in an additional way. The Amended Complaint includes putative Consumer Class members who "either paid an electrician to install a Siemens' panel box and AFCI breakers or purchased a home with Siemens AFCIs already installed."[305]  Combining consumers who actively had the Challenged Products installed in their homes with consumers who purchased homes in which the Challenged Products already were installed ignores the potential and likely differences in product knowledge and perceptions between consumers who may have been involved in the decision to purchase the Challenged Product and those whose ownership of the Challenged Products was ancillary to another transaction (e.g., buying a home) – and who may not have made a purchase at all.

113.    The Amended Complaint also includes Commercial Class members who "provide electrical-related or homebuilding services to their customers."[306]  It is reasonable to expect that pre-existing knowledge about AFCI products in general, Siemens AFCI products, and nuisance tripping is greater among individuals who provide these services (e.g., belonging

---

[304] "AFCIs Tell a Life Saving Story Worth Listening to About Home Electrical Safety," NFPA (https://www.nfpa.org/news-blogs-and-articles/blogs/2021/11/02/afcis-tell-a-life-saving-story-worth-listening-to-about-home-electrical-safety, accessed November 6, 2025).

[305] *See* Amended Complaint, at ¶ 10.

[306] *See* Amended Complaint, at ¶ 9.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

to the putative Commercial Class) and individuals who paid a professional to provide these

services (e.g., belonging to the putative Consumer Class).[307]

114.    Ms. Kees, Product Manager at Siemens, confirmed that nuisance tripping was a common

phenomenon across AFCI products, regardless of brand or manufacturer, which further

supports the notion that professional installers of these products would have had this pre-

existing knowledge.[308]

### 2.    Siemens Communications Regarding Tripping Prevention And Troubleshooting

115.    Relatedly, Siemens has made numerous efforts to disseminate knowledge on how to

prevent tripping and troubleshoot AFCI products to homeowners, electrical contractors,

and other professionals that could be members of the putative Consumer and Commercial

Classes as described in the Amended Complaint.[309]

a.  In 2012, Siemens published a "Troubleshooting Guide" White Paper on its website
    which identified "measures that the homeowners and electrical contractors can take to
    possibly eliminate [AFCI tripping] before it arises." [310]   For homeowners, these
    measures included checking light fixtures to ensure "all connections between the light
    socket and the light bulb base [are] tight" and checking that "the circuit is not
    overloaded with an excessive amount of electronics."[311]   The White Paper included
    separate tips for preventing tripping aimed at electrical contractors and outlined a
    flowchart (see **Figure 1** below) for troubleshooting 1-pole AFCI trips.[312]   Siemens has

---

[307] *See, e.g.,* Caves Report, at ¶ 29.  Explaining his selection of licensed electricians for his CBC survey, Dr. Caves "defined the target population to include primarily licensed electricians in the U.S. who purchased Siemens AFCIs between 2017 and the present," to ensure "that survey respondents are familiar with the Class AFCIs."  Here, Dr. Caves emphasizes the importance of selecting individuals who would fall within the Amended Complaint definition of putative Commercial Class members on the basis of their pre-existing knowledge.

[308] Kees and Duemmler Discussion on December 16, 2025.

[309] *See* Amended Complaint, at ¶¶ 9-10.

[310] SIEMENS_AFCI_00053986-989, at 987.

[311] SIEMENS_AFCI_00053986-989, at 987.

[312] SIEMENS_AFCI_00053986-989, at 987.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

updated this "Troubleshooting Guide" periodically, including, at least, in 2018, in 2021, and in 2023.[313]

b. In 2018 Ashley Bryant, a Product Manager, Electronic Circuit Breakers at Siemens, presented a Webinar Series, "Debunking the Myths of AFCI" to the group Independent Electrical Contractors.[314]  This presentation included "Troubleshooting Tips and Tricks" and "Additional Resources," including a "FREE AFCI Training Course" on the UL website, to orient professionals to methods for AFCI troubleshooting.[315]

116.   Individual putative Class members likely vary in their exposure or access to this information, both prior to and after purchasing the Challenged Products.  To the extent that certain putative Class members were exposed to the aforementioned information prior to purchasing the Challenged Products, that knowledge would have been taken into account in the purchaser's decision-making process and would have been embedded in the price(s) they were willing to pay for the Challenged Products.

---

[313] *See* SIEMENS_AFCI_00000289-292; SIEMENS_AFCI_00270694-695; SIEMENS_AFCI_00257830-834.

[314] SIEMENS_AFCI_00016127-162.

[315] SIEMENS_AFCI_00016127-162, at 152-162.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

**Figure 1**

**Siemens' Troubleshooting Methods for 1-Pole Combination Type AFCI Trips (2012)[316]**



117.    Siemens made repeated disclosures about AFCI nuisance tripping and ways to investigate

common causes prior to the beginning of the Class Period (meaning this information was

available in the market at the beginning of the Class Period).[317]  Siemens also provided

---

[316] SIEMENS_AFCI_00053986-989, at 987.

[317] *See, e.g.*, SIEMENS_AFCI_00079578-581; SIEMENS_AFCI_00053986-989; SIEMENS_AFCI_00048899-902.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

disclosures about AFCI nuisance tripping that were contemporaneous with the Class Period. For example, the aforementioned 2018 presentation from Siemens' product manager, Ashley Bryant, titled "Debunking the Myths of AFCI" listed "Nuisance Tripping" under a section headed "TYPICAL ARC FAULT CIRCUIT CONCERNS."[318] A 2020 document titled "AFCI-GFCI Circuit Breaker Diagnostic Guide" featured sections entitled "What is nuisance tripping?" and "Arc fault investigation" to address common causes of nuisance tripping.[319]

118.  A common proof approach to quantifying damages would not be able to reliably consider the varying levels of knowledge of the existence and/or frequency of nuisance tripping and of methods of prevention and troubleshooting tripping. Such knowledge (or lack thereof) may have impacted individuals' decisions to purchase the Challenged Products, replace the Challenged Products, and/or assertions to have been damaged by the Challenged Products. Consequently, individual inquiry is required to determine:

a.  the level of knowledge, including tripping prevention and troubleshooting, among individual putative Class members to reliably evaluate claimed damages;

b.  whether the alleged nuisance tripping by the Challenged Products exceeded or fell below the expectations for nuisance tripping associated with the Challenged Products; and

c.  the degree to which nuisance tripping translated into individual putative Class members' pricing expectations for AFCI products generally and Siemens AFCI products specifically.

---

[318] SIEMENS_AFCI_00016127-162, at 153.

[319] SIEMENS_AFCI_00362724-735.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

**C. <u>Individual Inquiry Is Required To Determine The Challenged Products Purchased By Putative Class Members</u>**

119.    The Amended Complaint refers to several distinct Siemens AFCI products (Challenged Products), including its "AFCI Circuit Breakers, Combination AFCI ('CAFCI') breakers, and its AFCI/GFCI dual function[] breakers for both 1 and 2 poles."[320]  However, while the Amended Complaint refers to "Siemens AFCI breakers" in general, it does not specify which Siemens AFCI products were purchased, used, investigated, or replaced by putative Class members.[321]  Presumably, putative Class members have purchased a variety of models of Challenged Products mentioned in the Amended Complaint, and therefore, a common proof approach to determining claimed damages is inadequate because it fails to address any model-specific factors associated with the Challenged Products.  The variety of choices and the fact that the Challenged Products consist of many AFCIs with different technical specifications implies different demands for the different Challenged Products, different prices for the different Challenged Products (discussed below), and potentially different values placed upon product attributes – negating a common proof approach.

**D. <u>Individual Inquiry Is Required To Determine The Price(s) Each Putative Class Member Paid For The Challenged Products</u>**

120.    The prices paid by individual putative Class members are an important factor in evaluating whether (and to what extent) each individual Class member suffered economic injury and damages.  However, analysis of pricing data and Plaintiff depositions indicates that there is not a single (i.e., uniform) purchase price that can be used to evaluate claimed economic

---

[320] Amended Complaint, at ¶ 61.

[321] *See* Amended Complaint, at ¶¶ 94-173.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

injury and damages on a Class-wide basis. Without individual inquiry, one cannot determine the specific price(s) an individual putative Class member paid for the Challenged Product(s) or the extent to which the price paid may or may not have been greater than the value received by that individual — rendering attempts to quantify claimed economic injury and claimed damages on a Class-wide (common proof) basis inaccurate and unreliable.

121. Analysis of sales data and Plaintiff depositions indicates that the prices putative Class members paid for the Challenged Products differ depending upon the circumstances surrounding their purchases, including product model(s), technical specifications, timing of purchase, retailer or distributor outlet, geographic location, pricing and/or other promotions, among other factors. Because of the wide variations in the Challenged Products' retail prices, putative Class members' economic injury and damages (if any) cannot be evaluated and quantified reliably on a Class-wide basis using common proof (or using just one average price or claimed price premium).

122. Sales data provided by Siemens suggest that AFCI unit prices vary significantly according to the year, state, account type (e.g., distributor, contractor, retailer, etc.), and model type associated with purchase.

   a. In 2018, the average unit price for Siemens 2-pole 22K Combination AFCI sold to domestic distributors appears to have been ███████ in California and ███████ in New Hampshire.[322]

---

[322] SIEMENS_AFCI_00362600. Using tab "AFCI_DF_by_State," I divide "Sales" by "Qty" to determine the unit price. I use a separate dataset ("SIEMENS_AFCI_00416123") to identify the product model name ("Mat Group 3 Name") according to the "Mat Group 3 Code" which is listed in both datasets.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

    b.  The average unit price of this same model sold to distributors in California appears to have swung from as low as ▮▮▮▮ to as high as ▮▮▮▮ between 2019 and 2021.[323]

These differences in average unit price to distributors suggest that customers likely have paid differing prices for the Challenged Products depending upon factors such as the timing, location, outlet, and model type of purchase.

123.    As shown in **Table 5** below, current (December 2025) online retail price offers for the Challenged Products confirm that individual product pricing varies depending upon the outlet or retailer.[324]  I offer two product examples below and expand on these examples in **Table 5**.

    a.  The following prices relate to a Siemens 20 Amp Single-Pole Combination AFCI (Model: QA120AFCP).

        i.  Amazon website: $52.64.[325]

        ii.  Lowe's website: $60.98.[326]

    b.  The following prices relate to a Siemens 15 Amp Single-Pole Combination AFCI (Model: QA115AFCP).

        i.  Amazon website: $48.50.[327]

---

[323] SIEMENS_AFCI_00362600; SIEMENS_AFCI_00416123.

[324] For comparison purposes, and as explained later in my report, I used the same Siemens products and models that Dr. Caves used for his analysis.  I also used the same retailers.  Comparisons are made later in my report of the results I obtained from my analysis to those reported by Dr. Caves.  I note here that Dr. Caves did not report the time period covered by his pricing analysis or which prices came from which retailers.  Dr. Caves also did not report more than one price per Siemens model number.

[325] "Siemens QA120AFCP 20-Amp Single Pole 120-Volt Plug On Combination AFCI Breaker," Amazon (https://www.amazon.com/Siemens-QA120AFC-120-volt-Combination-Breaker/dp/B00J59DYMS?ref_=ast_sto_dp &th=1, accessed December 1, 2025).

[326] "Siemens QAF 20-Amp 1-Pole Combination Arc Fault Circuit Breaker," Lowe's (https://www. lowes.com/pd/Siemens-QP-20-Amp-1-Pole-Combination-Arc-Fault-Circuit-Breaker/50149326, accessed December 1, 2025).

[327] "Siemens QA115AFCP 15-Amp Single Pole 120-Volt Plug On Combination AFCI Breaker," Amazon (https://www.amazon.com/Siemens-QA115AFCP-120-volt-Combination-Breaker/dp/B00J59DYDM/ref=sr_1_1? crid=38GH1UT0ILDLV&dib=eyJ2IjoiMSJ9.0n7gFkJmD7cC3zoDNCJshIMk8, accessed December 1, 2025).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

    ii.  Home Depot website: $60.00.[328]

124.    While the prices in **Table 5** are current prices (i.e., December 2025) and not prices that cover the putative Class Period from January 1, 2017 to December 10, 2021 (or alternatively June 21, 2017 to December 10, 2021), the prices in the table demonstrate the variability in prices across retailers at any point in time. I note that some models have a large price difference across retailers while other models do not.

**Table 5[329]**

**Retail Prices of Siemens AFCIs and AFCI/GFCIs**

| | Model | Specification | Product Type | Current Prices | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Caves Report | Home Depot | Lowe's | Amazon | Simply Breakers |
| | [A] | [B] | [C] | [D] | [E] | [F] | [G] | [H] |
| [1] | Q120DFN | PLUG-ON NEUTRAL 20A 1-POLE (10kA at 120V) | AFCI/GFCI | $60.12 | n/a | n/a | $45.48 | $58.75 |
| [2] | QA120AFCN | PLUG-ON NEUTRAL 20A 1-POLE (10kA at 120V) | AFCI | $44.99 | n/a | n/a | $43.00 | $48.99 |
| [3] | QA115AFCN | PLUG-ON NEUTRAL 15A 1-POLE (10kA at 120V) | AFCI | $44.99 | n/a | n/a | n/a | $52.99 |
| [4] | Q120DF | PLUG-IN PIGTAIL 20A 1-POLE (10kA at 120V) | AFCI/GFCI | $55.47 | n/a | n/a | n/a | $54.70 |
| [5] | QA120AFC | PLUG-IN PIGTAIL 20A 1-POLE (10kA at 120V) | AFCI | $47.93 | n/a | n/a | $47.03 | $47.93 |
| [6] | QA115AFC | PLUG-IN PIGTAIL 15A 1-POLE (10kA at 120V) | AFCI | $60.98 | n/a | n/a | $43.60 | $48.99 |
| [7] | Q115DFN | PLUG-ON NEUTRAL 15A 1-POLE (10kA at 120V) | AFCI/GFCI | $47.99 | n/a | n/a | n/a | $47.99 |
| [8] | Q115DF | PLUG-IN PIGTAIL 15A 1-POLE (10kA at 120V) | AFCI/GFCI | $57.59 | n/a | n/a | $56.07 | $57.59 |
| [9] | Q120DFP | PLUG-ON NEUTRAL 20A 1-POLE (10kA at 120V) | AFCI/GFCI | $43.69 | $77.38 | $77.98 | n/a | n/a |
| [10] | QA115AFCP | PLUG-ON NEUTRAL 15A 1-POLE (10kA at 120V) | AFCI | $49.69 | $60.00 | $60.98 | $48.50 | n/a |
| [11] | QA120AFCP | PLUG-IN PIGTAIL 20A 1-POLE (10kA at 120V) | AFCI | $61.98 | $60.00 | $60.98 | $52.64 | $122.99 |
| [12] | Q120DFWG | PLUG-ON NEUTRAL 20A 1-POLE (10kA at 120V) | AFCI/GFCI | $70.77 | n/a | n/a | $59.00 | n/a |
| [13] | Q115DFP | PLUG-ON NEUTRAL 15A 1-POLE (10kA at 120V) | AFCI/GFCI | $62.21 | $64.00 | $66.98 | $57.31 | n/a |
| [14] | Q120DFNP | PLUG-ON NEUTRAL 20A 1-POLE (10kA at 120V) | AFCI/GFCI | $63.34 | $63.98 | $64.98 | n/a | n/a |
| [15] | QA115AFCWG | PLUG-ON NEUTRAL 15A 1-POLE (10kA at 120V) | AFCI | $49.43 | n/a | n/a | $49.99 | n/a |
| [16] | Q115DFNP | PLUG-ON NEUTRAL 15A 1-POLE (10kA at 120V) | AFCI/GFCI | $53.57 | $63.98 | $64.98 | n/a | n/a |

---

[328] "15 Amp 1 in. Single-Pole Combination AFCI Circuit Breaker RBPU," The Home Depot (https://www.homedepot.com/p/Siemens-15-Amp-1-in-Single-Pole-Combination-AFCI-Circuit-Breaker-RBPU-US2-QA115AFCP/205090151, accessed December 18, 2025).

[329] **Exhibit 5**. Retail prices in **Table 5** were retrieved on December 1, 2025 or December 18, 2025. In addition to price differences across retailers, the same product is sometimes available at different prices within a retailer. For example, Simply Breakers offers both new and reconditioned products with a price difference for some AFCIs and AFCI/GFCIs. As an example, the price for a new Q120DFN AFCI/GFCI on December 5, 2025 was $49.74. The undiscounted and discounted price for a reconditioned Q120DFN AFCI/GFCI on December 5, 2025 was $54.99 and $39.99, respectively. *See* "Q120DFN - Siemens - Dual Function Circuit Breaker (New)," Simply Breakers (https://www.simplybreakers.com/products/siemens-dual-function-circuit-breaker-q120dfn?variant=40171276370000, accessed December 5, 2025); "Q120DFN - Siemens - Dual Function Circuit Breaker (Reconditioned)," Simply Breakers (https://www.simplybreakers.com/products/siemens-dual-function-circuit-breaker-q120dfn?variant=40897 707704400, accessed December 5, 2025). As another example, Home Depot also offers a one-time tiered new-account discount for customers who open a Home Depot Consumer Card. The discount applies to the next qualifying purchase of the customer. Specifically, the customer can receive a $25 discount for a purchase of $25-299, a $50 discount for a purchase of $300-999, or a $100 discount for a purchase of $1,000+ if they pay with the Home Depot Consumer Credit Card, the Home Depot Home Improver Card, the Pro Xtra Credit Card, or the Home Depot Commercial Account within 30 days of their account open date. In addition, Home Depot also provides a "Buy More, Save More" offer which includes a 10% and 20% discount if the customer places an order for 10-19 products and 20 or more

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

125.    The pricing data in **Figure 2** below shows how significant the variation in prices can be for the same product over time – in this case, from the beginning of the Class Period through present day.    The prices reported are Amazon prices for Siemens AFCI Model QA115AFCP.[330]    The prices reported in **Figure 2** demonstrate the variability in prices for the same model from the same on-line retailers, but across time.

**Figure 2[331]**

**Amazon Retail Price History of Siemens AFCI Model QA115AFCP**



126.    Further, Plaintiff depositions confirm that certain Plaintiffs recalled paying different prices for the Challenged Products.

---

products, respectively.  *See* "Credit Card Services," The Home Depot (https://www.homedepot.com/c/credit-center, accessed December 18, 2025); **Exhibit 5; Exhibit 23.**

[330] Siemens model QA115AFCP is a model used by Dr. Caves in his conjoint survey.  While Dr. Caves reported that he collected prices from Home Depot, Lowe's, Amazon, and Simply Breakers, he did not identify the time period or which prices came from which retailers.  The prices in **Figure 2** are historical prices from Amazon.

