# EXHIBIT 22

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

KEVIN BRNICH ELECTRICAL LLC, et   )
al.,                              )
                                  )
        Plaintiffs,               )   Civil Action No.
                                  )   22-01229 (MHC)
v.                                )
                                  )
SIEMENS INDUSTRY, INC.,           )
                                  )
        Defendant.                )
_____ )

Videotaped Deposition of CHARLES HANDFORD VODICKA

Asheville, North Carolina

Monday, January 13, 2025

9:58 a.m.

Reported by:  Karen Kidwell, RMR, CRR

Charles Vodicka
January 13, 2025

35

Q.   You got to let me finish, Mr. --

A.   Okay.  Sorry.

Q.   Okay.  Did your wife attend any of the walk-throughs?

A.   No.

Q.   So you left all of the inspection walk-throughs up to the contractor?

A.   Correct.

Q.   And that would have been Mr. Alexander?

A.   Correct.  Or his company.

Q.   HomeSource?

A.   Yes.

Q.   Okay.  And do you remember -- was Mr. Alexander the primary contractor on your job?

A.   HomeSource was the only -- was the general contractor.  And then he had people working for him, who were on site and did the expediting and so forth.

Q.   Do you remember the name of the man or woman who was the lead for the contractor on your site?

A.   Henry.

Q.   Henry?

A.   Snypes, I think was his last name.  He still is at HomeSource.  Not in that capacity anymore; he's been elevated.  But he -- he was the

on-site person for HomeSource.

Q.   Snypes?

A.   S-n-i-p-p-s, I think.

Can I check?

Q.   No, you don't --

A.   Okay.

Q.   When did you first become aware of the potential for unwanted tripping with the AFCI?

A.   Soon after we moved into the house.

Q.   So that would have been in 2014?

A.   Yeah -- or no, 2015.

Q.   Okay.  I --

A.   Because we moved in December 17th, so I don't recall -- you know, we may have had a -- a circuit breaker trip then, but the major problem started in 2015.

Q.   When in 2015?

A.   Probably January, but I don't remember a specific date.

Q.   And what happened?

A.   We started having a number of circuit -- 15-amp circuit breakers, that were the arc circuit breakers, trip.  And so we would go back and reset them, and sometimes they would trip again, and sometimes after two or three times they would be fine

Case 1:22-cv-01229-MHC   Document 174-26   Filed 08/04/26   Page 5 of 37
KEVIN BRNICH ELECTRICAL LLC vs
SIEMENS INDUSTRY
Charles Vodicka
January 13, 2025

37

for a while, and then they would trip again.

Q.   In January -- you say you closed -- or moved in on December 17th.  When you moved in, did you move all your stuff in right away?

A.   We had moved out of Miami and put our things in storage.  And they were delivered on or about that date.

Q.   Okay.  And by January 2015, was your house -- maybe not as far as your wife is concerned, but as far as you were concerned -- fully furnished and ready to go?

A.   In boxes, yeah.  I mean, we were --

Q.   You were still unpacking?

A.   We still -- yeah.  I had an apartment in Miami, because I was still working.  And I was a resident of Miami, and so I had an apartment in Miami, and I spent time there.

Q.   Okay.  So were you all -- how often were you in the house in Asheville during the year of 2015?

A.   Probably two weeks a month.

Q.   Two weeks a month?  And that would have been every month of 2015?

A.   Yes.

Q.   And who else lived in the house, or lives

41

more letters.

So that didn't work.  So . . .

Q.   And then you said you had speakers attached.  What type -- brand of speakers were they?

A.   I don't recall.

Q.   How about the CD player?

A.   I think it was a Sony.

Q.   And then you said you had a Dyson vacuum that the cleaning lady would plug in?

A.   Right.

Q.   How -- do you know the model of that vacuum, or how new it was?

A.    It was brand new.  And I don't remember the model number, but we bought one just like it a few years ago.  And that's not a -- it was not a problem.

