# EXHIBIT 23

1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

Kevin Brnich Electrical LLC, et  )
al.,                             )
                                 )
          Plaintiffs,            ) CASE NO. 22-01229
                                 ) (MHC)
     v.                          )
                                 )
Siemens Industry, Inc.,          )
                                 )PAGES 1 - 153
          Defendant.             )
                                 )
_____ )

DEPOSITION OF PATRICK CATES

Tuesday, January 21, 2025

LOS ANGELES, CALIFORNIA

STENOGRAPHICALLY REPORTED BY:
LINDSAY A. STOKER, RDR, RMR, CRR, CRC

CA CSR No. 14373

Job No.:  2025-968924

Case 1:22-cv-01229-MHC   Document 174-27   Filed 08/04/26   Page 3 of 31
Kevin Brnich Electrical LLC v                                    Patrick Cates
Siemens Industry, Inc.                                      January 21, 2025

45

that Dave's parents knew were Big Norm Annette, and so they said, "Would you be Dave's godfather?"  So they were his godparents, but I didn't know there was that connection until -- he was raised in the town of Bridgeport, Dave was.

Q.   Did Dave install the AFCIs in your home?

A.   No.  His electrician did.

Q.   So Soupa installed the AFCIs in your home?

A.   Correct.

Q.   And how do you know that?

A.   Well, I don't know that for a fact.  But considering he was the electrician, I assumed he did.

Q.   Do you have any other lawsuits relating to your vacation home currently?

A.   No.  I don't do this.  This is very unusual for me.

Q.   And do you own your Bridgeport home?

A.   Yes.

Q.   And you brought it in '21?

A.   I bought the lot in '17, met with the architects in '18.  And at the end of '18, got the building permit.  So '19 we started building, and it took two years to get it occupied.  In April -- I believe it was April 27 of 2021 -- is when we got

46

our certificate of occupancy where we could move into it.

Q.   Okay.

A.   And I believe, in December of 2021, we went from a temporary power pole out in the backyard to operating off of the circuit, the electricity that was installed in the house.  So in December of 2021, it was a functioning house, but no one was living there.

Q.   The Bridgeport home?

A.   The Bridgeport home.

Q.   Okay.  Do you know who purchased the AFCIs that were installed in your home?

A.   I am assuming the electrician.  I don't have any idea.

Q.   Have you spoken to the electrician since --

A.   No.

Q.   Let me finish the question.

A.   Sorry.

Q.   Have you spoken to the electrician -- did you speak with the electrician before moving into your home?

A.   No.

Q.   Have you spoken to the electrician after moving into your home?

A.   No.

Q.   How do you know Soupa, last name, was the electrician?

A.   Again, I told you I met with him when it was time to place lights and stuff.  We were up there.  He and his assistant -- I have no idea what the guy's name was -- was running the electrical wires, and "Where do you want stuff where, here, whatnot?"  He did it, and then we took up the ceiling lights and stuff, and he installed all of that stuff.  So everything was done according to the code.

Q.   Okay.  So you met Soupa?

A.   Just the one time.

Q.   Okay.  And he performed all the electrical work in the home; is that correct?

A.   He or his company, yes, which is that -- one of the guys.  I told you I have no idea who he is.  He is a small guy.

Q.   Do you recall if your home was ever inspected before you moved in?

A.   Yes.

Q.   By who?

A.   The Bridge -- well, I imagine the Mono County building inspectors as normal homes are

48

inspected.

Q. Did you receive a copy of the inspection report?

A. I have a copy -- I -- okay. They have a job site where they sign off on stuff when you're building. And I do not believe I had that copy, but I know everything was signed off because I couldn't have gotten the certificate of occupancy, which I do have a copy of at home. I could not get that without everything being up to code and -- and signed off.

Q. So do you have a copy of the inspection report?

A. Not the inspection report. I have a copy that I know of. But I do have a copy of the certificate of occupancy.

Q. Do you recall if there were any issues flagged in the inspection report?

A. There were little things like my alarm bell did not work on the fire system, a few things like that. But those things are corrected before I could move in. To the best of my knowledge, there was no electrical problems that were flagged.

