# EXHIBIT 25

1

                IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA


Kevin Brnich            )
Electrical, LLC, et al. )
                        )
        Plaintiffs,     )
                        )    Civil Action No:
   vs.                  )    22-01229 (MHC)
                        )
Siemens Industry, Inc., )
                        )
        Defendant.      )


            VIDEOTAPED DEPOSITION OF TYLER BARRETTE,

       taken pursuant to notice before Beth Gaige,

       RPR, New Hampshire LCR, at the offices of

       Rath, Young and Pignatelli, P.C., One Capital

       Plaza, Concord, New Hampshire, on May 5, 2025,

       commencing at 9:09 a.m.

116

valid and current.

Q. Okay.  So -- and you just gave him a call?

A. Yes.

Q. How long was that call?

A. Probably a half hour to an hour.  I don't recall the exact length.

Q. Okay.  And did you guys schedule during that call roughly September 2021?

A. In that area, yes.

Q. Okay.  How long before -- well, during that call, did you schedule a visit to your home?

A. I believe we did, yes.

Q. What did you guys discuss during that call, that initial call?

A. During the initial call I basically just explained the problems that I was experiencing and asked if he could come and take a look.

Q. Did you ask him about his rates?

A. No.  We had actually -- we had used him before, so we were familiar with him.

Q. When did you use him before?

A. We used him pretty much right when we moved in, maybe a month or so after we moved in, to install that -- the dryer outlet that I mentioned, the 220 dedicated outlet in the

117

laundry room.  That did not come with the house, so we had him add that.

Q.  Okay.  So when you went on Craigslist to find this electrician, it wasn't because of the AFCI tripping.

A.  Correct.  We already knew the electrician from the previous work he had done for us.

Q.  Okay.  And you were satisfied with his work with the laundry -- with the -- in the laundry room?

A.  Yes.

Q.  Okay.  And so from the date that you spoke to him to schedule a visit, how long did it take for him -- well, actually scratch that question.  It was terrible.

After you spoke to the electrician and you told him your issues, what happened next?

A.  He came out to our office and -- that was the first time he came out to our house.  He spent at least four hours troubleshooting seeing if there was anything he could identify immediately as far as, you know, is -- is this a real issue, are there arcs happening that we should be worried about.  He found no evidence of electrical arcing.

118

I believe during that first visit we also did some of that unplug testing where we unplugged all the devices and just left the lights on.

Q. Do you know what day he came to your house?

A. I don't recall the exact date.

Q. Do you know if it was a weekday or a weekend?

A. I don't recall, no.

Q. Was anybody home besides you?

A. I believe my wife Julia was also home.

Q. Okay.  Do you know, did he come -- what time of day the electrician came?

A. I think he was there kind of midmorning before noon.

Q. Does this electrician have, like, a -- some -- some electricians have, like, a fixed fee. Meaning, like, if I come in, it's automatically $100 plus whatever else.

Like, did he have, like, a troubleshooting fee?

Are you aware of him providing you with a troubleshooting fee?

A. So we -- we did compensate him for his time. I don't know if there was, like, a flat fee just for showing up.

Q. So during that -- so when he -- on whatever day that he came and he spent four hours, you paid him for that day?

A. Yeah, but I believe we did pay for the troubleshooting separately as we went.

Q. Okay.  Just making sure I'm clear and the record is clear.

That -- what's the name of the electrician?

A. His name is Keith Bowen.

Q. Okay.  So Mr. Bowen comes out for one day so far.

Did he get paid for his -- did he get paid for the four hours he came to troubleshoot in a separate payment or was there just one payment for that day?

A. I'm not sure I understand.  That kind of sounded like the same thing to me.

Q. Okay.  That's what I'm trying to clarify.

Was Mr. Bowen paid for the four hours the day he come -- came?

A. Oh.  I don't actually recall if we paid him that day or -- or after the fact.  I don't recall.

Q. Okay.  Do you recall what his hourly fee was?

120

A.   I don't know that he charged us an hourly
     exactly.  I think it was more just fair value
     based on the work performed at the end of the
     day.

