# EXHIBIT 27

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

KEVIN BRNICH ELECTRICAL,    )
LLC, et al.,                )
                            )
        Plaintiffs          )
VS.                         )  Civil Action No.
                            )  22-01229 (MHC)
SIEMENS INDUSTRY, INC.,     )
                            )
        Defendant           )


***********************************************************

ORAL AND VIDEOTAPED DEPOSITION OF JASON WYLIE

MAY 20, 2025

***********************************************************


ORAL AND VIDEOTAPED DEPOSITION OF JASON WYLIE, produced as a witness at the instance of the Defendant and duly sworn, was taken in the above styled and numbered cause on Monday, May 20, 2025, from 8:56 a.m. to 12:15 p.m., before SARA BIELAMOWICZ, CSR, RPR in and for the State of Texas, reported by computerized stenotype machine, at the offices of Eversheds Sutherland (US) LLP, 1001 Fannin Street, Suite 3700, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record herein.

Q.    Where did you -- what was the address, excuse me, of the property with the 32 acres?

A.    I don't recall.  I'd have to look on my phone.

Q.    Okay.

A.    It's -- it's in Muenster.

Q.    And you said you sold it or it's currently for sale?

A.    It's for sale.

Q.    Okay.  Other than this house in Spring, the house in Muenster, the 32 acres and then the lake house in Bowie, do you have any -- do you own any other property?

A.    We have 20 acres in Huntsville. That's where we moved our Longhorns to.

Q.    And are there any structures on that?

A.    There is a old house.

Q.    What's that currently used for?

A.    Nothing.

Q.    Okay.  And do you know what kind of electrical panel or breakers are in that house?

A.      No, I do not.

Q.      What about the lake house, do you know what kind of circuit breakers or what brand of electrical panel is in that house?

A.      No.  It's old.  I don't know. That's all I know, it's old.

Q.      When did you purchase that house?

A.      Probably ten years ago.

Q.      Okay.  So other than the house on North Ash Street, do you know what brand of electrical panel or circuit breakers are in any -- were in any of the other homes or properties that you owned?

A.      No.

Q.      And that includes your current house, correct?

A.      That's right.

Q.      I'm sorry.  Let me ask that more clearly.

A.      The Post Shadow, yes.

Q.      All right.  How did you come to find out that your house in Muenster on North Ash Street has Siemens AFCIs

39

installed?

A.    Stuart Hess, my electrician that was helping me.

Q.    Okay.  And can you explain how -- how you learned that your house had Siemens AFCIs?

A.    Yeah.  We were having problems and he was coming out and addressing them, and he couldn't -- everything was fine.  And so I think like the third time he came back he mentioned that they're Siemens and there was a problem with the breakers and some lawsuit.  And that's when I reached out to Siemens.

Q.    So the electrician told you about the lawsuit?

A.    Yeah.  I don't know how he found out.  I think he was researching the issue was how that came up.

Q.    Okay.  So I think you said that you -- the house you -- the North Ash Street house -- when I say "your home," I'm going to be referring to the North Ash Street, Muenster, home, unless I say something --

40

A.   Okay.

Q.   -- different.

A.   That's cool.

Q.   Okay?

A.   Yeah.

Q.   So was -- did you-all have that house built?

A.   Yes.

Q.   Okay.  And who built the home?

A.   Jared Smith.

Q.   And does he have a company?

A.   I think he has a tile company, but this was the first home he built.  I think it was Red River Tile.

Q.   And how did you come to the decision to have Jared, Mr. Smith build your house?

A.   He was helping us on some tile at the lake house for storm damage we had, and convinced us to go to Muenster because he lived there, and we built a house and asked him to do it.

Q.   And when the house was built there were Siemens AFCIs installed, to your understanding?

42

Q.      So you'd never worked with him before?

A.      Huh-uh.

Q.      Did you have any conversation with him about what type of electrical panel or breaker to be installed in the house?

A.      I think the only conversation we had is I just told him I wanted to make sure it was high quality and adequate for what was needed at the house.

Q.      Did you ever -- have you spoken to Mr. Hoenig since the house was completed?

A.      I have.

Q.      And when was that?

A.      After that we had a punch list that he was doing on some plugs.  And then we had to move a plug for a convection microwave, and that was it.

Q.      You said before that your breakers were breaking, so what -- did you ever talk to Mr. Hoenig once your breakers started breaking?

A.      No.

Q.      Why not?

A.      Well, they happened -- well, I really don't know why I didn't call him. But Stuart Hess was referred to us as a local guy, and Greg wasn't local.  So it was just easier to have a local guy come.

Q.      Do you know whether Mr. Hess ever talked to Mr. Hoenig about the installation of the breakers?

A.      I don't know.  I would doubt it, but I don't know.

Q.      So did you -- just to be clear, did you have any input into what type of breaker -- I don't mean brands, but AFCIs versus other types of breakers -- were installed in the home?

