# EXHIBIT 36

## (Redacted)

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA**

———————————————————

KEVIN BRNICH ELECTRIC LLC,
PERFORMANCE ELECTRIC, INC.,
ARTISTIC ELECTRIC INC., BOLT
ELECTRIC LLC, NATIONAL
SENTRY SECURITY SYSTEMS, INC.,
ELECTRICALIFORNIA, CHARLES
VODICKA, PATRICK CATES,
BRYAN BUTAKIS, NELS GORDON,
RICK KEYSER, TYLER BARRETTE,
and CLIFFORD OAKLEY *individually
and on behalf of all others similarly
situated*,

   Plaintiffs,

    v.

SIEMENS INDUSTRY, INC.,

   Defendant.

———————————————————

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: 1:22-cv-01229-MHC

**CLASS CERTIFICATION
EXPERT REPORT OF
KEVIN W. CAVES, PH.D.**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-1-

INTRODUCTION, ASSIGNMENT, AND SUMMARY OF OPINIONS ........................................ 2

QUALIFICATIONS ......................................................................................................... 7

I. BACKGROUND ........................................................................................................ 8

II. CLASSWIDE METHODS ARE AVAILABLE TO EVALUATE ECONOMIC INJURY TO THE CLASS ...... 10
    A.    Choice-Based Conjoint Analysis Is a Standard and Widely Accepted Economic Method for Quantifying Economic Damages ...................................... 10
    B.    Choice-Based Conjoint Is Used to Reliably Analyze Product Disclosures and Warnings ...................................................................................................... 12

III. CLASSWIDE ANALYSIS CONFIRMS A SUBSTANTIAL PRICE PREMIUM ARISING FROM SIEMENS' FAILURE TO DISCLOSE THE ALLEGED DEFECT ....................................... 14
    A.    Design of the CBC Survey ............................................................................ 14
        1.    Target Population and Screening ............................................................ 16
        2.    Attributes and Levels ............................................................................ 17
            a.    Manufacturer/Brand ............................................................................ 20
            b.    Function ...................................................................................... 21
            c.    Mounting/Connection .............................................................. 21
            d.    Interruption Rating and Current Rating ................................... 22
            e.    Poles .......................................................................................... 23
            f.    Price .......................................................................................... 24
            g.    Nuisance Tripping Disclosure ................................................. 24
            h.    Consolidated Table of Attributes and Levels .......................... 25
    B.    Results and Analysis .................................................................................... 27
        1.    The Data Demonstrate Strong Disutility for the Nuisance Tripping Defect 27
        2.    Simulation and Price Premium Analysis ................................................ 31
        3.    Siemens' Own Financial Data Indicate Siemens Could Profitably Supply Class AFCIs After Deducting The Full Price Premium ........................... 38

IV. AGGREGATE DAMAGES TO THE CLASS ARE CALCULATED USING CLASSWIDE METHODS AND DATA ............................................................................. 40

CONCLUSION ............................................................................................................. 42

APPENDIX A: SURVEY INSTRUMENT ........................................................................... A

APPENDIX B: MATERIALS RELIED UPON ..................................................................... B

APPENDIX C: CURRICULUM VITAE OF KEVIN W. CAVES .............................................. C

APPENDIX D: SENSITIVITY ANALYSIS ......................................................................... D

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-2-

### INTRODUCTION, ASSIGNMENT, AND SUMMARY OF OPINIONS

1.      I have been asked by counsel for Plaintiffs to assess whether economic injury and aggregate damages to members of the Class (defined below) can be reliably determined using data and methods common to the Class. Under Plaintiffs' theory of harm, economic injury and damages flow from discrepancies between (1) how Siemens Industry, Inc. ("Defendant" or "Siemens") marketed Class AFCIs to the Class in the actual world; and (2) how Class AFCIs would have been marketed to the Class in the but-for world, in which the certain defects alleged by Plaintiffs (described further below as the "Alleged Defect") would have been disclosed to the Class at the point of purchase. For purposes of my analysis, I assume that Plaintiffs' factual allegations, information obtained during discovery, and their understanding regarding the Alleged Defect are correct, and I assess the economic injury and damages to Class Members based on those assumptions.

2.      Plaintiffs allege that certain arc fault circuit interrupters ("AFCIs") manufactured by Siemens Industry, Inc. (the "Class AFCIs") are defective.[1] Specifically, Plaintiffs in their complaint allege that the Class AFCIs "trip in the presence of common appliances, even though they do not pose a risk due to electrical arcing, leading to excessive and frequent nuisance tripping",[2] and that "Siemens has failed to update its AFCIs to identify and ignore harmless arcing signatures caused by common appliances, especially as new appliances have been developed and electrical codes have expanded the locations where homeowners are required to use AFCIs."[3]

3.      Plaintiffs' counsel has informed me that the following defect described in paragraphs 35 and 36 of the Expert Report of Robert Durham is at issue in this litigation:

---

[1] *Kevin Brnich Electric LLC et al v. Siemens Industry, Inc., Second Amended Consolidated Class Action Complaint*, N.D. Georgia, Civil Action No.: 1:22-cv-01229 (May 12, 2025) [hereafter, Amended Complaint] ¶5.

[2] *Id.* ¶5.

[3] *Id.* ¶5.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-3-

Siemens AFCIs use an arc detection method that leads these AFCIs to trip due to common and safe voltage distortions that cause radio frequency harmonics. These distortions are generated by some models of common household appliances, electrical devices, and lighting, listed below:

1. Major household appliances, such as microwaves, ovens, washing machines, dryers, refrigerators, garage door openers and water heaters;

2. Lighting products, including LED light bulbs, Christmas lights, under cabinet lighting, light fixtures, recessed lighting, light switches, dimmers, halogen and fluorescent lights;

3. Plug-in electrical devices, like vacuum cleaners, wall charges, internet signal boosters, power tools, and printers; and,

4. Voltage distortions that may cause radio frequency harmonics from external sources, including electrical transformers and broadband power lines.

If AFCIs with the Nuisance Tripping Defect are installed on circuits with, or in the same panel of circuits serving, these devices, they may trip and shut off power when no dangerous arc fault exists.

Other current or future household products that create voltage distortions and radio frequency harmonics may also cause these same AFCIs to experience Nuisance Tripping.

Manufacturers of AFCIs with the Nuisance Tripping Defect have claimed their AFCIs are not designed to exclusively identify a true arc, but instead trip when they detect any signal that resembles an arc, even if that signal comes from a safe and properly functioning device.[4]

4.      Throughout this report, I will refer to the defect in Siemens AFCIs challenged by Plaintiffs and described above as the "Alleged Defect", or the "Nuisance Tripping Defect."

5.      I understand that Plaintiffs brought claims in their complaint on behalf of a proposed class of individuals (the "Class"), defined in the operative complaint as "Any person in the United States who purchased Siemens' AFCI breaker, except for resale."[5] Plaintiffs alternatively alleged to represent subclasses in nine states (the "Subclasses"), defined as follows:

**California Subclass**. Any person or business entity located in California who purchased a

---

[4] Expert Report of Robert Durham (October 31, 2025) [hereafter, Durham Expert Report] ¶¶35-36.

[5] Amended Complaint ¶174. The Amended Complaint defines a "Consumer Class," and distinguishes it from a "Commercial Class" comprised of "[a]ny business in the United States that installed and investigated, resolved, or attempted to resolve tripping presented by a Siemens' AFCI breaker." *Id.* I have not been asked to opine on the Commercial Class.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-4-

Siemens AFCI breaker.

**Maine Subclass.** Any person or business entity located in Maine who purchased a Siemens AFCI breaker.

**Nebraska Subclass.** Any person or business entity located in Nebraska who purchased a Siemens AFCI breaker.

**New Hampshire Subclass.** Any person or business entity located in New Hampshire who purchased a Siemens AFCI breaker.

**North Carolina Subclass.** Any person or business entity located in North Carolina who purchased a Siemens AFCI breaker.

**Oregon Subclass.** Any person or business entity located in Oregon who purchased a Siemens AFCI breaker.

**Pennsylvania Subclass.** Any person or business entity located in Pennsylvania who purchased a Siemens AFCI breaker.

**Texas Subclass.** Any person or business entity located in Texas who purchased a Siemens AFCI breaker.

**Wisconsin Subclass.** Any person or business entity located in Wisconsin who purchased a Siemens AFCI breaker.[6]

6.      The Class and the Subclasses alleged in the Complaint include electricians that purchased the Class AFCIs in order to provide electrical services,[7] as well as individuals that purchased the Class AFCIs for use in their own homes.[8]

7.      Plaintiffs allege that if the Alleged Defect had been disclosed, they would have purchased a competitor's AFCIs or paid less for the Class AFCIs.[9] Plaintiffs allege that they sustained economic injury and paid a premium for the Class AFCIs because Siemens concealed and omitted material information about how Siemens' AFCIs operated; namely, that they failed to leave a circuit energized when no dangerous arc existed in the circuit because they tripped due to

---

[6] *Id.* ¶176.

[7] *See, e.g., id.* ¶95 ("As part of its services, KB Electric purchases and installs AFCI breakers, including Siemens' AFCI breakers.")

[8] *See, e.g., id.* ¶131 (Named Plaintiff Charles Vodicka "replaced four Siemens' AFCIs with brand new ones at his own expense...")

[9] *Id.* ¶221.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-5-

appliances and other harmless conditions.[10]

8.    The materials I have relied upon in forming my opinions are footnoted throughout this report and listed in Appendix B. My analysis and conclusions regarding the existence and extent of economic injury are based on the evidence available to date. If additional relevant evidence becomes available, I reserve the right to assess the effect on my opinions (if any), and to amend my opinions if necessary.

9.    As detailed in the remainder of this report, I conclude that economic injury and aggregate damages can be reliably demonstrated using Choice-Based Conjoint ("CBC") analysis, a standard economic method common to the Class. My analysis of economic injury and damages incorporates real-world market data, including market prices and quantities, brand preferences, and detailed data on the cost of supplying the Class AFCIs, as well as information compiled from industry sources, the economic literature, interviews with professional electricians, and my own market research.

10.    I conclude that the Alleged Defect resulted in Class Members overpaying significantly for Class AFCIs. The magnitude of the overpayment ("Price Premium") is conservatively estimated at 32 percent. The Price Premium incorporates the supply side of the market by allowing Siemens to respond to decreased demand by restricting its supply of the Class

---

[10] *Id.* ¶71 ("Siemens knew that its AFCI breakers experienced abnormally high rates of nuisance tripping and omitted and concealed that fact from electricians and consumers."); *see also id.* ¶191 ("The defects Siemens concealed were material. Plaintiffs would not have purchased AFCI breakers that, like Siemens' AFCIs, failed to perform their essential purpose and caused them to repeatedly and unnecessary trip even when no dangerous arcing was occurring in the circuit."); *see also id.* ¶5 ("Siemens' AFCIs, however, fail to adequately distinguish between harmless and dangerous electrical arcs. As a result, Siemens' defective AFCI breakers suffer from nuisance tripping, where the breakers frequently and unnecessarily trip even where no dangerous electrical arc is present and there is no risk of electrical harm. Specifically, Siemens has failed to update its AFCIs to identify and ignore harmless arcing signatures caused by common appliances, especially as new appliances have been developed and electrical codes have expanded the locations where homeowners are required to use AFCIs.")

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

AFCIs in the but-for world.[11] My analysis of Siemens' financial data, detailed in Part III.B.3 below, demonstrates that Siemens could have profitably supplied the Class AFCIs even if it had reduced prices by the full amount of the Price Premium.

11.     Aggregate damages to the Class are calculated by applying the Price Premium to data on Siemens' revenue for the Class AFCIs. I have been asked by counsel for Plaintiffs to assume that the Class AFCIs include all single-function AFCIs[12] sold between January 1, 2017 and December 10, 2021 (the "Damages Period"), ████████████████████████████████████[13] According to data produced by Siemens, its revenue on Class AFCIs[14] sold in the United States during this time period came to approximately ██████████[15] Applying the Price Premium of 32 percent yields aggregate damages of approximately ██████████[16]

12.     In the alternative, I have been asked to limit the Class AFCIs to single-function

---

[11] This approach provides a more conservative estimate of damages than would be reached if one were to accept the supply of Class AFCIs as a fixed matter of historical fact, as has been done in other cases. *See, e.g., Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 606 (N.D. Cal. 2018) ("the conjoint survey…took into account the fixed quantity of supply of Canada Dry because those sales occurred in the past…The price premium study therefore passes muster under *Daubert* and Federal Rule of Evidence 702.")

[12] Single-function AFCIs protect only against arc faults, whereas dual-function AFCI/GFCIs protect against both ground faults and arc faults. *See* Part I and Part III.A.2.b below.

[13] *See Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' Fourth Set of Interrogatories* (May 12, 2025) ("The latest generation of [Siemens'] 1-pole CAFCI (Gen 4B) was released on or about December 10, 2021.")

[14] Siemens has produced both revenue data (SIEMENS_AFCI_00416123) and unit sales data (SIEMENS_AFCI_00416124). Siemens has confirmed that "[t]he updated sales data produced at SIEMENS_AFCI_00416124 reflects accurate and complete data for Siemens' AFCIs sold in the United States since 2017 and does not include data for non-AFCI products." *See* Letter from Ruben Reyna to Eric Kafka (May 8, 2025). Siemens has also confirmed that "the updated revenue data produced at SIEMENS_AFCI_00416123 reflects accurate and complete data for Siemens' AFCIs sold in the states where Plaintiffs reside since 2017 and does not include data for non-AFCI products." *See id*. In fact, SIEMENS_AFCI_00416123 includes data for all U.S. states. For purposes of this class certification report, I assume that SIEMENS_AFCI_00416123 reflects accurate and complete data for Siemens' AFCIs sold in all U.S. states since 2017.

[15] *See* Table 4 in Part IV below.

[16] *See* Table 4 in Part IV below. In the alternative, I have been asked to extend the Damages Period for six months to June 10, 2022, ████████████████████████████████████████████████ ██████ *See Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' Fourth Set of Interrogatories* (May 12, 2025) (████████████████████████████████████████████████ ██████████) Adding six months to the Damages Period increases aggregate damages from approximately ██████████████████████ *See* Caves Backup Materials, "Class AFCI Damages_withcalcs.xlsx".

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-7-

AFCIs sold between ████████ when Siemens released its "Gen 3A" AFCIs,[17] and ████████ ████████ According to data produced by Siemens, its revenue on Class AFCIs sold over this time period came to approximately ████████[18] Applying the Price Premium of 32 percent yields an alternative aggregate damages estimate of approximately ████████ [19]

13.    If damages are limited to the Subclasses, then aggregate damages come to approximately ████████ for the period beginning January 1, 2017 and ending December 10, 2021.[20] In the alternative, aggregate damages for the Subclasses are estimated at approximately ████████ for the time period beginning June 21, 2017 and ending December 10, 2021.

### QUALIFICATIONS

14.    My name is Kevin W. Caves. I am Managing Director at McClave + Associates, a nationally recognized firm with extensive expertise in economics, econometrics, and statistics. I served as Assistant Economist at the Federal Reserve Bank of New York before receiving my doctorate from the University of California at Los Angeles in 2005, specializing in applied econometrics and industrial organization. I apply my expertise in microeconomics and econometrics to a broad range of industries and research topics. I have testified as an expert witness in US district court, government agencies, and arbitration. My professional experience spans antitrust, class actions, consumer products, labor economics, mergers, price fixing, public policy analysis, sector-specific regulation, survey analysis, and other areas. I have experience in a variety of industries, including cable, broadcasting, energy, finance, freight rail, Internet & tech platforms,

---

[17] *See Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' Fourth Set of Interrogatories* (May 12, 2025) (████████████████████████████████████████████)
    *See* Table 4 in Part IV below.
[19] *See* Table 4 in Part IV below.
[20] As explained in footnote 16, *supra*, in the alternative, I have been asked to extend the Damages Period for six months. Adding six months to the Damages Period increases aggregate damages for the Subclasses from approximately ████████████████████ *See* Caves Backup Materials, "Class AFCI Damages_withcalcs.xlsx".