[331] "Siemens QA115AFCP 15-Amp Single Pole 120-volt Plug On Combination AFCI Breaker," camelcamelcamel.com.  (https://camelcamelcamel.com/product/B00J59DYDM, accessed December 2, 2025.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

a. Mr. Zank recalled paying $65 a piece for Siemens AFCIs.

b. Mr. Brnich recalled paying $42 for a Siemens AFCI.

c. Mr. Meade recalled paying $60 for a Siemens AFCI.

The price paid by Mr. Brnich is net of a price discount off of the asking prices from his supplier, while Mr. Meade purchased his Siemens AFCIs directly from Lowe's, Home Depot, and Amazon.[332]

127. As discussed earlier, Mr. Duemmler, a Director of Strategic Pricing at Siemens, also confirmed that Siemens does not sell AFCIs to distributors at a single price point because its pricing team factors in distributor-specific discounts.[333] According to Mr. Duemmler, "[f]rom a pricing perspective, we sell products to distributors via a stock price. This is a list price minus a discount, and the stock price is not the same for every distributor."[334]

128. Individual inquiry is required to determine the extent to which individual putative Commercial Class members received discounts on their purchases of Challenged Products, which would have altered the final price they paid for these products. In addition, such differences in prices (and/or differences in discounts received) could have been passed on to Consumer Class members. From a damages quantification perspective, the discounts

---

camelcamelcamel.com is "an Amazon price tracker that provides price drop alerts and price history charts for products sold by Amazon" and "is a participant in the Amazon Services LLC Associates Program, an affiliate advertising program designed to provide a means for sites to earn advertising fees by advertising and linking to Amazon.com." *See* "About camelcamelcamel," camelcamelcamel (https://camelcamelcamel.com/about, accessed December 5, 2025**); Exhibit 24**.

[332] *See* Zank Deposition, at pp. 142; Brnich Deposition, at pp. 144-145; Meade Deposition, at pp. 77, 97.

[333] Duemmler Deposition, at p. 74.

[334] Duemmler Deposition, at p. 74.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

received could be in excess of any claimed price premium being alleged – providing an additional reason for individual inquiry with respect to prices paid.

129.   Relating to discounts off of pricing, I understand that members of retailer loyalty programs (e.g., Home Depot's Pro Xtra loyalty program, MyLowe's Pro Rewards™ program, etc.) may be eligible to receive discounts on certain purchases.[335]   Retailers also occasionally offer store-based or online discounts or coupons (e.g., Black Friday, Fourth of July, Amazon Prime Day, etc.).   As one example, a search on Home Depot website in December 2025 relating to a Siemens 20A dual-function AFCI/GFCI Circuit Breaker yields the following pricing information (bolding in original display).[336]

   a.   Price: **$77.38**.

   b.   Credit card offer: "Pay **$52.38** after **$25 OFF** your total qualifying purchase upon opening a new card."

   c.   **Buy More, Save More**: Buy 10 – **10% Off**; Buy 20 – **20% Off**.

130.   Individual inquiry is required to determine which putative Commercial or Consumer Class members purchased Challenged Products while using such discount offers, which would have altered the final price paid for these products (and may have exceeded any claimed price premium).   In fact, some Commercial or Consumer Class members may have rationally waited until such discounted pricing was offered prior to buying the Challenged Products – especially if purchasing for general inventory purposes.

---

[335] *See, e.g.,* "MyLowe's Pro Rewards Program™," Lowe's (https://www.lowes.com/l/Pro/pro-benefits, accessed December 5, 2025); "Pro XTRA Loyalty Program," The Home Depot (https://www.homedepot.com/c/pro-xtra, accessed December 8, 2025).

[336] "20 Amp AFCI/GFCI Dual Function Circuit Breaker," The Home Depot (https://www.homedepot.com/p/Siemens-20-Amp-AFCI-GFCI-Dual-Function-Circuit-Breaker-Q120DFP/205488018, accessed December 18, 2025).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

131.    Dr. Caves' cognitive interview respondents provide evidence that unit pricing of AFCIs can be highly individualized, depending on, among other things:

   a.    the total volume of business conducted with the supplier on an annual basis;[337]

   b.    whether or not the purchaser is a client of the supplier;[338]

   c.    bargaining by the purchaser, which may be more effective if the purchaser travelled a long distance to make the order or is purchasing a large order;[339] and

   d.    personal relationships with suppliers.[340]

Hence, even purchasers who bought the same AFCIs from the same seller during the same time period may have paid different prices depending on the individual circumstances of the purchaser and their relationship with the supplier.

132.    A common proof approach that uses a single product price to calculate claimed damages is not sufficient to capture unit price factors (as outlined above), including the timing, location, outlet, model type of purchase, discount received, and final price paid.  Individual inquiry is required to determine the prices paid by individual Class members, which may vary significantly according to the aforementioned considerations.

   E.    **Individual Inquiry Is Required To Determine The Claimed Damages Allegedly Suffered By Individual Putative Class Members Given The Lack Of Class-wide Evidence**

133.    The claimed damages experienced by individual class members (if any) can be expected to vary substantially, including due to (a) differing types of alleged harm (e.g., the price premium one electrician allegedly paid due vs. the uncompensated time another electrician

---

[337] Cognitive Interview 1, at p. 9.

[338] Cognitive Interview 1, at pp. 8-9.

[339] Cognitive Interview 1, at p. 10.

[340] Cognitive Interview 5, at p. 26.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

spent troubleshooting alleged nuisance tripping by Challenged Products), (b) different prices paid for the Challenged Products, and (c) different levels of nuisance tripping, or manifestation rates, experienced (e.g., due to electrical / wiring installation or home appliance interoperability issues). Therefore, from an economic and damages quantification perspective, a common proof approach to quantifying damages cannot be applied across the varying levels of alleged harm that would have been experienced by individual putative Class members. Claimed damages can only be reliably measured through individual inquiry which accounts for each of these differences in individual experience(s) with the Challenged Products and whether a nexus exists to the alleged failure to disclose the Alleged Defect.

### 1. Form Of Claimed Injury And Documentation Issues

134. The Amended Complaint states that "[p]laintiffs were injured when they purchased Siemens' AFCI breakers because they paid a premium for Siemens' AFCI breaker because Siemens represented the AFCI breaker could perform functions that the breaker did not perform."[341] But the Amended Complaint also alleges harms to putative Commercial and Consumer Classes beyond an alleged price premium (as discussed earlier in my report), such as time spent troubleshooting the Alleged Defect and replacement costs.[342]

135. A common proof approach to determining claimed damages is inadequate because it fails to address a number of different considerations relating to alleged harm being claimed in the Amended Complaint, including but not limited to the following.

---

[341] *See, e.g.,* Amended Complaint, at ¶ 232. As discussed in **Section X** and below, Dr. Caves uses this price premium theory of claimed injury to calculate claimed aggregate Class-wide damages. *See* Caves Report, at ¶ 64.

[342] *See* Amended Complaint, at ¶¶ 16-24.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

   a.  <u>Commercial Class</u>: The Commercial Class is making claims for uncompensated time investigating and attempting to resolve the cause of tripping and the cost of replacing one or more of the Challenged Products.  Individual inquiry would be required to ascertain whether tripping investigations by electricians were either compensated or uncompensated.  If uncompensated, individual inquiry would be required to ascertain the amount of time associated with the investigation, the hourly rates of the electricians involved, and if travel time to the site should be included, among other things.

   b.  <u>Consumer Class</u>:

      i.  The Consumer Class is making claims for alleged damages in terms of "time effort" and repair and replacement costs as a result of nuisance tripping attributed to the Alleged Defect.  Individual inquiry would be required to ascertain the amount of time the putative Consumer Class member placed into coordinating efforts to resolve the tripping issue.  In addition, a value would have to be placed upon that time.  The amount of time and the value of that time would not be a constant across putative Consumer Class members.  Individual inquiry also would be required to determine the associated repair costs (if paid) and replacement costs (if paid).  The existence of the latter costs (i.e., repair costs and replacement costs) borne by the Consumer Class is subject to investigation as the Commercial Class is making a claim for such costs as not being compensated (i.e., a putative Consumer Class member did not make a payment to a Commercial Class member for work performed or replacement AFCIs).

     ii.  The Consumer Class also is described in the Amended Complaint as "consumers who either paid an electrician to install a Siemens' panel box and AFCI breakers in their homes or <u>purchased a home with Siemens AFCIs already installed</u>."[343]

        (a)  Individual inquiry would be required to determine the alleged damages to Consumer Class members who purchased a home with Siemens AFCIs already installed.

        (b)  It is not clear whether Named Consumer Plaintiffs are claiming AFCI replacement costs or a loss in value associated with their home purchase.

        (c)  Siemens may have replaced AFCIs for some putative Consumer Class members at no cost.  However, individual inquiry is required to determine:

           (i)  Which individuals within the putative Consumer Class have had their Siemens AFCIs replaced at no cost by Siemens; and

---

[343] Amended Complaint, at ¶ 10.  (Emphasis added.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

> (ii) How many of the AFCIs purchased by those individuals were replaced by Siemens at no cost.
>
> In any event, Named Plaintiffs have not submitted any common proof approach for evaluating claimed damages or quantifying claimed damages associated with such Consumer Class members. However, one area of investigation would be (i) whether the homeowner had an electrical inspection prior to the home purchase and (ii) whether the homeowner was made aware that the home had Siemens AFCIs installed or learned through the inspection process of any claimed Alleged Defects with the Siemens AFCIs.

136. In fact, even relating to just claimed Price Premium damages, Plaintiff depositions reveal that certain putative Commercial and Consumer Class members:

a. did not retain receipts for and could not recall the price(s) they paid for the purchase, installation, replacement, or investigation of Challenged Products;[344]

b. could not recall exactly how many of the Challenged Products they had purchased, installed, used, or replaced;[345] and/or

c. could not recall the exact timing of their purchase(s) of Challenged Products, including the circumstances leading up to the purchase and the period of time over which the purchase took place.[346]

137. Further, it is highly unlikely that all putative Class members could accurately recall the specific outlet of purchase (e.g., big box in-store retailer, online retailer, contractor,

---

[344] *See, e.g.,* Montoya Deposition, at pp. 147-148. *See also* Cates Deposition, at pp. 73-74; Butakis Deposition, at p.147; Vodicka Deposition, at pp. 129:16-130:8 (no recollection or receipts for the replacement costs incurred); Barrette Deposition, at pp. 128:21-129:1, 133:4-7 (confirmed that plaintiff paid in cash and does not recall the exact dollar amount paid); 134:20-135:4 ("Q. Okay. And so did he give you a dollar amount regarding the cost to replace the two breakers. A. He actually did not charge us for that one. He bought the breakers himself and retained them afterwards…").

[345] *See, e.g.*, Brnich Deposition, at p. 124. *See also* Butakis Deposition, at pp. 82-83; Plaintiff Jason Wylie's Responses and Objections to Siemens' First Set of Interrogatories to New Homeowner Plaintiffs, dated December 13, 2024, at p. 3 ("[T]he Siemens AFCIs installed in Plaintiff's home were purchased by the homebuilder who first built Plaintiff's home or were otherwise purchased on the homebuilder's behalf. Plaintiff has no information on where the homebuilder purchased the Siemens' AFCIs.").

[346] *See, e.g.*, Montoya Deposition, at p. 164. *See also* Butakis Deposition, at p. 119; Barrette Deposition, at pp. 170-171 ("Q. And you personally had no involvement in the selection of the Siemens AFCI that was installed in your home? A. Correct. Q. No builder or agent made any representation that the value of your home increased because of the Siemens AFCI, correct? A. Correct.").

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

distributor) or the precise geographic location of purchase, both of which may reasonably be expected to affect the final purchase price (as discussed earlier in my report).

138.    Taken together, these confirmed / likely unavailable pieces of evidence relating to efforts undertaken, models purchased, prices paid, quantities purchased, and other circumstances suggest that many putative Class members are unlikely to have maintained documentary evidence to allow for a reliable determination of the claimed economic injury with a nexus to the Alleged Defect. Without reliable records of the models, prices, costs, quantities, and circumstances, one cannot reliably evaluate the existence of (i.e., fact of) harm nor use a common proof approach to reliably calculate claimed damages across putative Class members. Individual inquiry is required to assess individual Class members experiences with Siemens Challenged Products to accurately begin to quantify the claimed damages suffered, if any.

### 2.   Existence, Frequency, And Reasons For Tripping

139.    Individual inquiry also is required to evaluate the existence and frequency of tripping and the reasons for tripping (e.g., whether the tripping is related to the Alleged Defect).

140.    Home Construction And Electrical Installations.   Several factors relating to home construction and electrical installations can influence the existence and frequency of nuisance tripping.

   a.   Dual AFCI/GFCI Products.   Because the Amended Complaint does not appear to explicitly exclude dual-function breakers, in certain cases, tripping may be specifically attributable to GFCI components or features (and not AFCI components or features) in the dual AFCI/GFCI subset of Challenged Products.[347] The same 2022 ESFI electrical contractor survey found that while 18 percent of service calls for tripped circuit

---

[347] Amended Complaint, at ¶ 61.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

breakers or fuses were for AFCI trips, 10 percent were for GFCI trips.[348]  Because dual-function AFCI/GFCI breakers are not excluded from the Challenged Products, individual inquiry is required to evaluate claims of injury and damages to determine if there is a nexus to the Alleged Defect.  With respect to this issue, the following would need to be assessed:

    i.    Which individuals purchased or installed dual AFCI/GFCI products (vs. single-function products); and

    ii.    Of those individuals who used dual AFCI/GFCI products, which individuals used these products in homes where plugs or outlets were in close proximity to a water source, as situations where water and electricity might come into contact are known to trip or interrupt GFCI circuits.[349]

    b.  <u>Loose Connections</u>.  Loose connections in the "load center, switches, receptacles, and hardwired lighting/appliances" can cause tripping.  Siemens "highly recommends using screw connections for wire termination on all outlets, switches, etc., instead of using the spring-loaded 'push-in' connections," while ensuring "all screws and lugs are tightened to specification" to troubleshoot tripping in the circuit.[350]

    c.  <u>Compromised Electrical Cords Or Outlets</u>.  Damaged or compromised electrical cords or outlets can cause tripping in circuits protected by an AFCI breaker.  According to a Siemens 2018 webinar series, damaged cords, blackened plugs, and furniture that is on or pushing against electrical wires are common conditions for homeowners to avoid nuisance tripping.[351]

    d.  <u>Improper Or Damaged Wiring</u>.  Improper or damaged wiring has been shown to cause nuisance tripping.  According to a NEMA white paper "consistent findings have revealed that the majority of what are referred to as "unwanted trip issues are, in fact, related to problems with the installed wiring or attached wiring devices."[352]  NEMA lists "reversing neutral and ground wires, shared neutral wiring on single pole AFCI circuits and ground wires touching neutral wires" as examples of issues that can cause unwanted tripping.[353]  According to Siemens' AFCI-GFCI Circuit Breaker Diagnostic

---

[348] SIEMENS_AFCI_00020560-563, at 563.

[349] *See* "What's the Difference Between AFCI, GFCI & Standard Circuit Breakers," Docking Drawer (https://www.dockingdrawer.com/pages/faq-what-s-the-difference-between-afci-gfci-standard-circuit-breakers, accessed November 12, 2025).

[350] SIEMENS_AFCI_00362724-735, at 732.

[351] SIEMENS_AFCI_00016127-162, at 161.

[352] "White Paper: Wiring Practices & Troubleshooting with AFCIs," NEMA (https://www.afcisafety.org/wp-content/uploads/2017/05/Troubleshooting-with-AFCI.pdf, viewed on December 5, 2025), at p. 6.

[353] "White Paper: Wiring Practices & Troubleshooting with AFCIs," NEMA (https://www.afcisafety.org/wp-content/uploads/2017/05/Troubleshooting-with-AFCI.pdf, viewed on December 5, 2025), at p. 6.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

> Guide, "damaged [wiring] insulation…may expose hot wires to neutral or ground wires," and "back-stabbing," or wiring that is pushed in instead of being wrapped around a screw terminal, can cause nuisance tripping.[354]

e. Age Of Home. Related to the wiring issues identified above, homes that are newly constructed or undergoing an addition may present clearer opportunities for identification of improper wiring (e.g., upon inspection) than older homes or homes that occupants move into well beyond when construction and wiring have taken place.

141. Appliances And Load On A Circuit. Additional factors relating to the type and combination(s) of appliances used in a home, as well as the load on a circuit, can influence the existence and manifestation rate of nuisance tripping.

a. Appliances. As discussed previously, "[t]he expansion of the NEC AFCI requirements to include kitchens and laundry areas [presents] new unwanted tripping challenges" as a greater number of appliances interact with and draw from the circuit.[355] Certain types of appliances have been associated with increased rates of nuisance tripping.

i. According to a 2022 report from the Association of Home Appliance Manufacturers ("AHAM"), "[a] considerable number of nuisance trip events have resulted from AFCIs connected to microwave ovens" because their "normal operation…creates non-sinusoidal, noisy waveforms that may be mistaken for an arc signature by present AFCI's trip algorithms."[356] NEMA compiled a list of nuisance tripping complaints submitted between 2019-2021 which cited microwaves as the most common device associated with complaints (among all identified devices).[357]

ii. Other devices associated with multiple complaints included ceiling fans, furnaces, refrigerators, and treadmills.[358]

iii. Vacuums, flat screen TVs, computers, and power drills also have been identified as common causes of nuisance tripping in AFCI breakers.[359]

---

[354] SIEMENS_AFCI_00362724-735, at 732.

[355] NEMA_S-0024317-325, at 319.

[356] SIEMENS_AFCI_00260454-459, at 457-458.

[357] NEMA_S-0069148.

[358] NEMA_S-0069148.