Q.   So brand new in 2015?

A.   Right.

Q.   What is your understanding of the harm associated with unwanted tripping?

MR. STAUBER:  Objection.  Lacks foundation.

THE WITNESS:  I'm not an electrician.  It was just annoying as hell.

BY MS. JACKSON:

Q.   Annoying?

A.   Right.  But --

Q.   To your knowledge --

A.   But I -- I don't know what problems -- I'm not an electrician; I have no knowledge of that, so I can't comment on -- I can't answer like what -- what specific harm it would do.  I'm just telling you what our experience was.

Q.   That's what I'm asking you, your understanding.

A.   Okay.

Q.   I'm not asking you to be an expert.

A.   I have no understanding.  My experience was that they tripped, and we had to go reset them to get power again.

Q.   And to your knowledge, it didn't break your electrical system, correct?

A.   No.  Did not break the electrical system.

Q.   It did not damage any of your --

A.   Correct.  Did not damage anything.

Q.   You got to let me finish, Mr. Vodicka --

A.   Sorry.

Q.   -- please.

When did you decide to join this lawsuit

43

as a Plaintiff?

A.   Do you want the -- it's not -- it's a damning storey for Siemens.

But for years afterwards, I contacted Siemens.  I spoke to a guy by the name of Wayne and e-mailed him, and you have copies of those e-mails. And Siemens continually said that there was nothing wrong with the circuit breakers.  And then they told me there was a new model out, and so if I bought that new model, I would -- it would probably solve the problem.

So I spent -- I bought all new circuit breakers and replaced all the 15-amp circuit breakers in the house and had the same problem.

And so finally in -- on October 17th of 2021, I replaced both panels and all the circuit breakers with Eatons, and I haven't had one trip since.  So we had no nuisance breaking after that point -- or any breaking at all.

Q.   So in January of 2015, when the number of 15-amp circuit breakers started tripping, did you believe that they were the problem?

A.   No.

Q.   And did you contact Siemens --

A.   Yes.

Q.    -- in January of 2015?

A.   I don't remember when I contacted them. But soon after -- it was apparent that the contractor couldn't fix the problem.  And he tried many different things.  And he couldn't fix the problem. So I called Siemens, and they were very -- they didn't take responsibility.  I --

Q.   In January of 2015 -- I want to make sure I have it clear -- you did not call Siemens about the AFCIs?

A.   No.

Q.   And you said you were there pretty much every month for two weeks in 2015.  Did you call Siemens in any of those other months?

A.   I don't recall when -- I don't recall when I called -- first called Siemens.  I -- I don't recall.

Q.   Okay.  Did you e-mail them as well?

A.   Yes.

Q.   Would the calls and the e-mails have been around the same time?

A.   I think I spoke to them first and -- and then e-mailed them after that.  And I don't remember the sequence of events or how long it -- it happened.

You know, the problem was that Siemens

Charles Vodicka
January 13, 2025

59

Do you have more than one guest bedroom, by the way?

A.   No.

Q.   In that guest bedroom, how many outlets do you have?

A.   I don't know.

Q.   And what is plugged in in that room, other than the TV, cable box, and CD player?

A.   A couple lamps.  A Bose radio.  Television equipment.  And I think that's all that's plugged in up there, in the outlets.

Q.   When you say "lamps," what type of lamps?

A.   LED lamps that have bulb -- LED bulbs in them.  And there are three brightness levels on the bulbs.

Q.   Where did you -- do you know where you purchased those lamps?  Did you have them before you moved in?

A.   I have no idea where we purchased them.

Q.   What type of TV did you have in the home?

A.   Sony.

Q.   And the CD player you said was a Bose?

A.   No, it was -- the radio was a Bose.  The CD player I think was a Sony.

Q.   Okay.  Now your wife's office.

KEVIN BRNICH ELECTRICAL LLC vs
SIEMENS INDUSTRY

Charles Vodicka
January 13, 2025

60

A.    On the first floor -- on the main floor.

Q.    Okay.  What was the problem going on with the unwanted tripping in her office?

A.    I don't remember -- recall specifically, but I know that we had all the outlets checked, and they were -- all the places that were causing tripping, and the wiring was done impeccably.  In the guest bedroom, I hired a separate electrician -- not the guy who did the installation, but I hired a separate electrician to evaluate my wife's office and the upstairs.  And they found nothing that was problematical.