Q. Are you aware of the wiring that was used in your home?

52

Q.  Do you know if your town adopted those standards?

A.  I believe they have.

Q.  Have you ever --

A.  I was going to say they usually adopt what the state recommends.

Q.  Have you ever reviewed the National Electric Standards or the National Electric Code?

A.  I'm going to say yes, but that is because of the fire stuff -- the fire inspections that I used to do.  So I don't have any knowledge of electricity.  I mean, I know it will kill you, things like that.  But just for certain things concerned with the fire department, nothing to do with building or so on.

Q.  So your knowledge of the National Electric Code doesn't relate to standards with respect to residential electrical work or AFCIs?

A.  Correct.

Q.  It is in the context of your firefighter days?

A.  Correct.  Correct.  Like where smoke alarms are required and things like that.

Q.  So you have no knowledge of what that code says about AFCIs, for example?

53

A.    Correct.  I didn't even know AFCIs until we built.

Q.    And you have -- you don't know if that code sets forth particular standards about AFCIs, their use, their installation; correct?

MS. MOGENSON:  Objection.

THE WITNESS:  I am assuming they -- they say something.  I don't know what it is.

BY MR. DAILEY:

Q.    But you have never read any of those?

A.    I have never read anything about it.

Q.    Okay.  Did you purchase Siemens AFCIs?

A.    No.

Q.    The electrician would have purchased Siemens AFCIs?

A.    Correct.

Q.    Did you purchase replacement breakers?

A.    Yes, I did.  Actually, no, I didn't.  A friend of mine did but -- because he knew which ones to get.

Q.    What is the name of that friend?

A.    I believe you already have his name, Mike Klusics.

Q.    Did you ask him to purchase those on your behalf?

54

A.   I asked him -- he used to be an electrician.  He is now a fireman; so now you know you can't trust him.  And he came up, saw what the problem was, bought them and came up and put the replacements in.

Q.   And his name is Michael?

A.   Mike Klusics, yes.

Q.   So you invited him to your home?

A.   Correct.

Q.   And you explained the problems you were having?

A.   Correct.

Q.   And he told you that you should get replacement breakers; is that right?

A.   Correct.

Q.   And then he subsequently purchased those replacement breakers for you?

A.   Correct.

Q.   Did he also install them?

A.   Yes.

Q.   When did he install the replacement breakers?

A.   I think we -- around 2023.

Q.   Is Michael an electrician?

A.   He was.  He is no longer an electrician.

55

He is not a licensed electrician.  He is a firefighter now.  That is how he makes his living.

Q.   How many replacement breakers did Michael install?

A.   Six.

Q.   Okay.  Earlier you mentioned five instances or five places where you experienced nuisance tripping in your home?

A.   Correct.

Q.   The saw, the disposal, laundry, trash disposal, laundry.  Did you experience nuisance tripping anywhere else in your home?

A.   No.

Q.   And just so I have the list right, you experienced tripping with the saw, the washer and dryer, the trash disposal, and in the bathroom?

A.   Correct.  And it would not be saw.  It would be saws, multiple saws.

Q.   Did I miss any other place where you experienced nuisance tripping?

A.   No.  I believe you said five.  So -- the two garages with the saws and then the trash -- the garbage disposal and the bathroom and the laundry.

MR. DAILEY:  I want to turn to the floor plans that you provided me today and --

56

(Reporter Clarification.)

MR. DAILEY:  We have been going for an hour.  Do you want to take a quick break, water?

THE WITNESS:  Well, I am okay to go a little longer, but I think she wants to go, and I am going to say we are taking a break because I don't argue with women.

MR. DAILEY:  Good idea.  Let's take 5, 10 minutes.

THE VIDEOGRAPHER:  Off the record at 11:05 a.m.

(Recess.)

THE VIDEOGRAPHER:  Back on the record at 11:10 a.m.

MR. DAILEY:  So, Pat, I want to mark as Exhibit 2 the floor plans that you provided me this morning.  I want you to walk me through what I'm looking at.

(Exhibit 2 was marked for identification.)

BY MR. DAILEY:

Q.    And before I turn this to you and then you walk me through them, the bottom of this first document, it says "Cates Residence," referring to you; correct?

A.    Correct.

69

A.    No.  I mean, no.  Like I said, that -- all those conversations occurred before I got into the lawsuit, and that's the first time I heard the term "nuisance tripping."