Q.   Do you recall how much that was or do you
     recall the total cost?

A.   Of that first visit?  I -- I don't recall, no.

Q.   Was it more or less than $500?

A.   Probably less than $500.  I don't recall the
     exact amount.

Q.   More or less than a hundred dollars?

A.   More than a hundred dollars.

Q.   Okay.  So between a hundred and $500?

A.   That seems fair, yes.

Q.   So during your first call with Mr. Bowen, were
     there any discussions about what could be
     causing your issue during that specific call?

A.   During that first call, I think I remember he
     asked me if we had added any new devices.
     Like, that was his first thought, was did we
     plug in anything else new, to which I answered
     no, we -- we hadn't.

Q.   Okay.  What else?

A.   The only other thing we discussed was the --
     the fact that it usually is related to bad or

121

old wiring; but, of course, he had been to our house before.  He knew it was a new build, and so he wasn't really looking at that as a likely cause at that time.

Q.  Okay.  Okay.  So walk me to -- walk me through Mr. Bowen's first visit.  He comes in midmorning.

What happens next?

A.  Excuse me.  The first thing he asked me to do is just try to reproduce the issue while he was there.  That proved not difficult but time consuming because it's -- it doesn't always happen.  So we just did our best to kind of load the system to try to force the issue.

So I went in and turned on my computer and the monitors and everything I could turn on in my room.  The amplifier stayed off.  But just turning on the computer and the monitors we were able to make a trip happen within the first hour or so.

Q.  Okay.  And then what did he do next?

A.  So at that point I believe he did some physical inspection of the wiring near the circuit breaker in the garage.

Q.  How?

122

A.   He removed part of the panel and was able to
kind of look behind and do a visual inspection
that way.

Q.   Did he have any tools with him?

A.   Yes.  His truck always has tools in it.

Q.   But inside your home when he --

A.   Oh, like, did he bring tools in?

Q.   Well, let me -- let me clarify.

Did he bring -- did he use any tools
specifically for that physical inspection of
the wiring behind the panel?

A.   I saw him use a screwdriver to take the panel
off, but beyond that I -- I didn't see any
specialized tools.

Q.   Okay.  So it was just a visual inspection?

A.   As far as I know, yes.

Q.   Was he speaking to you at that time while he
was inspecting?

A.   Yeah, there was some back and forth.

Q.   What was the back and forth?

A.   Just kind of him explaining what -- what he
was looking at, asking me some questions
about, you know, when did it start and how
often does it happen.

Q.   Do you know if he looked at any plugs as a

part of the visual inspection of the wiring?

A.   I know he did inspect the outer plugs in my office, but no faceplates were taken off or anything like that.

Q.   Did he also do a -- so I know you guys were in your home office.

Did he also look at the other office space on the top floor?

A.   No, because at that point the tripping was not happening upstairs.

Q.   Okay.  So Mr. Bowen visited in September 2021 but that was before your wife's first instance of tripping on the top floor.

Do I have that timeline correct?

A.   I believe so.  To the best of my recollection.

Q.   Okay.  Do you recall during Mr. Bowen's investigation, physical inspection of the wiring, did he tell you about any damaged wires?

A.   No.

Q.   Okay.

A.   He found no -- no evidence of damage.  The other component he mentioned was smell is oftentimes an indicator.  When the arcs happen, they can burn or even just singe

124

areas, and that can lead to a kind of a burned singed smell, but we didn't identify any of that.

Q. Okay. Did he say anything about noisy circuit breakers?

A. Not that I recall, no.

Q. Did he provide you with, like, a testing report?

A. Not in any official document. He just verbally informed me that he had found no issues.

Q. And so how do you and Mr. Bowen communicate typically?

A. Mostly through phone call, I would say. Occasionally though text message.

Q. How -- when did you guys start texting?

A. I don't recall the exact date. I know we have a document in here somewhere that has those texts. I believe it was August or September of '21.