A.      No.

Q.      Did you have any input into what brand of breakers were installed in the home?

A.      No.

Q.      Were there any statements about -- made by Siemens -- about their breakers or AFCIs that were ever

Case 1:22-cv-01229-MHC Document 174-31 Filed 08/04/26 Page 9 of 54
KEVIN BRNICH ELECTRICAL vs
SIEMENS INDUSTRY
Jason Wylie
May 20, 2025

44

communicated to you prior to installation

of the Siemens breakers in your house?

A.    No.

Q.    Is there anything else that you
can remember talking with the contractor
about or the electrician Mr. Hoenig about
the electrical panels or the breakers in
the house?

A.    No.

Q.    And when you told Mr. Hoenig
that you wanted to make sure, you know,
that the electric work was -- and
products were high quality, did -- did he
give any specific response to that as to
what he would do to make sure that it was
high quality?

A.    All I remember is he was
talking about -- he's done it before and
we had enough -- we were going to have
two big panels.  And so he planned to do
it at a commercial grade to make sure
that we didn't have any issues.  Because
we also have a metal building that was in
the -- I don't know how it works, but we
were having a metal building out there.

We had some lighting at the front,

significant lighting at the front in the

driveway area.  So we were having a lot

of power sources, and we were having a

lot of -- like, our media room has a lot

of stuff in it, so I was just wanting to

make sure that -- that was always

important to me is making sure that we

had what we needed there.

Q.    When you say commercial grade,

what did you understand for him that he

meant by that?

A.    I don't know.  I just assumed

it would cost me more.

Q.    Do you know whether there was,

like, some other sort of line of products

that were for commercial use that were

installed as opposed to, like,

residential products?

A.    When he said that I assumed,

but I don't know.

Q.    Do you know how many Siemens

AFCIs were installed in the house?

A.    I think there's -- and I'm

really guessing -- but I think there's 20

50

Q.     Okay.  So there's the master bedroom, you said there's a guest room --

A.     So the six bedrooms -- so there would be six bedrooms, the -- it does include the back office because it's really a bedroom, but we made it an office.  In addition to the six bedrooms, there's an office, a media room, and a pantry and then the main living room.

Q.     And the pantry is in the -- is it off of the kitchen, off of the master --

A.     It's next to the kitchen.

Q.     Okay.  And you said that's got a pantry room and laundry room combined?

A.     Yes, it's kind of oversized.

Q.     How many bathrooms are there?

A.     Four full bathrooms and one half.

Q.     So you talked about your breakers breaking; can you tell me what you mean by that and when that started?

A.     It started -- it started like within 90 days of moving in.  I don't think we perceived a problem probably

Case 1:22-cv-01229-MHC    Document 174-31    Filed 08/04/26    Page 12 of 54
KEVIN BRNICH ELECTRICAL vs                                    Jason Wylie
SIEMENS INDUSTRY                                              May 20, 2025

51

until -- I don't think we had Stuart come
out until six or seven months in when it
became -- it was just focused on really
three breakers.

Q.    Let's back up.  You moved into
the house when?

A.    Gosh, I knew you were going to
ask me that.  I cannot remember exactly
when we moved in because it was a -- we
had a rental, so it was a kind of staged
move-in.  It wasn't like all at once.

So I don't remember exactly,
but it would have been either late -- I
think it was in 20 -- early 2023?  It
could have been late 2022, but I think it
was somewhere in '23.

Q.    So then when Stuart, Mr. Hess,
first came out, would that be sometime in
the middle of 2023?

A.    Yeah, the first time he came
out was in the middle of 2023.

Q.    Okay.  So what was it that you
were experiencing that ultimately caused
to you have Mr. Hess come out?

A.    Well, mainly it was in my

52

daughter's -- two of the breakers, one was in my youngest daughter's, one was in the oldest daughter's room.  And they started complaining, and I'd have to go reset the breaker.

And when I called him it started happening in our master bedroom also.  And then I called him out.  And I think what it was is I couldn't get -- I think it was my youngest daughter's room, I couldn't get the breaker to reset.

And so I called him out.  And then, like, an hour before he got there, the breaker reset.  But he still came out.

Q.   So it initially was happening in one of your daughter's rooms or both around the same time?

A.   Kind of both at the same time. More -- the breaker in my youngest daughter's room is the breaker that throws the most.  And then I would say our master bedroom throws the second, and then my oldest daughter's room one throws the least.

53

Q.     Was your oldest daughter living in the home at the time?

A.     Yeah, yeah.  She's a freshman. So she just went to college in August of last year.

Q.     Okay.  So she would have been living in the home until around August of 2024?

A.     Yeah.

Q.     Prior to having Mr. Hess come out, had you done anything to try to -- on your own to try to figure out what was causing the breakers to break or to fix the issues you were having?

A.     I just flipped the breaker back.

Q.     So you would just flip it back and then go on, and when it happened again, you go and flip it back?

A.     Yeah.

Q.     Did you have this occurring in any of the other circuits besides the master bedroom and your daughter's room?

A.     No, in fact, I don't think we had any other breakers break besides

54

those three.