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-8-

healthcare, labor markets, motor vehicles, wireless and wireline networks, payment cards, personal computers, pharmaceuticals, professional sports, and others. I have designed and implemented CBC surveys in multiple litigation matters, and have testified on CBC surveys in *Baus v. Ford*[21] and *Cabrera v. Bayer*.[22]

15.     My work has been published in popular outlets, law journals and peer-reviewed economics journals, such as *The Atlantic*, *Antitrust*, *Communications & Strategies*, *Competition Policy International*, *Econometrica*, *The Economist*, *The Economist's Voice*, *George Mason Law Review*, *Information Economics & Policy*, *IT Business Edge*, *Journal of Competition Law & Economics*, *Journal of Sports Economics*, *Labor Law Journal*, *Research in Law & Economics*, and *Review of Network Economics*. I have published two book chapters, and have served on the editorial advisory board of the *Journal of Transportation Law, Logistics, & Policy*. I have published econometric techniques adopted in graduate-level curricula and integrated into STATA, a leading statistical software package. In 2023, I received the American Antitrust Institute Award for Outstanding Antitrust Litigation Achievement in Economics. A copy of my CV is attached at Appendix C. I have no financial stake in the outcome of this case. McClave + Associates is being compensated for my time at my standard hourly rate of $725.

## I. BACKGROUND

16.     A circuit breaker is "an electrical switch designed to protect an electrical circuit from damage caused by overcurrent/overload or short circuit."[23] An AFCI is a specific type of circuit breaker "that is designed to prevent electrical fires in buildings by detecting arcing electrical faults

---

[21] *Marc Baus et al. v. Ford Motor Company* (E.D. Mich.), Case No. 2:21-cv-10024-GAD-EAS.

[22] *Camille Cabrera v. Bayer Healthcare LLC et al.* (C.D. Cal.), Case No. 2:17-cv-08525-JAK.

[23] Eaton, "Circuit Breakers Fundamentals", available at: https://www.eaton.com/us/en-us/products/electrical-circuit-protection/circuit-breakers/circuit-breakers-fundamentals.html

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

in the electrical system."[24] AFCIs are designed to detect arc faults, which are "created when current flows through an unintended medium, usually directly through the air or loose connections, instead of through the wires in a circuit."[25] This arcing "creates heating at the point of the arc, sometimes exceeding 10,000°F, resulting in burning particles that may ignite surrounding material, such as wood framing or insulation."[26]

17.     AFCIs "use advanced electronic technology to 'sense' different arcing conditions by monitoring the circuit for the presence of 'normal' and 'dangerous' arcing conditions."[27] The National Electric Code ("NEC") first began to require the installation of AFCIs more than 25 years ago, "following a national call for increased electrical safety and electrical fire prevention."[28] By 2017, the NEC required that AFCIs be installed in all new residential construction and "in practically every room of a home[.]"[29] A properly functioning AFCI will "trip"–that is, shut off power to the circuit–when and only when dangerous arcing is detected.[30] Siemens AFCIs are sold through various sales and distributor locations, including electrical distributors, online sellers, and retailers such as Home Depot and Lowes.[31]

18.     AFCIs are complementary to ground fault circuit interrupters ("GFCIs"), which trip in the presence of ground faults. A ground fault occurs when electrical current takes an unintended

---

[24] NEMA_S-0062898.

[25] Amended Complaint ¶39.

[26] NEMA_S-0062898.

[27] NEMA_S-0062898.

[28] NEMA_S-0067791.

[29] Amended Complaint ¶45.

[30] Amended Complaint ¶50.

[31] *See, e.g.*, Siemens, "Arc Fault Circuit Breakers or AFCIs" ("Find where to buy Siemens products with our distributor    locator    and    at    participating    retail    partners    in    the    U.S."),    available    at https://www.siemens.com/us/en/products/energy/low-voltage/residential-circuit-breakers/residential-afci-circuit-breakers.html

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-10-

path to the ground, creating a risk of electrocution, electrocution, electric shocks and burns.[32] Some

circuit breakers are single-function AFCIs, meaning that they protect only against arc faults. Other

circuit breakers are dual-function ("AFCI/GFCIs"), which combine the functionality of both AFCIs

and GFCIs.[33]

## II. CLASSWIDE METHODS ARE AVAILABLE TO EVALUATE ECONOMIC INJURY TO THE CLASS

### A.    Choice-Based Conjoint Analysis Is a Standard and Widely Accepted Economic Method for Quantifying Economic Damages

19.    Economists have used CBC analysis for decades to study and to empirically quantify

customer preferences. CBC analysis is grounded in economic modeling techniques pioneered by

(among others) the Nobel Prize winning economist Daniel McFadden.[34] The economic modeling

---

[32] Safe Electricity, "Ground Fault Circuit Interrupters (GFCIs)", available at: https://safeelectricity.org/ground-fault-circuit-interrupters-gfcis/ *See also* National Electrical Manufacturers Association (NEMA), "What is an AFCI?," available at: https://www.afcisafety.org/afci/what-is-afci/#1469600123076-2fab3100-9afb ("There is a major difference between the functioning of an AFCI as compared to a GFCI (Ground Fault Circuit Interrupter). The function of the GFCI is to protect people from the deadly effects of electric shock that could occur if parts of an electrical appliance or tool become energized due to a ground fault. The function of the AFCI is to protect the branch circuit wiring from dangerous arcing faults that could initiate an electrical fire.")

[33] *See, e.g.,* Siemens, "Residential Dual-Function Circuit Breakers (AFCI & GFCI)", available at https://www.siemens.com/us/en/products/energy/low-voltage/residential-circuit-breakers/residential-dual-fuction-circuit-breakers.html. Dual-function AFCI/GFCIs should not be confused with combination-type AFCIs, which are designed to detect multiple types of arcing. *See* Amended Complaint ¶61. Combination-type AFCIs have been required by the National Electrical Code in new residential construction since 2008. *See, e.g.,* Texas Department of Licensing and Regulation, *Technical Bulletin IHB TB 09-02 – Combination Arc-Fault Circuit Interrupter (AFCI)* (Issued October 1, 2008; Revised July 2, 2012), available at https://www.tdlr.texas.gov/ihb/pdf/TB0902.pdf ("Article 210.12 of the 2008 NEC requires that all 120-volt, single phase, 15- and 20-ampere branch circuits supplying outlets installed in dwelling unit family rooms, dining rooms, living rooms, parlors, libraries, dens, bedrooms, sun rooms, recreation rooms, closets, hallways, finished basements, or similar rooms or areas to be protected by a listed AFCI, combination type installed to provide protection of the branch circuit.") All of the Class AFCIs are combination-type AFCIs. *See Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories* (June 19, 2024) at 4-5.
   *See also* Siemens, "Arc Fault Circuit Breakers or AFCIs", available at https://www.siemens.com/us/en/products/energy/low-voltage/residential-circuit-breakers/residential-afci-circuit-breakers.html ("Combination Type Arc Fault Circuit Interrupters (AFCIs) detect arcing faults (an unintentional arcing condition in a circuit) that standard circuit breakers are unable to detect. The device is intended to mitigate the effects of arcing faults by functioning to de-energize the circuit when an arc-fault is detected. A Combination Type AFCI detects all three types of arcing.")

[34] *See, e.g.*, Daniel McFadden, *The Choice Theory Approach to Market Research* 5(4) MARKETING SCIENCE 275-297 (1986); *see also* Daniel McFadden et al., "The Role of Conjoint Surveys In Reasonable Royalty Cases," *Law 360* (October 2013) [hereafter, McFadden (2013)]; Paul Green & V. Srinivasan, *Conjoint Analysis in Marketing: New Developments with Implications for Research and Practice* 54 JOURNAL OF MARKETING 3-19 (1990) [hereafter, Green & Srinivasan]; James Agarwal, Wayne DeSarbo, Naresh Malhotra & Vithala Rao, *An Interdisciplinary Review of*

frameworks that provide the underpinning for CBC analysis have been widely used to study a range of industries.[35]

20.    Conjoint analysis has been widely adopted by the private sector. As of the early 1980s, one study estimated that there were hundreds of commercial applications of conjoint analysis each year.[36] More recently, it has been estimated that tens of thousands of conjoint studies are conducted annually.[37] CBC has also been widely accepted by the courts as a reliable methodology.[38]

21.    CBC is used to rigorously quantify customer valuations of product attributes that are not priced separately. CBC uses survey responses to quantify the tradeoffs that customers reveal they are willing to make when selecting among different products comprised of different combinations of attributes.[39] In CBC analysis, a product is expressed as a bundle of features, and

---

*Research in Conjoint Analysis: Recent Developments and Directions for Future Research* 2 CUSTOMER NEEDS AND SOLUTIONS 19 (2015) [hereafter, Agarwal (2015)].

[35] *See, e.g.,* Gregory Werden & Luke Froeb, *The Effects of Mergers in Differentiated Products Industries: Logit Demand and Merger Policy* 10(2) JOURNAL OF LAW, ECONOMICS, & ORGANIZATION 407, 419 (1994); Aviv Nevo, *Mergers with Differentiated Products: The Case of the Ready-to-Eat Cereal Industry* 31 RAND JOURNAL OF ECONOMICS (2000). CBC is also used to survey professionals. *See, e.g.,* Janine Heck, Lars Jahnke, & Jens Leker, "Early evidence of a transition towards sustainability-oriented decision-making in the chemical industry in Germany, Austria, and Switzerland: A choice-based conjoint analysis," 187 *Energy Policy* 114028 (2024) (conjoint survey of chemical industry managers). *See also* James Wood, "5 Types of Conjoint Analysis for Healthcare Market Research," IDR Medical (December 18, 2023) ("For instance, when evaluating medical devices, conjoint analysis can help manufacturers determine which features are most important to healthcare professionals or patients.").

[36] Green & Srinivasan, *supra*, at 3, citing Dick Wittnick & Philippe Cattin, *Commercial Use of Conjoint Analysis: An Update,* 53 JOURNAL OF MARKETING 91-96 (1989).

[37] Bryan K. Orme, GETTING STARTED WITH CONJOINT ANALYSIS: STRATEGIES FOR PRICING RESEARCH, (4th ed. Research Publishers 2020) at 151 ("Since its introduction in the early 1970s, the use of conjoint analysis in commercial applications has grown exponentially…It is likely that well over 27 thousand conjoint analysis projects are conducted worldwide per year when considering all the professionals that employ conjoint-related techniques.") [hereafter, Orme (2020)].

[38] *See, e.g., Dzielak v. Whirlpool Corp.,* 2017 WL 1034197, at *5 D.N.J. (March 17, 2017) ("Conjoint analysis has won acceptance from courts and legal commentators."). *See also Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1107 (N.D. Cal. 2018) ("Kellogg does not appear to dispute 'that conjoint analysis is a well-accepted economic methodology.'"), citing *In re Dial*, 320 F.R.D. at 331; *Miller v. Fuhu Inc.*, 2015 WL 7776794, at *21 (C.D. Cal. Dec. 1, 2015) (stating that "numerous courts ... have accepted" conjoint analyses "as reliable methodologies for calculating price premiums on a classwide basis in customer class actions"); *Odyssey Wireless, Inc. v. Apple Inc.*, 2016 WL 7644790, at *9 (S.D. Cal. Sept. 14, 2017) ("Further, a conjoint analysis is a generally accepted method for valuing the individual characteristics of a product."); *Kurtz v. Kimberly Clark Corp.*, 321 F.R.D. 482, 551 (E.D.N.Y. 2017) (stating that conjoint analyses "have previously been approved in customer class actions as reliable methodologies available for calculating the price premium attributable to a product characteristic.").

[39] *See, e.g.,* Tim Stobierski, "What Is Conjoint Analysis, And How Can It Be Used?" *Harvard Business School Online* (December 18, 2020) ("Conjoint analysis is a form of statistical analysis that firms use in market research to

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-12-

each feature contributes something to the overall utility that the customer derives from the product. CBC respondents complete a series of choice tasks. In each choice task, the respondent is shown different products offered at different price points; the respondent selects which (if any) of the products the respondent would purchase in real life. By selecting the most-preferred bundle of features among the choices presented to them—that is, the choice that maximizes a respondent's utility—survey respondents reveal the value they derive from individual features.[40]

22.    CBC analysis uses data and methods common to all Class Members. The survey dataset that forms the basis for CBC analysis is the same for all Class Members. The econometric techniques used to analyze the survey database are likewise common to the Class, as are the techniques used to calculate the Price Premium attributable to the Alleged Defect. Aggregate damages are also calculated using data and methods common to the Class, by applying the (classwide) Price Premium to (classwide) data Siemens' revenue from Class AFCIs.

**B.    Choice-Based Conjoint Is Used to Reliably Analyze Product Disclosures and Warnings**

23.    From the perspective of CBC analysis, product labels, warnings, or similar information constitute product attributes and are readily incorporated into the standard CBC framework. The information conveyed by a label may be positive or negative from the customer's point of view. For example, in a 2021 study published in *Nature Scientific Reports*, the authors conducted a CBC survey in which adult e-cigarette users were asked to choose between e-cigarette

---

understand how customers value different components or features of their products or services. It's based on the principle that any product can be broken down into a set of attributes that ultimately impact users' perceived value of an item or service.") *See also* McFadden (2013), *supra* ("Today, most conjoint surveys are conducted in an online setting where survey respondents must choose among product profiles with different basic features. For example, a conjoint survey designed to elicit customer preferences with respect to colas might ask a respondent to choose among product profiles that differ in brand, amount of caffeine, type of sweetener and price.").

[40] *See, e.g.*, Agarwal (2015), *supra*; *see also* Sawtooth Software, "What is a conjoint analysis and how is it used?", available at https://sawtoothsoftware.com/conjoint-analysis.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-13-

products with different warning labels.[41] A 2017 Cambridge study used conjoint analysis to analyze

the effectiveness of nutritional labels.[42] A 2019 study used conjoint analysis to assess the effects of

claims appearing in direct-to-customer prescription drug advertising.[43] A 2011 study in the *American*

*Journal of Agricultural Economics* used conjoint analysis to examine the competitive interaction

between local labeling and other sustainability claims in the market for customer produce.[44] Conjoint

analysis has also been used to analyze product labeling claims in a litigation context.[45]

---

[41] Allison N. Baker et al., *Flavor and product messaging are the two most important drivers of electronic cigarette selection in a choice-based task*, 11 NATURE SCIENTIFIC REPORTS 4689 (2021), at 2 ("in the health warning category, the levels were 'This product contains  nicotine, a chemical known by the state of California to cause birth defects or other reproductive harm,' 'This  product contains nicotine, an addictive chemical,' and 'Not for sale to minors.'").

[42] Manuel Cabrera et al, *Nutrition warnings as front-of-pack labels: influence of design features on healthfulness perception and attentional capture,* 20(18) CAMBRIDGE CORE 3360 - 3371 (2017) [hereafter, Cabrera (2017)]; *see also* Azzurra Annunziata et al., *Nutritional information and health warnings on wine labels: Exploring customer interest and preference,* 106(1) APPETITE 58-69 (2016).

[43] Kathryn Aiken et al., *Customer tradeoff of advertising claim versus efficacy information in direct-to customer prescription drug ads* 15(12) RESEARCH IN SOCIAL AND ADMINISTRATIVE PHARMACY 1484 (2019).

[44] Yuko Onozaka et al, & Dawn Thilmany McFadden, *Does Local Labeling Complement or Compete With Other Sustainable Labels? A Conjoint Analysis of Direct And Joint Values For Fresh Produce Claims*, 93(3) AMERICAN JOURNAL OF AGRICULTURAL ECONOMICS 693–706 (2011).

[45] *See, e.g., In re FCA US LLC Monostable Elec. Gearshift Litig.,* 382 F. Supp. 3d 687, 697 (E.D. Mich. 2019) ("[C]onjoint analysis is a widely accepted method for estimating point-of-sale damages in consumer class actions alleging that product defects were concealed from buyers."); *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1105 (N.D. Cal. 2018) ("the conjoint analysis will  isolate the monetary value that customers in the cereal market (as it existed over the Consumer Class period) attached to the alleged affirmative misrepresentations. It is well-established that the "'price premium' attributable to" an alleged misrepresentation on product labeling or packaging is a valid measure of damages…"), *Id.* at 1110 ("conjoint analysis is widely-accepted as a reliable economic tool for isolating price premia[.]"); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 606 (N.D. Cal. 2018); *In re Juul Labs, Inc., Marketing Sales Practices and Products Liability Litigation, Order on Motion for Class Certification and Related Daubert Motions,* Case No. 19-md-02913-WHO (N.D. Cal. 2022) at 21 ("plaintiffs have used an accepted economic model – the conjoint study – to demonstrate the Price Premium class members paid for JUUL products."). *Id.* at 83 (the warning language used in plaintiffs' conjoint survey "was tied to plaintiffs' characterization of JLI's marketing campaigns portraying JUUL as a safer alternative to cigarettes and is based on the sorts of injuries that plaintiffs allege can be caused by use of JLI's products.")