[359] "Why Your Circuit Breaker Trips When Vacuuming," CoolToday (https://web.archive.org/web/20200927010615/ https://www.cooltoday.com/blog/why-your-circuit-breaker-trips-when-vacuuming, accessed November 7, 2025).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

b. <u>Older Appliances</u>.  Older appliances that predate U.S. consumer product safety standards, unlisted appliances, or appliances not used as the manufacturers intended can cause AFCIs to trip.[360]

c. <u>Newer Appliances</u>.  As discussed above, "the evolution in appliance designs…[presents] new unwanted tripping challenges" for AFCI manufacturers to design an AFCI that is compatible or interoperable with every conceivable other electrical device or combination of electrical devices that could end up in a home.[361] Newer appliances may be more likely to encounter interoperability issues with the Challenged Products due to lack of industry-wide standards.[362]  According to the 2022 AHAM report, "NFPA Code Making Panel 2 (CMP2) has rejected multiple requests to add an appliances exception for AFCI installation, allowing time for appliances to improve compatibility with AFCIs, as required by the National Electrical Code," and "[u]ntil [Underwriter Laboratories/Canadian Standards Association] device standards are modernized to reflect updated parameters, appliance designers, installers…and consumers will be forced to choose between a code compliant installation and an operational installation."[363]  Here, AHAM appears to acknowledge that new appliance designs may be subject to tripping across AFCI products (not specific to any particular brand of AFCI) due to the lack of industry-wide standards for AFCI tripping thresholds.[364]

d. <u>Circuit Overload</u>.  Overload on circuits has been associated with increased rates of nuisance tripping.

   i. In 2022, Electrical Safety Foundation International ("ESFI") conducted a survey in Massachusetts to determine how AFCI and GFCI devices performed in homes.[365] Electrical contractors reported that overloaded circuits were one of the most common mistakes observed, occurring in 27 percent of service calls.[366]

   ii. According to Mr. Meade of Bolt Electric, "I have had problems with breakers tripping from overload on all [AFCI] manufacturers … [i]ncluding Siemens and Square D and the other ones, because people have too many things plugged into one circuit."[367]

---

[360] NEMA_S-0019795.

[361] NEMA_S-0024317-325, at 319.

[362] SIEMENS_AFCI_00260454-459, at 456.

[363] SIEMENS_AFCI_00260454-459, at 459.

[364] SIEMENS_AFCI_00260454-459.

[365] SIEMENS_AFCI_00020560-563, at 562.

[366] SIEMENS_AFCI_00020560-563, at 562.

[367] *See* Meade Deposition, at p. 93.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

142.   From an economic and damages quantification perspective, individual inquiry is required to determine the degree to which any of the above factors influenced the level of nuisance tripping, or the manifestation rate, allegedly experienced by each individual putative Class member.

### F.   Summary Of Conclusions

143.   The circumstances surrounding each putative Class member's purchasing and usage of the Challenged Products must be evaluated to determine whether and to what extent a putative Class member allegedly was injured because of the alleged failure to disclose the Alleged Defect.   Failure to examine the considerations identified in this section of my report on an individualized basis would sever the economic nexus of tying the claimed harm to the Alleged Defect.   A common proof approach (such as that proposed by Dr. Caves which I evaluate next in my report) would not isolate from any claimed injury or damages calculations the putative Class members who suffered little or no harm due to the Alleged Defect, and, hence, should not be part of the Class-wide, common proof, injury and damages calculations.

### XII.   EVALUATION OF NAMED PLAINTIFFS' CLAIMED DAMAGES AS PRESENTED IN THE CAVES REPORT

### A.   The Caves Report Fails To Evaluate the Individual Inquiry Issues Associated with Assessing Plaintiffs' Claimed Economic Injury and Damages

#### 1.   Failure To Address Individual Inquiry Issues: Consumer Class

144.   Earlier in my report I identified and discussed the individual inquiry issues present that would need to be evaluated to determine whether an individual putative Class member was injured (and the quantum of that injury) because of Siemens' alleged failure to disclose the Alleged Defect.   That full discussion will not be repeated here.   However, it is important

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

to note a fundamental flaw in Dr. Caves' conjoint survey / market simulation analysis as applied to the Consumer Class: the Caves Report fails to acknowledge, discuss, or evaluate the individual inquiry issues associated with assessing Consumer Plaintiffs' claimed economic injury and damages.  This failure invalidates the approach presented and implemented in the Caves Report.

145.   It is important to note that this observation relating to Dr. Caves' approach does not require the finding or opinion that conjoint surveys or market simulations (in general) are inherently unreliable.  I am not giving that opinion.  The problem with the analysis developed and implemented by Dr. Caves is that it (a) assumes a common proof approach in this instance is reliable (without proper analysis to support that assumption), (b) assumes that the results of the common proof approach can be applied reliably to all putative Consumer Class members (without proper analysis to support that assumption), and (c) utilizes unreliable inputs.  However, as discussed earlier in my report (and only summarized here), individual inquiry issues are present.  A high level summary of the individual inquiry issues the Caves Report does not acknowledge, discuss, or evaluate includes such considerations as:

a.   the putative Class member's reasons for purchasing a Challenged Product and whether the reasons for purchase were or were not related to the alleged failure to disclose the Alleged Defect (e.g., a person who bought the Challenged Product because of its ability to mitigate the risk of a dangerous arc fault and who placed less importance on nuisance tripping);

b.   the putative Class member's knowledge and perceptions relating to the Alleged Defect when they purchased the Challenged Products (i.e., knowledge of the trade-off between an AFCI's nuisance tripping manifestation rate and its ability to detect dangerous arcs);

c.   the Challenged Products purchased by putative Class members given the variety of choices and that the Challenged Products consist of many AFCIs with different

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

technical specifications (implying different demands for the different Challenged Products and potentially different values placed upon product attributes);

d. the price(s) each putative Class member paid for the Challenged Products (e.g., individual purchases versus from an electrician; across retailers or other distribution outlets; over time; in different geographic locations; different models with different technical specifications; whether the purchase was made in combination with a price sale or other promotion; etc.); and

e. the claimed damages allegedly suffered by individual putative Class members given the lack of Class-wide evidence and given that Named Plaintiff depositions reveal that certain putative Consumer Class members:

   i. did not retain receipts for and could not recall the price(s) they paid for the purchase, installation, replacement, or investigation of the Challenged Products;[368]

   ii. could not recall exactly how many of the Challenged Products they had purchased, installed, used, or replaced;[369] and/or

   iii. could not recall the exact timing of their purchase(s) of the Challenged Products, including the circumstances leading up to the purchase and the period of time over which the purchase took place.[370]

146. The circumstances surrounding each putative Class member's purchasing and consumption of the Challenged Products must be evaluated to determine whether and to what extent a putative Class member was injured because of the alleged failure to disclose the Alleged Defect. Dr. Caves' failure to acknowledge and examine the individualized considerations sever the economic nexus tying the claimed harm as calculated by Dr. Caves to the Alleged Defect. Despite the individual inquiry issues noted throughout my report, neither Named

---

[368] *See, e.g.*, Montoya Deposition, at pp. 147-148. *See also* Cates Deposition, at pp. 73-74; Butakis Deposition, at p. 147; Vodicka Deposition, at pp. 129:16-130:8 (no recollection or receipts for the replacement costs incurred); Barrette Deposition, at pp. 128:21-129:1, 133:4-7 (confirmed that plaintiff paid in cash and does not recall the exact dollar amount paid); 134:20-135:4 "(Q. Okay. And so did he give you a dollar amount regarding the cost to replace the two breakers? A. He actually did not charge us for that one. He bought the breakers himself and retained them afterwards…").

[369] *See, e.g.*, Brnich Deposition, at p. 124. *See also* Butakis Deposition, at pp. 82-83.

[370] *See, e.g.*, Montoya Deposition, at p. 164. *See also* Butakis Deposition, at p. 119.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

Plaintiffs nor Dr. Caves have proposed any method (or methods) to identify individual Class members within the putative Classes (or for overcoming or addressing the significant challenges associated with identifying all individual members within the putative Classes) and/or identifying individual Class members that have suffered alleged harm with a nexus to the Alleged Defect.

147.	Dr. Caves calculates a claimed Price Premium and applies that Price Premium to all putative Consumer Class members and to all purchases of the Challenged Products. The flaw in this approach is that a common proof approach (such as that proposed and implemented by Dr. Caves) would not isolate from the claimed damages calculations the putative Class members who suffered little or no harm due to the Alleged Defect as I have discussed earlier in my report (and, hence, should not be part of a Class-wide, common proof, claimed injury and damages calculation).

148.	The above observation applies directly to the claimed Price Premium damages calculation performed by Dr. Caves and applied by him to the Consumer Class. The same observation also applies to the other alleged harms to the Consumer Class but not evaluated by Dr. Caves (as discussed earlier in my report).

a.	The Consumer Class also is making claims for alleged damages in terms of "time effort" and repair and replacement costs as a result of nuisance tripping attributed to the Alleged Defect. However, individual inquiry would be required to ascertain the amount of time the putative Consumer Class member placed into coordinating efforts to resolve the tripping issue. In addition, a value would have to be placed upon that time. The amount of time and the value of that time would not be a constant across all putative Consumer Class members. Individual inquiry also would be required to determine the associated repair costs (if paid) and replacement costs (if paid). None of these issues are acknowledged, discussed, or evaluated by Dr. Caves.

b.	The Consumer Class also is described in the Amended Complaint as "consumers who either paid an electrician to install a Siemens' panel box and AFCI breakers in their

- 98 -
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

homes or <u>purchased a home with Siemens AFCIs already installed</u>."[371] Individual inquiry would be required to determine the alleged damages to Consumer Class members who purchased a home with Siemens AFCIs already installed.

    i.    For example, it is not clear whether Named Consumer Plaintiffs are claiming AFCI replacement costs or a loss in value associated with their home purchase. However, even if such claimed harm did exist, individual issues would need to be investigated, including but not limited to: (a) the different types of AFCIs installed in the home; (b) the number of AFCIs installed in the home; and (c) the replacement cost (including price) for these AFCIs. Also, other important considerations would be (i) whether the homeowner had an electrical inspection prior to the home purchase and (ii) whether the homeowner was made aware that the home had Siemens AFCIs installed (or learned through the inspection process of any claimed Alleged Defects with the Siemens AFCIs).

    ii.    Alternatively, applying a Price Premium approach to quantifying claimed damages in such a case would require assuming that these individuals paid a Price Premium on their home purchase relative to what they would have paid where the Alleged Defect was disclosed at the point of home sale.

    (a)    Such an assumption would strain credibility, including because numerous other factors (e.g., home location, structural integrity, design features, etc.) would be expected to have far greater influence over the home price, and it is far from clear whether the type of AFCI installed would substantially affect the price consumers paid for their home.

    (b)    At a minimum, one would expect negotiations between the buyer and seller to determine the amount of the adjustment to the home price, if any. The outcome of such negotiations would depend upon the relative bargaining strengths of the buyer and seller (an individual inquiry issue) and also could be affected by other adjustments already made to the purchase price and/or the disclosures made by the seller at the time of the home sale. Nevertheless, such an approach would require individual inquiry.

    (c)    In the extreme, one could even posit that a separate and differently designed conjoint survey and market simulation exercise would be required to determine the price premium consumers paid (if any) under such circumstances.

149.    The Caves Report does not acknowledge, discuss, or evaluate any of these individual inquiry issues as they pertain to the Consumer Class and how a common proof approach

---

[371] Amended Complaint, at ¶ 10. (Emphasis added.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

could overcome these individual inquiry issues to produce a reliable measure of Consumer Class-wide damages

## 2. Failure To Address Individual Inquiry Issues: Commercial Class

150. The same general critique applies to the harm being claimed by the Commercial Class that Dr. Caves did not evaluate. The Commercial Class is making claims of harm related to uncompensated time investigating and attempting to resolve the cause of tripping and the cost of replacing one or more of the Challenged Products. At the highest level, individual inquiry would be required to ascertain whether tripping investigations by electricians as members of the Commercial Class were either compensated or uncompensated. If uncompensated, individual inquiry would be required to ascertain the amount of time associated with the investigation, the hourly rates of the electricians involved, and if travel time to the site should be included, among other things. Once over that hurdle, even if such claimed harm did exist, additional claimed unreimbursed costs would need to be evaluated, including the different types of AFCIs installed by the electrician, the number of AFCIs installed by the electrician, and the replacement cost (including price) for these AFCIs.

151. I do acknowledge that Dr. Caves stated in his report that he has not been asked to opine on the Commercial Class.[372] However, 90% of the respondents to Dr. Caves' conjoint survey are professional electricians, so I must make the above observations as to why his conjoint analysis and market simulation would not be applicable to the putative Commercial Class in the event the putative Consumer Class results were to be used for the Commercial Class.

---

[372] Caves Report, at ¶ 5, Footnote 5.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

I also note that Dr. Caves' final opinion is based upon the sensitivity analysis he performs where he limits the respondents only to the 90 percent that are professional electricians.[373]

### 3. Failure To Address Individual Inquiry Issues: Omission Of Key Attributes (Drivers Of Demand)

152. Dr. Caves' conjoint survey also omits key attributes that are confirmed to be drivers of AFCI demand, including by Named Plaintiffs who are professional electricians (just like the 90 percent of respondents to Dr. Caves' survey).

   a. Mr. Montoya's deposition testimony emphasized the importance of availability in influencing his Siemens AFCI purchase decision. According to Mr. Montoya's testimony, "between the years of 2016 and … 2019 … there certainly was a saturation of Siemens equipment at these Home Depots of which I frequented…I don't have to spend time shopping around or looking around for other brands."[374]

   b. Mr. Zank's deposition testimony emphasized the importance of convenience in influencing his Siemens AFCI purchase decision. According to Mr. Zank's testimony, "[w]e had multifamily units that were using, and you buy everything as a package … So I'm buying multiple buildings worth in a package."[375]

153. Attributes like availability and convenience are absent from Dr. Caves' CBC list of attributes.[376] By omitting these demand drivers that have influenced real-world AFCI purchasers to select Siemens AFCIs, Dr. Caves is not estimating the contributions of these attributes (i.e., demand drivers) to retail pricing when evaluating any alleged Price Premium – undermining the basis for his claimed damages calculation. It should be noted

---

[373] *See* Caves Report, Appendix D, at Table D, ¶ 4. (Bracketed text added for clarification.)

   As seen in row 6 of Table D1, I [Dr. Caves] perform additional sensitivity analyses in which I limit the analysis only to the professional electricians who made up 90 percent of respondents to the CBC survey. The Price Premium declines slightly, to 32 percent. Because this is the lowest Price Premium obtained in any of the sensitivity analyses, I conservatively use 32 percent when calculating aggregate damages.

[374] *See* Montoya Deposition, at pp. 155-156.

[375] *See* Zank Deposition, at pp. 110-111.

[376] Caves Report, at ¶ 42, Table 2.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

that Dr. Caves' instruction to survey respondents to "assume that all of the AFCIs you are shown in the survey have very similar or identical features, except for the features that you can actually see in the survey"[377] does not cure this problem as the availability and convenience attributes were specific to Siemens AFCIs and would not be applicable to competing AFCIs.[378]

### 4. Conclusion With Respect To Individual Inquiry Issues

154. The Caves Report does not acknowledge, discuss, or evaluate any of these individual inquiry issues as they pertain to the Commercial Class and how a common proof approach could overcome these individual inquiry issues to produce a reliable measure of Commercial Class-wide damages.

155. The Caves Report fails to evaluate the individual inquiry issues associated with assessing Commercial Plaintiffs' or Consumer Plaintiffs' claimed economic injury and damages. These individual inquiry issues invalidate a common proof approach to evaluating reliably the damages being claimed by either Class.

### B. The Caves Report Does Not Differentiate Between Nuisance Tripping Common To All AFCIs And Nuisance Tripping Allegedly Specific To Siemens' Arc Detection Method

156. From an economic and damages perspective, the claimed damages assessment methodology presented in the Caves Report is invalid because it incorrectly measures the price premium for Nuisance Tripping instead of the price premium for "excess nuisance tripping" attributable to the Challenged Products, which is fatal to the analysis.

---

[377] Caves Report, at ¶ 28. *See also* Caves Report, Appendix A, Question 20.

[378] According to Mr. Montoya's testimony, "I don't have to spend time shopping around or looking around for other brands." *See* Montoya Deposition, at pp. 155-156.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

157. As substantiated in **Table 4** in **Section XI.B.1**, nuisance tripping, as commonly understood, is a known issue with all AFCIs (made by any manufacturer), including all AFCIs available for purchase throughout the Class Period.  However, Named Plaintiffs allege that compared with other competing products on the market during the Class Period, Siemens AFCIs "were not of average quality, [and] were not fit for their ordinary purpose."[379]  Moreover, Plaintiffs contend that if they had "known that Siemens' AFCI breakers were defective and could not function as promised, [they] would have purchased a competitor's AFCI breaker instead, or paid less for Siemens' AFCI breakers."[380]  As it is a well-established fact that all AFCIs available for purchase during the Class Period were characterized by some degree of nuisance tripping (see **Table 4** in **Section XI.B.1**), Plaintiffs' theories of harm necessarily originate from an implicit assertion that Siemens AFCIs are *more* prone to nuisance tripping than competitor AFCIs.

158. In his CBC survey, Dr. Caves' definition of the "Nuisance Tripping Defect" does not differentiate between "baseline nuisance tripping"—i.e. nuisance tripping as it occurs among the "functional" competitor AFCIs that Plaintiffs allegedly would have bought instead of the Challenged Products—and the "excess nuisance tripping" underlying Named Plaintiffs' theories of harm.[381]  Consequently, some or all of Dr. Caves' CBC survey respondents likely interpreted nuisance tripping as described in the Nuisance Tripping

---

[379] Amended Complaint, at ¶ 199.

[380] Amended Complaint, at ¶ 221.

[381] *See* Caves Report, Appendix A, at p. 24.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

Disclosure as representing any and all nuisance tripping, assuming all AFCIs without the Nuisance Tripping Disclosure experience no nuisance tripping at all.

159.    **Figure 3** below illustrates (in a simple format) how failing to differentiate between "baseline nuisance tripping" and "excess nuisance tripping" affects Dr. Caves' analysis after adding the Nuisance Tripping Disclosure to Siemens single-function AFCIs.  For simplicity, I use **Figure 3** to illustrate the problem with Dr. Caves' analysis.  I focus on the demand for AFCIs produced by a single firm.

   a.  D1 represents the demand curve for the firm's AFCIs if they are only subject to "baseline nuisance tripping."

   b.  D2 represents the demand curve for the firm's AFCIs if they are subject to both "baseline nuisance tripping" and "excess nuisance tripping."

   c.  D3 represents the demand curve for the firm's AFCIs if they are not subject to any nuisance tripping.

160.    As illustrated, and using Dr. Caves' approach, additional nuisance tripping shifts the demand curve "downward" so that additional nuisance tripping reduces the willingness to pay for any particular quantity purchased, which is consistent with Dr. Caves' analysis.[382] Points in the figure represent the prices consumers are willing to pay for quantity Q1 of AFCIs subject to "baseline nuisance tripping" (Point A, equivalent to price P1), "baseline nuisance tripping" plus "excess nuisance tripping" (Point B, equivalent to price P2) and no nuisance tripping, respectively (Point C, equivalent to price P3).

---

[382] The negative estimated part-worth Dr. Caves obtains for the Nuisance Tripping Disclosure represents a downward shift in the demand curve for that AFCI.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

**Figure 3**

**Graphical Illustration of Differences in Willingness to Pay Given the Degree of Nuisance Tripping Associated with a Firm's AFCIs**



161.    The model presented in **Figure 3** is intuitive and no mathematics are required (and which would be a distraction to the point being made).  As graphically shown, (a) the decrease in willingness to pay when "excess nuisance tripping" and "baseline nuisance tripping" are combined is greater than (b) the decrease in willingness to pay when only "baseline nuisance tripping" occurs.  This result would then carry over to Dr. Caves' additional mathematical manipulations utilized to determine a claimed decrease in price.