Q.    It's helpful, if you want us to like not go all day, for you to try to answer my question.

A.    Okay.

Q.    You'll get a chance -- perhaps, if your attorney tries -- asks you something I didn't ask, that you want to say, you'll get a chance to do that.  But if we want to finish today, you might want to answer my question.

A.    Okay.

Q.    Okay?  So my question was, what was plugged into your wife's office that caused tripping?

A.    I don't recall.

Q.    Okay.  Does she have lights in her office?

61

A.    Yes.

Q.    Lamps?

A.    Yes.

Q.    Does she have a computer?

A.    Yes.

Q.    Does she have a radio?

A.    No.

Q.    Does she have a TV?

A.    No.

Q.    Did she have any other electronic devices in that office?

A.    A scanner, a Fujitsu scanner.  And I think -- that's all that I can recall.

Q.    A printer?

A.    No.  Printers were in my office.

Q.    Okay.  And what type of computer does she have, or did she have in 2016?

A.    A laptop, a Lenovo laptop.

Q.    Okay.  Now, you say "in the hallway."  Is this the same thing as the vacuum cleaner that was tripping with the cleaning woman?

A.    Yes.

Q.    Anything else trip in the hallway?

A.    I don't recall.

Q.    Okay.  We talked about the entertainment

126

Q.   Your rog responses?

A.   Yeah, I saw these.

Q.   And that's your signature on page 22?

A.   Yes.

Q.   Dated January 6, 2025?

A.   Yes.

Q.   All right.  And so -- and -- okay.

A.   I think that I sent my lawyers a picture of one of the circuit breakers that I -- that was replaced, and so that may be -- all I know is that they were 15-amp arc circuit breakers.  And so I'm assuming that when my lawyers put that in, they knew what they were doing.

Q.   Okay.  So Interrogatory Number 1, your response, it says "Plaintiff states:  All of the Plaintiff Siemens' AFCIs were Siemens 15A QAF2 circuit breakers.

A.   They weren't all.  Some of them were 20-amp.  And they were not ACFI --

Q.   I'm sorry.

A.   -- AFCI.

Q.   I only -- I only read you the part that identified it, because we talked about the 15-amp ARCs --

A.   Okay.

127

Q.   -- were 15 QAF2 circuit breakers.  I'm not talking about the 20 amps right now.

A.   Okay.  I'm assuming that the 15-amp that they're referring to in here, or that I referred to, are -- are ones that I had installed in my house.

Q.   And you say you sent them a picture of that circuit breaker?

A.   Of one of the circuit breakers.  I think I did.  But I don't recall specifically.

MS. JACKSON:  Did we receive a copy of that?

MR. STAUBER:  You would, yes.

MS. JACKSON:  Okay.

BY MS. JACKSON:

Q.   What was the date code, do you know, on that circuit breaker?

A.   Don't know.  I didn't even have a clue.

Q.   How much did Mr. Tatham charge you to wire your home?

A.   I don't know.  I paid the general contractor, and he paid Dudley Tatham -- or M.D. Tatham.

Q.   How much did your home cost?

A.   I think it was -- when it was all said and done, it was around $700,000.

128

Q.   And in that notebook, would there be an itemization of where those monies went?

A.   Yes.

Q.   The notebook that they . . .

When Mr. Tatham came in and replaced AFCIs when you were having problems with the tripping, did he bill you for his time to do that?