Q.    So what was Dave's response when you came to him and said, "I am having this issue with the outlets"?

A.    Again, it wasn't that consistent, saying that it was the -- "you bought a cheap saw."  So Dave is -- all my saws, I've got good saws too.

Q.    Was it possible that the saw led to the tripping?  Do you know for a fact that the saw didn't have any impact on the tripping that occurred?

MS. MOGENSON:  Objection.  Foundation.

BY MR. DAILEY:

Q.    You can still answer.

A.    I can answer.  Okay.  I don't know this legal stuff here.  Okay?

Well, if the saw caused a problem for that one circuit, maybe, but I never plugged into the garbage disposal with the saw.  I never plugged into the washer dryer with the saw; so I don't think the saw is causing the problem.  I would take the idea that I have proven it is not the saw.  It's the

70

product -- those particular circuits that I have
replaced.

Q.   But you never had another electrician come
to your home and evaluate any of the outlets or the
AFCIs or the saw to rule out the saw as the possible
problem?

A.   No, I did not.

Q.   Are there Siemens AFCIs installed in all of
the rooms in your home?

A.   Everything was either Siemens or Murray,
yes.

Q.   Murray?

A.   Yeah.  Murray was a subsidiary of Siemens.

Q.   And do you know which rooms have Siemens
AFCIs versus Murray AFCIs?

MS. MOGENSON:  You have to give a verbal answer.

THE WITNESS:  I am sorry.  You didn't hear the
rattling in my head?  No, I don't know.  And I
apologize.

THE REPORTER:  No problem.

BY MR. DAILEY:

Q.   But you do know that all of the AFCIs where
you experienced nuisance tripping were Siemens
AFCIs; is that right?

A.   Not all of them.  Some of them were --

Kevin Brnich Electrical LLC v
Siemens Industry, Inc.

Patrick Cates
January 21, 2025

71

are -- some of them were Siemens, and some of them
were Murray.

Q.   Okay.

A.   And I do know for a fact that dedicated
laundry was the Siemens that was -- that was one
that tripped the most.

Q.   I want to go back to the home builder.
This is Dave?

A.   Correct.

Q.   You mentioned that he referred to you --
recommended to you by a friend?

A.   Correct.

Q.   At the time you hired Dave to build your
home, what were his credentials?  What was his home
building credentials?

A.   Well, Dave has been building in that area
for years.  He has numerous homes that he has built.
He apprenticed with another guy that built in the
area for years.  So he's -- and that's what he has
done for his living for -- well, I don't know -- 30,
40 years.  I don't know how long.

He is in his '60s now, and I know he has been
doing it when he was in -- on the high school time
frame.  He would be building on the summers with
this other guy.  So I don't know how long he has

74

strike that.  Let me ask it a different way.

How many checks did you write to Dave for the
work performed on your home?

A.   I don't have a clue.

Q.   More than one check?

A.   Numerous -- numerous checks.  He would call
and say, "Send me $30,000."  I would send $30,000,
and then he would go and say, "Okay.  I've got
another bill coming in, send me more money."

Q.   You have no way of knowing how much of that
money was actually spent on the electrician versus,
say, the plumber?

A.   Correct.

Q.   You also have no way of knowing how much of
that money was spent on, say, installation of AFCIs;
right?

A.   Correct.

Q.   Do you know how much the AFCIs that were
installed in your home cost?

A.   No.

Q.   But the checks you wrote to Dave covered
all of the electrician's work, including the
installation of the AFCIs?

A.   Correct.

MS. MOGENSON:  Objection.  Asked and answered.

75

It is fine.

THE WITNESS:  Slap my wrist.  I'm a bad boy.

BY MR. DAILEY:

Q.   And the check that you would issue to Dave, was that issued from your checking account?

A.   We had taken out an equity line of credit on our house to pay for this.  When we first started, we were writing checks out of that, and then towards the end we were writing checks out of our own personal account.  If we had the money, we could.  So he got them from either the equity line or the -- or personal checks.

Q.   And did you write these checks directly to Dave personally or to his company?

A.   I believe to Dave Casaus.  It was the -- that was his company's name, so to Dave Casaus.  It didn't say Dave Casaus Construction or anything like that, just Dave Casaus.