Q. Have you used Mr. Bowen for any other electrical work?

A. So when we first moved in, there was the -- the dryer outlet that I had already mentioned.

We also had him install a -- this was

125

later well -- well after the facts of this case; but he came in and installed a wall charger for an electric vehicle, as well.

Q. When did you have your wall charger installed for your electric vehicle?

A. I don't recall the exact date. I just know it was this -- after we had put the replacement breakers in.

Q. 2022, 2023?

A. I mean, to the best of my recollection, that -- that sounds about right. I don't have the exact point in time.

Q. Okay. So Mr. Bowen -- so in the -- he shows up. In the first hour you guys were able to create -- you -- you were able to make a trip happen. And then he does the physical inspection of the wiring.

What else does he do after that?

A. So at that point we did some of the reducing load testing, unplugging things and trying to see if the -- the issue still persisted, which we were also able to make that happen on his first visit.

Q. So when you say reducing load, how did you guys do that?

132

or the other.  It was probably around 500.

Q.  Okay.  But no more than -- it wasn't anywhere
near, like, $1,000?

A.  No.

Q.  Okay.  Now, I'm talking about his
investigation work that he did for you.

Roughly do you recall how much he charged
you?

A.  I don't recall the dollar amount at this time,
no.

Q.  Do you recall how much you may have given
him -- I'm assuming you -- you paid with cash,
correct; you gave him cash?

A.  Yes.

Q.  And when you say cash, was it actual physical
dollar bills or was it, like, a check?

A.  Actual physical dollar bills.

Q.  And not talking about the actual parts for the
replacement but for his actual labor, do you
have an average of what he charged you?

A.  To be clear, we're talking about what he did
bill for the full replacement of everything?

Q.  No.  Just after the two visits, he's doing
troubleshooting for you, is he getting paid
for that?

133

A.   Yeah.  I believe we did pay him for those separately from the final when we actually had him replace everything.

Q.   Okay.  And but sitting here today, do you recall how much that first part, for the troubleshooting, how much he was paid?

A.   I don't recall the exact dollar amount, no.

Q.   Okay.  I wanted to backtrack on something you testified earlier.

     I know you tried to reach out to the agent that was in contact with your builder.

     Did you ever inquire about the electrician that did the installation, the wiring for your home?

A.   We weren't really sure who to inquire about that, other than the builder.  That was actually why we were trying to get in contact with the builder.

Q.   Okay.  So after Mr. Bowen's second visit, what was discussed?

A.   So after that second visit, the next steps he discussed with me were to try just swapping the breakers that were having problems out with breakers from a -- or sorry.

     The next steps after that second visit

KEVIN BRNICH ELECTRICAL vs
SIEMENS INDUSTRY

Tyler Barrette
May 05, 2025

134

were to replace those two breakers that were having problems with identical Siemens AFCI breakers, the same make, same model, same amperage, just to drop those in, brand-new ones, as a replacement to see if that fixed the issue.

Q. Okay.  And you were in agreement?

A. Yeah, that seemed like a reasonable next step.

Q. And so I just want to make sure I understand.

He told you to -- his advice was to replace the two breakers.

There were other breakers in that panel that were AFCIs -- Siemens AFCIs, correct?

A. Yes.

Q. Okay.  And he did not recommend to replace those at that time?

A. Not at that time because we weren't experiencing issues on any of the other breakers at that time.

Q. Okay.  And so did he give you a dollar amount regarding the cost to replace the two breakers?

A. He actually did not charge us for that one. He bought the breakers himself and retained them afterwards.  So he -- he bought them -- I

Case 1:22-cv-01229-MHC   Document 174-29   Filed 08/04/26   Page 16 of 28
KEVIN BRNICH ELECTRICAL vs
SIEMENS INDUSTRY

Tyler Barrette
May 05, 2025

135

guess you could consider it part of his tool set that he used just for the troubleshooting and took with him after the troubleshooting was done.