Q.     When Mr. Hess came out -- and you said he had come out a few times?

A.     Uh-huh.

Q.     Do you recall how many times he's been out?

A.     I think three.  Well, three initially and then a fourth time after the lawsuit was filed -- or that I contacted the lawyers.  I don't know when it was filed actually.  I should --

Q.     What do you recall him doing the first time he came out?

A.     The first time -- I'm not sure all the things he did.  I did go out in the garage because it was taking him a long time.  And he had all the front stuff off, the metal parts off, and was testing the breakers with the machine thing.

Q.     Do you know what machine thing it was?

A.     I got no idea.

Q.     Okay.  So he did that, and then what did he do or say?

55

A.     He said everything is good.  He
didn't know what's going on.

Q.     Did he go into the rooms and
look at the wiring or appliances or
anything, the outlets in the rooms?

A.     He did ask -- well, asked what
-- which rooms they related to, and then
he looked at what was hooked up.

Q.     Do you know whether he
inspected the wiring or the -- looked in
the outlets and inspected the outlets?

A.     You know, I don't know.
Honestly I don't know.  Because he got
there, my wife was there.  He was there
for about four hours, and I don't know
what he did before I got there.

Q.     So you said he looked at what
was in -- what was plugged into them, is
that what you said?

A.     Yeah, he asked me -- we went
through what was plugged into them and
what -- because he wanted to know if
there was something that was causing it
to trip.

Q.     Did he identify anything that

56

was plugged into the outlets that would

possibly cause it to trip?

A.      No.  I mean, those rooms only

have TVs and Alexas.

Q.      Did he --

A.      One of the rooms didn't even

have a TV.

Q.      And they also have, I think --

do they have lights that are on the

circuit?

A.      Yeah.  They -- there's four LED

lights in two each of the girls' rooms,

and then in the master bedroom, there's

five LED lights with a fan.

Q.      You said -- let me make sure.

There is two lights in each of the girls'

rooms or there's four lights in the --

A.      Four in each.

Q.      Okay.

A.      They're like squared.  The

master bedroom is shaped funny, so

there's a fifth one.

Q.      And is the fan -- is there a

light attached to the fan in the master

bedroom?

57

A.     I think there is.  I never use -- I don't ever use it, so I don't know. I can't tell -- I can't tell for sure. It may just be a fan, actually, because of all the lights.

Q.     So there's five separate lights and then a fan that may or may not have a light on it?

A.     Yeah, I don't think the fan has a light on it, the more I think about it. I think it's just a, kind of a farmhouse fan.

Q.     All right.  So the first time he came out, did he say anything to you about AFCI or a certain -- there would be a certain type of breaker that would be causing --

A.     No.

Q.     Okay.  And then did -- was there any change in the breakers breaking after Mr. Hess first came out?

A.     No, huh-uh.  They kept doing it for, I think it was another 30 to 90 days, and so we called him back out.

Q.     How often would you say for,

58

let's say the youngest daughter's room,

which I think is what you said where it

happens the most.  Is that right?

    A.     Yeah.

    Q.     How often would you say it

happens that you have to go and trip the

breaker?

    A.     I would say two to four times a

month.  It wasn't -- it didn't seem like

it was every week, but it would be close

to it.  It was often.

    Q.     What about in your older

daughter's room?

    A.     That one was more like once

every other month.

    Q.     What about in the master

bedroom?

    A.     So that one kind of fluctuated.

It initially didn't do it, and then it

started doing it close to what -- close

to once a month.  And then there was a

time where before I had the whole home --

what do you call that thing, whole home

protection breaker thing put in.

    Q.     The surge protector?

KEVIN BRNICH ELECTRICAL vs
SIEMENS INDUSTRY

Jason Wylie
May 20, 2025

59

A. That, yeah. It was doing it --
it was doing it a lot. Like, I'd say
twice a month. I mean, up to twice --
seemed like twice a week, I mean, it was
doing it. It would do it when we were
trying to go to bed and we'd just leave
it and mess with it the next day.

Q. Was there any correlation to
like -- did you get any new -- a new TV
or any other -- a new Alexa or any other
new appliances in that room at any point?

A. No. Same TV, we bought --
actually I bought the TV before we moved
in. So that TV was there the whole time.
And then my daughter's room was the same
TV. It was a Christmas present.

Q. Okay. And what about the Alexa
devices?

A. Oh, yeah, those are the same.

Q. And what about the use of the
fan, do you use the fan more often in
different times of the year, for example?

A. Definitely use it more in the
summer.

Q. Did you notice whether that was

60

correlating to the trip -- breaker tripping more often, when the fan was being used?

A.      No, never noticed that.

Q.      Around what time did the master bedroom start having the breakers tripping?

A.      It was within the first few months of having the house is the first time it tripped.  It just wasn't as frequent.  It didn't seem to me anyways. I mean, there's a point you don't really -- I mean you're not really thinking, oh, these are always going to trip, initially.  And then it takes a while for you to realize it's the same ones all the time.