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-14-

### III. CLASSWIDE ANALYSIS CONFIRMS A SUBSTANTIAL PRICE PREMIUM ARISING FROM SIEMENS' FAILURE TO DISCLOSE THE ALLEGED DEFECT

**A.    Design of the CBC Survey**

24.    In this section, I describe the CBC analysis, based on a survey conducted in July 2025. As detailed below, the CBC survey yielded a data set of over 82,000 data points[46] compiled from the 500 respondents in the target population of AFCI purchasers who completed the online survey described in this section.

25.    The survey included a pre-test questionnaire, shown in Appendix A.[47] Respondents who successfully completed this initial screening process moved on to complete a series of choice tasks (the "Conjoint Module.") Before finalizing and deploying the full survey, I conducted a pilot study using a draft of my survey design.[48] Professional electricians were recruited to participate in a series of "cognitive interviews," and provided their feedback on the survey.[49] A total of 15 in-depth cognitive interviews were conducted, each of which lasted approximately 30 to 45 minutes.[50]

---

[46] *See* Caves Backup Materials, "Final Survey Data.xlsx".

[47] The pre-test questionnaire consisted of Questions 1 - 14 of the survey instrument shown in Appendix A. After the pre-test, Questions 15-18 collected information on respondent demographics, before proceeding to the Conjoint Module.

[48] *See, e.g.,* Sarah Fisher, "7 Ways to pretest your survey before you send it," *Qualtrics Market Research* (November 13, 2020) [hereafter, Fisher (2020)] ("A pilot survey can give you a sense of the kind of responses you will receive and any issues that may arise during the real survey period.").

[49] *See, e.g.,* Paul Beatty & Gordon Willis, *Research Synthesis: The Practice of Cognitive Interviewing*, 71(2) PUBLIC OPINION QUARTERLY 287–311 (2007). *See also* Fisher (2020) ("Cognitive interviews are a good way to really understand what's going on in the minds of your respondents as they answer your questions. These interviews are typically performed face-to-face with a small sample of 5-15 respondents.") Although cognitive interviews can be helpful to designing a conjoint survey, they are by no means universally deployed by conjoint practitioners. *See also, e.g.,* Agarwal (2015) (no mention of cognitive interviews or focus groups); *see also* Cabrera (2017) (no mention of cognitive interviews or focus groups); *see also* Pranav Jindal, *Risk Preferences and Demand Drivers of Extended Warranties* 34(1) MARKETING SCIENCE 39-58 (2015) (no mention of cognitive interviews or focus groups in the article, or in the online appendix, available at: https://pubsonline.informs.org/doi/suppl/10.1287/mksc.2014.0879/suppl_file/mksc.2014.0879-sm-warrantiesconjoint-webappendix.pdf).

[50] The cognitive interview respondents were recruited by NewtonX, a global market research firm that specializes in facilitating interviews with and surveys of professionals in various fields. *See* https://www.newtonx.com/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-15-

26.    The purpose of the cognitive interviews was to collect feedback from respondents to ensure that the survey was clear and comprehensible. During the interviews, I discussed the survey with respondents via screen sharing. Respondents were walked through the survey questions and were asked about their comprehension of the questions of the pre-test questionnaire, as well as the choice tasks in the Conjoint Module. They were also asked whether there were any attributes that they considered important that were missing from the Conjoint Module. The interviews indicated that respondents were familiar with AFCIs and dealt with them regularly in a professional capacity. The interview subjects also agreed that the attributes included in the Conjoint Module gave them enough information to make an informed decision as to which (if any) of the AFCIs displayed they would purchase in real life. The interviews revealed some aspects of the survey that would benefit from further clarification. Accordingly, I implemented some modifications in the survey design.[51] When the final survey was deployed, over 99 percent of the respondents who completed the survey indicated they did not find any aspect of the survey to be confusing.

27.    Once the initial pilot testing was completed, the survey was finalized and deployed. A total of 500 respondents completed the survey, including the Conjoint Module. I used standard methods to confirm that a sample size of 500 respondents was more than sufficient for statistical

---

[51] For example, some interview subjects indicated that it might be challenging to compare AFCIs with different current ratings within the same choice task, given that the two types of products are used for different purposes. Accordingly, I modified the survey design such that interview subjects would only be shown AFCIs with a single current rating (either 15 or 20 Amperes) for each choice task.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-16-

purposes.[52] This was confirmed by analysis of the survey output, which yielded statistically and economically significant results.[53]

28.    As with virtually any CBC survey, it is neither possible nor advisable to fully specify every conceivable detail of the products displayed to respondents, and I do not attempt to do so here. Conjoint practitioners recognize the importance of limiting the number of attributes in a survey in order to avoid cognitive fatigue among respondents.[54] The unspecified attributes of the products at issue are held constant, allowing the CBC analysis to focus on key product attributes of interest. Accordingly, respondents were told to "assume that all of the AFCIs you are shown in the survey have very similar or identical features, except for the features that you can actually see in the survey."[55] As explained in Part III.A.2 below, AFCIs can be characterized succinctly in terms of their technical characteristics.

### 1.    Target Population and Screening

29.    To qualify for the survey, respondents answered a series of screening questions in the pre-test questionnaire, shown in Appendix A. I defined the target population to include primarily licensed electricians in the U.S. who purchased Siemens AFCIs between 2017 and the present. The target population also included non-electricians who purchased Siemens AFCIs in the U.S. between

---

[52] The minimum recommended sample size for CBC can be calculated from the following inequality: $[nta]/c \geq 500$. Here, $n$ is the number of respondents, $t$ is the number of choice tasks, $a$ is the number of alternatives per choice task (not including the "none" option) and $c$ is the largest number of levels for any attribute in the survey. In this case, we have $n = 500$, $t = 12$, $a = 3$, and $c = 5$. Therefore, $[nta]/c = 3,600$. This means that there are 3,600 representations per main-effect level—far above the minimum recommended level of 500 to 1,000. If we limit the sample to professional electricians, we have $[nta]/c = [450 \times 12 \times 3]/5 = 3,240$, which is also far above the minimum recommended level of 500 to 1,000. *See* Orme (2020) at 64.

[53] *See* Table 3 in Part III.B.1 below.

[54] *See, e.g.,* McFadden (2013), *supra* ("humans are limited in their capacity for choosing among a large number of options. In fact, extensive experience with conjoint surveys has shown that consumers cannot make effective decisions that involve weighing more than seven attributes.") *See also* Conjointly, "How many attributes can I test in a conjoint survey?", available at https://conjointly.com/faq/many-attributes-in-conjoint-study/ ("The general rule of thumb is to include no more than 7 attributes in a conjoint study because including more than 7 attributes will impose a substantial cognitive load on respondents…")

[55] *See* Appendix A, Question 20.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

2017 and the present, which they either installed themselves or procured as part of their professional responsibilities.[56] Licensed electricians constituted the vast majority (90 percent) of survey respondents. Defining the target population in this way ensures that survey respondents are familiar with the Class AFCIs, and thus equipped to comprehend the choice tasks with which they are presented in the Conjoint Module.

### 2.    Attributes and Levels

30.    Designing a CBC survey involves disaggregating the products at issue into components, typically referred to as attributes; each attribute may take on two or more levels.[57] As detailed below, I used industry sources, information obtained from discovery, and information obtained from interviews with electricians to identify the relevant attributes and levels for the AFCIs included in my CBC survey.

31.    Siemens uses alphanumeric codes such as QAF, QAF2, BAF2, etc. to refer to different categories of AFCIs.[58] These codes are referred to as "UL Types."[59] Within each UL Type, there are multiple Catalog Numbers that designate specific AFCIs, as illustrated below:

---

[56] Survey respondents were recruited by a panel provider contracted by Sawtooth, an industry-standard source for CBC software and analytics. *See, e.g., Apple v. Samsung, Order Granting In Part And Denying In Part Motions To Exclude Certain Expert Opinions,* Case No. 12-CV-00630-LHK (N.D. Cal.) (February 25, 2014), at 28, n. 9 ("Sawtooth Software is among the most-used marketing research software."). Using panel providers to recruit CBC survey participants is standard practice. *See, e.g.,* Sawtooth Software, "Lighthouse Studio Overview", available at https://sawtoothsoftware.com/lighthouse-studio ("[Sawtooth software] plays nicely with other survey platforms and supports all major panel providers.")

[57] *See, e.g.,* Sawtooth Software, "What is a conjoint analysis and how is it used?", available at https://sawtoothsoftware.com/conjoint-analysis ("To run a conjoint study, you break up the product or service you intend to research into its components, called attributes and levels.") *See also* Stobierski, *supra* ("Conjoint analysis is a form of statistical analysis that firms use in market research to understand how customers value different components or features of their products or services. It's based on the principle that any product can be broken down into a set of attributes that ultimately impact users' perceived value of an item or service.")

[58] *See, e.g.,* Siemens, "1 & 2 Pole Combination Type Arc-Fault Circuit Interrupters (CAFCI)[:] Plug-in and Bolt-on" (2018).

[59] *Id.* The abbreviation "UL" stands for Underwriters Laboratories, which offers "testing and certification services for AFCI protection devices." *See* "Arc Fault Circuit Interrupter (AFCI) Device Testing And Certification | UL", available at https://www.ul.com/services/arc-fault-circuit-interrupter-afci-device-testing-and-certification.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-18-

FIGURE 2: SIEMENS AFCI CATEGORY EXAMPLES (2018)

**1-Pole Plug-in Arc-Fault Circuit Interrupters**

| Catalog Number | Ampere Rating | Interrupting Rating | UI Type |
|---|---|---|---|
| QA115AFC | 15 | 10kA | QAF2 |
| QA120AFC | 20 | 10kA | QAF2 |
| QA115AFCH | 15 | 22kA | QAFH2 |
| QA120AFCH | 20 | 22kA | QAFH2 |
| QA115AFCHH | 15 | 65kA | HQAF2 |
| QA120AFCHH | 20 | 65kA | HQAF2 |

Source: Siemens, "1 & 2 Pole Combination Type Arc-Fault Circuit Interrupters (CAFCI)[:] Plug-in and Bolt-on" (2018).

32.    Table 1 below lists the top 25 AFCIs according to Siemens' data; as seen below, these products account for 95 percent of Siemens' AFCI revenue from the start of fiscal year 2017 (10/1/2016) through no later than 3/31/2025.[60] Siemens AFCIs can be categorized according to their technical characteristics, which inform the attributes and levels used in the CBC survey. For example, the top-selling product (Q120DFN) is a single-pole dual-function AFCI/GFCI with a plug-on neutral connection, a current rating of 20 amperes, and an interrupting rating of 10 kiloamperes.[61] In addition, the top-selling Class AFCI (QA120AFCN) is a single-pole single-function AFCI with a plug-on neutral connection, a current rating of 20 amperes, and an interrupting rating of 10 kiloamperes at 120 volts. Below I describe these product characteristics and I explain how they are used to construct the product attributes and levels used in the CBC survey. When determining which attributes and levels to include in the CBC survey, I focused on the most commonly sold Siemens

---

[60] Siemens has represented that the data it has produced in SIEMENS_AFCI_00416123 and SIEMENS_AFCI_00416124 were collected in the month of March 2025, but has not specified a precise cutoff date. See August 21, 2025 Email from R. Reyna to M. Vandenberg ("I believe the data in SIEMENS_AFCI_00416123 and SIEMENS_AFCI_00416124 were collected in the month of March 2025. So, it may cut off at some point during March.").

[61] Similarly, the sixth product listed (QA115AFC) is a single-pole single-function AFCI with a plug-in pigtail connection, a current rating of 15 amperes, and an interrupting rating of 10 kiloamperes. This product is also listed in Figure 2 above.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-19-

AFCIs. Overall, the various attributes and levels encompassed in the survey design encompass over

█████████ of sales of the Siemens AFCIs.[62]

---

[62] *Source:* SIEMENS_AFCI_00416123 and Caves Backup Materials.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-20-

TABLE 1: TOP 25 SIEMENS AFCIS
(10/1/2016 - NO LATER THAN 3/31/2025)

| Rank | Catalog # | Revenue | Share | Cumulative Share |
|---|---|---|---|---|


*Source*: SIEMENS_AFCI_00416123. Note: Catalog Numbers starting with "M" represent legacy products from the Murray brand, which has been phased out and replaced with comparable Siemens products. *See* Siemens, "Murray Legacy Electrical Products," available at: https://www.siemens.com/us/en/products/energy/low-voltage/murray.html

### a.    Manufacturer/Brand

33.    The manufacturer or brand name of an AFCI is a potentially important distinguishing feature. In addition to Siemens, the primary competing AFCI brands include Eaton,[63] Schneider

---

[63]    *See, e.g.,* Eaton, "Residential circuit breakers" available at https://www.eaton.com/us/en-us/products/electrical-circuit-protection/residential-circuit-breakers.html

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-21-

Electric (Square D),[64] and ABB/General Electric.[65] I confirmed during cognitive interviews with electricians that these are the primary competing AFCI brands.[66] Accordingly, the Manufacturer/Brand attribute can take on a total of four distinct values, as shown in Table 2 below.

### b.    Function

34.    Siemens AFCIs include both single-function AFCIs, which protect only against arc faults, as well as dual-function AFCI/GFCIs which protect against both ground faults and arc faults. The NEC requires both arc fault and ground fault protection in kitchen and laundry circuits.[67] Electricians can comply with this requirement by installing an AFCI circuit breaker in the electrical panel, combined with a GFCI receptacle at each outlet.[68] Alternatively, the electrician may install a dual-function AFCI/GFCI in an electrical panel.[69] The Function attribute can take on a total of two distinct values, as shown in Table 2 below.

### c.    Mounting/Connection

35.    As illustrated below, another distinguishing feature of an AFCI is the type of mounting used to connect the circuit breaker to the electrical panel. Older electrical panels generally require a "Plug-In Pigtail" connection, named for the short, neutral wire that extends from the AFCI and connects to the electrical panel. Newer electrical panels are compatible with a "Plug-On Neutral"

---

[64] *See, e.g.,* Square D | Schneider Electric, "Circuit Breakers" available at https://www.se.com/us/en/product-category/4200-circuit-breakers/?filter=business-4-low-voltage-products-and-systems

[65] ABB acquired GE Industrial Solutions in 2018. *See, e.g.,* "ABB completes acquisition of GE Industrial Solutions," available at https://new.abb.com/news/detail/5475/abb-completes-acquisition-of-ge-industrial-solutions

[66] I understand that Siemens has refused to produce information about the identity of its primary competitors, or on its market share, or the market shares of its competitors. I further understand that the Court is aware of Siemens' refusal to produce this information in advance of Plaintiffs' motion for class certification.

[67] *See* Siemens, "Residential Dual-Function Circuit Breakers (AFCI & GFCI)", available at https://www.siemens.com/us/en/products/energy/low-voltage/residential-circuit-breakers/residential-dual-fuction-circuit-breakers.html ("National Electrical Code (NEC®): requires both Arc Fault and Ground Fault protection on kitchen and laundry circuits.")

[68] *Id.*

[69] *Id.*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

connection, which snaps on to the panel without the need for a wire.[70] Accordingly, there are two possible mounting/connection types. The mounting/connection type is one component of the Technical Specifications attribute, as shown in Table 2 below.

FIGURE 3: AFCI CONNECTION TYPES

*Source*: Siemens Residential Dual-Function Circuit Breakers, *supra*.

### d.    Interruption Rating and Current Rating

36.    The Interruption Rating refers to the maximum current in kiloamperes ("kA") that an AFCI can safely interrupt in the event of an arc fault.[71] For example, one top-selling Siemens AFCI is catalog number ████████ with the interruption rating and voltage listed as ████████.[72] A small share of Siemens AFCIs have higher Interruption Ratings, of 22kA or 65kA, and are identified by catalog numbers ending with "H" or "HH."[73] The vast majority of Siemens AFCIs have an

---

[70] For example, Siemens' QTA Models are available with the Pigtail Connection Type, whereas the QTAN models are available in the Plug-On Neutral Connection Type. *See* Siemens, "Tandem Combination Type Arc-Fault Circuit Interrupters (CAFCI)" (2023). Some AFCIs use a "Bolt-on" mounting. *See* Siemens, "1 & 2 Pole Combination Type Arc-Fault Circuit Interrupters (CAFCI)[:] Plug-in and Bolt-on (2018). (showing Bolt-on AFCIs with catalog numbers starting with "B"). However, the Bolt-on mounting accounts for less than one percent of Siemens sales of the Class AFCIs. *See* SIEMENS_AFCI_00416123 (products with a Catalog Number starting with "B" account for under one percent of total sales from fiscal year 2017 onward).