162.    In his market simulation analysis, Dr. Caves estimates that willingness to pay drops by 68 percent when the Nuisance Tripping Disclosure is added to the product.[383]  However, because Dr. Caves does not instruct his CBC survey respondents to assume that all AFCIs are subject to baseline nuisance tripping, Dr. Caves' willingness to pay reduction associated with Siemens alleged failure to disclose the Alleged Defect is too large (i.e., it represents, in Dr. Caves' model, the combined effect of "baseline nuisance tripping" and

---

[383] Caves Report, at ¶ 57.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

"excess nuisance tripping"). Prior to applying his claimed supply side adjustment, Dr. Caves is measuring the equivalent of (P3 minus P2) rather than (P1 minus P2) – which creates an overstatement of the beginning figure Dr. Caves uses to then derive a claimed price premium (i.e., incorporating a claimed supply side adjustment does not cure this problem).

163.    Thus, even if Dr. Caves' conjoint survey / market simulation approach was otherwise valid, his Price Premium would likely capture, at least in part, the difference in (a) what putative Consumer Class members would have been willing to pay for a Siemens AFCI that never experienced nuisance tripping in a competitive market where nuisance tripping does not occur relative to (b) what they would be willing to pay for a Siemens AFCI that experienced nuisance tripping in a competitive market where no other products experience nuisance tripping. Given Named Plaintiffs' allegations, this is the wrong measure and clearly leads to an overstatement of claimed damages. This is because Dr. Caves does not explicitly differentiate between "baseline nuisance tripping" and "excess nuisance tripping." Dr. Caves' Price Premium estimate represents, at least in part, a price premium for any and all nuisance tripping, including both "baseline nuisance tripping" and "excess nuisance tripping," relative to a market in which no other AFCIs experience nuisance tripping at all. This would invalidate a nexus between Dr. Caves' Price Premium and claimed damages (if any) as implied by Plaintiffs' theory of harm, which is fatal to his analysis.

**C.    The Caves Report Does Not Derive A New Claimed Market Equilibrium Price Incorporating The Alleged Defect**

164.    The Caves Report does not derive a new claimed market equilibrium price incorporating the Nuisance Tripping Disclosure to use when comparing to claimed actual prices.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

Therefore, even within his approach, Dr. Caves has not calculated a reliable market derived Price Premium.

165.    In economic theory, equilibrium prices are determined by the interaction of supply and demand, and the properties of the structure of the market in which a product competes. However, as discussed in **Section IX.A**, the steps in the process Dr. Caves follows to obtain his estimated Price Premium are as follows.

   a.  Simulate market shares for a hypothetical four-brand, two-product per brand market wherein no products are assigned the Nuisance Tripping Disclosure attribute.

   b.  Add the Nuisance Tripping Disclosure attribute to Siemens single-function AFCIs, which represent a Challenged Product.

   c.  Adjust the price of Siemens single-function AFCIs with the Nuisance Tripping Disclosure attribute until Siemens' simulated market share is equal to its simulated market share computed in step (a).

   d.  Take the difference between the price in steps (a) and (c) and adjust for a claimed "supply-side" effect wherein Siemens adjusts prices and quantities.

166.    This analysis does not conform to any standard model of the determination of market prices in a competitive environment and no economic treatise will support Dr. Caves' determination of what he claims to be a new market equilibrium price. In a competitive environment, prices are determined by the interaction of supply and demand. In Dr. Caves' model, his initial price is determined by adjusting the price of Siemens single-function AFCIs with the Nuisance Tripping Disclosure attribute until Siemens' simulated market share is equal to its simulated market share computed without the disclosure. Also, in Dr. Caves' analysis, only Siemens was allowed to change any of its prices and Siemens only

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

was allowed to change one of its prices.  Consequently, the simulated market studied by Dr. Caves cannot possibly be in a general market equilibrium state.[384]

167.    In tacit acknowledgement of these conceptual issues, Dr. Caves attempts to adjust his analysis by introducing a claimed "supply-side" model.  Dr. Caves asserts that this analysis provides a conservative estimate of the Price Premium since it holds fixed the prices of competitors which, if allowed to compete, would put further downward pressure on the price of the Challenged Products.[385]  However, Dr. Caves neglects to account for the fact that, under economic models of multiproduct firms, Siemens also could change the price of its AFCI/GFCIs (i.e., "dual-function" AFCIs) in response to the Nuisance Tripping Disclosure demand shift from its AFCIs, thereby offsetting some of its losses and affecting the implied equilibrium Price Premium.[386]

168.    The inadequacy of Dr. Caves' analysis is underscored further by Allenby et al., which, in discussing the use of conjoint analysis for estimating profits attributable to product features, noted the following:

---

[384] *See, e.g.*, Mankiw, N. G., Principles of Economics (8th Edition), Cengage Learning, 2018 ("Mankiw 2018"), at p. 340.  According to Mankiw 2018, when there are only a few sellers in a market, as in the AFCI market studied by Dr. Caves, firms "each choose their best strategy given the strategies that the others have chosen" in equilibrium.  Within Dr. Caves modeling framework, because no other firms are allowed to strategically change their prices in response to Siemens' price change, the market cannot be in equilibrium both before and after Siemens changes its price.

[385] Caves Report, at ¶ 61.

[386] *See, e.g.*, Kittaka, Y., "Multiproduct Firms, Consumer Search, and Demand Heterogeneity," The Journal of Industrial Economics (2025), 1-12, at p. 1.  "I show that a positive demand shock to one product induces firms to increase that product's price while decreasing the other product's price, and the latter effect is greater than the former one."  Here, the Nuisance Tripping Disclosure should be regarded as a negative demand shock, which implies that Siemens would increase the price of its AFCI/GFCIs in response to the addition of the Nuisance Tripping Disclosure attribute to its AFCIs.  In Dr. Caves' model, Siemens AFCIs and AFCI/GFCIs are substitutes, since a decrease in purchases of Siemens AFCIs due to the Nuisance Tripping Disclosure also resulted an increase in the purchases of Siemens AFCI/GFCIs.  (*See* Caves Report, at ¶ 56.)  Hence, an increase in the price of Siemens AFCI/GFCIs would increase the demand for Siemens AFCIs, thereby reducing any claimed equilibrium Price Premium.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

> [A] conjoint survey, in and of itself, is not adequate to form the basis for equilibrium firm profit calculations. Not only must we calibrate demand for products but we must also compute industry equilibria. This requires measures of costs, a demand system not only for the focal product but also for the major competing products, and an equilibrium concept.[387]

169. Equilibrium profits are an explicit function of equilibrium prices, and so Allenby et al.'s claim applies in equal measure to equilibrium prices and any price premium measures derived from them.[388]  As Dr. Caves does not even attempt to specify an equilibrium concept in his supply-side analysis, Dr. Caves' Price Premium estimate cannot represent a reliable market-derived price premium estimate.

### D. The Caves Report Does Not Account For Nuisance Tripping Information Available In The Market

170. Dr. Caves' CBC survey and subsequent market simulation do not account for nuisance tripping information already available to putative Consumer Class members who had participated in the market.  As shown in **Table 4** in **Section XI.B.1**, nuisance tripping is a widely documented issue affecting all AFCIs, including all AFCIs available for purchase throughout the Class Period.  Consequently, some putative Class members likely were well-informed about nuisance tripping prior to purchasing a Siemens AFCI, while others may have been unaware of these issues.  This is an individual inquiry issue and is important

---

[387] Allenby, G.M., et al., "Valuation of Patented Product Features," The Journal of Law and Economics, Vol. 57, No. 3 (August 2014), 629-663, at 630.

[388] Allenby, G.M., et al., "Valuation of Patented Product Features," The Journal of Law and Economics, Vol. 57, No. 3 (August 2014), 629-663, at 630.  "The economic value of a patent should be based on the incremental profits that can accrue to firms that enhance their products with the features enabled by the patents.  These incremental profits are not just based on consumer valuation of features (demand) but also cost and competitive factors (supply).  Therefore, incremental profit calculations should be based on equilibrium profits."  Equilibrium profit is defined as total revenue at equilibrium, which is equal to equilibrium price times equilibrium quantity, minus total cost at equilibrium.  Thus, equilibrium profits are directly determined by equilibrium prices.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

to the assessment as to whether the value received by a putative Class member was greater than (or equal to) the price paid.

171.     This individual inquiry issue goes even deeper as the cognitive interviews conducted by Dr. Cave indicate very differing views concerning AFCI providers and the concept of nuisance tripping.  Electricians appear to have their own perceptions of which brands are susceptible to Nuisance Tripping.

   a.   One cognitive interview respondent told Dr. Caves: "Eaton and Siemens are well known to [have] n[uisc]ance tripping issues. I've never had a nuisance tripping issue with the Schneider product, [S]quare [D]."[389]

   b.   Another cognitive interview respondent told Dr. Caves: "Siemens is actually the only breaker that doesn't nuisance trip."[390]

172.     Dr. Caves knew (or should have known) his CBC survey respondents likely already had information about Nuisance Tripping prior to purchasing AFCIs.  In one instance, a cognitive interview respondent told Dr. Caves that "[e]very electrician knows what nuisance tripping is."[391]  However, in his claimed damages analysis, Dr. Caves treats putative Consumer Class members as though they were all completely unaware of any nuisance tripping when they made their AFCI purchase.[392]  As the available evidence indicates, at least some putative Consumer Class members may have been (or were) informed about AFCI nuisance tripping.

---

[389] Cognitive Interview 5, at p. 15.

[390] Cognitive Interview 1, at p. 23.

[391] Cognitive Interview 1, at p. 16.  Note that all of Dr. Caves' cognitive interview respondents are electricians. *See* Caves Report, at ¶ 25.

[392] The initial market simulation is the relevant one, as it claims to represent the market as it was during the Class Period and under the status quo. *See* Caves Report, at Figure 4.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

173.    To the extent that putative Consumer Class members' nuisance tripping experiences were aligned with their expectations, putative Consumer Class members were not damaged as claimed (or as measured by Dr. Caves).  Moreover, to the extent that putative Consumer Class members' experiences of nuisance tripping did not align with their expectations thereof, the extent to which they were allegedly damaged (if at all) depends on the degree to which their expectations and experiences of nuisance tripping did not align.  An assessment of damages suffered by putative Consumer Class members (if any) thus requires individual inquiry into the information possessed at the time of purchase.  Dr. Caves makes no attempt in his report to address this issue, suggesting a single Price Premium estimate as a basis for aggregate damages across all putative Consumer Class members, which is fatal to his analysis.

E.    **The Caves Report Fails To Differentiate Between A "Defect Rate" And A "Manifestation Rate"**

174.    In conducting his conjoint survey / market simulation analysis, Dr. Caves includes an attribute described as the "Nuisance Tripping Disclosure" to "model disclosure of the Alleged Defect to the customer at the point of purchase."[393]  Dr. Caves establishes a binary set of disclosures where "the Nuisance Tripping Disclosure could take on two different levels, indicating the presence or absence of the Nuisance Tripping Defect."[394]  In establishing this binary (i.e., "yes"/"no") set of disclosures, Dr. Caves fails to account for numerous individual-specific factors that likely inform (a) whether nuisance tripping occurs or does not occur and (b) the frequency and amount of nuisance tripping that does

---

[393] Caves Report, at ¶ 40.

[394] Caves Report, at ¶ 41.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

occur (i.e., the manifestation rate).  In other words, the analysis contained in the Caves report fails to differentiate between a "defect rate," (i.e., the rate at which Challenged Products are subject to the Nuisance Tripping Defect) and a "manifestation rate" (i.e., the rate at which the Alleged Defect causes nuisance tripping to occur).  Dr. Caves' failure to differentiate between a defect rate and a manifestation rate is fatal to the analysis.

175.   According to the Durham Report, the Alleged Defect is said to occur due to "common and safe voltage distortions that…are generated by *some* [emphasis added] models of common household appliances, electrical devices, and lighting."[395]  It follows that members of the putative Class, who own different models of appliances, electrical devices and lighting, will have experienced different nuisance tripping manifestation rates attributed to the Alleged Defect and that some putative Class Members have never and will never experience nuisance tripping attributed to the Alleged Defect.

176.   Further, even if all putative Class members were found to own models of appliances, electrical devices, and lighting affected by the Alleged Defect, the nuisance tripping manifestation rate still is an important determinant of demand, as the willingness to pay for a putative Class member that experiences nuisance tripping "every day" will be lower than the willingness to pay for a putative Class member that experiences nuisance tripping once a month, or once a year.

177.   According to Siemens' records, reports of nuisance tripping are infrequent.  For example, in fiscal year 2017, Siemens received ▮ reports of nuisance tripping.  Based upon this figure and the total number of Siemens AFCIs shipped that fiscal year, Siemens estimated,

---

[395] Durham Report, at ¶ 35.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

assuming three Siemens AFCIs installed per call, that ▮▮▮ percent of households reported nuisance tripping.  Siemens also expressed this as one nuisance tripping call per every ▮▮▮ AFCIs shipped.[396]

178.  Dr. Caves does not address manifestation rates in his CBC survey, conjoint analysis, and market simulation.  Dr. Caves fails to incorporate any notion of manifestation rates in his CBC survey.[397]  As such, it is impossible to determine how willingness to pay varies with the nuisance tripping manifestation rate from Dr. Caves' survey results.  Thus, even if Plaintiffs provided data detailing manifestation rates of putative Class members and the Challenged Products, Dr. Caves' CBC survey could not be used to determine a claimed price premium percentage to apply to putative Class members based upon the fact that the manifestation rate is different than the claimed defect rate (and that different putative Class members likely experienced different nuisance tripping manifestation rates).

179.  Moreover, in at least one instance, Dr. Caves was made aware that incorporating manifestation rate information could be useful to his CBC survey respondents.  When Dr. Caves asked one of his cognitive interview respondents "is there more information that you think an electrician would need to have to make an informed decision, and if so, what … would that be?," the respondent replied "[y]ou're saying like, if you put a diagram of like … each brand like how often they nuisance trip," indicating that manifestation rates (i.e.

---

[396] *See* SIEMENS_AFCI_00047353, at tab "FY17 Summary."  The data produced by Siemens for later years do not appear to capture the proportion of nuisance tripping reports vs. number of AFCI products sold.  For later years, I filtered on the column "SR Abstract" or "Abstract" for each year using the term "nuisance" to yield report counts of 157, 158, 198, 164, and 44 for fiscal years 2019, 2020, 2021, 2022, and Q1 2023, respectively.  *See* SIEMENS_AFCI_00002899, at tabs "2019," "2020," "2021," "2022," "2023."

[397] *See* Caves Report, Appendix A, at p. 24.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

frequency of nuisance tripping) would have been useful information for survey respondents. Dr. Caves did not pursue further discussion on this topic.[398] Two economic observations flow from this failure.

a. As discussed throughout my report, from an economic perspective, if manifestation rates had been incorporated into Dr. Caves analysis (especially at real world rates), the claimed Price Premium would have been reduced.

b. If such a manifestation diagram had been incorporated into Dr. Caves analysis based on real-world nuisance trip rates observed across products in the market, no AFCI product would have had a zero manifestation rate and there would have been little differentiation among competing products. As noted, Ms. Kees and Mr. Duemmler confirmed that nuisance trip rates across product brands and manufacturers are and have been essentially "on a level playing field."[399]

180. Dr. Caves' failure to incorporate manifestation rates in his CBC survey makes his market simulation Price Premium estimates uninterpretable. In his market simulation, Dr. Caves implicitly assigns a defect rate of 100 percent to the Challenged Products but has not stipulated that the manifestation rate would be different from the defect rate.[400] Because Dr. Caves' CBC respondents were not provided with a manifestation rate, many respondents likely attributed different manifestation rates with different frequencies (e.g., once a day, once a week, once a month) to the Alleged Defect with 100 percent of the Accused Products having their implicitly assumed manifestation rate and frequency. Thus, it is impossible to determine what manifestation rate Dr. Caves' Price Premium estimate corresponds to, and whether it is representative of the manifestation rate (or, potentially,

---

[398] Cognitive Interview 1, at p. 29. Dr. Caves chose not to invite more discussion or probe on this topic and the discussion moved away from this topic.

[399] Kees and Duemmler Discussion on December 16, 2025.

[400] *See* Caves Report, at ¶¶ 55-56, Figure 5.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

manifestation *rates*, because the rate experienced by any one putative Class member is determined by the electrical appliances they own) experienced by putative Class members.

181.   By presenting the Alleged Defect rate as a binary choice between occurrence and absence, rather than a metric that captures a spectrum of Alleged Defect rates observed in the market, Dr. Caves takes the wrong measurement.   As discussed elsewhere in my report, in economic terms, when a consumer selects an AFCI they effectively are trading off between the lower risk of undetected dangerous arcs and the higher risk of nuisance tripping.   Dr. Caves reaches the conclusion based upon his survey that consumers have disutility associated with nuisance tripping.   However, regarding how nuisance tripping affects a purchase decision and willingness to pay, AFCIs that experience nuisance tripping at a rate of ██████ percent of households would experience little to no negative price effects relative to AFCI's that experience nuisance tripping at a rate of 100 percent.

### F.   The Caves Report Omits Incorporating The Primary Benefit Associated With The Challenged Products.

182.   Consumer purchasing decisions often involve trade-offs.   I understand that perfectly accurate differentiation between harmless and dangerous arc faults is not technically feasible given the recent state of AFCI technology, and as such, manufacturers face a trade-off between two different kinds of error when designing AFCIs.[401]

---

[401] *See e.g.* Tian, C., et al., "Arc Fault Detection Using Artificial Intelligence: Challenges and Benefits," Mathematical Biosciences and Engineering, Vol. 20, Issue 7 (May 2023), 12404-12432, at p. 12404: "The findings of this review suggest that AI plays a significant role in enhancing the accuracy and speed of detection and allowing for customization to specific types of faults in arc fault detection. Simultaneously, three major challenges were also identified, including *missed and false detections* [emphasis added], the restricted application of neural networks and the paucity of relevant data."

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

183.   The first type of error—what statisticians call "type I error" in the language of hypothesis testing—is a false positive.[402]   Stated in the language of hypothesis testing, an AFCI detection algorithm's type I error rate or false positive rate is calculated by dividing the number of nuisance trips by the total number of harmless electrical arcs.[403]

184.   The second type of error—what statisticians call "type II error" in the language of hypothesis testing —is a false negative.[404]   Stated in the language of hypothesis testing, an AFCI detection algorithm's type II error rate or false negative rate is obtained by dividing the number of truly dangerous electrical arcs not detected by the total number of dangerous electrical arcs.