A.   No.

Q.   Okay.

A.   And -- and he did not bill me for the -- the panels, the circuit breakers or his time.  All of it was done gratis.

Q.   Well, now let me break that down.

In the period of 2014 to 2019, when he was coming in and doing -- running these tests and replacing things, did Tatham buy the circuit breakers, or did you?

A.   Tatham did them.

Q.   Did he bill you for any of those between 20 -- let me finish the question -- between 2014 -- and I'm just using 2014 to go all the way through to 2019; did he bill you for any of those AFCIs?

A.   Yes.  When I replaced all of the Siemens circuit breakers with Siemens ACFIs, when I -- I paid for all the circuit breakers; he paid for the time.

129

Q.   And that was the final -- I'm talking about to 2019 -- okay.  My question is not clear. It's clear it's not clear.

Before you put the two Eaton AFCIs in. You following me?

A.   Yeah.

Q.   Mr. Tatham replaced the Siemens AFCIs between 2014 and 2019, correct?

A.   Yes.

Q.   Did you pay for the replacement Siemens AFCIs between 2014 and 2019?

A.   I -- when he replaced all of the ACFIs, 15-amp, with Siemens -- the newer ones with Siemens -- I paid for all those amps and -- all of those circuit breakers, and he paid for the time.

Q.   Okay.  And then did you pay for the two Eaton AFCIs in 2019?

A.   I don't recall.

Q.   You don't recall?  Did you pay for his time to install those two?

A.   I don't recall.

Q.   Okay.  Wouldn't you have received a bill from him, if you had?

A.   I might have.  I don't recall.  I don't recall.  Some things he sent me a bill for and some

130

things he did gratis, and if I -- if I paid him, I got a bill.  If I didn't pay him, I don't have a bill.

But I don't have records of that, because I can't go back and -- more than a couple years ago for my checks, because I use Quicken, and it was -- I lost all my data a couple years ago and had to start over again.  So . . .

Q.   And you don't keep any paper records?

A.   No.  All on my computer.

Q.   That's pretty good.

Did you speak to anyone else about replacing your AFCIs, other than Mr. Tatham?

A.   No.

Q.   When you were building your home, did you ask for the Siemens AFCIs?

A.   No.

Q.   Okay.  Was it recommended by your electrician?

A.   Yes.

Not verbally, but that's what he installed, so I'm assuming that's what he was recommending.

Q.   Okay.

A.   The panels and the circuit breakers were

131

all Siemens, because they had to be -- by code, they had to be the same manufacturer.

Q.   So do you know if it was a contractor or the electrician who decided what it would be?

A.   Probably -- I don't know, but I'm assuming the electrician did, because the contractor relied on his subs for some things, like the electrical, I'm sure.

Q.   Okay.

A.   Okay.  And that was part of the rough-out for the electrician.  The electricity.  That was not the finish work.

Q.   Did the contractor or the electrician specifically tell you they were going to install Siemens?

A.   No.

Q.   Was it ever described to you as a premium?

A.   No.

Q.   Was there a bonus added feature described to you?

A.   No.

Q.   What is your understanding of a home upgrade?

MR. STAUBER:  Object to form.  Vague and ambiguous.

132

THE WITNESS:  I don't have an understanding, because I don't know what that is.

BY MS. JACKSON:

Q.   When you were building your home --

A.   Yeah.

Q.   -- and you -- you said at the end, it got up to 700,000, right?

A.   Yeah.

Q.   Did the builder offer you a bunch of upgrades?

A.   No.

Q.   No?

A.   No.  We started out -- my financial situation when we started out was different than when we built the house.  And so he had, at the time -- unless you increase the square footage, it was -- he would charge just his time to do things, and he wouldn't charge you for the upgrades.

And we -- we upgraded a lot of the appliances and a lot of the fixtures and so forth, because we had the money to do it.  And a lot of it we bought directly, and we didn't use the contractor for that.