Q.   Okay.  Now, when you began to experience nuisance tripping, did you hire someone to review the nuisance tripping or to investigate what was happening?

A.   No.

Q.   And you didn't know that it was nuisance tripping until you learned that term from your

76

lawyers?

A.   Correct.  In that -- in that exchange at that time period.  So --

Q.   Online on the website?

A.   Right.  Never heard the term "nuisance tripping" until then.  Now I've heard it a lot.

Q.   Do you recall the name of the person who told you you were experiencing nuisance tripping, the person at the law firm?

A.   I think it was written.  I don't -- no.  To answer your question, no, I don't know who told me that.

Q.   But they told you that online, through some online sort of chat box?

A.   Exchange.  I don't -- I don't know exactly. It was in that exchange of us.  We were still researching, and we didn't even know the term "nuisance tripping" until we got associated with the lawsuit.  Now we know the term, and we know what to look for.

Q.   Okay.  Any decision -- electrical decision made about your home like the installation of AFCIs or selecting the Siemens AFCIs to install, all those were decisions made by the electrician; correct?

A.   Everything to do with the electric --

99

Q.   And sometimes that would fix the problem; correct?

A.   For a few times.

Q.   When you say "a few times," you mean it would work for a couple minutes or work for a couple days and then stop working?

A.   It would work for a few cuts because you are making cuts, and sometimes it would -- right away it would trip and not -- not work.  And then I don't know if it had to cool off.  I don't know what the processes was that made it work and not work, but I got a lot of steps in going up and down to turn the circuit breaker back on and off -- off and on, I am sorry.

Q.   And the nuisance tripping with the garbage disposal, you would flip the garbage disposal, the switch, and it wouldn't work; is that right?

A.   It wouldn't work, or sometimes it would go for a second.  Generally, it just never worked. It's like -- it never -- never tried to start with the garbage disposal.  It was like it wasn't connected.

Q.   And in the same way you did the saw issue, you would go down the circuit breaker, turn it off, turn it on.  And sometimes it would remedy the

100

problem, and sometimes it would not; is that right?

A.   A garbage disposal pretty much would remedy itself for a few times, but a few times might have been 5 times or 20 times.  I don't know what that is.  And then you would flip it on, got to take a walk on down.

Q.   And the way you knew there were issues with the circuit or with the AFCIs was because the device didn't work?

A.   Correct.

Q.   Whatever the device was?

A.   Correct.

Q.   Were any of those devices plugged into a protector surge when they didn't work?

A.   No.

Q.   Once you replaced the breakers, did you have any problems with the saw working, for example?

A.   Everything has worked fine since I replaced the -- the breakers.

Q.   No nuisance tripping?

A.   No nuisance tripping.

Q.   And you replaced the breakers when?

A.   I believe it was in '22, probably the fall of '22-ish.  I am guessing.

Q.   So between the spring of '22 and the fall

Kevin Brnich Electrical LLC v
Siemens Industry, Inc.

Patrick Cates
January 21, 2025

101

of '22, you joined this lawsuit.  You replaced the breakers.  The tripping has subsided -- has stopped?

A.  Correct.

Q.  And you attribute that solution -- the fact that the tripping is no longer happening, you attribute that to the fact that you have new breakers; is that correct?

A.  The breakers I put in are not AFCIs.  So there will be no AFCIs; so there will be no AFCI nuisance tripping.  I would like to put in AFCIs when they get reliable.  So I put in standard circuit breakers.

Q.  But you do have AFCIs in other places in your home --

A.  Correct.

Q.  -- that are still working?

A.  Correct.

Q.  And those are places where you never experience tripping?

A.  Correct.

Q.  And you know those are Siemens AFCIs because you've seen them with your own eyes?

A.  Siemens or Murray.  I can't remember which ones.

MR. DAILEY:  It's 12:07.  I promised a break.

102

So we will go off the record.

THE VIDEOGRAPHER:  One moment.  Off the record at 12:07 p.m.

(Luncheon recess taken at 12:07

p.m.)

* * *

137

A.   Correct.

Q.   And any of the contractors who did work on your home -- the plumber, the electrician -- you had no sort of contractual relationship with them; correct?

MS. MOGENSON:  Objection.

THE WITNESS:  Correct.