Q.  Okay.  So I just want to make sure I understand.

He replaced it -- he replaced the two breakers for you guys to keep or is it just as a part of the troubleshooting?

A.  Just as a part of the troubleshooting.

Q.  Okay.

A.  We did not keep the two he bought.  He took them with him at the end of the visit.

Q.  So if -- say if, hypothetically speaking, if the two breakers -- say if the -- say if replacement of the two breakers worked, you had no issue, would you then be required to now buy two additional breakers or would he have let you keep that?

A.  I mean, this feels like I'd have to speculate. I don't know -- I mean, I assume he would charge me for them, but he would probably let me keep them.

Q.  Okay.

A.  But that's pure speculation.  I'm not him.  I

142

try a Square D?

A. I definitely can't speak to what his go-to might be. I don't -- he definitely -- he didn't pull something off of his truck. I know he went out and bought new ones for the -- for the purpose of this.

Q. Okay. And he did not charge you for it -- that two that he replaced, the Square D, correct, the -- okay.

A. Correct.

Q. Okay. And then after you had replaced -- after he had replaced the two circuits with the Square D, what happened?

A. So after having those replaced, I think we gave it a week or so of just seeing if that had fixed the problem, and we observed no trips, not one single trip during that evaluation period, which was approximately one week.

Q. Why was this observation longer than the first time when the Siemens AFCI were replaced with identical model?

A. I wanted to give this one a little extra time, because it seemed like it actually had resolved the issue. Just to be sure the extra

KEVIN BRNICH ELECTRICAL vs
SIEMENS INDUSTRY

Tyler Barrette
May 05, 2025

143

time seemed warranted.

Q.   Okay.  And during that one-week observation, were you hearing from Mr. Bowen?

A.   I mean, he -- I don't recall any specific interactions.  He -- he may have checked in to ask if -- if any issues.  I, of course, told him no issues, and no meaningful or substantive conversations.

Q.   Okay.  And after one week, what happened?

A.   That's pretty much when I decided that, you know, this seems to have fixed the issue and I -- I wanted to call the issue resolved.  At which point Mr. Bowen informed me that the way we had set that up was not going to fly with New Hampshire electric code.  It -- it goes against code to mix and match different vendors in the same electrical box, which led me to the path of now I have to replace everything in the box.

     So we started down that path of shopping for parts and doing the full replacement of every breaker and the panel itself.

Q.   Did Mr. Bowen ever make -- were you aware that there was this New Hampshire electrical code at the time he had suggested swapping out with

KEVIN BRNICH ELECTRICAL vs
SIEMENS INDUSTRY

Tyler Barrette
May 05, 2025

144

a different brand?

A. I believe he did mention it at the time we did the initial swap and informed me that this was just for troubleshooting purposes and that we couldn't leave it in that configuration.

Q. Okay.  And so after he informed you that this code now requires you to essentially replace everything, did he give you a cost?

A. I don't know if it was at the time we did the two replacements.  I think it happened after the evaluation period; but yes, he did estimate labor costs for the full replacement.

Q. And what was that?

A. It was estimated roughly $1,500.

Q. And how was this communicated to you?

A. I don't recall exactly.  Most likely over the phone, which is our primary communication method.

Q. What was your general reaction to that cost?

A. My reaction was that's more money than I would like to be spending today, but it seemed in line with the amount of work that needed to be done.

Q. Did you ever ask for an itemized bill to understand where that 1500 number was coming

163

message was a joke; but if the New Hampshire code was modified, right, and it allowed you to basically, I think what you've described as a mismatch, you wouldn't have had to replace the entire breakers, correct?

A.   Only if I had replaced the Siemens AFCI breakers with Siemens non-AFCI breakers, which again I likely would not have done because that's a safety issue.