Q.      And so then once it -- every time they tripped you would be able to go out to the breaker panel, reset the breaker and it is fine?

A.      Yeah.

Q.      For at least -- for another few weeks or a month or --

A.      There was just that one time

65

like, okay, well, now what, you know.

Q.    Well, I mean, so what did you say?  Did you say to him, okay, well, what do you want me to do?  I mean, what am I supposed to do now?

A.    No.  He just said there's nothing -- basically, there's nothing that I can see or know of, or I don't have any suggestions.  I think I asked him, you know, do you -- do you replace them or should I replace them?  And he says, you have to rely on your -- talk to your electrician, and -- and that was it.

Q.    And when did you -- okay.  So you then at some point became involved in the lawsuit, right?

A.    Uh-huh.

Q.    So how did that come about?

A.    I think when he -- he kind of indicated that's all they, Siemens could do, then I Googled, found the law firm and emailed them.

Q.    And do you recall which law firm you emailed?

A.    Honestly I don't.  I'm assuming

66

it's the same, but I don't -- I don't

know that.

Q.      And do you recall when that

was?

A.      I don't.

Q.      How close in time was it?  Do

you remember whether it was before or

after you talked to the gentleman at

Siemens?

A.      After.  It would have been

within a week after.  He said he just

didn't, he didn't have a solution.

        And he was real nice.  I don't

want to imply that he wasn't professional

or nice.  He just didn't have a solution.

Q.      Did you ever get -- did you

ever replace the breakers or any of the

breakers?

A.      No.  After that I did because

it kept going -- I did Google noise,

because I just mentioned talking about

noise in the line.  And there was --

Google said that the home breaker thing

would help with noise in the line.

Q.      The surge protector?

Case 1:22-cv-01229-MHC    Document 174-31    Filed 08/04/26    Page 24 of 54
KEVIN BRNICH ELECTRICAL vs                                    Jason Wylie
SIEMENS INDUSTRY                                              May 20, 2025

67

A.    Yeah.  You're right, it's not a breaker.  That, the surge thing.  And then so I called Stuart and talked to him about if it would benefit to replace the breakers.  He said he does not think it would do any benefit and it would cost, it would cost money to do that.  And then I -- he didn't think the whole home thing, surge protector would matter much but I asked him to go ahead and do that.

Q.    Did he say whether he thought replacing the panel with a different brand would make any difference?

A.    Well, yeah.  He said -- I think the conversation before that we talked about you could replace the whole thing but it was going to be crazy expensive. I think it was, like, 30, $40,000, something like that.

Q.    To replace the electrical panel?

A.    Yeah, to pull all the panels out, replace all the breakers, go to a different brand.

Q.    Do you recall when you paid the

initial -- paid for the home initially.

I know you said that you had the

contractor, Mr. Smith, I think?

    A.    Uh-huh.

    Q.    And then Mr. Hoenig was the

electrician.  You said that you

contracted directly with the electrician.

Is that right?

    A.    I mean, I didn't have a written

contract, but I paid him directly.  I --

    Q.    Do you recall whether -- what

kind of invoices you received from him?

    A.    No.

    Q.    Do you recall whether you got

actual invoices?

    A.    I don't.

    Q.    So you wouldn't know whether

the electrical panel or the breakers were

itemized on the invoices that he sent you

at all?

    A.    No.

    Q.    Did you look back to see, as

part of the lawsuit in discovery request,

did you look back to see whether you had

any emails or other type of

83

A.     No.

Q.     All right.

MS. MOHR:  Why don't we take a break.

VIDEOGRAPHER:  Going off the record.  The time is 10:17 a.m.

(Recess taken from 10:17 a.m. to 10:27 a.m.)

VIDEOGRAPHER:  Going back on the record.  The time is 10:27 a.m.

Q.     (BY MS. MOHR)  Mr. Wylie, we were talking about when Mr. Hess came to your home a few times to -- to investigate the breakers that you -- the issue you were having with the breakers. Do you know at any of those times whether he looked around -- that he looked at the -- into the outlet, the wiring in the boxes behind the outlets?

A.     I don't know.  I think the only time he could have done it was that first time when he was there for like four hours before I got there.  I never saw him do that the other two times.

Q.     And you're not sure whether he

84

did it the first time?

A. Yeah, I just don't know.

Q. Okay. Do you know whether he or anybody else has used a -- well, are you aware or have you heard of a device from Siemens called the Intelli-Arc diagnostic tool?