[71] *See, e.g.,* Schneider Electric, "What does ampere interrupting rating mean for a circuit breaker?" (last modified 8/8/2022), available at: https://www.se.com/us/en/faqs/FA93276/

[72] *See* Siemens, "US2:Q120DFN" (specifying "10kA AT 120V"), available at https://sieportal.siemens.com/en-us/products-services/detail/US2%253AQ120DFN

[73] *See, e.g.*, Siemens, "1 & 2 Pole Combination Type Arc-Fault Circuit Interrupters (CAFCI)[:] Plug-in and Bolt-on" (2018).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-23-

Interruption Rating of ███████████[74] Accordingly, all of the AFCIs used in the CBC survey have this Interruption Rating, as shown in Table 2 below.

37.    While the Interrupting Rating is the maximum fault current the AFCI can interrupt, the Current Rating is the (lower) maximum current that the circuit can carry under normal conditions.[75] An AFCI's Current Rating cannot exceed the circuit current on which it is placed. For example, an AFCI with a Current Rating of 15 Amps can only be used on circuits carrying 15 Amps or less. Siemens AFCIs may have a current rating of either 15 Amps or 20 Amps, as indicated by the catalog number.[76] As shown in Table 2 below, the AFCIs used in the CBC survey have a current rating of either 15 or 20 Amps.

### e.    Poles

38.    Another distinguishing attribute of an AFCI is the number of poles. Single-pole circuit breakers are found in narrow switches located in a home's electrical panel, while a double-pole circuit breaker is "essentially two single pole breakers that are mechanically linked together."[77] The number of poles in a Siemens AFCI can be identified based on the first digit that appears in the catalog number.[78] The vast majority of Siemens AFCIs are Single-Pole AFCIs.[79] Accordingly, all of the AFCIs used in the CBC survey have a single pole, as shown in Table 2 below.

---

[74] *See* SIEMENS_AFCI_00416123 (products with a Catalog Number including "H" account for under one percent of total sales from fiscal year 2017 onward).

[75] Siemens sometimes refers to the current rating as the "continuous current rated value." *See, e.g.,* Siemens, Data sheet for US2:QA115AFC (last modified 1/7/2021).

[76] *See, e.g.,* "Siemens USA - US2:Q120DFN" (specifying a 20-Amp "20A" Current Rating), available at https://sieportal.siemens.com/en-us/products-services/detail/US2%25253AQ120DFN; *see also* "Siemens USA - US2:QA115AFCN" (specifying a 15-Amp "15A" Current Rating), available at https://sieportal.siemens.com/en-us/products-services/detail/US2%253AQA115AFCN.

[77] Cool Today, "What's The Difference Between A Single And A Double-Pole Breaker?" (May 10, 2023), available at https://www.cooltoday.com/blog/whats-the-difference-between-a-single-and-a-double-pole-breaker#:~:text=Single%2Dpole%20breakers:%20Provide%20120,that%20share%20one%20neutral%20wire.

[78] *See, e.g.,* footnote 76, *supra* (specifying "1-POLE"); *see also* "Siemens USA - US2:Q220AFC" (specifying "2-pole"), available at https://sieportal.siemens.com/en-us/products-services/detail/US2%25253AQ220AFC.

[79] *See* SIEMENS_AFCI_00416123 ███████████████████████

-24-

### f.  Price

39.    Pricing data for the Siemens AFCIs and other AFCI brands is available from customer-facing industry sources. I constructed the Price attribute using market data on actual retail prices compiled from sources such as Home Depot, Lowes, Amazon, and Simply Breakers, an online electrical supply retailer. My survey data confirm that electricians frequently obtain their AFCIs from such sources.[80] Using this pricing data, I constructed a range of market prices to be displayed to respondents during the Conjoint Module, based on the observed distribution of market prices. As seen in Table 2 below, the prices displayed to respondents ranged from $43.69 to $70.77. During the cognitive interview phase, I confirmed with interview subjects that the prices displayed to them were consistent with what they would expect to pay in real life.[81]

### g.  Nuisance Tripping Disclosure

40.    The final attribute is designed to model disclosure of the Alleged Defect to the customer at the point of purchase. To accurately characterize the Nuisance Tripping Defect to respondents, I relied on Plaintiffs' technical expert, Robert Durham.[82] The text of the Nuisance Tripping Disclosure shown to respondents is displayed below. During the cognitive interview phase, respondents confirmed their understanding of the Nuisance Tripping Disclosure, and confirmed that they were familiar with Nuisance Tripping in their professional experience. The Nuisance Tripping Disclosure omits any mention that the Nuisance Tripping Defect is associated with Siemens

---

[80] According to my survey results, 81 percent of professional electricians indicated that they had purchased AFCIs from big-box retailers such as Home Depot, Lowes, or Amazon. *See* Appendix D, Question 6. In addition, 36 percent of professional electricians indicated they had most frequently purchased AFCIs from these retailers. *Id.* Question 7.

[81] Electrical supply distributors do not publish their AFCI prices. The cognitive interviews did not indicate any systematic differences between the pricing of AFCIs sold at electrical distributors, compared with publicly available retail pricing.

[82] *See* Durham Expert Report at ¶¶35-36.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-25-

products. During the CBC module, the Nuisance Tripping Disclosure appeared with equal likelihood for all brands.

\*\*\*

In the questions that follow, certain AFCIs have a "Nuisance Tripping Defect." These AFCIs use an arc detection method that, according to reports, leads these AFCIs to trip due to common and safe voltage distortions that cause radio frequency harmonics. These distortions are generated by some models of common household appliances, electrical devices, and lighting, listed below:

1. Major household appliances, such as microwaves, ovens, washing machines, dryers, refrigerators, garage door openers and water heaters;
2. Lighting products, including LED light bulbs, Christmas lights, under cabinet lighting, light fixtures, recessed lighting, light switches, dimmers, halogen and fluorescent lights;
3. Plug-in electrical devices, like vacuum cleaners, wall charges, internet signal boosters, power tools, and printers; and,
4. Voltage distortions that may cause radio frequency harmonics from external sources, including electrical transformers and broadband power lines.

If AFCIs with the Nuisance Tripping Defect are installed on circuits with, or in the same panel of circuits serving, these devices, they may trip and shut off power when no dangerous arc fault exists.

Other current or future household products that create voltage distortions and radio frequency harmonics may also cause these same AFCIs to experience Nuisance Tripping.

Manufacturers of AFCIs with the Nuisance Tripping Defect have claimed their AFCIs are not designed to exclusively identify a true arc, but instead trip when they detect any signal that resembles an arc, even if that signal comes from a safe and properly functioning device.

\*\*\*

41.     As seen in Table 2 below, the Nuisance Tripping Disclosure could take on two different levels, indicating the presence or absence of the Nuisance Tripping Defect.

### h.     Consolidated Table of Attributes and Levels

42.     Table 2 below lists the attributes and levels used in the CBC survey. Before commencing the CBC Module, respondents were given an opportunity to review and confirm their

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-26-

understanding of each of the attributes used in the survey.[83] During the Conjoint Module respondents could refresh their recollection of survey attributes using "tool tips," which appeared when respondents clicked or hovered their mouse or finger over the relevant attribute or level.

TABLE 2: ATTRIBUTES AND LEVELS IN CBC SURVEY

| Attribute | Description | Levels |
|---|---|---|
| | | |
| *Brand* | Manufacturer/Brand | ABB/General Electric |
| | | Eaton |
| | | Siemens |
| | | Schneider Electric (Square D) |
| | | |
| *Function* | Presence/Absence of Ground Fault Detection | Single Function (AFCI) |
| | | Dual Function (AFCI/GFCI) |
| | | |
| *Mounting/Connection/ Current Rating/ Pole(s)/Interruption Rating/Voltage* | Technical Specifications | PLUG-IN PIGTAIL 20A 1-POLE (10kA at 120V) |
| | | PLUG-IN PIGTAIL 15A 1-POLE (10kA at 120V) |
| | | PLUG-ON NEUTRAL 15A 1-POLE (10kA at 120V) |
| | | PLUG-ON NEUTRAL 20A 1-POLE (10kA at 120V) |
| | | |
| *Price* | Price Per AFCI | $43.69 |
| | | $55.47 |
| | | $59.97 |
| | | $62.53 |
| | | $70.77 |
| | | |
| *Nuisance Tripping Disclosure* | Defect Disclosure | DEFECTIVE: Prone to Nuisance Tripping |
| | | NOT DEFECTIVE |

---

[83] *See* Appendix A.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-27-

## B.    Results and Analysis

### 1.    The Data Demonstrate Strong Disutility for the Nuisance Tripping Defect

43.    By applying standard Hierarchical Bayesian ("HB") statistical methods to the CBC survey response data,[84] I have quantified the utility (or disutility) that respondents derive from each of the attributes and levels shown in Table 2 above. This allows me to estimate consumer disutility for the Class AFCIs that would have resulted from disclosure to customers of the Nuisance Tripping Defect at the point of purchase. As explained below, this analysis reveals strong consumer disutility flowing from the Nuisance Tripping Defect.

44.    CBC analysis models respondents' choices in the CBC module as utility-maximizing decisions governed by a flexible extension to the multinomial logit model of consumer choice.[85] The total utility that a respondent would derive from purchasing a given AFCI is determined by the sum of the AFCI's attribute-specific utilities (or "part-worths"). AFCIs that deliver greater total utility are more likely to be selected than AFCIs that deliver lower total utility. For example, as detailed below, analysis of the price attribute confirms that the part-worths for this attribute are higher when the price is lower, as would be expected.

45.    Table 3 below displays summary statistics for the part-worths of each of the attributes and levels included in the CBC Module. The partworths in Table 3 are properly measured relative to one another. For example, with respect to the Brand attribute, the most-preferred brand, on average, is Siemens with an average partworth of 0.29. In contrast, the average utility for Schneider

---

[84] *See, e.g.,* Peter Lenk, Wayne DeSarbo, Paul Green, & Martin Young, *Hierarchical Bayes Conjoint Analysis: Recovery of Partworth Heterogeneity from Reduced Experimental Designs* 15(2) MARKETING SCIENCE 173-191 (1996). *See also* John Howell, "CBC/HB for Beginners," Sawtooth Software Research Paper Series (2009), available at: https://sawtoothsoftware.com/resources/technical-papers/cbc-hb-for-beginners

[85] CBC analysis extends the basic multinomial logit framework by modeling individual-specific variation in the utility (or disutility) that consumers derive from each attribute and level. *See, e.g.,* Bryan Orme & John Howell, "Application of Covariates Within Sawtooth Software's CBC/HB Program: Theory and Practical Example," Sawtooth Software Research Paper Series (2009), available at: https://sawtoothsoftware.com/resources/technical-papers/application-of-covariates-within-sawtooth-softwares-cbc-hb-program-theory-and-practical-example.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-28-

Electric/Square D is 0.00. This means that, on average, a purchaser's utility would increase by 0.29 if they were to purchase a Siemens AFCI instead of a Schneider Electric/Square D AFCI, assuming both products are otherwise identical with respect to all other attributes, including their price.[86] This result is to be expected, given that the target population focused on purchasers of Siemens AFCIs.

46.    Similarly, the data for the Function attribute show that dual function AFCI/GFCIs are, on average, preferred to single function AFCIs, because the average utility for a dual-function AFCI/GFCI is positive (equal to 0.29), whereas the average utility for a single-function AFCI is negative (equal to -0.29). This means that, on average, a purchaser's utility would increase by 0.58 if they were to purchase a dual-function AFCI/GFCI instead of a single-function AFCI, assuming both products are otherwise identical with respect to all other attributes, including their price.[87] This increase in utility is statistically significant, as indicated by the 95 percent confidence intervals. This result is to be expected, given that a single-function AFCI provides less functionality than an otherwise identical dual-function AFCI/GFCI.

47.    The data for the Technical Specifications attribute indicate that Plug-On Neutral connections are somewhat preferred to Plug-In Pigtail connections. As noted previously, by construction, the design of the survey did not allow for direct comparisons between 15 Amp AFCIs compared with 20 Amp AFCIs.[88] Nor do I rely on such comparisons in performing my market simulation analysis.

48.    The data for the Price attribute confirms that purchasers prefer lower prices to higher prices, consistent with economic expectations. For instance, the average utility for the lowest price

---

[86] Equal to 0.29 minus 0.00.

[87] Equal to 0.29 minus negative 0.29.

[88] As explained in Part II.A above, interview respondents indicated that it might be difficult to compare AFCIs with different current ratings within the same choice task, given that the two types of products are used for different household circuits. Accordingly, I modified the survey design such that interview subjects would only be shown AFCIs with a single current rating (either 15 or 20 Amperes) for each choice task.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-29-

of $43.69 is 0.92, while the average utility for the highest price of $70.77 is -1.08. This means that, on average, a purchaser's utility would increase by 2.00 if the price of an AFCI were to decrease from $70.77 to $43.69, assuming the product remained identical with respect to all other attributes.[89] The 95 percent confidence intervals confirm that the increase in utility from a decrease in price is statistically significant.

49.    Finally, the results for the Nuisance Tripping attribute confirm that purchasers strongly prefer AFCIs without the Nuisance Tripping Defect. The average utility for a product with the Nuisance Tripping Defect is -1.79, while the average utility for a product without the Nuisance Tripping Defect is 1.79. This means that, on average, a purchaser's utility would increase by 3.58 if they were to purchase an AFCI without the Nuisance Tripping Defect, compared to a product with the Nuisance Tripping Defect, assuming both products are otherwise identical with respect to all other attributes, including their price.[90] The CBC survey results therefore reveal a strong disutility for the Nuisance Tripping Defect.

---

[89] Equal to 0.92 minus negative 1.08.
[90] Equal to 1.79 minus negative 1.79.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-30-

TABLE 3: SUMMARY STATISTICS FOR PART-WORTHS (UTILITIES)

| Attributes/Levels | Utility | Std Dev | Lower 95% CI | Upper 95% CI |
|---|---|---|---|---|
| **Brand** | | | | |
| Siemens | 0.29 | 0.60 | 0.23 | 0.34 |
| ABB/General Electric | -0.25 | 0.46 | -0.29 | -0.20 |
| Schneider Electric (Square D) | 0.00 | 0.51 | -0.04 | 0.05 |
| Eaton | -0.05 | 0.47 | -0.09 | 0.00 |
| **Function** | | | | |
| Single Function (AFCI) | -0.29 | 0.32 | -0.31 | -0.26 |
| Dual Function (AFCI/GFCI) | 0.29 | 0.32 | 0.26 | 0.31 |
| **Technical Specifications** | | | | |
| PLUG-IN PIGTAIL 15A 1-POLE (10kA at 120V) | 0.25 | 0.36 | 0.22 | 0.28 |
| PLUG-ON NEUTRAL 15A 1-POLE (10kA at 120V) | 0.31 | 0.36 | 0.28 | 0.34 |
| PLUG-IN PIGTAIL 20A 1-POLE (10kA at 120V) | -0.32 | 0.39 | -0.36 | -0.29 |
| PLUG-ON NEUTRAL 20A 1-POLE (10kA at 120V) | -0.24 | 0.37 | -0.27 | -0.20 |
| **Price** | | | | |
| $43.69 | 0.92 | 0.98 | 0.83 | 1.00 |
| $49.56 | 0.60 | 0.63 | 0.55 | 0.66 |
| $59.97 | 0.06 | 0.18 | 0.04 | 0.07 |
| $62.28 | -0.50 | 0.58 | -0.55 | -0.45 |
| $70.77 | -1.08 | 1.07 | -1.17 | -0.98 |
| **Nuisance Tripping** | | | | |
| DEFECTIVE: Prone to Nuisance Tripping | -1.79 | 1.93 | -1.96 | -1.62 |
| NOT DEFECTIVE | 1.79 | 1.93 | 1.62 | 1.96 |
| **No Purchase** | -3.92 | 1.91 | -4.09 | -3.75 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-31-

## 2.      Simulation and Price Premium Analysis

50.      The results in the prior section suggest that consumers paid a very substantial Price Premium for the Class AFCIs, and that many Class Members would not have purchased the Class AFCIs if the Nuisance Tripping Defect had been disclosed at the point of purchase. This is confirmed by the market simulation analysis implemented in this section. These simulations model the market interactions of consumers, Siemens, and competing manufacturers. The simulations detailed below allow me to calculate the Price Premium, starting with the downward shift in demand, which is measured using the decrease in the marginal consumer's willingness to pay for the Class AFCIs when the Nuisance Tripping Defect is disclosed at the point of sale.[91] The simulations incorporate the supply side by allowing for Siemens to reduce the supply of the Class AFCIs in response to decreased demand. The resulting equilibrium between supply and demand yields the Price Premium, which I estimate conservatively at 32 percent.