185.   As shown by Chabert et al., arc fault detection algorithms trade off between type I error rates (i.e. the false positive rates) and type II error rates (i.e. the false negative rates): for a given detection algorithm, to reduce the false positive rate, one must necessarily increase the false negative rate.[405]   Consequently, AFCI manufacturers, and by implication

---

[402]   Powers, D.M.W., "Evaluation: From Precision, Recall and F-Measure to ROC, Informedness, Markedness & Correlation," Journal of Machine Learning Technologies, Vol. 2, Issue 1 (2011), 37-63, at p. 39. "Note that [false positive] and [false negative] are sometimes referred to as Type I and Type II Errors, and the [false positive rate and false negative rate] as alpha and beta, respectively – referring to falsely rejecting or accepting a hypothesis."

[403] *See e.g.* Chabert, A., et al., "A Transformer Neural Network for AC Series Arc-Fault Detection," Engineering Applications of Artificial Intelligence, Vol. 125 (2023), 1-11, at p. 8. Here, a false positive rate is defined as the number of false positives divided by the number of true negatives plus false positives (i.e., total negatives).

[404] Powers, D.M.W., "Evaluation: From Precision, Recall and F-Measure to ROC, Informedness, Markedness & Correlation," Journal of Machine Learning Technologies, Vol. 2, Issue 1 (2011), 37-63, at p. 39. "Note that [false positive] and [false negative] are sometimes referred to as Type I and Type II Errors, and the [false positive rate and false negative rate] as alpha and beta, respectively – referring to falsely rejecting or accepting a hypothesis."

[405] *See e.g.* Chabert, A., et al., "A Transformer Neural Network for AC Series Arc-Fault Detection," Engineering Applications of Artificial Intelligence, Vol. 125 (2023), 1-11, at p. 8. Chabert et al. demonstrate this tradeoff with a figure showing that the false positive rate and true positive rate are positively related to one another. As the false negative rate is equal to one minus the true positive rate, the figure presented by Chabert et al. implies that the false positive rate and false negative rate are negatively related to one another. For definitions of the false negative rate, false positive rate, and true positive rate, *see e.g.* Powers, D.M.W., "Evaluation: From Precision, Recall and F-Measure

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

consumers, face a trade-off between safety and nuisance tripping. An AFCI that is made to capture more truly dangerous arcs is necessarily more prone to nuisance trips.

186. Deposition testimony confirms that Plaintiffs understand that AFCIs trade off safety and nuisance tripping. For example, Plaintiff Keyser's deposition testimony indicates that at least some putative Class members would acknowledge and understand this trade off.

   a. Plaintiff Keyser testified that he "think[s] [that] under certain circumstances [AFCIs] could [improve the safety of a home]."[406]

   b. When asked to elaborate on what circumstances he had in mind, Plaintiff Keyser testified that "[i]f you were to let's say plug in a device that had an unknown fault and were to try to use it, you may be introducing a condition that would be unsafe, and an AFCI could potentially identify that."[407]

   c. When asked about his "understanding of any downsides of AFCIs," Plaintiff Keyser replied "that they are sensitive and they trip for conditions that would not be related to safety."[408]

187. In economic terms, when a consumer selects an AFCI they effectively are trading off between the lower risk of undetected dangerous arcs and the higher risk of nuisance tripping. This is a common problem in economics. Economists that have studied how consumers make choices under uncertainty have found that consumers differ with respect to their "risk preferences" with some consumers willing to pay more to reduce risk than others.[409]

---

to ROC, Informedness, Markedness & Correlation," Journal of Machine Learning Technologies, Vol. 2, Issue 1 (2011), 37-63, at pp. 38-39.

[406] Keyser Deposition, at p. 25.

[407] Keyser Deposition, at p. 25.

[408] Keyser Deposition, at p. 25.

[409] Cohen, A. and Einav, L., "Estimating Risk Preferences from Deductible Choice," The American Economic Review, Vol. 97, No. 3 (June 2007), 745-788, at p. 746.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

188.    In the present context, the type I and II error rate relationship between nuisance tripping and dangerous electrical arc detection implies that one could view an AFCI's nuisance tripping manifestation rate as a cost associated with dangerous arc fault detection.  Viewed in these terms, the economics of choice under uncertainty implies that some consumers will prefer an AFCI that is more prone to nuisance tripping and less likely to miss dangerous arcs over other AFCIs less prone to nuisance tripping but more likely to miss dangerous arcs.  Indeed, one electrician interviewed by Dr. Caves even explained that an AFCI that nuisance trips (a false positive) is not considered "defective," but rather, a ███████████████████████████████████████████████████████" (a false negative).[410]

189.    In his analysis, Dr. Caves does not incorporate any trade-off between an AFCIs nuisance tripping manifestation rate and its ability to detect dangerous arcs.  Dr. Caves thus omits an important determinant of demand for AFCIs that would directly offset the disutility consumers experience because of nuisance tripping.  Therefore, the willingness to pay and the difference in prices (even within the approach utilized by the Caves Report) would be different than that calculated by Dr. Caves (i.e., when the benefit of a reduced type II error rate (i.e. a greater share of detected dangerous electrical arcs) associated with the Challenged Products is incorporated into the analysis).

---

[410] Cognitive Interview 4, at p. 19.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

**G. The Caves Report Inappropriately Uses A Single, Constant, Claimed Price Premium Percentage Applied To All Purchases Of The Challenged Products**

190.    The calculation of claimed price premium damages contained in the Caves Report inappropriately uses a "one size fits all" approach, applying a single, constant, claimed Price Premium percentage to all purchases of the Challenged Products. This approach is inappropriate given the many individual inquiry issues that I have outlined in my analysis.

**1.    Differences In Prices**

191.    As one example, when conducting his market simulation analysis to quantify the alleged Price Premium, Dr. Caves performs his calculations for a single set of AFCI prices: a price of $51.43 for 1-pole AFCIs and a price of $57.19 for all 1-pole dual-function AFCI/GFCIs, which Dr. Caves claims "are the average of observed market prices for Siemens products."[411] These prices likely differ substantially from the prices actually paid by members of the putative Consumer Class, and as such, do not reflect the basis for a price premium actually experienced by members of the putative Consumer Class.

192.    As shown in **Section XI.D**, consumers did not pay a consistent price for the Challenged Product. Putative Class members shopped at different retailers, bought different products among the Challenged Products, made purchases at different points in time during the Class Period, and, in some instances, may have had access to retailer discounts, all of which imply that individual inquiry is required to determine the actual price paid by individual putative Class members. Availability and convenience of purchase also are purchase drivers important to Named Plaintiffs. To accurately calculate price premiums paid by

---

[411] Caves Report, at Figure 5.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

putative Class Members (if any) who paid different prices, Dr. Caves would need to take an individualized approach that accounts for differences in prices across retailers, geographies, time, and other considerations – which he does not do.

### 2. Differences In Technical Specifications

193. Dr. Caves performs his market simulation analysis for a hypothetical market wherein all products are assigned the same technical specifications as a Siemens QA120AFCN AFCI, which is a 1-pole single-function AFCI with a plug-on neutral connection, a current rating of 20 amperes, and an interrupting rating of 10 kiloamperes at 120 volts.[412]  However, as discussed above in **Section XI.C**, the Challenged Products consist of many AFCIs with different technical specifications, and the market for AFCIs consists of these products as well as similar products offered by competing manufacturers.

194. Moreover, AFCIs with different technical specifications appear to be viewed by professional electricians as having different attributes and uses.  Indeed, Dr. Caves notes that, in a pilot survey of professional electricians, "some interview subjects indicated that it might be challenging to compare AFCIs with different current ratings within the same choice task, given that the two types of products are used for different purposes."[413]

195. Because AFCI products with different technical specifications—such as, but not limited to, different current ratings—are viewed as having different uses and likely differ with respect to the number of competing products, demand, and equilibrium price points, obtaining a price premium for these different AFCIs requires separate analyses.  Dr. Caves'

---

[412] Caves Report, at ¶ 53.

[413] Caves Report, at ¶ 26, Footnote 51.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

approach, wherein he obtains a single Price Premium estimate for a single hypothetical market representing the technical specifications of a single Siemens product and applies that Price Premium as a percentage to all of Siemens AFCIs, is insufficient. Individual inquiry is required to estimate price premiums for the distinct uses for AFCIs with other technical specifications.

### 3. Differences Over Time

196.    Finally, even among putative Class Members having different information about AFCI nuisance tripping during the Class Period, it is likely that putative Class Members who purchased AFCIs later in the Class Period would be making purchases in a market environment where more information concerning nuisance tripping was generally known relative to putative Class Members who purchased AFCIs earlier in the Class Period.

### 4. Differences Implied by Dr. Caves' Own CBC Analysis

197.    When Dr. Caves introduces the Nuisance Tripping Defect and generates simulated market shares holding prices constant, Siemens' market share for single-function AFCIs drops from ▮ percent to ▮ percent.[414] In other words, according to Dr. Caves' own analysis, more than ▮ percent of consumers who would have bought Siemens single-function AFCIs before the introduction of the Nuisance Tripping Disclosure still would choose to purchase Siemens single-function AFCIs after the introduction of the Nuisance Tripping Disclosure.[415] Hence, Dr. Caves' own analysis implies that at least ▮ percent of consumers who bought Siemens products featuring the Alleged Defect would have made

---

[414] Caves Report, at ¶ 56.

[415] Calculated as ▮ percent / ▮ percent × 100% = ▮▮%.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

the same purchase at the same price, calling into question the subsequent claimed pricing adjustments in Dr. Caves' analysis.

### H. The Caves Report Fails To Account For The Potentiality Of Double-Counting Claimed Damages

198.    The Amended Complaint claims alleged harms to putative Commercial Plaintiffs and putative Consumer Plaintiffs, while the Caves Report only opines as to the claimed price premium allegedly experienced by the putative Consumer Plaintiffs, not the putative Commercial Plaintiffs. [416]   However, Dr. Caves calculates his suggested Class-wide damages by applying his calculated Price Premium to "Siemens Class AFCI Revenue." "Siemens Class AFCI Revenue" is derived from net sales for "all single-function AFCIs sold between June 21, 2017 and December 10, 2021."[417]  I understand these aggregated sales to represent all Challenged Product sales made in the U.S. during this period, which includes sales to individuals represented by the Commercial Class who lie outside of the Consumer Class.  Consequently, Dr. Caves erroneously assigns damages that may have been incurred by the Commercial Class to the Consumer Class.  This may result in overestimating damages by double counting the amount attributable to the Consumer Class if, for example, a product was purchased by a member of the Commercial Class (for which damages, again, have not been calculated by Dr. Caves but, according to the Amended Complaint, are owed) and subsequently sold to a member of the Consumer Class, who

---

[416] Caves Report, at ¶ 5, Footnote 5: "I have not been asked to opine on the Commercial Class."

[417] Caves Report, at Table 4.  *See* also, SIEMENS_AFCI_00416123.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

separately claimed damages on this same product.[418]  Further, in certain instances, the alleged Price Premium may have been paid by a member of the Commercial Class who subsequently installed the Challenged Products without a charge to a member of the Consumer Class (thereby overestimating claimed Consumer Class Price Premium damages for this reason alone).[419]

199.    Without individual inquiry, it is impossible to determine:

   a.  The proportion of the Consumer Class that purchased the Challenged Products themselves without the services of an electrician for the purchase, thereby paying the alleged price premium that is the basis for Dr. Caves' damages assessments. (Dr. Caves has not provided such a proportion);

   b.  The proportion of the Consumer Class that purchased the Challenged Products from a member of the Commercial Class, which may expose a damages estimate to double counting pending an assessment of alleged damages due to the Commercial Class (which Dr. Caves has not done but which is alleged in the Amended Complaint).  (Dr. Caves has not provided such a proportion); and/or

   c.  The proportion of the Consumer Class that may have received the Challenged Products as a "no-charge" replacement from an electrician (but which units would show up in Siemens' sales figures – here, purchased by the electrician).  (Dr. Caves has not provided such a proportion.)

---

[418] I also note here that Dr. Caves appears to create an irreconcilable inconsistency between the Consumer Class as defined in the Amended Complaint and the respondents to his survey.  In Amended Complaint, at ¶ 174, the Consumer Class is defined as "[a]ny person in the United States who purchased a Siemens' AFCI breaker, except for resale." However, Dr. Caves' survey instructions ask survey respondents, who are 90% professional electricians, to "assume [they] are in the market to purchase AFCIs for a typical project or projects, or for general inventory." (*See* Caves Report, at Appendix A, p. 21).  This creates an irreconcilable inconsistency between (a) the Consumer Class defined in the Amended Complaint (which excludes any resale activities such as those that likely would be associated with a "typical project or projects" or purchases "for general inventory") and (b) the respondents to Dr. Caves survey and the instructions provided to them. Dr. Caves does not appear to acknowledge or attempt to resolve this inconsistency or the challenges it creates for accurately evaluating damages for the putative Consumer Class (as Dr. Caves claims to do).

[419] *See, e.g.*, Brnich Deposition, at p. 90. When asked "so in your example that you used earlier where a new Siemens' AFCI fixed a problem, you didn't pass the purchase of that new Siemens' AFCI on to the customer?," Mr. Brnich replied "no, I did not."

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

200. Because Dr. Caves does not apply individual inquiry in his damages calculation, he likely double-counts the price premium damages allegedly owed by Siemens.

**I.   The Caves Report Makes Unsupported And Incorrect Assumptions About AFCI Prices In The Market**

201. As discussed earlier in my report, according to Dr. Caves, "[c]onjoint practitioners use market simulators to analyze how equilibrium prices shift in response to changes in product attributes."[420]   Using the estimates of consumer utilities obtained from his conjoint analysis, Dr. Caves estimates a Price Premium for the Challenged Products via a market simulation.[421]   According to Dr. Caves, "[t]hese simulations model the market interactions of consumers, Siemens, and competing manufacturers."[422]

202. In constructing the first stage of his market simulation analysis, Dr. Caves assumes a price of $51.43 for each brand for all single-function AFCIs and a price of $57.19 for each brand for all dual-function AFCI/GFCIs.[423] These pricing assumptions are used (in part) to evaluate consumers' purchase preferences and to obtain simulated market shares under a hypothetical market outcome without the Nuisance Tripping Disclosure.[424]  At this stage, based upon the values assigned to the attributes contained in Dr. Caves' conjoint analysis (including price), Dr. Caves reports that Siemens accounts for a ▮ percent share of sales in the simulated market, the largest share of all brands considered.[425]  However, there are

---

[420] Caves Report, at ¶ 52.

[421] Caves Report, at ¶¶ 50-51.

[422] Caves Report, at ¶ 50.

[423] According to Dr. Caves, this is the average of the prices he observed for Siemens products in the market. *See* Caves Report, at Figure 4.

[424] *See* Caves Report, at p. 33, Figure 4.

[425] Caves Report, at ¶ 54.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

numerous problems with Dr. Caves' initial pricing assumptions and initial claimed results. My observations and conclusions are based upon my review of the Caves Report, my review of Dr. Caves' support materials,[426] and the AFCI pricing analysis I presented earlier in my report. Dr. Caves has provided no support or only inadequate support for his AFCI pricing assumptions. In addition, his pricing assumptions are inaccurate. I list my observations below. (I use Dr. Caves' "single-function" AFCI nomenclature for ease of exposition and to reduce the potential for confusion over terms.[427])

a.  <u>Single-Function AFCIs</u>. Dr. Caves employs the following assumptions regarding the price of single-function AFCIs utilized in his market simulation.

i.  Dr. Caves assumes Siemens' AFCI prices have been constant over time (i.e., throughout the four-year putative Class Period at $51.43).

ii.  Dr. Caves assumes Siemens' AFCI prices are the same across all Siemens single-function AFCI models.

iii.  Dr. Caves assumes Siemens' AFCI prices are the same across all retail outlets.

iv.  Dr. Caves assumes Siemens AFCI prices are the same for all putative Class members.

However, Dr. Caves has provided no support or only inadequate support for his single-function AFCI pricing assumptions. In addition, his pricing assumptions are inaccurate. I provide additional support for this conclusion immediately below.

---

[426] *See* Caves Report backup material "AFCI Product Research.xlsx." This document contains a list of 16 Siemens AFCIs and AFCI/GFCIs specifying product features and corresponding prices. In the phraseology of Dr. Caves, seven of the 16 listed products are single-function AFCIs and the remaining nine are dual-function AFCI/GFCIs. The document contains basic product features, including mounting type, number of poles, and current, voltage and interrupting rating. The document also contains a single price corresponding to each product, ranging from $43.69 to $70.77. The average prices reported by Dr. Caves are the simple averages for single-function and dual-function AFCIs (listed as $51.43 and $57.19 respectively). The document states the following: "Note: Pricing data obtained online from sources such as Home Depot, Lowes [*sic*], Amazon, and Simply Breakers, an online electrical supply retailer." Nowhere in this document does Dr. Caves specify sources for specific prices.

[427] While Dr. Caves uses the term "single-function AFCIs" in his report to refer to AFCI products without dual AFCI/GFCI functionality, I understand that "single-function" is not a term commonly used to refer to certain AFCI products in the market.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

    i. Dr. Caves collects prices for only seven Siemens AFCI models. No prices are reported (or by inference, collected) by Dr. Caves in his support document.

    ii. Dr. Caves collects only one price for each of the seven Siemens AFCI models (even though he states he researched prices across four retail / distribution outlets).

    iii. While Dr. Caves says he has collected these seven prices from Home Depot, Lowe's, Amazon, and Simply Breakers, he does not identify which prices came from which retailer / distributor.

    iv. Dr. Caves does not identify the time period for which the prices were collected.

    v. Dr. Caves assumed a $51.43 price for single-function AFCIs as the simple average of the prices he collected. This masks the range of the seven prices he collected – which range from $44.99 to $61.98 (i.e., a 37.8 percent range relative to the lower bound price).

    vi. Dr. Caves does not provide sufficient documentary support (or any documentary support) for each of these prices.

b. <u>Dual-Function AFCIs</u>. Dr. Caves employs the following assumptions regarding the price of dual-function AFCIs utilized in his market simulation.

    i. Dr. Caves makes the exact same assumptions for the pricing of dual-function AFCI/GFCIs in his market simulation as he did for the pricing of single-function AFCIs (but now at a price of $57.19). Each and every price-related observation I provided above with respect to Dr. Caves' treatment of single-function AFCIs also applies to Dr. Caves' assumed pricing for dual-function AFCI/GFCIs (incorporated by reference), with the following differences.

    (a) Assumed price of dual-function AFCI/GFCIs: $57.19.