So his book -- his records are only going

133

to show what he paid for, not what we paid for, and I don't have any recollection.  Ten years ago, I can't even tell you what we -- I -- I know some of the things we bought, but I -- I can't remember everything.

Q.   Let me see if I can try to help you on this, in terms of getting what I'm thinking about.  I got what you're talking about.

Sometimes when you're building a house, the -- the contractor, the builder, will say, you know, "You can have the Carrier HVAC, or you can have a Trane.  Trane is better; that's also more expensive."

A.   No.  We didn't have that at all.

Q.   Those discussions of upgrades, that's what I'm talking about; on your systems, not your appliances.

A.   No.

Q.   Okay.  So to be clear, the cost of your home did not increase based on the use of Siemens AFCIs?

A.   Did not.

Q.   It was included in the total cost of your home, correct?

A.   Yes.

134

Q.   Do you recall, when you had to replace the
AFCIs, the Siemens AFCIs -- with the Siemens AFCIs --
how much those replacements were?

A.   I believe they were $900, is what I paid.

Q.   900, for . . . ?

A.   The Siemens -- for the circuit breakers.
And the time -- the electrician provided the time.
But I bought the circuit breakers.

Q.   So it would be the 35 -- I'm taking you
at the -- you said you had 35 --

A.   Yeah, somewhere around 35.  I'd have to
go -- I could go count them when I go home, but . . .

Q.   That would be too late, but -- I hear you.

A.   I've added a couple of circuit breakers
since then, since the house was built, and so . . .

I think there were 35 originally.  That's
my recollection.

Q.   And where did you go to purchase the
replacements?

A.   I didn't.  Tatham did.

Q.   Tatham did.  It's Tatham, not Tatham.
Okay?

A.   T-a-t-h-a-m.

Q.   I saw the H, but I just decided I didn't
want to pronounce it.

KEVIN BRNICH ELECTRICAL LLC vs
SIEMENS INDUSTRY

Charles Vodicka
January 13, 2025

135

So Tatham charged you $900 for the AFCIs?

A.   That was his cost.

Q.   Right.  And -- and did he submit that to you as a -- in a bill, or some kind of itemized statement?

A.   I don't recall.  I just know I paid for them.  And I'm assuming I paid for them with a check, because I never gave them a credit card.

Q.   Okay.

A.   When we built the house, we bought a lot of stuff with a credit card so we could get the points.

Q.   Did you use a credit card to purchase the Siemens AFCIs?

A.   No.

Q.   That was my next question.

A.   No.

Q.   So Tatham charged you $900, but he didn't charge you for his time?

A.   Correct.

Q.   How long did it take for him to change out?

A.   I don't remember.  Probably a few hours, because it was pretty fast.  When he replaced the panels and all the circuit breakers, it took his crew

KEVIN BRNICH ELECTRICAL LLC vs
SIEMENS INDUSTRY

Charles Vodicka
January 13, 2025

136

about a half a day.  So I'm assuming the circuit breakers would have -- probably a couple hours.  But then there's travel time also, so . . .

Q.   Did he charge you for travel time normally?

A.   Yes.

Q.   Who is Duke Progress Energy?

A.   The electric company that provides our electric service.

Q.   And did you retain their services over this issue?

A.   Their service was free, and it was a guy by the name of Jim McGee, and he came out to the house.  And I recall he wasn't in good health and near retirement, so I'm sure he's retired or dead by now.  But he had to sit down and work on the electrical system, because he couldn't stand.

And so I'm sure that -- and he came out, and he had a lot of experience for them, with this kind of work.  And so he hooked up all of the equipment to monitor if there were any power surges.

Q.   Okay.  And when you say "power surges," is that the same thing as an arc?

A.   I have no idea.  I was just told that if -- if there's a spike in the electric coming into

223

A.   No.

Q.   No?  Do you know anyone who has experienced an electrical fire in their home?

A.   No.

Oh, wait a minute.  As an insurance agent in Florida, did I know of anybody that had an electrical fire?  I don't think so.  To the best of my knowledge, the answer is no.