BY MR. DAILEY:

Q.   And David would have that relationship with the contractors?

A.   Correct.

MS. MOGENSON:  Objection.

BY MR. DAILEY:

Q.   Do you know if David or the electrician ever called Siemens about the AFCIs?

MS. MOGENSON:  Objection.

THE WITNESS:  No, I don't know.

BY MR. DAILEY:

Q.   Did they ever tell you that they called Siemens about the AFCIs?

A.   No.

Q.   Do you know if the AFCIs that were used in your home were under warranty?

A.   No.

Q.   Do you know if any of the replacements were

138

covered by warranty?

A.   No.

Q.   And you didn't call Siemens about replacing the AFCIs at any time; right?

A.   No.

Q.   And you only replaced the tripping AFCIs; correct?

A.   Correct.

Q.   Or six of those; right?

A.   There were five that were tripping.  I replaced the sixth for the refrigerator just to make sure that that didn't trip.

Q.   But the sixth was not tripping, but you replaced it anyway?

A.   Correct.

Q.   And why did you do that?  Why did you replace the one that wasn't tripping?

A.   It would seem to me that, if they're tripping when a motor starts up and there's a motor in a refrigerator, I didn't want it tripping when I wasn't around.  And I had food in the refrigerator, and the food would spoil, and I've got a nasty mess. So I figured it was worthwhile to replace it.

Q.   So you replaced it because you thought something could happen with that AFCI?

139

A.    Correct.

Q.    Nothing had happened?

A.    Correct.  And I never said it has.

Q.    Okay.  Do you know the amount of cost associated with the replacement of these six AFCIs?

MS. MOGENSON:  Objection.

THE WITNESS:  I don't know.  I think it was like $60, $80, Home Depot, something like that.  They don't cost that much.

BY MR. DAILEY:

Q.    And -- and you didn't pay Mike for his labor?

A.    Correct.

Q.    And you did pay Mike to cover the cost of the AFCIs; right?

A.    Correct.

Q.    He purchased them, and then you paid him back?

A.    Correct.

Q.    Do you have a receipt of the purchase?

A.    No.

Q.    Did you ever see a receipt of the purchase?

A.    Nope.

Q.    The replacement breakers that you purchased, how did you determine which type of

140

breaker to purchase?

A.   I didn't.

Q.   Who -- who made that decision?

A.   Mike.

Q.   Now, I thought he -- I thought you reached out to him, or he told you that you had the wrong size?

A.   Well --

Q.   Did he say something more than that?

A.   He said I had the wrong type that would not fit in there.  Like you said, maybe the wrong size.  The -- and he purchased the right size that would fit in there.  I purchased the right amperage -- or I purchased ones that would fit in a Siemens-Murray panel.  For example, I bought -- I bought Chevy and needed a Ford.  So he got the Ford part that would fit.

Q.   I mean, you have not had any issues with the new ones?

A.   Correct.

Q.   And they have been in since 2023?

A.   Correct.

Q.   Is there any reason why after you began experiencing the tripping you didn't seek to speak with the electrician who installed the AFCIs?

143

MR. DAILEY:  I am going to show you what we will now mark as Exhibit 8.  So we are on 7 now?

THE REPORTER:  Yeah.

(Exhibit 7 was marked for identification.)

BY MR. DAILEY:

Q.   Okay.  So you were not aware of a Kevin Bowin; is that right?

A.   Not that I know of.

Q.   The friend that you mentioned purchased the replacement breakers on your behalf.  That's Mike, whom we have been talking about?

A.   Right.

Q.   And he purchased those at no cost to you. In other words, he installed those for free; correct?

A.   He installed them for free, and I repaid him for what he paid for the breakers -- breakers.

Q.   Okay.  And David, the home builder's last name is C-a-s-a-u-s; correct?

A.   Yes.

Q.   And you met Mike through David?

A.   No.

Q.   No?  How did you meet Mike?

A.   Mike is a neighbor of mine.  He is a

144

fireman for Santa Barbara County, and we fished together.

Q.    And so David's -- David's recommendation to you about resolving the tripping issue did not include speaking to an electrician or -- or any third party?