Q.   Okay.  So let me ask you this.

Would the change in the code allow Mr. Bowen to say to you you could keep the Square D -- the two Square D replacements into the panel, would he -- would he -- would this code have allowed you to be able to keep the two Square D brands in the Siemens panel?

MR. VANDENBERG:  Objection.  Calls for speculation.

A.   So based on my understanding, no.  That is a separate part of the code that deals with mixing and matching of vendors.  That is, to my knowledge, still not allowed.

BY MS. OGUNYANWO:

Q.   Okay.  I just wanted to make sure.

The next document I will be giving you --

Case 1:22-cv-01229-MHC   Document 174-29   Filed 08/04/26   Page 21 of 28

KEVIN BRNICH ELECTRICAL vs
SIEMENS INDUSTRY

Tyler Barrette
May 05, 2025

164

so what I'm going to mark as Exhibit 6 and 7

will be PLAINTIFFS_0007, as well as

PLAINTIFFS_001.

    And, Mr. Barrette, this appears to be two

proofs of purchases regarding the Square D

AFCIs marked -- not marked -- but dated

September 7, 2021.

    MS. OGUNYANWO:  So we are going to mark

Plaintiffs_001 as Exhibit 6.

    (Deposition Exhibit No. 6 was marked for

identification.)

    (Off-the-record colloquy.)

    MS. OGUNYANWO:  And then marked as

Exhibit 7 would be -- Exhibit 7.  Hold on a

second.  This will be Exhibit 7.

    (Deposition Exhibit No. 7 was marked for

identification.)

BY MS. OGUNYANWO:

Q.  Okay.  We're going to start off with

Exhibit 6, Mr. Barrette, which should be -- at

the bottom right should be PLAINTIFFS_001.

    Do you recognize this document?

A.  I do.

Q.  And how do you recognize this document?

A.  It's familiar to me because it came from my

165

e-mail.  It's a receipt for the replacement parts that I purchased.

Q. And this was based on your -- and then before we -- actually that one, if you could go to the next exhibit, Exhibit 7, which I believe is a duplicate but might be a receipt from Home Depot.

A. (Witness complying)

Q. Do you recognize this document?

A. I do.  It appears to be a condensed receipt of all the information from the previous document.

Q. Okay.  And both are complete and accurate representations of the parts that you had to buy, correct?

A. That is correct.

Q. All right.  So first and foremost, Home Depot, are you a loyalty member?

A. I'm not.

Q. Okay.  Did Mr. Bowen -- so regarding when Mr. Bowen recommended the replacement for the Square D AFCIs, I believe, why did you choose Home Depot to make your purchase?

A. Location, convenience.  There aren't too many hardware stores around in rural New Hampshire.

166

Q.  Were these parts delivered to you or did you
have to pick them up?

A.  I picked them up myself.

Q.  Okay.  Did Mr. Bowen give you the make and
model of what you should choose or did you do
that on your own?

A.  So what he gave me were instructions on how to
match the models one to one so that we're
getting exact replacements for the Siemens
equipment; but I took that information and
then made the decisions and the choices
myself.

Q.  And how did he provide these instructions?

A.  To the best of my recollection, verbally over
the phone.

Q.  Do you recall writing them down?

A.  No.  It was fairly straightforward.

Q.  Okay.  And so in total you roughly paid
$666.01 regarding the parts that you needed to
replace the AFCIs; is that correct?

A.  That is correct.

Q.  Do you recall what Mr. Bowen had estimated
what the parts would be if he were to get it
himself?

A.  I don't recall the exact amount.  I just know

Case 1:22-cv-01229-MHC   Document 174-29   Filed 08/04/26   Page 24 of 28

KEVIN BRNICH ELECTRICAL vs
SIEMENS INDUSTRY

Tyler Barrette
May 05, 2025

169

package?

A.  I don't know that I ever got that in writing or anything; but yeah, he's -- he definitely puts his name behind his work.  If there was a problem with the work he had done, he would come back out quickly.  Absolutely.