A. I have no idea.

Q. And so you don't know whether Mr. Hess or anyone else used that at your house?

A. I don't.

Q. And that wasn't something that Mr. -- that was mentioned by the gentleman at Siemens that you spoke with?

A. No.

Q. Have you ever had an electrical fire in a home you've lived in?

A. No.

Q. Do you know anybody -- do you know anybody who has?

A. No.

Q. Do you know whether your AFCIs were under warranty when you -- when the issue started arising?

85

A.      I don't.  I don't know.

Q.      Did you go back and try to find that out?

A.      No, never thought of that.

Q.      When you spoke with the gentleman at Siemens in March 2024, around that time, did you ask about getting a refund for the AFCI -- for the breakers?

A.      No.  I was more on -- focused on getting them fixed.

Q.      At the time when you called him or you reached out to him and were speaking to him, you were aware that there was a lawsuit regarding Siemens AFCIs, right?

A.      That's right.

Q.      But you had not yet reached out and spoken with a lawyer yet?

A.      That's correct.

Q.      What's your understanding of the -- the purpose of a breaker?

A.      I really don't know.  Make sure stuff doesn't catch on fire, huh?

Q.      Did you have a general

Case 1:22-cv-01229-MHC   Document 174-31   Filed 08/04/26   Page 29 of 54
KEVIN BRNICH ELECTRICAL vs                                    Jason Wylie
SIEMENS INDUSTRY                                            May 20, 2025

86

understanding then that breakers like these are safety devices to prevent house fires?

A.     Yeah, I think that would be my expectation.

Q.     Do you have any reason to think that the breakers installed in your home in Muenster were not fulfilling the purpose of protecting the house from electrical fires?

A.     No, I have nothing to make me think that they wouldn't prevent a -- or do their job in preventing fires.

Q.     And in what way do you feel like you have been harmed by the presence of Siemens AFCI breakers in your house?

A.     Well, I mean, it's a pain in the butt when you're sitting in your room getting ready to go to bed while all you're doing is watching TV and everything goes out, or when you have to keep responding to your daughters' panic because their power is out.  And then having to pay Stuart for the stuff he did.

And I mean, I still -- they're still -- I don't know what it would take to actually make it stop and not do it. So I don't know if you'd actually have to replace the panels with different brands or if Siemens has a fix, I don't know.

Q.    You haven't looked at whether there's newer models or generations of -- of the Siemens breakers that you could use to replace the ones you have?

A.    No.  I mean, so Stuart indicated there wasn't anything available that way because it would have had to have been -- and I guess you have to go the same brand, the panel I guess.  I don't know.  I mean, he couldn't -- he had to use the same brand.  And then the guy on the phone had -- didn't have any options on that.  But I mean, if that's an option and it fixes it I would do it tomorrow, frankly.

I didn't have anybody tell me that that's an option.

Q.    So what are you seeking through the lawsuit?

88

A.    It would be nice to have that issue fixed, and then get reimbursed for my Stuart Hess stuff.

Q.    And how -- do you recall how much you paid Stuart for dealing with the -- for coming out on the breaker issue?

A.    I can't remember how much the -- I know you have the receipt for the whole home deal, and I think it was just a couple hundred dollars in addition to that.

Q.    Is there anything else you're seeking through the lawsuit other than having the issue fixed and getting reimbursed?

A.    I mean, the lawyer fees.

Q.    Now, if you move out of the home and you sell the home, you won't have the issue anymore, right?

A.    Yeah, that's true.

Q.    Have you had any discussions with your -- well, do you have a real estate agent that's helping you with the sale of the house?

A.    Yeah.

89

Q.     Have you had any discussions with the real estate breaker about breakers?

A.     Actually, yeah, I talked to her about it and if it was something that we should disclose.  And so I walked her through it and she said she didn't think it should be disclosed.

Q.     Did she say any reason why?

A.     I think because after the whole home thing it's lessened.

Q.     How much has it lessened since you put in the whole home breaker, or surge protector?

A.     I'd say -- I'd say a third.  I mean it went from really being annoying to the master bedroom it still trips. And my oldest daughter's room, I don't know that it's tripped since.  Sometimes it's hard to -- because they don't always tell you because she was at an age where she would just go flip it herself.  But as far as I know that one, I don't know if it's tripped since we've done that.

And the younger daughter's has

Q.    So you don't have any understanding that an AFCI is looking for something different when it's trying to prevent a fire than a traditional circuit breaker in a house?

MS. DEMARIS:  Objection, form.

A.    I didn't even know there were different circuit breakers.  So I'm assuming that's true.  I mean, I didn't know one was different than the other.

Q.    (BY MS. MOHR)  And do you have any understanding that different brands manufacture traditional circuit breakers and also manufacture AFCI circuit breakers?

A.    No.

Q.    So do you have any reason to think that Siemens AFCI breakers trip any more frequently than other brands of AFCI breakers?

A.    I have no idea.

Q.    Going back to paragraph 211 of Exhibit 2, the amended complaint.

A.    Yeah.

Q.    All right.  When it says -- in

98

the second sentence it said that you paid
more for the breakers than you would have
had you known they contained a defect.

What do you mean by a defect?
Or what's your understanding of what's
meant by a defect?