51.      The Price Premium measures the difference between the economic value of the Class AFCIs without the Alleged Defect and the economic value of the Class AFCIs with the Alleged Defect, based on the decrease in the market price that would have occurred if the Nuisance Tripping Defect had been disclosed at the point of purchase. This difference in economic value can be applied to all users and purchasers of Class AFCIs.  I am not offering a legal opinion as to whether current users or original purchasers are entitled to recover damages from the Challenged Conduct. The Price Premium provides an objective measure of the decrease in economic value of the Class AFCIs as a result of the Challenged Conduct, regardless of which party is legally entitled to recover damages.

---

[91] *See* McFadden (2013) ("It is the WTP [willingness to pay] of the marginal consumer that is equivalent to the price premium associated with the infringing level of the attribute; this marginal consumer can be identified by offering respondents a "no buy" option."). The Conjoint Module in the survey I deploy here offers respondents a "no buy" option, because respondents are given the option to not to purchase any of the AFCIs shown to them. *See* Appendix A.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

52.     Conjoint practitioners use market simulators to analyze how equilibrium prices shift in response to changes in product attributes.[92] Here, I employ these techniques to simulate the effect of disclosing the Nuisance Tripping Defect in Siemens' AFCIs. The decrease in demand is calculated using a three-step process. First, as a baseline, I simulate the market shares of competing AFCIs offered by different manufacturers. Second, I introduce the Nuisance Tripping Defect to the Siemens single-function AFCI, and simulate the extent to which Siemens' market share would decline if the Nuisance Tripping Defect were disclosed at the point of purchase. Third, I simulate the percentage reduction in the price of Siemens's single-function AFCIs that would be required to return Siemens to its initial market share, calculated in the first step. This calculation reveals the extent to which Siemens would have to drop the price of its single-function AFCIs in order to sell the same quantity of AFCIs that it sold when the Nuisance Tripping Defect was not disclosed to customers.

### a.     Baseline Simulation

53.     As noted above, the top-selling Class AFCI (QA120AFCN) is a single-pole single-function AFCI with a plug-on neutral connection, a current rating of 20 amperes, and an interrupting rating of 10 kiloamperes at 120 volts. Figure 4 below calculates simulated market shares for competing AFCIs and AFCI/GFCIs with the same Technical Specifications. Consistent with standard practice, the market shares used in my simulations are calculated using the utilities obtained from the Hierarchical Bayesian analysis of the CBC survey data, and therefore do not require external market share data.[93]

54.     As seen below, Siemen's simulated market share is 14 percent for single-function AFCIs and 18 percent for dual-function AFCI/GFCIs, for a total market share of approximately 32

---

[92] *See, e.g.,* Bryan Orme, *Market Simulators for Conjoint Analysis, in* Orme (2020), *supra*, Chapter 10.

[93] *Id.* As explained above, I understand that Siemens has refused to produce information about the identity of its primary competitors, or on its market share, or the market shares of its competitors. I further understand that the Court is aware of Siemens' refusal to produce this information in advance of Plaintiffs' motion for class certification.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-33-

percent. Schneider Electric (Square D)'s simulated total market share is approximately 25 percent.

Eaton's simulated total market share is approximately 23 percent. ABB/General Electric's simulated

total market share is approximately 19 percent. Finally, a small share of the market (less than 1

percent) would not purchase any of these AFCIs.

FIGURE 4: INITIAL SIMULATED MARKET SHARES (NO NUISANCE TRIPPING DEFECT)



*Note*: Market shares may not sum to 100% due to rounding. Simulated market shares are for a single-pole single-function AFCI with a plug-on neutral connection, a current rating of 20 amperes, and an interrupting rating of 10 kiloamperes, priced at $51.43 for each brand, and for a single-pole dual-function AFCI/GFCI with a plug-on neutral connection, a current rating of 20 amperes, and an interrupting rating of 10 kiloamperes, priced at $57.19 for each brand. The prices used in the simulation are the average of observed market prices for Siemens products. The Nuisance Tripping Defect is absent in all products.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-34-

55.    In Figure 5 below I perform a different simulation, in which the Nuisance Tripping Defect is introduced only to the Siemens single-function AFCI product. All other attributes and levels in the market are held constant. Because the simulation includes both Siemens single-function AFCIs and Siemens dual-function AFCI/GFCIs, the simulations allow customers to substitute towards Siemens AFCI/GFCIs when the Nuisance Tripping Defect is introduced to the Siemens AFCIs. The simulations also allow customers to substitute towards the AFCIs and the AFCIs/GFCIs sold by competing manufacturers.

56.    Introducing the Nuisance Tripping Defect to the Siemens single-function AFCI product causes the market share of that product to decline by four percentage points, from 14 percent to 10 percent. The market share of the Siemens dual-function AFCI product increases from 18 percent to 19 percent, as some customers switch from the defective Siemens AFCI to the non-defective Siemens AFCI/GFCI. Accordingly, Siemens combined market share declines by three percentage points (from 32 percent to 29 percent). Other manufacturers also see increases in market share. For example, Eaton's market share increases from $13 + 10 = 23$ percent to $14 + 11 = 25$ percent.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-35-

FIGURE 5: SIMULATED MARKET SHARES
(ADDING NUISANCE TRIPPING DEFECT TO SIEMENS SINGLE-FUNCTION AFCIS)



*Note*: Market shares may not sum to 100% due to rounding. Simulated market shares are for a single-pole single-function AFCI with a plug-on neutral connection, a current rating of 20 amperes, and an interrupting rating of 10 kiloamperes, priced at $51.43 for each brand, and for a single-pole dual-function AFCI/GFCI with a plug-on neutral connection, a current rating of 20 amperes, and an interrupting rating of 10 kiloamperes, priced at $57.19 for each brand. The prices used in the simulation are the average of observed market prices for Siemens products. The Nuisance Tripping Defect present in the Siemens single-function AFCI product, and absent in all others.

57.    These initial simulations demonstrate that consumers exhibit a strong disutility for the Nuisance Tripping Defect. The next step is to simulate the percentage reduction in the price of the Siemens AFCI that would be required to return Siemens to its initial market share of 32 percent. This involves a series of simulations in which the Siemens price is reduced by a greater and greater percentage, until the original market share of 32 percent is achieved. This analysis reveals that

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-36-

Siemens prices would have to decline very significantly–by approximately 68 percent–to return Siemens' market share to its initial level.[94]

58.      Next, I conduct additional supply-side analysis that allows Siemens to reduce the supply of the Class AFCIs in the but-for world in response to decreased demand resulting from the Nuisance Tripping Defect. Restricting supply would have permitted Siemens to charge a higher price than it otherwise could have for the Class AFCIs (albeit still lower than the price of the AFCIs in the actual world). This analysis also allows Siemens to incur lower costs in the but-for world by supplying fewer Class AFCIs than it did in the actual world. Thus, this supply-side analysis allows Siemens to earn greater profit than it otherwise would have in the but-for world by restricting its supply in response to the downward shift in demand resulting from disclosure of the Nuisance Tripping Defect.

59.      Elementary economic principles show that an increase in demand leads to an increase in the market price of a good or service, while a decrease in demand has the opposite effect.[95] Facing a substantial decrease in demand, Siemens would no longer be able to sell the same quantity of AFCIs at the same price. Siemens could sell the same quantity of AFCIs if it were to reduce its price by the amount of the Price Premium. If Siemens reduced its price by less than the amount of the Price Premium, it would sell fewer AFCIs in the but-for world than it did in the actual world.

60.      This tradeoff can be modeled using a linear approximation of the demand curve, as is common in economics.[96] For a linear demand curve, $Q = \alpha - \beta P$, where $\alpha$ is the intercept of the

[94] *See* Caves Backup Materials.

[95] *See e.g.*, N. Gregory Mankiw, PRINCIPLES OF MICROECONOMICS, (Cengage Learning 8th ed. 2018) at 67-69.

[96] *See, e.g.,* Philippe Choné & Laurent Linnemer, *Linear demand systems for differentiated goods: Overview and user's guide* 73 INTERNATIONAL JOURNAL OF INDUSTRIAL ORGANIZATION 102663 (2020) ("Linear demand systems and quasi-linear quadratic utility models are widely used in industrial economics."). *See also* Betul Lus & Ana Muriel, *Measuring the Impact of Increased Product Substitution on Pricing and Capacity Decisions Under Linear Demand Models*, 18(1) PRODUCTION AND OPERATIONS MANAGEMENT 95-113 (2009), at 95 ("We consider two substitutable products and compare two alternative measures of product substitutability for linear demand functions that are

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-37-

demand curve, $\beta$ is the slope of the demand curve, $Q$ is the quantity demanded, and $P$ is price. This equation can be rewritten $P = \alpha/\beta - Q/\beta$. If the intercept of the demand curve, $\alpha$, shifts downward to $\alpha'$, then the downward vertical shift is $\Delta P = [\alpha/\beta - Q/\beta] - [\alpha'/\beta - Q/\beta] = [\alpha - \alpha']/\beta$. The profit-maximizing price for a firm facing a linear demand curve is $P_{MAX} = 0.5[\alpha/\beta + C]$, where $C$ is marginal cost.[97] The decrease in the firm's profit-maximizing price resulting from a downward shift in demand is $\Delta P_{MAX} = 0.5[\alpha/\beta + C] - 0.5[\alpha'/\beta + C] = 0.5[\alpha - \alpha']/\beta = 0.5\Delta P$.

61.    Accordingly, the decrease in the profit-maximizing price resulting from a downward vertical shift in the demand curve can be estimated as one-half of the distance of the vertical shift—that is, [68 percent] x [0.5] = 34 percent. This calculation conservatively holds fixed the prices of competing AFCIs; to the extent that Siemens' rivals responded to Siemens' price cuts by decreasing their own prices, this would place still more downward pressure on the price.

62.    In Appendix D, I conduct various sensitivity analyses. I conduct additional simulations using different combinations of product attributes, representing different types of competing AFCIs. These simulations encompass the vast majority (over 95 percent) of Siemens' AFCI revenue. I also checked the data for potential "speeders" who completed the survey significantly faster than most respondents. Additionally, I checked the data for so-called potential "straight-liners," defined as those who consistently selected the same response. I performed

---

commonly used in the literature."); Jerry Hausman, Serge Moresi & Mark Rainey, *Unilateral effects of mergers with general linear demand*, 111(2) ECONOMICS LETTERS 119–121, 119 (2011) ("We derive the formula for the unilateral price effects of mergers of two products with linear demand in the general asymmetric situation. The formula uses the same information required to calculate upward pricing pressure in the 2010 Horizontal Merger Guidelines."); Jerry Hausman, *Sources of Bias and Solutions to Bias in the Consumer Price Index*, 17(1) JOURNAL OF ECONOMIC PERSPECTIVES 23-44 (2003) [hereafter, Hausman (2003)] (using a linear approximation to the demand curve to calculate consumer surplus). More generally, linear approximations are standard in economics. *See, e.g.,* ROBERT S. PINDYCK & DANIEL L. RUBINFELD, ECONOMETRIC MODELS & ECONOMIC FORECASTS 233 (McGraw-Hill, Inc. 3rd ed., 1991) [hereafter, Pindyk & Rubinfeld] ("[A]ny nonlinear function can be expressed as a [linear] Taylor series expansion."). *See also id.* at 510-511.

[97] The profit-maximizing price satisfies the equation $(P - C)/P = (\partial P/\partial Q)\text{x}(Q/P)$, the solution of which is: $P_{MAX} = 0.5[\alpha/\beta + C]$.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-38-

additional sensitivity analyses in which I limited the analysis only to the professional electricians who made up 90 percent of respondents to the CBC survey. I also assigned different weights to different respondents to match information on the demographics of electricians in the U.S., obtained from the Bureau of Labor Statistics ("BLS"), which reports demographic information by occupation.[98]

63.     The sensitivity analyses in Appendix D confirm that the magnitude of the Price Premium is consistently high, and generally fluctuates within a narrow range, between 32 percent to 36 percent.[99]

64.     My final estimate of the Price Premium is 32 percent. This is the low end of the various Price Premium estimates detailed in Appendix D.

### 3.     Siemens' Own Financial Data Indicate Siemens Could Profitably Supply Class AFCIs After Deducting The Full Price Premium

65.     Siemens has produced financial data that encompasses the Class AFCIs. This includes data that detail the costs associated with supplying AFCIs and GFCIs for fiscal years 2017 - 2025, for nine U.S. states.[100] These data include variable costs such as materials and labor.[101] This information allows me to estimate Siemens variable costs for the Class AFCIs. Variable costs are

---

[98] *See, e.g.,* https://www.bls.gov/cps/cpsaat11.htm; *see also* https://www.bls.gov/emp/tables/educational-attainment.htm.

[99] When the sample is reweighted based on demographics, the Price Premium increases to 38 percent. *See* Appendix D.

[100] SIEMENS_AFCI_00455706. ████████████████████████████████████████████ *See* SIEMENS_AFCI_00416123. I have seen no evidence that my conclusions would differ materially if Siemens had produced comparable variable profit and cost data for all U.S. states. I further understand that the Court is aware that Siemens has refused to produce nationwide cost data in advance of Plaintiff's motion for class certification.

[101] I understand that Siemens has represented with respect to SIEMENS_AFCI_00455706 that "the costs reflected in this data represent only standard costs such as material, labor, and overhead. Secondary costs, such as research and development, sales and marketing, and general administrative costs are spread across the whole Residential Products Division, and are therefore not reflected in this customer profitability data." *See* August 19, 2025 Email from R. Reyna to E. Kafka.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-39-

the economically relevant costs here.[102] These estimates are likely conservative because the data include both AFCIs and GFCIs. ████████████████████████

████████████████████████████████████████

█████████████████████████

66.    Siemens' data indicate that it consistently earned high variable profit margins on the Class AFCIs. ████████████████████████████████

████████████████████████████ Data for individual U.S. states shows a similar pattern. During the Damages Period, the lowest variable profit margin for any of the nine U.S. states for which Siemens has produced data was █████████ the highest was █████████ On average, Siemens' variable profit margin across the nine states was █████████ during the Damages Period.[104]

67.    Therefore, Siemens own financial records indicate that Siemens could have cut its prices by █████████ on average and still earned a variable profit margin on the Class AFCIs. Had Siemens cut its prices by 32 percent, it would have continued to earn an average variable profit margin of █████████████████[105]

68.    Additional financial data produced by Siemens indicate that Siemens would continue to make a profit even if one were to (improperly) allocate non-variable costs to AFCIs. Siemens has produced profit and loss statements for its Residential Products Division.[106] Siemens' profit and loss statements report the following expenses in addition to cost of sales: Research and development

---

[102] Elementary economics demonstrates that profit-maximizing firms consider marginal costs, rather than total costs, when making pricing decisions. *See, e.g.,* N. Gregory Mankiw, PRINCIPLES OF MICROECONOMICS (8th ed. 2018) at 296-297.

[103] SIEMENS_AFCI_00054887 ██████████████████████████
█████████████

[104] In the alternative, if I limit the data to the shorter Damages Period starting on June 21, 2017, Siemens' average variable profit margin is still █████████

[105] In the alternative, if I limit the data to the shorter Damages Period starting on June 21, 2017, Siemens would have continued to earn an average variable profit margin o █████████████

[106] SIEMENS_AFCI_00455705.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-40-

expenses, Selling expenses, General administrative expenses, and Other operating expenses.[107]

Taken together, these expenses come to approximately ████████ of Residential Products revenue

during the Damages Period.[108] Even if all of these expenses were proportionally allocated to AFCIs,

Siemens' average profit margin would be ████████████ percent after deducting the full Price

Premium.[109]

### IV. AGGREGATE DAMAGES TO THE CLASS ARE CALCULATED USING CLASSWIDE METHODS AND DATA

69.    Aggregate damages are calculated using data and methods common to the Class. As

explained in Part III.B.2 above, I estimate the Price Premium at 32 percent, adopting a conservative

approach that allows Siemens to retain more profit than it otherwise could have in the but-for world

by restricting the supply of Class AFCIs. As explained in Part III.B.3 above, Siemens still would

have earned a profit on its Class AFCIs, even if it had implemented this 32 percent price decrease in

the but-for world.

70.    As seen in Table 4 below, multiplying this Price Premium by aggregate Siemens

Class AFCI Revenue yields aggregate damages of approximately ████████ for Class AFCIs sold

in the United States for the period beginning January 1, 2017 and ending December 10, 2021. In the

alternative, aggregate damages are estimated at approximately ████████ if the Class AFCIs are

limited to those sold between June 21, 2017 and December 10, 2021.