    (b) Number of prices collected: 9.

    (c) Range of AFCI/GFCI prices collected: $43.69 to $70.77 (i.e., a 62.0 percent range relative to the lower bound price).

    ii. Dr. Caves has provided no support or only inadequate support for his AFCI/GFCI pricing assumptions. In addition, his pricing assumptions are inaccurate (for exactly the same reasons listed for Dr. Caves' treatment of single-function AFCIs).

c. Competitor AFCIs. As Dr. Caves assigns the same prices to Siemens' competitors' single-function and dual-function AFCIs, these criticisms apply also to Siemens' competitors' single-function and dual-function AFCI prices as assigned by Dr. Caves.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

203.  In short, Dr. Caves' assumptions about Siemens' and its competitors' prices—a foundational component of his market simulation, Price Premium estimate, and report as a whole—are unsupported assertions without any reliable evidence or analysis supporting them.  Moreover, even if Dr. Caves were to assert that he did in fact observe these prices in the market for Siemens AFCIs, he has not demonstrated that these prices were obtained during the putative Class Period, where they were obtained, and why he did not obtain more than one price (presumably from only one retailer versus the four he mentions), or why they are applicable to the entire putative Class Period.  Dr. Caves has not demonstrated that the prices he uses are representative of Siemens AFCI prices throughout the Class Period.  Additionally, Dr. Caves does not even attempt to account for the variability in the Siemens AFCI market prices he claims to observe.  (Dr. Caves does not perform any sensitivity analyses to test the robustness of his results to different pricing assumptions.)

204.  For at least each of these reasons stated above, Dr. Caves' market simulation analysis and Price Premium estimates are premised on unreliable assumptions and data about Siemens AFCI prices and AFCI prices among Siemens' competitors.  This is fatal to Dr. Caves' analysis.  For this reason alone, Dr. Caves' conjoint survey, market simulation analysis and resulting Price Premium conclusions are unreliable.  Contrary to Dr. Caves' assertion, Dr. Caves' market simulations do not model accurately the market interactions of consumers, Siemens, and competing manufacturers.

**J.   The Caves Report Does Not Use Real World Market Share Statistics**

205.  As discussed, Dr. Caves determines the Price Premium used to estimate claimed damages by running a market simulation analysis to measure "the downward shift in demand …

- 127 -
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

using the decrease in the marginal consumer's willingness to pay for the Class AFCIs when the Nuisance Tripping Defect is disclosed at the point of sale."[428]  This simulated decrease in demand allows "Siemens to reduce the supply of the Class AFCIs" and "[t]he resulting equilibrium between supply and demand yields the Price Premium."[429]  As Dr. Caves explains, this "decrease in demand is calculated using a three-step process" which begins with a baseline simulation of "the market shares of competing AFCIs offered by different manufacturers."[430]  These initial baseline simulated market shares for "competing AFCIs and AFCI/GFCIs with the same technical specifications" and no Nuisance Tripping Defect disclosed "are calculated using the utilities obtained from the Hierarchical Bayesian analysis of [Dr. Caves'] CBC survey data."[431]  In other words, Dr. Caves' Price Premium calculation, and therefore his calculation of claimed Class damages, are derived using the simulated shares of sales obtained from his own CBC survey results.

206.  Dr. Caves emphasizes that these simulation-estimated market shares "do not require external market share data."  (For completeness, Dr. Caves notes that Siemens did not provide him with market share data for Siemens or its competitors.[432])  As such, Dr. Caves does not seek to determine whether the market shares derived from his survey results align with the actual market shares of these competing manufacturers in the real world.

---

[428] Caves Report, at ¶ 50.

[429] Caves Report, at ¶ 50.

[430] Caves Report, at ¶ 52.

[431] Caves Report, at ¶ 53.

[432] Caves Report, at ¶ 53.  This may indicate that Dr. Caves was interested in seeing market share data. However, Dr. Caves did not state whether he attempted research to see if third-party estimates of company AFCI market shares existed.  A simple search on Bing, typing in "What are the market shares of AFCI producers?" into the search bar yields at least three potential sources of such information.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

However, if the real-world market shares were different from the baseline market shares Dr. Caves derives from his survey respondents, this would tend to invalidate his analysis and Price Premium calculation, which, as explained, is obtained by simulating changes in survey respondent-generated baseline market shares.

207. Dr. Caves reports total market shares for single-function and dual-function AFCIs in his baseline simulation as follows: Siemens (███████), Schneider Electric (Square D) (███████), Eaton (██ percent), and ABB/General Electric ██ percent). Dr. Caves notes, "a small share of the market (less than 1 percent) would not purchase any of these AFCIs."[433]

208. Based on documents produced in this matter, I understand that in a September 2017 internal planning and specifications document for "Gen 3, Low Cost and Twin Combination Type AFCI" products, Siemens estimated its market shares for AFCI products as ████████ ████████████████████████████████" – ████████████████ percent estimate Dr. Caves derives from his survey respondents.[434] While this document falls early within the window that Dr. Caves assumes is relevant, the estimated market share at this time was far below Dr. Caves' simulated market share. Siemens' estimates of competitor market shares also differ substantially from those in Dr. Caves' baseline simulation. Siemens estimates that ████████████████████████████████████████ (████████████████████████████████ respectively, with ██ ████████████████████████████████

---

[433] Caves Report, at ¶ 54. *See also*, Caves Report, at Figure 4.

[434] SIEMENS_AFCI_00019107-116, at 111.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

percent).[435]  Further, I understand from speaking with Ms. Kees and Mr. Duemmler that

████████████████████████████████████████████████████ among these

manufacturers, including throughout the Class Period.[436]  Ms. Kees also stated that

█████████████████████████████████████████████████████████████████

███████████████████ by Dr. Caves during the remainder of that Period.[437]  In discussing

"summary statistics for the part-worths of each of the attributes and levels included in [his]

CBC Module," Dr. Caves explains "with respect to the Brand attribute, the most-preferred

brand, on average, is Siemens" and "[t]his result is to be expected, given that the target

population [of his survey] focused on purchasers of Siemens AFCIs."[438]

209.  Additionally, in Dr. Caves' CBC survey and subsequent market analysis, he omits AFCI

products that are significant enough to be known and mentioned by his electrician cognitive

interview respondents.

    a.  One electrician interview respondent noted: "Square D has 2 brands. [They h]ave Home[l]ine breakers, and they have Q[O] breakers. I've gotten both of those … Q[O] is significantly more popular with electricians than Home[line]."[439]  While Homeline and QO are in fact both "Square D" branded, they are also separate product lines with different features.  Homeline is considered a "budget friendly" option whereas the QO product line is higher end and incorporates additional product characteristics.[440]  Dr. Caves erroneously treats "Schneider Electric (Square D)" as a single product line.[441]

---

[435] SIEMENS_AFCI_00019107-116, at 112.

[436] Kees and Duemmler Discussion on December 16, 2025.

[437] Kees and Duemmler Discussion on December 16, 2025.

[438] Caves Report, at ¶ 45.

[439] Cognitive Interview 1, at p. 7.

[440] *See, e.g.,* "Square D QO Vs Homeline – Let's Compare and Contrast," Galvin Power (https://www.galvinpower.org/square-d-qo-vs-homeline/, accessed December 15, 2025).

[441] Caves Report, at ¶ 33.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

    b.  A different electrician interviewed by Dr. Caves noted: ██████████████ ████████████████████████████████████████████████████ "[442]

210.    Dr. Caves omits these well-recognized AFCI brands/product lines and thereby excludes their market shares when estimating the market shares of all brands included in his CBC survey and market simulation analysis. Hence, even if Dr. Caves' methodology had otherwise been sound, his market simulation analysis would not accurately represent Siemens' market share.

211.    From an economic and damages quantification perspective, Dr. Caves has overestimated Siemens' market shares (and underestimated its competitors' market shares) in his baseline market simulation. Given Dr. Caves' approach, this appears to be due to his survey targeting purchasers of Siemens AFCIs. Consequently, given Dr. Caves' methodology in the first stage of his analysis of equalizing Siemens' share of sales with and without the use of the Nuisance Tripping Disclosure, the Price Premium he derives and the claimed damages he calculates are not based upon actual data and are unreliable. Dr. Caves has not tested how his results might vary if market shares closer to actual market shares had been utilized in his analysis. Once again, contrary to Dr. Caves' assertion, Dr. Caves' market simulations do not model accurately the market interactions of consumers, Siemens, and competing manufacturers.

---

[442] NewtonX Transcript - #2, May 19, 2025 ("Cognitive Interview 2"), at p. 54. Cutler Hammer AFCIs are now made by Eaton but are a distinct brand of AFCIs. *See, e.g.*, "Cutler Hammer Vs. Eaton Breaker: A Detailed Comparison," Essential Electric Supply (https://essentialparts.com/blogs/news/cutler-hammer-vs-eaton-breaker-a-detailed-comparison, accessed December 12, 2025).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

### K.  The Caves Report Claims, But Does Not Reliably Show, That A Price Decrease Of ▮ Percent Is Sustainable For Siemens

212. While one can reach the conclusion that no further analysis is required to conclude that Dr. Caves' claimed Price Premium analysis is unreliable (given his pricing and market share assumptions), Dr. Caves makes an attempt to justify his 32 percent Price Premium as being reliable and sustainable.

213. Dr. Caves has a section of his report entitled "Siemens' Own Financial Data Indicate Siemens Could Profitably Supply Class AFCIs After Deducting The Full Price Premium."[443]  Dr. Caves makes the following statements in this section of his report.

> Siemens' data indicate that it consistently earned *high variable profit margins* on the Class AFCIs. During the Damages Period, Siemens' aggregate variable profit margin for these nine states ranged from ▮ ▮. Data for individual U.S. states shows a similar pattern. During the Damages Period, the lowest variable profit margin for any of the nine U.S. states for which Siemens has produced data was ▮ percent; the highest was ▮ percent. On average, Siemens' variable profit margin across the nine states was ▮ percent during the Damages Period.[444]

> Therefore, Siemens [*sic*] own financial records indicate that Siemens could have cut its prices by ▮ percent on average and still earned a variable profit margin on the Class AFCIs. Had Siemens cut its prices by ▮ percent, it would have continued to earn an average variable profit margin of ▮ = ▮ percent.[445]

214. I make the following observations relating to Dr. Caves' commentary.

   a.  Dr. Caves states that Siemens consistently earned ▮ on the Class AFCIs.  Dr. Caves has provided no analytical support for this statement.  Variable profit margins also can be called "contribution to profits."  These types of profit

---

[443] *See* Caves Report, Section III.B.3, at p. 38.

[444] *See* Caves Report, at ¶ 66. (Footnote omitted, emphasis added.)

[445] *See* Caves Report, at ¶ 67. (Footnote omitted.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

margins can (and do) vary from industry to industry.[446]  These types of variable profits contribute to overall profits by generating funds (at the variable cost level) to pay for a company's fixed costs.  (Hence, the synonymous term "contribution to profits.")  Dr. Caves has provided no benchmarking analysis (for example) to demonstrate that Siemens' variable profit margins are "high" in the context of this industry.

b.  Dr. Caves states that ████████████████████████████████████████ ████████████████████████████████████."  Dr. Caves also states that "[h]ad Siemens cut its prices by ██ percent, it would have continued to earn an average variable profit margin of ████████████████."  These are mathematical statements rather than economic conclusions.

    i.  First, Dr. Caves' analysis ignores the concept of "opportunity cost" (i.e., what is the next best alternative activity for Siemens' resources).  Zero accounting profit (as one example and which appears to be the baseline to which Dr. Caves is making his comparison) means that Siemens would not be covering its opportunity costs (i.e., what Siemens could earn with its resources in the next best alternative productive activity).  When opportunity costs are not being covered (even when a company may be earning positive accounting profits), there would either be upward pressure on prices or a company would stop producing the item of interest.[447]

    ii.  Second (relatedly), Dr. Caves' analysis ignores the difference between short run decision-making and long run decision-making.  While firms may incur losses in the short run, in the long run resources gravitate to their highest valued use.  The putative Class Period in this dispute is from January 1, 2017 to December 10, 2021—a five-year period.[448]  Dr. Caves has not analyzed whether Siemens would

---

[446] See, e.g., Lee, C.Y. and Mahmood, I.P. "Inter-Industry Differences in Profitability: The Legacy of the Structure-Efficiency Debate Revisited," Industrial and Corporate Change, Vol. 18, No. 3 (April 2009), 351-380, at pp. 355, 367, Table 1.  After defining price-cost margin, Table 1 shows variability in price-cost margin, which is equal to variable profit margin divided by price.

[447] Resources gravitate to their highest valued use. Hence, "opportunity cost" is an important economic concept. See, e.g., Clarkson, K.W. and Miller, R.L., Industrial Organization: Theory, Evidence, and Public Policy, McGraw-Hill Book Company, 1982 ("Industrial Organization"), at pp. 97-98; **Exhibit 25**. (Italics and **bolding** in original.)

> Firms enter or remain in an industry only if they earn, at a minimum, a *normal rate of return*.  By this term we mean that people will not invest their wealth in a business unless they obtain a positive competitive rate of return – that is, unless their invested wealth pays off.  Any business wishing to attract capital must expect to pay at least the same rate of return on that capital that all other businesses in a similar situation are willing to pay.  For example, if individuals can invest their wealth in almost any publishing firm and get a rate of return of 10 percent per year, then every firm in the publishing business must *expect* to pay 10 percent as the normal rate of return. *This is a cost to the firm.*  It is called the **opportunity cost of capital**.  Capital will not stay in industries where the expected rate of return falls below its opportunity cost.

[448] See Caves Report, at ¶ 70.  Dr. Caves also calculates claimed Price Premium damages over a shorter period of June 21, 2017 to December 10, 2021.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

be able to maintain the reduced prices to which he opines over a five-year period (a longer period of time as opposed to a temporary price reduction).[449]

iii. Third (relatedly), from an economic and data perspective and contrary to Dr. Caves' section title, Siemens' own financial data does not indicate Siemens could profitably supply class AFCIs on a sustained basis after deducting the full Price Premium. According to Dr. Caves' own analysis:

> During the Damages Period, the lowest variable profit margin for any of the nine U.S. states for which Siemens has produced data was ██████████ ; the highest was ██ percent. On average, Siemens' variable profit margin across the nine states was ██ percent during the Damages Period.[450]

Dr. Caves then goes on to state that "had Siemens cut its prices by ██ percent, it would have continued to earn an average variable profit margin of ████████ ."[451] However, Dr. Caves fails to acknowledge (or point out) that his mathematically calculated ██ percent is ██ percentage points lower than the lowest variable profit margin reported by Dr. Caves over the putative Class Period. While a ██ percent variable profit margin still is positive, it is significantly lower than the profitability experienced by Siemens on these products over the putative Class Period. Hence, Dr. Caves has not provided support that a ██ percent variable profit margin on Siemens' Class AFCIs is sustainable.

## L. The Caves Report Contains Irreconcilable Economic Inconsistencies And Omissions

### 1. Irreconcilable Economic Inconsistency Between The Consumer Class And The CBC Survey Respondents

215. Dr. Caves appears to create an irreconcilable economic inconsistency between the Consumer Class as defined in the Amended Complaint and the respondents to his survey

---

[449] Dr. Caves states that "Elementary economics demonstrates that profit-maximizing firms consider marginal costs, rather than total costs, when making pricing decisions." *See* Caves Report, at ¶ 65, Footnote 102. While an accurate statement, the statement is incomplete. In the short run, a firm must cover its variable costs or it is more profitable to shut down production. (*See* Industrial Organization, at p. 40; **Exhibit 25**: "It does not pay the firm to continue production if it cannot at least cover variable costs.") In the long run, a firm must cover its total costs or its resources will gravitate to a higher valued use.

[450] *See* Caves Report, at ¶ 66. (Footnote omitted.)

[451] *See* Caves Report, at ¶ 67. (Footnote omitted.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

who are 90 percent professional electricians.[452]  This observation is from an economic and damages quantification perspective and not a survey design perspective.

216.  In the Amended Complaint, the Consumer Class is defined as "[a]ny person in the United States who purchased a Siemens' AFCI breaker, except for resale."[453]  However, Dr. Caves' CBC survey instructions ask survey respondents, who are 90 percent professional electricians, to "assume [they] are in the market to purchase AFCIs for a typical project or projects, or for general inventory." [454]   This creates an irreconcilable economic inconsistency (that cannot be resolved within the analysis presented by Dr. Caves) between (a) the Consumer Class defined in the Amended Complaint (which excludes any resale activities such as those that may be associated with a "typical project or projects" or purchases "for general inventory"), (b) the professional electrician respondents to Dr. Caves' conjoint survey and the instructions provided to them, and (c) the attempt to evaluate claimed Price Premium damages isolated to the Consumer Class.[455]

217.  Solely from an economic and damages quantification perspective (and not related to survey design), with respect to the Consumer Class, Dr. Caves is attempting to evaluate claimed Price Premiums associated with purchases by consumers for their own use and not for resale.  Consequently, when Dr. Caves instructs his survey respondents to "assume [they] are in the market to purchase AFCIs for a typical project or projects, or for general

---

[452] *See* Caves Report, at ¶ 62.

[453] Amended Complaint at ¶ 174.

[454] Caves Report, at Appendix A, p. 21.

[455] I understand that Dr. Caves only is evaluating claimed damages associated with the putative Consumer Class and the Subclasses.  Dr. Caves does not address the putative Commercial Class as he "ha[s] not been asked to opine on the Commercial Class." *See* Caves Report, at ¶ 5, Footnote 5.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

inventory,"[456] this would have to mean (a) the consumer is installing the AFCI or (b) the consumer is paying someone else to install the AFCI (but not paying them for the AFCIs). (Additional options are provided below.)  Dr. Caves does not evaluate which option is occurring and whether option "a" or option "b" is most prevalent.  Also, Dr. Caves does not inquire or evaluate whether the professional electricians fit into option "a" or option "b" or are acquiring the AFCIs for professional use (meaning the respondents would not fit into the Consumer Class – invalidating their responses as providing guidance to any assessment of claimed damages by the putative Consumer Class).  Dr. Caves does not recognize or discuss these possibilities in his report.

218.    Continuing with these irreconcilable economic inconsistencies, as stated, Dr. Caves explicitly instructs his survey respondents to think of buying AFCIs at a quantity sufficient to suit the "typical project or projects, or for general inventory" as imagined by the respondent.  For putative Consumer Class members who Dr. Caves claims to address in his report (excluding Commercial Class members), "typical project or projects, or for general inventory"  likely would consist of installing AFCIs in newly built homes, or replacing or installing AFCIs in existing homes, which might involve purchasing on the order of one or two dozen AFCIs.[457]  On the other hand, for professional electricians, it is not clear from the survey whether they are (i) answering as consumers with the required restrictions to be part of the Consumer Class or (ii) answering as professional electricians purchasing AFCIs to install for others and then being reimbursed for the cost of the AFCIs.  In the latter case,

---

[456] *See e.g.* Caves Report, Appendix A, p. 29.