Q.   Do you know what warnings or information came with the Siemens AFCI?

A.   No.

Q.   Have you ever seen the packaging or labeling that came with your Siemens AFCIs?

A.   The -- the original ones, no.  The replacements, I -- you know, I saw the box of them, but I didn't look at the specifics.

Q.   So it would be no, you didn't actually read them, right?

A.   Correct.

Q.   Okay.  Have you ever seen any articles or studies regarding the Siemens AFCI?

A.   No.

Q.   Do you know anything about how Siemens manufactures the AFCI?

A.   No.

224

Q.   What is your understanding of what you are alleging went wrong with the AFCI?

A.   They didn't work.  Period.  They did not work.  They kept tripping, until they were replaced. And not one of the replacements has tripped in over three years.  So I'm assuming -- pardon my -- my ignorance not knowing -- but I'm assuming, because there have been a tripping, there was a problem with the circuit breakers.

It just seems -- it's res ipsa loquitur to me.  But -- I don't know if that's true or not, but . . .

Q.   All right, Mr. Vodicka.  I love that -- esquire.

Have you ever read any materials about AFCIs from Siemens?

A.   No.

Q.   Do you know the rate of unwanted tripping experienced in Siemens AFCIs?

MR. STAUBER:  Objection.  Lacks foundation.

THE WITNESS:  No.  Why would I know that? I don't know any --

BY MS. JACKSON:

Q.   I get to ask --

225

A.   I don't care --

Q.   -- the questions --

A.   Yeah.  No, I --

Q.   -- and you get to answer.

A.   My answer is I don't care and I don't
know.

Q.   Okay.  Have you done any research about
that?

A.   Other than to find out -- other than to
Google Siemens circuit breaker lawsuits, the answer
is no.  But when I Googled it, it was obvious that
other people were having the same problem.

Q.   Okay.

A.   Okay?

Q.   Are you aware of any of Siemens' internal
process for identifying and addressing instances of
unwanted tripping?

A.   No.

MR. STAUBER:  Objection.  Lacks
foundation.

BY MS. JACKSON:

Q.   Are you familiar with UL testing?

A.   Yes.

Q.   Okay.  What is UL?

A.   United Laboratories, I think.

231

MR. STAUBER:  Objection.  Lacks foundation.

THE WITNESS:  Theoretically, yes, but I don't know what that -- what that threshold is.

BY MS. JACKSON:

Q.  Right.  And when I say "too many things," I mean like seven Dyson vacuums.

MR. STAUBER:  Same objection.

THE WITNESS:  No idea.

MR. STAUBER:  Misstates prior testimony.

THE WITNESS:  No idea.

BY MS. JACKSON:

Q.  Would you agree with me that it could?

MR. STAUBER:  Same objections.

THE WITNESS:  No.  I -- I wouldn't -- I won't agree with you that it could or it couldn't.  I -- I don't know.  That's the -- I'm sorry, but I just don't know.

BY MS. JACKSON:

Q.  Would you agree that if a circuit is overloaded, it will trip?

MR. STAUBER:  Objection.  Lacks foundation.

THE WITNESS:  I don't know.  I'm assuming, maybe, but I don't know.  I'm not an electrician

Case 1:22-cv-01229-MHC   Document 174-26   Filed 08/04/26   Page 28 of 37
KEVIN BRNICH ELECTRICAL LLC vs                    Charles Vodicka
SIEMENS INDUSTRY                                  January 13, 2025

232

or have an electrical engineering background, so

I have no idea.

BY MS. JACKSON:

Q.   Is it your understanding, or do you know if the AFCIs trip when an overload means the maximum allowable current or amperage has been reached on that line?

MR. STAUBER:  Objection.  Lacks foundation.  Vague and ambiguous.

THE WITNESS:  I -- I don't know how to answer that question.  I don't know the answer to that question.