A.    Correct.

Q.    In your responses to our first set of interrogatories, these are the new responses that we talked about earlier today that are dated December 13th of last year.  You mentioned spending $80 on AFCIs -- the replacement AFCIs.  Is that in reference to the replacement breakers?

A.    For Mike.  That I paid Mike for the replacement breakers, if I can talk.

Q.    And are there any other out-of-pocket expenses that you incurred for the replacement breakers?

A.    No.

Q.    Do you have receipts for those replacement breakers?

A.    No.

Q.    And the replacement breakers that you paid Mike for, those were purchased at Home Depot; correct?

145

A.    I believe so, yes.

Q.    How much time do you think it took Mr. --
Mr. Mike to install the new replacement breakers?

MS. MOGENSON:  Objection.

You can answer.

THE WITNESS:  Two, three hours.

BY MR. DAILEY:

Q.    And did he install the new replacement
breakers all the same day?

A.    Correct.

Q.    Okay.  And I think you -- I recall you
saying that Mike lives a good distance away from
where you live; is that right?

A.    No.  He lives close to me.  He is about a
quarter mile from where I live in Newbury Park, but
we are 383 miles away to the vacation home.

Q.    All right.  So Mike is your neighbor at
your primary residence?

A.    Correct.

Q.    So Mike drove from Newbury Park up to Twin
Lakes -- to Bridgeport to install the replacement
breakers?

A.    Correct.

Q.    Do you know if the replacement breakers
were purchased in Newbury Park or up where your

152

I certify or declare under declaration under penalty of perjury that the foregoing testimony is true and correct.

Executed this _____ day of _____, 2024, at _____, California.


_____
                    PATRICK CATES

153

STATE OF CALIFORNIA    )

                       )   ss.

COUNTY OF ORANGE       )

            I, LINDSAY ANNE STOKER, RDR, RMR, CRR, CRC,

and Certified Shorthand Reporter of the State of

California, does hereby certify:

            That the foregoing deposition was taken

before me at the time and place therein set forth, at

which time the witness was duly sworn by me;

            That the statements made on the record were

recorded stenographically by me and were thereafter

transcribed; said transcript being a true and correct

copy of the proceedings thereof;

            I further certify that I am neither counsel for

nor related to any party to said action, nor in any way

interested in the outcome thereof;

            Further, that if the foregoing pertains to the

original transcript of a deposition in a federal case,

before completion of the proceedings, review of the

transcript was not requested/offered on the record.

            In witness whereof, I have subscribed my name,

this 4th day of February, 2024.

_____

            Lindsay A. Stoker, RDR, RMR, CRR, CRC
            CA CSR No. 14373

READ/SIGN DEPOSITION OF: __Patrick Cates__
DATE OF DEPOSITION: 1-21-2025
IN THE MATTER OF: Kevin Brnich Electrical v Siemens Industry, Inc.

DO NOT WRITE ON THE DEPOSITION ITSELF

| Page | Line | Changes or corrections and reason | |
|------|------|------------------------------------|-|
| 15 | 11 | Change: 43 to 44 | Reason: correction |
| 15 | 12 | Change: 40 to 41 | Reason: correction |
| 43 | 1, 3 | Change: Casus to Casaus | Reason: correction |
| 46 | 4, 7 | Change: 2021 to 2020 | Reason: correction |
| 49 | 6 | Change: Gronex to Romex | Reason: typo |
| 53 | 23 | Change: Klusics to Klusyk | Reason: typo |
| 54 | 7 | Change: Klusics to Klusyk | Reason: typo |

55    17-18    See below

Change: "Correct. And it would not be saw. It would be saws, multiple saws." to

"I experienced nuisance tripping with the circuit breakers to which the saws were plugged into."

Reason: clarification to make it clear the issue discussed was with the circuit breakers

55    21-23    See below

Change: "No. I believe you said five. So -- the two garages with the saws and then

the trash -- the garbage disposal and the bathroom and the laundry."   to

"I experienced nuisance tripping with the circuit breakers in the following places:

two in garage, the garbage disposal, the bathroom, and the laundry."

Reason: clarification to make it clear the issue discussed was with the circuit breakers

I have inspected and read my deposition and have listed all changes and corrections above, along with my reason therefor.

DATE: 2/24/2025    SIGNATURE: /s/ Patrick Cates

**Lexitas**
**(888) 267-1200**