Q.  Was Home Depot your regular go-to for home related repairs?

A.  I don't know that I have a go-to.  We don't -- we don't do much in this line.

Q.  Okay.  Did you do any research independently of what Mr. Bowen recommended to you regarding what you bought September 7, 2021?

A.  No.

Q.  Do you know if there was any coupon or sale going on regarding the AFCIs you were selected -- that -- that were selected for purchase?

A.  There was no sale that I'm aware of, no.

Q.  Did you ever inquire with Mr. Bowen for an itemized bill?

A.  No.

        MS. OGUNYANWO:  I just have a couple more questions for you, Mr. Barrette, but I think now is going to be a good time to take a

170

break.  Let me readjust my notes, and I think in less than an hour we should be ready.

THE VIDEOGRAPHER:  This concludes Media No. 6.  Going off record 2:09 p.m.

(Recess taken.)

THE VIDEOGRAPHER:  Here marks the beginning of Media No. 7.  Going back on record 2:26 p.m.

MS. OGUNYANWO:  Okay.  Mr. Barrette, welcome back.  Thank you again for your time. Just have a couple of questions for you.

BY MS. OGUNYANWO:

Q.  From the time that you moved into your home, which was roughly late summer, early fall of 2020 to August 2021, you did not experience any unwanted tripping, correct?

A.  That's correct.

Q.  So roughly about 10 to 12 months the Siemens AFCI gave you no issue?

A.  Correct.

Q.  And your home that you moved into in 2020 was a new build, correct?

A.  Yes.

Q.  And you personally had no involvement in the selection of the Siemens AFCI that was

171

installed in your home?

A.   Correct.

Q.   No builder or agent made any representation
that the value of your home increased because
of the Siemens AFCI, correct?

A.   Correct.

Q.   And during -- at all relevant times regarding
the unwanted tripping, you personally did not
make any contact with Siemens, correct?

A.   Correct.

Q.   You chose not to?

A.   Correct.

Q.   Your electrician did not contact Siemens
regarding troubleshooting -- any
troubleshooting for the AFCIs, correct?

A.   Not that I'm aware of.

Q.   And you did not rely on any troubleshooting
materials that were available online by
Siemens, correct?

A.   I was not aware of the materials at that time.

Q.   But you had an opportunity -- you could have
gone online and looked for it, correct?

A.   To be clear, I -- I did look for -- I guess I
didn't specifically look for Siemens
troubleshooting guide, but I did look up

172

generic resources, and the Siemens resources

did not come up in that search.

Q.  All right.  So sitting here today, you can't

say that the troubleshooting materials --

Siemens troubleshooting materials do not

exist, correct?

A.  I cannot be certain of that.

Q.  Okay.  And you did not reach out to Siemens at

any time for a refund, correct?

A.  Correct.

Q.  Okay.  And what injuries -- if you had to

describe for me, what injuries did you sustain

as a result of the unwanted tripping?

A.  I guess the first and most obvious one is loss

of work.  It was -- you know, it happened

during my workday where I may be working on a

document that may be lost due to the sudden

power outage.

In addition to that, just every time I

had to kind of get up and -- and walk over and

reset the breakers, and each one -- it's not

the most frustrating thing to deal with one at

a time, but when you're getting up every

couple minutes or every hour to do it, it

starts to add up and that frustration

179

STATE OF NEW HAMPSHIRE

I, Beth Gaige, RPR, and licensed court reporter in the State of New Hampshire, do hereby certify that the within-named deponent was sworn to testify the truth, the whole truth, and nothing but the truth in the aforementioned cause of action.

I further certify that this deposition was stenographically reported by me and later reduced to print through computer-aided transcription, and the foregoing is a full and true record of the testimony given by the deponent.

I further certify that I am a disinterested person in the event or outcome of the above-named cause of action.

IN WITNESS WHEREOF, I have hereunto set my hand this   13th    day of  May, 2025.

_____
Beth Gaige, LCR/RPR
New Hampshire Lic. No: 00153