A.     That they over break.

Q.     And what is your basis for
believing that that's a defect in the
product itself?

A.     Well, I've never had a breaker
do that.  And it's isolated to three of
the 60 breakers, and there's no reason
for them to be doing it otherwise.  So, I
mean, the conclusion my electrician
reached was that it was a breaker
problem.

Q.     But I thought he said that the
breakers were fine and there was no
reason to replace them?

A.     Right.  But he -- from the
lawsuit there was some defect in the
breaker.  Not that the breaker physically
looked like there was something wrong,
but that there was a defect in the design

99

of the breaker.

Q.    But it wasn't happening with the other 60-something?  Did he have any reason to why only these three would have a defect?

A.    No, I think that was why he told me about the lawsuit.  Because he didn't know what else to do.

Q.    So once you --

A.    And, you know, this -- I did want to -- this mentions he replaced a breaker.  He may have.  I don't recall.

Q.    Okay?

A.    Sitting here today, but --

Q.    We'll go through the allegations in a minute.  I want to get back to this defect.

So other than your conversations with Mr. Hess, what is -- do you have any understanding of the allegations that are being made about how Siemens AFCIs are allegedly defective other than what you read about the lawsuit?

A.    So I would -- I'm going to do

103

A.    And then in context to when we use that room, we would usually wake up, go do what we were doing and come back in there.  We wouldn't hang out in our bedroom, maybe people do, we wouldn't hang out.  So we'd go in and I'd turn the TV on and we'd watch TV.

Now, there was at least two or three times I can remember where you'd go to flip the light on and it just be off.  So you'd have to go -- so I don't know what -- the TV wasn't on.

Q.    Okay.  So I just want to clarify on the TV thing though.

You're not saying it happened every time you turned on the TV?

A.    No, no I didn't mean to imply that.  My apologies if I left that impression.

Q.    So you watched TV before bed pretty much every night?

A.    Pretty much.

Q.    And it happened -- when it was most frequent in the master bedroom, it happened like once a month?

Case 1:22-cv-01229-MHC   Document 174-31   Filed 08/04/26   Page 37 of 54

KEVIN BRNICH ELECTRICAL vs
SIEMENS INDUSTRY

Jason Wylie
May 20, 2025

104

A.      Yes, once a month.  I mean,
occasionally it would do it couple times
back-to-back, but once a month would be
my best estimate.

Q.      And then that was at the most
frequent, right?  It's been less frequent
since then?

A.      Yeah.

Q.      Okay.  Okay.  Let's go back to
page -- paragraph 204 of this exhibit.

Okay.  It says that in 2022 you
had your home built.  Does that sound
right?

A.      Yeah, I think it started -- I
don't remember when in '22, but it took
like 14 months to build.

Q.      So then it says, After having a
Siemens panel with Siemens AFCI breakers
installed, plaintiff began to experience
nuisance tripping almost immediately?

A.      That's true.

Q.      Now, I think you had initially
said it was 90 -- you said it was within
90 days of moving in?

A.      I'd say it was within the first

105

90 days, yeah.

Q.    Okay.

A.    I mean, I don't know -- I couldn't tell you was it day 1, was it day 5, was it day 14.  It was -- it started happening and then it -- by day 90 it was happening more than -- you know, you start to really notice so is there something going on.

Q.    And when -- the complaint uses a term "nuisance tripping," what's your understanding of what that means?

A.    It means like not doing -- there's nothing that would that cause it to trip and it was just throwing.  Like, you know, I can understand like I'd plug in a gigantic power sprayer or something and it pops the breaker, you know.

Q.    Do you have any understanding of when an AFCI might trip that wouldn't be nuisance tripping?

A.    I guess in my mind it would be if, like, a lightning strike.  I do recall in another house we had, that was something I plugged in, and it

Case 1:22-cv-01229-MHC   Document 174-31   Filed 08/04/26   Page 39 of 54
KEVIN BRNICH ELECTRICAL vs                                        Jason Wylie
SIEMENS INDUSTRY                                                  May 20, 2025

106

immediately tripped the breaker.  And it did it like three times in row, because I wasn't -- but so there -- like, there is some reason you have a piece of equipment or something you plug in.

I guess I don't know if it was demanding too much power or something. Too much power demand?  I don't know.

Q.     Do you have any understanding that whether the AFCI breakers aren't looking just at the amount of power but they're looking at specific -- at other aspects of the power to see if there's something that might -- where there might be -- let me change that.  That was -- let me start that one over.

Do you understand that AFCI breakers aren't designed to look just at the amount of power that's in the outlet but at other aspects of the power that's going through the outlet?

MS. DEMARIS:  Objection, form.

Q.     (BY MS. MOHR)  The circuit rather?

A.     I have no idea.

134

this paragraph?

A.    No, I mean, for me it "danger bad, TV good." That's about -- that's what I'm -- that would be my scientific conclusion.

Q.    Okay.

A.    This -- when I look at this, this all seems to say something along those lines.  But I can't explain it or understand it.