---

[107] *Id.*

[108] In the alternative, if I limit the data to the shorter Damages Period starting on June 21, 2017, these expenses remain at approximately ██████ of Residential Products revenue.

[109] In the alternative, if I limit the data to the shorter Damages Period starting on June 21, 2017, Siemens' profit margin would be ████████ percent after deducting the full Price Premium.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-41-

TABLE 4: AGGREGATE DAMAGES
(1/1/2017 - 12/10/2021)

| Fiscal Year | Siemens Class AFCI Revenue | Price Premium | Aggregate Damages |
|---|---|---|---|
| ██████████ | ██████████ | 32% | ██████████ |
| | | 32% | |
| | | 32% | |
| | | 32% | |
| | | 32% | |
| | | 32% | |
| **TOTAL** | | **32%** | |
| **TOTAL** (6/21/2017 - 12/10/2021) | | **32%** | |

*Source*: SIEMENS_AFCI_00416123, using filters Regional Profit Center Name= "AFCI/GFCI" and Sold to State Code excluding 11, CMX, GU, LI, ON, QC, SJ, and blanks. Siemens's fiscal year 2017 ran from ██████████████████ To estimate Siemens revenue beginning ██████ I adjusted Siemens' fiscal year 2017 revenue downward by a factor of ██████ The first "TOTAL" row includes all single-function AFCIs sold through ██████████ To estimate Siemens revenue in fiscal year 2022 through 12/10/2021, I adjusted Siemens' revenue downward by a factor of ██████ The second "TOTAL" row includes all single-function AFCI sold between June 21, 2017 and December 10, 2021. To estimate the later start date, I adjusted Siemens' fiscal year 2017 revenue downward by a factor of ██████

71.    If damages are limited to the Subclasses, then aggregate damages come to approximately ██████████ for the period beginning January 1, 2017 and ending December 10, 2021. In the alternative, aggregate damages are estimated at approximately ██████████ if the Subclasses are limited to AFCIs sold between June 21, 2017 and December 10, 2021.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-42-

## CONCLUSION

72.     For the foregoing reasons, I conclude that economic injury and aggregate damages to the Class can be reliably determined using standard methods and evidence common to all Class Members. I conclude that Siemens' failure to disclose the Alleged Defect at the point of purchase resulted in Class Members paying a Price Premium of 32 percent. Aggregate damages are estimated at approximately ▮▮▮▮▮ for Class AFCIs sold in the United States for the period beginning January 1, 2017 and ending December 10, 2021. In the alternative, aggregate damages are estimated at approximately ▮▮▮▮▮ if the Class AFCIs are limited to those sold between June 21, 2017 and December 10, 2021.

\*          \*          \*


Kevin W. Caves, Ph.D.:




_____

Kevin W. Caves


Executed on October 31, 2025.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-1-

**APPENDIX A: SURVEY INSTRUMENT**

Your participation in and responses to this survey are entirely anonymous and confidential. Your personal information is protected and will not be shared or disclosed.

○ I wish to continue with the survey

○ I DO NOT wish to continue with the survey

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-2-

Q1 Which state do you live in?

▼ Alabama (1) ... I do not reside in the United States (52)

*Skip To: End of Block If Q1 = I do not reside in the United States*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-3-

Q2 What is your age?

○ Younger than 18

○ 18-21

○ 22-29

○ 30-39

○ 40-49

○ 50-59

○ 60-69

○ 70 or older

*Skip To: End of Block If Q2 = Younger than 18*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-4-

Q3 What does the abbreviation "AFCI" stand for?

☐    Arc Fault Critical Infrastructure

☐    American Financial Clearinghouse Institute

☐    Anti Fault Circuit Interference

☐    Administrative Failure with Circuitous Inference

☐    Arc Fault Circuit Interrupter

☐    American Federal Circuit Infrastructure

☐    Anti Failure Chlorine Instrument

☐    Association of Federal Chiropractic Inspectors

☐    Association of Financial Consultant Inspectors

☐    American Financial Compliance Institute

☐    I don't know

*Skip To: End of Block Unless Q3 = Arc Fault Circuit Interrupter*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-5-

Q4 Have you purchased Arc Fault Circuit Interrupters, or "AFCIs," in the United States between 2017 and the present? Note: Throughout this survey, the term "AFCI" refers to **breakers** that are located in the electrical panel, and **not** receptacles installed at an outlet.

○ Yes

○ No

○ I don't know

*Skip To: End of Block If Q4 = No OR Q4 = I don't know.*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-6-

Q5 What brand(s) of AFCIs have you purchased between 2017 and the present? (Please select all that apply).

☐     ABB/General Electric

☐     Eaton

☐     Schneider Electric (Square D)

☐     Siemens

☐     Other [Please specify_____]

☐     I don't know

*Skip To: End Of Block <u>Unless</u> Siemens Is One Of The Brands Selected In Q5, AND/OR if "I don't know" Is Selected.*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-7-

Q6  Where have you purchased AFCIs between 2017 and the present? (Please select all that apply).

☐     Electrical supply distributors (e.g., Crescent Electric, Livewire Electric Supply)

☐     Big-Box Retailers (e.g., Home Depot, Lowe's)

☐     Other Retailers (e.g., hardware store)

☐     Amazon

☐     Manufacturer websites [Please specify_____]

☐     Other [Please specify_____]

☐     I don't know

*Skip To: End of Block If Q6 = I don't know.*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-8-

Q7  Where have you <u>most often</u> purchased AFCIs between 2017 and the present? (Please select <u>only one</u>).

☐    Electrical Supply Distributors (e.g., Crescent Electric, Livewire Electric Supply)

☐    Big-Box Retailers (e.g., Home Depot, Lowe's)

☐    Other Retailers (e.g., hardware store)

☐    Amazon

☐    Manufacturer website(s) [Please specify_____]

☐    Other [Please specify_____]

☐    I don't know

*Skip To: End of Block If Q7 = I don't know.*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-9-

Q8 Are you a licensed electrician in any U.S. state?

☐    Yes

☐    No

*Skip To: Q10 only If Q8 = No. Otherwise, proceed to Q9.*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-10-

Q9 You answered that you are a licensed electrician. In what state(s) are you licensed?

▼ Alabama (1) ... I am not licensed in any U.S. state.

*Skip To: End of Block If Q9 = I am not licensed in any U.S. state. Otherwise, Skip To: Q11.*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-11-

Q10 You answered that you are not a licensed electrician, but that you have purchased AFCIs between 2017 and the present. Did you install the AFCIs yourself?

☐    Yes

☐    No, but I purchased the AFCIs as part of my professional responsibilities

☐    No

☐    I don't know

*Skip To: End of Block If Q10  = No OR Q10 = I don't know*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-12-

Q11 Have you taken any surveys in the last 30 days on these topics? (Select all that apply.)

☐    Vitamins/Dietary Supplements

☐    Clothing

☐    Advertisements

☐    Video Games

☐    Circuit Breakers or other electrical supplies

☐    Cosmetics

☐    Other Category

☐    I have not taken any surveys.

☐    I don't know.

*Skip To: End of Block If Q11 = Circuit Breakers or other electrical supplies OR Q11 = I don't know.*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-13-

Q12 You have been selected to participate in our survey about Arc Fault Circuit Interrupters. We care about the quality of our survey data. For us to get the most accurate measures of your opinions, it is important that you provide thoughtful answers to each question in this survey. We ask that you do so without help from anyone else, and that you complete the survey in one sitting and without stopping in the middle. Do you commit to doing this?

○ I can't promise either way

○ Yes, I will

○ No, I will not

○ I don't know

*Skip To: End of Block <u>Unless</u> Q12 = Yes, I will*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-14-

Q13 How frequently do you typically purchase AFCIs?

○ Once a week or more

○ Once every two weeks

○ Once every month

○ Once every two months

○ Once every three months

○ Once every four months

○ Once every six months

○ Once every year

○ Other [Please specify_____]

○ I don't know

*Skip To: End of Block if Q13 ="I don't know"*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-15-

Q14 When was the last time you purchased AFCIs?

○ Within the past week

○ Within the past two weeks

○ Within the past month

○ Within the past two months

○ Within the past three months

○ Within the past four months

○ Within the past six months

○ Within the past year

○ Other [Please specify_____]

○ I don't know

*Skip To: End of Block if Q14 = "I don't know"*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-16-

Q15 Are you of Hispanic, Latino, or Spanish origin?

○ Yes

○ No

○ Prefer not to answer

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-17-

Q16 What is your race? Please check all that apply.

○ American Indian or Alaska Native

○ Asian

○ Black or African American

○ Caucasian/White

○ Native Hawaiian or other Pacific Islander

○ Prefer not to answer

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-18-

Q17 What is your gender?

○ Female

○ Male

○ Other

○ Prefer not to answer

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-19-

Q18  What is the level of schooling you have completed?

○ Grade school

○ Some high school

○ High school or GED

○ Some college

○ Trade/technical/vocational training

○ Associate's Degree

○ Bachelor's Degree

○ Master's Degree

○ Professional Degree

○ Doctorate Degree

○ Prefer not to answer

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-20-

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**\*\*\*\*\*\*\* CONJOINT MODULE FOLLOWS\*\*\*\*\*\*\*\***

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-21-

Q19 For the remainder of this survey, please assume you are in the market to purchase **AFCIs** for a typical project or projects, or for general inventory. If the typical project(s)/inventory you have in mind would require AFCIs to be compatible with the panels of specific brands or manufacturers, please take this into consideration when deciding on your answer.

You will be shown three types of AFCIs with different brands, features, and prices. After carefully considering the three types of AFCIs, **please select which (if any) of the three that you would actually purchase in real life**, if these were the **only three** types of AFCIs available.

If you would not purchase any of the three types of AFCIs shown to you, please select the fourth option ("I would not purchase any of these three types of AFCIs if these were the only options.").

This survey will ask you to make this decision twelve (12) times.

○ I understand

○ I do not understand

*Skip To: End of Block If Q19 = I do not understand*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-22-

Q20 Please assume that all of the AFCIs you are shown in the survey have very similar or identical features, except for the features that you can actually see in the survey.

○ I understand

○ I do not understand

*Skip To: End of Block If Q20 = I do not understand*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-23-

Q21 In the questions that follow, there are no right or wrong answers. The survey is simply asking for your honest opinion on which (if any) of the AFCIs you would purchase.

○ I understand

○ I do not understand

*Skip To: End of Block If Q21 = I do not understand*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-24-

Q22 In the questions that follow, certain AFCIs have a "Nuisance Tripping Defect." These AFCIs use an arc detection method that, according to reports, leads these AFCIs to trip due to common and safe voltage distortions that cause radio frequency harmonics. These distortions are generated by some models of common household appliances, electrical devices, and lighting, listed below:

1. Major household appliances, such as microwaves, ovens, washing machines, dryers, refrigerators, garage door openers and water heaters;
2. Lighting products, including LED light bulbs, Christmas lights, under cabinet lighting, light fixtures, recessed lighting, light switches, dimmers, halogen and fluorescent lights;
3. Plug-in electrical devices, like vacuum cleaners, wall charges, internet signal boosters, power tools, and printers; and,
4. Voltage distortions that may cause radio frequency harmonics from external sources, including electrical transformers and broadband power lines.

If AFCIs with the Nuisance Tripping Defect are installed on circuits with, or in the same panel of circuits serving, these devices, they may trip and shut off power when no dangerous arc fault exists.

Other current or future household products that create voltage distortions and radio frequency harmonics may also cause these same AFCIs to experience Nuisance Tripping.

Manufacturers of AFCIs with the Nuisance Tripping Defect have claimed their AFCIs are not designed to exclusively identify a true arc, but instead trip when they detect any signal that resembles an arc, even if that signal comes from a safe and properly functioning device.

○ I understand

○ I do not understand

*Skip To: End of Block If Q22 = I do not understand*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-25-

Q23 In the questions that follow, the AFCIs have different **manufacturers/brands**. These include ABB/General Electric, Eaton, Schneider Electric (Square D), and Siemens. If the typical project(s)/inventory you have in mind would require AFCIs to be compatible with the panels of specific brands or manufacturers, please take this into consideration when deciding on your answer.

○ I understand

○ I do not understand

*Skip To: End of Block If Q23 = I do not understand*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-26-

Q24 In the questions that follow, some of the AFCIs will be single function (labeled AFCI), and others will be dual function (labeled AFCI/GFCI).

○ I understand

○ I do not understand

*Skip To: End of Block If Q24 = I do not understand*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-27-

Q25 In the questions that follow, technical specifications will be displayed for all of the AFCIs. Some of the AFCIs will have a Plug-On Neutral connection, and others will have a Plug-In Pigtail connection. The technical specifications will also list the current rating, the number of poles, and the interruption rating.

○ I understand

○ I do not understand

*Skip To: End of Block If Q25 = I do not understand*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-28-

Q26 In the questions that follow, prices will be displayed for all of the AFCIs. Please assume that the prices shown are the total amount you would pay for each AFCI, inclusive of any taxes and fees (if applicable).

◯ I understand

◯ I do not understand

*Skip To: End of Block If Q26 = I do not understand*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-29-

*Respondents Were Shown Twelve Randomized Choice Tasks. Example:*

Please assume you are in the market to purchase AFCIs for a typical project or projects, or for general inventory. Which, if any of the three AFCIs below would you purchase if these were the only options? If the typical project(s)/inventory you have in mind would require AFCIs to be compatible with the panels of specific brands or manufacturers, please take this into consideration. (Click or hover over each feature for details.)

(1 of 12)

| | Eaton | Siemens | ABB/General Electric |
|---|---|---|---|
| **Brand** | Eaton | Siemens | ABB/General Electric |
| **Function** | Dual Function (AFCI/GFCI) | Single Function (AFCI) | Single Function (AFCI) |
| **Technical Specifications** | PLUG-IN PIGTAIL 15A 1-POLE (10kA at 120V) | PLUG-IN PIGTAIL 15A 1-POLE (10kA at 120V) | PLUG-ON NEUTRAL 15A 1-POLE (10kA at 120V) |
| **Price** | $59.97 | $49.56 | $62.28 |
| **Nuisance Tripping** | NOT DEFECTIVE | DEFECTIVE: Prone to Nuisance Tripping | DEFECTIVE: Prone to Nuisance Tripping |
| | Select | Select | Select |

**I would not purchase any of these three types of AFCIs if these were the only options.**

Select

*Note: The third Attribute is restricted such that all offerings for a given Choice Task have the same Current Rating (either 15A or 20A).*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-30-

*Example of Choice Task With Tool Tip:*

Please assume you are in the market to purchase AFCIs for a typical project or projects, or for general inventory. Which, if any of the three AFCIs below would you purchase if these were the only options? If the typical project(s)/inventory you have in mind would require AFCIs to be compatible with the panels of specific brands or manufacturers, please take this into consideration. (Click or hover over each feature for details.)

(1 of 12)

| | | | |
|---|---|---|---|
| **Brand** | ABB/General Electric | ABB/General Electric | ABB/General Electric |
| **Function** | Dual Function (AFCI/GFCI) | Single Function (AFCI) Arc fault protection | Dual Function (AFCI/GFCI) |
| **Technical Specifications** | PLUG-ON NEUTRAL 20A 1-POLE (10kA at 120V) | PLUG-IN PIGTAIL 20A 1-POLE (10kA at 120V) | PLUG-IN PIGTAIL 20A 1-POLE (10kA at 120V) |
| **Price** | $49.56 | $59.97 | $62.28 |
| **Nuisance Tripping** | NOT DEFECTIVE | NOT DEFECTIVE | DEFECTIVE: Prone to Nuisance Tripping |
| | Select | Select | Select |

**I would not purchase any of these three types of AFCIs if these were the only options.**

Select

*Note: This choice task illustrates the Tool Tip for Function = Single Function (AFCI). Respondents could view this text by hovering their mouse or finger over the attribute.*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-31-

*Example of Choice Task With Tool Tip:*

Please assume you are in the market to purchase AFCIs for a typical project or projects, or for general inventory. Which, if any of the three AFCIs below would you purchase if these were the only options? If the typical project(s)/inventory you have in mind would require AFCIs to be compatible with the panels of specific brands or manufacturers, please take this into consideration. (Click or hover over each feature for details.)