[457] For example, Plaintiff Butakis claims to have bought 15 Siemens AFCIs to install in his newly built home. *See* Amended Complaint, at ¶ 143.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

the demand drivers for a purchaser operating as part of a business transaction could be very different than for a putative Consumer Class member making their own purchases of AFCIs for a personal project.  For a professional electrician purchasing AFCIs as part of a business transaction, a "typical project or projects, or for general inventory" could prompt the respondent to imagine (or include) buying many dozens or hundreds of AFCIs.[458]  Hence, as a consequence of Dr. Caves' own CBC survey instructions, differences in demand drivers and in economic environments (including location of purchase, whether purchased through a retailer or distributor, existing relationships with retailers or distributors, planned quantity purchased, availability, convenience, and prices typically paid after for example applying bulk-purchase discounts and bargaining) could have differently impacted the CBC survey choice decisions of his consumer and electrician respondents (as electrician respondents may have imagined purchasing many more AFCIs under different purchase circumstances than consumer respondents imagining purchases for their own personal use).

219.    As introduced above, consumer and professional electrician respondents could make AFCI purchasing decisions in very different economic environments and under different economic conditions.  Consumers building a new home may not be particularly price sensitive to the cost of purchasing a dozen AFCIs as the construction of a new home is a complex project involving hundreds, if not thousands, of high-cost purchase decisions that are often managed, in part, by building managers and contractors.[459]  Professional

---

[458] For example, Plaintiff KB Electric claims to have purchased "hundreds" of Siemens AFCIs. *See* Amended Complaint, at ¶ 101.

[459] Plaintiff Wylie demonstrates, for example, that some putative Class members do not even consider which AFCIs were installed when they built their homes as, electricians sometimes make these purchases on their behalf, nor are they aware of how much they cost. *See* Wylie Deposition, at pp. 41, 93-94.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

electricians, who might buy many dozens or hundreds of AFCIs for a single project, and who compete for work based on pricing, have multiple reasons to be highly price-sensitive when purchasing AFCIs.[460]  Consequently, from an economic and damages quantification perspective, it is likely that Consumer Class members purchasing AFCIs for their own use and professional electricians have very different demand drivers and price sensitivities.

220.   Dr. Caves does not appear to acknowledge or attempt to resolve this irreconcilable economic inconsistency or the challenges it creates for accurately evaluating damages for the putative Consumer Class (as Dr. Caves claims to do).  This economic inconsistency is "irreconcilable" in that Dr. Caves cannot rectify it by changing his analysis of the data he has collected – as outlined below.

   a.   As part of Dr. Caves' survey and without evaluating the issues identified above (at least in his report), Dr. Caves specifically targeted professional electricians and prompted them to imagine purchasing multiple AFCIs for a "typical project or projects, or for general inventory."

   b.   Consequently, Dr. Caves' professional electrician respondents, which represent 90 percent of his sample,[461] do not appear to be representative of the Consumer Class as defined in the Amended Complaint.[462]  They were not instructed that their hypothetical purchases would be for their own use.

   c.   According to Dr. Caves' own analysis, limiting the sample to consumer respondents only (i.e., a set of respondents likely more representative of the Consumer Class) would

---

[460] Plaintiff Zank demonstrates this point by testifying that he had switched from Cutler Hammer, a competing product, to Siemens because Siemens was cheaper, and that "you had to meet a price point to get these jobs … [s]o I just found a product that met that criteria, and that's what we did," suggesting that the lower price point of Siemens' product enabled his access to certain projects. *See* Zank Deposition, at pp. 41, 42.

[461] Caves Report, at ¶ 29.

[462] Amended Complaint, at ¶ 174. "Consumer Class. Any person in the United States who purchased a Siemens' AFCI breaker, except for resale."

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

yield a sample size that is smaller than the recommended minimum sample size for CBC analysis.[463]

221.  Thus, Dr. Caves cannot reliably estimate a Price Premium for the Consumer Class with his sample, even if he limits his sample to consumer respondents who are representative of the Class.  The above observations are fatal to his analysis.[464]

### 2. Important Demand Drivers—Convenience And Availability—Are Omitted From Dr. Caves' Model

222.  Dr. Caves' conjoint survey also omits key attributes that are confirmed to be drivers of AFCI demand as identified by Named Plaintiffs who are professional electricians (just like the 90 percent of respondents to Dr. Caves' survey).

a.  Andrew Montoya.  Mr. Montoya's deposition testimony emphasized the importance of availability in influencing his Siemens AFCI purchase decision.  According to Mr. Montoya's testimony, "between the years of 2016 and … 2019 … there certainly was a saturation of Siemens equipment at these Home Depots of which I frequented … I don't have to spend time shopping around or looking around for other brands."[465]

b.  Trevor Zank.  Mr. Zank's deposition testimony emphasized the importance of convenience in influencing his Siemens AFCI purchase decision.  According to Mr. Zank's testimony, "[w]e had multifamily units that were using, and you buy everything as a package.  So I'm buying multiple buildings worth in a package."[466]

---

[463] *See* Caves Report, at ¶ 27, Footnote 52. According to Dr. Caves, the minimum recommended number of CBC survey respondents $n$ should be such that $[nta]/c \geq 500$, where "$t[=12]$ is the number of choice tasks, $a[=3]$ is the number of alternatives per choice task (not including the "none" option) and $c[=5]$ is the largest number of levels for any attribute in the survey." Limiting the sample to the 50 consumer respondents surveyed by Dr. Caves produces $[nta]/c = [50 \times 12 \times 3]/5 = 360$, which is less than 500, so Dr. Caves' 50 consumer respondents are not sufficient to meet his claimed minimum recommended number of CBC survey respondents.

[464] Moreover, even disregarding all of the Consumer and Commercial Class individual inquiry issues noted throughout my report, these observations also would be fatal to an alternative analysis that addresses both Classes combined. Such an alternative analysis based on the analysis in the Caves Report would be fatally flawed because Dr. Caves (a) has a limited number of Consumer Class respondents and (b) does not provide enough information to determine what kind of project electrician respondents had in mind while taking the survey (and hence whether their answers mirror the demands and factors influencing the purchase decisions of the Consumer Class or the Commercial Class.

[465] *See* Montoya Deposition, at pp. 155-156.

[466] *See* Zank Deposition, at pp. 110-111.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

223.    Attributes like availability and convenience are absent from Dr. Caves' CBC list of AFCI product attributes.[467]  By omitting these demand drivers that have influenced real-world AFCI purchasers to select Siemens AFCIs, Dr. Caves is not estimating the contributions of these attributes (i.e., demand drivers) to retail pricing (or willingness to pay) when evaluating any alleged Price Premium – undermining the basis for his claimed damages calculation.  It should be noted that Dr. Caves' instruction to survey respondents to "assume that all of the AFCIs you are shown in the survey have very similar or identical features, except for the features that you can actually see in the survey"[468] does not cure this problem.  In fact, with respect to these attributes, the assumption negates "availability" and "convenience" as differentiators as the availability and convenience attributes were specific to Siemens AFCIs and would not be applicable to competing AFCIs.[469]

224.    From an economic perspective, these omissions directly affect Dr. Caves' Price Premium estimate.  In his market simulation, Dr. Caves explicitly assumes that all eight products are equally readily available and equally convenient, as each consumer in Dr. Caves' market simulation can always choose between any one of the eight products and the "none" option.  Furthermore, Dr. Caves assumes that the entire cost of purchasing AFCIs is captured in the price of the product—i.e. it is assumed that all eight products (except for the presented attributes) are otherwise the same.  Note that for this to be true in practice with respect to the omitted purchase drivers, all consumers (a) would have to face the same travel costs

---

[467] Caves Report, at ¶ 42, Table 2.

[468] Caves Report, at ¶ 28. *See also* Caves Report, Appendix A, at Question 20.

[469] According to Mr. Montoya's testimony, "I don't have to spend time shopping around or looking around for other brands."  *See* Montoya Deposition, at pp. 155-156.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

and shipping costs with respect to every retailer carrying AFCIs and (b) would all face the same opportunity costs (e.g., with respect to time spent shopping) associated with accessing all of these options.  However, these are individual inquiry issues.

**M. The Approach And Stages Utilized By Dr. Caves To Determine His Claimed Price Premium Do Not Make Economic Sense**

225.  Dr. Caves opines that "[f]or the foregoing reasons, I [Dr. Caves] conclude that economic injury and aggregate damages to the Class can be reliably determined using standard methods and evidence common to all Class Members."[470]  Dr. Caves asserts that he can determine a claimed Price Premium by taking the results of his conjoint survey and conducting a market simulation based upon the conjoint survey results.  However, Dr. Caves introduces conceptual and quantitative economic errors into his analysis when he conducts his market simulation (which he needs to derive his claimed Price Premium percentage).  These errors are fatal as they contain input errors, violate basic economic principles, and create contradictory results.  The errors in Dr. Caves' market simulation methodology become readily apparent if one walks step-by-step through the calculations performed by Dr. Caves.

**1.  Simulated Market Shares From Conjoint Survey: No Disclosure Statement**

226.  As stated earlier in my report, Dr. Caves conducts his market simulation analysis in three steps.  First, Dr. Caves obtains simulated market shares from his conjoint survey for the eight hypothetical competing AFCIs he includes in his analysis (and the outside option of "no purchase").[471]  Dr. Caves assumes a price of $51.43 for each brand for all single-

---

[470] Caves Report, at ¶ 72.

[471] Caves Report, at ¶¶ 52-54, Figure 4.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

function AFCIs and a price of $57.19 for each brand for all dual-function AFCI/GFCIs.[472]

These prices are used (in part) to obtain simulated market shares under a hypothetical market outcome without the Nuisance Tripping Disclosure.[473]  At this stage, Dr. Caves reports that Siemens accounts for an approximately ▮ percent share of sales in the simulated market, the largest share of all brands considered.[474]  The aforementioned prices utilized in the analysis and the ▮ percent share of sales figures are important inputs into Dr. Caves' derivation of a claimed Price Premium percentage.  (Note that I have analyzed these aspects of Dr. Caves' conjoint survey / market simulation earlier in my report; the result of those analyses will not be repeated in detail here.)

227.    Presumably, the collective conditions described above represent an AFCI market in equilibrium when tripping disclosure statements are not made.  Dr. Caves claims to have identified the primary AFCI competitors (as these are the competitors that consumers can choose from in his conjoint survey), the prices used in the conjoint survey (based upon claimed observed Siemens prices in the market), and the distribution of sales across competitors (based upon consumer preferences as measured through his conjoint analysis).  In this environment, consumers are maximizing utility subject to their budget constraints and firms are maximizing profits.[475]

---

[472] According to Dr. Caves, these prices are the averages of the prices he observed for Siemens products in the market. *See* Caves Report, at Figure 4.

[473] *See* Caves Report, at ¶¶ 53-54, Figure 4.

[474] Caves Report, at ¶ 54.

[475] With respect to consumers maximizing utility, *see, e.g.,* Caves Report, at ¶ 21 (Footnote omitted):

> In CBC analysis, a product is expressed as a bundle of features, and each feature contributes something to the overall utility that the customer derives from the product. CBC respondents complete a series of choice tasks. In each choice task, the respondent is shown different products

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

228.    Dr. Caves uses the aforementioned collective conditions and claimed market results to measure the impact of the introduction of the Nuisance Tripping Disclosure into the marketplace and what the impact of the Nuisance Tripping Disclosure would be in a new market equilibrium relative to the initial market equilibrium.  However, I note the following inconsistencies in this first step of Dr. Caves' analysis.

229.    Price Assumptions.  As stated earlier in my report, there are significant pricing-related issues with Dr. Caves' analysis.  Those issues will not be repeated here, but are incorporated by reference.  Dr. Caves' pricing assumptions are used (in part) to evaluate consumers' purchase preferences and to obtain simulated market shares under a hypothetical market outcome without the Nuisance Tripping Disclosure.[476]  At this stage, based upon the values assigned to the attributes contained in Dr. Caves' conjoint analysis (including price), Dr. Caves reports that Siemens accounts for a ▮ percent share of sales in the simulated market, the largest share of all brands considered.[477]

230.    Market Shares.  Dr. Caves reports that Siemens accounts for a▮ percent share of sales in the simulated market, the largest share of all brands considered.[478] As stated earlier in my report, there are significant market share-related issues with Dr. Caves' analysis.  Those

---

offered at different price points; the respondent selects which (if any) of the products the respondent would purchase in real life. By selecting the most-preferred bundle of features among the choices presented to them—that is, the choice that maximizes a respondent's utility—survey respondents reveal the value they derive from individual features.

The Caves Report also has numerous references to firms maximizing profits. *See, e.g.*, Caves Report, at ¶¶ 66, 69, Footnotes 97, 102.

[476] *See* Caves Report, at ¶¶ 52-54, Figure 4.

[477] Caves Report, at ¶ 54.

[478] Caves Report, at ¶ 54.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

issues will not be repeated here but are incorporated by reference. Dr. Caves' market share

results are not accurate relative to actual market share figures.

231.　Conclusion. Based upon the above analysis of the inputs and initial market outcome used

by Dr. Caves when performing his market simulation (to which he will compare a claimed

market outcome when a Nuisance Tripping Disclosure is introduced), the conclusion Dr.

Caves reaches regarding a claimed price premium percentage is not reliable.

### 2.　Intermediate Observation: Total Market Size

232.　No further analysis is required to conclude that Dr. Caves' claimed Price Premium analysis

is unreliable. However, Dr. Caves makes additional conceptual and quantitative economic

errors in his attempts to support his conclusion. As an intermediate observation, using Dr.

Caves' model and assuming Siemens' market share to be ▮ percent would imply that the

total size of the market is ▮ times Siemens sales (i.e., Siemens sales / 0.▮ = ▮ ×

Siemens sales). This result is used later in my economic evaluation of Dr. Caves' model

for evaluating a claimed price premium.

### 3.　Simulated Market Shares From Conjoint Survey: With Disclosure Statement

233.　Dr. Caves performs another market simulation wherein simulated market shares are

determined after including the Nuisance Tripping Disclosure as an attribute of Siemens

single-function AFCIs.[479] In Dr. Caves' simulation, consumers who would have bought

Siemens single-function AFCIs without the Nuisance Tripping Disclosure (but now in Dr.

Caves' model are aware of such a disclosure) are allowed to substitute to a Siemens dual-

---

[479] Caves Report, at ¶ 55.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

function AFCI/GFCIs or to a single-function or dual-function product offered by another

manufacturer.[480]

a. In this second simulation, Dr. Caves continues to assume a price of $51.43 for each brand for all single-function AFCIs and a price of $57.19 for each brand for all dual-function AFCI/GFCIs.[481]  In other words, neither Siemens nor the other suppliers have different prices or change their prices.

b. In this second simulation, Dr. Caves continues to assume all competing brands of AFCIs charge the same price as Siemens for AFCIs.  This includes Siemens not changing its price on its AFCIs with the now present Nuisance Tripping Disclosure.

c. Relative to his first simulation, Siemens' simulated market share drops ▮ percentage points to ▮ percent, with a ▮ percentage point drop in Siemens' single-function AFCI simulated market share and a ▮ percentage point increase in Siemens' dual-function AFCI/GFCI simulated market share.  The ▮ percentage point decline in Siemens' market share is spread across the other manufacturers of AFCIs.[482]

d. As part of Dr. Caves' modeling, in addition to holding prices constant, Dr. Caves also is holding constant the incremental cost associated with producing and selling additional units.  This means, given the constant price and cost assumptions made by Dr. Caves, that AFCI unit and revenue changes are proportional.  For a single AFCI product, an observed 10 percent decline in unit sales would lead to a 10 percent observed decline in revenues for that product.

e. For a single product, holding prices constant and incremental costs constant means per unit profitability is constant.  It also means that overall profitability is proportional to units sold and unit-derived revenue changes.  A 10 percent reduction in units sold would decrease profits by 10 percent.  Equivalently, a 10 percent reduction in revenues as a result of a 10 percent reduction in units sold would decrease profits by 10 percent.

f. For a two-product firm, statement (f) above holds if both products have equal per unit profits – an assumption I am making in this analysis for ease of exposition and because it is consistent with Siemens' actual approximate per unit profits on its AFCIs and AFCI/GFCIs, as represented by Siemens.[483]

---

[480] Caves Report, at ¶ 55.

[481] According to Dr. Caves, this is the average of the prices he observed for Siemens products in the market.  *See* Caves Report, at Figure 5.

[482] Caves Report, at ¶ 56.

[483] Kees and Duemmler Discussion on December 16, 2025.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

g.  As previously shown, the market is  times Siemens' sales.  Using Dr. Caves' model and assumptions, a ▮ percent decline in Siemens' market share would lead to a ▮ percent decline in unit sales and/or revenues with a proportional ▮ percent decline in profits.  (▮ × Siemens' sales = total size of the market.  A ▮ percent decline in Siemens' market share would lead to a loss in unit sales of ▮ × Siemens' sales × ▮ = ▮ × Siemens sales (i.e., ▮ percent of Siemens sales)).

234.  <u>Conclusion</u>.  According to Dr. Caves' analysis and modeling, if Siemens did nothing else but make the Nuisance Tripping Disclosure (and chose not to change its prices after incorporating the Nuisance Tripping Disclosure), its profits would decline ▮ percent with the ▮ percent decline in market share (and holding prices constant as Dr. Caves assumes).

### 4.  Intermediate Observation: Firms Maximize Profits

235.  As another intermediate observation, and as introduced earlier, a fundamental premise of microeconomics is that the objective of the firm is to maximize profits.  This new level of Siemens' profitability (described above) can be compared with other strategies that Dr. Caves claims Siemens could employ, to understand which strategy Siemens is better off implementing within Dr. Caves' models (e.g., (a) higher profits by holding prices constant and losing ▮ percent of its market share or (b) evaluating the profitability associated with making different adjustments).  <u>Recall that this is all within the model created by Dr. Caves and the analyses he performs.</u>[484]

---

[484] Comparing relative profitability from different strategies and choosing the strategy that yields higher profits is consistent with firms having the objective of maximizing profits and also is consistent with the framework utilized (at times) by Dr. Caves.  *See* Caves Report, at ¶ 69.

> Aggregate damages are calculated using data and methods common to the Class.  As explained in Part III.B.2 above, I estimate the Price Premium at 32 percent, adopting a conservative approach that allows Siemens to retain more profit than it otherwise could have in the but-for world by restricting the supply of Class AFCIs.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

236.  This fundamental economic premise is used later in my evaluation of Dr. Caves' model but it is important to point out now.  A guiding principle in the discussion that follows is that firms will choose the strategy that leads to the greatest level of profits (and, again, this principle is applied within Dr. Caves' framework).