BY MS. JACKSON:

Q.   When was the first time that an AFCI tripped in your home?

A.   It was either the end of 2014 or the beginning of 2015.

Q.   And when you say the end -- you moved in on December 17th?

A.   So it would be sometime between September -- between December 17th and December 31st, or in January of 2015.

Q.   So sometime between 12-17 and 1-31?

A.   Yeah.

Q.   And what happened in that first trip?

KEVIN BRNICH ELECTRICAL LLC vs
SIEMENS INDUSTRY

Charles Vodicka
January 13, 2025

233

Was it -- was there more than one, first?

A.   I don't recall.  You know, I -- I just remember that it tripped; we went down; I flipped a switch.  I looked for the one that was off, and I flipped it on and off and off and on, and it came on.  And that was it.

Q.   So we got to -- I'm going to ask you: Exhibit 4 is the picture of your panel box?

A.   Uh-huh.

Q.   When you went in and you flipped it back, did you happen to look to see what the description was of that particular breaker?

A.   When I originally did it, I didn't.  And I don't recall now, because I haven't had one trip in three -- over three years, so I don't recall.  But I know that there were two lights there, and if one light was on, it was -- supposedly something caused it to trip, and one light was -- another thing.

But if I switched them on and off -- if I switched them off and on, and a light came on that was -- that was green, it was okay.  I think it was green and amber were the two colors.  But I don't --

Q.   How did you --

A.   But I don't recall.

Q.   How did you know the breaker had flipped?

245

thinking like the Lovesac, where they have the

speakers built in -- that had like, you know,

electronic appliances in it?

     A.   No.  We're old school.

     Q.   No, you're not.

     A.   We're -- we're too old to have that stuff.

         MS. JACKSON:  Would you agree with me,

he's not old --

         THE WITNESS:  Sofas and -- speakers in --

         MS. JACKSON:  He's not old school,

because --

         MR. STAUBER:  We're hearing about a lot

of -- a lot of technology.

         MS. JACKSON:  Thank you.

         Do you have six Roombas?

         MR. STAUBER:  I do not.

BY MS. JACKSON:

     Q.   In -- in your work with Mr. Tatham and the

guy from Duke Energy, whose name has escaped me --

     A.   Jim McGee.

     Q.   -- Jim McGee, did you identify -- other

than those two circuits, did you identify any other

problem circuits?

     A.   Jim McGee had nothing to do with it.  And

Dudley Tatham had nothing to do with identifying

246

circuit.  It was all Susan and I, when the circuits
tripped, we went downstairs and turned them on again.

So Dudley Tatham and Jim McGee had nothing
to do with identifying issues with the circuit
breakers.

Q.   Did you happen to look at the wiring on
those circuits when you were going down there to flip
them?

A.   I had electrician -- I had Dudley look at
it, and I had the separate electrician look at it,
and there was no problem with the wiring.

Q.   "Separate electrician" is the 2018 guy
whose name --

A.   Yeah.

Q.   -- you can't remember?

A.   Yeah.

Q.   When -- when you looked at them, did you
see anything that --

A.   No.

Q.   -- looked amiss?

A.   No.  But I wouldn't know what I was
looking at anyway, so . . .

Q.   Well, if you saw a wire sticking out?

A.   I didn't see that.

Q.   Okay.  How about a bent plug or something?

247

A.   No.

Q.   How about any burnt --

A.   No.

Q.   -- like scarring or anything in there?

A.   No.  Everything looked normal, except they were tripped, and I had to flip them off and flip them on again.

MS. JACKSON:  All right.  Let's look at -- all right.

(Exhibit 5 was marked for identification.)

BY MS. JACKSON:

Q.   Please take a look at that, and tell me if you recognize the document, Mr. Vodicka.

A.   Too many years ago.  But I know who Stan is.

Q.   Who's Stan?

A.   He's one of the other homeowners, who has an engineering degree -- in sanitary engineering, not in electrical engineering.  But I had no idea . . .

Q.   Okay.  You want to take a look at the -- the other side is usually the first e-mail in the chain.  So if you want to take a look at that first one, it looks like it's from you to Mr. Tatham and Henry Snypes, Tim Alexander.  You see that?

A.   The one that's from Henry Snypes?  Oh,

248

it's Henry Snypes, S-n-y-p-e -- that's the guy at -- at HomeSource.  It's not S-n-i-p-p-s; it's S-n-y-p-e-s.

Q.    Okay.  But this is an e-mail from you, on June 28th, 2017?

A.    Yeah.

Q.    To Mr. Tatham and Snypes and Alexander, correct?

A.    Yes.

Q.    And Snypes and Alexander are at HomeSource?

A.    Right.

Q.    And you wrote this to Mr. Tatham, correct?

A.    Yeah.

Q.    And it says "We continue to have problems with our 15-amp breakers.  It seems that many of them trip on starting a vacuum cleaner or, in the garage, a miter saw."  Do you see that?

A.    I do.

Q.    Okay.  Earlier, when we were talking, you said they had not tripped inside the garage.

A.    Correct.

Q.    Okay.  But this says something different.

A.    All this is -- is white noise, as far as I'm concerned.  Because, you know, the fact is that

249

they -- that when I replaced the circuit breakers, I had no more tripping.  So all this is just white noise, as far as I'm concerned.  But -- okay.

Q.   It can be white noise to you, Mr. Vodicka, but I'm entitled to ask you questions about it --

A.   You are.

Q.   -- and you're under oath, so you've got to answer them.  Okay?

A.   Okay.

Q.   Did you ever buy this --

A.   Yeah.

Q.   -- high magnetic -- HM circuit breaker?

A.   Yeah.

Q.   When?

A.   June 28th, 2017; is that the one you're looking at?  Are you looking at mine to Stan, June 28th, 2017?  Or the one that's --

Q.   I'm looking at the one we were talking about when I pointed out that you said it trips -- this first paragraph on that back page.  I haven't turned the page yet.

A.   Oh.  "Hi Stan:  Below is the reply I got from the electrician who wired the house.  What do you think?"  That one?

Q.   No.  It's -- "I was talking to a friend of

304

STATE OF NORTH CAROLINA
COUNTY OF MECKLENBURG

I, Karen K. Kidwell, RMR, CRR, in and for the State of North Carolina, do hereby certify that there came before me on Monday, January 13, 2025, the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of his knowledge concerning the matters in controversy in this cause; that the witness was thereupon examined under oath, the examination was stenographically reported and reduced to typewriting under my direction, and the deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any attorney or counsel employed by the parties hereto or financially interested in the action.

This the 24th day of January, 2025.

*Karen Kidwell*

_____
Karen K. Kidwell, RMR, CRR
Notary Public #19971050142

KEVIN BRNICH ELECTRICAL LLC vs
SIEMENS INDUSTRY

Charles Vodicka
January 13, 2025

305

ERRATA

PAGE   LINE   CHANGE

_____   _____   _____

REASON: _____

_____   _____   _____

REASON: _____

_____   _____   _____

REASON: _____

_____   _____   _____

REASON: _____

_____   _____   _____

REASON: _____

_____   _____   _____

REASON: _____

_____   _____   _____

REASON: _____

_____   _____   _____

REASON: _____

_____   _____   _____

REASON: _____

_____   _____   _____

REASON: _____

_____   _____   _____

REASON: _____

KEVIN BRNICH ELECTRICAL LLC vs
SIEMENS INDUSTRY

Charles Vodicka
January 13, 2025

306

ACKNOWLEDGMENT OF DEPONENT

I, CHARLES HANDFORD VODICKA, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____

CHARLES HANDFORD VODICKA                    DATE

Subscribed and sworn to before me this

_____ day of _____, 20 \_\_\_\_\_.

My commission expires: _____

_____

Notary Public