Q.    So would you rather have, so I understand, a dangerous condition that's not caught or something that's overprotective and catches too often even if there's not a dangerous condition?

A.    I would think it would be relative.  If it was my oven and it threw it every once in a while, I don't know if that would bother me as much as when I'm just trying to watch TV.  So, I mean, to me it's more -- it's in context of what it was.  I don't perceive this as a -- it triggering for a dangerous issue.  I think it's just not working properly.

Q.    Why would it bother you less if

135

it was the oven?

A.    Well, it just seems like it's a more dangerous thing.  It has fire and heat and draws a whole bunch of electricity and there are special -- the wire is bigger.

Q.    Uh-huh.

A.    Because I think it has a 240.

Q.    I have the same question on page 14 and 15, the response to Interrogatory Number 7, Please describe the information that you claim Siemens failed to disclose considering your AFCIs and state your factual basis for this belief.  And then the response talks about Siemens omitting various information from various alleged material.

Did you read or hear anything about Siemens AFCIs before you -- before they were installed in your home?

A.    No.

Q.    Did you read any packaging materials that came with AFCIs?

A.    No.

136

Q.    So looking at the response to Interrogatory Number 17, do you actually have any personal knowledge about any of these supposed omissions from Siemens?

A.    I don't have personal knowledge.

Q.    On page 16, Response to Interrogatory Number 18, it -- the response is that Plaintiff has not experienced any nuisance tripping with respect to any non-Siemens AFCIs.

And so I just want to clarify, you don't know whether you've ever even had any non-Siemens AFCIs installed in any home you have lived in, have you?

A.    I don't know the brand.

Q.    Do you know whether you've had AFCIs installed in any other home?

A.    No.  I just know I've not had tripping.  So other than these I've never had nuisance tripping.  So I guess that would be not only non-Siemens, but if I had other Siemens they didn't nuisance trip.

Q.    Other types of Siemens

Q.      So was there a reason that you sent him these rather than the information about the -- what was on the circuit in the three bedrooms where you were having issues?

A.      He specifically asked for my appliances because he said that was the noise thing.  He said he wanted to make sure there wasn't an appliance that they knew caused an issue.

Q.      Did you tell him that you weren't having issues on the circuits where these were plugged in?

A.      Yeah.

Q.      Did he ask you to send information about the devices or appliances that were plugged in the circuits where you were having issues?

A.      He asked -- we went through them, what was in there, but he didn't ask for -- I may have walked -- if he said he asked me the Sony, the model, I would have just walked over and looked on my TV and on my cell phone and told him what it was.

153

Q.      So you went over that on the phone?

A.      Yeah, he walked me through each of those rooms and then he asked for the appliance stuff.  And I think I told him, Well, let me just send you the receipt because it's got all the model numbers and everything on there.

Q.      But this wasn't all of the information that you guys -- that he asked for and you gave him about devices in the home.  It was just -- the rest of it was discussed on the phone, not the email?

A.      Yeah, I think we talked about washer and dryer even.

Q.      Okay.

A.      Which, you know, was on a different circuit entirely.

Q.      Okay.  And then if you look at Exhibit 9.  And this is -- looks like an email that you sent to yourself or something?

A.      Yeah, I'm not sure.  This went to the lawyer, I think.  I'm not sure why

I sent it to -- I don't know.

Q.      It looks like maybe you took a picture of an invoice and then sent it to --

A.      Oh, that's right.  I took a picture on my phone.  That's why it says Daddy because my wife -- or my daughters hijacked my phone.

Q.      Okay.  And so you had the electrician come out in June of 2024?

A.      Yeah, this is when he did the whole home thing.

Q.      So this is the 814.50 that you paid for.  It was for the labor and materials for the -- installing the whole home surge protector?

A.      That's right.

Q.      And you were already involved in the lawsuit.  You already had -- involved in the lawsuit at that point in June of 2024, right?

A.      Yeah, I had reached out to lawyers.  I don't know, honestly, when involved, like, as far as formally when all that happened but I know that --

155

because I reached out to them after this
exchange of information with Carl Joseph.

Q.    Well, I'll represent that the
motion for leave to amend the complaint
to add you as a plaintiff was filed in
April 16th of 2024.  So would you have
been --

A.    Yeah.

Q.    -- Signed onto the lawsuit by
then?

A.    Yeah, I'm sure I -- because
they were responsive also.

Q.    Did you -- I mean, you're a
lawyer.  I'm not asking for
attorney-client privileged information.

       Did you have any discussions
with them about -- just yes or no, about
having an electrician come out and
install the surge protector?

A.    No, this is just me and Google
looking for noise.

Q.    Okay.

       (Exhibits 10 and 11 marked.)

Q.    (BY MS. MOHR)  Take a look at
what's been marked as Exhibit 10.  This

162

have.  I just don't recall learning or anything like that.

Q.    And so I'm going to ask a bunch of questions.  The answer may be no, no, no, I don't know.  That's fine.

So you have not done any research or -- you don't have any information about electrical codes requiring AFCIs as opposed to other kinds of traditional circuit breakers, right?

A.    No, no.

Q.    You don't have any information about alternatives to Siemens AFCIs and whether other types of AFCIs -- other brands of AFCIs, rather, can experience nuisance tripping the same as Siemens AFCIs do?

A.    I do not.

Q.    And you don't know anything about the design of AFCIs in general or Siemens AFCIs in particular, right?

A.    Correct, I don't.

Q.    And you don't know anything about Siemens' internal processes for updating the design of AFCIs to reduce

163

unwanted tripping, right?

A.    Correct, I don't.

Q.    And you don't know whether
Siemens has updated the design of the
AFCIs over time to address these issues,
do you?

A.    I do not.

Q.    You don't know what kind of
warnings or information came with the
Siemens AFCIs that were put in your home,
right?

A.    Correct, I don't.

Q.    Have you ever read any articles
or studies regarding Siemens AFCIs?

A.    No.

Q.    Other than the Siemens
website -- okay.  You said you looked at
the Siemens website, I know that.  What
other websites did you look at that were
pulled up from your Google searches?

A.    I don't - I think I was looking
for Siemens.

Q.    Well, you said you found a
lawsuit or the lawyers for the lawsuit,
right?

KEVIN BRNICH ELECTRICAL vs
SIEMENS INDUSTRY

Jason Wylie
May 20, 2025

164

A.      Yeah, I did.  I just, I don't remember whether -- if I looked at -- if I just picked one and looked at it and emailed them, or called them.  I don't -- so I think those were two steps.  I was looking for Siemens related to the issue, and then when we concluded talking to, I think it was Carl, the Siemens guy, then I probably added "lawyer" to my search and just picked one.

Q.      Okay.  And did you at that time read any -- any of the -- more details about what the lawsuit was about or just did you see, okay, this is about if you have a Siemens AFCI and you're having it trip more than you want to and you called the lawyer?

A.      Yeah, I saw nuisance tripping.

Q.      Okay.

A.      That's what Stuart said I had.

Q.      Okay.  But you didn't look at any, what does that mean or do any more reading to inform yourself about what exactly that means, did you?

A.      Not -- no, not like what the

170

CORRECTIONS AND SIGNATURE

WITNESS:  JASON WYLIE            DATE:  MAY 20, 2025

PAGE   LINE   CHANGE                REASON

_____

NO CHANGES
_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

I, JASON WYLIE, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted on the correction page.

_____
JASON WYLIE

172

                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF GEORGIA


KEVIN BRNICH ELECTRICAL,   )
LLC, et al.,               )
                           )
          Plaintiffs       )
VS.                        )  Civil Action No.
                           )  22-01229 (MHC)
SIEMENS INDUSTRY, INC.,    )
                           )
          Defendant        )

                    REPORTER'S CERTIFICATION
                    ORAL DEPOSITION OF JASON WYLIE
                         MAY 20, 2025

     I, SARA BIELAMOWICZ, Certified Shorthand Reporter

in and for the State of Texas, hereby certify to the

following:

     That the witness, JASON WYLIE, was duly sworn by

the officer and that the transcript of the oral

deposition is a true record of the testimony given by

the witness;

That pursuant to information given to the deposition

officer at the time said testimony was taken, the

following includes all parties of record and the amount

of time used by each party at the time of the

deposition:

173

FOR THE PLAINTIFF:
00:00
     Ms. Madison DeMaris
     ZIMMERMAN REED LLP
     1100 IDS Center
     80 South 8th Street
     Minneapolis, Minnesota  55402
     612.341.0400
     madison.demaris@zimmreed.com


FOR THE DEFENDANT:
02:56
     Ms. Stacey Mohr
     EVERSHEDS SUTHERLAND (US) LLP
     999 Peachtree Street, N.E.
     Atlanta, Georgia  30309
     404.853.8000
     staceymohr@eversheds-sutherland.com


     I further certify that pursuant to FRCP Rule 30

(f)(1) that the signature of the deponent:

__X___ was requested by the deponent or a party before

the completion of the deposition and returned within 30

days from date of receipt of the transcript.  If

returned, the attached Changes and Signature Page

contains any changes and the reasons therefor;

_____ was not requested by the deponent or a party

before the completion of the deposition.

     I further certify that I am neither attorney nor

counsel for, related to, nor employed by any of the

parties to the action in which this testimony was taken.

     Further, I am not a relative or employee of any

attorney of record in this cause, nor do I have a

174

financial interest in the action.

Subscribed and sworn to on this the 27th day of May, 2025.

SARA BIELAMOWICZ, CSR, RPR
CSR NO. 4838; Expiration Date: 10-31-26
Lexitas    Firm Registration No. 95;
Expiration Date:  1-31-27
13101 Northwest Freeway, Suite 210
Houston, Texas 77040
281-469-5580