(1 of 12)

| | | | |
|---|---|---|---|
| **Brand** | ABB/General Electric | ABB/General Electric | ABB/General Electric |
| **Function** | Dual Function (AFCI/GFCI) | Si_ (A | If the typical project(s)/inventory you have in mind would require AFCIs to be compatible with the panels of specific brands or manufacturers, please take this into consideration when deciding on your answer. |
| **Technical Specifications** | PLUG-ON NEUTRAL 20A 1-POLE (10kA at 120V) | PLUG-IN PIGTAIL 20A 1-POLE (10kA at 120V) | PLUG-IN PIGTAIL 20A 1-POLE (10kA at 120V) |
| **Price** | $49.56 | $59.97 | $62.28 |
| **Nuisance Tripping** | NOT DEFECTIVE | NOT DEFECTIVE | DEFECTIVE: Prone to Nuisance Tripping |
| | Select | Select | Select |

**I would not purchase any of these three types of AFCIs if these were the only options.**

Select

*Note: This choice task illustrates the Tool Tip for Brand (All Levels). Respondents could view this text by hovering their mouse or finger over the attribute.*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-32-

*Post Conjoint Module Question:*

Q27 Did you find any aspect of the survey to be confusing?

☐     Yes

☐     No

☐     I don't know

*The next question is only for those answering "Yes" or "I don't know" to the prior question:*

Q28 Please describe, in your own words, any aspect(s) of the survey you found confusing.

_____

_____

_____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**\*\*\*\*\*\*\* END OF SURVEY \*\*\*\*\*\*\*\***

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

APPENDIX B: MATERIALS RELIED UPON

*Note*: All documents cited in this report are incorporated by reference herein.

**<u>Legal</u>**

Kevin Brnich Electric LLC et al v. Siemens Industry, Inc., *Second Amended Consolidated Class Action Complaint*, N.D. Georgia, Civil Action No.: 1:22-cv-01229 (May 12, 2025)

*Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories* (June 19, 2024)

*Siemens Industry, Inc.'s Responses and Objections to Plaintiff's Second Set of Interrogatories* (November 22, 2024)

*Siemens Industry, Inc.'s Responses and Objections to Plaintiffs' Fourth Set of Interrogatories* (May 12, 2025)

Letter from Ruben Reyna to Eric Kafka (May 8, 2025)

Email from R. Reyna to E. Kafka (August 19, 2025)

Email from R. Reyna to M. Vandenberg (August 21, 2025)

*Apple v. Samsung, Order Granting In Part And Denying In Part Motions To Exclude Certain Expert Opinions,* Case No. 12-CV-00630-LHK (N.D. Cal.) (February 25, 2014)

*Camille Cabrera v. Bayer Healthcare LLC et al.* (C.D. Cal.), Case No. 2:17-cv-08525-JAK

*Dzielak v. Whirlpool Corp.,* 2017 WL 1034197 D.N.J. *(March 17, 2017)*

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592 (N.D. Cal. 2018)

*Hadley v. Kellogg Sales Co.,* 324 F. Supp. 3d 1084 (N.D. Cal. 2018)

*Kurtz v. Kimberly- Clark Corp.,* 321 F.R.D. 482 (E.D.N.Y. 2017)

*Marc Baus et al. v. Ford Motor Company* (E.D. Mich.), Case No. 2:21-cv-10024-GAD-EAS

*Miller v. Fuhu Inc.*, 2015 WL 7776794 (C.D. Cal. Dec. 1, 2015)

*Odyssey Wireless, Inc. v. Apple Inc.,* 2016 WL 7644790 (S.D. Cal. Sept. 14, 2017)

*In re FCA US LLC Monostable Elec. Gearshift Litig.,* 382 F. Supp. 3d 687 (E.D. Mich. 2019)

*In re Juul Labs, Inc., Marketing Sales Practices and Products Liability Litigation, Order on Motion for Class Certification and Related Daubert Motions,* Case No. 19-md-02913-WHO (N.D. Cal. 2022)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-2-

**Expert Report**

Expert Report of Robert Durham, October 31, 2025

**Literature & Industry Sources**

James Agarwal, Wayne DeSarbo, Naresh Malhotra & Vithala Rao, *An Interdisciplinary Review of Research in Conjoint Analysis: Recent Developments and Directions for Future Research* 2 Customer Needs and Solutions 19 (2015)

Kathryn Aiken et al., *Customer tradeoff of advertising claim versus efficacy information in direct-to customer prescription drug ads* 15(12) Research in Social and Administrative Pharmacy 1484 (2019)

Azzurra Annunziata et al., *Nutritional information and health warnings on wine labels: Exploring customer interest and preference,* 106(1) Appetite 58-69 (2016).

Paul Beatty & Gordon Willis, *Research Synthesis: The Practice of Cognitive Interviewing*, 71(2) Public Opinion Quarterly 287–311 (2007)

Allison N. Baker et al., *Flavor and product messaging are the two most important drivers of electronic cigarette selection in a choice-based task*, 11 Nature Scientific Reports 4689 (2021)

Manuel Cabrera et al, *Nutrition warnings as front-of-pack labels: influence of design features on healthfulness perception and attentional capture,* 20(18) Cambridge Core 3360 - 3371 (2017)

Philippe Choné & Laurent Linnemer, *Linear demand systems for differentiated goods: Overview and user's guide* 73 INTERNATIONAL JOURNAL OF INDUSTRIAL ORGANIZATION 102663 (2020)

Sarah Fisher, "7 Ways to pretest your survey before you send it," *Qualtrics Market Research* (November 13, 2020)

Paul Green & V. Srinivasan, *Conjoint Analysis in Marketing: New Developments with Implications for Research and Practice* 54 Journal of Marketing 3-19 (1990)

Jerry Hausman, Serge Moresi & Mark Rainey, *Unilateral effects of mergers with general linear demand*, 111(2) ECONOMICS LETTERS 119–121, 119 (2011)

Jerry Hausman, *Sources of Bias and Solutions to Bias in the Consumer Price Index*, 17(1) JOURNAL OF ECONOMIC PERSPECTIVES 23-44 (2003)

Janine Heck, Lars Jahnke, & Jens Leker, "Early evidence of a transition towards sustainability-oriented decision-making in the chemical industry in Germany, Austria, and Switzerland: A choice-based conjoint analysis," 187 Energy Policy 114028 (2024)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-3-

John Howell, "CBC/HB for Beginners," Sawtooth Software Research Paper Series (2009), available at: https://sawtoothsoftware.com/resources/technical-papers/cbc-hb-for-beginners

Pranav Jindal, *Risk Preferences and Demand Drivers of Extended Warranties* 34(1) Marketing Science 39-58 (2015)

Graham Kalton and Ismael Flores-Cervantes, *Weighting Methods,* 19(3) Journal of Official Statistics (2003)

Peter Lenk, Wayne DeSarbo, Paul Green, & Martin Young, *Hierarchical Bayes Conjoint Analysis: Recovery of Partworth Heterogeneity from Reduced Experimental Designs* 15(2) MARKETING SCIENCE 173-191 (1996)

Betul Lus & Ana Muriel, *Measuring the Impact of Increased Product Substitution on Pricing and Capacity Decisions Under Linear Demand Models*, 18(1) PRODUCTION AND OPERATIONS MANAGEMENT 95-113 (2009)

N. Gregory Mankiw, PRINCIPLES OF MICROECONOMICS, (Cengage Learning 8th ed. 2018)

Daniel McFadden, *The Choice Theory Approach to Market Research* 5(4) Marketing Science 275-297 (1986)

Daniel McFadden et al., "The Role of Conjoint Surveys In Reasonable Royalty Cases," *Law 360* (October 2013)

Andrew Mercer, Arnold Lau & Courtney Kennedy, *For Weighting Online Opt-In Samples, What Matters Most?*, PEW RESEARCH CENTER, (Jan 26, 2018) [hereafter Mercer et al. (2018)], available at: https://www.pewresearch.org/methods/2018/01/26/how-different-weighting-methods-work/#fn-91-7

Aviv Nevo, *Mergers with Differentiated Products: The Case of the Ready-to-Eat Cereal Industry* 31 Rand Journal of Economics (2000)

Yuko Onozaka et al, & Dawn Thilmany McFadden, *Does Local Labeling Complement or Compete With Other Sustainable Labels? A Conjoint Analysis of Direct And Joint Values For Fresh Produce Claims*, 93(3) American Journal of Agricultural Economics 693–706 (2011)

Bryan K. Orme, Getting Started with Conjoint Analysis: Strategies for Pricing Research, (4th ed. Research Publishers 2020)

Bryan Orme & John Howell, "Application of Covariates Within Sawtooth Software's CBC/HB Program: Theory and Practical Example," Sawtooth Software Research Paper Series (2009), available at https://sawtoothsoftware.com/resources/technical-papers/application-of-covariates-within-sawtooth-softwares-cbc-hb-program-theory-and-practical-example

Robert S. Pindyck and Daniel L. Rubinfeld, ECONOMETRIC MODELS & ECONOMIC FORECASTS 233 (McGraw-Hill, Inc. 3rd ed., 1991)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-4-

Tim Stobierski, "What Is Conjoint Analysis, And How Can It Be Used?" *Harvard Business School Online* (December 18, 2020)

Richard Valliant & Jill Dever, *Survey Weights: A Step-by-Step Guide to Calculation* 52-53; 58-60 (STATA Press 2017)

Gregory Werden & Luke Froeb, *The Effects of Mergers in Differentiated Products Industries: Logit Demand and Merger Policy* 10(2) Journal of Law, Economics, & Organization 407, 419 (1994)

Dick Wittnick & Philippe Cattin, *Commercial Use of Conjoint Analysis: An Update,* 53 Journal of Marketing 91-96 (1989)

James Wood, "5 Types of Conjoint Analysis for Healthcare Market Research," IDR Medical (December 18, 2023)

**Bates-Numbered Documents**

NEMA_S-0062898-NEMA_S-0062899

NEMA_S-0067791-NEMA_S-0067804

NEMA_S-0015646

NEMA_S-0075998-NEMA_S-0076053

NEMA_S-0013136-NEMA_S-0013137

NEMA_S-0004202-NEMA_S-0004204

NEMA_S-0027296-NEMA_S-0027300

NEMA_S-0024317-NEMA_S-0024325

NEMA_S-0019790

NEMA_S-0019795

NEMA_S-0019792

SIEMENS_AFCI_00019107-SIEMENS_AFCI_00019116

SIEMENS_AFCI_00020000-SIEMENS_AFCI_00020001

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-5-

SIEMENS_AFCI_00016127-SIEMENS_AFCI_00016162

SIEMENS_AFCI_00040540-SIEMENS_AFCI_00040553

SIEMENS_AFCI_00054821-SIEMENS_AFCI_00054838

SIEMENS_AFCI_00048769-SIEMENS_AFCI_00048840

SIEMENS_AFCI_00108430-SIEMENS_AFCI_00108440

SIEMENS_AFCI_00101877-SIEMENS_AFCI_00101878

SIEMENS_AFCI_00113650-SIEMENS_AFCI_00113659

SIEMENS_AFCI_00115093-SIEMENS_AFCI_00115096

SIEMENS_AFCI_00197030-SIEMENS_AFCI_00197061

SIEMENS_AFCI_00278207-SIEMENS_AFCI_00278214

SIEMENS_AFCI_00217892-SIEMENS_AFCI_00217899

SIEMENS_AFCI_00226247-SIEMENS_AFCI_00226311

SIEMENS_AFCI_00222368-SIEMENS_AFCI_00222401

SIEMENS_AFCI_00230045-SIEMENS_AFCI_00230061

SIEMENS_AFCI_00054887

SIEMENS_AFCI_00098400


**Bates-Numbered Data**

SIEMENS_AFCI_00013306

SIEMENS_AFCI_00023696

SIEMENS_AFCI_00362080

SIEMENS_AFCI_00362600

SIEMENS_AFCI_00362079


HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-6-

SIEMENS_AFCI_00416123

SIEMENS_AFCI_00416124

SIEMENS_AFCI_00054862

SIEMENS_AFCI_00455705

SIEMENS_AFCI_00455706

**Websites**

ABB acquired GE Industrial Solutions in 2018. *See, e.g.,* "ABB completes acquisition of GE Industrial Solutions," available at https://new.abb.com/news/detail/5475/abb-completes-acquisition-of-ge-industrial-solutions

U.S. Bureau of Labor Statistics, *Labor Force Statistics from the Current Population Survey, Table 11: Employed persons by detailed occupation, sex, race, and Hispanic or Latino ethnicity,* available at https://www.bls.gov/cps/cpsaat11.htm;

U.S. Bureau of Labor Statistics*, Employment projections, Educational attainment for workers 25 years and older by detailed occupation*, available at https://www.bls.gov/emp/tables/educational-attainment.htm

Conjointly, "How many attributes can I test in a conjoint survey?", available at https://conjointly.com/faq/many-attributes-in-conjoint-study/

Cool Today, "What's The Difference Between A Single And A Double-Pole Breaker?" (May 10, 2023), available at  https://www.cooltoday.com/blog/whats-the-difference-between-a-single-and-a-double-pole-breaker#:~:text=Single%2Dpole%20breakers:%20Provide%20120,that%20share%20one%20neutral%20wire

Eaton, "Circuit Breakers Fundamentals", available at: https://www.eaton.com/us/en-us/products/electrical-circuit-protection/circuit-breakers/circuit-breakers-fundamentals.html

Eaton, "Residential circuit breakers" available at https://www.eaton.com/us/en-us/products/electrical-circuit-protection/residential-circuit-breakers.html

National Electrical Manufacturers Association (NEMA), "What is an AFCI?," available at: https://www.afcisafety.org/afci/what-is-afci/#1469600123076-2fab3100-9afb

Safe Electricity, "Ground Fault Circuit Interrupters (GFCIs)", available at: https://safeelectricity.org/ground-fault-circuit-interrupters-gfcis/

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

-7-

Sawtooth Software, "Lighthouse Studio Overview", available at
https://sawtoothsoftware.com/lighthouse-studio

Sawtooth Software, "What is a conjoint analysis and how is it used?", available at
https://sawtoothsoftware.com/conjoint-analysis

Schneider Electric, "What does ampere interrupting rating mean for a circuit breaker?" (last
modified 8/8/2022), available at: https://www.se.com/us/en/faqs/FA93276

Siemens, "Arc Fault Circuit Breakers or AFCIs", available at
https://www.siemens.com/us/en/products/energy/low-voltage/residential-circuit-
breakers/residential-afci-circuit-breakers.html

Siemens, "Murray Legacy Electrical Products," available at:
https://www.siemens.com/us/en/products/energy/low-voltage/murray.html

Siemens, "Residential Dual-Function Circuit Breakers (AFCI & GFCI)", available at
https://www.siemens.com/us/en/products/energy/low-voltage/residential-circuit-
breakers/residential-dual-fuction-circuit-breakers.html

"Siemens USA - US2:Q120DFN" (specifying a 20-Amp "20A" Current Rating), available at
https://sieportal.siemens.com/en-us/products-services/detail/US2%25253AQ120DFN

"Siemens USA - US2:QA115AFCN" (specifying a 15-Amp "15A" Current Rating), available at
https://sieportal.siemens.com/en-us/products-services/detail/US2%253AQA115AFCN

"Siemens USA - US2:Q220AFC" (specifying "2-pole"), available at
https://sieportal.siemens.com/en-us/products-services/detail/US2%25253AQ220AFC

Square D | Schneider Electric, "Circuit Breakers" available at  https://www.se.com/us/en/product-
category/4200-circuit-breakers/?filter=business-4-low-voltage-products-and-systems

Texas Department of Licensing and Regulation, *Technical Bulletin IHB TB 09-02 – Combination
Arc-Fault Circuit Interrupter (AFCI)* (Issued October 1, 2008; Revised July 2, 2012), available at:
https://www.tdlr.texas.gov/ihb/pdf/TB0902.pdf

NewtonX. https://www.newtonx.com/

Underwriters Laboratories, "Arc Fault Circuit Interrupter (AFCI) Device Testing And Certification
| UL", available at https://www.ul.com/services/arc-fault-circuit-interrupter-afci-device-testing-
and-certification

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**APPENDIX C: CURRICULUM VITAE OF KEVIN W. CAVES**

**McClave + Associates**
STATISTICAL AND ECONOMIC CONSULTING

## Kevin W. Caves, Ph.D.
Managing Director
McClave + Associates, LLC

2970 SW 50th Terrace, Suite 300
Gainesville, FL 32608
Main:  352-381-4545
Mobile: 301-787-6781
E-mail: kevin.caves@mcclaveandassociates.com

## Professional Background

With expertise in microeconomics and econometrics, Dr. Caves has more than 15 years of experience in antitrust, class actions, merger analysis, sector-specific regulation, survey analysis, consumer product litigation and more. He has applied his expertise to a variety of industries, including cable, broadcasting, energy, finance, freight rail, Internet & tech platforms, healthcare, labor markets, motor vehicles, wireless and wireline networks, payment cards, personal computers, pharmaceuticals, and professional sports. Dr. Caves has served as a testifying expert in U.S. district court, before Federal regulators, and in arbitration. He is co-developer of the Ackerberg-Caves-Frazer (ACF) algorithm, an econometric technique adopted in graduate-level curricula and integrated into STATA, a leading statistical software package. In 2023, Dr. Caves received the American Antitrust Institute's Award for Outstanding Antitrust Litigation Achievement in Economics.

---

## Employment History

Managing Director, McClave and Associates, LLC, f/k/a Infotech Consulting, August 2023- Present.

Expert Economist, Infotech Consulting, February 2021 to July 2023.

Partner, Econ One Research, September 2018 to February 2021.

Vice President, Economists Incorporated, November 2016 to August 2018.

Senior Economist, Economists Incorporated, January 2014 to November 2016.

Director, Navigant Economics, March 2011 to December 2013.

Associate Director, Navigant Economics, February 2010 to March 2011.

Vice President, Empiris LLC, September 2008 to February 2010.

Senior Economist, Criterion Economics LLC, October 2006 to September 2008.

Senior Consultant, Deloitte & Touche LLP, September 2005 to October 2006.

Teaching Fellow, Department of Economics, UCLA, January 2002 to June 2004.

Assistant Economist, Federal Reserve Bank of New York, August 1998 to June 2000.



## Education

Doctor of Philosophy, Economics, 2005
University of California at Los Angeles, Los Angeles, California

Masters in Economics, 2002
University of California at Los Angeles, Los Angeles, California

Bachelor of Arts in Economics, 1998, *Magna cum laude*
Haverford College, Haverford, Pennsylvania

## Publications + Research Papers

*Are the Lowest-Paid UFC Fighters Really Overpaid?* JOURNAL OF SPORTS ECONOMICS (2021), co-authored with Ted Tatos and Augustus Urschel.

*Competing Approaches to Antitrust: An Application in the Payment Card Industry,* 27:3 GEORGE MASON LAW REVIEW (2020), co-authored with Hal J. Singer.

*When the Econometrician Shrugged: Identifying and Plugging Gaps in the Consumer Welfare Standard,* 26:2 GEORGE MASON LAW REVIEW (Fall 2018), co-authored with Hal J. Singer.

*Applied Econometrics: When Can an Omitted Variable Invalidate a Regression?* ANTITRUST SOURCE (December 2017), co-authored with Hal J. Singer.

*Identification Properties of Recent Production Function Estimators,* 83(6) ECONOMETRICA 2411-2451 (November 2015), co-authored with Daniel Ackerberg and Garth Frazer. "Ackerberg-Caves-Frazer Method" adopted by STATA Software (acfest command).

*On the Utility of Surrogates for Rule of Reason Cases,* COMPETITION POLICY INTERNATIONAL (May 2015), co-authored with Hal J. Singer.

*Analyzing High-Tech Employee: The Dos and Don'ts of Proving (and Disproving) Classwide Antitrust Impact in Wage Suppression Cases,* THE ANTITRUST SOURCE (February 2015), co-authored with Hal J. Singer.

*Life After Comcast: The Economist's Obligation to Decompose Damages Across Theories of Harm,* 28 ANTITRUST (Spring 2014), co-authored with Hal J. Singer.

*Mobile Wireless Performance the EU and the US: Implications for Policy,* 93 COMMUNICATIONS & STRATEGIES (Q1 2014), co-authored with Erik Bohlin and Jeffrey A. Eisenach.

*Econometric Tests for Analyzing Common Impact,* co-authored with Hal J. Singer, in THE LAW AND ECONOMICS OF CLASS ACTIONS: 26 RESEARCH IN LAW AND ECONOMICS 135-160 (James Langenfeld, ed., Emerald Publishing 2014).

*Vertical Integration in Multichannel Television Markets: A Study of Regional Sports Networks,* 12 REVIEW OF NETWORK ECONOMICS 61-92 (2013), co-authored with Hal J. Singer and Chris Holt.



*Assessing Bundled and Share-Based Loyalty Rebates: Application to the Pharmaceutical Industry,* 8 JOURNAL OF COMPETITION LAW & ECONOMICS 889-913 (2012), co-authored with Hal J. Singer.

*Modeling the Welfare Effects of Net Neutrality Regulation: A Comment on Economides and Tåg,* 24 INFORMATION ECONOMICS & POLICY 288-292 (2012).

*Economic and Legal Aspects of FLSA Exemptions: A Case Study of Companion Care,* 63 LABOR LAW JOURNAL 174-202 (2012), co-authored with Jeffrey A. Eisenach.

"What Happens When Local Phone Service Is Deregulated?" *Regulation* (Fall 2012), co-authored with Jeffrey A. Eisenach.

*The Bottle and the Border: What can America's failed experiment with alcohol prohibition in the 1920s teach us about the likely effects of anti-immigration legislation today?* 9 THE ECONOMISTS' VOICE (June 2012).

"What a Nobel-Prize Winning Economist Can Teach Us About Obamacare," *The Atlantic* (May 23, 2012), co-authored with Einer Elhauge. Reprinted in EINER ELHAUGE, OBAMACARE ON TRIAL (August 2012).

*Quantifying Price-Driven Wireless Substitution in Telephony,* 35 TELECOMMUNICATIONS POLICY 984-998 (December 2011).

*State Dependence and Heterogeneity in Aggregated Discrete Choice Demand Systems: An Example from the Cigarette Industry* (UCLA Dissertation, December 2005).

---

## Expert Reports, Testimony + Filings
(Confidential proceedings not listed)

Osterhaus Pharmacy, Inc., et al. v. UnitedHealth Group, et al. Case No. 2:23-cv-01944-RS. Expert Report of Kevin W. Caves, Ph.D. (June 9, 2025).

Baus et al. v. Ford Motor Company (E.D. Mich.), Case No.: 2:21-cv-10024-GAD-EAS. Expert Deposition of Kevin W. Caves, Ph.D. (April 18, 2025).

Baus et al. v. Ford Motor Company (E.D. Mich.), Case No.: 2:21-cv-10024-GAD-EAS. Expert Report of Kevin W. Caves, Ph.D. (April 14, 2025).

Osterhaus Pharmacy, Inc., et al. v. CVS Health Corporation, et al. Case No. 2:24-cv-01539-JJT. Expert Report of Kevin W. Caves, Ph.D. (January 15, 2025).

STB Ex Parte No. 711 (Sub No. 1), Reciprocal Switching, Supplemental Verified Statement and Written Testimony of Kevin W. Caves, Ph.D. On Behalf of The American Chemistry Council, The Fertilizer Institute, and The Corn Refiners Association, Surface Transportation Board (April 4, 2022).

Think Operations, LLC v. Top Shelf Barber Supplies, LLC, American Arbitration Association Case No. 01-1900002-4754. Expert Testimony of Kevin W. Caves, Ph.D. (April 6, 2020).



Think Operations, LLC v. Top Shelf Barber Supplies, LLC, American Arbitration Association Case No. 01-1900002-4754. Expert Report of Kevin W. Caves, Ph.D. (March 18, 2020).

Camille Cabrera v. Bayer Healthcare LLC et al. (C.D. Cal.), Case No. 2:17-cv-08525-JAK. Expert Deposition (December 16, 2019).

STB EP 755 (Final Offer Rate Review); EP 761 (Railroad Revenue Adequacy) Expert Testimony on Behalf of the American Chemistry Council et al., Surface Transportation Board (December 12, 2019).

Camille Cabrera v. Bayer Healthcare LLC et al. (C.D. Cal.), Case No. 2:17-cv-08525-JAK. Expert Rebuttal Report of Kevin W. Caves, Ph.D. (December 6, 2019).

STB EP 755 (Final Offer Rate Review); EP 761 (Railroad Revenue Adequacy) Verified Statement of Kevin W. Caves, Ph.D. on Behalf of the American Chemistry Council et al., Surface Transportation Board (November 12, 2019).

United States ex rel. Streck v. Bristol-Myers Squibb Company (E.D. Pa.), Civil Action No. 2:13-cv-07547. Expert Deposition of Kevin W. Caves, Ph.D. (October 4, 2019).

United States ex rel. Streck v. Bristol-Myers Squibb Company (E.D. Pa.), Civil Action No. 2:13-cv-07547. Rebuttal Expert Report of Kevin W. Caves, Ph.D. (September 5, 2019).

United States ex rel. Streck v. Bristol-Myers Squibb Company (E.D. Pa.), Civil Action No. 2:13-cv-07547. Expert Report of Kevin W. Caves, Ph.D. (August 16, 2019).

Camille Cabrera v. Bayer Healthcare LLC et al. (C.D. Cal.), Case No. 2:17-cv-08525-JAK. Declaration and Expert Report of Kevin W. Caves, Ph.D. (July 16, 2019).

STB Docket No. NOR 42144, In Re: North America Freight Car Assoc. et al. v. Union Pacific, *Rebuttal Verified Statement of Kevin W. Caves,* PhD  Surface Transportation Board (May 31, 2019).

STB Ex Parte No. 711 (Sub No. 1), Reciprocal Switching, *Reply Verified Statement of Kevin W. Caves, PhD On Behalf of The Shipper Coalition for Railroad Competition,* Surface Transportation Board (January 9, 2017).

Payday, Vehicle Title, and Certain High-Cost Installment Loans, (Docket No. CFPB-2016-0025/RIN 3170-AA40), Expert Comments on Proposed Rule by Kevin W. Caves and Hal J. Singer, "A Consumer Welfare Analysis of the CFPB's Proposed Regulation of Payday Loans," Bureau of Consumer Financial Protection (October 2016).

In the Matter of 2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, (MB Docket Nos. 14-50, 09-182), Expert Report of Kevin W. Caves and Hal J. Singer: "An Economic Analysis of the FCC's Eight Voices Rule," Federal Communications Commission (July 2016).

In the Matter of Implementation of Section 103 of the STELA Reauthorization Act; Amendment to the Commission's Rules Related to Retransmission Consent, (MB Docket Nos.15-216, 10-71) Expert Report of Kevin W. Caves and Bruce M. Owen: "Bundling in Retransmission Consent Negotiations: A Reply to Riordan" Federal Communications Commission (February 2016).

Public Hearing, STB Docket No. Ex Parte 722 & STB Docket No. Ex Parte 664, *Expert Testimony on Behalf of the American Chemistry Council et. al.,* Surface Transportation Board (July 23, 2015).



STB Ex Parte No. 722 (Railroad Revenue Adequacy), Reply Comments of Concerned Shipper Associations Verified Statement of Kevin Caves and Hal Singer, Surface Transportation Board (November 4, 2014).

In the Matter of Petition of US Telecom for Forbearance Pursuant to 47 U.S.C. § 160(c) from Obsolete ILEC Regulatory Obligations that Inhibit Deployment of Next-Generation Networks, Expert Declaration of   Kevin  W.  Caves, Federal Communications Commission (October 6, 2014).

In the Matter of 2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, (MB Docket No. 14-50), Expert Report of Kevin W. Caves and Hal J. Singer: "Competition in Local Broadcast Television Advertising Markets,"  Federal Communications Commission (August 2014).

In the Matter of Special Access for Price Cap Local Exchange Carriers; AT&T Corporation Petition for Rulemaking to Reform Regulation of Incumbent Local Exchange Carrier Rates for Interstate Special Access Services (WC Docket No. 05-25 & RM-10593), Declaration of Kevin W. Caves and Jeffrey A. Eisenach, Federal Communications Commission (March 2013).

In the Matter of Amendment of the Commission's Rules Related to Retransmission Consent, (MB Docket No. 10-71), Reply Declaration of Jeffrey A. Eisenach and Kevin W. Caves, Federal Communications Commission (June 2011).

In the Matter of Amendment of the Commission's Rules Related to Retransmission Consent, (MB Docket No. 10-71), Declaration of Jeffrey A. Eisenach and Kevin W. Caves, Federal Communications Commission (May 2011).

Guardian Pipeline, L.L.C., v. 295.49 acres of land, more or less, in Brown County, Calumet County, Dodge County, Fond du Lac County, Jefferson County and Outagamie County, Wisconsin, et al., Case No. 08-C-28 (E.D. Wis.), Expert Declaration of Kevin W. Caves, Ph.D. (September 2010).

---

## White Papers

The Empirical Link Between Fibre-to-the-Premises Deployment and Employment: A Case Study in Canada (prepared with support from Bell Canada, co-authored with Hal Singer and Anna Koyfman, October 2015).

Mobile Wireless Performance in Canada: Lessons from the EU and the US (prepared with support from TELUS, co-authored with Erik Bohlin and Jeffrey A. Eisenach, September 2013).

Mobile Wireless Performance in the EU & the US (prepared with support from GSMA, co-authored with Erik Bohlin and Jeffrey A. Eisenach, May 2013).

Estimating the Economic Impact of Repealing the FLSA Companion Care Exemption (prepared with support from National Association for Home & Hospice Care, co-authored with Jeffrey A. Eisenach, March 2012).

The Impact of Liberalizing Price Controls on Local Telephone Service: An Empirical Analysis (prepared with support from Verizon Communications, co-authored with Jeffrey A. Eisenach, February 2012).



Bundles in the Pharmaceutical Industry: A Case Study of Pediatric Vaccines (prepared with support from Novartis, co-authored with Hal J. Singer, July 2011).

Evaluating the Cost-Effectiveness of RUS Broadband Subsidies: Three Case Studies (prepared with support from The National Cable & Telecommunications Association, co-authored with Jeffrey A. Eisenach, April 2011).

Video Programming Costs and Cable TV Prices: A Reply to CRA (prepared with support from The National Association of Broadcasters, co-authored with Jeffrey A. Eisenach, June 2010).

Modeling the Welfare Effects of Net Neutrality Regulation: A Comment on Economides and Tåg (prepared with support from Verizon Communications, April 2010).

Retransmission Consent and Economic Welfare: A Reply to Compass-Lexecon (prepared with support from The National Association of Broadcasters, co- authored with Jeffrey A. Eisenach, April 2010).

The Benefits and Costs of Implementing "Return-Free" Tax Filing in the U.S. (prepared with support from The Computer & Communications Industry Association, co-authored with Jeffrey A. Eisenach & Robert E. Litan, March 2010).

The Benefits and Costs of I-File (prepared with support from The Computer & Communications Industry Association, co-authored with Jeffrey A. Eisenach & Robert E. Litan, April 2008).

The Effects of Providing Universal Service Subsidies to Wireless Carriers (prepared with support from Verizon Communications, co-authored with Jeffrey A. Eisenach, June 2007).

---

## Speaking Engagements / Presentations

*Econometrics in Antitrust Cases: Lessons From Olean*, University of Utah (August 28, 2024).

*Economic Tools For Enforcement Actions: Lessons From The Trenches*, California Lawyers Association (February 29, 2024).

*Competition and Monopsony In Labor Markets: Theory, Evidence, and Antitrust Implications*, New York State Bar Association, Antitrust Law Section, New York, NY, (April 23, 2014).

*Econometric Tests of Common Impact*, Covington & Burling LLP, Washington, DC., (May 23, 2013).

*Vertical Integration in Cable Networks: A Study of Regional Sports Networks*, Federal Communications Commission (May 21, 2013).

*Regression Methods: Theory and Applications of Fixed-Effects Models*, O'Melveny & Myers LLP, Washington, DC., (July 16, 2012).

*Regression Methods: Theory and Applications*, Antitrust Practice Group, Cohen Milstein Sellers & Toll PLLC, Washington, DC., (June 4, 2012).

*Using Regression in Antitrust Cases*, University of Pennsylvania Law School, Philadelphia, PA., (April 12, 2012).



Interview with IT Business Edge on Rural Utilities Service Broadband Subsidies (May 17, 2011).

---

## Reviewer

International Journal of the Economics of Business

Journal of Competition Law & Economics

Journal of Transportation Law, Logistics & Policy (Editorial Advisory Board)

Research in Transportation Economics

Review of Network Economics

---

## Fellowships, Honors and Awards

+ American Antitrust Institute Award for Outstanding Antitrust Litigation Achievement in Economics, 2023.

+ Howard Fellowship for Excellence in Teaching, University of California at Los Angeles, 2005.

+ Graduate Fellowship, University of California at Los Angeles, 2000-2004.

+ Departmental Honors in Economics, Haverford College, May 1998.

+ Phi Beta Kappa Society, elected May 1998.

September 19, 2025