**5.  Simulated Market Shares: Equalizing Siemens' Market Share With And Without The Disclosure Statement**

237.  Dr. Caves performs additional iterative simulations where Dr. Caves simulates the percentage reduction in the price for Siemens single-function AFCIs that would be required to return Siemens to a simulated market share of ▮ percent, as in the first simulation.[485]  This is a strategy that Dr. Caves posits Siemens could employ – i.e., having as their objective the maintenance of a market share level rather than striving to achieve the greatest profits possible.

238.  Through a process of trial-and-error, Dr. Caves concludes that to equalize Siemens' simulated market shares with and without the Nuisance Tripping Disclosure, Siemens would need to reduce (in the "with disclosure" simulation) the price of its single-function AFCIs by approximately ▮ percent.[486]

   a.  In this step, Dr. Caves assumes that Siemens would have an objective to maintain its same market share with the disclosure as without the disclosure.  Dr. Caves does not utilize the fundamental economic premise that firms maximize profits in this intermediate step.

   b.  To maintain market share, according to Dr. Caves, Siemens would need to reduce its prices by ▮ percent. (This ▮ percent reduction in price is derived from the results of Dr. Caves' conjoint analysis.)  This price reduction would lead to at least a ▮ percent decline in incremental profitability for Siemens single-function AFCIs, given the

---

[485] Caves Report, at ¶ 57.

[486] Caves Report, at ¶ 57.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

    assumptions utilized in Dr. Caves' models and assuming that Siemens AFCIs and AFCI/GFCIs have equal unit profitability.

    c.   For comparison purposes, Dr. Caves posits that Siemens could follow this course of action and reduce prices by ▮ percent and lose at least ▮ percent of its profits on approximately ▮ percent of its output.[487]  A reduction of ▮ percent of the profits on ▮ percent of the sales implies a reduction in overall profits by at least ▮ percent (i.e., when the profits associated with Siemens AFCIs and AFCI/GFCIs are combined).[488]

    d.   A ▮ percent reduction in profits in this scenario can be compared to (in Dr. Caves' model) the scenario where Siemens does nothing but provide the Nuisance Tripping Disclosure (i.e., not change prices) and only loses ▮ percent of its profits.  (<u>All within Dr. Caves' model and analyses.</u>)

239.   <u>Conclusion</u>.  The implications of Dr. Caves' analysis and his model do not make economic sense.

    a.   Dr. Caves is positing that Siemens would prefer to make the Nuisance Tripping Disclosure, <u>lower its prices to maintain its market share</u>, and lose ▮ percent of its incremental profits rather than (within his model) making the Nuisance Tripping Disclosure, holding prices constant, losing ▮ percent market share, and losing only ▮ percent of its profits.

    b.   Within Dr. Caves' model, he has Siemens behaving irrationally and choosing a ▮ percent decline in profits rather than a ▮ percent decline in profits.  This invalidates Dr. Caves' model and approach.

---

[487] According to Dr. Caves' model, Siemens' AFCI market share is ▮ percent and its AFCI/GFCI market share is ▮ percent after the ▮ percent price reduction.  Therefore, AFCIs comprise ▮ percent of Siemens' combined AFCI and AFCI/GFCI sales. (▮▮▮▮▮▮▮▮▮▮.)  Note that these are approximate market share figures obtained from Dr. Caves' ▮ percent price reduction simulation and rounded to the nearest integer. *See* Caves Report backup material "Simulation Report_8Prod_20A_PON_withcalcs.xlsx," at tab "Calculations."  For ease of exposition, this calculation uses rounded market shares but can be made more precise when preformed with the unrounded numbers, which are approximately ▮ and ▮, and which gives final percentages of ▮ (instead of ▮).

[488] ▮ percent of ▮ percent is ▮ percent (or ▮▮▮▮▮▮▮) percent using unrounded numbers).  This is the percentage fall in total profits relative to Dr. Caves' first simulation if Siemens AFCIs are produced at zero marginal cost (i.e., price is equal to unit profit). Total profits fall by more than ▮ percent after factoring in non-zero marginal cost for Siemens AFCIs (i.e., price is greater than unit profit).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

### 6. **Supply Side Adjustment**

240.    Dr. Caves does make one more suggested adjustment.  To arrive at the final Price Premium estimate to which he opines (prior to incorporating claimed sensitivity analyses into his overall opinion), Dr. Caves supplements his market simulation with a claimed "supply-side analysis."  In this claimed "supply-side analysis," Dr. Caves allows Siemens to adjust its quantity supplied of Class AFCIs in response to the claimed reduction in demand associated with the Nuisance Tripping Disclosure.[489]  Note that Dr. Caves does not utilize the results of his conjoint analysis for this additional adjustment (i.e., the derived ▮ percent loss in market share associated with the disclosure) but instead works with an assumed downward sloping linear demand curve and constant marginal costs.[490]

241.    In spite of his initial model indicating that Siemens could keep its prices constant and lose only ▮ percent of its market share, Dr. Caves posits that Siemens would adjust the quantity it supplied to the market and lower its prices by ▮ percent to maximize profits (switching from a maintaining market share strategy originally posited to a profit maximizing strategy).[491]

242.    Dr. Caves' conclusion requires explanation.

---

[489] Caves Report, at ¶ 58.  ("Next, I conduct additional supply-side analysis that allows Siemens to reduce the supply of the Class AFCIs in the but-for world in response to decreased demand resulting from the Nuisance Tripping Defect.")

[490] Caves Report, at ¶¶ 60-61.

[491] Caves Report, at ¶ 61.  ("Accordingly, the decrease in the profit-maximizing price resulting from a downward vertical shift in the demand curve can be estimated as one-half of the distance of the vertical shift—that is, [ ▮ ] x [0.5] = ▮ percent.")

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

    a. According to Dr. Caves, allowing Siemens to restrict its quantity supplied in response to a shift in demand increases Siemens' profits by allowing it to charge a higher price and incur lower costs than it would holding quantity supplied fixed.[492]

    b. Dr. Caves' word phrasing can be confusing. For clarification, the "increase" in Siemens' profits is relative to a ▮ <u>percent price reduction holding quantity supplied fixed</u>.

        i. In other words, the "higher price" is a <u>lower reduction in price of</u> ▮ <u>percent</u> (and allowing quantity supplied to decrease) as opposed to a <u>reduction in price of</u> ▮ <u>percent</u> (and holding market share constant).

        ii. It is not a comparison to holding prices constant and losing ▮ percent market share.

        iii. It is not a comparison to the pre-Nuisance Tripping Disclosure world.

    c. Also for clarification, the "lower costs" are lower <u>total</u> costs (because less units are produced); per unit marginal costs are assumed constant.[493]

243. Dr. Caves then opines that "[t]hus, this supply-side analysis allows Siemens to earn greater profit than it otherwise would have *in the but-for world* by restricting its supply in response to the downward shift in demand resulting from disclosure of the Nuisance Tripping Defect."[494] This statement in isolation is unclear as to what exactly Dr. Caves is saying. For clarity, Dr. Caves is opining that introducing this supply-side analysis allows Siemens to earn greater profit by (a) *lowering price by* ▮ *percent and allowing the quantity supplied by Siemens to decrease* relative to (b) *lowering price by* ▮ *percent and producing and selling the same number of units as prior to the addition of the disclosure statement.* The obfuscation by Dr. Caves is that he defines *the but-for world* by assuming Siemens would

---

[492] Caves Report, at ¶ 58. "This analysis also allows Siemens to incur lower costs in the but-for world by supplying fewer Class AFCIs than it did in the actual world." This assertion by Dr. Caves is unclear. I infer that by "costs," Dr. Caves means "total costs," as he assumes per unit marginal costs are constant in his analysis. *See* Caves Report, at ¶ 60.

[493] *See* Caves Report, at ¶ 60.

[494] *See* Caves Report, at ¶ 58. (Emphasis added.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

behave irrationally by lowering price by ▮ percent to maintain its market share (even though this would yield lower profits than other strategies implied by Dr. Caves' model). Also, relative to lowering its price by ▮ percent, Siemens would indeed earn greater profit if it only lowered its price by ▮ percent. However, since I have shown that the ▮ percent was not a profit-maximizing price to begin with, Dr. Caves' own supply-side model *necessarily* implies that a price reduction of ▮ percent is also not profit-maximizing for Siemens.[495] In other words, Dr. Caves' "supply-side analysis" merely moves Siemens from one non-profit maximizing price to another.

244. <u>Conclusion</u>. In Dr. Caves' final opinion and <u>within his model</u>, he has Siemens choose the ▮ percent decline in price, which is not profit-maximizing for Siemens. The outcome Dr. Caves describes and uses to derive his ▮ percent price decrease is not an equilibrium where Siemens is maximizing profits – which is an inconsistency in Dr. Caves' modeling efforts and is fatal to his conclusions.

### 7. **Dr. Caves Has Not Demonstrated That His Claimed Price Reduction Is Sustainable**

245. As I have stated numerous times in my presentation above, one can reach the conclusion that no further analysis is required to conclude that Dr. Caves' claimed Price Premium analysis is unreliable. However, as I have noted in **Section XII.K** of my report, Dr. Caves

---

[495] This is because the "optimal price change" $\Delta P_{MAX}$ derived by Dr. Caves shows how much Siemens should change its price to move from an *initially optimal price* to the *new optimal price* after a shift in the demand curve. (*See* Caves Report, at ¶ 60, where Dr. Caves defines $\Delta P_{MAX}$ as the difference between two *optimal* prices.) I have shown that the initial price reduction of ▮ percent was not profit-maximizing and is not an optimal price (because Siemens earns more profit by keeping prices constant and accepting a ▮ percentage point drop in market share). When Dr. Caves obtains his ▮ percent Price Premium, he does so by applying his derived "optimal price change" to an initial price that did not maximize profits to begin with. Hence, the change from a ▮ percent price reduction to ▮ percent price reduction necessarily moves Siemens from one sub-optimal price to another sub-optimal price (i.e., another price that is not profit maximizing).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

makes an additional attempt to justify his █ percent Price Premium as being reliable and sustainable by arguing that "Siemens [*sic*] own financial records indicate that … [h]ad Siemens cut its prices by █ percent, it would have continued to earn an average variable profit margin of ███████ percent."[496]

246.  As I have noted and substantiated in **Section XII.K** of my report, Dr. Caves' assertion that his █ percent Price Premium is reliable and sustainable lacks support.

a.  Dr. Caves has provided no support for his claim that Siemens' consistently earned *high variable profit margins* on the Class AFCIs. For example, he provided no benchmarking analysis to demonstrate that Siemens' variable profit margins are "high" in this industry.

b.  Dr. Caves' analysis ignores the concept of "opportunity cost" (i.e., what is the next best alternative activity for Siemens' resources). When opportunity costs are not being covered (even when a company may be earning positive accounting profits), there would either be upward pressure on prices or a company would stop producing the item of interest.[497]

c.  Dr. Caves' analysis ignores the difference between short run decision-making and long run decision-making and has not analyzed whether Siemens would be able to maintain the reduced prices to which he opines over a five-year period (a longer period of time as opposed to a temporary price reduction).[498]

---

[496] *See* Caves Report, at ¶ 67. (Footnote omitted.)

[497] Resources gravitate to their highest valued use. Hence, "opportunity cost" is an important economic concept. *See, e.g.,* Industrial Organization, at pp. 97-98; **Exhibit 25**. (*Italics* and **bolding** in original.)

> Firms enter or remain in an industry only if they earn, at a minimum, a *normal rate of return*. By this term we mean that people will not invest their wealth in a business unless they obtain a positive competitive rate of return – that is, unless their invested wealth pays off. Any business wishing to attract capital must expect to pay at least the same rate of return on that capital that all other businesses in a similar situation are willing to pay. For example, if individuals can invest their wealth in almost any publishing firm and get a rate of return of 10 percent per year, then every firm in the publishing business must *expect* to pay 10 percent as the normal rate of return. *This is a cost to the firm.* It is called the **opportunity cost of capital**. Capital will not stay in industries where the expected rate of return falls below its opportunity cost.

[498] Dr. Caves states that "Elementary economics demonstrates that profit-maximizing firms consider marginal costs, rather than total costs, when making pricing decisions." *See* Caves Report, at ¶ 65, footnote 102. While an accurate statement, the statement is incomplete. In the short run, a firm must cover its variable costs or it is more profitable to shut down production. (*See* Industrial Organization, at p. 40; **Exhibit 25**: "It does not pay the firm to continue

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

    d. Dr. Caves fails to acknowledge (or point out) that while a ▮ percent variable profit margin still is positive, his own analysis shows that it is significantly lower than the profitability experienced by Siemens on the Challenged Products over the putative Class Period.[499] Hence, Dr. Caves has not provided support that a ▮ percent variable profit margin on Siemens' Class AFCIs is sustainable.

247. <u>Conclusion</u>. Dr. Caves has not demonstrated that his claimed Price Premium reduction is sustainable. This failure provides an additional basis upon which to conclude that Dr. Caves' model and analysis are not reliable.

## XIII. THE CLAIMED SENSITIVITY ANALYSES PRESENTED IN THE CAVES REPORT DO NOT VALIDATE THE CONJOINT SURVEY / MARKET SIMULATION RESULTS PRESENTED IN THE CAVES REPORT

248. As I note elsewhere in my report, Dr. Caves claims to "conduct various sensitivity analyses" in Appendix D of his report. Dr. Caves claims these sensitivity analyses "confirm that the magnitude of the Price Premium is consistently high, and generally fluctuates within a narrow range, between 32 percent to 36 percent."[500] However, the claimed alternative simulations and sensitivity analyses are limited and do not confirm that the calculated Price Premium is "robust" or "fluctuates in a narrow range" as claimed by Dr. Caves.[501] As explained in more detail below, I reach this conclusion because in the claimed determination of alternative Price Premiums, the same underlying deficient survey data was used with no new or different attributes (i.e., demand drivers) or alternative

---

production if it cannot at least cover variable costs." In the long run, a firm must cover it total costs or its resources will gravitate to a higher valued use.

[499] *See* **Section XII.K** of my report.

[500] Caves Report, at ¶¶ 62-63. Dr. Caves also states that "When the sample is reweighted based on demographics, the Price Premium increases to ▮ percent. *See* Appendix D." Caves Report, at ¶ 63, Footnote 99.

[501] Caves Report, Appendix D, at ¶¶ 7-8.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

phraseologies for the tested disclosure statement.    Additional detail is provided immediately below.

a.  First, Dr. Caves introduces "additional simulations using different combinations of product attributes, representing different types of competing AFCIs and AFCI/GFCIs" where he substitutes the product and attributes used in his main market simulations for those reflecting alternative top-selling Class AFCI products.[502]    However, these analyses are very limited because they are derived from the same (flawed) survey results used in his original market simulation analysis.

  i.  For example, as discussed above in **Section XII.J**, Dr. Caves' survey target population of purchasers of Siemens AFCIs has led to the market shares he assigns to Siemens in his simulations to be too high.[503]    In the claimed sensitivities with results summarized in rows 2-4 of Table D1 of his Appendix D, Dr. Caves has simply doubled down on the flaws in his original survey design, which would tend to invalidate these claimed sensitivity results in the same ways they invalidated his original analysis.[504]

  ii.  As another example, instead of continuing to use of the same binary "DEFECTIVE: Prone to Nuisance Tripping" vs. "NOT DEFECTIVE" Nuisance Tripping Disclosure attribute, a more insightful sensitivity analysis would have allowed for a disclosure of a non-binary selection of nuisance tripping manifestation rates observed by products in the real world, which would be between his survey's implied manifestation rates of 0 and 100 percent.

  iii.  Further, an alternative sensitivity analysis would have offered a more complete description of the nuisance tripping issue to participants, such as explaining that the product's increased sensitivity is associated with an increase in the likelihood of detecting electrical conditions that may lead to a home fire.  From an economic perspective, such a sensitivity analysis would have captured the trade-offs consumers often make in their purchasing decisions.

b.  Second, Dr. Caves performs a similar claimed sensitivity analysis in which he removes "speeders" who either "completed the survey significantly faster than most respondents" and/or "straight-liners"  who "consistently selected the same response to the Conjoint Module."[505]  Again, this claimed sensitivity is flawed because Dr. Caves has merely reduced his results to a subset of his original target population used in his

---

[502] Caves Report, Appendix D, at ¶ 2, Table D1.

[503] *See* Caves Report, at ¶¶ 45, 54.

[504] Caves Report, Appendix D, at Table D1.

[505] Caves Report, Appendix D, at ¶ 3.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

survey and, therefore, any flaws in his original survey to flow through to this subpopulation.

c.  Third, Dr. Caves performs a claimed sensitivity analysis in which he "limit[s] the analysis only to the professional electricians who made up 90 percent of respondents to the CBC survey."[506]  Dr. Caves then claims he obtains comparable results as to his full survey.  This is a misdirection.  As Dr. Caves notes, the original survey was primarily comprised of professional electricians (90 percent). Therefore, it is unsurprising that this claimed sensitivity hardly changes his results.

d.  Fourth, Dr. Caves performs a claimed sensitivity analysis in which he "assign[s] different weights to different respondents to match information on the demographics of electricians in the U.S."[507]  This claimed sensitivity analysis suffers from the same flaws as the analysis it is derived from (which focuses on professional electricians).

## XIV.  <u>SUMMARY OF CONCLUSIONS</u>

249.  Based upon (a) my economics and damages quantification training and experience, (b) documentary evidence, (c) deposition testimony, (d) my review of the Caves Report and Durham  Report, (e) an interview of Siemens' employees, (f) legal filings in this matter, and (g) independently obtained publicly available documents, *inter alia*, I have reached the following conclusions with respect to the assignments I was asked to undertake.

a.  Determining whether and to what extent a putative Class member was injured because of the Alleged Defect requires individual inquiry (and is not amenable to a common proof approach).

b.  Dr. Caves' conjoint survey / market simulation analysis is flawed and unreliable from an economic and damages quantification perspective and does not provide a valid common proof approach to evaluating claimed Class-wide injury and damages suffered by the Consumer Class.

* * * * * *

---

[506] Caves Report, Appendix D, at ¶ 4.

[507] Caves Report, Appendix D, at ¶ 5.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Keith R. Ugone, Ph.D.
December 19, 2025

250.    My analyses and opinions contained in this report are based upon information available to date.  I reserve the ability to review documents, deposition transcripts, or other information still to be produced by the parties to this dispute and to supplement my opinions based upon that review.


_Keith R. Ugone_
Keith R. Ugone, Ph.D.
December 19, 2025

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY